ACCEPTED
03-14-00510-CV
4519217
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/16/2015 4:59:06 PM
JEFFREY D. KYLE
CLERK

_____

## No. 03-14-00510-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/16/2015 4:59:06 PM
JEFFREY D. KYLE
Clerk

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

_____

# Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause,
*Appellants*

## v.

# Tracy D. Strandhagen,
*Appellee*

FROM THE DISTRICT COURT OF TRAVIS COUNTY,
353RD JUDICIAL DISTRICT, CAUSE NO. D-1-GN-13-002811,
THE HONORABLE ORLINDA NARANJO PRESIDING

# APPELLANTS' REPLY BRIEF

Amanda G. Taylor
ataylor@textaxlaw.com
Texas Bar No. 24045921
**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

INDEX OF AUTHORITIES ...................................................................... iii

REPLY ARGUMENT ................................................................................. 1

I.    Strandhagen Failed to Conclusively Establish Element Two: "Unreasonable Forecast." ......................................................... 2

    A.    General Rule: Proof of Actual Damages is Required. ...................................................................... 3

        1.    It is undisputed that Strandhagen offered no proof of actual damages............................................. 5

    B.    Narrow Exceptions: Two Types of Facial Invalidity................................................................ 5

        1.    Multiplier of actual damages:...................................... 6

        2.    One size fits all: ............................................................ 8

            a.    Strandhagen failed to prove that this is a facially invalid "one size fits all" provision. ................................................. 9

    C.    Conclusion on "Unreasonable Forecast." ............................. 13

II.    Additional Reply Arguments:............................................................ 15

    A.    Arguments Made in the Physicians' Motion for New Trial Were Preserved for Review. ................................. 15

    B.    The Physicians "Modification" Argument Was Not an Affirmative Defense. ....................................................... 16

    C.    Strandhagen Cannot Use the Declaratory Judgment Act to Create Jurisdiction. .................................. 18

PRAYER .......................................................................................... 21

CERTIFICATE OF COMPLIANCE............................................................ 22

CERTIFICATE OF SERVICE.................................................................. 23

ii

# INDEX OF AUTHORITIES

## CASES

*Ayeni v. State*,
    440 S.W.3d 707 (Tex. App.—Austin 2013, no pet.) ...........................15

*Bethel v. Butler Drilling Co.*,
    635 S.W.2d 834 (Tex. Civ. App.—Houston [14th Dist.] 1982,
    writ ref'd n.r.e.) ..................................................................................8

*CDS Enters., Inc. v. Myrad Real Estate, Inc.*,
    No. 14-97-00197-CV, 1999 WL 548226, (Tex. App.—Houston
    [14th Dist.] 1999, no pet.) ...................................................................4

*Chan v. Montebello Dev. Co.*,
    No. 14-06-00936-CV, 2008 WL 2986379 (Tex. App.—Houston
    [14th Dist.] 2008, pet. denied) ............................................................4

*Charbonnet v. Shami*,
    No. 04-12-00711-CV, 2013 WL 2645720 (Tex. App.—San Antonio
    2013, pet. denied) ...............................................................................15

*Chenault v. Phillips*,
    914 S.W.2d 140 (Tex. 1996) ...............................................................19

*Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*,
    679 S.W.2d 721 (Tex. App.—Houston [1st Dist.] 1984,
    no writ)........................................................................................... 8, 12

*Devon Energy Prod. Co. v. KCS Res., LLC*,
    450 S.W.3d 203 (Tex. App.—Houston [14th Dist.] 2014,
    pet. filed on other grounds) ............................................................. 18

*Dunlap v. Gayle*,
    No. 13-12-00105-CV, 2013 WL 1500377 (Tex. App.—Corpus Christi
    2013, no pet.) ...................................................................................... 7

*Eberts v. Businesspeople Personnel Servs., Inc.*,
   620 S.W.2d 861 (Tex. App.—Dallas 1981, no writ) ............................ 13

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., LP*,
   426 S.W.3d 59 (Tex. 2014).................................................................. 6

*Garden Ridge, L.P. v. Advance Int'l, Inc.*,
   403 S.W.3d 432 (Tex. App.—Houston [14th Dist.] 2013,
   pet. denied) ................................................................................... 3, 4

*GPA Holding, Inc. v. Baylor Health Care Sys.*,
   344 S.W.3d 467 (Tex. App.—Dallas 2011, pet. denied)........................ 3

*Healix Infusion Therapy, Inc. v. Bellos,*
   No. 11-02-00346-CV, 2003 WL 22411873
   (Tex. App.—Eastland Oct. 23, 2003, no pet.) ...................................... 3

*Hill v. Heritage Res., Inc.*,
   964 S.W.2d 89 (Tex. App.—El Paso 1997, pet. denied) .......................17

*In re Dow Corning Corp.*,
   419 F.3d 543 (6th Cir. 2005)............................................................. 12

*Khan v. Meknojiya*,
   No. 03-11-00580-CV, 2013 WL 3336874 (Tex. App.—Austin 2013,
   no pet.) ............................................................................................ 7

*Magill v. Watson*,
   409 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2013,
   no pet.) ............................................................................................ 7

*Mayfield v. Hicks*,
   575 S.W.2d 571 (Tex. App.—Dallas 1978, writ ref'd n.r.e.) .................. 8

iv

*Murphy v. Cintas Corp.*,
923 S.W.2d 663 (Tex. App.—Tyler 1996, writ denied) ........................ 9

*Oetting v. Flake*,
553 S.W.2d 793 (Tex. App.—Fort Worth 1977, no writ) ..................... 4

*Phillips v. Phillips*,
820 S.W.2d 785 (Tex. 1991) ..................................................... 3, 6, 7

*R. Conrad Moore & Assoc., Inc. v. Lerma*,
946 S.W.2d 90 (Tex. App.—El Paso 1997, writ denied) ..................... 12

*Southern Union Co. v. CSG Sys., Inc.*,
No. 03-04-00172-CV, 2005 WL 171349 (Tex. App.—Austin
Jan. 27, 2005, no pet.) .................................................................... 3

*SP Terrace, L.P. v. Meritage Homes of Texas, LLC*,
334 S.W.3d 275 (Tex. App.—Houston [1st Dist.] 2010,
no pet.) ........................................................................................ 11

*Stewart v. Basey*,
245 S.W.2d 484 (Tex. 1952) ............................................................. 8

*Taylor v. State Farm Lloyds, Inc.*,
124 S.W.3d 665 (Tex. App.—Austin, 2003, pet. denied) .................... 19

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
852 S.W.2d 440 (Tex. 1993) .......................................................... 18

*Triton 88, L.P. v. Star Elec., LLC*,
411 S.W.3d 42 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ............ 3

*Urban Television Network Corp. v. Liquidity Solutions, L.P.*,
277 S.W.3d 917 (Tex. App.—Dallas 2009, no pet.) ........................ 9, 11

*Williams v. Colthurst,*
      253 S.W.3d 353 (Tex. App.—Eastland 2008, no pet.) ........................17

## **STATUTES & RULES**

Tex. R. App. P. 9.4 ................................................................. 21

Tex. R. App. P. 9.5 ................................................................. 21

Tex. R. App. P. 33.1 ............................................................... 16

Tex. R. App. P. 43.3 .................................................................2

Tex. R. App. P. 43.4 ............................................................... 19

Tex. R. Civ. P. 139................................................................ 19

## **OTHER**

RESTATEMENT (SECOND) OF CONTRACTS § 356............................................. 14

# REPLY ARGUMENT

In their Appellants' Brief, the Physicians provided this Court several, alternative grounds upon which to reverse the judgment. Namely, the final summary judgment granting declaratory relief in favor of Strandhagen should be reversed because: (1) Strandhagen was required to establish two elements to prevail on her affirmative defense, and she conceded her inability to establish the first element; (2) even if Strandhagen was required to prove only one element, she failed to conclusively establish the second element; (3) Strandhagen did not satisfy her summary-judgment burden of proof regarding the Physicians' third-party beneficiary status; and (4) the trial court lacked jurisdiction over Strandhagen's unripe declaratory judgment claim, and it erred in denying the Physicians' Plea to the Jurisdiction on this basis.

Strandhagen offers no response to argument (3) in her Appellee's Brief. Based on the argument and authorities presented by the Physicians, and Strandhagen's abandonment of this issue, the Court should conclude that Strandhagen's prior argument regarding the Physicians' third-party-beneficiary status does not provide a ground upon which to affirm the summary judgment.

Consequently, the summary judgment must either stand or fall based on Strandhagen's other ground for unenforceability of the liquidated damages provision: her argument that it is a penalty. Although the Physicians maintain their arguments (1) and (4), this Reply Brief focuses on argument (2). Regardless of the scope of Strandhagen's burden of proof and regardless of the claim's ripeness, the summary judgment should be reversed because Strandhagen failed to conclusively prove the second element of her defense ("unreasonable forecast").

## I. STRANDHAGEN FAILED TO CONCLUSIVELY ESTABLISH ELEMENT TWO: "UNREASONABLE FORECAST."

Strandhagen agrees with the Physicians that, as the party seeking to invalidate the liquidated damages clause, she had the summary-judgment burden to conclusively establish that the clause did not provide a reasonable forecast of just compensation. *Appellee's Brief*, p.9. Strandhagen argues that she satisfied this burden by proving that the clause was invalid "on its face," and was therefore excused from the requirement of proving actual damages in comparison to the liquidated damages amount. *Id.*, p.12-13. This Court should reject her argument because Texas case law recognizes only two theories of "facial invalidity" as exceptions to the general requirement of proving actual damages, and Strandhagen has

failed to conclusively demonstrate that this liquidated damages provision satisfies either theory. Strandhagen offers nothing more than broad assumptions without any supporting proof.

### A. General Rule: Proof of Actual Damages is Required.

Strandhagen's argument over-generalizes the law regarding facial challenges to liquidated damages provisions. Without specifying the reasons why certain provisions have been held facially invalid, Strandhagen cites a string of cases for the implication that a facial challenge broadly provides an alternative in every case to the requirement of proving actual damages. *See id.*, p.13-14. This is not an accurate assessment of Texas law. Contrary to Strandhagen's argument, Texas courts have invalidated liquidated damage provisions based on only two types of facial challenges, and have oft recognized the limitations of these theories. *Infra*, Reply Argument I.B.

The general rule remains that a party is required to prove an unreasonable disparity between the amount of actual damages and the amount of liquidated damages to satisfy its burden of proof on the "unreasonable forecast" element of penalty. Many cases recognize this general standard. *See Appellants' Brief*, p.23-25 (citing *Phillips*, *Healix*, *Triton*, *Southern Union*, and *GPA Holdings*); *see also, e.g., Garden Ridge,*

3

*L.P. v. Advance Int'l, Inc.*, 403 S.W.3d 432, 440 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("[T]o determine whether a term fixes unreasonably large liquidated damages, it follows that courts would need to consider what actual harm, if any, was caused by the breach and then compare it to the stipulated amount of liquidated damages."); *Chan v. Montebello Dev. Co.*, No. 14-06-00936-CV, 2008 WL 2986379, at *3-4 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("[T]o meet this burden [of proving unreasonable forecast], the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum."); *CDS Enters., Inc. v. Myrad Real Estate, Inc.*, No. 14-97-00197-CV, 1999 WL 548226, *2-3 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Texcon was required to prove the amount of Myrad's actual damages, if any, for establishing an absence of an approximation between the actual loss and the stipulated sum. . . . Texcon did not meet its burden in proving the liquidated damages clause was unenforceable because it failed to prove the amount of Myrad's actual damages."); *Oetting v. Flake*, 553 S.W.2d 793, 795 (Tex. App.—Fort Worth 1977, no writ) ("The [party seeking to invalidate the clause], by both allegation and proof, must raise the issue and assume the burden of proving the amount of the actual

4

damages for the purpose of showing an absence of approximation between the actual loss and the stipulated sum.").

> ### 1. It is undisputed that Strandhagen offered no proof of actual damages.

The record plainly demonstrates that Strandhagen offered no evidence of the amount of any actual damages suffered by the Physicians. Strandhagen does not contend otherwise. *See Appellee's Brief*, p.14. Thus, the only way to hold that Strandhagen satisfied her summary-judgment burden of proof on the "unreasonable forecast" element would be to conclude that she established, as a matter of law, that the liquidated damages provision satisfies a "facial invalidity" exception to the general requirement of proving actual damages. Strandhagen did not do so, meaning the summary judgment must be reversed.

## B. Narrow Exceptions: Two Types of Facial Invalidity.

The Texas Supreme Court has recognized two exceptions in which a party may satisfy its burden of proving that a liquidated damages provision is not a reasonable forecast of just compensation in the absence of proof of actual damages. These two exceptions arise where the liquidated damages provision is deemed unenforceable "on its face" or "as a matter of law" either because: (1) the amount of liquidated damages is based on a

multiplier of actual damages or (2) the liquidated damages provision is triggered by any breach of the contract without regard to the importance or triviality of the breach. Strandhagen labels the latter a "one size fits all" provision. The liquidated damages provision in the parties' Operations Agreement does not satisfy exception.

### 1. Multiplier of actual damages:

In *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991) the Court did not hold, as Strandhagen suggests, that the second element (unreasonable forecast) can be satisfied in every case with either a facial challenge or proof of actual damages. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co., LP*, 426 S.W.3d 59, 72 (Tex. 2014) ("*Phillips* did not create a broad power to retroactively invalidate liquidated damages provisions that appear reasonable as written. Nor do we create such a power here.") (rejecting facial challenge to liquidated damages clause).

The *Phillips* court merely held a facial challenge was satisfactory in that particular case because the liquidated damages amount was a multiplier (10x) of the actual damages. 820 S.W.2d at 787. "The provision cannot meet the second prong of the test because, instead of attempting to forecast actual damages, it calls for them to be determined and then multiplied." *Id.* at 789; *see also Magill v. Watson*, 409 S.W.3d 673, 681

6

(Tex. App.—Houston [1st Dist.] 2013, no pet.) (reaching same conclusion where liquidated damages provision multiplied actual damages by three).

Following *Phillips*, this Court and others courts have recognized that the unique facial invalidity present there does not automatically relieve the burden in all cases to prove an unreasonable disparity between the actual damages and liquidated damages amounts. *See e.g., Khan v. Meknojiya*, No. 03-11-00580-CV, 2013 WL 3336874, at *4 n.4 (Tex. App.—Austin 2013, no pet.) ("Meknojiya's reliance on *Phillips* in this case is misplaced" because the provision "does not require a separate determination of damages or the application of any multiplier to that amount. Thus, . . . unlike the court in *Phillips* we could not conclude that it constitutes a penalty on its face."); *Dunlap v. Gayle*, No. 13-12-00105-CV, 2013 WL 1500377, *6 (Tex. App.—Corpus Christi 2013, no pet.) (liquidated damages provision based on a multiplier of earnest money rather than actual damages was not facially invalid under *Phillips*).

The liquidated damages provision in this case does not rely on a multiplier of actual damages. (CR.168). Thus, just as in *Khan*, Strandhagen's reliance on *Phillips* to establish a facial invalidity is misplaced.

**2. One size fits all:**

The only other type of facial invalidity recognized by Texas courts arises when a provision imposes the same amount of liquidated damages for both substantial and trivial breaches. *See, e.g., Stewart v. Basey*, 245 S.W.2d 484, 487 (Tex. 1952) (in building lease agreement, clause providing for liquidated damages of $150/month for each month of the remaining term for any breach of the agreement, whether it be a failure to perform the most important obligation or a minor covenant, was facially invalid); *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 727 (Tex. App.—Houston [1st Dist.] 1984, no writ) (liquidated damages clause was unenforceable because, even though it provided reasonable damages for major breaches of the contract, it also allowed unreasonable damages for trivial breaches); *Bethel v. Butler Drilling Co.*, 635 S.W.2d 834, 837 (Tex. Civ. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.) (liquidated damages provision was facially invalid where it "would apply with equal force for such trivial breaches by appellee Butler as failing to pay utilities, provide parking space or pay an additional hourly labor charge of $10.00," as well as to full termination of contract without cause); *Mayfield v. Hicks*, 575 S.W.2d 571, 575 (Tex. App.—Dallas 1978, writ ref'd n.r.e.)

8

(provision was unenforceable because liquidated damages could be imposed upon "even a minor default").

### a. Strandhagen failed to prove that this is a facially invalid "one size fits all" provision.

Unlike all of the foregoing cases, the liquidated damages provision here is triggered by only one form of breach, and it is a major one: a physician's early departure from the practice without just cause, as specified in the contract. (CR.167-169); *Appellants' Brief*, p.7, 26-27. Hence, this provision is facially valid, as the court concluded in *Urban Television Network Corp. v. Liquidity Solutions, L.P.*, 277 S.W.3d 917, 919-20 (Tex. App.—Dallas 2009, no pet.). There, the court disagreed "with appellant's assertion that the liquidated damages provision applied to any breach of the agreement, no matter how trivial" because—as in this case—the liquidated damages were recoverable for only "material" defaults specified within the contract.[1]

---

[1]  *See also Appellants' Brief*, p.27-29 (discussing support provided by *Murphy v. Cintas Corp.*, 923 S.W.2d 663, 666 (Tex. App.—Tyler 1996, writ denied) and RESTATEMENT (SECOND) OF CONTRACTS § 356, Liquidated Damages and Penalties (1981)). Strandhagen's attempt to distinguish these authorities fails. *See Appellee's Brief*, p.14 n.10. Contrary to her argument, the Physicians do not cite *Murphy* and the RESTATEMENT for the proposition that actual damages must be proven in <u>all</u> cases. Rather, these authorities demonstrate why Strandhagen was required to prove actual damages <u>here</u> because her facial challenge fails. Just as in *Murphy*, the timing of the breach does not render the clause per se unreasonable, and just as in the RESTATEMENT, the Court's focus should be on the actual circumstances present here. *Appellants' Brief*, p.8.

In attempt to overcome the blatant distinction between this case and the ones she relies upon, Strandhagen claims that the amount of damages resulting from this one type of material breach (early departure) "would obviously be greater the earlier Dr. Strandhagen stopped working at AAT." *Appellee's Brief*, p.17. Strandhagen offered no proof to support this allegedly "obvious" outcome.

Contrary to Strandhagen's unsupported conclusion, there is no "obvious" reason why the damages suffered would vary greatly depending on when she or another physician left the practice. Following any departure constituting a breach, the practice would be disrupted, suffer a loss of goodwill, incur scheduling and short-staffing issues, and incur costs and expenses related to finding a temporary and/or long-term replacement for the departed physician—all of which would have a negative impact on the group's profit-making and bonus-earning capabilities. *See Appellants' Brief*, p.4-7, 26-27. Whether the departure occurred in year 1 or year 5, these negative impacts would be felt for some period of time before a replacement physician could be located, trained, and incorporated into the practice; the goodwill could be rebuilt; and the profitability could be restored.

In the absence of any evidence offered by Strandhagen, there is no way to know what amount of damages would be incurred for a breach at the start of the term versus a breach at the end of the term, and certainly no way to conclude that the damage amounts would be vastly different at either time. Moreover, without any proof from Strandhagen, there is no way to conclude that the liquidated amount of $500,000 would be greatly disproportionate to the actual damages suffered for any such breach. This was Strandhagen's burden to prove, and she failed to prove it. The summary judgment should be reversed.

Several cases demonstrate that unsupported conclusions like Strandhagen's are insufficient to carry the burden of proof on this type of facial challenge. In *SP Terrace, L.P. v. Meritage Homes of Texas, LLC*, 334 S.W.3d 275, 287-88 (Tex. App.—Houston [1st Dist.] 2010, no pet.), the court rejected SP Terrace's facial challenge because it "adduced no evidence" to establish that the amount of liquidated damages was unreasonable either because the "breach was a trivial one" or because the breach was of a far greater magnitude than would be justly compensated. *Id.* ("We decline to remove a limitation of remedy provision absent any evidence that the liquidated amount in the contract is unreasonably high or low in light of the alleged breach."); *see also Urban Television*, 277 S.W.3d

11

at 920 ("Appellant has not established that the liquidated damages provision is unenforceable on its face or presented evidence raising a genuine issue of material fact as to its enforceability."); *R. Conrad Moore & Assoc., Inc. v. Lerma*, 946 S.W.2d 90, 96 (Tex. App.—El Paso 1997, writ denied) (where liquidated damage amount would be the amount of earnest money regardless of time of breach, clause was not unreasonable on its face; proof of actual damages was necessary to satisfy this element); *Community Dev.*, 679 S.W.2d at 727 (jury findings and evidence supported claim that provision operated as penalty); *In re Dow Corning Corp.*, 419 F.3d 543, 552 (6th Cir. 2005) (Dow satisfied its burden to prove unreasonable forecast by presenting evidence that the parties never discussed potential damages at the time of making the contract and "that the clause was initially proposed as a penalty untied to any potential damages"). Strandhagen offered absolutely no evidence in support of her contention that the magnitude of the breach would be greater depending on its timing. Without any proof, Strandhagen's bare conclusion cannot be accepted in satisfaction of her summary-judgment burden.

Strandhagen has not cited and the Physicians have not found a single case rendering a liquidated damages provision akin to this one unenforceable on the basis of a "one size fits all" facial challenge. The case

Strandhagen specifically relies on for this proposition is distinguishable. *See Appellee's Brief*, p.17 (citing *Eberts v. Businesspeople Personnel Servs., Inc.*, 620 S.W.2d 861 (Tex. App.—Dallas 1981, no writ). In *Eberts*, the provision was deemed unenforceable because it would impose the same amount of liquidated damages regardless of whether the breach continued for one day or two years. *Id.* at 864. Here, the liquidated damages are not imposed upon variable lengths of a "continuing" breach. Instead, the breach would occur at the moment of improper early departure, as specified in the contract. As discussed above, the practice would suffer disruption and financial hardship for some period of time following that breach whether it occurred in year 1 or year 5. Strandhagen offered no evidence to establish that the length of disruption or magnitude of hardship would vary depending on the time of the breach. The liquidated damages are intended to justly compensate for these negative financial effects, whenever incurred.

## C. Conclusion on "Unreasonable Forecast."

To satisfy her summary-judgment burden of proof on the second element of her penalty affirmative defense ("unreasonable forecast"), Strandhagen would generally be required to prove actual damages and

demonstrate an unreasonable disparity between that amount and the liquidated damages amount. Strandhagen admittedly failed to do so.

In the alternative, Strandhagen could satisfy her burden of proof by demonstrating, as a matter of law, that this liquidated damages provision is invalid on its face because it is a "one size fits all" provision. Strandhagen failed to carry her burden of proof on this theory because (1) the liquidated damages are triggered by only one form of material breach, early departure from the practice under specified circumstances; and (2) Strandhagen offered nothing beyond speculation to establish that a physician's early departure would constitute a breach of greater magnitude if it occurred earlier than later in the physician's term of employment. Consequently, Strandhagen has failed to prove that the liquidated damages would be equally imposed upon breaches of both important and trivial natures. Strandhagen therefore failed to demonstrate any facial invalidity as a matter of law.

Because Strandhagen has failed to satisfy her summary-judgment burden of proof on the second element of her affirmative defense (and she concedes her inability to prove the first element), the summary judgment should be reversed.

## II. ADDITIONAL REPLY ARGUMENTS:

### A. Arguments Made in the Physicians' Motion for New Trial Were Preserved for Review.

Strandhagen argues that arguments made by the Physicians for the first time in their Motion for New Trial were not preserved for review. *Appellee's Brief*, p.5, 7, 20. Although it may generally be true that an argument raised for the first time in a motion for new trial is not preserved, there is an exception applicable here.

"[T]he efficacy of a post-judgment motion to preserve a complaint for appellate review depends upon whether the trial court affirmatively considers the new grounds and proof as memorialized by a written order." *Charbonnet v. Shami*, No. 04-12-00711-CV, 2013 WL 2645720, *5 (Tex. App.—San Antonio 2013, pet. denied). Where the court considers the new grounds asserted in the post-judgment motion and signs a new order affirming its prior ruling based upon the entire record—as opposed to simply allowing the motion to be overruled by operation of law—the new arguments are preserved for review. *Id.* at *5-6; *see also Ayeni v. State*, 440 S.W.3d 707, 709 (Tex. App.—Austin 2013, no pet.) (arguments and evidence presented in motion for reconsideration of summary judgment were preserved where order specified that court considered these arguments and evidence). None of the cases cited by Strandhagen in

15

support of her waiver argument reflect that such circumstances were present to satisfy this exception; thus, they are distinguishable from this case. *See Appellee's Brief*, p.21 n.18.

Strandhagen acknowledges that there was "full briefing and a hearing" on the arguments raised in the Physicians' Motion for New Trial. *Appellee's Brief*, p.6. Moreover, the Order Denying the Motion for New Trial expressly states that the district court "considered the grounds asserted in the Motion, the Response, the arguments of counsel, the evidence filed, and the contents of the Court's file" in making its determination. (CR.271). Because it is apparent from the record that the arguments raised by the Physicians in their Motion for New Trial were considered on their merits and denied, these arguments were preserved for review. *See generally* Tex. R. App. P. 33.1.

### B. The Physicians "Modification" Argument Was Not an Affirmative Defense.

The Physicians argued that the severability clause in Section 7(f) of the Operations Agreement demonstrated a genuine issue of material fact about the interpretation and enforceability of the liquidated damages provision. (CR.223) (arguing that "a genuine issue of material fact remains about what modified amount or calculation would be reasonable to enforce

in[stead of the $500,000 liquidated amount]" based on the severability clause).

Contrary to Strandhagen's argument, the Physicians' argument did not present the affirmative defense of "modification." *See, e.g.*, *Williams v. Colthurst*, 253 S.W.3d 353, 359 (Tex. App.—Eastland 2008, no pet.) (affirmative defense of modification is based on argument that parties had a "meeting of the minds" to a new agreement "supported by consideration," such as an "accord and satisfaction"); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 113 (Tex. App.—El Paso 1997, pet. denied) ("To conclude that there was a valid modification, the jury had to favorably determine two elements. The first is that the modification is based upon new consideration. The second is that there existed the same degree of mutuality and meeting of the minds as was present for the original contract.") (collecting cases; citations omitted).

The Physicians were in no way seeking to avoid the enforcement of the parties' contract by arguing that the parties had reached a new, modified agreement supported by sufficient consideration, as would be the case under the affirmative defense of modification. Instead, the Physicians were simply arguing that Strandhagen failed to carry her traditional summary-judgment burden because a genuine issue of material fact existed

within the four corners of the Operations Agreement, which was part of the original summary-judgment record. Hence, there were no "elements" on which the Physicians carried the burden of proof.

## C. Strandhagen Cannot Use the Declaratory Judgment Act to Create Jurisdiction.

Strandhagen argues that a live controversy sufficient to support jurisdiction under the Declaratory Judgments Act ("DJA") exists based on the arguments presented by the Physicians to this Court regarding the proper interpretation of the liquidated damages provision. *Appellee's Brief*, p.24, 26. To accept Strandhagen's argument would turn the DJA on its head.

The DJA cannot be used to create jurisdiction where a live controversy does not already exist. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) ("[W]e have interpreted the [DJA] to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions."); *Devon Energy Prod. Co. v. KCS Res., LLC*, 450 S.W.3d 203, 210, 212 (Tex. App.—Houston [14th Dist.] 2014, pet. filed on other grounds) (same; holding court lacked jurisdiction over declaratory judgment claim because it was premised on the happening of a future, hypothetical event—an underlying legal determination about

the parties' intent); *Taylor v. State Farm Lloyds, Inc.*, 124 S.W.3d 665, 668-69 (Tex. App.—Austin, 2003, pet. denied) ("[The DJA] does not confer jurisdiction on a trial court but rather makes declaratory judgment available as a remedy for a cause of action already within the court's jurisdiction.") (citing *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996) (holding that mere request for declaratory judgment does not establish jurisdiction)).

Here, there is no evidence that the Physicians had taken any action or threatened or pursue a claim for breach of contract against Strandhagen. At most, Strandhagen's affidavit includes a conclusory and speculative statement that she "learned . . . [the Physicians] and perhaps others are seeking to pursue her for collection." (CR.8, 12). In reality, the Physicians never took any action to pursue a claim against her. If there was any evidence that the Physicians had done so, Strandhagen surely would have presented that evidence to the district court to demonstrate jurisdiction. She now blames the Physicians for being unable to prove a negative.

Before any actual dispute or controversy ripened between Strandhagen and the Physicians, Strandhagen filed this preemptive suit, which the Physicians were then forced to answer and defend. At that time, an active controversy existed between Strandhagen and her employer

19

(AAT) regarding whether or not she had been terminated for cause. (CR.39, 80, 85-87, 91-93, 144). The Physicians were entitled to wait and see how that issue developed and/or was resolved before deciding whether to pursue a claim against Strandhagen because her early departure would not be considered a breach of the Operations Agreement if it resulted from AAT's termination of her employment without cause. (CR.168). On this basis, when Strandhagen filed suit against the Physicians, their determination about whether or not to pursue a claim against Strandhagen remained an open, theoretical issue.[2]

The fact that the Physicians have defended the validity of their contractual language does not demonstrate that a sufficiently ripe claim for breach of contract existed at the time Strandhagen filed suit for purposes of jurisdiction. The trial court erred in denying the Physicians' Plea to the Jurisdiction and in granting Strandhagen's Motion for Summary Judgment on this basis.

---

[2]    Strandhagen cites to page 8 of Appellants' Brief as proof of that an allegedly ripe controversy existed. *Appellee's Brief*, p.26. She claims the Physicians "admit[ted]" that her employment was terminated "under circumstances where they contend she 'would be liable for payment of liquidated damages.'" *Id*. Rather than "acknowledging" the existence of a ripe controversy, the Physicians argument is presented in hypothetical terms: "If [it] were true [that Strandhagen was terminated on the basis of discrimination] it would provide [an] exception to her liability under the liquidated damages provision.  . . . [On the other hand, if the Company were correct that] Strandhagen quit or was terminated with cause in September 2013 . . . [then she] would be liable for payment of liquidated damages." *Appellants' Brief*, p.8.

20

## **PRAYER**

Based on the foregoing, Appellants respectfully pray that this Court sustain both of their issues on appeal and reverse the district court's grant of Strandhagen's Motion for Summary Judgment, its partial denial of the Physicians' Plea to the Jurisdiction, and its denial of the Physicians' Motion for New Trial. If the jurisdictional ruling is reversed, then this Court should render judgment in favor of the Physicians dismissing Strandhagen's claim in its entirety. Otherwise, this Court should remand to the district court for further proceedings.

Appellants further pray that this Court tax all costs against Strandhagen, both in this Court and below, and award the Appellants any such other relief at law or equity to which they may be justly entitled. Tex. R. App. P. 43.4; Tex. R. Civ. P. 139.

Respectfully submitted,

**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**

By: ___*/s/ Amanda G. Taylor*_____
    Amanda Garrett Taylor
    ataylor@textaxlaw.com
    Texas Bar No. 24045921
    301 Congress Avenue, Suite 1950
    Austin, Texas 78701
    Tele: (512) 542-9898
    Fax: (512) 542-9899

ATTORNEY FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

I certify that this Appellants' Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i) because, according to the word-count tool of the computer program used to prepare this document, it contains **4,368 words**, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/*Amanda Taylor*_____
Amanda Taylor

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this Appellants' Brief was filed electronically and served on all counsel via e-mail in compliance with Tex. R. App. P. 9.5(b) and L.R.3 on this 16th day of March, 2015.

Daniel Byrne
DByrne@FBHH.com
Lessie Fitzpatrick
LFitzpatrick@FBHH.com
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Blvd, Suite 2000
Austin, TX 78701
Telephone: (512) 476-2020

/s/ *Amanda Taylor*
Amanda Taylor

440 S.W.3d 707
Court of Appeals of Texas,
Austin.

Alhaji Isa Adegori AYENI, Appellant

v.

The STATE of Texas; The City of Houston, Texas; and
The Transit Authority of Houston, Texas, Appellees.

No. 03–11–00604–CV.　|　Feb. 20, 2013.

**Synopsis**
**Background:** Attorney General brought action on behalf of city and transit authority against taxpayer to recover delinquent sales taxes, penalties, and interest. The District Court, Travis County, Scott H. Jenkins, J., entered summary judgment against taxpayer. Taxpayer appealed.

**Holdings:** The Court of Appeals, Pemberton, J., held that:

[1] taxpayer's verified denial of Comptroller's certificate of delinquency did not rebut or join issue with the certificate, such that its prima facie or presumptive validity under statute effectively disappeared, and

[2] affidavit by taxpayer's bookkeeper was incompetent summary judgment evidence.

Affirmed.

Pemberton J., concurred and filed opinion.

**Attorneys and Law Firms**

**\*708**  Tina Lin, Jorge Romero, Matthew G. Wylie, Matthew G. Wylie, P.C., Houston, TX, for Appellant.

John C. Adams, Assistant Attorney General, Cristina M. Nahidi, Bankruptcy & Collections Division, Austin, TX, for Appellees.

Before Justices PURYEAR, PEMBERTON and HENSON.

### *MEMORANDUM OPINION*

BOB PEMBERTON, Justice.

This is an appeal from a final summary judgment in a sales tax deficiency case. We will affirm the judgment.

### BACKGROUND

Appellant Ayeni operated a convenience store out of his residence in Houston, Texas. The Comptroller conducted a sales-tax audit of Ayeni's business for the period covering January 1, 2004, through December 31, 2006. Ayeni acknowledges that he "did not keep a good record of his business documents," [1] and in the absence of such records, the Comptroller resorted to estimating Ayeni's sales and tax liability from records of Ayeni's beer purchases obtained from certain of his vendors and industry sales averages. [2] Through these calculations, the Comptroller determined that Ayeni owed the appellee taxing authorities [3] approximately $48,000 in unpaid sales taxes for the audit period, penalties, and interest.

After Ayeni failed to pay the determination, the Comptroller issued a certificate of tax delinquency to the Attorney General's office for collection. The Attorney General subsequently sued Ayeni on appellees' behalf to recover the delinquent sales taxes, penalties, and interest as set forth in the Comptroller's certificate of deficiency, plus attorney's fees. Ayeni filed a general denial, later amended to a verified denial. Appellees filed a traditional motion for summary judgment on all of their claims, attaching as evidence the Comptroller's certificate and an affidavit from appellees' counsel averring that they had incurred $7,500 in attorney's fees in the proceeding. Ayeni filed a response to appellees' motion and a supplement, presenting affidavits **\*709** from himself and his bookkeeper in which each disputed the accuracy of the Comptroller's tax calculations and underlying estimates of Ayeni's beer sales. In further support, Ayeni attached numerous receipts that purported to reflect actual beer purchases by Ayeni. Ayeni also presented an affidavit from his counsel attempting to controvert appellees' attorney's fees affidavit.

Following a hearing, the district court granted partial summary judgment that Ayeni was liable for the deficiency in the certified amount. However, it denied appellees' motion on their claim for attorney's fees.

Ayeni filed a motion to reconsider the partial summary judgment, attaching additional documents from the Comptroller reflecting the Comptroller's methodology in estimating the sales taxes Ayeni owed. Following a hearing, the district court denied the motion for reconsideration by written order. To ensure "a clear appellate record," the order further specified that the district court had ultimately considered the entirety of the evidence and arguments Ayeni had filed in the case in its summary-judgment ruling.

Subsequently, the district court signed a final judgment incorporating its earlier partial summary judgment and awarding appellees $2,000 in attorney's fees. [4] It is from this final judgment that Ayeni now appeals.

## ANALYSIS

Ayeni seeks reversal of the district court's judgment in four issues that claim error in the summary-judgment ruling. In his first two issues, Ayeni asserts that he presented summary-judgment evidence of his tax liability that controverted the Comptroller's certificate and raised a fact issue that precluded summary judgment for appellees. In his third issue, Ayeni insists that the district court erred or abused its discretion by granting partial summary judgment when appellees had instead sought a final summary judgment. In his fourth issue, Ayeni argues that the Comptroller's certificate of delinquency could not support summary judgment in appellees' favor in the face of Ayeni's verified denial.

**Standard of review**

The standards of review for summary judgments are well established. We review the summary-judgment motion and response, if any, de novo to determine if the competent summary-judgment evidence included with those pleadings shows that there is no genuine issue as to any material fact and the movant is entitled to summary judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *See Valence,* 164 S.W.3d at 661.

 [1]  Where, as here, the movant relies on the "traditional" summary-judgment standard, the movant has the initial burden of demonstrating that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) (per curiam). Assuming this burden is met, and only if it is, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact as to the movant's claims. *See id.* If the non-movant's evidence raises a fact issue, summary judgment is not appropriate. *See id.*

**\*710  Verified denial**

 **[2]**   We begin with Ayeni's fourth issue because it logically precedes the others—it amounts to a challenge to whether appellees' summary-judgment proof was sufficient to meet their initial burden of showing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See id.* To meet their burden as to Ayeni's sales tax liability, appellees relied solely on the Comptroller's certificate of delinquency. As Ayeni acknowledges, subsection (a) of tax code section 111.013 makes the Comptroller's certificate—

> ... prima facie evidence of:

> (1) the stated tax or amount of the tax, after all just and lawful offsets, payments, and credits have been allowed;

> (2) the stated amount of penalties and interest;

> (3) the delinquency of the amounts; and

> (4) the compliance of the comptroller with the applicable provisions of this code in computing and determining the amount due.

Tex. Tax Code Ann. § 111.013(a) (West 2008). Consequently, it is well established that a Comptroller's certificate of delinquency suffices to meet a taxing authority's initial summary-judgment burden in a sales-tax deficiency suit, shifting the burden to the taxpayer to raise a fact issue in order to avoid summary judgment. *See N.S. Sportswear, Inc. v. State,* 819 S.W.2d 230, 232 (Tex.App.-Austin 1991, no writ) ("If unrebutted, [Comptroller's certificates of deficiency] are sufficient to establish, as a matter of law, the amount of tax the taxpayer owes." (citing *Baker v. Bullock,* 529 S.W.2d 279, 281 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.))). But Ayeni argues that his verified denial of appellee's claims served to rebut or join issue with the Comptroller's certificate, such that its prima facie or presumptive validity effectively disappeared, returning appellees to their status quo ante—and leaving appellees lacking in any summary-judgment proof to meet their initial burden. We disagree that Ayeni's verified denial had this effect.

Ayeni emphasizes subsection (b) of tax code section 111.013, which states:

> The defendant may not deny a claim for taxes, penalties, or interest unless the defendant timely files a sworn written denial that specifically identifies the taxes, penalties, and interest the defendant asserts are not due and the amounts of tax, penalties, and interest that are not due.

Tex. Tax Code Ann. § 111.013(b). Ayeni suggests that subsection (b), read together with subsection (a)'s provisions describing the prima facie effect of the Comptroller's certificate, means that the filing of a verified denial under subsection (b) rebuts or negates the prime facie effect of a Comptroller's certificate under subsection (a), much like a verified denial in a suit on sworn account. *See* Tex.R. Civ. P. 185; *Rizk v. Financial Guardian Ins. Agency, Inc.,* 584 S.W.2d 860, 862 (Tex.1979) ("It is settled ... that a defendant's verified denial of the correctness of a plaintiff's sworn account in the form required by Rule 185 destroys the evidentiary effect of the itemized account attached to the petition and forces the plaintiff to put on proof of his claim."). However, unlike the rules governing suits on sworn accounts, nothing in section 111.013 says that subsection (b)'s verified denial has any impact on the operation and effect of subsection (a)'s Comptroller's certificate. *Cf.* Tex.R. Civ. P. 185 (providing affidavit on sworn account is "prima facie evidence [of the account], unless the party resisting such claim shall file a written denial, under oath"). Nor can Ayeni point to any Texas court that has said it does.

**\*711** Neither subsection (a) or (b) references the other, and we can only conclude that both provisions must be given the effect the Legislature prescribes within each. Subsection (b) is in the nature of a pleading requirement with which defendants in sales-tax deficiency cases must comply in order to join issue with the taxing authority's petition; otherwise, the taxpayer loses by default. *See Noorani Gas & Convenience, Inc. v. State,* No. 03–06–00463–CV, 2008 WL 1827605, at \*5 (Tex.App.-Austin Apr. 24, 2008, no pet) (mem. op.). In contrast, subsection (a) speaks to the evidence on which the taxing authority may rely to meet its burden of proof if and when its pleadings are placed at issue by a verified denial. And the Legislature in subsection (a) has made Comptroller's certificates of deficiency prima facie evidence without preconditions. *See* Tex. Tax Code Ann. § 111.013(a). Accordingly, Ayeni's verified denial does not affect the prima facie evidentiary nature of the Comptroller's certificate of deficiency in this case. We overrule Ayeni's fourth issue on appeal.

**Controverting proof**

Because appellees attached the Comptroller's certificate of deficiency to their summary-judgment motion and it is sufficient to meet their initial summary-judgment burden, the burden shifted to Ayeni to raise a question of fact as to the amount of taxes, penalties, and interest he owed for the audit period at issue or as to the Comptroller's compliance with the applicable provisions of the tax code in computing and determining the amount due. *See id.; N.S. Sportswear, Inc.,* 819 S.W.2d at 232. Appellees have urged that Ayeni had to do more than present the legally sufficient contrary evidence that is ordinarily required on summary judgment. In their view, Ayeni was required to adduce *conclusive* contrary evidence—i.e., prove as a matter of law that he did not owe the amount the Comptroller certified—in order to preclude summary judgment based on the certification. In his second issue, Ayeni disputes appellees' view of his summary-judgment burden, urging that he was required to present only summary-judgment evidence sufficient to raise a genuine issue of

material fact regarding his tax liability, not conclusive evidence. In his first issue, Ayeni argues that his summary-judgment proof is sufficient to raise a fact issue and even rises to the level of conclusive contrary evidence.

We need not address Ayeni's second issue because we conclude that he has not presented competent evidence sufficient to raise a fact issue even under the customary summary-judgment burdens. In an attempt to raise a fact issue, Ayeni submitted his and his bookkeeper's affidavits, sales-tax returns for 2005, 2006, 2007, 2008, 2009, and the first quarter of 2010, and various receipts from beer vendors dated between 2004 and 2006. Ayeni's affidavit stated that he did not owe the taxes, penalties, and interest claimed by the Comptroller because those amounts were "based on incorrect taxable sale amounts." He then averred that the correct taxable sale amounts were set forth in the sales-tax returns attached to his summary-judgment response. Finally, Ayeni stated in his affidavit that the Comptroller incorrectly estimated his beer sales for the audit period and that his records showed that he made gross beer purchases of $8,827.11 in 2004, $5,681.99 in 2005, and $6,622.02 in 2006.

Similarly, Ayeni's bookkeeper testified in his affidavit that Ayeni did not owe the amounts established by the Comptroller's certificate of deficiency because those amounts were based on incorrect taxable sale amounts. The correct amount of taxes owed, the bookkeeper averred, were set forth in the attached sales-tax returns and vendor receipts, which returns the bookkeeper **\*712** prepared in the regular course of Ayeni's business. Finally, Ayeni's bookkeeper reiterated Ayeni's contentions regarding the gross purchases of beer made by Ayeni in 2004, 2005, and 2006.

 **[3]**    **[4]**    The affidavit testimony that the Comptroller's amounts are incorrect and that Ayeni's amounts are correct are bare conclusions unsupported by facts. These statements are thus incompetent summary-judgment evidence. To be competent summary-judgment evidence, an affidavit must contain specific factual bases, admissible in evidence, upon which its conclusions are based. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *see* Tex.R. Civ. P. 166a(f) (affidavits "shall set forth such facts as would be admissible in evidence"). The same is true of affidavit assertions that the Comptroller's estimates of his beer sales are incorrect: Although Ayeni does offer that "his records showed" that he made gross beer purchases of $8,827.11 in 2004, $5,681.99 in 2005, and $6,622.02 in 2006" and he includes some of those purchase receipts, he does not assert that those were his *total* purchases of taxable items during that period or state with any specificity how the Comptroller's numbers were incorrect. More important, Ayeni's affidavits do not state what Ayeni's total sales amounts were for the period at issue, which amounts are, by statute, the basis for determining sales tax owed. *See* Tex. Tax Code Ann. § 151.051 (West 2008) (imposing sales tax based on a percentage of sale price). To that extent, even if the affidavits were competent summary-judgment evidence, they do not raise a question of fact as to the correct amount of sales taxes owed. Accordingly, summary judgment in favor of the appellees was proper. We overrule Ayeni's first issue.

**Partial summary judgment**

 **[5]**   In his third issue, Ayeni contends that the district court had no authority to grant a partial summary judgment because the Comptroller did not seek alternative or partial relief in its summary-judgment motion. But rule 166a explicitly permits a trial court to grant a partial summary judgment:

> **Case not Fully Adjudicated on Motion.** If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

Tex.R. Civ. P. 166a(e). Here, the Comptroller sought summary judgment on two claims—a claim seeking delinquent sales taxes owed and a claim for attorney's fees—but the district court determined that the Comptroller met its summary-judgment burden only as to its claim for sales taxes owed and not as to its claim for attorney's fees. Accordingly, under rule 166a, it was appropriate for the district court to grant a partial summary judgment on the claim for sales tax owed and deny the Comptroller's motion as to attorney's fees. *See Pinnacle Anesthesia Consultants, P.A. v. Fisher,* 309 S.W.3d 93, 100 (Tex.App.-Dallas 2009, pet. denied) ("If a case is not fully adjudicated on a motion for summary judgment, the trial court is authorized to render partial summary judgment, making 'an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just' ") quoting Tex.R. Civ. P. 166a(e))).

Ayeni also suggests that the district court improperly granted partial summary judgment on no-evidence grounds. But there is nothing in the district court's order suggesting that the "partial" aspect of the summary judgment was a reference to **\*713** the traditional versus no-evidence standard, as opposed to the claims being addressed.

Accordingly, we overrule Ayeni's third issue on appeal.

## CONCLUSION

We affirm the district court's judgment.

Justice HENSON Not Participating.

Concurring Opinion by Justice PEMBERTON.

BOB PEMBERTON, Justice, concurring.

Although I join in the majority's opinion and judgment—I wrote them, after all—I write separately to offer some additional observations about Ayeni's second issue. While it was ultimately unnecessary for us to reach that issue here, it nonetheless warrants emphasis that Ayeni has identified an aberration in this Court's past jurisprudence addressing the effect of Comptroller certificates of deficiency and how a taxpayer can oppose a summary-judgment motion predicated on one.

The notion that a taxpayer must present conclusive contrary evidence to rebut a Comptroller's certificate of deficiency does not find explicit textual support in the current tax code. Subsection (a) of section 111.013 states only that the Comptroller's certificate is "prima facie evidence" of the taxes, penalties, and interest due, the delinquency of those amounts, and of the comptroller's compliance with the tax code. *See* Tex. Tax Code Ann. § 111.013(a) (West 2008). "Prima facie" is Latin for "first view," [1] and "prima facie evidence" typically denotes evidence that is determinative of a fact's or facts' existence, sometimes stated in terms of giving rise to a "presumption" of their existence, unless and until some contrary evidence is presented. *See Coward v. Gateway Nat'l Bank of Beaumont,* 525 S.W.2d 857, 859 (Tex.1975); *Dodson v. Watson,* 110 Tex. 355, 220 S.W. 771, 772 (1920) ( "Prima facie evidence is merely that which suffices for the proof of a particular fact until contradicted and overcome by other evidence."); *Black's Law Dictionary* 638–39 (9th ed.2009) (defining "prima facie evidence" as "[e]vidence that will establish a fact or sustain a judgment unless contrary evidence is produced"). [2] But nothing in section 111.013 purports to require *conclusive* contrary evidence to rebut or join issue with a Comptroller's certificate. *See* Tex. Tax Code Ann. § 111.013.

Appellees rely less on the tax code than on precedents of this Court, and I must concede they find some support there. As best I can tell, these decisions trace back to a 1967 no-writ case involving a trial on the merits of a tax-deficiency claim, *Smith v. State,* 418 S.W.2d 893 (Tex.Civ.App.-Austin 1967, no writ). *Smith,* in turn, purported to rely on the analysis in a 1942 Texas Supreme Court opinion, *Southland Life Insurance Co. v. Greenwade,* 138 Tex. 450, 159 S.W.2d 854 (1942). [3] *Southland Life* addressed the nature and application **\*714** of the presumption of receipt afforded a properly stamped, addressed, and mailed letter in the context of a suit by a life-insurance beneficiary to recover policy proceeds. *See id.* at 858. The defendant insurance carrier asserted that the decedent's life-insurance policy had lapsed prior to the insured's death due to the insured's failure to make a premium payment that had come due. The case went to trial, at which the plaintiff beneficiary presented detailed evidence that the decedent had properly stamped, addressed, and mailed the premium payment to the insurance company prior to its final due date. This evidence gave rise to the legal presumption that the insurance company had received the payment. *See id.*

at 857 ("It is settled in this state, however, that when a letter properly addressed and with postage prepaid is mailed, a presumption of fact (rebuttable of course) arises that it was duly received by the addressee."). In response, the insurance company presented evidence that it had not received the premium payment. *Id.* The trial court rendered judgment in favor of the plaintiff beneficiary.

On appeal to the Waco Court of Civil Appeals, the insurance company asserted, among other points, that the evidence did not support a finding that the premium payment had been timely paid. *See Southland Life Ins. Co. v. Greenwade,* 143 S.W.2d 648, 650–51 (Tex.Civ.App.-Waco 1940), *reversed by* 159 S.W.2d at 858. Specifically, the insurance company argued that because it had produced evidence that it had never actually received the premium, both the presumption of receipt and the foundational evidence supporting that presumption—i.e., that the payment letter had been properly stamped, addressed, and mailed to the company—"disappeared" such that the trier of fact could no longer consider it; thus leaving the plaintiff without any proof of receipt. *See id.* at 650. The Waco court overruled that issue, holding that even in the face of evidence of non-receipt, the presumption of receipt "continued as evidence" that was sufficient to support the trial court's judgment. *See id.* at 650.

On appeal, although ultimately affirming the trial court's judgment and holding that the evidence was sufficient to support a finding that the premium check had been timely received, the supreme court explicitly rejected the Waco court's view that a presumption like that of receipt could itself be considered evidence. Instead, the supreme court held that a presumption is not evidence and that it disappears once "substantial contrary evidence" is offered by the party against whom the presumption operates. *See Southland Life,* 159 S.W.2d at 857 (citing Wigmore on Evidence, 2d ed., § 2491); *see also General Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex.1993) ("Once ... evidence contradicting the presumption has been offered, the presumption disappears."). But the court then went on to clarify that the evidence that gave rise to the presumption could still be considered and weighed by the fact-finder, vis-à-vis the carrier's contrary evidence, as evidence that the premium payment had, in fact, been timely received. *Southland Life,* 159 S.W.2d at 857; *see Saenz,* 873 S.W.2d at 359. In other words, although the insurance company had offered evidence that it had not timely received the payment, thus eliminating the ***presumption*** of receipt, the trier of fact could still consider the facts underlying the presumption-i.e., that the defendant stamped, addressed, and mailed the payment letter to the company-as themselves **\*715** evidence that the insurance company received the payment. *See Southland Life,* 159 S.W.2d at 857. And, relying on this evidence of payment, the supreme court went on to hold that the evidence was sufficient to support the trial court's finding that the payment was timely received. *See id.*

The court in *Southland Life* then went on to observe that there might be circumstances where the presumption's foundational facts ***could not*** be considered—i.e., would not support an affirmative finding—by the trier of fact:

> We hold that an inference established prima facie (as in the present case) is overcome, together with the evidentiary facts tending to establish it, only when the evidence tending to support the contrary inference is conclusive, or so clear, positive and disinterested that it would be unreasonable not to give effect to it as conclusive.... [P]rima facie evidence and presumptions of fact disappear when the true facts are *conclusively shown by other evidence. ...* In other words, presumptions, when controverted by facts, disappear, as such, and cannot be weighed *as evidence* against such facts.

*Id.* at 858 (internal citations omitted) (emphases in original). In other words, if the party against whom the presumption of receipt operates presents evidence that ***conclusively*** negates receipt of the mail, both the presumption of receipt and the probative value of any proof of underlying facts could be said to "disappear" because the evidence, by definition, is legally insufficient to support a finding of receipt. This amounts merely to an observation about the nature of conclusive evidence that negates a fact's existence. *See [City of Keller v. Wilson,](https://...) [168 S.W.3d 802, 810 (Tex.2005)](https://...)* (discussing conclusive contrary evidence and noting that " '[n]o evidence points must, and may only, be sustained when the record discloses [that] the evidence establishes conclusively the opposite of the vital fact' " (quoting Robert W. Calvert, "*[No Evidence" and "Insufficient Evidence" Points of Error,](https://...) [38 Tex. L.Rev. 361 (1960))](https://...)*.

In *Smith,* this Court, citing *Southland Life,* described a taxpayer's burden in opposing the presumed correctness of a Comptroller's certificate of deficiency at trial as follows:

> With the prima facie presumption established that the State's claim for admissions taxes[4] against [the owner of a business on the taxpayer's property] was as shown in the Comptroller's certificate under Article 1.08[5], appellant [taxpayer] had the burden to overcome the inference with such evidence tending to support the contrary as would be conclusive, or evidence so clear and positive it would be unreasonable not to give effect to it as conclusive.

*[Smith,](https://...) [418 S.W.2d at 896](https://...)* (citing *[Southland Life,](https://...) [159 S.W.2d at 858](https://...)*). This Court has continued to describe the taxpayer's burden at trial in similar terms.[6] To the **\*716** extent such descriptions refer to the concepts that a Comptroller's certificate, even if met with the taxpayer's contrary evidence, may nonetheless be legally sufficient to support a fact finding of tax liability unless the taxpayer's contrary evidence is conclusive, it is merely an application of the principles described in *Southland Life.* In any event, Ayeni does not quarrel with the notion that he would be required, at least practically speaking, to present conclusive contrary evidence in order to overcome the effect of a Comptroller's certificate at trial on the merits. Otherwise, under the *Southland Life* analysis, the

certificate would remain as legally sufficient evidence that could potentially support fact findings against the taxpayer.

But it is quite another thing, Ayeni urges, to hold that a nonmovant must present conclusive contrary evidence to preclude summary judgment based on a Comptroller's certificate, as appellees argue here. I agree.

The notion that a taxpayer nonmovant must counter a Comptroller's certificate with conclusive contrary evidence in order to preclude summary judgment traces back to a 2004 memorandum opinion of this Court, *Wimmer v. State,* No. 03–03–00135–CV, 2004 WL 210629, at *3–4 (Tex.App.-Austin Feb. 5, 2004, pet. denied) (mem. op.). In *Wimmer,* we held that a taxpayer "must *conclusively* establish that he owes no tax" to overcome a summary judgment predicated on a Comptroller's certificate of deficiency. *See id.* at *3. For support, this Court cited *Smith* and its progeny-again, cases that involved trials on the merits. *See id.* at *3–4 (citing *Sundown Farms,* 89 S.W.3d 291, 293 (Tex.App.-Austin 2002, no pet.); *Hylton v. State,* 665 S.W.2d 571, 572 (Tex.App.-Austin 1984, no writ); *Smith,* 418 S.W.2d at 893). There was zero explanation or analysis of whether or how those concepts should properly be applied in the vastly different procedural context of summary judgment. *See Wimmer,* 2004 WL 210629 at *3–4. [7]

Contrary to the holdings of *Wimmer,* and any progeny, their analytical cornerstone in *Southland Life* would imply that the contrary evidence used to rebut the presumption, even if not conclusive, would raise a fact issue that would have to be resolved by the fact finder and not by summary judgment. *See Southland Life,* 159 S.W.2d at 857; *see also Balawajder v. Texas Dep't of Criminal Justice Inst. Div.,* 217 S.W.3d 20, 27 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) ("In the context of a summary judgment, the party against whom the presumption operates must produce evidence sufficient 'to neutralize the effect of the presumption' for the case to proceed to trial." quoting *Amaye v. Oravetz,* 57 S.W.3d 581, 584 (Tex.App.-Houston [14th Dist.] 2001, pet. denied)); *First Nat'l Bank of Libby, Montana v. Rector,* 710 S.W.2d 100, 103 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (holding that where document created presumption of foreign judgment's validity, the party against whom the presumption operates must "produce some evidence at least raising an issue of material fact as to the validity" of the judgment to defeat summary judgment). And *Wimmer,* and any subsequent cases that might have followed it, are at odds with the summary-judgment burdens that the Texas Supreme Court has prescribed. Even if it is in some sense correct to state that a taxpayer must overcome a Comptroller's **\*717** certificate with conclusive evidence at trial on the merits, the supreme court has made it clear that nonmovants do not face higher or different summary-judgment burdens based on the burdens of proof they may face at trial: "The failure of one party in a hearing upon a motion for summary judgment to discharge the burden which would rest on him at a trial on the merits is no ground for a summary judgment in favor of the other party." *Tigner v. First Nat'l Bank of Angleton,* 153 Tex. 69, 264 S.W.2d 85, 87 (1954). It has likewise made clear that a movant's summary-judgment burden does not

depend on its burden of proof at trial: "The presumptions and burden of proof for an ordinary or conventional trial are immaterial to the burden that a movant for summary judgment must bear." *Missouri–Kan.–Tex.R.R. Co. v. City of Dallas,* 623 S.W.2d 296, 298 (Tex.1981) (citing *Tigner,* 264 S.W.2d at 87). In fact, the supreme court held in *Missouri–Kansas–Texas Railroad* that the taxing authority, which enjoyed a number of presumptions in its favor, including that its property valuations were valid, must nevertheless " 'establish [its] entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of [its] cause of action or defense as a matter of law.' " *Id.* (quoting *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)). Thus, even if the taxpayer's burden of proof at trial requires him to produce conclusive evidence to prevail on the merits, he must only produce evidence sufficient to raise a question of fact as to the taxing authority's claim in order to avoid summary judgment.

Nonetheless, because Ayeni has not presented competent contrary summary-judgment evidence that would even meet the customary burden of a summary-judgment nonmovant, this is not the case in which this Court should undertake to reexamine the suspect holdings of *Wimmer* and any progeny en banc. [8] But that case will come along inevitably, so I leave this writing as a place marker for that day. Alternatively, the Legislature could, of course, provide statutory clarification that would obviate the need for any such reexamination.

## Footnotes

1   *Cf.* Tex. Tax Code Ann. § 151.025 (West 2012) (requiring taxpayers to maintain certain records, including records of gross receipts, purchases, sales tax received or collected on each sale); 34 Tex. Admin. Code § 3.281(b) (2012) (Comptroller of Public Accounts, Records Required, Information Required) (2012) (same); *see also Smith v. State,* 418 S.W.2d 893, 895–96 (Tex.Civ.App.-Austin 1967, no writ) (holding that Comptroller may develop system to estimate taxes if taxpayer fails to keep required records).

2   *See* Tex. Tax Code Ann. § 111.008(a) (West 2008) ("If the comptroller is not satisfied with a tax report or the amount of the tax required to be paid to the state by a person, the comptroller may compute and determine the amount of tax to be paid from information contained in the report or from any other information available to the comptroller."); 34 Tex. Admin. Code § 3.281(c) (allowing Comptroller to, among other things, estimate tax liability based on any available information if taxpayer fails to keep required records); *Alon USA, LP v. State,* 222 S.W.3d 19, 32 (Tex.App.-Austin 2005, pet. denied) (noting that comptroller is expressly authorized to determine taxes on the basis of any information within comptroller's possession if taxpayer fails to keep proper records).

3   The State of Texas, the City of Houston, Texas, and the Transit Authority of Houston, Texas.

4   Although the Hon. Scott H. Jenkins signed the final judgment, the Hon. Tim Sulak made the summary-judgment rulings.

1   *See Black's Law Dictionary* 1310 (9th ed.2009); *Webster's Third New Int'l Dictionary* 1800 (2002).

2   *See In re Allen,* 366 S.W.3d 696, 706 (Tex.2012) ("We presume the Legislature is aware of relevant case law when it enacts or modifies statutes.") (citing *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990)); *HCBeck, Ltd. v. Rice,* 284 S.W.3d 349, 363 (Tex.2009) ("We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired ...." (citing Tex. Gov't Code Ann. § 311.011)).

3   *Southland Life Insurance Co. v. Greenwade,* 138 Tex. 450, 159 S.W.2d 854 (1942), was decided by the Texas Commission of Appeals. However, because the opinion was adopted by the Texas Supreme Court and, thus, has the full authority of a Texas Supreme Court decision, it was effectively decided by the Texas Supreme Court. *See National Bank of Commerce v. Williams,* 125 Tex. 619, 84 S.W.2d 691, 692 (1935); *see also Cadle Co. v. Butler,* 951 S.W.2d 901, 911 (Tex.App.-Corpus Christi 1997, no pet.) (noting that Commission opinions adopted by the Texas Supreme Court are given the same force, weight, and effect as supreme court opinions).

4    "Admissions taxes" are taxes paid "on fees for admission to all places of amusement." *See Smith v. State,* 418 S.W.2d 893, 895 (Tex.Civ.App.-Austin 1967, no writ).

5    Predecessor statute to section 111.013 of the Texas Tax Code.

6    *Accord Sundown Farms, Inc. v. State,* 89 S.W.3d 291, 293 (Tex.App.-Austin 2002, no pet.); *Penny v. State,* No. 03–97–00399–CV, 1998 WL 394173, at *2 (Tex.App.-Austin July 16, 1998, no pet.) (mem. op.); *State v. Glass,* 723 S.W.2d 325, 327 (Tex.App.-Austin 1987, writ ref'd n.r.e.); *Hylton v. State,* 665 S.W.2d 571, 572 (Tex.App.-Austin 1984, no writ); *Nu–Way Oil Co. v. Bullock,* 546 S.W.2d 336, 339 (Tex.Civ.App.-Austin 1976, no writ); *Baker v. Bullock,* 529 S.W.2d 279, 281 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.); *State v. Gifford–Hill & Co.,* 428 S.W.2d 451, 457 (Tex.Civ.App.-Austin 1968) *rev'd on other grounds by* 442 S.W.2d 320 (Tex.1969).

7    *See also Kawaja v. State,* No. 03–05–00491–CV, 2006 WL 1559343 (Tex.App.-Austin June 8, 2006, no pet.) (mem.op.) (also applying, without analysis, conclusive-evidence notion to summary-judgment proceeding) (citing *Glass,* 723 S.W.2d at 327; *Hylton,* 665 S.W.2d at 572).

8    We may not overrule a prior panel opinion of this court absent an intervening change in the law by the Legislature or a higher court or by decision of this court sitting en banc. *See* Tex.R.App. P. 41.2 (providing that en banc consideration is appropriate to secure or maintain uniformity of appellate court decisions); *In re Smith,* 366 S.W.3d 282, 289 (Tex.App.-Dallas 2012, no pet.); *Nowzaradan v. Ryans,* 347 S.W.3d 734, 739 (Tex.App.-Houston [14th Dist.] 2011, no pet.).

---

**End of Document**                                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (2)

1. State v. Ayeni
2011 WL 9864681 , Tex.Dist. , Sep. 07, 2011

*Judgment Affirmed by*

2. Ayeni v. State 👓
440 S.W.3d 707 , Tex.App.-Austin , Feb. 20, 2013

### Related References (2)

3. State v. Ayeni
2011 WL 9864678 , Tex.Dist. , June 08, 2011

*Reconsideration Denied by*

4. State v. Ayeni
2011 WL 9864683 , Tex.Dist. , Sep. 07, 2011

635 S.W.2d 834
Court of Appeals of Texas, Houston (14th Dist.).

William J. BETHEL, Jr. dba Ra-Comm Electronics, Appellant,
v.
BUTLER DRILLING COMPANY, Appellee.

No. A2546. | May 27, 1982.

Action was brought for breach of contract. The District Court, Harris County, William W. Kilgarlin, J., entered judgment on jury verdict in favor of plaintiff, but failed to award prejudgment interest, and both parties appealed. The Court of Appeals, Price, J., held that: (1) alleged liquidated damage provision of contract was actually penalty and unenforceable; (2) jury award of $12,000 attorney fees was authorized and supported by evidence; (3) prejudgment interest should have been awarded plaintiff; (4) sufficient evidence supported jury's finding that successor corporation ratified contract and such finding was not against great weight and preponderance of evidence; (5) evidence supported jury finding that president of company had authority to sign contract on behalf of company and such finding was not against great weight and preponderance of evidence; (6) plaintiff was not judicially estopped from claiming unlawful termination by reason of testimony given in another lawsuit; (7) evidence did not establish conversion or specific amounts claimed by defendant; and (8) evidence did not exclusively establish as matter of law or by great weight and preponderance of evidence that defendant was terminated for good cause due to alleged insubordination and misconduct.

Judgment reformed and as reformed affirmed.

**Attorneys and Law Firms**

**\*836** Murry B. Cohen, Wm. B. (Ben) Adair, Brynes, Myers, Adair, Campbell & Sinex, Houston, for appellant.

Harold Lloyd, Michael L. O'Brien, Houston, for appellee.

Before J. CURTISS BROWN, C. J., and JUNELL and PRICE, JJ.

**Opinion**

PRICE, Justice.

This is a breach of contract case. The principal issue on appeal is whether a provision in the written contract in question should be construed as a liquidated damage provision or whether it is a penalty provision which may not be enforced by appellant as liquidated damages. Other points of error asserted by appellant William J. Bethel, Jr. d/b/a Ra-Comm Electronics relating to attorney's fees and pre-judgment interest and cross points by appellee Butler Drilling Corporation are discussed below. We reform the judgment of the trial court to provide for pre-judgment interest from October 1, 1977, on the sum of $10,189.72, and otherwise affirm the judgment of the trial court.

The appellant was originally engaged by Butler Drilling Company to perform certain motor vehicle radio maintenance and repair duties for appellee. From 1967 to 1974 appellant operated under an oral month to month agreement. By contract dated August 28, 1974, appellant and Butler Drilling Company entered into a written contract to perform such motor vehicle radio repairs and maintenance on a twenty-four hour on-call basis. The services provided for under the contract were exclusive as to appellee but non-exclusive as to appellant. The contract was signed by appellant William J. Bethel, Jr., and for Butler Drilling Company was signed by its president, Duncan Butler, with a notary acknowledgment also dated August 28, 1974. On October 1, 1974, Butler Drilling Company sold its assets to Mitchell Energy Corporation and Butler Drilling Corporation became the successor corporation. Duncan Butler also served as president of the successor corporation. The contract provided that employment of appellant would continue for a period of three consecutive years beginning September 1, 1974, and ending August 31, 1977. Appellant would be paid in specified semi-monthly installments with the amount of such payments to increase yearly in specified sums. Additional labor performed by appellant would be billed and paid for at an hourly rate of $10 per hour. Appellee agreed to provide either a vehicle or travel reimbursement to appellant as well as shop space, utilities and parking facilities. Appellee further agreed to furnish all repair and replacement parts; appellant was to purchase these parts and bill appellee monthly for them at cost plus fifteen percent. The contract contained the following **\*837** provisions which relate to the liquidated damages claimed by appellant in this appeal:

> "Because the services to be performed by Ra-Comm are personal services, the death of William J. Bethel, Jr., or such bad health or accident as shall render him unable to fully perform said services, shall be grounds to relieve both parties from any further obligations concerning the contract. In the event that Butler breaches the contract and fails to perform for any reasons other than those set out above, then it shall pay as liquidated damages to Ra-Comm the balance of the monthly installment payments set out above."

It was undisputed the contract was terminated by appellee on October 24, 1975, but there was a dispute as to whether such termination was with or without good cause. The jury found in answer to special issues that Butler Drilling Corporation assumed and ratified appellant's contract with Butler Drilling Company, that appellant was an independent contractor from October 1, 1974 to October 24, 1975, that appellant was terminated, that Butler Drilling Corporation did not have

good cause to terminate appellant, that Duncan Butler was authorized by Butler Drilling Company to enter into the contract, that $14,500 would reasonably and fairly compensate appellant for the termination of the contract, that Butler Drilling Corporation did not convert any of appellant's personal property on or about October 24, 1975, that appellant did not furnish Butler Drilling Corporation any equipment for which he was not paid, that reasonable attorney's fee for appellant's attorneys was $12,000, and that appellant did not convert assets of Butler Drilling Corporation to his own use. The court on appellee's Motion disregarded the jury finding that appellant did not convert any of appellee's assets and rendered final judgment in favor of appellant for $10,189.72 by taking the jury's damage answer of $14,500.00 and subtracting the conversion offset admitted by appellant in the amount of $4,310.28.

The court also awarded $12,000.00 in attorney's fees on the jury finding, and denied appellant's Motion for Judgment on attorney's fees of $16,500.00. The court further refused appellant's Motion for Judgment for liquidated damages of $41,825.00 and pre-judgment interest on the liquidated sum. From this final judgment appellant appeals.

Appellant's seven points of error are that the trial court erred in denying appellant's Motion for Judgment for liquidated damages provided by the contract and that there was no evidence and insufficient evidence to prove the liquidated damage clause was a penalty; that the trial court erred in denying appellant's Motion for Judgment for $16,500.00 attorney's fees and that there was no evidence and insufficient evidence to support the jury finding of $12,000.00 attorney's fees; and that the trial court erred in not awarding pre-judgment interest from January 1, 1976.

 [1]   [2]   [3]   [4]   [5]   With respect to appellant's first three points of error, we construe the language employed in the contract in question to be a penalty, as a matter of law as pleaded by the appellee in its trial pleading, and as construed by the trial court, rather than a valid liquidated damage provision as contended by appellant. The liquidated damage provision is not triggered solely by contract termination and nonpayment of monthly rentals by Butler. The liquidated damage provision was not carefully drawn and as it was written, it applied equally to any breach of any provision of the contract by appellee irrespective of the importance or triviality of such breach. The liquidated damage provision of the contract in question, as written, would apply with equal force for such trivial breaches by appellee Butler as failing to pay utilities, provide parking space or pay an additional hourly labor charge of $10.00. Under the liquidated damage clause as written, appellant would be entitled to the full amount of monthly payments for the full term of the contract irrespective of the nature of the breach or appellant's actual loss or damage. Because the contract provides the same reparation **\*838** for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one or of the whole contract, we hold that the parties have not adhered to the rule of just compensation and that the provision is a penalty. The leading case on the subject is Stewart v. Basey, 150 Tex. 666, 668, 245 S.W.2d 484 (Tex.1952), which involved a building lease providing for monthly rentals of $325.00 per month. Prior to the

completion of the lease term, the lessee vacated the building and failed to pay the monthly rentals as provided in the written contract. The lease contract of the parties included a liquidated damage provision that provided "(t)he failure of Lessee to make said payment or payments or the breach of this contract otherwise by him shall render him liable to Lessors, as agreed liquidated damages, the sum of One Hundred Fifty ($150) Dollars per month for each and every month of the unexpired term..." (Emphasis added.) Stewart v. Basey, supra at 485. In holding that such stipulated damage provision would be treated as a penalty the Texas Supreme Court pointed out that the liquidated damage provision was not carefully drawn and was not limited to the breach of any one particular covenant, but rather provided for the same reparation for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one of the contract. Therefore, the Supreme Court reasoned, the provision did not adhere to the rule of just compensation. The court then reversed and remanded the case to determine the amount of actual damages to which lessor was entitled for the breach. The court emphasized that damages to be enforceable as liquidated damages must be uncertain and the stipulation must be reasonable. The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. A party has no right to have a court enforce a stipulation which violates the principle underlying the rule. Again, the Supreme Court in Stewart v. Basey, supra, at 486, stated:

"The true theory is well expressed in Williston on Contracts, Revised Edition, Sec. 779, p. 2192, in this language: 'But as has been seen, the chief, almost the only, means of determining whether the parties in good faith endeavored to assess the damages is afforded by the amount of damages stipulated for, and the nature of the breach upon which the stipulation was agreed to become operative...' "

Finally, the Supreme Court quoted from the comments from Restatement of Contracts, Sec. 339, subsection (1) as follows:

"b. Contracts are frequently made in which performance of very different degrees of importance and value are promised and one large sum of money is made payable as damages for any breach whatever. Since such a contract promises the same reparation for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one or of the whole contract, it is obvious the parties have not adhered to the rule of just compensation. In this matter neither the intention of the parties nor their expression of intention is the governing consideration. The payment promised may be a penalty, though described expressly as liquidated damages, and vice versa."

Appellant here urges that the liquidated damage provision in the contract in question should be enforced in this case because of the contract termination by appellee without good cause and

his nonpayment of monthly rentals, but that it should not be enforced for trivial breaches of the contract. We recognize it is a stringent case on the facts from appellant's viewpoint, but we do not believe that we are empowered to pick and choose which breaches are enforceable by liquidated damages since the provision plainly states it is applicable to all breaches of the contract and the Supreme Court in Stewart v. Basey has so directly spoken. Further, if there is any doubt on the question under the language of the instrument, that doubt must be resolved against appellant who prepared the instrument. **\*839** American Lease Plan v. Ben-Kro Corporation, 508 S.W.2d 937, 942 (Tex.Civ.App.-Houston (1st Dist.) 1974, writ ref'd n.r.e.). Another similar case in point is Krenek v. Wang Laboratories, Inc., 583 S.W.2d 454 (Tex.Civ.App.-Waco 1979, no writ) where the lessor brought action against lessee for failure to make monthly payments under an equipment lease and sought to recover liquidated damages as provided in the contract. The Waco Court, in reversing the trial court, followed Stewart v. Basey, supra, and held the provision was a penalty because it could be triggered by a breach of lesser covenants in the lease and not just by a breach of a major covenant such as nonpayment of rentals. Still another case in point is Servisco v. Tramco, Inc., 568 S.W.2d 434 (Tex.Civ.App.-Texarkana 1978, writ ref'd n.r.e.) which relied on Stewart v. Basey, supra, and distinguished a case relied upon by appellant in the instant case, Oetting v. Flake Uniform and Linen Service, 553 S.W.2d 793 (Tex.Civ.App.-Fort Worth 1977, no writ).

Appellant relies principally on Oetting v. Flake Uniform & Linen Service, supra. That case is distinguishable from the instant case because as the Fort Worth Court specifically pointed out at page 796 of the opinion, the liquidated damage provision in that case could be triggered only by the failure of the customer to pay the monthly service charge and the termination of the contract by the supplier because of nonpayment by the customer. The Fort Worth Court pointed out that the liquidated damage clause as written could not be triggered by any lesser breaches, but could only be triggered by the most major breach of all, nonpayment. Appellant also cites Johnson Engineers, Inc. v. Tri-Water Supply Corporation, 582 S.W.2d 555 (Tex.Civ.App.-Texarkana 1979, no writ) and R.M. Robinson v. Granite Equipment Leasing Corporation, 553 S.W.2d 633 (Tex.Civ.App.-Houston (1st Dist.) 1977, writ ref'd n.r.e.). In Johnson Engineers Inc., v. Tri-Water Supply Corporation, supra, which was a suit for payment under a construction contract, liquidated damages were pled as an offset to cover the period of delay beyond the agreed completion date of the contract. There was no defensive pleading that the liquidated damage provision was a penalty, as was done in the instant case, and there was no evidence of actual damages to show any disproportionate amount of actual damages to stipulated damages. More importantly, the liquidated damage clause did not apply to major and trivial covenants under the contract, but applied only to the payment of $100.00 per day for each day of delay by the appellant after the allotted construction time under the contract. R.M. Robinson v. Granite Equipment Leasing Corporation, supra, was a nonjury trial for liquidated damages by reason of defendant-lessee's default of monthly payments under a personal property lease. The liquidated damage provision requiring payment of all unaccrued rentals was triggered only by the defendant-lessee's default in timely payment of such monthly rentals, and not by any breach of any minor or trivial covenant

in the lease. Further, there was no defensive pleading that it was a penalty and such defense was waived. Appellant's first three points of error are overruled.

 [6]   [7]   Appellant contends by his next three points of error that the trial court erred in denying appellant's Motion for Judgment for attorney's fees in the amount of $16,500 and allowing only $12,000 attorney's fees on the jury finding, because there was no evidence or insufficient evidence to support such finding. Appellant's trial attorney testified that he was familiar with fees charged for services similar to those rendered in this case and that "it is my opinion that ... a proper legal fee and reasonable fee for the same or similar circumstances in Harris County would be approximately $16,500." There was no cross-examination of the witness nor was there any contradictory attorney fee expert opinion evidence produced by appellee. The jury found $12,000 would be a reasonable attorney's fee. Appellant recognizes the unbroken long line of case authority holding that the amount of attorney's fees is a fact issue even when no contradictory evidence is offered. Further, the trier of fact may determine the credibility of the witness **\*840** and accept or reject his expert opinion testimony in whole or in part. However, appellant urges such authority was changed by the June 6, 1979, amendment to Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp.1981) which provided:

"... The usual and customary fees in such cases shall be presumed to be reasonable, but such presumption may be rebutted by competent evidence..." (Emphasis added).

The amendment further provides the act is to be liberally construed to promote its underlying purposes. In addition, it is remedial in nature and is intended to apply to all pending and future actions regardless of the time of institution or of the accrual of any cause of action asserted. Thus, the 1979 amendment applies to the instant case. Appellant contends the presumption found in Article 2226, as amended, mandates and makes conclusive an award of attorney's fees in the amount testified to by appellant's counsel in the absence of contradictory evidence. No cases have been cited to us by the parties nor have we found any construing the effect or meaning of this presumption since the 1979 amendments. Appellee cites two cases, Law Offices of James R. Bass, Inc. v. Bryan, 609 S.W.2d 652 (Tex.Civ.App.-San Antonio 1980, no writ), and Graves v. Sommerfeld, 618 S.W.2d 952 (Tex.Civ.App.-Waco 1981, no writ). Both of these cases hold the issue of amount of attorney's fees is a fact issue, but neither case discusses the 1979 amendment, and it is not shown from the opinions whether the cases were tried before or after the effective date of the 1979 amendments. See also: Neal v. Neal, 606 S.W.2d 729 (Tex.Civ.App.-Beaumont 1980, no writ) to the same effect.

A look at the legislative history relating to the presumptions on attorney's fees under Article 2226 is helpful. In 1971, the 62nd Legislature amended Article 2226 to provide the then current State Bar Minimum Fee Schedule shall be prima facie evidence of reasonable attorney's fees, and in nonjury cases the court may take judicial knowledge of the minimum fee schedule and of the contents of the case file in determining the amount of attorneys fees without hearing further evidence. The cases

following that amendment uniformly held that the bar fee schedule was not conclusive even in the absence of contradictory proof but was only prima facie evidence of reasonable attorney's fees. Aztec Pipe and Supply Company Inc. v. Sundance Oil Company, 568 S.W.2d 401 (Tex.Civ.App. Houston (1st Dist.) 1978, writ ref'd n.r.e.). Also, opinion testimony as to the value of services was held not conclusive, and in jury cases if reliance was not made on the bar fee schedule, there had to be evidence of the reasonableness of attorney's fees to support such an award. Dorsey v. Aguirre, 552 S.W.2d 576 (Tex.Civ.App.-Waco 1977, writ ref'd n.r.e.). In summary judgment cases, the courts also uniformly held there could be no summary judgment as to the amount of reasonable attorney's fees because the uncontradicted opinion of an expert was only an opinion, thereby raising only a fact issue on the amount. McFadden v. Bresler Malls Inc., 526 S.W.2d 258 (Tex.Civ.App.-Austin 1975, no writ), appeal after remand, 548 S.W.2d 789 (Tex.Civ.App.-Austin 1975, no writ); Coward v. Gateway National Bank of Beaumont, 525 S.W.2d 857 (Tex.1975).

Effective January 1, 1978, however, Tex.R.Civ.P. 166-A was amended to provide that a Summary Judgment may be based on uncontroverted testimonial evidence of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts-if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies and could have been easily controverted. Thus, it became possible to obtain a Summary Judgment on the issue of reasonable attorney's fees on the basis of uncontradicted Summary Judgment evidence. Bado Equipment Co., Inc. v. Ryder Truck Lines Inc., d/b/a Ranger Division, 612 S.W.2d 81, 83 (Tex.Civ.App.-Houston (14th Dist.) 1981, writ ref'd n.r.e.).

Effective August 29, 1977, the 65th Legislature deleted the provision in Art. 2226 **\*841** which had provided that the State Bar Minimum Fee Schedule shall be prima facie evidence of reasonable attorney's fees and that the court in a nonjury case may take judicial knowledge of the schedule and the contents of the case file in determining the amount of reasonable attorney's fees without further evidence. That deletion was prompted by the United States Supreme Court decision in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Thereafter, in every case positive proof by opinion testimony of reasonableness was required to support the award of attorney's fees in a jury or nonjury trial. In the absence of testimony that such fees were reasonable, no such attorney's fees were recoverable. Brown v. De La Garza Service Center, Inc., 576 S.W.2d 134 (Tex.Civ.App.-Waco 1978, no writ).

Finally, the 66th Legislature, effective June 6, 1979, amended the current Article 2226 to provide that usual and customary fees in such cases shall be presumed to be reasonable, and also added that in a jury or nonjury case if the issue of attorney's fees is submitted to the court for determination, the court may in its discretion take judicial knowledge of the usual and customary fees in such matters and of the contents of the case file without receiving further evidence. This raises the question of whether the reasonableness of such an unrebutted presumption of usual and customary fees under the 1979 amendment should be treated differently than the 1971 prima facie evidence

provision of reasonableness under the State Bar Minimum Fee Schedule in a trial on the merits. Should it be treated as a true presumption which entitles one to an instructed verdict in the absence of evidence to the contrary? Farley v. M M Cattle Company, 529 S.W.2d 751, 756 (Tex.1975); Sudduth v. Commonwealth County Mutual Ins. Co., 454 S.W.2d 196, 198 (Tex.1970).

**[8]** **[9]** **[10]** We hold that Article 2226, as amended, does not render conclusive and mandatory the award of a specific sum of attorney's fees based on uncontradicted expert opinion evidence of reasonableness or uncontradicted evidence of "usual and customary fees." We believe the effect of the statute is to presumptively provide the element of "reasonableness" of attorney's fees where there is uncontradicted testimony of what "the usual and customary fees" are and that such evidence will support an award up to that amount, but that such evidence is not conclusive and mandatory. Where the issue of attorney's fees is determined by the court, whether it is a jury or nonjury case, the court is authorized to take judicial notice of what the usual and customary fees are in such matters and of the contents of the case file without hearing further evidence. We do not believe this means, or that it was intended, that, the court, having taken judicial notice of "usual and customary fees," is mandated to award that specific amount in every instance. Rather, we think the court is authorized to make an award up to that amount. Neither do we believe the statute mandates the award of a specific sum in a jury or nonjury case where there is unrebutted direct testimony of "the usual and customary fees," or of unrebutted opinion testimony of "reasonable attorneys fees" whether or not they are the usual and customary fees. Under the current provisions of Tex.R.Civ.P. 166-A, the court may render summary judgment on attorney's fees if the affidavit or other summary judgment evidence meets the clear, positive, direct and uncontradicted requirements of that rule. On the other hand, as stated above, we do not believe Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp.1981) makes conclusive or mandatory in a trial on the merits the award of a specific sum based on uncontradicted evidence of "the usual and customary fees." This holding and interpretation will reconcile the range of possible attorney's fee awards in cases where there is uncontradicted evidence of "the usual and customary fees," with the cases where there may be no evidence of "usual and customary fees" but there is uncontradicted opinion evidence of "reasonableness" of attorney's fees. Also, this view of the meaning and application of Art. 2226 would apply equally to a default judgment situation where there is always **\*842** uncontradicted oral testimony or uncontradicted affidavit proof on attorney's fees. We do not believe Art. 2226 was intended to render conclusive or mandate a specific award of attorney's fees in default judgment situations.

**[11]** If the Legislature had intended uncontradicted opinion evidence on reasonableness of attorney's fees or uncontradicted evidence of "usual and customary" fees to be conclusive and mandate the award of a specific sum, it could easily have so stated. In the absence of such a clear statement, we do not believe the Legislature so intended. The previous amendments all appear to relate to the question of supplying the element of "reasonableness" and of prima facie proof, and we believe this is also the thrust of the June 6, 1979, amendment. We hold Article 2226, as

amended, and the state of the evidence does not mandate the award of $16,500.00 attorney's fees in the instant case and that the jury answer of $12,000.00 was authorized and supported by the evidence.

Additionally, in the case at bar, the opinion of appellant's trial attorney on attorney's fees was not couched in terms of "the usual and customary fees" which is the language used in Article 2226 to invoke the presumption of reasonableness. Further, the attorney's opinion testimony of the amount was not clear, direct and positive. The appellant's trial attorney opined that a reasonable fee for these services would be "approximately $16,500.00." The uncontradicted evidence did not indicate what "the usual and customary fees" were, but rather supplied the element of "reasonableness" and stated a reasonable fee would be approximately $16,500.00. Appellant's points of error four, five and six are overruled.

 **[12]**   **[13]**   **[14]**   **[15]**   Appellant's seventh point of error contends the trial court erred in denying 6% pre-judgment interest from January 1, 1976, under the provisions of Tex.Rev.Civ.Stat.Ann. art. 5069-1.03 (Vernon Supp.1981). That statute provides:

> "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable."

Where pre-judgment interest is sought on the basis of a written contract fitting the description of Article 5069-1.03 an award of this statutory interest, or interest eo nomine as it is known, may be supported by a prayer for general relief. See e.g., The Republic National Bank of Dallas v. Northwest National Bank of Fort Worth, 578 S.W.2d 109 (Tex.1978) (allowing pre-judgment interest on a letter of credit), and Miner-Dederick Construction Corporation v. Mid-County Rental Service, Inc., 603 S.W.2d 193 (Tex.1980) (allowing pre-judgment interest on construction contracts). It is distinguished from a situation where pre-judgment interest is sought at common law as an element of damages, in which case the plaintiff must have a pleading to support pre-judgment interest. Black Lake Pipe Line Company v. Union Construction Company, Inc., 538 S.W.2d 80 (Tex.1976) (quantum meruit under a construction contracts); Pickett v. J. J. Willis Trucking Company, 624 S.W.2d 664 (Tex.Civ.App.-Houston (14th Dist.) 1981, writ ref'd n.r.e.); Zuider Zee Oyster Bar, Inc. v. Martin, 503 S.W.2d 292 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e.); City of Galveston v. Russo, 508 S.W.2d 882 (Tex.Civ.App.-Houston (14th Dist.) 1974, writ ref'd n.r.e.). In either case, pre-judgment interest is recoverable as a matter of right where an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment. The Republic National Bank of Dallas v. Northwest National Bank of Fort Worth, supra; Black Lake Pipe Line Company v. Union Construction Company, Inc., supra. Pre-judgment interest is that interest calculated on a sum payable to the plaintiff from the time of his loss or injury to date of judgment. The Republic National Bank of Dallas v. Northwest National Bank of Fort

Worth, supra. Appellant did not have a specific pleading for pre-judgment interest in the instant case, but he **\*843** had a general prayer for relief which is sufficient for the award of pre-judgment interest under Art. 5069-1.03. The Republic National Bank of Dallas v. Northwest National Bank of Fort Worth, supra, at 116.

 **[16]** In the instant case, the suit was for recovery of damages based on the breach of a written contract. The amount of appellant's damages cannot be ascertained on the basis of the liquidated damage clause because it has been construed as a penalty provision. However, the contract in question ended August 31, 1977, and the actual damages were found by the jury and were ascertained in the damage issue as a definite sum as of September 1, 1977, less the conversion offset admitted by appellant. We hold that appellant was entitled to recover 6% pre-judgment interest under Article 5069-1.03 on the sum of $10,189.72 from October 1, 1977, pursuant to the thirty day provision of that statute to date of judgment on June 9, 1980.

 **[17]** Appellee asserts ten cross-points of error. In his first two cross-points, he argues the evidence conclusively showed as a matter of law that Butler Drilling Corporation did not assume or ratify the contract, or that the jury finding to special issue number one was so against the great weight and preponderance of the evidence as to be manifestly unjust. The contract in question indicates it was signed and notarized on August 24, 1974, during which period of time negotiations were being had for purchase of the assets of Butler Drilling Company. It was signed by Duncan Butler, President of Butler Drilling Company, who also was president of the successor corporation, Butler Drilling Corporation. There was evidence the contract in question was listed as an asset of Butler Drilling Company when the assets were sold and the successor corporation Butler Drilling Corporation acquired them. The attorney for the purchaser discussed the contract with Mr. McClain, Vice-President of Butler Drilling Company, who also later became vice-president of the successor corporation, and the attorney testified Mr. McClain told him the contract was oral. Butler Drilling Corporation abided by and operated under the contract for a year from October 1, 1974, to October 24, 1975, when it terminated the contract. In addition, a letter from Mr. McClain was in evidence which referred to the written contract while he was acting as vice-president of Butler Drilling Corporation. Appellant contends that Duncan Butler actually signed the contract sometime after August 24, 1974, and that Butler Drilling Corporation thought the contract was an oral month to month arrangement rather than a written contract. While the evidence is conflicting, we find there was sufficient evidence to support the jury answer to special issue number one and said answer was not against the great weight and preponderance of evidence. Appellee's first and second cross-points are overruled.

 **[18]** In its cross-points three and four, appellee contends the evidence conclusively showed as a matter of law that Duncan Butler did not have authority to sign the contract on behalf of Butler Drilling Company, or that the jury answer to special issue number five to such effect was so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellee

contends there is no authority shown because the charter, by-laws and corporate minutes do not reflect the granting of any authority and the contract in question is not a matter in the ordinary and usual course of company business indicating inherent apparent authority. The special issue included both actual and apparent authority. The only Board of Directors for the company was Joe K. Butler, chairman of the Board; Duncan Butler, President; and Lee McClain, Vice-President. Joe K. Butler testified that he instructed Duncan Butler and Lee McClain to negotiate a contract with appellant. The by-laws of the corporation provide the President has the power to employ and discharge all employees and agents for the company. Both Butler Drilling Company and Butler Drilling Corporation operated and acted under the contract for more than a year, which provided for maintenance of the company's radio equipment, an activity **\*844** in the every day operation of the company. This was the same activity which had been carried on by appellant for Butler Drilling Company on a month to month oral basis for nine to ten years prior to the date of the written contract. Appellee's cross-points three and four are overruled.

 **[19]** **[20]** **[21]** In its fifth and sixth cross-points, appellee says the evidence conclusively shows as a matter of law appellant is judicially estopped from claiming unlawful termination by reason of testimony given in another lawsuit where he stated he quit, or that the answer by the jury to special issue number three that plaintiff was terminated is so against the great weight and preponderance of the evidence as to be manifestly unjust because of this prior testimony of plaintiff. While appellant appeared to make conflicting statements as to whether he quit or was terminated, he later explained the discrepancy. He said he was confused and thought he was being asked about the other corporation, not Butler Drilling Corp., and equivocated on the earlier testimony that he quit. One of the requirements for application of the doctrine of judicial estoppel is that the statement must be deliberate, clear and unequivocal. American Savings and Loan Association of Houston v. Musick, 531 S.W.2d 581, 589 (Tex.1975). The elements related to judicial estoppel are not shown conclusively or by the overwhelming weight and preponderance of the evidence, and we believe the question went to the weight of the evidence. Further, no one contended appellant quit at the instant trial. Both parties to the instant trial agreed appellant was terminated by appellee. The contested issue was whether the termination was with or without good cause. Appellee's cross-points five and six are overruled.

 **[22]** Appellee's cross-points seven and eight assert that as a matter of law appellant converted property of the value of $6420.28, rather than the $4300.00 awarded by the court, and that by the great weight and preponderance of evidence, the jury should have answered $6420.28 to the conversion issue in special issue number thirteen. One of the items of conversion was a General Electric base station radio for which appellee had paid appellant but had never received. Appellant admitted by pleading and evidence this conversion of payment and this was the item which the trial court offset against the damages awarded appellant when the court disregarded the jury answer to special issue number thirteen. The other items contended by appellant to establish conversion as a matter of law or by the overwhelming weight and preponderance of the evidence relate to

evidence of appellee's padding of an expense account of $100.00 per month for approximately ten (10) months and the removal of two A.C. and D.C. test stands by appellant valued at $600.00 each. The burden of proof on the issue was on appellee and from a review of the evidence we do not believe conversion or the specific amounts claimed were established as a matter of law or by an overwhelming weight and preponderance of the evidence. We overrule appellee's seventh and eighth cross-points.

 **[23]**    Appellee's final two cross-points of error assert the evidence conclusively established as a matter of law appellant was terminated for good cause and that special issue number four should not have been submitted to the jury, or else the jury's answer thereto should have been disregarded. Further, appellee contends that the jury finding to special issue number four was so against the great weight and preponderance of evidence as to be manifestly unjust. The evidence was in conflict on the question but in our view it does not show as a matter of law or by the great weight and preponderance of the evidence that appellant was terminated for good cause due to alleged insubordination and misconduct. Appellee's cross-points nine and ten are overruled.

The judgment of the trial court is reformed to provide for six percent prejudgment interest on the sum of $10,189.72 from October 1, 1977, to date of judgment on June 9, 1980 with post judgment interest as provided by law. The judgment of the trial court is otherwise affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

⚑ 1. Bethel v. Butler Drilling Co. ↻
635 S.W.2d 834 , Tex.App.-Hous. (14 Dist.) , May 27, 1982 , writ refused n.r.e. ( Sep 15, 1982 )

1999 WL 548226
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE 47.7, UNPUBLISHED OPINIONS HAVE NO PRECEDENTIAL VALUE BUT MAY BE CITED WITH THE NOTATION "(not designated for publication)."

Court of Appeals of Texas, Houston (14th Dist.).

CDS ENTERPRISES, INC. d/b/a Texcon, Appellant,
v.
MYRAD REAL ESTATE, INC. and Fountainhead Development Corp., Inc., Appellees.

No. 14-97-00197-CV.   |   July 29, 1999.

On Appeal from the 361st District Court, Brazos County, Texas; Trial Court Cause No. 42,016-361.

Before Justices ANDERSON, EDELMAN, and SEARS. [*]

**OPINION**

ROSS A. SEARS, Justice.

**\*1** CDS Enterprises, Inc. d/b/a Texcon (Texcon) appeals judgment in favor of Myrad Real Estate, Inc. (Myrad) and Fountainhead Development Corp., Inc. (Fountainhead). Texcon brings eleven points of error, while Myrad brings four cross-points. We affirm in part as modified and reverse and render in part.

**I. Background**

Myrad and Fountainhead are residential real estate developers. Fountainhead is a wholly owned subsidiary of Myrad. Texcon is a construction contractor. On June 23, 1994, Myrad entered into a written contract with Texcon for the construction of roadway, drainage, sewer, and waterline improvements to the Cat Hollow subdivision in College Station, Texas (the Cat Hollow contract). On October 6, 1994, Fountainhead entered into a written contract with Texcon for the construction of similar improvements to the Cypress Meadow subdivision and the Hidden Hollow subdivision,

and for improvements to Rock Prairie Road, also located in College Station (the Springbrook contract).

Texcon claimed it entered into several oral agreements with Myrad and Fountainhead for additional work outside the written contracts and was never paid for this work. Consequently, Texcon filed three mechanic's and materialman's liens on Cat Hollow, Cypress Meadow, and Hidden Hollow.

Subsequently, Myrad and Fountainhead sued Texcon, each asserting a claim for breach of contract and seeking actual and liquidated damages for the untimely completion of the Cat Hollow and Springbrook contracts. Furthermore, Myrad and Fountainhead each sought a declaratory judgment that Texcon's liens were invalid and unenforceable because they were not filed timely. Myrad also brought a claim for fraud, alleging Texcon falsely represented on April 19, 1995, that it was accepting payment in full and had no outstanding claims for work performed before such date.

Texcon filed a counterclaim, alleging breach of contract for Myrad and Fountainhead's failure to pay for additional work performed pursuant to oral agreements. Texcon also brought a claim for fraud, alleging several misrepresentations, including: (1) Myrad and Fountainhead wanted an informal working relationship in which they could request that work be performed by Texcon on an as needed basis and Texcon would be compensated for such work; and (2) Texcon would not be subject to any penalties as a result of any delays or interference caused by Myrad, Fountainhead or their other contractors. Texcon also sought (1) a declaratory judgment that its liens were valid, and (2) the foreclosure of its liens and the sale of the properties.

At trial, the jury found: (1) Texcon did not breach the Springbrook contract; (2) Texcon breached the Cat Hollow contract and awarded Myrad $10,000.00 for the cost of obtaining a bond to secure Texcon's lien claims, but did not award any damages for lost profits or lost business opportunity; (3) Myrad or Fountainhead breached an oral or written agreement with Texcon and awarded Texcon $75,000.00; (4) Texcon did not commit fraud against Myrad or Fountainhead; (5) Myrad and Fountainhead did not commit fraud against Texcon; and (6) Myrad or Fountainhead acted with intent to harm, or with conscious indifference to the rights of Texcon, but did not award exemplary damages. The jury awarded attorney's fees to Texcon in the amount of $83,000.00 for trial and additional amounts for appeal to the court of appeals and the Texas Supreme Court.

**\*2** The jury was further asked to determine the start and completion dates for Texcon's work under the contracts. The jury found: (1) the beginning date for Cat Hollow was July 5, 1994, and the completion date was January 30, 1995; (2) the beginning date on Hidden Hollow was December 21, 1994, and the completion date was April 14, 1995; and (3) the beginning date for Cypress Meadow was October 6, 1994, and the completion date was February 12, 1995.

Myrad and Fountainhead filed a motion for partial judgment on the verdict, motion for attorney's fees, motion for liquidated damages, and motion for partial judgment notwithstanding the verdict. Granting all of Myrad and Fountainhead's motions, the trial court entered judgment that (1) Myrad recover liquidated damages in the amount of $29,500.00, plus prejudgment interest, and actual damages in the amount of $10,000.00, plus prejudgment interest on the Cat Hollow contract; (2) Fountainhead recover liquidated damages in the amount of $65,000.00, plus prejudgment interest on the Springbrook contract; (3) Myrad and Fountainhead recover attorney's fees in the amount of $100,000.00 for services rendered through the rendition of judgment, plus additional amounts for appeal; and (4) Texcon's liens were invalid and unenforceable. The court further entered judgment on the jury's award of $75,000.00 for breach of contract and attorney's fees to Texcon.

## II. Cat Hollow

### A. Liquidated Damages

In its first point of error, Texcon claims the trial court erred in awarding liquidated damages to Myrad under the Cat Hollow contract. Texcon first argues the liquidated damages clause is an unenforceable penalty. A liquidated damages clause is the measure of recovery in the event of a breach of the contract. *See Newsom v. State,* 922 S.W.2d 274, 281 (Tex.App.-Austin 1996, writ denied); *Baker v. International Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ).* Whether a liquidated damages provision is enforceable is determined by a two-prong test: (1) the harm caused by the breach must be incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991).* Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law. *See id.*Factual issues, however, must sometimes be resolved before a legal conclusion can be determined. *See id.*

The party asserting that the liquidated damages clause is an unenforceable penalty bears the burden of proving it is a penalty. *See R. Conrad Moore & Assocs., Inc. v. Lerma,* 946 S.W.2d 90, 95 (Tex.App.-El Paso 1997, writ denied); *Commercial Union Ins. Co. v. La Villa Indep. Sch. Dist.,* 779 S.W.2d 102, 106 (Tex.App.-Corpus Christi 1989, no writ).* To satisfy its burden, Texcon was required to prove the amount of Myrad's actual damages, if any, for establishing an absence of an approximation between the actual loss and the stipulated sum. *See Johnson Eng'rs, Inc. v. Tri-Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.-Texarkana 1979, no writ); *Robinson v. Granite Equip. Leasing Corp.,* 553 S.W.2d 633, 637 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.).* If the liquidated damages are shown to be disproportionate to the actual damages, the liquidated damages provision must be declared a penalty and recovery is limited to actual damages proven.*Commercial Union Ins. Co.,* 779 S.W.2d at 107.

**\*3** The liquidated damages clause in the Cat Hollow contract states in pertinent part:

If the CONTRACTOR should neglect, fail, or refuse to complete work within the time herein specified, or any proper extension thereof granted by the OWNER'S REPRESENTATIVE, then the CONTRACTOR does hereby agree as part of consideration for the awarding of this contract, that OWNER may withhold permanently from CONTRACTOR'S total compensation the sum of Five Hundred and no/100 Dollars ($500.00) for each and every calendar day that the CONTRACTOR shall be in default after the time stipulated for completing the work, not as a penalty, but as liquidated damages for the breach of [the] contract.

\* \* \*

The amount is fixed and agreed upon by and between the CONTRACTOR and the OWNER because of the impractability and extreme difficulty in fixing and ascertaining actual damages. The OWNER would, in such an even [sic], sustain, and the amount is agreed to be damages the OWNER would sustain and shall be retained by [the] OWNER from current periodic estimates for payment or from final payment.

Texcon claims Myrad's damages were not uncertain or difficult to estimate because Myrad presented evidence regarding the amount of its damages. Dan Bensimon, one of Myrad's owners, testified that Myrad lost $52,000.00 from the inability to use and sell the Cat Hollow lots during Texcon's delayed performance. Another court of appeals has rejected a similar argument. *See Murphy v. Cintas Corp.,* 923 S.W.2d 663, 666 (Tex.App.-Tyler 1996, writ denied). In *Murphy,* the court observed that even if actual damages could have been calculated at the time of trial, such testimony was long after the execution of the contract. *See id.* The uncertainty or difficulty in determining damages must have existed at the time the contract was executed. *See id.; Oetting v. Flake Uniform & Linen Serv. Inc.,* 553 S.W.2d 793, 796 (Tex.Civ.App.-Fort Worth 1977, no writ). Similarly, Bensimon's testimony regarding Myrad's damages was two years after the parties entered into the Cat Hollow contract.

Moreover, Texcon did not meet its burden in proving the liquidated damages clause was unenforceable because it failed to prove the amount of Myrad's actual damages. *See Murphy,* 923 S.W.2d at 666; *Johnson Eng'rs, Inc.,* 582 S.W.2d at 557; *Robinson,* 553 S.W.2d at 637. To satisfy its burden, Texcon would have had to offer evidence of Myrad's actual damages. Texcon failed to introduce such evidence. [1]

**\*4** Texcon also asserts there is no reasonable relation between the jury's award of $0 for lost profits and lost business opportunities and the trial court's award of $29,500.00 for liquidated damages. The jury found Texcon breached the Cat Hollow contract, but awarded no damages for lost profits and lost business opportunities. The contract provided Texcon had 150 days in which

to complete its work. The jury found Texcon began construction under the Cat Hollow contract on July 5, 1994, and completed performance on January 30, 1995, which was 59 days late. Myrad moved for judgment N.O.V. on its' liquidated damages. The trial court granted Myrad's motion and entered a finding of fact that Texcon completed its work 59 days late. The trial court further entered conclusions of law that Myrad's damages were uncertain and difficult or impossible to calculate, and that $500.00 per day liquidated damages was reasonable. Therefore, we find the trial court's award of liquidated damages in the amount of $29,500.00 is proper.

Next, Texcon argues Myrad waived the liquidated damages clause by releasing the retainage. *See Anderson Dev. Corp. v. Coastal States Crude Gathering Co.,* 543 S.W.2d 402, 405 (Tex.Civ.App.- Houston [14th Dist.] 1976, writ ref'd n.r.e.). Waiver is an affirmative defense which may be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct which is inconsistent with the claimed right. *See Tenneco, Inc. v. Enterprise Prods. Co.,* 925 S.W.2d 640, 643 (Tex.1996). In determining whether waiver has occurred, the court must examine the acts, words, or conduct of the parties and it must be unequivocally manifested that it is the intent to no longer assert the right. *See Robinson v. Robinson,* 961 S.W.2d 292, 299 (Tex.App.- Houston [1st Dist.] 1997, no writ.).

Debbie Keating, the engineer on Cat Hollow, reviewed Texcon's invoices for approval for payment. When she received the "Invoice for Balance Due" from Texcon in April 1995, she called O.E. "Buster" Smith, president of Texcon, to determine if it was, in fact, the last invoice because it showed retainage was due. After speaking to Smith, she recommended paying the retainage, but not all the items on the invoice. If this had not been the last invoice, Keating would not have recommended paying the retainage.

After paying the retainage, Myrad received several invoices on April 28, 1995, in the amount of $59,000 for work performed months earlier, which Texcon asserts was extra-contractual done pursuant to oral agreements. Keating did not believe these invoices were valid because they were for delay or idle time, which were expressly not payable under the contract, and for backfilling, which was incidental to work and not a separate item under the contract.

Bensimon testified that Texcon was to submit its bills on or before the 25th of each month for work done in the preceding month. This procedure included bills for any additional work not covered by the written contract. Myrad could have no way of knowing Texcon would submit additional invoices for work done months before. Under these circumstances, it cannot be said Myrad waived its right to seek liquidated damages. Texcon's first point of error is overruled.

## B. Delay in Performance

**\*5** In its second point of error, Texcon claims the trial court erred in awarding liquidated damages to Myrad under the Cat Hollow contract because any delay in performance was excused by the untimely performance of another contractor hired by Myrad. In its third point of error, Texcon claims the evidence is legally and factually insufficient to support the jury's finding that Texcon breached the Cat Hollow contract.

A contractor is excused from performance when the owner fails to provide the required means to complete the contract. *See Sage Street Assocs. v. Northdale Constr. Co.,* 809 S.W.2d 775, 777 (Tex.App.-Houston [14th Dist.] 1991), *aff'd in part and remanded in part on other grounds,*863 S.W.2d 438 (1993). Excuse for nonperformance is an affirmative defense upon which Texcon had the burden of proof. *See*TEX.R.CIV.P. 94.

Because Texcon bore the burden of proof at trial that its untimely performance was excused, it must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). For a no evidence point of error, we examine the record for all evidence that supports the jury's finding, while ignoring all evidence to the contrary. *See id.*If there is no evidence to support the jury's finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *See id.*

In reviewing a challenge that the jury's adverse finding is against the great weight and preponderance of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). We must uphold the jury's finding unless it so against the great and weight and preponderance of the evidence as to be manifestly unjust or wrong. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). The jury as trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 213 (Tex.App.-Houston [14th Dist.] 1991, no writ). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.), *cert. denied,*525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *See Peter v. Ogden Ground Servs., Inc.,* 915 S.W.2d 648, 650 (Tex.App.-Houston [14th Dist.] 1996, no writ).

**\*6** Myrad argues Texcon, by its failure to submit a separate jury question on excuse rather than an instruction, waived any finding that its breach of the Cat Hollow contract was excused. We note, however, that in broad form submission, an affirmative defense may be submitted as an instruction where the burden of proof is properly placed. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646,

651 (Tex.1988); *Edwards Transp., Inc. v. Circle S Transp., Inc.,* 856 S.W.2d 783, 788 (Tex.App.-Amarillo 1993, no writ). The question submitted to the jury asked:

> Did Texcon breach the Cat Hollow contract and proximately cause damage to Myrad or Fountainhead?

Several instructions on excuse were submitted to the jury:

> Failure to comply by a party is excused if compliance is waived by the other party.

> A waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

> Failure to comply by a party is excused if all the following circumstances occurred:

> 1. the acting party:

>> a. By words or conduct made a false representation or concealed material facts,

>> b. With knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

>> c. With the intention that the other party would rely on the false representation or concealment in acting or deciding not to act; and

> 2. the excused party:

>> a. Did not know and had no means of knowing the real facts and

>> b. Relied to its detriment on the false representation or concealment of material facts.

> Failure to comply, if any, by a party is excused by the other party's previous failure, if any, to comply with a material obligation of the same agreement.

Here, because the burden of proof was properly placed, Texcon did not waive this defense. In any event, we find that Texcon's challenge to the sufficiency of evidence that its delayed performance was not excused must fail.

As previously noted, the contract provided Texcon had 150 days to complete its work. The jury found Texcon began construction under the Cat Hollow contract on July 5, 1994, and completed performance on January 30, 1995, when Texcon signed the completion certificate, or 209 days. In accordance with the jury's finding, Texcon's timely completion of the Cat Hollow contract should have occurred by December 1, 1994.

The road work for Cat Hollow involved the laying of (1) the subgrade, (2) the curbs and gutters, (3) the base, and (4) the asphalt. Myrad contracted with Texcon for the subgrade, base, and asphalt, but not the curbs and gutters. South Construction was to provide that work. In subgrading, the entire road bed is graded, and then lime is laid down to stabilize the surface. The curb and gutter work cannot begin until the lime stabilization is complete.

 **\*7** On October 3, 1994, Texcon submitted a construction schedule to Myrad, under which Texcon would complete the subgrade by October 17, 1994. Texcon allowed eleven to sixteen days for South Construction to put in approximately 5000 linear feet of curbs and gutters. Texcon claims South Construction was to begin work on the curbs and gutters on October 17, 1994, completing such work by November 1, 1994. Myrad does not dispute that it should have taken South Construction eleven to sixteen days to complete its work. Myrad asserts Texcon completed the subgrade late. Therefore, South Construction started the curb and gutter work late. Myrad also maintains that South Construction timely completed its work once it was able to start work.

At trial and at deposition, Smith gave conflicting testimony regarding when Texcon had completed the subgrade. At trial, Smith testified that Texcon completed the subgrade on October 25, 1994. In his deposition testimony, which was read at trial, Smith stated that Texcon completed the subgrade on November 5, 1994. Therefore, South Construction, by either date, could not have started its work on October 17, 1994.

Bensimon testified, based on concrete delivery tickets, the curb and gutter work started on November 7 or 8, 1994. This is consistent with Smith's testimony that Texcon completed the subgrade on November 5. Myrad further presented evidence that Texcon was laying the base in December. David Dobbs, the city inspector, testified that his log entry for December 9, 1994, shows that Texcon was laying the base on two of the four streets in Cat Hollow, which indicated to him that South Construction had finished the curbs and gutters on those two streets. Furthermore, Dobbs testified that his log entry for December 13 1994, states that Texcon was "laying base throughout entire job."

The final stage of street construction, which is laying the base, involves hauling in the rock which makes the base, spreading it, blading it with a grader, watering it, compacting it, and finally having it tested for compaction. Dobbs testified that his log entries for the compaction testing showed that testing was occurring on all four streets on December 21, 1994, but he did not have any test dates after that. Therefore, according to Myrad, the base was completed as of December 21, 1994.

Texcon disputes Myrad's claim that it had completed the base as of December 21, 1994. With respect to compaction testing, Dobbs further stated he felt sure there was other testing after

December 21, 1994, even though he was not able to find such entries after that date. The compaction testing results were not entered into evidence.

Texcon further points to testimony that the quality of South Constructions's work was poor and had to be redone through out the subdivision. Dobbs testified that he believed this curb and gutter project was the first such project for Larry Schultz of South Construction. Smith testified that South Construction tried to use a machine to pour the concrete, but its crew did not know how to use the machine and spent considerable time practicing with it. Moreover, Dobbs testified he found the curb and gutter work to be of poor quality and not acceptable to the standards for the City of College Station. Dobbs stated that those unacceptable sections of curb and gutter had to be taken out and redone, taking additional time.

**\*8** Dobbs' log entry for December 13, 1994, shows, in addition to "Texcon-laying base through out entire job," that South Construction needed to remove and replace two sections of the curb. Dobbs' log entry for January 3, 1995, states "Mike South-told him to tear out curb in culdesac [sic] on Lynx and put it back to grade!"Dobbs's log book contains several entries showing that Texcon was doing backfilling work on the curbs in late December 1994, and backfilling the sidewalks through most of January 1995.

The jury, as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, was entitled to discount the testimony of any witness. *See Skrepnek v. Shearson Lehman Bros., Inc.,* 889 S.W.2d 578, 579 (Tex.App.-Houston [14th Dist.] 1994, no writ). Because we are not the fact finder, we may not substitute our own judgment for that of the jury, even if we were to draw a different conclusion on the evidence. *See Maritime Overseas Corp.,* 971 S.W.2d at 407. Therefore, we cannot say the jury's finding is against the great weight and preponderance of the evidence. Texcon's second and third points of error are overruled.

### C. Bond

In its fourth point of error, Texcon challenges the legal and factual sufficiency of the evidence in support of the jury's finding that Myrad's cost of obtaining a "bond" was $10,000.00.[2] The question submitted to the jury asked for "[t]he reasonable and necessary cost of obtaining a bond."Texcon first asserts the only evidence Myrad presented concerned a letter of credit, not a bond. In the alternative, Texcon argues there is no evidence or insufficient evidence for an award greater than $5,000.00.

**\*9** Bensimon testified that to convey clear title to the Cat Hollow lots, Myrad had to obtain a "nonstatutory bond." To this end, Myrad executed an "Indemnity Agreement with Letter of Credit to Protect Against Defects in Title," under which Myrad indemnified University Title

Company against all adverse claims, including Texcon's liens. Commercial National Bank issued a $119,000.00 letter of credit to the title company to secure Myrad's obligation under the Indemnity Agreement.

Texcon argues Myrad's letter of credit is not a suretyship bond because it is not a negotiable instrument. *See* TEX.BUS. & COM.CODE ANN. § 3.104(a); *Heritage Housing Corp. v. Ferguson, 651 S.W.2d 272, 273 (Tex.App.-Dallas 1983, no writ).* [3] No definition of "bond" was provided in the jury charge which would limit the type of instrument for which Myrad could recover damages. Here, the letter of credit served the same purpose as a "bond," that is, to indemnify Myrad against Texcon's liens. Accordingly, the evidence is legally and factually sufficient to support a finding that Myrad had obtained a "bond."

In the alternative, Texcon contends there is no evidence or factually insufficient evidence that Myrad expended more than $5,000.00 to obtain the letter of credit. Bensimon testified that the total expense of the letter of credit was $5,000.00, "not including having to put up cash collateral for the letter of credit."A review of the record reflects no evidence of the amount of damages Myrad sustained from the of loss of the use of the cash it had put up as collateral for the letter of credit. Therefore, we find the evidence legally insufficient to support the jury's award of $10,000.00 for the cost of obtaining a bond. Texcon's fourth point of error is sustained and the award for obtaining a bond is reduced to $5,000.00.

### III. Springbrook Contract

**\*10** In its fifth point of error, Texcon asserts the trial court erred in awarding liquidated damages to Fountainhead under the Springbrook contract. At trial, Fountainhead claimed Texcon breached the Springbrook contract by failing to complete timely all improvements to Hidden Hollow. [4] The jury found that Texcon did not breach the Springbrook contract and, consequently, awarded no damages. In a summary judgment hearing prior to trial, the court found that Texcon commenced work on the Springbrook contract, which included Cypress Meadow and Hidden Hollow, on October 6, 1994, and completed work on April 14, 1995. In a separate question regarding Texcon's beginning and completion dates, the jury found Texcon began construction on Hidden Hollow on December 21, 1994, and completed construction on April 14, 1995, 114 days later.

Fountainhead filed a motion for partial judgment notwithstanding the verdict, asking that the trial court enter judgment against Texcon for breach of the Springbrook contract and to enforce the liquidated damages provision for 130 days in accordance with the court's previous summary judgment finding. Granting the motion, the trial court awarded $65,000.00 in liquidated damages to Fountainhead. Subsequently, the trial court entered findings of fact and conclusions of law to

the effect that Fountainhead's damages were uncertain and difficult or impossible to calculate, and $500.00 per day liquidated damages are reasonable.

At trial, Texcon argued its breach, if any, was excused by Bensimon "pulling" its crews of the Hidden Hollow project to work on the Cypress Meadow subdivision. [5] Therefore, we shall address the propriety of the trial court's granting Fountainhead's motion for partial JNOV. [6]

 **\*11** A motion for JNOV is based upon the same grounds that have or could have been urged in a motion for directed verdict. *See* TEX.R.CIV.P. 301. A JNOV may be upheld only if there is no evidence to support the jury's findings. *See Mancorp., Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). In considering a "no evidence" point, we review the record in the light most favorable to the jury's findings, considering only the evidence and inferences supporting the finding and rejecting evidence and inferences to the contrary. *See Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If more than a scintilla of evidence supports the jury's finding, the verdict must be upheld, and the JNOV reversed. *See Culpepper,* 802 S.W.2d at 228; *Navarette,* 706 S.W.2d at 310.

Smith, and Texcon's project manager Gary Arnold, testified that once Texcon started work on Hidden Hollow, Fountainhead sent Texcon's crews to work on Cypress Meadow. Dobbs testified that he witnessed Texcon workmen being pulled from the Hidden Hollow worksite. Considering only the evidence supporting the jury's finding of no breach, and rejecting all evidence to the contrary, we find there is more than a scintilla of evidence to support the jury's finding that Texcon did not breach the Springbrook contract on the basis that any delay by Texcon was caused by Fountainhead. Therefore, the trial court erred in granting Fountainhead's motion for JNOV and awarding Fountainhead liquidated damages on its own finding of breach. Accordingly, Texcon's fifth point of error is sustained.

### IV. Special Exceptions

In its seventh point of error, Texcon contends the trial court erred in refusing to give Texcon an opportunity to amend its pleadings after sustaining a special exception on a claim for constructive fraud. When the trial court sustains special exceptions, the pleader must be given, as a matter of right, an opportunity to replead. *Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998). Only after the special exceptions are sustained and the party has been given an opportunity to amend its pleadings may a claim be dismissed for failure to state a cause of action. *See Centennial Ins. Co. v. Commerical Union Ins. Cos.,* 803 S.W.2d 479, 483 (Tex.App.-Houston [14th Dist.] 1991, no writ).

On the first day of trial, after hearing arguments from the parties, the court granted Myrad and Fountainhead's special exception to Texcon's claim for constructive fraud. [7] Afterwards, Texcon stated to the court, "Your Honor, we should be entitled to replead as to that particular issue then."Texcon failed to obtain a ruling from the trial court.

**\*12** Myrad and Fountainhead argue Texcon waived this complaint for review for failure to request an opportunity to amend and failure to obtain a ruling. Once special exceptions have been granted, the party against whom the special exceptions have been sustained has the burden to seek leave to amend its pleadings. *See Fuentes v. McFadden,* 825 S.W.2d 772, 779 (Tex.App.-El Paso 1992, no writ). Before a party can complain on appeal that it was denied the opportunity to amend after special exceptions have been sustained, it must show that an opportunity was requested and denied. *See Inglish v. Prudential Ins. Co. of Am.,* 928 S.W.2d 702, 705 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (citing TEX.R.APP.P. 52(a) (current rule TEX.R.APP.P. 33.1)). Where a party is denied the right to amend and such fact is not reflected in the record, a motion for new trial will preserve such error. *See id.*

Although Texcon requested an opportunity to amend its counterclaim, it did not obtain a ruling on its request. Texcon claims it has preserved error in its motion for new trial. Our review of the motion for new trial finds that Texcon has not preserved error on its complaint that it was denied an opportunity to amend its counterclaim with respect to constructive fraud. Texcon's seventh point of error is overruled.

## V. Validity of the Liens

In its eighth point of error, Texcon complains the trial court erred in declaring its liens invalid and unenforceable. The jury awarded Texcon $75,000.00 on its breach of contract claim. The jury, however, did not determine the amount of any indebtedness for each tract. In its conclusions of law filed post-judgment, the trial court stated the liens "are not capable of enforcement and must be invalidated because any indebtedness for work performed on any specific, separate tract of land for which a lien was claimed was not established and Texcon thus waived its right to enforcement by foreclosure of a lien, if any."Texcon argues the trial court could have apportioned the damages among the three liens and credited each lien with a pro-rata reduction. [8]

To be entitled to foreclose on a mechanic's and materialman's lien, the claimant must prove the property on which he wants to foreclose is the improvement itself or the parcel of land connected with the improvements. *See Houston Elec. Distrib. Co. v. MBB Enters.,* 703 S.W.2d 206, 207-08 (Tex.App.-Houston [14th Dist.] 1985, no writ). In *Centex Materials, Inc. v. Dalton,* the court reasoned:

**\*13** In order to establish a constitutional lien on Lot 7, appellant had the burden of proving the value of the concrete supplied to that lot so that the court would be able to order a foreclosure for the specific amount due and owing on that particular lot. In our view appellant failed to discharge its burden of proving the value of the concrete attributable to Lot 7 as distinguished from Lot 5.

574 S.W.2d 621, 624 (Tex.Civ.App.-Tyler 1978, no writ).*Morris v. Chauce A. Beane & Co.* involved multiple plaintiffs and four contracts on three separate oil field leases. 635 S.W.2d 658, 660 (Tex.App.-Fort Worth 1982, no writ). Although the jury in *Morris* found damages for each indebtedness as to each plaintiff, the trial court entered judgment in a single amount to the plaintiffs. *See id.*The court of appeals found the trial court erred in failing to segregate the damages. The trial court's judgment should establish the indebtedness accrued for which the defendant was liable as to each plaintiff, as applied to each parcel of land foreclosed and ordered sold, with the decree framed so that each parcel is directed to be sold separately so that from time of judgment, the amount necessary to redeem the lien on each parcel is known. *See id.* at 559.The defective judgment prejudiced the defendant's right to redemption. *See id.*

Similarly, Texcon's failure to obtain a jury finding for each separate tract under each of the liens prejudices Myrad and Fountainhead's right to redemption in the event of foreclosure. The trial court may not enter an order foreclosing a mechanic's and materialman's lien without a determination of the amount of indebtedness for improvements applicable to each separate tract.

Texcon further argues the trial court could have apportioned the $75,000.00 jury award among the three liens on a pro-rata basis. *See Gill Sav. Ass'n v. International Supply Co.,* 759 S.W.2d 697, 700 (Tex.App.-Dallas 1988, writ denied).*Gill Sav. Ass'n* is distinguishable from this case. The issue in that case was whether a lien affidavit, which stated an amount in excess of the amount reconciled by the time of trial, was in substantial compliance with the statute. *See id.*Texcon's eighth point of error is overruled.

In its ninth point of error, Texcon asserts the trial court erred in determining that Texcon's Cypress Meadow and Hidden Hollow liens were untimely filed. Because of our disposition of Texcon's eighth point of error, it is not necessary to for us to address this point.

### VI. Exclusion of Evidence

In its tenth point of error, Texcon claims the trial court erred in excluding the testimony of a witness. The admission or exclusion of evidence rests within the sound discretion of the trial court. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). To obtain reversal of a

judgment based upon error in the admission or exclusion of evidence, the appellant must show (1) the trial court did in fact commit error, and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX.R.APP.P. 44.1; *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). The appellant must show the judgment turns on the particular excluded or admitted evidence. *See Alvarado,* 897 S.W.2d at 753-54.

**\*14** Texcon proffered its expert witness, A.P. Boyd, who was designated for matters relating to construction methods, to testify about prior dealings he had had with Myrad on a different subdivision construction project. Myrad and Fountainhead objected on the basis that Texcon was trying to show conformity with a prior act. *See* TEX.R.EVID. 404(b). [9] The trial court sustained the objection. Texcon contends such evidence is admissible to establish intent for fraud and exemplary damages.

In the bill of exception, Boyd testified the city inspector had told him it was too wet to shoot the base. Bensimon, however, ordered Boyd to prime the streets and told him he would "accept the responsibility" for it. After priming the streets, it rained, washing the prime into a creek. The city ordered Boyd's company to clean up the oil spoil. After signing a full lien release, Boyd invoiced Myrad $800 for the cleanup.

We find that Boyd's testimony was intended to show that Myrad was acting in conformity with prior conduct. Therefore, it was not relevant to the issue of intent in Texcon's claims for fraud and exemplary damages. The trial court did not err in excluding Boyd's testimony. Texcon's tenth point of error is overruled.

## VII. Attorney's Fees

In its sixth point of error, Texcon claims the trial court erred in awarding attorney's fees to Myrad and Fountainhead. First, Texcon argues Myrad and Fountainhead are not entitled to attorney's fees because they should not have prevailed on their claims. As already determined, Myrad prevailed on its claim for breach of the Cat Hollow contract and Myrad and Fountainhead both prevailed on their claims for declaratory judgment that Texcon's liens are invalid and unenforceable. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997) (providing attorney's fees to party prevailing on breach of contract claim); TEX.CIV.PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997) (providing for attorney's fees in declaratory judgment proceeding).

Second, Texcon asserts the trial court erred in awarding attorney's fees based on the testimony of Myrad and Fountainhead's expert, Cully Lipsey. Lipsey, Myrad and Fountainhead's original attorney on this case, testified that a reasonable hourly rate is $150.00 to $200.00. He testified to overall reasonable fees as follows: $100,000.00 for trial and trial preparation; $5,000.00 to

$10,000.00 for appeal to the court of appeals; $3,000.00 for writ of error to the Texas Supreme Court; and $2,000.00 to $3,000.00 if writ is granted.

**\*15** Texcon objected to Lipsey's testimony on the basis that his opinions and mental impressions had not been disclosed in response to Texcon's interrogatories. In their response to Texcon's interrogatories, Myrad and Fountainhead stated Lipsey would "testify regarding reasonableness of liquidated damages and attorneys [sic] fees."Texcon argues Lipsey's testimony should have been excluded under Rule 215(5) of the Texas Rules of Civil Procedure, which provides for the automatic exclusion of evidence for failure to respond to or supplement a response to a request for discovery in the absence of good cause. *See*TEX.R.CIV.P. 215(5); *see also Stern v. State ex rel. Ansel,* 869 S.W.2d 614, 627-28 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Texcon contends that if Lipsey's testimony had been excluded, there would have been no basis on which the trial court could take judicial notice of Myrad and Fountainhead's attorney's fees.

When the issue of attorney's fees is left to the trial court rather than the jury, the court may determine a reasonable fee for legal services based upon its knowledge of usual and customary rates and its review of the file, even if no other evidence is offered. *See Long Trusts v. Atlantic Richfield Co.,* 893 S.W.2d 686, 687 (Tex.App.-Texarkana 1995, no writ); *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex.App.-Houston [14th Dist.] 1993, no writ); *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 626 (Tex.App.-Dallas 1987, writ denied). The court may take judicial notice of the contents of its file with or without the request of a party. *See*TEX.R.EVID. 201(c). Even if the trial court does not state that it took judicial notice of reasonable attorney's fees, the appellate court may presume the trial court took judicial notice of reasonable attorney's fees. *See Ross v. 3D Tower Ltd.,* 824 S.W.2d 270, 273 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

A trial court's award of attorney's fees will not be disturbed absent an abuse of discretion. *See id.*The test for whether the trial court has abused its discretion is whether it acted without reference to any guiding rules and principles, that is, whether the court's action was arbitrary or unreasonable. *See Long Trusts,* 893 S.W.2d at 688.

Here, the parties agreed to try the issue of Myrad and Fountainhead's attorney's fees to the trial court. The court's judgment does not reflect that it relied on Lipsey's testimony. The trial court was entitled to take judicial notice of its file and determine reasonable fees based on its knowledge of usual and customary rates without any testimony or other evidence. Moreover, even though there is no indication of whether the trial court took judicial notice of its file, we shall presume it did. We cannot say the trial court abused its discretion in its awarding attorney's fees to Myrad and Fountainhead.

**\*16** Texcon also argues Myrad and Fountainhead had a duty to segregate its attorney's fees by claims. Generally, the party seeking attorney's fees must segregate the fees incurred for claims

under which fees are recoverable from those for which attorney's fees are not recoverable. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10-11 (Tex.1991). In such a case as this, where the claims are dependent upon the same set of facts or circumstances and, therefore, are so intertwined to be inseparable, Myrad and Fountainhead were not required to segregate their attorney's fees for each claim and may recover their fees for all their claims. *See id.* at 11. [10] Texcon's sixth point of error is overruled.

## Prejudgment Interest

In its eleventh point of error, Texcon contends the trial court erred in calculating prejudgment interest. The court awarded prejudgment interest at a rate of six percent. The court, however, entered amounts for prejudgment interest equal to the damage award plus interest. This appears to be a clerical error. When the trial court errs in calculating the judgment, this court has the authority to reform the judgment. *See GXG, Inc. v. Texacal Oil & Gas,* 977 S.W.2d 403, 423 (Tex.App.-Corpus Christi 1998, pet. denied); *H.J. Thywissen Corp. v. Cron,* 781 S.W.2d 682, 687 (Tex.App.-Houston [1st Dist.] 1989, writ denied). We therefore reform the judgment to reflect the actual amount of prejudgment interest on the $29,500.00 liquidated damages award and the modified $5,000.00 award for the cost of obtaining the letter of credit, rather than the actual awards combined with their respective prejudgment interest. Texcon's eleventh point of error is sustained.

## VIII. Cross-Points

In four cross-points, Myrad and Fountainhead challenge the submission of jury questions regarding their alleged breach of any oral or written contract with Texcon, the jury's finding that they breached any oral or written contract with Texcon, and the award of damages to Texcon for such breach. Texcon asserts that Myrad and Fountainhead have waived each point by requesting that the trial court enter judgment on the jury's findings on their breach.

If a party files a motion for the trial court to enter judgment on the verdict, and the trial court enters that judgment, the party cannot challenge the judgment on appeal *Casu v. Marathon Ref. Co.,* 896 S.W.2d 388, 389 (Tex.App.-Houston [1st Dist.] 1995, writ denied). This is a variation of the invited error doctrine which prohibits a party from complaining on appeal about an error which it invited. *See Morse v. Delgado,* 975 S.W.2d 378, 381 (Tex.App.-Waco 1998, no pet.).

**\*17** Myrad and Fountainhead filed a motion for partial judgment on the verdict, in which they requested that the trial court accept the jury's findings that Texcon had breached the Cat Hollow contract, that Myrad was entitled to damages, and that they did not commit fraud against Texcon.

In its judgment, the trial court stated that "having considered the above-referenced motions, and the arguments of counsel, [it] is of the opinion that the motions should be granted."In addition to ordering Myrad and Fountainhead's relief, the trial court ordered Texcon's recovery: "IT IS FURTHER ORDERED that the Defendant, Texcon General Contractors, A Division of CDS Enterprises d/b/a Texcon have and recover from Plaintiffs the sum of Seventy Five Thousand Dollars ($75,000.00)." The final page of the judgment contains signature lines for all trial counsel for "APPROVED AS TO FORM." However, none of the trial counsel signed as approving the form of the judgment.

Myrad and Fountainhead specifically asked the trial court to enter judgment on specific jury findings favorable to them and on other recovery which they had specifically requested. At no time did they request the trial court to enter judgment on the jury's verdict that they had breached any oral or written contract with Texcon. We do not find that Myrad and Fountainhead waived their right to challenge that portion of the judgment entered in favor of Texcon.

In their first cross-point, Myrad and Fountainhead claim the trial court erred in submitting Questions Nos. 5 and 6 regarding breach of an oral contract because (1) they were multifarious and (2) there was no evidence of any oral contract. [11] Myrad and Fountainhead first argue Question No. 5 was multifarious. A review of the record establishes that Myrad and Fountainhead failed to object to the submission of this question on that basis. Therefore, Myrad and Fountainhead have failed to preserve error on this complaint. *See*TEX.R.APP.P. 33.1.

Next, Myrad and Fountainhead do not dispute that they made verbal requests of Texcon for extra work not included in the written contracts and that Texcon was paid for any work done pursuant to verbal requests. [12] Instead, they assert there is no evidence that they orally requested Texcon to do the work covered by the invoices upon which Texcon sues or that they agreed to pay Texcon for such work. Texcon maintains that the evidence establishes several implied contracts.

**\*18** To be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). The difference between an express contract and one implied in fact is the character and manner of proof required to establish them. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972). In each instance, the element of mutual assent must be shown, which, in the case of an implied contract, is inferred from the circumstances. *See id.*Any conduct of one party, from which the other party may reasonably draw the inference of a promise, is effective in law as such. *See id.* at 609-10.

Because Myrad and Fountainhead have brought a no evidence point of error, we may only consider the evidence and inferences supporting the existence of any oral contracts, and must disregard all evidence to the contrary. *See ACS, Inv., Inc.,* 943 S.W.2d at 430. Therefore, under this point

of error, we shall not consider any evidence Myrad and Fountainhead have cited which does not support the submission of an issue on the existence of any oral agreements.

Myrad and Fountainhead assert the only evidence of the existence of any oral agreement was from a conversation between Smith and Bensimon prior to signing the Cat Hollow contract. Smith testified that he told Bensimon that he was concerned about another contractor doing the curb and gutter work and how that would affect or delay Texcon's performance of the Cat Hollow contract. Smith further testified that Bensimon promised there would be no delay and if there were a problem, Myrad would take care of it.

Texcon claims there is evidence sufficient to support the existence of several oral agreements, which are implied in fact. With regard to the Cat Hollow contract, Smith and Arnold testified that Texcon was ultimately responsible for constructing reinforced concrete sidewalks and recessed storm sewer inlets, even though these structures were deleted from the Cat Hollow contract and other contractors had started working on them. Texcon performed this work pursuant to oral agreements with Myrad. Smith further testified that the late invoices for labor and services furnished at Cat Hollow included idle time and the inexperience of the curb and gutter contractor resulting in Texcon's having to be on the job to assure drainage and protection for the subgrade, was work performed pursuant to verbal agreements, and that Texas was not paid.

With regard to Cypress Meadow, Smith testified that work for relocating and lowering a gas line, which was installed on Fountainhead's property, and for relocating water and sewer service markers, which were destroyed by the street contractor, was performed in accordance with oral agreements and the invoices for this work were not paid. Smith also testified that Texcon has not been paid for work done in repairing utility ditch lines, which was done pursuant to a verbal agreement.

**\*19** Moreover, in support of its claim that the oral contracts were implied in fact, Texcon relies on *Buxani v. Nussbaum,* 940 S.W.2d 350 (Tex.App.-San Antonio 1997, no writ). In that case, a contractor was hired to do a remodeling job. *See id.* at 351.During the course of remodeling, the owners orally requested extra work from the contractor, which was performed. *See id.*When, the contractor presented the owners with an itemized statement of the additional work performed, the owners refused payment. *See id.*On appeal, the owners challenged the trial court's finding of mutual assent. The court of appeals found mutual assent based on the parties' conduct: (1) the owners assented to the terms of the oral agreement through their conduct, and (2) the owners allowed the items to be installed and services to be performed without objecting to anything until the time for payment arrived. *See id.* at 352.Mutual assent was also found in the contractor's testimony that he told the owners there would be an additional charge for the extra items and that the owners agreed to pay for the extra work. *See id.* at 352-53.

Similarly, mutual assent can be based upon Myrad and Fountainhead's allowing work to be performed on their property without objecting. Even if price is lacking, a reasonable price can be implied when all other elements of a contract have been met. *See id.* at 353 (citing *Bendalin v. Delgado,* 406 S.W.2d 897, 900 (Tex.1966)). We find there is more than a scintilla of evidence to support the existence of oral contracts for additional work. Myrad and Fountainhead's first cross-point is overruled.

In their second cross-point, Myrad and Fountainhead challenge the legal and factual sufficiency of the evidence to support the jury's verdict that they had breached any oral or written contract with Texcon. We shall consider the evidence discussed in the previous cross-point. Additionally, in our factual sufficiency review, we shall consider evidence contrary to the jury's finding that there was a breach. *See Cain,* 709 S.W.2d at 176.

Myrad and Fountainhead argue that any unpaid invoices contain charges for delay time or remedial work not compensable under the terms of the written contracts. Also, pursuant to the written contracts, Texcon was to bill on a monthly basis for the work performed during the prior month, regardless of whether such work was done under the written contract or for extra work. Smith testified that he followed this procedure.

On the Cat Hollow contract, Smith testified that he did not submit the invoices to Myrad for work done under any oral agreements until after he had accepted the retainage because he "had mixed emotions about what to do with them. And then there were circumstances that arose afterwards that helped [him] make up [his] mind."Myrad contends delay and idle time are specifically prohibited under the Cat Hollow contract. Bensimon testified that he did not agree to pay Texcon for any idle time.

 **\*20** Texcon submitted invoices for work it claims was performed under the written Cat Hollow contract related to trench safety, laying pipe, and excavation, which was done in July and August 1994. Myrad refused payment of these invoices when they were originally submitted. Texcon again submitted these invoice in April 1995, with its request for retainage. Debbie Keating, the project engineer, rejected these invoices for payment. Bensimon stated that these invoices were not paid because Myrad disagreed with the requested amounts.

With respect to the invoice for repairing ditch lines in Cypress Meadow, Texcon prepared this invoice on April 28, 1995, even though this work apparently started in January. Texcon completed Cypress Meadow on April 14, 1995. Fountainhead asserts that there is no evidence that Fountainhead agreed to pay for this work. Mike McClure, the project engineer, testified that this was remedial work for which Texcon was responsible without further compensation under the written contract. Smith testified that the written contract does not provide for extra compensation for repairing ditch lines.

With respect to the invoices for relocating and lowering a gas line, which was installed on Fountainhead's property, and for relocating water and sewer service markers, which were destroyed by the street contractor, these were not line items under the written contract. Fountainhead contends there is no evidence that Texcon was asked to do this work or why Texcon would have to redo this work when it was the fault of another contractor or the gas company.

The only invoice under the written contract regarding Cypress Meadow is for unpaid retainage in the amount of $30,510.00, which was included in the original amount of the lien. With respect to Hidden Hollow, Texcon introduced five invoices totaling $30,092.50 for work under the written contract. There is no dispute that Texcon was not paid the balance for these invoices, but Fountainhead asserts Texcon failed to complete timely Hidden Hollow and was entitled to liquidated damages. The jury, however, did not find that Texcon had breached the Springbrook contract and we have found the trial court erred in granting Fountainhead's motion for JNOV.

We cannot say the jury's finding that Myrad or Fountainhead breached any oral or written contract is so against the great and weight and preponderance of evidence as to be manifestly unjust or wrong. *See Pool,* 715 S.W.2d at 635. The jury, as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, was entitled to discount the testimony of any witness. *See Skrepnek,* 889 S.W.2d at 579. Myrad and Fountainhead's second cross-point is overruled.

In their third cross-point, Myrad and Fountainhead argue that even if there is evidence of their breach of any contract with Texcon, there is no evidence or factually insufficient evidence of damages in the amount of $75,000.00; therefore, the trial court erred in entering judgment against them for $75,000.00.

**\*21** The total amount of allegedly unpaid invoices which Texcon sought in the three liens was $121,120.36. Under the written Cat Hollow contract, Texcon claims $8,341.00 in unpaid work and $59,001.75 under its oral agreements with Myrad. Texcon submitted an invoice for $30,510 for unpaid retainage on Cypress Meadow and $25,380.50 for unpaid work done pursuant to oral agreements. The original amount of the lien on Cypress Meadow was $55,890.50, but Texcon filed a partial release for $32,205.39, leaving a net lien of $23,685.11. On Hidden Hollow, Texcon submitted five invoices for unpaid work performed under the written contract totaling $30,092.50, the amount of the Hidden Hollow lien. Smith testified to loss of interest income of $27,500.00 and loss for interest on loans of $72,689.00.

Considering the amount of damages sought by Texcon and the amount which the jury ultimately awarded, it is clear that the jury did not find that Texcon was entitled to recovery on every claim. It is clear, however, that the $75,000.00 award is supported by the evidence. While it is not clear how the jury arrived at this amount, it is within the jury's discretion to award damages within a

range of evidence presented at trial. *See Howell Crude Oil Co. v. Donna Ref. Partners, Ltd.,* 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Myrad and Fountainhead's third cross-point is overruled.

In its fourth cross-point, Myrad and Fountainhead contend the trial court erred in entering judgment against it because jury's findings were not sufficient to support the judgment. Because of the disjunctive form of the questions, it cannot be ascertained from the jury's finding whether it was Myrad or Fountainhead that was in breach of contract. Moreover, the judgment does not specify whether Texcon is to recover from Myrad, Fountainhead, or both.

They argue the trial court did not have the proper specific findings upon which to enter a sufficiently definite and certain judgment. A judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it should provide a definite means of ascertaining such rights, to the end that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated. *See Stewart v. USA Custom Paint & Body Shop, Inc.,* 870 S.W.2d 18, 20 (Tex.1994).

In a case from another court of appeals, a similar argument was addressed: *i.e.,* that the liability of multiple defendants could not be determined from the jury's answer's to disjunctive questions and, thus, the trial court had no basis upon which to render a proper judgment. *See J & C Drilling Co. v. Salaiz,* 866 S.W.2d 632, 640 (Tex.App.-San Antonio 1993, no writ). The *J & C Drilling* court noted that the appellants had properly preserved error in their supplemental motion for judgment notwithstanding the verdict and motion for new trial. *See id.*A review of the record reveals that Myrad and Fountainhead failed to raise this complaint in the trial court in either its motion for new trial, motion to modify, correct or reform the judgment, or motion to disregard the jury verdict. Instead, they asserted it for the first time on appeal. Having waived this complaint for appellate review, Myrad and Fountainhead's fourth cross-point is overruled.

## IX. Conclusion

**\*22** We affirm the judgment with respect to liquidated damages for Texcon's breach of the Cat Hollow contract, Myrad and Fountainhead's attorney's fees, and damages for Myrad and Fountainhead's breach of oral contract. The judgment awarding Myrad $10,000.00 for the cost of obtaining a bond is modified to $5,000.00 and the prejudgment interest on the $29,500.00 award for liquidated damages is modified to reflect the actual amount of prejudgment interest rather the award for liquidated damages combined with prejudgment interest. As modified, the judgment is affirmed. Finally, that portion of the judgment awarding Fountainhead liquidated damages for breach of the Springbrook contract is reversed and it is rendered that Fountainhead take nothing on its claim that Texcon breached the Springbrook contract.

## Footnotes

\*     Senior Justice Ross A. Sears sitting by assignment.

1     Texcon also asserts Myrad's damages were capable of estimation because they should be calculated as the rental value during the delay in the same way damages are calculated for the delayed construction of a building. *See Muller v. Light,* 538 S.W.2d 487, 488 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.); *Ryan v. Thurmond,* 481 S.W.2d 199, 206 (Tex.Civ.App.-Corpus Christi 1972, writ ref'd n.r.e.). This comparison between a finished building and improved land is inapposite. In any event, Texcon failed to introduce any evidence of the rental value of the improved lots. *See Murphy,* 923 S.W.2d at 966; *Johnson Eng'rs, Inc.,* 582 S.W.2d at 557; *Robinson,* 553 S.W.2d at 637.

2     Because Texcon challenges a jury finding upon which Myrad had the burden of proof, we will use the "no evidence" standard of review. When reviewing a challenge to the legal sufficiency of evidence, *i.e.,* a "no evidence" point of error, the reviewing court may consider only the evidence and inferences that support the challenged finding and should disregard all evidence and inferences to the contrary. *See ACS Inv., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges merely go to the weight of the evidence. *See Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). The court may sustain a no evidence point of error if: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). There is some evidence when the proof supplies a reasonable basis upon which reasonable minds could reach different conclusions about the existence of a vital fact. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

3     A letter of credit is the third contract in a set of three independent contracts. The first contract is the agreement between the parties to the underlying obligation, or the contract between the obligor and obligee. The second contract is ordinarily between the bank or the issuer and the obligor, which precipitates the issuance of the letter of credit. The third contract, or letter of credit, is a contract between the issuer and the beneficiary providing that the issuer will make payment to the beneficiary upon the presentation of a draft and certain documents, a documentary draft, or upon the presentation of a draft, a clean letter. *See AIG Risk Management, Inc. v. Motel 6 Operating, L.P.,* 960 S.W.2d 301, 307 n. 1 (Tex.App.-Corpus Christi 1997, no pet.)(citing *Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth,* 578 S.W.2d 109, 112 (Tex.1978)).

4     Fountain claims Texcon was to complete Hidden Hollow in 60 days and Cypress Meadow in 210 days. Texcon maintains that had 210 days to complete all work under the Springbrook contract, including Hidden Hollow, and therefore, it completed its work in a timely manner. For the disposition of this point of error, we need not determine this provision of the Springbrook contract.

5     We find this argument dispositive of the other arguments contained in this point of error. Texcon also argues (1) the liquidated damages clause is an unenforceable penalty, and (2) the contract provided Texcon with 210 days to substantially complete the Springbrook contract, which included both Cypress Meadow and Hidden Hollow and, therefore, there was no breach because Hidden Hollow was completed timely.

6     Fountainhead asserts that Texcon does not challenge the trial court's granting of the JNOV, but only challenges the enforcement of the liquidated damages clause on the basis of the jury's finding of no breach. To the contrary, we find Texcon's challenge to the trial court's award of liquidated damages to Fountainhead a challenge to the JNOV.

7     Myrad and Fountainhead filed a special exception to Texcon's first amended counterclaim on May 2, 1996. Attempting to address the special exception, Texcon filed a second amended counterclaim on May 6, 1996. At a hearing on May 10, 1996, Myrad and Fountainhead asked the trial court to consider their special exception to the first amended counterclaim. The court, however, ordered them to refile their special exception. They did not refile their special exception, but instead, on the first day of trial, asked the trial court to rule on the previously tendered special exception. Texcon reminded the court of what had transpired at the previous hearing and argued that they should have amended their special exception to address the second amended counterclaim. Myrad and Fountainhead acknowledged that Texcon had repleaded in response to their special exception, but argued Texcon still had not alleged facts to support a claim for constructive fraud.

8     Texcon filed three liens: (1) on Cat Hollow for $67,342.75, (2) on Cypress Meadow for $55,890.50, and (3) on Hidden Hollow for $30,092.50. Texcon filed a partial release on the Cypress Meadow lien in the amount of $32,205.39, with $23,685.11 remaining on that claim.

9     Rule 404(b) states:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,....
>
> TEX.R.EVID. 404(b).

Our reversal of Fountainhead's award of liquidated damages under the Springbrook contract does not affect this result.

Question No. 5 asked:

> Did Myrad or Fountainhead breach any oral or written agreement with Texcon and proximately cause damage to Texcon?

Question No. 6 asked:

> What sum of money if paid now in cash would fairly and reasonably compensate Texcon for its damages, if any, from the breach you have found in Question No. 5.

Citing to the Texas Pattern Jury Charges, Myrad and Fountainhead argue Texcon failed to obtain a jury question on the existence of an oral agreement. *See* COMM. ON PATTERN CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 101.1 (1997). The comment also provides that in broad from submission, the issues of existence and breach may be combined. *See id.*

---

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (6)

### Direct History (2)

⚑ 1. Myrad Real Estate Inc. v. Texcon General Contractors
1996 WL 34444704 , Tex.Dist. , Nov. 05, 1996

*Reversed in Part, Modified in Part by*

2. CDS Enterprises, Inc. v. Myrad Real Estate, Inc. 👓
1999 WL 548226 , Tex.App.-Hous. (14 Dist.) , July 29, 1999

### Related References (4)

3. Myrad Real Estate, Inc v. CDS Enterprises, Inc.
1996 WL 34444707 , Tex.Dist. , May 13, 1996

4. Myrad Real Estate, Inc. v. CDS Enterprises, Inc.
1996 WL 34444705 , Tex.Dist. , May 15, 1996

5. Myrad Real Estate, Inc. v. CDS Enterprises, Inc.
1996 WL 34444706 , Tex.Dist. , Aug. 16, 1996

6. Myrad Real Estate, Inc. v. Cds Enterprises, Inc.
1997 WL 34673003 , Tex.Dist. , May 05, 1997

2008 WL 2986379
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (14th Dist.).

Chiu Moon CHAN and Ella Y. Chan, Appellants
v.
MONTEBELLO DEVELOPMENT COMPANY,
L.P. and Stewart Title Company, Appellees.

No. 14-06-00936-CV. | July 31, 2008.

On Appeal from the 151st District Court, Harris County, Texas, Trial Court Cause No.2005-73439.

**Attorneys and Law Firms**

Eric G. Carter, O. Kyler Carter, for Appellants.

George R. Gibson, Thomas Michael Ballases, Seth Adam Miller, for Appellees.

Panel consists of Justices FOWLER, FROST, and Senior Justice PRICE. [*]

**MEMORANDUM OPINION**

WANDA McKEE FOWLER, Justice.

**\*1** In this case, the buyers of a residential high-rise condominium signed a purchase contract with the seller and deposited their earnest money with a title company. However, the buyers did not close on the property as provided in the purchase contract, and, at the seller's instruction, the title company transferred the buyers' earnest money to the seller. The buyers, Chiu Moon Chan and Ella Y. Chan, later sued the seller, Montebello Development Company, L.P. ("Montebello") and the title company, Stewart Title Company ("Stewart Title"), for the return of their earnest money. The trial court granted summary judgment in favor of Montebello and Stewart Title, and declared that the purchase contract was terminated and Montebello was entitled to keep the earnest money as liquidated damages under the purchase contract.

In eight issues on appeal, the Chans contend that the trial court erred by: (1) granting summary judgment on the appellees' declaratory judgment action; (2) determining that the amount of the earnest money, $92,000, was an accurate estimate of actual damages; (3) granting summary judgment when the purchase contract was void for lack of mutuality of obligation; (4) granting summary judgment in favor of Montebello on all of the Chans' claims for affirmative relief; (5) granting summary judgment in favor of Stewart Title on all of the Chans' claims for affirmative relief; (6) awarding attorneys fees of $20,000 because the award is inequitable and unjust; (7) failing to exclude the affidavit of George Gibson as evidence in support of the attorney's fee award; and (8) failing to exclude the affidavit of Jeanette Harris as summary judgment evidence.

For the reasons stated below, we affirm.

**Factual and Procedural Background**

Montebello is the owner and developer of the Montebello Condominium, a thirty-story residential condominium building located in Uptown Park in Houston, Texas. In February 2002, Montebello and the Chans entered into a Purchase Contract (the "Contract") for the sale and purchase of a condominium unit on the twenty-third floor of the building for a total purchase price of $920,000. As provided in the Contract, the Chans deposited earnest money, defined in the purchase contract as the "Initial Payment," of $92,000 with Stewart Title. The Chans had negotiated the Initial Payment down from twenty percent to ten percent of the total purchase price. Ultimately, however, the Chans failed to close on the unit, and Stewart Title delivered the Initial Payment to Montebello.

In November 2005, the Chans sued Montebello and Stewart Title to recover the Initial Payment, asserting claims of unjust enrichment, breach of contract, and tortious interference with contract against Montebello. The Chans alleged conversion and negligence against both Montebello and Stewart Title, and as to Stewart Title only, the Chans alleged promissory estoppel, fraud, negligent misrepresentation, and breach of fiduciary duty. The Chans sought actual and punitive damages, and attorney's fees. [1] Montebello and Stewart Title answered, and Montebello also filed a counterclaim asserting breach of contract and requesting a declaratory judgment that it was entitled to the Initial Payment as liquidated damages under the Contract. Montebello requested attorney's fees as provided in the Contract and under the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM.CODE § 37.009. The Chans answered and alleged as affirmative defenses fraud, misrepresentation, waiver, mistake, failure to mitigate, non-occurrence of conditions precedent, and denial of pre-judgment interest.

**\*2** Montebello and Stewart Title moved for summary judgment against all of the Chans' claims and sought a declaration that, as a matter of law, the Contract was terminated and Montebello was entitled to the Initial Payment as liquidated damages. Among other things, Montebello asserted that it substantially completed the construction of the unit, but the Chans did not comply with the

Contract's obligations, including scheduling a final walk-through inspection and timely closing on the property. Appellees also asserted that Stewart Title properly delivered the Initial Payment to Montebello in accordance with the Contract. The Chans responded and objected to Montebello and Stewart Title's summary judgment proof, [2] but they did not deny that they failed to comply with their obligations under the Contract to purchase the unit. Instead, they asserted that, after entering into the Contract, they encountered financial difficulties and requested a refund of the Initial Payment, and they also offered to reimburse Montebello for an "agreed amount of reasonable actual damages." However, Montebello refused to refund any amount of the Initial Payment. The Chans further asserted that the contractual provision permitting Montebello to retain the Initial Payment in the event of the purchaser's default was unreasonable and an unenforceable penalty.

After the parties submitted additional briefing, the trial court entered a judgment in favor of Montebello and Stewart Title. In the judgment, dated September 27, 2006, the trial court declared that the Contract was terminated and Montebello was entitled to keep the Initial Payment as liquidated damages under the Contract, and awarded attorney's fees of $20,000 to Montebello and additional attorney's fees of $7,500 if an appeal is filed in the court of appeals and $7,500 if a petition for review is filed in the Texas Supreme Court. The trial court included in the judgment language demonstrating that it expressly intended to dispose of all parties and claims and that the judgment was final. [3] This appeal followed.

**Analysis of the Chans' Issues**

**I. Is the Liquidated Damages Provision an Unenforceable Penalty?**
In their first two issues, the Chans contend that the trial court erred in granting summary judgment on Montebello's claim for declaratory judgment and awarding it the $92,000 Initial Payment as liquidated damages under the Contract, because the amount is excessive and constitutes an illegal penalty. [4] We disagree.

**B. The Contract Provision at Issue**
The Contract provided for liquidated damages in the event of default by the purchaser in the following provision:

> In the event of any default by Purchaser under this Contract, Seller may (i) terminate this Contract, in which event the Initial Payment shall be delivered to Seller as liquidated damages and not as a penalty because of the uncertainty and difficulty of ascertaining and measuring Seller's actual damages, and neither Purchaser nor Seller shall have any further rights or obligations under this

Contract, (ii) enforce specific performance of this Contract, or (iii) seek damages or any other available remedies.

## B. The Applicable Law

**\*3** The test for determining whether a provision is valid and enforceable as liquidated damages is (1) if the damages for the prospective breach of the contract are difficult to measure; and (2) the stipulated damages are a reasonable estimate of actual damages. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (citing *Rio Grand Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 240, 342 n. 2 (Tex.1979)); *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ); *Naylor v. Siegler,* 613 S.W.2d 546, 547 (Tex.Civ.App.-Fort Worth 1981, no writ). Generally, the question of whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court and is to be determined as of the time when the contract was executed. *See Phillips,* 820 S.W.2d at 788; *Zucht v. Stewart Title Guar. Co.,* 207 S.W.2d 414, 418 (Tex.Civ.App.-San Antonio 1947, writ dism'd); *Bourland v. Huffhines,* 244 S.W. 847, 849 (Tex.Civ.App.-Amarillo 1922, writ dism'd w.o.j.).

In determining whether a provision is for a penalty or for liquidated damages, the intention of the parties should govern. *Zucht,* 207 S.W.2d at 418. Merely designating a provision as one for "liquidated damages" will not prevent the court from holding that the provision is in fact a penalty; however, when it clearly appears from the terms of the contract that it was the intention of the parties that the sum stated should be treated as providing for liquidated damages, this intention will be enforced. *Elliott v. Henck,* 223 S.W.2d 292, 295 (Tex.Civ.App.-Galveston 1949, writ ref'd n.r.e.).

The burden is on the party asserting the defense of penalty to demonstrate that the contractual provision is an unenforceable penalty rather than an enforceable liquidated damages provision. *See Fluid Concepts, Inc. v. DA Dallas Apartments Ltd. P'ship,* 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005, no pet.); *Johnson Eng'rs, Inc. v. Tri-County Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.-Texarkana 1979, no writ); *Tri-Cities Constr., Inc. v. Am. Nat'l Ins. Co.,* 523 S.W.2d 426, 428 (Tex.Civ.App.-Houston [1st Dist.] 1975, no writ). In order to meet this burden, the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum. *Johnson Eng'rs, Inc.,* 582 S.W.2d at 557. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages must be declared a penalty and recovery limited to the actual damages proven.*Id.*

Texas courts have consistently held that damages for breach of a contract to buy or sell real estate are " 'uncertain and not easily estimated with accuracy.' " *Thanksgiving Tower Partners v. Anros Thanksgiving Partners,* 64 F.3d 227, 232 (5th Cir.1995) (citing *Enclave, Inc. v. Resolution*

*Trust Corp.,* 986 F.2d 131, 134(5th Cir.1993) (quoting *Zucht,* 207 S.W.2d at 419)). For example, in *Zucht,* the court explained: "It has been held, time and again, that a provision for liquidated damages in a contract for the sale and purchase of real estate is proper as being a transaction in which the damages for the breach thereof are uncertain and not easily estimated with accuracy." *Zucht,* 207 S.W.2d at 419 (collecting cases). Texas courts have recognized that often "[i]t is impossible to forecast the damages which might flow to the seller of real property in the event of breach of the contract by the purchasers," because "[r]eal property has a fluctuating value" and "[t]here is no way to ascertain at any given time what the value of a particular tract of real property might be in the future." *Naylor,* 613 S.W.2d at 547.

### C. The Liquidated Damages Provision is Not an Unenforceable Penalty

**\*4** In support of their contention that the Contract's liquidated damages provision is an unenforceable penalty, the Chans stress the following language from *Phillips:*

> The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule.

*Phillips,* 820 S.W.2d at 788. Consequently, the Chans argue the trial court erred because it "never inquired into the evidence of actual injuries to attempt to do justice between the parties," and as a result, Montebello received a windfall. *See id.*(noting that, although the question whether a contractual provision is enforceable is a question of law, sometimes factual issues must be resolved before the legal question can be decided).

The Chans, relying on a 2006 property tax record from the Harris County Appraisal District, assert that information concerning Montebello's actual damages was readily available. However, evidence that a property sold at a later date for the same price, or even at a profit, is no evidence that a provision is an unreasonable stipulation as to contemplated damages. *Zucht,* 207 S.W.2d at 419; *Thanksgiving Tower Partners,* 64 F.3d at 232-33;*see also Baker,* 812 S.W.2d at 55 ("Evidence related to the difficulty of estimation and the reasonable forecast must be viewed as of the time the contract was executed."). The Chans also speculate that Montebello must possess other information that would show actual damages, such as "financial information with respect to the construction and occupancy of the property" and "marketing allowances for each Unit." However, they submitted no evidence of any such information in response to the motion for summary judgment. [5] The Chans further speculate as to the type of actual damages that would be incurred by Montebello, such as "remarketing expenses" and "depreciation expense," and conclude that the

amount of $92,000 is "such a bad estimate of damages, that Montebello reaped a windfall profit off of the misfortune" of the Chans, but cite no evidence or authorities in support of this conclusion.

Moreover, the primary authorities the Chans do cite are distinguishable. First, in *Phillips,* the Texas Supreme Court considered a contractual provision in which one party agreed to pay the other party as liquidated damages ten times the actual damages. *See Phillips,* 820 S.W.2d at 787, 789. The Court determined that such a provision involved no fact issues, as it could not meet either part of the test for an enforceable liquidated damages provision. *Id.* at 789. The Chans also cite *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005), to support their contention that the trial court erred because the amount of liquidated damages, $92,000, was excessive. In that case, the Court was asked, on certified questions from the Fifth Circuit, to construe certain statutes applying to contracts for deed. *Id.* at 428. The Court noted that, while an amount stipulated in advance as an acceptable measure of damages may be either an enforceable liquidated damages provision or an unenforceable penalty under the common law, the same "does not always hold true for statutes." *Id.* at 431. Consequently, the Court determined that a statutory "liquidated damages" provision for noncompliance, when invoked, was penal in nature. *Id.* at 433. Here, in contrast, the contractual provision at issue is in no way comparable to the provision at issue in *Phillips* or the statutes considered in *Flores,* and so neither case supports the Chans' claim.

 **\*5**  The Chans also complain that Montebello has offered no legal authority or extrinsic evidence to support its assertion that damages would be impossible to ascertain or that the liquidated damages amount was a reasonable estimate of actual damages. However, as the party asserting the affirmative defense of penalty, the burden was on the Chans, not Montebello, to demonstrate that the Contract's liquidated damages provision was an unenforceable penalty. *See, e.g., Fluid Concepts, Inc.,* 159 S.W.3d at 231; *Johnson Eng'rs, Inc.,* 582 S.W.2d at 557; *Tri-Cities Constr., Inc.,* 523 S.W.2d at 428.

The Chans, as the party with the burden to prove their affirmative defense of penalty, cite no authorities to contradict the longstanding recognition that damages for the breach of a contract to buy or sell real estate are uncertain and not easily estimated. *See, e.g., Thanksgiving Tower Partners,* 64 F.3d at 232; *Zucht,* 207 S.W.2d at 419; *Naylor,* 613 S.W.2d at 547. Further, the Chans agreed to the liquidated damages provision, which clearly provides that, in the event of the Chans' default, the Initial Payment shall be delivered to Montebello "as liquidated damages and not as a penalty" because of "the uncertainty and difficulty of ascertaining and measuring" Montebello's actual damages. The provision plainly reflects the intent of the parties to provide for liquidated damages in the amount of the Initial Payment. *See Elliott,* 223 S.W.2d at 295 (holding that terms of agreement to purchase beach-front property plainly expressed the parties' intention that the earnest money constituted liquidated damages and stating that "[h]ere the amount of the damages that would be sustained by the seller by a breach was uncertain in the same sense that the amount of the damages for a breach of a contract for the sale of real estate is generally uncertain.").

Moreover, the Chans negotiated the amount of the Initial Payment down from twenty percent of the purchase price of the unit to ten percent, further limiting their liability under the provision. The negotiated amount of earnest money, $92,000, or ten percent of the total purchase price of $920,000, is a reasonable amount of liquidated damages in a real estate transaction such as this one. *See Ashton v. Bennett,* 503 S.W.2d 392, 394-95 (Tex.Civ.App.-Waco 1974, writ ref'd n.r.e.) (upholding liquidated damages provision entitling seller to approximately sixteen percent of purchase price); *Thanksgiving Tower Partners,* 64 F.3d at 232 (holding that $5 million was a reasonable liquidated damage amount despite an internal memorandum stating that the anticipated damages were only $1.4 million); *see also Aguiar v. Segal,* 167 S.W.3d 443, 455-56 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (holding that buyers' failure to close within agreed time constituted a breach of earnest money contracts and sellers were entitled to terminate contracts and recover earnest money as liquidated damages). Consequently, given the information before it, there was no need for the trial court to resolve additional factual issues before rendering its decision.

**\*6** Therefore, we agree with the trial court's conclusion that, as a matter of law, the Contract's provision was an enforceable liquidated damages provision rather than an unenforceable penalty. We overrule the Chans' first two issues.

## II. Is the Contract Void for Lack of Mutuality of Obligation?

In their third issue, the Chans contend that the trial court erred in granting summary judgment because the Contract is void for lack of mutuality of obligation. According to the Chans, under the Contract, Montebello was under no obligation to actually provide a unit to them because the Contract specifically states that Montebello would not "warranty the completion of the Unit on any given date."Again, we disagree.

### A. The Contract Provision at Issue

The provision the Chans rely on is the following:

7. *Construction Schedule/Effects of Building Activities.* the Unit is or will be constructed in accordance with plans and specifications for the Unit to be prepared by Ziegler Cooper Architects (the "*Plans and Specifications*") based on the preliminary plans and specifications prepared by Ziegler Cooper Architects dated January 9, 2001, more particularly described on *Exhibit "D "* attached hereto (the "*Preliminary Plans*"), subject to normal and acceptable tolerances and pursuant to standard building practices found in residential construction in Houston, Harris County, Texas. The Preliminary Plans are located in Seller's offices. Purchaser acknowledge that all drawings and plans constituting the Preliminary Plans are not the final construction drawings for construction of the Property or the Unit and that refinements may be

made thereto. Furthermore, the construction of the Unit is also subject to any changes in the Preliminary Plans and the Plans and Specifications, materials, fixtures or methods that may be required by federal, state or local governmental authority, and other refinements, amendments and adjustments to the Plans and Specifications by Seller that do not affect the fair market value of the Property or the Unit. Seller reserves the right to substitute materials, fixtures or equipment of equal or better quality. **In constructing the Unit, Seller shall employ its normal construction schedule, and does not therefore warrant the completion of the Unit on any given date. Accordingly, Seller shall not be liable to Purchaser for any damages resulting from Seller's inability or failure to complete the Unit except for those provided for in Paragraph 17 of the Contract.**[ ] Purchaser recognizes that the construction of the Condominium imposes an inherent risk to the health of trees presently located on the Property and hereby acknowledges that Seller cannot guarantee the viability of those trees.

(emphasis added). Paragraph 17 provides in relevant part that:

> In the event that Seller is unable to obtain suitable construction financing, or should any dispute arise between Seller and Purchase prior to Closing concerning construction of the Unit **or any other matter relating to the interpretation of this Contract,** the Seller shall have the right, upon written notice to the Purchaser, to terminate this Contract. In the event of such termination by Seller, Seller shall cause the Title Company to return the Initial Payment to Purchaser in full satisfaction of Purchaser's relief hereunder; **no claims or causes of action shall accrue on behalf of Purchaser; and neither Purchaser nor Seller shall have any further rights or obligations under this Contract.**

**\*7** (emphasis in bold added). Thus, the Chans contend that, under the Contract, Montebello had no duty to provide anything whatsoever to them, and, therefore, the Contract is illusory as a matter of law. [6]

**B. The Applicable Law**

Contracts are valid if there is consideration on each side. *See Air Am. Jet Charter Inc. v. Lawhon,* 93 S.W.3d 441, 444 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (citing *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 409 (Tex.1997) (stating contract "must be based upon a valid consideration, in other words, mutuality of obligation")). Consideration consists of a benefit to the promisor or a detriment to the promisee. *N. Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 607 (Tex.1998). There is no requirement that the consideration on each side be the same. *Air Am. Jet Charter Inc.,* 93 S.W.3d at 444 (citing *N. Natural Gas Co. .,* 986 S.W.2d at 607-08). Texas courts generally construe contracts in favor of mutuality of obligation. *Tex. Gas Utils. Co. v. Barrett,* 460 S.W.2d 409, 412 (Tex.1970); *Young v. Neatherlin,* 102 S.W.3d 415, 420 (Tex.App.-Houston

[14th Dist.] 2003, no pet.). A contract that lacks consideration lacks mutuality of obligation and is unenforceable. *See Tex. Gas Utils. Co.,* 460 S.W.2d at 412.

## C. The Contract is Not Void For Lack of Mutuality of Obligation

We do not construe the language of the provision to reflect a lack of mutuality of obligation as the Chans contend. The provision the Chans rely on is included in a section concerning the construction schedule for the Montebello condominium, which was not completed at the time the Contract was executed. This provision is intended to recognize the myriad of factors that can affect the construction process and to provide flexibility to Montebello rather than to obligate it to complete the construction on a specific date or risk breaching the contract. It does not mean that Montebello has no obligation to perform at all. Montebello agreed to sell a specific condominium unit and the Chans agreed to purchase the unit. As a result, Montebello removed the unit from the market and was thereafter precluded from entertaining other offers for it. Montebello also was required to sell the unit to the Chans at the specified sales price, which the Chans agreed to pay. Therefore, we conclude that the Contract is not void for lack of mutuality. We overrule the Chans' third issue.

## III. Did the Trial Court Err in Granting Summary Judgment in Favor of Montebello on All of the Chans' Claims for Affirmative Relief?

In their fourth issue, the Chans contend that the trial court erred in granting summary judgment in favor of Montebello on all of their claims for affirmative relief. Specifically, the Chans assert that Montebello did not demonstrate it was entitled to summary judgment as a matter of law because there are fact issues regarding their affirmative claims of unjust enrichment, breach of contract, conversion, negligence, and intentional interference with contract, which the Chans pleaded in their petition.

**\*8** To prevail on a traditional motion for summary judgment, the movant must show that there is no genuine issue as to any material fact and that it entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc., v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678-79 (Tex.1979). Declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. *Lidawi v. Progressive County Mut. Ins. Co.,* 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

Here, the Chans do not dispute that they failed to purchase the condominium unit as they were obligated to do under the Contract with Montebello, and do not dispute that Montebello was entitled to some measure of damages as a result. The only dispute between the Chans and Montebello was whether the Contract's liquidated damages provision was enforceable. We have already held that the liquidated damages provision was enforceable, and that Montebello was therefore entitled to keep the Initial Payment. All of the Chans' claims against Montebello were premised upon Montebello's allegedly wrongful retention of the Initial Payment. Therefore, Montebello demonstrated that, as a matter of law, it was entitled to summary judgment, and the burden then shifted to the Chans to raise a genuine issue of material fact sufficient to defeat summary judgment. However, although the Chans pleaded the affirmative claims they identify in their petition, they did not assert any of them in response to appellees' motion for summary judgment, and they point to no summary judgment evidence raising a fact issue on the claims.

We therefore overrule the Chans' fourth issue.

### IV. Did the Trial Court Err in Granting Summary Judgment in Favor of Stewart Title on All of the Chans' Claims for Affirmative Relief?

In their fifth issue, the Chans contend that, although Stewart Title was a party to the motion for summary judgment, the motion did not address the Chans' claims against Stewart Title, which were different than the claims against Montebello. Specifically, the Chans assert that their claims against Stewart Title were based upon an "Earnest Money Receipt" provided to the Chans, which stated that the Chans' earnest money would not be dispersed unless all parties agreed. [7] Despite this representation, the Chans contend, Stewart Title paid the earnest money (the Initial Payment) to Montebello. The Chans asserted claims against Stewart Title for conversion, negligence, promissory estoppel, fraud, negligent misrepresentation, and breach of fiduciary duty [8] based on these alleged facts.

 **\*9** The Chans' argument in this issue is the same as that made in the previous issue against Montebello. The Chans assert that fact issues were raised on each of their claims against Stewart Title precluding summary judgment in its favor. However, the Chans did not raise these claims in response to appellees' summary judgment motion or present any evidence to demonstrate that a genuine issue of material fact existed. Moreover, in appellees' motion for summary judgment, appellees showed that, in response to Montebello's instruction, Stewart Title delivered the Initial Payment to Montebello in accordance with paragraph 2(d) of the Contract, which provided that "the Title Company shall cause the Initial Payment to be delivered promptly to whichever party shall become entitled thereto pursuant to the terms of this Contract and without further approval from either party."

As we have previously discussed, the trial court correctly found that Montebello was entitled to keep the Initial Payment as liquidated damages under the Contract. Further, appellees demonstrated that, under the Contract, the Chans agreed that Stewart Title was to deliver the Initial Payment to Montebello "without further approval from either party."Thus, the trial court could have correctly concluded that Stewart Title properly delivered the Initial Payment to Montebello. At that point, the burden shifted to the Chans to raise a genuine issue of material fact on their claims against Stewart Title, all of which were based on the allegedly wrongful delivery of the Initial Payment to Montebello without the Chans' consent. In the Chans' response to appellees' motion for summary judgment, they attached a copy of the Earnest Money Receipt and discussed it in their recitation of the facts, but they did not make any legal argument concerning the document or argue that paragraph 2(d) of the Contract did not apply. Moreover, the Chans did not assert any of their claims in response to appellees' motion for summary judgment, and, other than the "Earnest Money Receipt," they point to no summary judgment evidence raising a fact issue on the claims.

We therefore overrule the Chans' fifth issue.

## V. Did the Trial Court Abuse Its Discretion in Awarding Attorney's Fees and Considering Attorney's Affidavit Concerning Fees?

In their sixth issue, the Chans contend that the award of attorney's fees is inequitable and unjust under the Declaratory Judgments Act. *See*TEX. CIV. PRAC. & REM.CODE § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). In their seventh issue, they contend that the trial court erred in failing to sustain their objections to the affidavit of George Gibson in support of the attorney's fees. The Chans brief these issues together, and so we will consider them together.

First, the Chans argue that it is fundamentally inequitable and unjust that Montebello, "who hasn't sustained any actual damages, and has already been awarded $92,000, should be awarded an additional $20,000 attorneys fees."The Chans complain that, "for whatever reason [the Chans] did not close, they attempted to negotiate the release of the contract," but Montebello took advantage of them and pushed forward with the scheduling of the walk through and closing with the specific intent of obtaining the earnest money. The crux of the Chans' argument appears to be that, even though Montebello prevailed on its claim that it was entitled to keep the liquidated damages as provided in the Contract (and agreed to by the Chans), Montebello is not entitled to attorney's fees to compensate it for being required to litigate the issue, because it allegedly did not incur actual damages. The Chans cite no evidence or authorities to support this argument; therefore, we do not consider it. *See*TEX.R.APP. P. 38.1(h); *Sunnyside Feedyard, L.C. v. Metro. Life Ins. Co.,* 106 S.W.3d 169, 173 (Tex.App.-Amarillo 2003, no pet.)("Failure to either cite authority or advance substantive analysis waives the issue on appeal."). Moreover, Montebello also sought reasonable

attorney's fees as provided under the Contract, [9] and the Chans do not challenge this alternative basis for the award.

**\*10** Next, the Chans contend that the trial court should have sustained the Chans' objections to the affidavit of George Gibson, one of appellees' attorneys, in support of the attorney's fees, and not considered it in determining the amount of attorney's fees to award. [10] The Chans argue that the affidavit is conclusory because the amounts requested are unreasonable, the affidavit does not reflect how much time was spent on the case, and statements concerning anticipated fees for appeal and post-judgment motions and other actions are speculative and "not readily controvertible." *See* TEX.R. CIV. P. 166a(c) ("A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."); *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997) (same). We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Owens-Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). We likewise review the allowance of attorney's fees for abuse of discretion. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990).

As the Texas Supreme Court explained in *Montiel,* the mere fact that an affidavit is self-serving does not necessarily make the evidence an improper basis for summary judgment. *See Montiel,* 949 S.W.2d at 310. Further, whether the evidence contained in an affidavit "could have been readily controverted" does not mean that the summary judgment evidence could have been easily and conveniently rebutted, but rather indicates that the testimony could have been effectively countered by opposing evidence. *Id.* The trial court, as fact finder, may award attorney's fees as a matter of law based on the uncontradicted testimony of an interested witness, "especially when the opposing party has the means and opportunity of disproving the testimony or evidence and fails to do so." *Ragsdale,* 801 S.W.2d at 882.

As one of appellees' attorneys, Gibson averred that he was licensed to practice in Texas and had previously represented clients in connection with commercial litigation in Harris County, he was familiar with the fees customarily charged by attorneys in Harris county for handling similar suits, and was familiar with the attorneys' services normally required for the proper prosecution of lawsuits like the present one. Gibson identified and listed the specific legal services performed in connection with the prosecution of the lawsuit, and opined that additional hours of his time would be necessary for post-judgment motions and to enforce the judgment. He further opined that, taking into consideration the complexity of the case, the legal questions involved, and the time involved, a reasonable attorney's fee for the legal services rendered to Montebello would be $20,000. Finally, he opined that a reasonable additional attorney's fee for an appeal to the court of

appeals would be $10,000, and if "an application for writ of error" is filed in the Texas Supreme Court, a reasonable additional attorney's fee would be $10,000. [11]

**\*11** The averments in Gibson's affidavit were sufficiently clear and could have been readily controverted. In response, the Chans asserted their objections, but offered no opposing affidavits or other contradicting evidence to challenge Gibson's opinions concerning the attorney's fees incurred or to be incurred, and whether or not they were reasonable or necessary. Therefore, we cannot say the trial court abused its discretion to the extent it considered Gibson's affidavit in awarding attorney's fees to Montebello. We overrule the Chans' sixth and seventh issues.

### VI. Did the Trial Court Err in Granting Summary Judgment by Failing to Exclude the Affidavit of Jeanette Harris?

Lastly, in their eighth issue, the Chans contend that the trial court erred in granting summary judgment by failing to exclude the affidavit of Jeanette Harris, an employee of The Interfin Companies LP, a partner of Montebello. Appellees submitted Harris's affidavit to support the merits of their motion for summary judgment. In her affidavit, Harris made statements concerning Montebello's substantial completion of the unit and its performance of all work and obligations under the contract, the Chans' failure to respond to Montebello's attempt to contact the Chans, the Chans' failure to contact Montebello to schedule a specific time for or attend the closing, and the parties' rights and obligations under the Contract. The Chans contend that these statements are merely factual and/or legal conclusions, no extrinsic evidence was offered to support them, and they cannot be readily controverted. [12]

Harris averred that she was an employee of The Interfin Companies LP, a partner of Montebello, and that the facts stated in her affidavit were within her personal knowledge and were true and correct. Her factual statements were supported by documents and correspondence attached to appellees' motion for summary judgment, which she referenced in her affidavit, and which reflected that Harris either sent the document, was the recipient of the document, or was copied on the document. Moreover, although the Chans submitted the affidavit of Mrs. Chan in response to the motion for summary judgment, Mrs. Chan did not contradict any of the factual statements Harris made concerning Montebello's substantial completion of the unit, the Chans' failure to communicate with Montebello concerning scheduling, or the Chans' failure to attend the closing. Thus, we cannot say that the trial court erred to the extent that it may have considered the factual statements that could have been controverted by the Chans, but were not.

Although some of Harris's statements concerning the legal effect of the Contract, such as her assertion that Montebello was entitled to recover its reasonable attorney's fees and court costs in accordance with the Contract, constituted legal conclusions, nothing in the record demonstrates that the trial court considered any conclusory statements or based its decision on them. Moreover,

even if we assume the trial court considered any conclusory statements, because the Chans did not deny that they failed to close on the unit as they were obligated to do under the Contract, many, if not all, of those statements are unnecessary to the trial court's decision. We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex.2000); *Owens-Corning Fiberglas Corp.,* 972 S.W.2d at 43; TEX.R.APP. P. 44.1(a). The complaining party must usually show that the whole case turned on the evidence at issue. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753-54 (Tex.1995). The Chans have not demonstrated how the complained-of statements in the affidavit, if considered by the trial court, probably caused the rendition of an improper judgment. Therefore, we overrule the Chans' eighth issue.

## Conclusion

**\*12** We overrule the Chans' issue and affirm the trial court's judgment.

## Footnotes

\*   Senior Justice Frank C. Price sitting by assignment.

1   The Chans also asserted that they were entitled to arbitration under the Contract, but arbitration is not an issue in this appeal.

2   The record does not reflect that the trial court ruled on the Chans' objections to the summary judgment proof. Additionally, although it appears the trial court held a hearing on the motion for summary judgment, no reporter's record of the hearing is included in the record.

3   The language indicating finality was as follows:

> It is further
> ORDERED that Defendants are granted judgment in their favor as to all claims and cause of actions by Chiu Moon Chan and Ella Y. Chan, and Chiu Moon Chan and Ella Y. Chan shall take nothing by their claims and cause of actions in this case. It is further
> ORDERED that Defendants shall be entitled to all writs and processes necessary to enforce this judgment. It is further
> ORDERED that all other relief not specifically granted herein is denied and that this is a final appealable judgment.

4   As an initial matter, appellees assert that, because penalty is an affirmative defense and the Chans failed to plead it, the issue is waived. However, the Chans raised the issue of penalty in its response to appellees' motion for summary judgment and in supplemental responses in opposition to the motion. We therefore conclude the issue is preserved for appeal. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.,* 20 S.W.3d 692, 699 (Tex.2000) (raising affirmative defense in response to motion for summary judgment preserved issue for appeal). Moreover, the record does not reflect that appellees objected to the lack of formal pleading in their responses or otherwise. Unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex.1991) (applying rules of error preservation and trial by consent to issues raised in summary judgment).

5   In their response, the Chans incorporated by reference a motion to compel and motions to continue the hearing on appellees' motion for summary judgment, and argued that Montebello's failure to respond to their discovery requests denied them the opportunity to fully present summary judgment evidence to support their claims and defenses. However, the referenced motions do not appear in the record, and the Chans do not argue on appeal that the trial court erred by failing to compel any discovery or failing to grant a continuance.

6   Appellees contend that the Chans failed to preserve this issue for appeal because they did not raise this issue in their response to appellees' motion for summary judgment. However, the Chans did raise the issue in a supplemental response filed before the trial court ruled on the motion, and appellees did not object to it. Therefore, under the facts of this case, we conclude the Chans preserved the issue for appeal. *See* TEX.R. CIV. P. 166a(c).

7   The relevant portion of the document entitled "Earnest Money Receipt" provides as follows: "Notwithstanding any terms of the Contract, Stewart Title does not agree to pay any portion of the Earnest Money to anyone unless uniform written authority to do so is given by all parties to the Contract." It is signed only by a representative of Stewart Title.

In this issue, the Chans also contend that they sued Stewart Title for breach of contract, but the breach of contract claim in the Chans' original petition-the only petition of theirs in the record-is directed only to Montebello.

The Contract provided as follows: "If either party employs an attorney or attorneys to enforce the terms of this Contract, either by arbitration, litigation or negotiation, the losing party agrees to reimburse the prevailing party for reasonable attorneys' fees, arbitration fees, court costs and expenses incurred."Montebello pleaded for attorney's fees under the Contract and the Declaratory Judgments Act, and sought attorney's fees in the motion for summary judgment under the Contract and Texas Civil Practice and Remedies Code sections 38.001 and 37.009.

The record does not reflect that the trial court ruled on the Chans' objections. We do not presume that objections to summary judgment evidence were overruled when a trial court grants a summary judgment.*Seidner v. Citibank (S.D.) N.A.,* 201 S.W.3d 332, 335 n. 2 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). But an objection to the substance of a summary judgment affidavit, rather than a defect in the form, is not waived by failure to obtain a ruling from the trial court on the objection. *See, e.g., Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997) ( "Conclusory statements by an expert are insufficient to support or defeat summary judgment.").

We note that the trial court awarded the lesser amounts of $7,500 for additional attorney's fees in its judgment.

The Chans also argue that Harris does not explain how she has personal knowledge to make several of the statements in her affidavit. However, the Chans did not obtain a ruling on their objections to Harris's affidavit. An objection that an affidavit is not based on personal knowledge is one of form. *See Hou-Tex, Inc. v. Landmark Graphics,* 26 S.W.3d 103, 112 n. 9 (Tex.App.-Houston [14th Dist.] 2000, no pet.)("Whether an affiant has personal knowledge and is competent are objections to form."). Thus, the Chans have waived any complaint of lack of personal knowledge on appeal. *See id.*

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (2)

## Direct History (2)

1. Chan v. Montebello Development Co., LP
2006 WL 5541009 , Tex.Dist. , July 20, 2006

*Judgment Affirmed by*

2. Chan v. Montebello Development Co. 👓
2008 WL 2986379 , Tex.App.-Hous. (14 Dist.) , July 31, 2008 , review denied ( Dec 05, 2008 )

2013 WL 2645720
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

Cathy CHARBONNET and Ernest Charbonnet, Appellants
v.
Farouk SHAMI, Individually; Farouk Systems, Inc. d/b/a Farouk Systems Group; Armstrong McCall, Inc.; Armstrong McCall Holdings, Inc.; Armstrong McCall Management, L.C.; and Andrew Guerra, Appellees.

No. 04–12–00711–CV.  |  June 12, 2013.

From the 98th District Court, Travis County, Texas, Trial Court No. D–1–GN–11–001136; Tim M. Sulak, Judge.

**Attorneys and Law Firms**

Mark T. Murray, John Stevenson & Associates, Houston, TX, for Appellants.

David E. Chamberlain, Austin, TX, Andrew George Jubinsky, Dallas, TX, for Appellees.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice, REBECA C. MARTINEZ, Justice.

**MEMORANDUM OPINION**

Opinion by CATHERINE STONE, Chief Justice.

**\*1** This is an appeal of a summary judgment in a suit for personal injury damages sustained by Cathy Charbonnet. Cathy and her husband, Ernest, appeal the trial court's entry of a summary judgment in favor of Appellees. The appeal largely focuses on the validity and effect of a release of liability signed by Cathy. We affirm the summary judgment.

## BACKGROUND

Cathy attended a hair show in Mississippi hosted by Appellees for the purpose of having her hair styled by her regular stylist. After arriving at the location, Cathy was told that her stylist would not be able to style her hair, so she agreed to let Andrew Guerra, one of the Appellees, style her hair.

Cathy did not model in the show but, instead, sat backstage while her hair was being colored and styled. While sitting backstage, a representative of Appellees requested permission to use photographs of Cathy for marketing purposes. Cathy was asked to sign a document granting Appellees permission to use her photograph and releasing them from liability for future claims arising from their services or products. According to Cathy, she was informed that the form she signed permitted use of her photograph, but she was never told she was also releasing Appellees from future liability.

The coloring and treatment products were applied to Cathy's hair at approximately 8:45 a.m. and removed at approximately 2:00 p.m. During that time period, multiple individuals worked with Cathy's hair, sometimes with lengthy intervals between activity. When Cathy expressed concern about the amount of time the chemicals had been on her hair and scalp, she was assured the chemicals had not been on her hair too long. Around 2:00 p.m., the chemicals were washed out of Cathy's hair.

When Cathy awoke the next morning, she noticed that her hair was beginning to fall out. Within a few weeks, Cathy lost all of the hair on her body. Cathy was diagnosed with *alopecia areata universalis,* which is a medical condition that causes rapid loss of all hair on one's body. There is no treatment for the condition, and it is likely permanent. It is alleged that Cathy's condition manifested as a result of her prolonged exposure to the chemicals used by Appellees.

In April of 2011, the Charbonnets filed suit against Appellees. Cathy and Mr. Guerra were deposed in February of 2012. In April of 2012, Appellees filed motions for summary judgment. After a hearing on the motions, the trial court granted summary judgment in favor of Appellees. The Charbonnets then filed a motion for new trial, and it was overruled by operation of law.

## THE RELEASE

### A. *Standard of Review*

Appellate courts review the grant of summary judgment de novo. *Exxon Corp. v. Emerald Oil & Gas Co.,* 331 S.W.3d 419, 422 (Tex.2010); *Lesieur v. Fryar,* 325 S.W.3d 242, 246 (Tex.App.- San Antonio 2010, pet. denied). In a traditional motion for summary judgment, the movant must

show "there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law ."*Browning v. Prostok,* 165 S.W.3d 336, 344 (Tex.2005). If the trial court does not state the grounds for its ruling, we will affirm the summary judgment if any of the grounds presented in the motion are meritorious. *Id.;State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency ($90,235),* 390 S.W.3d 289, 292 (Tex.2013)."A defendant moving for summary judgment on an affirmative defense has the burden to conclusively establish that defense."*Havlen v. McDougall,* 22 S.W.3d 343, 345 (Tex.2000); *Fields v. Klatt Hardware & Lumber, Inc.,* 374 S.W.3d 543, 545–46 (Tex.App.-San Antonio 2012, no pet.). When reviewing the grant of a traditional motion for summary judgment, "we take as true all competent evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor."*Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005); *Lesieur,* 325 S.W.3d at 246.

### B. Did the Release Provide Fair Notice?

**\*2**  In their second point of error, the Charbonnets claim the trial court erred in granting Appellees' motions for summary judgment because there are fact issues concerning whether the release signed by Cathy provided fair notice that she was releasing Appellees from liability for their own negligence. The Texas Supreme Court has developed fair-notice requirements that must be met when parties attempt to exculpate themselves, in advance, from liability for their own negligence. *Dresser Indus., Inc. v. Page Petroleum, Inc. .,* 853 S.W.2d 505, 508 (Tex.1993). A party has provided fair notice of a release from future liability when its release complies with the express negligence doctrine and is conspicuous. *Id.* at 508; *Tamez v. Sw. Motor Transp., Inc.,* 155 S.W.3d 564, 569 (Tex.App.-San Antonio 2004, no pet.). Whether a release of liability fulfills the requirements of fair notice is a question of law for the court. *Dresser,* 853 S.W.2d at 509. Thus, a release that does not satisfy both fair notice requirements is unenforceable as a matter of law. *Storage & Processors, Inc. v. Reyes,* 134 S.W.3d 190, 192 (Tex.2004).

The Charbonnets argue only that the release in this case was not conspicuous; therefore we will not consider whether the release satisfies the express negligence doctrine. A release of future liability is conspicuous when it draws the attention of a reasonable person looking at the face of the document such that the person ought to notice it. TEX. BUS. & COM.CODE ANN. § 1.201(b)(10) (West 2009); *Dresser,* 853 S.W.2d at 508, 511 (defining conspicuousness as it is defined in the Texas Business and Commerce Code). When determining whether a release is conspicuous, we consider whether the release is set off by a heading in capital letters and in a different size, type, font, or color than the surrounding text. TEX. BUS. & COM.CODE ANN. § 1.201(b)(10)(A); *see also Dresser,* 853 S.W.2d at 510–11. We also examine whether the language in the body of the release is in a different size, type, font, or color from the surrounding text, or whether it is "set off from the surrounding text of the same size by symbols or marks that call attention to the language."TEX. BUS. & COM.CODE ANN. § 1.201(b)(10)(B); *Littlefield v. Schaefer,* 955 S.W.2d 272, 274–75 (Tex.1997). Further, releases are often conspicuous when the entire document containing the

release is a single page and the language of the release appears on the front side of the page and not "hidden under a separate heading or surrounded by unrelated terms."*Dresser,* 853 S.W.2d at 510 (citing *Enserch Corp. v. Parker,* 794 S.W.2d 2, 9 (Tex.1990)).*But see Littlefield,* 955 S.W.2d at 274 (holding that the release was not conspicuous, despite the fact that release was the only writing on a single-page document, when the text of the release was so small that it was illegible).

As reproduced below, the document releasing Appellees from liability is a single page and contains only two paragraphs on the front side of the page.

*Farouk Systems, Inc.*
*Technical Model's Release and Waiver Form*

ALL MODELS MUST BE AT LEAST 18 YEARS OF AGE.

You Grant Permission to Use Photos
In consideration of the services performed by or on behalf of FAROUK SYSTEMS, INC. and the Farouk Systems Distributors (herein collectively called "Farouk"), I hereby give Farouk and their successors and assigns unrestricted permission to copyright, produce, exhibit, reproduce, use, publish, sell or transfer any photographic pictures of me (whether in motion or still) in conjunction with my own or a fictitious name, for any and all lawful purposes, including without limitation, art, advertising or trade, including the use of any printed matter in conjunction therewith, and I hereby transfer all rights, title and interest, if any, I have in said pictures, negatives, reproductions, and copies; or any use to which they may be applied. This release also applies to finished pictures, finished product, negatives, and reproductions, including any printed matter in conjunction therewith.

YOU RELEASE "FAROUK" FROM LIABILITY
Further, I hereby release and hold harmless Farouk Systems, Inc, Farouk Systems Distributors, their employees and representatives, and their successors and assigns (collectively referenced as "Farouk") for all claims, demands and liabilities that I, my heirs, personal representatives or assigns have, may have or claim to have arising directly or indirectly out of any hair care or beauty services performed on my person or property by Farouk or any products or equipment used in connection with the beauty or hair care services. This release includes but is not limited to claims for personal injury or property damage which is the result of Farouk's negligence, gross negligence, misconduct, product liability and/or strict liability whether or not Farouk's negligence, gross negligence, misconduct, product liability and/or strict liability occurs in the future.

Program or Function: _____ Date: 4-11-09 · 4-12-07 _____
Technician(s): _____

I AM AT LEAST 18 YEARS OLD, HAVE READ AND UNDERSTAND ALL THE PROVISIONS OF THIS RELEASE AND WAIVER, AND I AGREE TO ALL ITS CONTENTS AS EVIDENCED BY MY SIGNATURE BELOW.

| Please Print Name: CATHY CHARBONNET | Mailing Address: 7300 Bullard Ave | Work Phone: (713) 237-0752 |
| Model's Signature: | City/State/Zip: N.O. LA -10124 | Home Phone: ( ) |

**\*3** The document is clearly identified as a release and waiver. The first paragraph grants Appellees permission to use Cathy's photo and the second paragraph releases Farouk, its representatives, its employees, and its distributors [1] from liability. As is evident, the heading of the second paragraph states: "YOU RELEASE 'FAROUK' FROM LIABILITY." This heading is in capital letters, is larger than the heading of the first paragraph, and is in a bold font. The language in the body of the second paragraph is also in a larger font than the language in the body of the first paragraph and is in a bold font, unlike the first paragraph. It also appears the heading and body of the second paragraph are in a different font than the heading and body of the first paragraph. Additionally,

apart from the release paragraph, surrounded by multiple lines of space, and directly above Cathy's signature is a sentence in all capital letters that reads: "I AM AT LEAST 18 YEARS OLD, HAVE READ AND UNDERSTAND ALL THE PROVISIONS OF THIS RELEASE AND WAIVER, AND I AGREE TO ALL ITS CONTENTS AS EVIDENCED BY MY SIGNATURE BELOW."

Relying on *Littlefield v. Schaefer,* the Charbonnets argue that the text in the body of the second paragraph is "nearly illegible" and that "[a]lthough capital letters are present in a few areas of Defendants' document, the capital letters do not effectively contrast one portion of the release from another."Specifically, the Charbonnets point to language in *Littlefield* stating that larger font in the heading of a release is not, alone, sufficient to make the release conspicuous. *Littlefield,* 955 S.W.2d at 275. Although we do not dispute the truth of this general proposition, it must be placed in context. The release in *Littlefield* contained larger headings indicating that the text was a release of liability, but the body of the text was printed in "miniscule typeface" that was smaller than the surrounding text and was placed in the bottom left corner of the document. *Id.* at 274–75.The statement cited by the Charbonnets was explaining that merely using larger headings indicating a release of liability will not suffice when the signatory has no idea what claims he is releasing because the text is too small to read. *Id.* at 275.The release in this case is nothing like the release in *Littlefield.*The release signed by Cathy contained not only a larger heading, but also text of a legible size in a bold font.

The Charbonnets also appear to assert that Cathy was misled about the contents of the document, claiming that she was informed only that the document granted Appellees permission to use her photograph. The Charbonnets never alleged fraud, nor did they point to any authority holding that a less-than-complete or misleading description of a document's contents can defeat a release that provides fair notice of its contents. Thus, any such contention is waived by the Charbonnets. TEX.R.APP. P. 33.1; TEX.R.APP. P. 38.1. Because the document containing the release was only about half of a page in length and contained only two paragraphs, and because the language of the release was legible and distinguished from the surrounding texts in multiple ways, we conclude the release signed by Cathy was sufficiently conspicuous to put a reasonable person on notice of its existence and terms.

### C. Can a Pre–Injury Waiver of Liability Release Appellees from Liability for a Subsequent Misrepresentation?

**\*4** In their fourth appellate point, the Charbonnets argue that a pre-injury waiver of claims cannot release a party from liability for misrepresentations or warranties made after the waiver is signed. The Charbonnets cite no authority supporting their contention that a valid waiver does not operate against future wrongdoings of Appellees. Moreover, since a pre-injury waiver is designed to release a party in advance from liability, future wrongdoings would generally be encompassed within the scope of the waiver. *Dresser,* 853 S.W.2d at 508.

In this case, the Charbonnets released Appellees from any claim "arising directly or indirectly out of any hair or beauty services performed" regardless of whether the conduct giving rise to the claim occurred then or in the future. A release "operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter."*Dresser,* 853 S.W.3d at 508.In light of the existing law on this issue, and in the absence of any contrary authority provided by the Charbonnets, we overrule their fourth appellate issue.

### D. Was the Release Invalid As Against Public Policy to the Extent It Purported to Waive Claims of Gross Negligence?

In their third point of error, the Charbonnets contend Texas public policy prohibits Appellees from obtaining an advance waiver of their liability for gross negligence. Appellees assert that the Charbonnets have not preserved this claim for appellate review because they did not specifically plead gross negligence as a cause of action or raise the issue in their response to Appellees' motions for summary judgment. The Charbonnets argue that their factual allegations put Appellees on notice of their gross-negligence claim and that gross negligence is only negligence of a different degree, not type, so it does not have to be separately pleaded. Assuming, without deciding, the Charbonnets' factual assertions in their pleadings were sufficient to permit proof of gross negligence at trial, the Charbonnets' argument regarding the public policy of prohibiting waiver of gross negligence is not properly preserved for our review.

The purpose of Texas Rule of Civil Procedure 166a(c) is to require motions for summary judgment, responses, and other replies to provide adequate information to the opposing party and to define the issues to be determined for summary judgment. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993)."Issues not expressly presented to the trial court by written motion, answer[,] or other response shall not be considered on appeal as grounds for reversal."TEX.R. CIV. P. 166a(c). After the movant has presented a legally sufficient motion for summary judgment, "the non-movant must expressly present to the trial court, by written answer or response, any issues defeating the movant's entitlement."*McConnell,* 858 S.W.2d at 343 (citing *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979))."[T]hese rules further the policy of seeking clarity and simplicity in summary judgment practice."*Id.* at 341.

 **\*5** Appellees' motions for summary judgment clearly stated that they were premised on the affirmative defense of release of liability. Indeed, Appellees expressly stated that "Plaintiff signed a release that expressly bars any claims against Farouk and its distributor's [for] negligence, gross negligence, misconduct, product liability, or strict liability."This and similar statements gave the Charbonnets notice that Appellees were asserting release of liability as an affirmative defense to any possible claim of gross negligence. As a result, the Charbonnets had an obligation to present in writing any and all reasons why the asserted affirmative defense did not bar their gross negligence claim.

The Charbonnets' response argued that summary judgment was improper because there had not been adequate time for discovery and because the release was not conspicuous. The Charbonnets' response did not, however, present any argument regarding the possible public policy in Texas prohibiting an advance waiver of liability for gross negligence. Thus, this argument was not preserved for our review. TEX.R. CIV. P. 166a(c); *see also Rosen v. National Hot Rod Ass'n,* No. 14–94–00775–CV, 1995 WL 755712, at *6 (Tex.App.-Houston [14th Dist.] Dec. 21, 1995, writ denied) (not designated for publication) (concluding that the appellant's argument that summary judgment was improper because the release was against public policy was not preserved for review because it was not presented to the trial court in the appellant's response).

The Charbonnets presented their public-policy argument for the first time in their motion for new trial. For the reasons explained below, however, the motion for new trial also did not preserve the claim for appellate review. We review a trial court's decision on a motion for new trial for an abuse of discretion. *In re Columbia Med. Ctr. of Las Colinas,* 290 S.W.3d 204, 213 (Tex.2009).

When a motion for new trial is filed after the rendition of summary judgment, "a trial court has the discretion to consider the grounds in a post-judgment motion and supporting proof[,] and reaffirm its summary judgment based on the entire record."TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 7.06[1] (3d ed.2012); *see also Auten v. DJ Clark, Inc.,* 209 S.W.3d 695, 702 (Tex.App.-Houston [14th Dist.] 2006, no pet.). The trial court also has the discretion to simply deny a motion filed after the entry of summary judgment without considering its substance. *First Gibraltar Bank, FSB v. Farley,* 895 S.W.2d 425, 430 (Tex.App.-San Antonio 1995, writ denied). In the latter situation, an appellate court need only consider arguments and evidence presented prior to the summary-judgment hearing. TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 7.06 [1] (3d ed.2012); *see also Laurel v. Herschap,* 5 S.W.3d 799, 802 (Tex.App.-San Antonio 1999, no pet.)."Thus, the efficacy of a post-judgment motion to preserve a complaint for appellate review depends upon whether the trial court affirmatively considers the new grounds and proof as memorialized by a written order."TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 7.06[1] (3d ed.2012) (citing *Auten,* 209 S.W.3d at 701; *Stephens v. Dolcefino,* 126 S.W.3d 120, 133–34 (Tex.App.-Houston [1st Dist.] 2003, pet. denied)).

**\*6** The Charbonnets' motion for new trial was overruled by operation of law. Because the trial court did not sign a new order affirmatively indicating its consideration of the Charbonnets' motion-for-new-trial claims, the Charbonnets' contention that they asserted a claim for gross negligence and that it could not be released under the public policy of Texas was not preserved for appellate review.

## MOTION FOR CONTINUANCE

In their first point of error, the Charbonnets contend the trial court's summary judgment was premature because "there was a substantial amount of discovery yet to be completed."Although Texas Rule of Civil Procedure 166a(i) requires a party to wait until there has been adequate time for discovery before moving for a no-evidence summary judgment, Rule 166a(a) permits a party to file a traditional motion for summary judgment "at any time after the adverse party has appeared or answered."TEX.R. CIV. P. 166a(a), (i); *Reynolds v. Murphy,* 188 S.W.3d 252, 258 n. 8 (Tex.App.-Fort Worth 2006, pet. denied). Furthermore, even if this were an exceptional case where discovery should be permitted before a traditional motion for summary judgment can be granted, we hold that the parties had an adequate opportunity to obtain discovery. *See Reynolds,* 188 S.W.3d at 258 n. 8 (citing *Nelson v. PNC Mortgage Corp.,* 139 S.W.3d 442, 446 (Tex.App.-Dallas 2004, no pet.)) (explaining that a traditional motion for summary judgment may not be appropriately granted in some rare, factually specific cases if there has not been adequate time for discovery).

In order to preserve a claim of inadequate opportunity for discovery, the party requesting additional time must file an affidavit stating its reasons for needing additional discovery or a verified motion for continuance. *Tenneco Inc. v. Enterprise Prods. Co.,* 925 S.W.2d 640, 647 (Tex.1996). Charbonnet preserved her claim by filing a verified motion for continuance that sought more time to obtain depositions of Appellees' corporate representatives and others. This motion was denied by the trial court.

We review a trial court's denial of a motion for continuance for an abuse of discretion. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 161 (Tex.2004); *Tenneco,* 925 S.W.2d at 647. "A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law."*Joe,* 145 S.W.3d at 161. When reviewing a trial court's denial of a motion for continuance seeking additional time for discovery, we consider the following nonexclusive list of factors: (1) how long the suit has been pending; (2) the materiality of and reason for the discovery sought; and (3) whether due diligence has been exercised to obtain the discovery sought. *Id.;City of San Antonio v. En Seguido, Ltd.,* 227 S.W.3d 237, 240 (Tex.App.-San Antonio 2007, no pet.).Rule 166a"does not require that discovery be completed, only that there was adequate time for discovery."*Rankin v. Union Pacific R.R. Co.,* 319 S.W.3d 58, 67 (Tex.App.-San Antonio 2010, no pet.).

**\*7** All three of the factors mentioned above weigh against the Charbonnets. First, the Charbonnets' suit was filed on April 15, 2011, and the first motion for summary judgment was not filed until April 27, 2012. In addition, no hearing on the motions for summary judgment was held until June 25, 2012. Accordingly, the Charbonnets had over a year to conduct discovery. The Charbonnets contend they need additional time for discovery because the last answer to their latest

amended petition was filed only three weeks before the motion for summary judgment was filed. This fact, however, is of little significance. The motions for summary judgment in this case were predicated on the affirmative defense of release of liability, and release of liability was first asserted as a defense to the Charbonnets' claim in an original answer filed on May 13, 2011. Therefore, the Charbonnets had knowledge of and could have sought discovery related to the release for almost a year before the motions for summary judgment were filed.

With regard to the materiality of and reason for needing additional discovery, the Charbonnets provide no specific reason why the additional depositions are material to their case. Instead, the Charbonnets generally assert that they need the deposition of various corporate representatives and "other individuals with knowledge of relevant facts surrounding the putative release."The Charbonnets do not name most of the corporate representatives or "other individuals" they seek to depose, nor do they state what information they expect any of these individuals to provide. SeeTEX.R. CIV. P. 252. Moreover, it is unlikely that any further testimony or evidence would aid the trial court in its decision on Appellees' motions for summary judgment because the validity of a release of liability is a question of law to be decided by the court. Dresser, 853 S.W.2d at 509.

Finally, the Charbonnets have wholly failed to make a showing of due diligence. Although the Charbonnets contend they had an agreement with Appellees that multiple other corporate representatives and witnesses would be produced for depositions, they cite no evidence of such agreement. In contrast, Appellees point to a Rule 11 Agreement made on January 9, 2012 that shows the parties' agreement that Farouk would produce Andrew Guerra for deposition in February. The agreement also reflects Appellees' intention to "file their summary judgment motion on the release and have it set for hearing as soon as possible."Thus, this agreement reflects the Charbonnets' intention to allow the summary-judgment motions to proceed in exchange for the opportunity to depose Guerra.

Based on the length of time the Charbonnets had notice Appellees were asserting the release of liability as an affirmative defense, the vague and general assertions of the need for additional discovery, and the absence of evidence suggesting the exercise of due diligence in obtaining discovery prior to the filing of the motion for summary judgment or the hearing thereon, we conclude the trial court did not abuse its discretion in denying the Charbonnets' motion for continuance.

## CONCLUSION

**\*8** Because the release signed by Cathy was conspicuous and because the Charbonnets had adequate time to obtain discovery, we conclude the trial court did not err in granting summary judgment in favor of Appellees. The Charbonnets' remaining claims were not properly preserved

for appellate review. Accordingly, we overrule the Charbonnets' points of error and affirm the judgment of the trial court.

## Footnotes

1    Armstrong McCall, Inc., Armstrong McCall Holdings, Inc., and Armstrong McCall Management, L.C. (collectively "AMPL") asserts that it is a distributor of Farouk, and the Charbonnets do not challenge the applicability of the waiver to AMPL.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

## Direct History (4)
1. Charbonnet v. Shami
2012 WL 10243769 , Tex.Dist. , June 25, 2012


*Judgment Affirmed by*

2. Charbonnet v. Shami ⌐
2013 WL 2645720 , Tex.App.-San Antonio , June 12, 2013 , review denied ( Nov 22, 2013 )


3. Charbonnet v. Shami
2012 WL 10243770 , Tex.Dist. , June 26, 2012


*Judgment Affirmed by*

4. Charbonnet v. Shami ⌐
2013 WL 2645720 , Tex.App.-San Antonio , June 12, 2013 , review denied ( Nov 22, 2013 )

914 S.W.2d 140
Supreme Court of Texas.

Bill CHENAULT et al., Relators,
v.
The Honorable Tom PHILLIPS, Dan Morales, John T. Adams,
and Martha Whitehead, In Their Official Capacities, Respondents.

No. 95–0865.   |   Jan. 11, 1996.

Attorneys filed original petition in Supreme Court seeking declaration that attorney occupation tax was unconstitutional, injunction against officials responsible for collecting tax, and writs prohibiting enforcement of tax. The Supreme Court held that action to challenge constitutionality of attorney occupation tax was not within original jurisdiction granted to Supreme Court.

Denied.

**Attorneys and Law Firms**

**\*141** Miles H. Appleberry, San Antonio, Roy Beene, Houston, William B. Chenault, III, San Antonio, for Relators.

Dan Morales, David S. Morales, Austin, for Respondents.

**Opinion**

**PER CURIAM.**

In this case we decide whether this Court, in exercising its original jurisdiction, may consider an original petition seeking relief from the Attorney Occupation Tax, Texas Tax Code §§ 191.141–.145. Without reaching the merits, we hold that this action is not within the original jurisdiction granted to this Court by either the Texas Constitution or the Legislature, and deny the motion for leave to file the petition because Relators have an adequate remedy at law.

Bill Chenault, Roy Beene, and Miles Appleberry (Relators) filed an original petition in this Court seeking a declaration that the attorney occupation tax is unconstitutional, an injunction against the officials responsible for collecting the tax, and writs prohibiting enforcement of the tax. [1] Relators, members of the State Bar of Texas, argue that the statute's enforcement provision, which automatically suspends the license of any attorney who does not timely pay the tax, deprives attorneys of their right to a full impartial hearing prior to the imposition of any sanction. Relators

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

further contend that the statute improperly infringes on this Court's inherent power to regulate the legal profession in Texas, and that it violates the separation of powers provision of Article II, section one of the Texas Constitution by delegating the tax collection powers of the executive branch to the judicial branch. Relators argue that this Court has jurisdiction over this original action under Article III of the Texas Constitution, sections 22.001–.002 of the Government Code, and Rules 121 and 122 of the Texas Rules of Appellate Procedure.

**[1]** **[2]** **[3]** This Court's jurisdiction, like that of all Texas courts, is conferred solely by the Texas Constitution and state statutes. We do not have jurisdiction to decide any case absent an express constitutional or statutory grant. *See Pope v. Ferguson,* 445 S.W.2d 950, 952 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970). A request for declaratory relief alone does not establish jurisdiction in this Court. We have held that the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, is not a grant of jurisdiction, but "merely a procedural device for deciding cases already within a court's jurisdiction." *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994); *see also Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). Likewise, we may not consider the merits of Relators' requests for injunctions, writs of prohibition, and other relief under Rules 121 and 122 in a case not otherwise properly before the Court. *See Texas Employers' Ins. Ass'n v. Kirby,* 137 Tex. 106, 152 S.W.2d 1073, 1073 (1941).

**[4]** **[5]** Relators also seek a writ of mandamus. Mandamus is an extraordinary remedy and generally is not available from any court in this state when a party has an adequate legal remedy. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992); *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Relators may file their challenge to the Attorney Occupation Tax in district court and appeal any adverse ruling through the ordinary appellate process. They have not met their burden of showing that pursuing their claims first in the trial court will cause them to suffer any immediate harm that would entitle them to mandamus relief under the *Walker* standard.

**\*142** **[6]** **[7]** Moreover, this Court will not issue an original writ of mandamus absent a "compelling reason." TEX.R.APP.P. 121(a); *LaRouche v. Hannah,* 822 S.W.2d 632, 633–34 (Tex.1992); *Sears v. Bayoud,* 786 S.W.2d 248, 249–50 (Tex.1990). Relators assert as compelling reasons for the invocation of this Court's original jurisdiction the need to protect this Court's role as the ultimate supervisory authority over the State Bar of Texas, the presence of state officers as necessary parties in the suit, and the statewide importance of the issue. None of these proffered jurisdictional bases presents a compelling reason for this Court to exercise its original jurisdiction.

Relators cite *State Bar of Texas v. Gomez,* 891 S.W.2d 243 (Tex.1994), as authority for the relief they seek. In *Gomez,* several indigent litigants brought an action in district court to mandate that the State Bar of Texas or this Court require all Texas attorneys to provide pro bono legal services.

Central to our decision in that case was this Court's exclusive administrative authority to regulate the practice of law in Texas, an authority that "is derived from both statutory and inherent powers." *Id.* at 245. The State Bar, we held, is by itself powerless to address the harm alleged by the indigent litigants, as its authority in this regard is limited to proposing regulations to the Court. We then rejected any attempt to involve the district court in the regulation of the practice of law: "[T]o the extent the remedies are sought against the Supreme Court, they would clearly impinge on the Court's exclusive authority to regulate the practice of law.... No subordinate court in Texas has the power to usurp our authority or responsibility in this area." *Id.* at 246.

Relators interpret this language as this Court's assumption of exclusive original jurisdiction over any action affecting attorneys in Texas. In so doing, they misconstrue our decision in *Gomez.* First, we observed that the Court's inherent powers, such as the power to regulate the bar, are *administrative* powers, not *jurisdictional* powers. *Id.* at 245. We then held that a district court could not impose a new requirement on Texas attorneys because "a district court has no authority to assume this Court's authority to regulate the legal profession." *Id.* at 246. Unlike the plaintiffs in *Gomez,* Relators do not seek imposition of new regulations on lawyers in Texas, but rather challenge the constitutionality of a statute that affects lawyers. Yet, as we noted in *Gomez,* constitutional challenges to rules enacted by this Court must be brought in the district court and heard by this Court in the exercise of its appellate jurisdiction. "Had this Court actually promulgated rules establishing a pro bono program and had Gomez challenged the constitutionality of such rules, the district court would have jurisdiction to decide, in the first instance, whether such rules met constitutional standards.... Such a case would be justiciable because the district court would be capable of rendering a judgment that accords the parties complete relief, subject of course to appellate review." *Id.* at 246. Analogously, Relators must follow the same procedure in challenging the constitutionality of the Attorney Occupation Tax. A litigant may not bring such a claim in the first instance in this Court.

Accordingly, without hearing oral argument, *see* Texas Rule of Appellate Procedure 122, a majority of this Court overrules Relators' motion for leave to file an original petition for writ of mandamus and writs pursuant to Texas Rules of Appellate Procedure 121 and 122.

**Parallel Citations**

39 Tex. Sup. Ct. J. 204

## Footnotes

1    While the enforcement mechanisms for the various statutes differ, at the same time the Legislature imposed the Attorney Occupation Tax, it increased by $200 the fees assessed against numerous other license holders, including the following: physicians, TEX.REV.CIV.STAT.ANN. art. 4495b, §§ 3.10–.11A; dentists, TEX.REV.CIV.STAT.ANN. art. 4550c; optometrists, TEX.REV.CIV.STAT.ANN. art. 4552–3.03B; accountants, TEX.REV.CIV.STAT.ANN. art. 41a–1, § 9A; engineers,

TEX.REV.CIV.STAT.ANN. art. 3271a, § 13B; real estate brokers, TEX.REV.CIV.STAT.ANN. art. 6573a, § 11A; and securities dealers, TEX.REV.CIV.STAT.ANN. art. 581–41. The proceeds of these increases in fees, like the proceeds of the Attorney Occupation Tax, go into the foundation school fund and the general revenue fund. *Id.*

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

679 S.W.2d 721
Court of Appeals of Texas,
Houston (1st Dist.).

COMMUNITY DEVELOPMENT SERVICE, INC.,
d/b/a Champion Equity Corporation, Appellant,
v.
REPLACEMENT PARTS MANUFACTURING, INC., Appellee.

No. 01–84–0092–CV.    |    Oct. 18, 1984.

Vendor brought action against purchaser for breach of land purchase contract. The 268th District Court, Fort Bend County, A. Reagan Clark, J., entered judgment in favor of vendor, and purchaser appealed. The Court of Appeals, Doyle, J., held that: (1) purchaser's obligation to pay taxes and interest subject to purchase contract was not conditioned upon vendor's keeping lots clear of trash and debris; (2) evidence was sufficient to support award of "benefit of the bargain" damages to vendor; (3) liquidated damages provision in contract was unenforceable; and (4) evidence was sufficient to support conclusion that retention of earnest money by vendor did not adequately compensate vendor for harm caused by purchaser's breach.

Affirmed.

**Attorneys and Law Firms**

 **\*722**  Barry G. Flynn, Barry G. Flynn & Associates, Houston, for appellant.

Andrew F. Spalding, Bracewell & Patterson, Houston, for appellee.

Before DOYLE, DUGGAN and LEVY, JJ.

**OPINION**

DOYLE, Justice.

This is an appeal from a judgment awarding appellee damages for breach of contract in the amount of $71,820 actual damages, plus $11,440.60 prejudgment interest.

 **\*723**  On October 6, 1978, appellant, Community Development Service, Inc., d/b/a, Champion Equity Corporation (Champion Equity) entered into a contract with appellee, Replacement Parts

Manufacturing, Inc. (RPM) to purchase 144 residential lots over a three-year period. Title to the lots was to be acquired as each one was "taken down" or closed. Appellant was also required to pay interest to appellee and property taxes on any of the 144 lots for which legal title had not been acquired.

Between October 1978 and October 1980, appellant "took down" only 30 lots. Additionally, appellant stopped making tax and interest payments to appellee. Consequently, in October, 1980 appellee notified appellant that the contract was cancelled. In response thereto, appellant filed suit alleging that appellee had breached his contract by failing to deliver lots with construction of the roads in accordance with the City of Stafford and Federal Housing Authority (FHA) specifications. Appellee filed a counter-claim, alleging that appellant's failure to pay property taxes and interest constituted a material breach of the contract.

The jury found that appellant materially breached the contract and found that appellee suffered damages in the amount of $71,820 based on the lost profits on the non-sale of 114 residential lots.

In its first two points of error, appellant contends that the trial court erred in entering judgment based on the jury's response to special issue numbers 11 and 12 because appellant did not have a contractual obligation to pay property taxes as they accrued or to pay interest to appellee in October 1980. Thus, as a matter of law, such failure did not constitute a material breach of the contract in question.

In response to special issues 11 and 12, the jury specifically found that appellant's failure to pay interest and property taxes as they accrued to appellee in October 1980 constituted a material breach of the contract.

Appellant relies on his contractual interpretation of paragraphs II (b) and (c) of the contract of sale to substantiate his contention. These paragraphs describe the manner in which the purchase price of the lots shall be paid:

(c) The balance of the total purchase price shall be payable to Seller as follows:

(1) The sum of $310,500.00 (representing remaining 90% of lot price multiplied by 30 lots) shall be paid to Seller 60 days after notification to Buyer by Seller, which shall include certification of lot completion, at which time Seller shall convey to Buyer by general warranty deed, insured by owners title policy, good and indefeasible title to Buyer to 30 lots selected by Buyer, and

(4) The sum of $351,900.00 (representing remaining 90% of lot purchase price multiplied by 34 lots) shall be paid to Seller within 1095 days of said notification to Buyer by Seller of lot completion at which time Seller shall convey title as above described to remaining 34 lots.

Provided however, (a) Buyer may at any time tender to Seller $10,350.00 per lot and demand that Seller convey title to lots selected by Buyer and the purchase price of any lots so acquired shall be counted in reduction of the next due installment of Buyer to Seller as above described; (b) Buyer shall pay all taxes as due from the date of lot completion and furnish Seller with copy of said paid tax receipts and (c) Buyer shall pay Seller interest at the rate of 10% per annum on the unpaid balance outstanding, such interest to commence upon the date of lot completion and to be payable quarterly thereafter.

Specifically, the appellant contends for the first time on appeal, that the last paragraph cited above, which describes the appellant's duty to pay taxes and interest to appellee, is part of paragraph II (c).

The contract also provides as follows:

> Provided that the obligations of Seller as enumerated in paragraphs (a)–(f) of Paragraph I on pages 1–2 of this Contract  **\*724**  shall be conditions precedent to the obligations of Buyer as set forth in Paragraphs II(b) and (c) of this Contract with respect to each group of lots to be purchased thereunder.

Appellant urges this court to find that the above contractual language requires the seller (appellee) to fulfill certain "conditions precedent" before the buyer (appellant) will be responsible for payment of taxes and interest as allegedly required in paragraph II (c). Some of the conditions which the seller is required to fulfill are described in paragraph I(a):

Seller agrees to the following:

(a) Seller shall clear the street right-of-way and utility easements within Kingsway, it being understood that (1) any additional clearing shall be done by Buyer at its expense, and (2) Seller shall minimize damage to the trees within Kingsway; (b) each lot or reserve being conveyed shall be free of trash, garbage, or any improvements not contemplated hereby, and except for clearing of trees, be in a condition suitable for commencement of construction of single family detached housing; ...

Appellant claims that because appellee failed to keep each lot free of trash, the appellee had not fulfilled the conditions which activate appellant's responsibility for taxes and interest. The appellee argues that the language does not constitute a condition precedent, but merely a covenant, the breach of which might be a defense to any contract action by appellee against appellant.

 **[1]** **[2]** As a general rule, where neither party has alleged that the contract is vague or ambiguous, the construction of the contract is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex.1968). The court also construes the meaning of contracts where neither party makes allegations specifying the language subject to different interpretation, so that the opposing party is prepared to offer evidence explaining the meaning. *Sale v. Contran Corporation,* 486 S.W.2d 161 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). The court is required to give effect to the intention of the parties as expressed or as it is apparent in the writing. *Pitts v. Ashcraft,* 586 S.W.2d 685 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

 **[3]** In the instant case, reading the contract as a whole and considering the surrounding circumstances, the trial court could have reasonably concluded that the paragraph which contained the language, "Buyer shall pay all taxes as due from the date of lot completion and furnish Seller with copy of said paid tax receipts", was not part of paragraph II (b) and (c) of the contract which set forth the conditions precedent to the obligation of buyer to pay the balance of the purchase price. Instead, the court could have construed the provision as being a written covenant, contained in a separate paragraph.

 **[4]** The passage containing the language starts a new paragraph which introduces an alternative method of purchasing the lots, and outlines the seller's obligation to pay taxes and interest. If the parties had intended this section to be part of paragraph II (c), they could have easily included it numbered as (c)(5) or clearly shown that it was part of (c)(4). Moreover, it is well established that if the intent of the parties is doubtful, or if a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976).

In the case at bar, to hold that the appellee's three-year obligation to make tax and interest payments on the lot was suspended until appellant cleared the occasional debris that accumulated on the lots would impose "an absurd result" particularly in light of the other conditions which suspend tax and interest payments.

Paragraph II(b) provides for payment only upon the completion of the development of 144 lots. Paragraph II(c) provides that the balance of the total purchase price is only payable sixty days after seller notifies **\*725** the buyer by sending certification of lot completion and conveying to buyer a general warranty deed.

The paragraph clearly demonstrates the parties' intention to condition appellant's obligation to pay the balance on the lots on their certification as being complete. Since such intent is not clearly demonstrated in the paragraph requiring the payment of taxes and interest, we find that the appellee's obligation to pay taxes and interest was not part of paragraph II(b) or (c) and was

therefore not conditioned on appellee's keeping the lots clear of trash and debris. Points of error one and two are overruled.

In points of error three, four, and five, appellant contends that the trial court erred in granting judgment in favor of appellee for damages because there was no evidence, or alternatively insufficient evidence of the "benefit of the bargain" or the value of the property at the time appellee knew or should have known of the breach as compared to the value the property should have had at that time.

 **[5]**   Generally, the measure of damages for breach of contract is the amount necessary to place plaintiff in a financial position equal to that which it would have had if the contract had been performed by both parties. *Little Darling Corp. v. Ald, Inc.,* 566 S.W.2d 347 (Tex.Civ.App.— Dallas 1978, no writ). Under this standard, the injured party is compensated only for the damages or loss actually sustained. *North American Corp. v. Allen,* 636 S.W.2d 797 (Tex.App.—Corpus Christi 1982, no writ).

 **[6]**   Lost profits are recoverable under this standard if the evidence shows that the loss of profits was a material and probable consequence of the breach of the act complained of and the amount due is shown with sufficient certainty. *Id.* at 799; *see also Little Darling Corp., supra.*

 **[7]**   Generally, lost profits are properly calculated by deducting the costs of the injured party's performance supported by data from the actual contract price. *Wilfin, Inc. v. Williams,* 615 S.W.2d 242, 244 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). However, a witness may also provide evidence of lost profits by testifying as to what his profit would have been, based on his knowledge of the cost of performance of each element of the contract and subtracting the total of such costs from the contract price. *Wilfin, Inc., supra* at 245.

In the instant case, the jury was given the following instructions for determining the damages:

### INSTRUCTION

In connection with the following Special Issue, you are only to consider such damage, if any, that you find from a preponderance of the evidence was shown to have been the natural, probable, and foreseeable consequence of Champion Equity's conduct or to have been within the contemplation of the parties. You may consider only those losses, if any, the payment of which would place R.P.M., Inc. as nearly as possible in the position it would have occupied had Champion Equity performed the contract, if, indeed it did not. You may consider only such damage, if any, that was actually sustained and you shall not speculate as to damages which, although possible, have not been proved by a preponderance of the credible evidence.

The jury was also to consider only such damage, if any, that they found from

> a preponderance of the evidence would give Champion Equity the benefit of its bargain as of the date Champion Equity knew of the breach or should have known of the breach, if any, of R.P.M., Inc. You are further instructed that benefit of its bargain is the difference between the value of what Champion Equity had at the time it knew or should have known of the breach and the value of what Champion Equity should have had at that time.

The jury was instructed to consider only such losses that would place appellee in the position it would have occupied had the breach not occurred. According to this instruction, lost profits would be included **\*726** within the foreseeable consequences of a lost sale, and would be recoverable if supported by the evidence. *Wilfin, Inc., supra.*

 **[8]**   Evidence of appellee's lost profits was provided by Mr. Webster, who was the president and sole stockholder in appellee's corporation. Mr. Webster testified without objection that the costs of appellee's performance included a 10% down payment on its lots owned by Mr. Shipwash, which were to be resold by appellee to appellant.

The appellee had contracted to pay Mr. Shipwash $9720 per lot. Appellee then contemplated selling these same lots to appellant for $11,500 each.

Appellant had paid a down payment of 10% or $1,150 per lot to appellee, and had contracted to pay the remaining $10,350 per lot over a period of three years. Appellee had anticipated that his gross profit would be $630 per lot. Appellant's breach of contract, after purchasing only 30 of the 144 lots, caused appellee to lose $630 profit on each of the remaining 114 lots, or a total of $71,820. Mr. Webster's testimony provided competent evidence of appellee's "benefit of the bargain" which included lost profits. Appellant's third, fourth, and fifth points of error are overruled.

In its sixth point of error, appellant contends that the trial court erred in awarding appellee damages because the damages awarded were barred by the liquidated damages clause contained in the contract for deed.

The contract for deed provided as follows:

> Seller shall give Buyer thirty (30) days written notice of any default hereunder and should the Buyer fail to correct such default within ten (10) days from receipt of notice, Seller, its successors or assigns, shall have, as its sole remedy the right to declare this agreement terminated and Buyers earnest money forfeited. In the event of default by Seller, Buyer's sole remedy is that the earnest money shall be refunded and this agreement terminated.

Appellant contends that this provision limited damages for any default by buyer to the earnest money paid to appellee. The jury found in response to special issue no. 15 that the earnest money totalled $165,600. Appellant further contends that since the above provision is enforceable as liquidated damages, and the appellee was in possession of the earnest money, the trial court was barred from awarding additional damages to appellee. The appellant further contends that the provision is unenforceable because it provides for a penalty to secure performance of the contract.

The leading case relating to appellant's contention is *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952) which sets out the applicable rule in cases similar to the instant one:

> In those cases in which courts enforce stipulations of the parties as a measure of damages for the breach of covenants, the principle of just compensation is not abandoned and another principle substituted therefor. What courts really do in those cases is to permit the parties to estimate in advance the amount of damages, provided they adhere to the principle of just compensation. Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:
>
>> (1) An agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless
>>
>> (a) the amount so fixed is a reasonable forecast *of just compensation* for the harm that is caused by the breach, and
>>
>> (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation. (emphasis added)

In *Stewart,* the court held that the "stipulated damage provision" in a lease would be treated as a penalty because the provision was not narrowly drawn or limited to the breach of any one major covenant, but could also be triggered by the breach of a trivial or unimportant covenant. The Texas **\*727** Supreme Court emphasized that the provision did not adhere to the rule of "just compensation." *Id. See also Bethel v. Butler Drilling,* 635 S.W.2d 834 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); (Court refused to uphold a liquidated damages provision in a lease, which was triggered equally by the nonpayment of rent or the breach of any other covenant); *Mayfield v. Hicks,* 575 S.W.2d 571 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.); (Court condemned a similar provision as a penalty because the contract provided the same reparation for breach of each and every covenant); *Loggins Const. Co. v. Stephen F. Austin St. Univ.,* 543 S.W.2d 682 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.).

 **[9]**  Under the principle of just compensation, "The general rule is that if such a provision is for a penalty to secure performance of the contract, it is unenforceable and the party claiming a breach is required to prove his actual damages." However, if the parties actually intended the

provision to constitute their estimate of the damages that would actually be sustained by the party harmed by the breach, and the amount so fixed is a reasonable estimate of just compensation for the harm contemplated by the breach, and the amount of the damages is incapable or hard to determine, it is enforceable. The parties' intention in making the provision is not controlling in this respect. *Loggins Construction Co., supra; Brace v. Dante,* 466 S.W.2d 66, 69 (Tex.Civ.App. —Dallas 1971, no writ).

 **[10]**   Applying this principle of law to the contractual provision before this court, we conclude that the parties intended that the provision constitute an estimate of their damages in the event of a breach. However, the amount fixed is not a reasonable forecast of just compensation for the harm caused by any breach of the contract.

The provision states that "upon any default hereunder by the buyer" or "in the event of default" by the seller, the sole remedy shall be the retention, or refund respectively, of any earnest money tendered. The defect in this provision which makes it a penalty rather than a liquidated damage provision, is that upon the occurrence of any default, even a minor one, by either party, the injured party may terminate the contract and keep over $160,000 in earnest money as damages.

 **[11]**   A provision becomes a penalty if it provides for unreasonable damages for trivial breaches as well as reasonable damages for major breaches. *Stewart, supra; Bethel, supra;* and *Mayfield, supra.* It is immaterial that the actual breach was for default in tax and interest payments. *Mayfield, supra.* If the seller failed to keep any one lot entirely free from trash, or if the buyer paid the taxes but failed to furnish seller with a copy of paid tax receipts, either injured party could terminate the contract and demand to keep the earnest money. Certainly, such minor breaches could not be held to warrant termination of the contract plus the award or retention of any earnest money.

Because the clause in this case subjects the parties to the same reparation for any default under the contract, we hold that the provision is a penalty rather than one of liquidated damages. Therefore, the trial court did not err in awarding damages to appellee and the appellant's sixth point of error is overruled.

 **[12]**   In its last point of error, appellant contends that the trial court erred in awarding damages to appellee based on the jury's response to special issue 13 because the appellee receives an inequitable windfall, recovering both the earnest money and $71,820 in lost profits. Appellant contends that this result is inequitable in that the award grants recovery of both liquidated damages and recovery of profits.

In special issue 13, the jury was instructed to consider only those losses, if any, the payment of which would place appellee as nearly as possible in the position it would have occupied had the appellant performed the contract. The jury was further instructed to consider only those damages

that were shown to be the natural, probable, **\*728** and foreseeable consequences of appellant's conduct.

The appellee contends that the jury correctly found that appellant's forfeited earnest money did not give appellee the benefit of its bargain and did not put appellee in the position it would have occupied had appellant performed the contract. Appellee points out that except for the defective liquidated damages provision, the contract does not provide that the earnest money must be returned once the parties began performance. Appellee urges this court to find that the jury rightfully considered the "realities of the transaction made the basis of this lawsuit."

The jury had sufficient evidence before it from which it could conclude that the retention of appellant's earnest money by appellee did not adequately compensate appellee for the harm caused by appellee's breach and did not place appellee in the position it would have occupied had the appellant performed the contract.

The record reflects that the earnest money contracted for and received by appellee reduced the amount of the outstanding purchase price. Both parties agree that between November 10, 1978 and March 1979, appellant closed or "took down" 30 lots under the contract for deed. Moreover, appellant paid approximately $222,021 in interest on lots not taken down. Several homes were built and sold on the lots "taken down." Clearly, both parties had begun performance of the three-year contract. This is important because there is no evidence that any of the "earnest money" was placed in an escrow account to secure performance of the contract. In fact, appellee testified that the majority of the money appellant paid to appellee was immediately passed to Mr. Shipwash in order to pay off the appellee's debt to Mr. Shipwash on the parallel contract. The record also reflects that appellee subtracted the amounts received from appellant on the "taken down" lots, including the $165,000 earnest money, before appellee computed his lost profits.

Therefore, the jury's finding, that appellee would need an additional $71,820 in order to be fairly and reasonably compensated for damages sustained by appellant's breach, was supported by the evidence and did not constitute a "double recovery." Appellant's seventh point of error is overruled.

The judgment of the trial court is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

450 S.W.3d 203
Court of Appeals of Texas,
Houston (14th Dist.).

DEVON ENERGY PRODUCTION COMPANY, L.P., Appellant

v.

KCS RESOURCES, LLC, Appellee.

No. 14–13–00348–CV.  |  Oct. 30, 2014.
|  Rehearing En Banc Overruled Dec. 9, 2014.

**Synopsis**
**Background:** Vendor of mineral interests brought declaratory judgment action against purchaser seeking declaration of the parties' intent regarding the conveyance of the disputed interests under the purchase and sale agreement. Purchaser brought counterclaims for declaratory relief and, alternatively, claims for fraud and negligent misrepresentation. The District Court, Harris County, Michael Gomez, J., entered summary judgment in favor of purchaser, and later granted vendor's motion to modify the summary judgment order and dismissed for want of subject matter jurisdiction. Both parties appealed.

**Holdings:** The Court of Appeals, Ken Wise, J., held that:

[1] trial court lacked subject matter jurisdiction over vendor's declaratory judgment action;

[2] surviving collateral terms of purchase and sale agreement did not preclude the application of the merger doctrine to the conveyance terms;

[3] trial court lacked jurisdiction to resolve dispute as to whether vendor or purchaser owned disputed property in Louisiana;

[4] attorney fees may be awarded to a party defending against a declaratory judgment action over which the trial court lacks subject matter jurisdiction;

[5] purchaser was eligible to recover its attorney fees; and

[6] point in time when the trial court lacked subject matter jurisdiction over vendor's predicate claims was irrelevant to purchaser's claim for attorney fees.

Affirmed in part, reversed in part, and remanded.

Kem Thompson Frost, C.J., concurred in part, dissented in part, and filed opinion.

**Attorneys and Law Firms**

**\*206** Jack Oneill, Stephen Maurice Ryan, Houston, for Appellant.

Lauren Beck Harris, Eugene M. Nettles, Thomas A. Zabel, Houston, for Appellees.

Panel consists of Chief Justice FROST and Justices JAMISON and WISE.

## OPINION

KEN WISE, Justice.

In this dispute over ownership of property in Louisiana, appellant Devon Energy Production Company, L.P., contends that the trial court erred in granting summary judgment in favor of appellee KCS Resources, LLC, on the ground that the trial court lacked subject matter jurisdiction over Devon's action for relief under the Uniform Declaratory Judgments Act. In a cross-issue, KCS contends the trial court erred in concluding that it also lacked jurisdiction to decide KCS's counterclaim for **\*207** attorney's fees under the Act. We affirm in part and reverse and remand in part.

## BACKGROUND

Devon and KCS are parties to a Purchase and Sale Agreement, effective February 22, 2005, in which Devon agreed to sell to KCS certain oil and gas assets in Texas, Louisiana, and Mississippi (the PSA). The assets to be sold were listed in Exhibit A to the PSA, which was further divided into three sub-parts. Exhibit A–3 of the PSA identified "Leases and Lands" to be conveyed, including oil and gas leases, wells, mineral interests, and associated assets located in DeSoto Parish, Louisiana. Under the PSA, the assets included all of Devon's right, title, and interest in and to the oil and gas leases, lands, and wells described in Exhibit A as follows:

*2.1 Purchase and Sale.* Subject to the terms and conditions of this Agreement, [Devon] agrees to sell, and [KCS] agrees to purchase and pay for, ***all of [Devon]'s right, title and interest in and to the following*** (less and except for the Excluded Assets, collectively, the "*Assets* "):

(a) the ***oil and gas leases*** more particularly described in *Exhibit A,* subject to any depth restrictions described in *Exhibit A* (collectively, the "*Leases* "), ***together with any and all other rights, titles, and interests of [Devon] in and to (i) the leasehold estates created thereby,*** subject to any depth restrictions described in *Exhibit A* and to the terms, conditions, covenants, and obligations set forth in the Leases and/or *Exhibit A* and (ii) ***the lands covered by the Leases*** or included in Units with which the Leases may have been pooled or unitized, subject to any depth restrictions described in *Exhibit A* (the "*Lands* "), ***including in each case, without limitation, fee interests,*** royalty interests, overriding royalty interests, production payments, net profits interests, carried interests, reversionary interests, ***and all other interests of any kind or character;***

(b) ***all oil and gas wells located on the Leases and the Lands*** or on other leases or lands with which the Leases and/or the Lands may have been pooled or unitized (collectively and including the wells set forth on *Exhibit A,* the "*Wells* "), and all Hydrocarbons produced therefrom or allocated thereto.

(Emphasis added). The PSA also included a forum selection clause specifying that Texas law applied and that all actions arising out of or related to the PSA would be exclusively litigated in Harris County.

After about six weeks of due diligence, the parties closed the deal on April 13, 2005. At the closing, Devon executed various deeds conveying the assets to KCS, including a "Deed, Assignment and Bill of Sale" conveying the DeSoto Parish properties (the DeSoto Deed). Although the parties had negotiated revisions to some of the deeds during the due diligence period, Exhibit A to the DeSoto Deed contained the same properties that were previously listed on Exhibit A–3 of the PSA, with no revisions other than the addition of recording information. On April 18, 2005, the DeSoto Deed was recorded in the public records of DeSoto Parish.

About five years later, a dispute arose between KCS and Devon concerning the scope of the mineral interests Devon conveyed to KCS in DeSoto Parish. That dispute is the subject of this lawsuit. KCS contends that Devon intended to convey all of its right, title, and interest in two mineral servitudes [1] known as the "Olin Mathieson **\*208** Servitude" and the "Riverwood Servitude" burdening ten sections of land. Conversely, Devon maintains that its conveyance was restricted to specific wells or wellbores located within the two mineral servitudes. For convenience, we will refer to the properties at issue as the "Disputed Properties."

In 2010, after Devon learned that KCS had mortgaged some of the Disputed Properties, Devon filed a "Petition to Quiet Disturbance" in Louisiana seeking to cancel KCS's mortgage on those mineral interests. Devon contends that, after it filed that petition, EXCO Resources, Inc., another oil and gas company, informed Devon that KCS was claiming an interest in wells in which Devon had retained an interest under the PSA. Recognizing that Devon and KCS "had different views regarding what interests were intended to be conveyed by the PSA," Devon argues that it filed this declaratory action in Texas in accordance with the PSA's forum-selection clause.

KCS disputes Devon's account. According to KCS, EXCO contacted both Devon and KCS in the fall of 2009 to confirm who owned the Disputed Properties in connection with EXCO's plans to drill new wells in the area and, rather than acknowledge KCS's ownership, Devon seized an opportunity "to re-gain the now highly valuable" mineral interests. According to KCS, Devon sought to maintain its suit in both Louisiana and Texas by challenging the conveyance of different sections of the Disputed Properties in each action. KCS also argues that Devon's original pleadings in the Texas action sought a declaration as to the parties' rights under the DeSoto Deed and an adjudication of title to Louisiana real property, not declaratory relief under the PSA.

Litigation over the Disputed Properties proceeded in both Texas and Louisiana. In response to Devon's Louisiana petition, KCS answered and filed a counterclaim to have its rights under both the PSA and the DeSoto Deed declared in its favor, as well as alternative claims for fraud, misrepresentation, and violations of Louisiana law. KCS later amended its request for declaratory relief to seek a declaration as to the DeSoto Deed only. The Louisiana case has since been stayed pending the completion of the present case.

In the Texas action, KCS filed a motion to dismiss Devon's request for declaratory relief. Because Devon originally sought a declaration as to the parties' rights under the PSA and the DeSoto Deed in the Texas action, KCS argued that the Texas court lacked subject matter jurisdiction to interpret the DeSoto Deed and declare title to the Disputed Properties in Louisiana. The trial court treated KCS's motion as a plea to the jurisdiction and conditionally granted it, but allowed Devon the opportunity to amend its original petition.

Devon then amended its pleading to seek a declaration of the parties' intent regarding the conveyance of the Disputed Properties under the PSA alone. In response, KCS again challenged the court's jurisdiction over Devon's amended claims, arguing that the court must look first to the DeSoto Deed, not the PSA, because the conveyance provisions of the PSA had been merged into and were superseded by the conveyance provisions of the later-executed DeSoto Deed. The trial court denied KCS's motion, but stated that it would be willing to revisit the issue of subject matter jurisdiction later in the proceedings.

**\*209** KCS later challenged the trial court's subject matter jurisdiction for a third time in a motion for summary judgment, arguing that a declaration of the PSA would not resolve the parties' dispute and would be an advisory opinion on a question of title to land in Louisiana. Although the trial court held a hearing on the motion, it made no ruling for several months. As the trial date approached, KCS amended its pleadings to file counterclaims for declaratory relief and alternatively, claims for fraud and negligent misrepresentation, subject to its jurisdictional challenge. Devon also filed a second amended petition.

The trial court granted KCS's motion for summary judgment on March 27, 2012, and ordered that Devon "take nothing" on its claims. Devon filed a motion to modify the trial court's summary judgment order, arguing that the trial court's ruling on the merits was improper and that the proper relief was to dismiss Devon's claims for lack of subject matter jurisdiction. Shortly after that, KCS nonsuited all of its counterclaims except for its counterclaim for attorney's fees and costs as provided in the declaratory judgments act.

Almost a year later, on March 25, 2013, the trial court granted Devon's motion to modify and entered a final judgment dismissing Devon's declaratory judgment claims and KCS's attorney's fees claim for lack of subject matter jurisdiction. Both parties have appealed the final judgment.

## ANALYSIS OF DEVON'S ISSUE

### I. Summary of the Parties' Arguments

In its motion for summary judgment, KCS argued that the trial court lacked jurisdiction to interpret the conveyance terms of the PSA because any decision on that issue would be an impermissible advisory opinion that would not resolve the parties' dispute concerning the ownership of the Disputed Properties. KCS contended that the declaratory relief Devon seeks would be advisory for three reasons: (1) the PSA merged into the DeSoto Deed, so only the deed controls the respective rights of the parties; (2) the parties' intent under the PSA was superseded and mooted by the execution of the DeSoto Deed; and (3) the statute of frauds bars enforcement of any declaration since the PSA lacks the requisite recording information contained only in the DeSoto Deed. According to KCS, the final DeSoto Deed establishes the interests that were actually conveyed, and therefore any disagreement between the parties concerning ownership of the Disputed Properties must be resolved by a Louisiana court because the law is well-settled that Texas courts lack subject matter jurisdiction to determine title to real property located in another state.

On appeal, Devon argues that the declaratory relief it seeks does not amount to an advisory opinion concerning a question of title to land in Louisiana because the PSA was not merged into or superseded by the DeSoto Deed, the dispute regarding the meaning of the PSA is not moot, and the statute of frauds does not apply. Devon also contends that its claims arise directly out of the

PSA and so are governed by the PSA's forum selection and choice of law clause providing for litigation of the action in Harris County and the application of Texas law. Further, Devon asserts that Texas courts have jurisdiction to interpret contracts involving land in another state so long as the case does not involve a "naked question of title," and that this is such a case.

## II. Standard of Review and Applicable Law

**[1]** **[2]** **[3]** We review a trial court's grant of summary judgment de novo. **\*210** *Masterson v. Diocese of Nw. Tex.,* 422 S.W.3d 594, 607 (Tex.2013). To prevail on its motion, KCS was required to prove that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 157 (Tex.2004). We take as true all evidence favorable to Devon, the non-movant, and we indulge every reasonable inference and resolve any doubts in Devon's favor. *See Joe,* 145 S.W.3d at 157. We affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Id.*

**[4]** **[5]** **[6]** **[7]** Subject matter jurisdiction is essential to the authority of a court to decide a case and is never presumed. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443–44 (Tex.1993). The absence of subject matter jurisdiction may be raised by a motion for summary judgment. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). In reviewing a challenge to the court's subject matter jurisdiction, the trial court may review the pleadings and any other evidence relevant to the subject matter jurisdiction issue. *Id.* at 554–55. Whether a trial court has subject matter jurisdiction is a question of law. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

**[8]** **[9]** Under Article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions. *Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000) (per curiam); *see Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 147 (Tex.2012) ("The Texas Constitution—the source of the requirements of justiciability in Texas—bars our courts from rendering advisory opinions and limits access to the courts to those individuals who have suffered an actual, concrete injury."). An advisory opinion decides an abstract question of law without binding the parties, and a judgment based on an advisory opinion addresses only a hypothetical injury rather than remedying an actual or imminent harm. *Tex. Ass'n of Bus.,* 852 S.W.2d at 444. The prohibition on advisory opinions likewise precludes the courts from deciding moot controversies. *Klein v. Hernandez,* 315 S.W.3d 1, 3 (Tex.2010).

**[10]** **[11]** The Uniform Declaratory Judgments Act (UDJA) allows a person interested under a written contract to have determined any question of construction or validity arising under the contract and to "obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code § 37.004(a). But the Act does not create or enlarge a trial court's subject matter jurisdiction; it is "merely a procedural device for deciding cases already within a court's

jurisdiction." *Tex. Ass'n of Bus.,* 852 S.W.2d at 444. Thus, a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the declaration will resolve the controversy. *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995); *see also* Tex Civ. Prac. & Rem.Code § 37.008 ("The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.").

## II. Analysis of the Parties' Arguments

## A. Merger of the PSA into the DeSoto Deed and Mootness

### 1. The PSA is Merged Into, Superseded By, and Mooted by the DeSoto Deed.

In its summary-judgment motion, KCS first argued that any decision construing the PSA would be an advisory opinion because the DeSoto Deed is the controlling **\*211** instrument under the merger doctrine. The Supreme Court of Texas has long recognized that the conveyance provisions in a contract for the sale of real property merge into the deed executed in accordance with the contract. *Alvarado v. Bolton,* 749 S.W.2d 47, 48 (Tex.1988).

**[12]** **[13]** The merger doctrine requires courts to look to the deed alone in evaluating the parties' respective rights even if the terms of the deed vary from the contract. *Id.* ("Though the terms of the deed may vary from those contained in the contract, still the deed must be looked to alone to determine the rights of the parties."); *see also Turberville v. Upper Valley Farms, Inc.,* 616 S.W.2d 676, 678 (Tex.Civ.App.-Corpus Christi 1981, no writ) ("Where a deed has been executed and accepted as performance of an executory contract to convey real estate, the contract is functus officio, and the rights of the parties rest thereafter solely in the deed."). "The merger doctrine is an analogue of the parol evidence rule and functions to prevent enforcement of prior or contemporaneous transactions on the assumption that all agreements merged into the final executed contract." *See GXG, Inc. v. Texacal Oil & Gas,* 977 S.W.2d 403, 415 (Tex.App.-Corpus Christi 1998, pet. denied).

For example, in *Commercial Bank, Unincorporated, of Mason, Tex. v. Satterwhite,* the plaintiff sought to cancel a general warranty deed conveying to the defendant the plaintiff's mother's and her late husband's community interests in the family ranch. *See* 413 S.W.2d 905, 906 (Tex.1967). The mother had entered into a contract for sale with the defendant to sell "all of *her* right title and interest in and to" the ranch. *Id.* at 909 (emphasis added). The deed that she executed individually and in her capacity as executrix of her husband's estate, however, conveyed specifically described tracts encompassing the ranch. *Id.* The court held that pursuant to the merger doctrine, in the absence of fraud, accident, or mistake, "all prior agreements entered into between the parties [were]

considered merged in the deed" and it refused to reform the deed to reflect that only the mother's community interest in the ranch had been conveyed. *Id.*

Similarly, in *Carter v. Barclay,* 476 S.W.2d 909, 915 (Tex.Civ.App.-Amarillo 1972, no writ), an action to quiet title to real property, the plaintiff argued that certain language in a contract to purchase land prevented the rights of the parties from merging into the deed, and that the contract and deed were cumulative of the parties' rights. The court held that the deed alone controlled the terms on which the property was conveyed and superseded any other agreement between the parties regarding the conveyance terms, the consideration, and the method of payment:

> [I]n the absence of fraud, accident or mistake in the execution, the deed, an absolute conveyance on its face, must be considered *the final expression and the sole repository of the terms upon which [the parties] have agreed with respect to the property conveyed,* the consideration and the method of payment. Although ... certain rights of appellee are still governed under the contract, such as the furnishing of water, restrictions and easements, ... the matter of consideration and method of payment were finalized in the deed which was an absolute conveyance of the property in question..... *[T]he general warranty deed by its very nature has finalized and supersedes any other agreement between the parties* regarding consideration and method of payment ....

*Id.* at 914–15 (emphasis added) (internal citation omitted).

**\*212** KCS argues that, as in these cases, the conveyance terms of the PSA merged into and were superseded by the DeSoto Deed when it was executed at closing. Consequently, a determination of the parties' intent under the PSA would be no more than parol evidence, admissible only in the event a Louisiana court finds that the conveyance terms of the DeSoto Deed were ambiguous or were procured by fraud. *See GXG, Inc.,* 977 S.W.2d at 416 ("principles of law permit referral to agreement upon which deed is founded to explain an ambiguity in deed"). Because the Louisiana court has made no such determination, and may never do so, the declaration Devon seeks would be premised on the happening of a future, hypothetical event. Thus, KCS argues, any such declaration would be advisory because it would not resolve the ownership of the Disputed Properties conveyed by the DeSoto Deed. *See Stop #N Go Mkts. of Tex., Inc. v. Exec. Sec. Sys., Inc. of Am.,* 556 S.W.2d 836, 837 (Tex.Civ.App.-Houston [14th Dist.] 1977, no writ) (recognizing "[a] justiciable controversy does not exist and an advisory opinion is being sought if a party requests a court to render a declaratory judgment premised upon the happening of a future, hypothetical event").

**[14]** **[15]** KCS also argues that the declaration Devon seeks would be advisory because the issue of what interests the parties intended to convey under the PSA is mooted by the execution of the DeSoto Deed. Mootness is a component of subject matter jurisdiction. *See Valley Baptist Med. Ctr.,* 33 S.W.3d at 822. The mootness doctrine prevents courts from rendering advisory

opinions, which they have no jurisdiction to issue. *Id.* A case becomes moot if there ceases to be a justiciable controversy between the parties, such as when "the issues presented are no longer 'live.' " *Heckman,* 369 S.W.3d at 162; *see also In re H & R Block Fin. Advisors, Inc.,* 262 S.W.3d 896, 900 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding) ("An issue may become moot when a party seeks a ruling on some matter which, when rendered, would not have any practical legal effect on a then-existing controversy.").

 **[16]**   We agree with KCS that any issue regarding what the parties intended to convey under the PSA is no longer live because the DeSoto Deed is the final expression and sole repository of the parties' agreement with respect to the properties conveyed. *See Satterwhite,* 413 S.W.2d at 909; *Carter,* 476 S.W.2d at 915. This conclusion is consistent not only with the case law but also with the practical application of the doctrine. Devon's own land manager testified that anyone seeking to determine what properties were actually conveyed to KCS would need to review the exhibits attached to the deeds executed at the closing of the transaction—not the exhibits attached to the PSA that was executed six weeks earlier—because the exhibits to the PSA were not revised to reflect any changes made when properties were removed or added to the deal as a result of the due-diligence process. The parties' agreement to apply Texas law to the construction of the PSA further compels the application of this settled Texas doctrine.

Applying the doctrine of merger, any interpretation of the PSA would not resolve the issue as to who owns the Disputed Properties because the final DeSoto Deed establishes the interests that were actually conveyed. [2] The declaration Devon seeks will have no determinative legal **\*213** effect on the parties' controversy over ownership of the Disputed Properties conveyed by the DeSoto Deed, as only the Louisiana court has the ability to adjudicate title to realty. Because any declaration of the parties' intent under the PSA would not resolve the parties' dispute, the declaration Devon seeks would be advisory only and therefore the trial court lacks subject matter jurisdiction to consider it. *See, e.g., Patterson v. Planned Parenthood of Houston and Se. Tex., Inc.,* 971 S.W.2d 439, 443 (Tex.1998); *Tex. Ass'n of Bus.,* 852 S.W.2d at 444.

### 2. Devon's Contrary Arguments Concerning Merger and Mootness are Unpersuasive.

Devon contends that the trial court erred in concluding that it lacked subject matter jurisdiction over the parties' dispute because the PSA was not merged into, superseded by, or mooted by the DeSoto Deed. Discussing the merger and superseded contract doctrines together with mootness, Devon argues these doctrines do not apply because (1) the PSA survived the closing and did not address the same subject matter as the DeSoto Deed; and (2) KCS made allegations of fraud and misrepresentation regarding the PSA and also sought reformation of the PSA. Because the PSA was neither merged into nor superseded by the DeSoto Deed, Devon asserts, the controversy regarding its meaning is not moot.

### (a) The Existence of Surviving Collateral Terms Does Not Preclude the Application of the Merger Doctrine to the Conveyance Terms.

First, Devon contends that the merger doctrine does not apply because the PSA created continuing rights and obligations that were independent of the conveyances within it. *See Harris v. Rowe,* 593 S.W.2d 303, 306–07 (Tex.1979); *Stanford Dev. Corp. v. Stanford Condo. Owners Ass'n,* 285 S.W.3d 45, 52 (Tex.App.-Houston [1st Dist.] 2009, no pet.). Devon argues that the PSA contains a number of independent rights and obligations that survived closing, such as an agreement to cooperate in effectuating the intent of the PSA and detailed indemnification provisions. Devon also points to language in the DeSoto Deed that "the execution and delivery of this Assignment ... shall not operate to release or impair any surviving rights and obligations of Assignor or Assignee under the [PSA]." Further, Devon argues that as a practical matter, the parties continued to revise leases and assignments under the PSA even beyond the closing date, something they would not have done if the DeSoto Deed rendered the PSA moot.

In response, KCS does not dispute that certain provisions of the PSA survived beyond the execution of the deeds at the closing, but argues that Devon's argument ignores the actual dispute between them, which concerns the scope of the conveyance as it relates to the Disputed Properties rather than any of the PSA's surviving terms. We agree. Devon's cited authorities concern disputes over collateral terms, not disputes over terms of the conveyance that were merged into the subsequently executed agreement. For example, in *Harris v. Rowe,* the Texas Supreme Court held that an escrow agreement pertaining to funds for post-conveyance construction work was collateral to and independent of the conveyance terms in the purchase contract. 593 S.W.2d at 306–07. Likewise, in *Stanford Dev. Corp.*, the court of appeals held that arbitration provisions in homeowners' earnest money contracts created rights collateral to and independent of the deeds to their condominiums that were not merged into and extinguished by the subsequent deeds. 285 S.W.3d at 52.

**\*214**  **[17]**   Here, the dispute between Devon and KCS does not involve the PSA's surviving collateral terms, such as the right to transfer properties after closing. It involves the scope of the conveyance itself and whether Devon conveyed the Disputed Properties to KCS based on the descriptions provided in the DeSoto Deed. Under the PSA, Devon agreed to convey all of its "right, title and interest" in and to the described assets, and Devon points to nothing in the PSA indicating that the parties intended to retain some legal or equitable interest in those assets, and it is undisputed that the descriptions of the properties conveyed in the exhibits to both the PSA and the DeSoto Deed are the same. Devon's reliance on the collateral-rights exception is misplaced and does not defeat the application of the merger doctrine.

In a related argument, Devon contends that the merger doctrine does not apply because the DeSoto Deed addressed only a small portion of the multistate assets identified in the PSA. *See, e.g., Superior Laminate & Supply, Inc. v. Formica Corp.,* 93 S.W.3d 445, 448–49 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) ("A merger occurs when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter."). Devon contends that it was clearly not the intent of the parties that the PSA be merged into, superseded by, or mooted by the DeSoto Deed because the parties included in the DeSoto Deed the statement that the Deed was "expressly made subject to" the PSA.

These arguments also fail because the parties' actual dispute is confined to the ownership of the Disputed Properties, which are addressed by both the PSA and the DeSoto Deed. None of Devon's authorities support its argument that because the PSA involves properties in addition to those conveyed in the DeSoto Deed, the merger doctrine does not apply to a property addressed by both instruments. That the deal included other assets in other states has no bearing on the parties' dispute over the assets conveyed in Louisiana. For the same reason, we reject Devon's argument that the DeSoto Deed's language that it is made "subject to" the PSA indicates the parties' intent that the PSA would not be merged into, superseded by, or mooted by the DeSoto Deed. The evidence shows that although revisions were made to the exhibits attached to the deeds during the due-diligence process, the exhibits to the PSA describing the properties to be conveyed were not correspondingly revised. Thus, the deeds, rather than the PSA, reflect the parties' final agreement as to which properties were conveyed to KCS. Moreover, as KCS argues, if the conveyance terms of the DeSoto Deed were "subject to" the PSA, then the revisions the parties made to deeds during the due-diligence period would be irrelevant. Such a construction of the DeSoto Deed would also undermine the purpose of the merger doctrine. Therefore, both the evidence and the case law are consistent with the application of the merger doctrine in this case. *See Alvarado v. Bolton,* 749 S.W.2d at 48 (stating that when a deed is delivered and accepted as performance of a contract to convey, the contract is merged into the deed).

### (b) KCS's Dismissed Counterclaims Do Not Preclude Application of the Merger Doctrine.

Second, Devon argues that the merger doctrine does not apply because KCS made allegations of fraud and misrepresentation regarding the PSA, and also sought reformation of the PSA. *See, e.g., GXG Inc.,* 977 S.W.2d at 416 ("The doctrine of merger is inapplicable when there is an allegation of fraud, mistake, or accident, **\*215** or an ambiguity in the contract."); *see also Givens v. Ward,* 272 S.W.3d 63, 68–69 (Tex.App.-Waco 2008, no pet.) (declining to apply merger doctrine when claim for reformation of deed required determination of parties' original agreement). But Devon's arguments against application of the merger doctrine based on KCS's counterclaims fail for two reasons.

 **[18]**   First, KCS's fraud, misrepresentation, and reformation counterclaims, which were expressly made subject to KCS's jurisdictional challenge, were nonsuited and dismissed in May 2012. Thus, the counterclaims were not live pleadings when the final order on KCS's summary-judgment motion was modified and signed on March 25, 2013. [3]  Second, all of KCS's counterclaims were in opposition to Devon's requested declarations as to the PSA and called into question Devon's conduct leading up to the execution of the PSA, not the DeSoto Deed. The cases Devon cites are distinguishable because they each address allegations of fraud or reformation relating to execution of the subsequent deed, not the preliminary contracts for sale like the PSA. As KCS acknowledges, it could not have sought an interpretation of the DeSoto Deed because the trial court lacks jurisdiction over such a claim.

We conclude that Devon has failed to demonstrate that the merger doctrine is inapplicable to this case.

## B. The PSA's Forum Selection Clause

Devon's lead appellate argument is that the trial court's ruling was erroneous because the PSA's forum selection clause requires that the parties' dispute be litigated in Harris County. This clause provides that the PSA and the parties' legal relations shall be governed by Texas law, that all parties to the PSA consent to the exercise of personal jurisdiction by Texas courts for any action arising out of the PSA or other transaction documents, and that "[a]ll actions or proceedings with respect to, arising directly or indirectly in connection with, out of, related to or from" the PSA "shall be exclusively litigated in courts having sites in Houston, Harris County Texas."

Devon argues that its declaratory judgment action must be litigated in Harris County because the relief Devon sought in its amended petition required a judicial determination of the intent of the parties to the PSA. Devon notes that Texas' public policy strongly favors the freedom of parties to contract, so long as their agreement does not violate the law or public policy. *See BMG Direct Mktg., Inc. v. Peake,* 178 S.W.3d 763, 767 (Tex.2005); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129–30 & n. 11 (Tex.2004). Therefore, Devon contends, its forum selection clause "should be given full effect." *See In re Lisa Laser USA, Inc.,* 310 S.W.3d 880, 883 (Tex.2010).

But the trial court did not rule that the PSA's forum selection clause was unenforceable; it ruled that the trial court  **\*216**  lacked subject matter jurisdiction over Devon's declaratory judgment. Devon does not argue that the forum selection clause somehow confers subject matter jurisdiction on the court, nor do Devon's cited cases so hold. The law is well settled that parties may by agreement consent to personal jurisdiction and venue in a given court, but subject matter jurisdiction cannot be conferred merely by agreement of the parties. *See, e.g., Burke v. Satterfield,* 525 S.W.2d 950, 953 (Tex.1975) ("It is also fundamental ... that the subject matter jurisdiction of a court cannot be enlarged by an agreement between the parties or a request that the court exceed its powers.");

*Taub v. Aquila Sw. Pipeline Corp.,* 93 S.W.3d 451, 461 (Tex.App.-Houston [14th Dist.] 2002, no pet.) ("Subject matter jurisdiction cannot be conferred by consent, waiver, or estoppel at any stage of a proceeding."). Therefore, Devon's reliance on this clause is misplaced because the presence of the forum selection clause in the PSA cannot confer subject matter jurisdiction where it does not otherwise exist.

## C. Adjudication of Title to Land in Another State

Devon next argues that Texas courts have subject matter jurisdiction to determine obligations under a contract that may involve land located in another state, and that this action is such a case. According to Devon, the trial court has jurisdiction over this declaratory judgment action because it does not involve a "naked question of title."

 **[19]**    As Devon acknowledges, Texas courts have no subject matter jurisdiction to adjudicate title to realty, including interests in oil and gas leases, in another state or country. *See, e.g., Trutec Oil & Gas, Inc. v. Western Atlas Int'l, Inc.,* 194 S.W.3d 580, 583 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (citing *Holt v. Guerguin,* 106 Tex. 185, 163 S.W. 10, 12 (1914)); *Kelly Oil Co., Inc. v. Svetlik,* 975 S.W.2d 762, 764 (Tex.App.-Corpus Christi 1998, pet. denied); *Miller v. Miller,* 715 S.W.2d 786, 788 (Tex.App.-Austin 1986, writ ref'd n.r.e.). But a Texas court with jurisdiction over the parties may enforce a party's personal or contractual obligation that indirectly involves property in another state. *See Tex. & Pac. Ry. Co. v. Gay,* 86 Tex. 571, 26 S.W. 599, 605–06 (1894); *Hartman v. Sirgo Operating, Inc.,* 863 S.W.2d 764, 766 (Tex.App.-El Paso 1993, pet. denied). For example, a Texas court may compel a party over whom it has jurisdiction to execute a conveyance of a real property interest situated in another state. *See McElreath v. McElreath,* 162 Tex. 190, 345 S.W.2d 722, 727–28 (1961). Some courts have described the distinction as whether the case involves a "naked question of title." *See, e.g., Hartman,* 863 S.W.2d at 766.

To determine the nature of Devon's action, we look to Devon's pleadings and the relevant evidence. *See Trutec Oil & Gas, Inc.,* 194 S.W.3d at 583–88 (rejecting appellant's contention that its action was only "tangentially" related to real property and affirming trial court's dismissal of appellant's claims for lack of subject matter jurisdiction when a review of the pleadings and evidence demonstrated that appellant's core complaint was that that it had been wrongfully deprived of the functional equivalent of oil and gas leases in Nigeria). In Devon's second amended petition, Devon sets out in detail the dispute between it and KCS over the extent of the mineral interests conveyed.[4] Devon describes the **\*217**  nature of the present action as seeking "a determination of the parties' intent with respect to certain Louisiana mineral interests described in Exhibit A–3 of the PSA." In its request for relief, Devon further states:

By the present action, Devon does not seek a construction of the [DeSoto Deed], or a determination or adjudication of title to the Louisiana properties listed in the PSA. Rather,

Devon seeks a construction of the PSA and the determination of the parties' intent under the PSA regarding the mineral interests the PSA was intended to encompass. Such an action must necessarily precede any action to adjudicate title....

Devon then requests specific declarations that (1) the parties intended to include in "the PSA transaction" only Devon's interest in specifically named wells located on specific sections of the lands described on Exhibit A–3 to the PSA pertaining to DeSoto Parish, Louisiana, and not all of Devon's right, title and interest in the mineral servitudes; and (2) the parties intended to exclude from "the PSA transaction" three additional sections of land in DeSoto Parish, Louisiana.

Throughout its pleading, Devon insists that the controlling document is the PSA and not the DeSoto Deed, and restricts its requested relief to an interpretation of the parties' intent under the PSA. It is evident, however, that the relief Devon ultimately seeks is the resolution of the disagreement between it and KCS as to which of them owns the Disputed Properties in Louisiana. Notably, Devon first filed suit in Louisiana, claiming that it owned the mineral interests KCS had mortgaged. And when Devon originally filed this lawsuit in Texas, it requested declarations regarding ownership of the Disputed Properties under both the DeSoto Deed and the PSA. Only after the trial court granted KCS's plea to the jurisdiction did Devon amend its pleadings to argue that the dispute could be resolved by interpreting the PSA alone. Moreover, although Devon relies on cases like *McElreath* for the proposition that a Texas court has subject matter jurisdiction to order a conveyance of out-of-state property, neither party has requested such relief. Instead, Devon requests a declaration of the Louisiana mineral interests it intended to convey.

The other authorities on which Devon relies are also distinguishable. *See Hartman,* 863 S.W.2d at 766 (affirming trial court's jurisdiction to determine the validity of a contract for the sale and exchange of certain oil and gas properties in New Mexico because the "trial court was not required to determine ownership of land in New Mexico nor was any relief sought requiring the transfer of title to land in New Mexico"); *Protech of Tex., Inc. v. BP Oil Pipeline Co.,* No. 01–95–00270–CV, 1995 WL 737442, at *3 (Tex.App.-Houston [1st Dist.] Dec. 14, 1995, pet. denied) (mem. op., not designated for publication) (holding case did not simply involve "a naked question of title" and trial court had subject matter jurisdiction when plaintiff's claims sounded in tort, contract, and quasi-contract); *Askanase v. Maddox,* No. 05–91–01595–CV, 1992 WL 224588, *5 (Tex.App.-Dallas Sept. 10, 1992, writ denied) (mem. op., not designated for publication) (reversing plea to the jurisdiction because the "substance and purpose" of the claim was the recovery of money damages for breach of contract, tortious interference, and the declaration of contractual rights, **\*218** not a transfer of property or adjudication of title).[5]

**[20]** In contrast, the pleadings, factual allegations, and relief sought in this case demonstrate that the gravamen of Devon's action is the determination of the parties' existing property interests located in another state. Despite being couched as a request for declaratory relief under the UDJA, the relief Devon seeks is in essence a determination of title to land in Louisiana-a matter over which the trial court lacks jurisdiction. *See Trutec Oil & Gas, Inc.,* 194 S.W.3d at 588; *Miller,*

715 S.W.2d at 789; *see also Renwar Oil Corp. v. Lancaster,* 154 Tex. 311, 276 S.W.2d 774, 776 (1955) (in context of venue dispute, suit was in essence one for recovery of interest in land despite being cast as one for declaratory judgment).

## IV. Disposition of Devon's Appeal

We conclude that the trial court did not err in dismissing Devon's claims for lack of subject matter jurisdiction on the basis that Devon's requested declaratory relief sought an impermissible advisory opinion concerning Devon's conveyance of mineral interests located in Louisiana. We overrule Devon's issues and affirm that portion of the trial court's judgment granting summary judgment in favor of KCS.

## KCS's Cross–Issue

In one cross-issue, KCS contends the trial court erred in dismissing its counterclaim for attorney's fees under the UDJA for lack of subject matter jurisdiction. According to KCS, a trial court has jurisdiction to adjudicate a defendant's claim for costs and attorney's fees when the defendant succeeds on its claim that the trial court lacks subject matter jurisdiction over the plaintiff's claim for declaratory relief.

In response, Devon argues that when a trial court lacks subject matter jurisdiction over a case from the time of filing, the only action the court may take is to dismiss the case. To hold otherwise would be contrary to controlling case law, the plain language of the UDJA, and those courts which have distinguished between cases in which the court had subject matter jurisdiction and lost it and those in which the court never properly acquired subject matter jurisdiction. As above, when reviewing whether subject matter jurisdiction exists, we review the trial court's ruling de novo. *Miranda,* 133 S.W.3d at 228.

## A. Attorney's Fees Under the UDJA

 **[21]**   In any proceeding under the UDJA, the court "may award costs and reasonable and necessary attorneys' fees as are equitable and just." Tex. Civ. Prac. & Rem.Code § 37.009. The UDJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). Under the UDJA, a party defending a suit brought under the UDJA may be awarded its reasonable and necessary attorney's fees. *Bradt v. State Bar of Tex.,* 905 S.W.2d 756, 760 (Tex.App.-Houston [14th Dist.] 1995, no pet.).

Devon argues broadly that if KCS is correct that the trial court lacked subject matter jurisdiction over Devon's claims, **\*219** then the trial court likewise lacked subject matter jurisdiction to award KCS its costs and attorney's fees. *See Goss v. City of Houston,* 391 S.W.3d 168, 176 (Tex.App.-Houston [1st Dist.] 2012, no pet.) ("Subject matter jurisdiction is essential to the authority of the courts to decide a case."); *Little v. Tex. Bd. of Law Examiners,* 334 S.W.3d 860, 862 (Tex.App.-Austin 2011, no pet.) ("Failure to comply with a jurisdictional requirement deprives the trial court of the power to act, other than to determine that it lacks jurisdiction."); *see also Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990) (per curiam) (stating that a judgment is void if it is apparent that the court rendering the judgment lacks subject matter jurisdiction). But the trial court's determination that it lacked subject matter jurisdiction over Devon's claims does not necessarily mean that it had no authority to consider KCS's counterclaim for fees and costs in defending the lawsuit.

### 1. KCS's authorities are on point and persuasive.

KCS points to two cases expressly holding that a trial court maintains jurisdiction over a counterclaim for attorney's fees under the UDJA despite the dismissal of the plaintiffs declaratory judgment action for lack of subject matter jurisdiction. *See Castro v. McNabb,* 319 S.W.3d 721, 735–36 (Tex.App.-El Paso 2009, no pet.); *Zurita v. SVH–1 Partners, Ltd.,* No. 03–10–00650–CV, 2011 WL 6118573, at \*8 (Tex.App.-Austin Dec. 8, 2011, pet. denied) (mem. op.). In *Castro,* the court examined the plain language of section 37.009 and determined that the UDJA "does not require a judgment on the merits of the dispute as a prerequisite to a fee award." 319 S.W.3d at 735. Accordingly, the court concluded that

> Castro invoked the entire [UDJA] when she filed suit. Her failure to make the City a party to the suit meant that any declaration sought does not change the nature of the proceedings below. Because this was a proceeding under the [UDJA], the trial court properly exercised jurisdiction under Section 37.009 to award attorney's fees to McNabb.

*Id.* at 735–36. The *Zurita* court reached the same conclusion, holding that the dismissal of a clam under the UDJA for lack of subject matter jurisdiction does not preclude the trial court from awarding attorney's fees under the statute to the party who succeeded in having the claims dismissed. *See Zurita,* 2011 WL 6118573, at \*8.

Devon asserts, however, that these cases are "non-controlling" and adverse to decisions of the Houston appellate courts. As support for its contention, Devon relies on *Graves v. Diehl,* No. 01–00–00412–CV, 2006 WL 1699527 (Tex.App.-Houston [1st Dist.] June 22, 2006, pet. denied) (mem. op.), and *Kenneth Leventhal & Co. v. Reeves,* 978 S.W.2d 253 (Tex.App.-Houston [14th

Dist.] 1998, no pet.). But these cases are distinguishable and do not control the disposition of KCS's issue.

In *Reeves,* the plaintiff sought attorney's fees in connection with a breach of contract claim and an identical claim for declaratory relief. 978 S.W.2d at 256. This Court reversed the trial court's award of attorney's fees because the plaintiff recovered no damages and so could not recover attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code. *Id.* at 257–58. Further, the court held that the plaintiff could not use a request for declaratory relief identical to his breach of contract claim "simply to pave the way to recover attorney's fees not otherwise available." *Id.* at 258–59. The *Reeves* court went on to note that the plaintiff's claim for declaratory relief "should have been dismissed by the trial **\*220** court because it was moot" and therefore the plaintiff was not entitled to recover fees on the basis of either breach of contract or declaratory judgment. *Id.* at 259–60. In a single paragraph, the court addressed the defendant's second issue as follows:

> In its second point of error, [the defendant] argues that even if there was a legal basis for an award of attorney's fees to [the plaintiff], the court abused its discretion and, if anything, should have awarded fees to [the defendant]. Having found no legal basis for awarding attorney's fees to [the plaintiff] we likewise find no legal basis for awarding such fees to [the defendant]. Therefore, [the defendant's] second point of error is overruled.

*Id.* at 260. In other words, having concluded that the plaintiff improperly invoked the UDJA to request the same relief already sought under his breach of contract claim, the court held that the UDJA was not a proper procedural vehicle to award either party attorney's fees. In contrast, Devon's UDJA claim was not duplicative of any other claim or urged solely for the purpose of obtaining attorney's fees; Devon properly invoked the UDJA when it filed its original petition seeking a declaration of the rights, obligations, and legal status of the parties under the PSA and the DeSoto Deed.

*Graves* is factually distinguishable because in that case only the defendants sought affirmative declaratory relief and attorney's fees. The defendants' requested relief was denied for lack of subject matter jurisdiction, so fees were not warranted. *See* 2006 WL 1699527, at \*9. The *Graves* court's decision was also based on its determination that the declaratory judgment and fee award were an abuse of discretion because the lawsuit did not involve the construction of a deed to the defendants' property as recited in the trial court's judgment; it involved the manner in which the defendants made use of their property, and no deed was even offered into evidence. *Id.* at \*10. Thus, the court concluded there was no basis in the record for the trial court to award either a declaratory judgment or attorney's fees under the UDJA. *Id.* This was not a case in which the fees were incurred solely in defense of a plaintiff's UDJA claim.

 **[22]**  We also note that more recently, the same court has held, consistent with *Castro* and *Zurita,* that the trial court had the power to award attorney's fees under the UDJA even though it had dismissed the plaintiff's declaratory judgment claim for lack of jurisdiction. *See Feldman v. KPMG LLP,* 438 S.W.3d 678, 685–86 (Tex.App.-Houston [1st Dist.] 2014, no pet.). Thus, the decisions in *Graves* and *Reeves* do not preclude this Court from holding that the trial court maintained jurisdiction to resolve the issue of attorney's fees. We find *Feldman, Castro*, and *Zurita* persuasive authority and agree that attorney's fees may be awarded to a party defending against a declaratory judgment action over which the trial court has determined that it lacks subject matter jurisdiction over the plaintiff's claim.

### 2. Devon's argument that the plain language of the UDJA precludes an award of attorney's fees is unpersuasive.

Devon argues that section 37.009's provision allowing for attorney's fees in any proceeding "under" the UDJA requires the trial court to first have subject matter jurisdiction over the underlying controversy to have the authority to award fees. To support this interpretation of the statute, Devon points to federal case law interpreting substantive federal statutes. *See*  **\*221** *Cliburn v. Police Jury Ass'n of La., Inc.,* 165 F.3d 315, 316 (5th Cir.1999) (per curiam) (holding that trial court's award of attorney's fees under ERISA [6] was inconsistent with dismissal for lack of subject matter jurisdiction because there was no ERISA "action" under the statute and neither the plaintiff nor the defendant were a "participant, beneficiary, or fiduciary" eligible to invoke the substantive statute's attorney's fees provision); *In re Knight,* 207 F.3d 1115, 1117–18 (9th Cir.2000) (relying in part on *Cliburn* to hold that when district court dismissed ERISA action for lack of subject matter jurisdiction, "there was no ERISA action" and therefore no jurisdiction to award attorney's fees and costs); *W.G. v. Senatore,* 18 F.3d 60, 64–65 (2d Cir.1994) (holding that when trial court lacked subject matter jurisdiction over plaintiff's substantive claims under IDEA, [7] the court lacked jurisdiction to consider plaintiff's request for fees allowed in "any action or proceeding brought under this subsection").

Devon further argues that Texas courts have held that a trial court has jurisdiction to award attorney's fees only when a party has "properly invoked" the UDJA. *See Knighton v. Int'l. Bus. Machines Corp.,* 856 S.W.2d 206, 210 (Tex.App.-Houston [1st Dist.] 1993, writ denied) ("When a claimant ... *has properly invoked* the declaratory judgment statute, either party may plead for and obtain attorney's fees.") (emphasis added); *Hartford Cas. Ins. Co. v. Budget Rent–A–Car Sys., Inc.,* 796 S.W.2d 763, 771 (Tex.App.-Dallas 1990, writ denied) ("[W]here a claimant or a counter-claimant has *properly invoked* the declaratory judgment statute, either party may plead for and obtain attorney's fees.") (emphasis added). Devon also cites *City of Houston v. Chemam,* 01–08–01005–CV, 2010 WL 143476, at \*8 (Tex.App.-Houston [1st Dist.] Jan. 14, 2010, no pet.) (mem. op.), in which the court held that the trial court lacked subject matter jurisdiction

over the underlying declaratory judgment action and thus "any claim for attorney's fees arising *under* it." (emphasis added). According to Devon, the section of the UDJA allowing an award of attorney's fees is a subset of the larger Act, and a trial court without jurisdiction under the Act cannot selectively assert subject matter jurisdiction over the remedies section of the Act to award fees.

 **[23]**    Initially, we note that decisions of the federal courts, other than the Supreme Court, may be persuasive in a state court or a federal matter, but in this appeal they are not binding. *See J.M. Huber Corp. v. Santa Fe Energy Res., Inc.,* 871 S.W.2d 842, 846 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Further, all of the federal cases Devon cites involved the interpretation of federal substantive statutes. In contrast, the UDJA is a procedural device that does not establish jurisdiction. *Chenault v. Phillips,* 914 S.W.2d 140, 141 (Tex.1996) (per curiam) ("[T]he [UDJA] is not a grant of jurisdiction, but 'merely a procedural device for deciding cases already within a court's jurisdiction.' ") (quoting *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994)). The court in *In re Knight,* on which Devon relies, expressly acknowledged that courts can award fees even in the absence of subject matter jurisdiction when those fees are authorized by statutes and rules that are non-substantive. *See* 207 F.3d at 1117.

Under the UDJA, the trial court has authority to award attorneys' fees and costs "[i]n any proceeding under this chapter." *See* **\*222** Tex. Civ. Prac. & Rem.Code § 37.009. By seeking declaratory relief, Devon initiated a "proceeding under this chapter" that falls squarely within the plain language of Section 37.009. In response, KCS properly pleaded an ancillary claim for relief under the statute through its counterclaim for attorneys' fees. *See id.* § 37.004. KCS's fee claim was likewise a "proceeding under this chapter" and thus remained viable even though Devon's action was properly dismissed.

Also unpersuasive is Devon's claim that the trial court lacked jurisdiction to award fees because the UDJA was not "properly invoked" from the outset. None of the cases Devon relies on involve the absence of subject matter jurisdiction over the primary claim. The references to properly invoking the statute in these cases relate only to proper pleading and improper attempts to use the UDJA to recover fees when they are not available under the substantive law that serves as the basis for the plaintiff's claims. *See Knighton,* 856 S.W.2d at 210–11 (holding that trial court did not abuse its discretion to deny request for attorney's fees when the record reflected that the trial court recognized that both parties pursued legitimate rights and therefore each should bear its own attorney's fees); *Hartford Cas. Ins. Co.,* 796 S.W.2d at 772 (reversing judgment for plaintiff on contract claim and declining to remand for consideration of equitable and just attorney's fees under UDJA when plaintiff's additional request for declaratory relief was unnecessary and improper). Similarly, *City of Houston v. Chemam* is not on point, because in that case the court reversed a trial court's denial of the City's plea to the jurisdiction when a plaintiff attempted to avoid governmental

immunity by filing a redundant declaratory judgment action and demand for attorney's fees. *See* 2010 WL 143476, at \*8.

**[24]** Devon "invoked" the UDJA through its pleadings. KCS, therefore, was eligible to recover its attorneys' fees as a party defending a claim for declaratory relief. *See Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 641–43 (Tex.2005); *Bradt,* 905 S.W.2d at 759–60; *see also Corcoran v. Atascocita Cmty. Improvement Ass'n, Inc.,* No. 14–12–00982–CV, 2013 WL 5888127, at \*9–12 (Tex.App.-Houston [14th Dist.] Oct. 31, 2013, pet. denied) (mem. op.) (affirming award of attorney's fees to third-party defendant against whom appellants filed suit). Therefore, regardless of whether Devon prevailed on its own claims, the trial court had jurisdiction over KCS's attorneys' fee claim for the defense of that litigation.

### 3. Texas law does not recognize Devon's distinction between intervening mootness and mootness ab initio.

The Texas Supreme Court has recognized that a trial court retains jurisdiction to award attorneys' fees even if the merits of the dispute become moot. *See Hallman,* 159 S.W.3d at 643; *Camarena v. Tex. Emp't Comm'n,* 754 S.W.2d 149, 151 (Tex.1988). Devon argues that these cases are distinguishable, however, because they involve situations in which a trial court properly had subject matter jurisdiction over a declaratory judgment action at the outset of the case but then later, because of subsequent actions, lost jurisdiction. As support for its contention, Devon cites to *Samsung Electronics Co., Ltd. v. Rambus, Inc.,* 398 F.Supp.2d 470, 481 (E.D.Va.2005). In that case, the court stated that "[w]here a court is divested of its subject matter jurisdiction over the substantive claim by virtue of intervening mootness, it nonetheless retains jurisdiction to 'consider collateral issues after an action is no longer pending.' " *Id.* at 482. But the court went on to state that, in contrast, "lack of subject matter jurisdiction over a substantive **\*223** claim serves 'to bar an award of attorney's fees where an action was moot at the time of filing.' " *Id.* at 481.

**[25]** We conclude that, under Texas law, the point in time when the court lacked subject matter jurisdiction over Devon's predicate claims is irrelevant to KCS's fee claim. Although *Hallman* and *Camarena* involved situations in which the court lost subject matter jurisdiction during the pendency of the litigation because the plaintiff's claims became moot, the same analysis applies to a situation in which the court lacks subject matter jurisdiction over the plaintiff's claims from the inception of the case. *See Hallman,* 159 S.W.3d at 642 ("[A] dispute over attorneys fees is a live controversy.") (citing *Camarena,* 754 S.W.2d at 151).

For example, this Court has recognized that attorneys' fees may be awarded to a defendant under the UDJA when the plaintiff who sought declaratory relief lacked standing to assert its claims. *See Galveston Cnty. Commissioner's Court v. Lohec,* 814 S.W.2d 751, 754–55 (Tex.App.-

Houston [14th Dist.] 1991), *rev'd on other grounds,* 841 S.W.2d 361 (Tex.1992) (remanding for determination of attorneys' fees under the UDJA to party defending claims brought by county commissioner who lacked standing to sue in individual or official capacity); *see also Save Our Springs Alliance, Inc. v. City of Dripping Springs,* 304 S.W.3d 871, 891 (Tex.App.-Austin 2010, pet. denied) (district court had jurisdiction to award attorneys' fees incurred in connection with defense of plaintiff's claims over which the court determined plaintiff lacked standing).

 **[26]**  **[27]**  Standing, like mootness, is a component of subject matter jurisdiction. *Tex. Ass'n of Bus.,* 852 S.W.2d at 445. When a plaintiff lacks standing, the court lacks subject matter jurisdiction. *Id.* at 444–45 ("[A] lack of standing deprives a court of subject matter jurisdiction because standing is an element of such jurisdiction."). In *Lohec,* when this Court found that the intervening plaintiff lacked standing to assert his declaratory judgment claims, this Court necessarily determined that it lacked subject matter jurisdiction over his claims from their inception. 814 S.W.2d at 754–55. Nevertheless, this Court held that the trial court had jurisdiction to decide whether it would be equitable and just to award fees to the defendant. *Id.* at 755. Similarly, in *City of Dripping Springs,* in which the plaintiff argued, as Devon does here, that the trial court lacked jurisdiction to award fees under the UDJA because it lacked jurisdiction over the plaintiff's claims, the Austin Court of Appeals held that the court had authority to award fees. 304 S.W.3d at 891–92.

Devon's argument and reliance on *Samsung Electronics* for the proposition that a court has jurisdiction to award fees when a case becomes moot while the action is pending, but not when the action is moot from its inception, is misplaced because it is contrary to Texas law. According to the Texas cases interpreting the UDJA on which KCS relies, the absence of subject matter jurisdiction over Devon's claims at the inception of the litigation has no effect on whether KCS could recover its fees under the UDJA for defending against them when Devon's pleadings invoked the statute. We therefore sustain KCS's cross-issue.

## CONCLUSION

We hold that the trial court did not err in dismissing Devon's claims for lack of subject matter jurisdiction because Devon's requested declaratory relief sought an impermissible advisory opinion concerning title to Louisiana mineral interests. We therefore affirm that part of the trial **\*224** court's judgment. We further hold that the trial court did not lose subject matter jurisdiction over KCS's counterclaim for attorney's fees when it determined that it lacked subject matter jurisdiction over Devon's request for declaratory relief, and therefore the trial court erred when it dismissed KCS' claim for attorney's fees and costs under the UDJA. Accordingly, we reverse and remand for the trial court to determine whether, in its discretion, KCS is entitled to attorney's fees and costs arising from its defense against Devon's declaratory judgment action.

C.J. FROST, concurring and dissenting.

KEM THOMPSON FROST, Chief Justice, concurring and dissenting.
The trial court correctly concluded that it lacked subject-matter jurisdiction over both the plaintiff's claims under the Texas Declaratory Judgments Act and the defendant's counterclaim for attorney's fees under that statute for defending against the plaintiff's claims. Therefore, this court should affirm the trial court's judgment in its entirety.

### *Recovery of Attorney's Fees under Texas Civil Practice and Remedies Code section 37.009*

Appellant/plaintiff Devon Energy Production Company, L.P. sued appellee/defendant KCS Resources, L.L.C. asserting claims for declaratory relief under the Texas Declaratory Judgments Act.[1] KCS counterclaimed, asserting a variety of claims, but KCS later nonsuited all of them except its claim for reasonable and necessary attorney's fees incurred as a result of Devon's declaratory-judgment claims. KCS sought to recover these fees only under Texas Civil Practice and Remedies Code section 37.009, and there is no other apparent basis on which KCS might recover these fees.[2] The trial court determined that it lacked subject-matter jurisdiction over both Devon's declaratory-judgment claims and KCS's section 37.009 claim and therefore dismissed all claims without prejudice for lack of subject-matter jurisdiction.

In determining parties' entitlement to attorney's fees, Texas courts follow the American Rule, which provides that litigants may recover attorney's fees only if a statute or contract specifically provides for such a recovery.[3] Thus, in determining whether a party may recover attorney's fees, Texas courts must interpret and apply the statute or contract under consideration, rather than crafting judge-made rules to supply the legal standard to be applied.[4] In today's case, the only possible authority under which KCS might recover attorney's fees is section 37.009.

### *To recover attorney's fees under Texas Civil Practice and Remedies Code section 37.009, the claimant must do so in a proceeding under the Texas Declaratory Judgments Act, and a claim for fees is not such a proceeding.*

Section 37.009, entitled "Costs," provides in its entirety that "[i]n *any proceeding* under this chapter, the court may award costs and reasonable and necessary attorney's **\*225** fees as are equitable and just."[5] We are to review the trial court's interpretation of applicable statutes de novo.[6] In interpreting a statute, our objective is to determine and give effect to the Legislature's

intent. [7] If possible, we must ascertain that intent from the language the Legislature used in the statute and not look to extraneous matters for an intent the statute does not state. [8] If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. [9] We are not to engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. [10]

A proceeding under the Declaratory Judgments Act is for the purpose of determining one or more requests for declaratory relief under that statute. [11] In such a proceeding the trial court has discretion to award reasonable and necessary attorney's fees as are equitable and just. [12] But, a request or claim for reasonable and necessary attorney's fees is not independent of the declaratory-judgment claims asserted in the trial court; rather, the attorney's fees awarded must relate to those claims. [13] Under the unambiguous language of the Declaratory Judgments Act, reasonable and necessary attorney's fees under section 37.009 must be awarded in a proceeding under that statute and a request for such fees, standing alone, is not a declaratory-judgment proceeding. [14]

*Because the trial court lacked subject-matter jurisdiction over the plaintiffs declaratory-judgment claims, the proceedings under the Declaratory Judgments Act were void, and there are no proceedings that would permit an award of attorney's fees under Texas Civil Practice and Remedies Code section 37.009.*

The trial court correctly ruled that it lacked subject-matter jurisdiction over Devon's declaratory-judgment claims; therefore, the proceedings relating to these claims are void. [15] Because there are no such proceedings, there is no basis for awarding KCS reasonable and necessary attorney's fees under section 37.009. KCS's claim for these attorney's fees was ancillary to Devon's claims and the trial court lacked subject-matter jurisdiction over Devon's claims. Thus, the trial court did not err in dismissing all of these claims for lack of subject-matter jurisdiction. [16]

 **\*226** The issues raised by KCS's cross-appeal have not been addressed by a precedent from the Supreme Court of Texas or from this court, and three sister courts of appeals have reached the opposite conclusion. Without citing any authority in support of the proposition, the sister courts determined that the absence of subject-matter jurisdiction over claims from filing through dismissal does not affect the nature of these claims. [17] But, the lack of jurisdiction is fundamental, and its absence has a material effect on both the trial court proceeding and the analysis of the issue on appeal. The lack of subject-matter jurisdiction over Devon's declaratory-judgment claims from the moment of filing until the moment of dismissal makes the proceedings void. [18]

Various federal courts of appeals have held in an analogous situation that a trial court's lack of subject-matter jurisdiction over claims under the Employee Retirement Income Security Act ("ERISA") means that the court also lacks subject-matter jurisdiction over claims seeking attorney's fees under a statute giving trial courts discretion to award attorney's fees in an ERISA action.[19] Under this line of cases, in the absence of subject-matter jurisdiction over the ERISA claims, there is no ERISA "action" in which attorney's fees could be awarded under the statute.[20] These cases provide persuasive authority in support of the conclusion that the trial court lacked subject-matter jurisdiction over KCS's claim seeking attorney's fees under section 37.009.[21]

KCS cites two cases from the Supreme Court of Texas, *Hallman* and *Camarena,*[22] to support its position. In the *Camarena* case, which did not involve section 37.009, the high court held that a live issue still existed between the parties as to whether the trial court erred in denying the plaintiff's request for attorney's fees even though it granted the plaintiffs the other relief they requested.[23] The *Camarena* court held that, although the issues regarding the other relief granted in the trial court's judgment later had become moot, the issue as to whether the trial court erred in denying the plaintiff's request for attorney's fees was not moot.[24] Significantly, in *Camarena,* the trial court had subject-matter jurisdiction over the claims from filing through the initial rendition of judgment, and the fee request denied by the trial court addressed attorney's fees during the period in which the trial court **\*227** had subject-matter jurisdiction.[25] The *Camarena* court did not address whether the plaintiffs were seeking fees for the time period after the other issues became moot or whether the trial court had jurisdiction over such a request, and this silence does not create any precedent on this issue.[26] In any event, there is a significant difference between a case in which the trial court never has subject-matter jurisdiction over the plaintiff's claims and a case in which the trial court lost jurisdiction over the claims after rendition of judgment.

The *Hallman* case involved an appeal from the trial court's denial of attorney's fees requested under section 37.009 in an insurance dispute in which other issues in the case became moot while the case was pending in the Supreme Court of Texas.[27] The *Hallman* court held that the issue as to whether the insurer had a duty to defend was still a live controversy because it would determine whether a remand was necessary for the trial court to consider whether to change its denial of the fee request in light the new prevailing party on that issue.[28] Even presuming that the insured was seeking attorney's fees for the period after the issues became moot, the case is not supportive of Devon's position because the *Hallman* court did not address whether the trial court had jurisdiction over such a request, and this silence does not create any precedent on this issue.[29]

In *Galveston County Commissioners' Court v. Lohec,* this court reversed the trial court's ruling on the merits of declaratory-judgment claims, held that one plaintiff lacked standing, and remanded to the trial court to consider the defendant's request for attorney's fees under 37.009.[30] The

Supreme Court of Texas disagreed with this court's disposition regarding the declaratory relief, reversed this court's judgment, and rendered judgment, so the case was never remanded.[31] In *Lohec,* no party raised the issue of whether the trial court had jurisdiction over the defendants' requests for attorney's fees against the plaintiff who lacked standing, and this court did not opine on the matter.[32] The *Lohec* court did not address whether the trial court had jurisdiction over such a request, and the court's passing over this issue in silence does not create any precedent.[33] Thus, the issue appears to be one of first impression in this court. Instead of following the sister courts of appeals, this court instead should look to the plain language of the statute and analogous federal **\*228** authority and hold that the lack of subject-matter jurisdiction precludes an award of attorney's fees under section 37.009.

## Conclusion

The Texas Legislature has the authority and know-how to enact a statute providing that a trial court may award reasonable and necessary attorney's fees to a defendant who succeeds in having a plaintiff's declaratory-judgment claims dismissed for lack of subject-matter jurisdiction. To date, the Texas Legislature has not done so. The trial court correctly ruled that it lacked subject-matter jurisdiction over Devon's declaratory-judgment claims; therefore, the proceedings relating to these claims are void. Because there are no such proceedings, there is no basis for awarding KCS reasonable and necessary attorney's fees under section 37.009. KCS's claim for attorney's fees was ancillary to Devon's claims, over which the trial court lacked subject-matter jurisdiction. The trial court did not err in dismissing all of these claims for lack of subject-matter jurisdiction. To the extent this court reverses this ruling, I respectfully dissent.

Footnotes

1    A mineral servitude is "the right of enjoyment belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." La.Rev.Stat. § 31:21.

2    Because of our disposition of this issue, it is unnecessary to reach the parties' arguments concerning the applicability of the statute of frauds.

3    In its reply brief, Devon argues that KCS's counterclaims were live pleadings when the trial court initially granted KCS's summary-judgment motion on March 27, 2012, and that the trial court's final judgment on March 25, 2013 "did nothing to alter its earlier March 27, 2012 order." We note that the 2012 order denied Devon's request for declaratory relief and granted a take-nothing judgment against Devon, while the 2013 order dismissed Devon's declaratory judgment action for lack of subject matter jurisdiction and also dismissed KCS's counterclaim for attorney's fees. Although the court ruled in KCS's favor in both orders, the basis for the rulings and relief granted are distinctly different. Therefore, on these facts, we look to the state of the pleadings at the time the trial court signed its final judgment.

4    KCS argues that the operative pleading is Devon's first amended petition, and not the second amended petition, which Devon filed after KCS moved for summary judgment but before the trial court's judgment was signed. Devon's first amended petition did not request specific declarations, but set out each party's contentions concerning the Disputed Properties and merely requests that the court declare the parties' intent under the PSA. For purposes of our analysis, however, the same dispute is reflected in both petitions.

We also note that *Protech* and *Askanase* are pre–2003 memorandum opinions designated "do not publish" and thus have no precedential value. *See* Tex.R.App. P. 47.2 cmt. (opinions issued in civil cases before 2003 and affirmatively designated "do not publish" lack precedential value).

The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461.

The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1485.

*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.001, *et seq.* (West 2014).

*See id.* § 37.009 (West 2014). Unless otherwise specified all statutory references in this opinion are to the Texas Civil Practice and Remedies Code.

*See Epps v. Fowler,* 351 S.W.3d 862, 865 (Tex.2011).

*See id.* This principle does not apply to the extent that a party seeks to recover attorney's fees as damages under a particular claim. KCS does not seek to recover attorney's fees as damages.

Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (emphasis added).

*See Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989).

*See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000).

*Id.*

*St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997).

*See id.*

*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.001, *et seq.*

*See id.* § 37.009.

*See Rapid Settlements, Ltd. v. Settlement Funding, LLC,* 358 S.W.3d 777, 786–87 (Tex.App.-Houston [14th Dist.] 2012, no pet.).

*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.001, *et seq.*; *Tanglewood Homes Ass'n, Inc. v. Feldman,* 436 S.W.3d 48, 68–69 (Tex.App.-Houston [14th Dist.] 2014, no pet. h.); *Rapid Settlements, Ltd.,* 358 S.W.3d at 786–87.

*See State v. PR Investments,* 180 S.W.3d 654, 664, n. 8 (Tex.App.-Houston [14th Dist.] 2005) (en banc), *aff'd,* 251 S.W.3d 472 (Tex.2008); *Smith v. Gulf States Utilities,* 616 S.W.2d 300, 302 (Tex.Civ.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.).

*See PR Investments,* 180 S.W.3d at 664, n. 8; *Tanglewood Homes Ass'n, Inc.,* 436 S.W.3d at 68–69.

*See Feldman v. KPMG LLP,* 438 S.W.3d 678, 685–86 (Tex.App.-Houston [1st Dist.] 2014, no pet. h.); *Zurita v. SVH–1 Partners, Ltd.,* No. 03–10–00650–CV, 2011 WL 6118573, at *8 (Tex.App.-Austin Dec. 8, 2011, pet. denied) (mem. op.); *Castro v. McNabb,* 319 S.W.3d 721, 735–36 (Tex.App.-El Paso 2009, no pet.).

*See PR Investments,* 180 S.W.3d at 664, n. 8; *Gulf States Utilities,* 616 S.W.2d at 302.

*Cliburn v. Police Jury Ass'n of Louisiana, Inc.,* 165 F.3d 315, 316 (5th Cir.1999) (per curiam); *W.G. v. Senatore,* 18 F.3d 60, 64–65 (2d Cir.1994); *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co. of Florida,* 827 F.2d 1454, 1458 (11th Cir.1987) (per curiam).

*Cliburn,* 165 F.3d at 316; *W.G.,* 18 F.3d at 64–65; *Laborers Local 938 Joint Health & Welfare Trust Fund,* 827 F.2d at 1458.

*Cliburn,* 165 F.3d at 316; *W.G.,* 18 F.3d at 64–65; *Laborers Local 938 Joint Health & Welfare Trust Fund,* 827 F.2d at 1458.

*See Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642 (Tex.2005); *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 150–51 (Tex.1988).

*See Camarena,* 754 S.W.2d at 150–51.

*See id.*

*See id.*

*United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37–38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (concluding that in deciding its jurisdiction, a court is not bound by a prior exercise of jurisdiction in a case in which the jurisdictional issue was not questioned, but was passed over *sub silentio* ); *Gantt v. Gantt,* 208 S.W.3d 27, 30, n. 4 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (same).

*See Hallman,* 159 S.W.3d at 642.

*See id.*

*L.A. Tucker Truck Lines, Inc.,* 344 U.S. at 37–38, 73 S.Ct. at 69; *Gantt,* 208 S.W.3d at 30.

30 *See Galveston County Commissioners' Court v. Lohec,* 814 S.W.2d 751, 754–55 (Tex.App.-Houston [14th Dist.] 1991), *rev'd on other grounds,* 841 S.W.2d 361 (Tex.1992).

31 *See Lohec v. Galveston County Commissioner's Court,* 841 S.W.2d 361, 366 (Tex.1992).

32 *See Lohec,* 814 S.W.2d at 754–55.

33 *L.A. Tucker Truck Lines, Inc.,* 344 U.S. at 37–38, 73 S.Ct. at 69; *Gantt,* 208 S.W.3d at 30.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (3)
1. Devon Energy Production Co., LP v. KCS Resources, LLC
2012 WL 10205215 , Tex.Dist. , Mar. 27, 2012

*Modified by*

2. Devon Energy Production Co., L.P. v. KCS Resources, LLC
2013 WL 7087254 , Tex.Dist. , Mar. 25, 2013

*Judgment Affirmed in Part, Reversed in Part by*

3. Devon Energy Production Co., L.P. v. KCS Resources, LLC
450 S.W.3d 203 , Tex.App.-Hous. (14 Dist.) , Oct. 30, 2014 , rehearing overruled
( Dec 09, 2014 ) , petition for review filed ( Jan 22, 2015 )

### Related References (1)
4. Devon Energy Production Co., L.P. v. KCS Resources, LLC
2010 WL 10931227 , Tex.Dist. , June 16, 2010

2013 WL 1500377
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Sherry DUNLAP, Appellant,
v.
Cindy GAYLE, Appellee.

No. 13–12–00105–CV.   |   April 11, 2013.

On appeal from the 135th District Court of Goliad County, Texas. Stephen Williams, District/County Judge.

**Attorneys and Law Firms**

Ken Fields, Hermansen, McKibben, Woolsey, Corpus Christi, TX, for Appellant.

David C. Griffin, Robert E. McKnight, Marek, Griffin & Knaupp, Victoria, TX, for Appellee.

Before Justices RODRIGUEZ, GARZA and PERKES.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice GARZA.

**\*1** This is an appeal of a no-evidence/traditional summary judgment granted in favor of appellee, Cindy Gayle. By two issues, appellant, Sherry Dunlap, contends the trial court erred in: (1) granting summary judgment, and (2) awarding damages to Gayle pursuant to a contractual liquidated damages provision. We affirm.

**I. BACKGROUND**

In November 2007, Dunlap and Gayle signed an earnest money contract for Dunlap to purchase a house and acreage in Goliad County owned by Gayle, a real estate agent.[1] Pursuant to the

contract, Gayle provided Dunlap with a survey of the property. The contract provided that any party wrongfully refusing to sign a release acceptable to the escrow agent of the $10,000 in earnest money was liable "to the other party for liquidated damages of three times the amount of the earnest money."Dunlap failed to close by the date specified in the contract and refused to release the earnest money to Gayle. Dunlap sued Gayle, asserting fraud and breach of contract. Gayle counterclaimed, asserting that she was entitled to contractual liquidated damages of three times the amount of the earnest money.

Gayle filed a no-evidence motion for summary judgment and later filed a combined no-evidence/ traditional motion for summary judgment on Dunlap's claims and her own counterclaim. With regard to Dunlap's fraud allegation, Gayle asserted that Dunlap had no evidence: (1) that Gayle made a material false representation to Dunlap; or (2) that Dunlap suffered damages. As to Dunlap's breach of contract claim, Gayle asserted that Dunlap had no evidence that: (1) Dunlap performed or was excused from performing under the contract; (2) Gayle breached the contract; or (3) Gayle's breach caused Dunlap damages. [2]

Dunlap filed responses to Gayle's motions. [3] Dunlap attached an affidavit, dated May 23, 2011, to her first response and attached a second affidavit, dated November 22, 2011, to her supplemental response. Gayle objected to Dunlap's summary judgment evidence, arguing that both affidavits were incompetent summary judgment evidence.

On November 30, 2011, the trial court granted Gayle's no-evidence/traditional motion without stating the basis for its ruling. The trial court also awarded Gayle actual damages in the amount of $30,000 and attorney's fees. This appeal followed.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

A no-evidence motion for summary judgment under Texas Rule of Civil Procedure 166a(i) is essentially a motion for pretrial directed verdict.*Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009). A no-evidence motion for summary judgment is appropriate when there is no evidence of one or more essential elements of a claim on which the adverse party will bear the burden of proof at trial. TEX.R. CIV. P. 166a(i); *Scripps Tex. Newspapers, L.P. v. Belalcazar,* 99 S.W.3d 829, 840 (Tex.App.-Corpus Christi 2003, pet. denied). The motion must be specific in challenging the evidentiary support for an element of a claim or defense. *Gish,* 286 S.W.3d at 310. "When reviewing a no-evidence summary judgment, we 'review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.'"*Id.* (quoting *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006)).

**\*2** When, as here, the trial court's order granting summary judgment does not state the grounds for its ruling, we must affirm the judgment if any of the grounds alleged in the motion are meritorious. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). When a party moves for summary judgment under both rules 166a(c) and 166a(i) of the Texas Rules of Civil Procedure, as here, we will first review the trial court's judgment under the standards of rule 166a(i).*Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the non-movant fails to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the non-movant's summary judgment proof satisfies the less stringent rule 166a(c) burden. *Id.*

## III. DISCUSSION

### A. Fraud

In her motion, Gayle challenged the "material false representation" and damage elements of Dunlap's fraud claim. Dunlap attached to her first response: (1) her May 23, 2011 affidavit; (2) a survey plat of the property, which showed a "trash dump" located on the property; (3) a "Seller's Disclosure Notice," a standardized form which requires a seller to disclose certain prescribed property "conditions," and which reflected that there was no "landfill" on the property [4]; (4) a legal description of the property; (5) a letter from Dunlap's counsel stating her refusal to release the earnest money; (6) the contract for sale of the property; and (7) a letter to Dunlap from the escrow agent stating that she would forfeit the earnest money if she failed to complete the purchase of the property by the closing date. In her response, Dunlap asserted that Gayle: (1) falsely represented the property as "pristine"; and (2) stated in the written disclosures that there was no "landfill" on the property, when the plat "show[ed] a landfill." Dunlap's response states that Gayle breached the contract by not disclosing the existence of the "landfill."

In her supplemental response, Dunlap stated that she "did not want a trash dump or a landfill" and that "these two words mean essentially the same thing to her."Dunlap also asserted that she did not receive the survey, which revealed the existence of the trash dump, "until the third [November 2007] contract."Dunlap attached to her supplemental response: (1) an excerpt from Gayle's no-evidence/traditional motion for summary judgment, in which Gayle asserted her counterclaim for contractual liquidated damages; and (2) Dunlap's November 22, 2011 affidavit, in which she stated that "[t]he words 'trash dump' and 'land fill' mean the same thing" to her, and that she "did not know about the land fill or trash dump until the third contract." [5]

Dunlap asserts that the evidence of a material false representation about the property consists of: (1) Gayle's written representation that there was no landfill on the property; and (2) Gayle's statement that the property was "pristine." Gayle responds that: (1) her representation that there

was not a landfill on the property was not false; and (2) assuming that she described the property as "pristine," the use of such a term was mere "puffing," not a misrepresentation of material fact.

**\*3** To establish fraud or misrepresentation, a plaintiff must show, among other things, that the defendant made a false statement concerning a past or existing material fact. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). This element requires proof that when Gayle made the representation, she "knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion."*Id.* A false representation may consist of a deceptive answer or any other indirect or misleading language, and a statement that is literally true may be actionable if used to create an impression that is substantially false. *See Nelson v. Najm,* 127 S.W.3d 170, 175 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

"Landfill" is defined as "a system of trash and garbage disposal in which the waste is buried between layers of earth to build up low-lying land—called also *sanitary landfill.*" MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 654 (10th ed.1996). "Dump" is defined as "an accumulation of refuse and discarded materials" or "a place where such materials are dumped."*Id.* at 359.Dunlap correctly notes that "dump" is the first synonym listed for "landfill." *Id.* at 654.She argues that, although Gayle's representation that there was "no landfill" on the property could technically be true, it would nonetheless be fraudulent if it was used to create a substantially false impression. Dunlap has offered no evidence, however, that when Gayle checked "no landfill" on the standardized seller's disclosure form, she intended to create an impression that was substantially false. Gayle's affidavit unequivocally stated that the areas labeled "trash dump" on the survey "is not a landfill." Her affidavit further stated that, although she has burned trash in barrels in the area labeled "trash dump," "there has never been any trash simply dumped there and left."We conclude that the presence of a "trash dump" on the property did not render Gayle's "no landfill" representation false.

Dunlap also points to Gayle's description of the property as "pristine" as evidence of a material false representation. In her affidavit, attached to her response, Dunlap asserted that Gayle represented that the property was "pristine." Gayle argues that, even assuming that she described the property as "pristine," such a description is mere "puffing" or opinion, and cannot constitute fraud.

Generally, there are three factors courts consider when determining whether a statement is actionable, or mere puffing or opinion. *Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 230 (Tex.App.-Houston [14th Dist.] 1996, writ denied). We consider (1) the specificity of the alleged misrepresentation, (2) the comparative knowledge between the buyer and seller, and (3) whether the representation concerns past or present conditions, or future conditions.*Id.; see also Helm v. Kingston,* No. 13–10–00224–CV, 2011 WL 6746064, at \*6 (Tex.App.-Corpus Christi Dec. 21,

2011, pet. denied) (mem.op.). An imprecise or vague representation constitutes a mere opinion. *Humble Nat'l Bank,* 933 S.W.2d at 230.

**\*4** "Pristine" is defined in this context as "not spoiled, corrupted, or polluted (as by civilization), pure."MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 927. Dunlap asserted in her affidavit:

> When I inspected the property, Cindy Gayle and I walked the border fence most of the way around the property[;] however[,] when we got to the corner where I now know there is a land fill, she distracted me and took me back to the house. She clearly was concealing the fact that the property has a landfill. I have not seen the landfill location with my own eyes.
>
> ....
>
> I absolutely relied on her representation that the property was "pristine" and had no landfill when I offered to buy the property.

The property consisted of approximately twenty-six acres and was improved with a house.[6] First, we examine the specificity of the alleged misrepresentation. *See Humble Nat'l Bank,* 933 S.W.2d at 230. We conclude that as used in the present context—to describe property—the term "pristine" is vague and indefinite in meaning and therefore cannot constitute an actionable misrepresentation. *See Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 464 (Tex.App.-Dallas 1990, writ denied (holding that representation that Mercedes was the best engineered car in the world was not actionable); *see also Bill & Jo Deane Bradford Invs., Inc. v. Cutter Aviation San Antonio, Inc.,* No. 04–04–00791– CV, 2005 Tex.App. LEXIS 9789, at \*6, 2005 WL 3161083 (Tex.App.-San Antonio Nov. 23, 2005, no pet.)(mem.op.) (holding statement that an aircraft engine was "good, safe and reliable" was mere opinion or puffing).

Second, we compare the subject-matter knowledge of the buyer and seller, asking "whether or not [a statement's] correctness is a matter of which either of the parties can judge as well as the other," and upon which the buyer can reasonably be expected, in the exercise of ordinary diligence, to have formed his own opinion. *See Aguilar,* 794 S.W.2d at 463. Here, Gayle as the owner of the property was more familiar with it, and Dunlap claims that when she inspected the property, Gayle "distracted" her and deliberately prevented her from inspecting the area where the "trash dump" was located. Nonetheless, we find that whether the property was "pristine" could be judged equally by either party and was a matter upon which Dunlap could have formed her own opinion through ordinary diligence.[7] *See id.* at 464.

Third, the alleged statement concerned a present condition, not a future condition, and therefore requires greater scrutiny. *See id*.We hold that the alleged statement that the property was "pristine" is an expression of opinion, not a representation of fact.

We hold that Dunlap failed to present evidence of the "material false representation" element of her fraud claim, and the trial court did not err in granting no-evidence summary judgment as to her fraud claim. *See* TEX.R. CIV. P 166a(i).

## B. Breach of Contract

**\*5** Gayle's no-evidence motion asserted that Dunlap had no evidence that: (1) Dunlap performed or was excused from performing under the contract; (2) Gayle breached the contract; or (3) Gayle's breach caused Dunlap damages. In her affidavit, Dunlap stated that Gayle breached the contract by failing to "disclose the landfill" on the Seller's Disclosure of Property Condition. Dunlap's evidence included: (1) the Seller's Disclosure, which reflected that the property did not contain a landfill, and (2) the survey showing the existence of a "trash dump."

To establish that Gayle breached the contract by failing to "disclose the landfill," Dunlap must present evidence that a landfill actually exists. We have already determined that the presence of a "trash dump" did not render Gayle's "no landfill" representation to be false. Dunlap's affidavit simply asserts that there is a landfill on the property, even though she concedes that she "has not seen the landfill location with [her] own eyes." Gayle's affidavit unequivocally states that there is no landfill on the property and that the area labeled "trash dump" on the survey is not a landfill. We hold that Dunlap has not presented evidence establishing that Gayle breached the contract by failing to disclose a landfill. *See id.* We further hold that the trial court did not err in granting summary judgment on Dunlap's breach of contract claim, and we overrule Dunlap's first issue.

## C. Damages

By her second issue, Dunlap contends the trial court erred in awarding Gayle $30,000 in actual damages because the contract provision authorizing such damages is an unenforceable penalty. Paragraph 18(D) of the contract provides: "Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages of three times the amount of the earnest money." The earnest money payable by Dunlap to Gayle under the contract was $10,000.

Gayle responds that Dunlap's claim that a liquidated damages clause is an unenforceable penalty is an affirmative defense, which Dunlap was required to plead and prove. Citing *Phillips v. Phillips,* Dunlap responds that pleading the defense is unnecessary when the unenforceability of the liquidated damages provision appears on the face of the pleadings. *See* 820 S.W.2d 785, 789 (Tex.1991) (holding that the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law).

An assertion that a liquidated damages provision constitutes an unenforceable penalty is an affirmative defense, and the party asserting penalty bears the burden of proof. Generally, that party must prove the amount of actual damages, if any, to demonstrate that "the actual loss was not an approximation of the stipulated sum."If the amount stipulated in the liquidated damages clause is "shown to be disproportionate to actual damages," we should declare that the clause is a penalty and limit recovery to actual damages.

**\*6** *SP Terrace, L.P. v. Meritage Homes of Tex., LLC,* 334 S.W.3d 275, 287 (Tex.App.-Houston [1st Dist.] 2010, no pet.)(internal citations omitted).

It is undisputed that Dunlap did not plead or raise her penalty defense to the trial court. Dunlap argues that under *Phillips,* she did not waive her penalty argument because the liquidated damages provision in the contract—providing for liquidated damages of three times the amount of the earnest money—was unenforceable on its face. We disagree.

In *Phillips,* the Texas Supreme Court found that a provision which provided for liquidated damages ten times the amount of *actual* damages to be an unenforceable penalty. 820 S.W.2d at 789. The court found the provision did not meet the two-prong test for determining whether to enforce a liquidated damages provision. *See id.* at 788–89 (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 s.W.2d 340, 342 n. 2 (Tex.1979)). To enforce such a provision, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation. *See id.* at 788.The provision at issue in *Phillips* did not meet the first prong of the test because it assumed that actual damages must be determined before the "ten times" multiplier can be applied. *See id.* at 789.The provision did not meet the second prong of the test because it did not forecast actual damages, but called for them to be determined and then multiplied. *See id.*

The liquidated damages provision in the present case does not call for multiplying the amount of *actual* damages, as in *Phillips. See id.*Rather, it calls for trebling the agreed-upon amount of earnest money. [8] For these reasons, we find *Phillips* to be inapposite. Dunlap neither pleaded the affirmative defense of penalty nor presented evidence showing that the damage award was excessive. We overrule her second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

## Footnotes

1    The parties signed two earlier contracts regarding the same property, one in September 2007 and another in October 2007. Dunlap did not close on either of the two earlier contracts or on the November 2007 contract at issue in this case.

2    We note that Gayle's first no-evidence motion for summary judgment asserted that Dunlap lacked evidence of these elements, as well as other elements.

3    Dunlap filed a response to Gayle's first no-evidence motion and later filed a "Supplemental Response."

4    A seller of residential real property is required to provide the buyer with a "Seller's Disclosure of Property Condition." *See*TEX. PROP.CODE ANN. § 5.008 (West Supp.2011).

5    We note that only the first and last page of the November 22, 2011 affidavit appear in the record. The intervening pages, if any, are missing.

6    Although no house appears on the survey, Dunlap refers to the house in her affidavit, and Gayle's affidavit states that "the property has a house, sewage and everything else required of a modern home."

7    We note that the parties dispute when Dunlap first received the survey reflecting the existence of a "trash dump." Gayle's affidavit states that Dunlap had the survey before she entered into the second and third (present) earnest money contracts. Dunlap asserts that she did not receive the survey "until the third contract."

8    We note that the sales price in the contract was $460,000. Thus, the $10,000 earnest money was slightly more than 2% of the sales price.

---

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

620 S.W.2d 861
Court of Civil Appeals of Texas, Dallas.

Gerald E. EBERTS, Appellant,
v.
BUSINESSPEOPLE PERSONNEL SERVICES, INC., Appellee.

No. 20573.   |   Aug. 6, 1981.

Employer brought action for injunctive relief against former employee to restrain him from violating restrictive covenants in his employment contract. The 219th District Court, Collin County, John McCraw, Jr., J., granted the injunction and awarded damages, and employee appealed. The Court of Civil Appeals, Guittard, C. J., held that: (1) evidence was sufficient to support award of injunctive relief, and (2) trial court erred in awarding damages when an injunction was granted.

Affirmed in part; reversed in part; and judgment rendered.

**Attorneys and Law Firms**

**\*861** James R. Caton, James R. Caton & Associates, McKinney, for appellant.

Jerry W. Mills, Richards, Harris & Medlock, Dallas, for appellee.

**\*862** Before GUITTARD, C. J., and AKIN and CARVER, JJ.

**Opinion**

GUITTARD, Chief Justice.

Businesspeople Personnel Services, Inc., sued its former employee, Gerald E. Eberts, to restrain him from competing in violation of restrictive covenants in his employment contract and also for liquidated damages. The trial court, sitting without a jury, granted the injunction and awarded recovery of damages in an amount less than that stipulated in the contract. Defendant Eberts appeals. We affirm the injunction and modify the judgment by denying recovery of damages.

## 1. Special Exceptions

**[1]** Defendant complains of the court's action in overruling his special exceptions because the petition was factually insufficient to allege a cause of action. The special exceptions, however, fail to point out that the petition is insufficient to allege grounds for injunctive relief. They complain, rather, that various allegations of the petition are conclusions of the pleader and are too vague and general to give defendant fair notice. Defendant does not show in what manner the generality of the pleadings deprived him of a reasonable opportunity to defend. He made no objection to plaintiff's evidence on the ground that it came as a surprise or was not within the scope of the pleadings. Consequently, any error in overruling the special exceptions is waived. Banner Dairies v. Geers, 292 S.W.2d 169, 171 (Tex.Civ.App. El Paso 1956, writ dism'd); Pounds v. Jenkins, 157 S.W.2d 173, 176 (Tex.Civ.App. Texarkana 1941, no writ).

## 2. Injunctive Relief

**[2]** Defendant urges that there is no evidence, or insufficient evidence, to show that injunctive relief is necessary for the protection of plaintiff's business and goodwill. Our review of the record reveals evidence sufficient to support the trial court's findings in this respect. The court found that plaintiff had trained defendant as a job counselor in providing placement and counselling services; that defendant had established and maintained substantial goodwill for plaintiff between himself and plaintiff's clients and prospective clients; that defendant had access to confidential business information, including lists of clients and business methods; that defendant resigned his employment with plaintiff and began an employment agency business with his wife; that he advertised the services of such agency and contacted various employers who were previous or prospective customers of plaintiff; that defendant had declared his intention to continue such competitive activities before he was restrained by the court; and that plaintiff's goodwill and its relationship with its clients had been damaged. These findings support the court's conclusions that defendant's actions constitute a material breach of his employment agreement and that the injunction prayed for was reasonably necessary to protect plaintiff's goodwill from further competitive activities by defendant and safeguard plaintiff's confidential business information. Consequently, we hold that there is sufficient evidence to support the injunctive relief granted.

**[3]** Defendant further contends that the contract was unenforceable because of wrongful conduct by plaintiff. Although defendant alleged certain breaches of the employment contract, the court made no finding of fact as to that issue, and defendant made no request for additional findings as authorized by rule 298 of the Texas Rules of Civil Procedure. Consequently, this defense was waived. Elliott v. Bowden, 564 S.W.2d 825, 828 (Tex.Civ.App. Corpus Christi 1978, writ ref'd n. r. e.); Micrea, Inc. v. Eureka Life Insurance Co. of America, 534 S.W.2d 348, 357 (Tex.Civ.App. Fort Worth 1976, writ ref'd n. r. e.).

**[4]** Defendant complains that the injunction in the terms of the contract is overbroad and is unenforceable for want of specificity. We cannot agree. The injunction restrains defendant from engaging in the business of a private employment agency or agent within a one-hundred mile radius from the Dallas County Courthouse until **\*863** February 15, 1982, and from assisting in the finding of employees for employers, or employment for employees for a commission or fee, within that area for that period. The injunction further restrains defendant from disclosing plaintiff's confidential records, business methods, and names of its customers and clients. This decree conforms to the terms of the contract and we find from the record that it meets the test of reasonableness as to time and space established by Weatherford Oil Tool Co. v. Campbell, 161 Tex. 310, 340 S.W.2d 950, 951 (1960). Consequently, it is valid and enforceable. Gonzales v. Norris of Houston, Inc., 575 S.W.2d 110, 113 (Tex.Civ.App. Houston (14th Dist.) 1978, writ ref'd n. r. e.); Integrated Interiors, Inc. v. Snyder, 565 S.W.2d 350, 352 (Tex.Civ.App. Fort Worth 1978, writ ref'd n. r. e.). Defendant has not suggested any manner in which it should be reformed so as to limit its scope in any other respect. Consequently, we need not consider whether such a reformation would be proper.

### 3. Damages

Finally, defendant urges that the trial court erred in awarding "liquidated damages" of $7,500 because the evidence is insufficient to meet plaintiff's burden of proof as to reasonableness. Plaintiff makes no attempt to justify the award of $7,500 as based on evidence of actual damages, but presents a counterpoint urging that it is entitled to recover the $10,000 liquidated damages stipulated in the contract. We conclude that the trial court's award of $7,500, which it characterized as "liquidated damages," cannot be supported either as actual damages or as liquidated damages, and that the $10,000 payment stipulated is an unenforceable penalty in view of the specific enforcement of the contract by injunction.

**[5]** **[6]** The award of $7,500 cannot be supported as actual damages because, as defendant contends, the evidence does not establish any basis for the recovery of that amount. The only testimony concerning damages was by plaintiff's president, who testified that he was unable to state the amount of any damages from defendant's breach of the contract other than expenses of litigation, including attorney's fees and loss of time by himself and other employees. There was no estimate of the amount of commissions lost because of defendant's competition in the period between the termination of his employment with plaintiff on February 15, 1980, until he was restrained from further competition on March 4, 1980. The trial court found that plaintiff has expended $5,000 for attorney's fees and expenses of suit. This record contains neither pleading nor proof supporting recovery of $7,500 as either a statutory or a contractual attorney's fee. Expenses of litigation are not recoverable as damages unless expressly provided by statute or contract. Hammonds v. Hammonds, 158 Tex. 516, 313 S.W.2d 603, 605 (1958); Wm. Cameron & Co., Inc.

v. American Surety Co. of New York, 55 S.W.2d 1032, 1035 (Tex.Comm'n App. 1932, opinion adopted). This rule applies to a litigant's loss of time. Phillips v. Latham, 523 S.W.2d 19, 27 (Tex.Civ.App. Dallas 1975, writ ref'd n. r. e.).

Neither is plaintiff entitled to recovery of the full $10,000 as the liquidated damages stipulated in the contract. Plaintiff argues that the liquidated damages provision is enforceable because the amount stipulated is payable in lieu of actual damages that are difficult to ascertain. This argument is inconsistent with the petition, which alleges and prays for both actual and liquidated damages. If this inconsistency is ignored, we must consider whether the provision for $10,000 liquidated damages is a reasonable forecast of just compensation for the harm expected as a result of a breach; otherwise the provision is an unenforceable penalty. Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952); Restatement of Contracts, s 339 (1932).

The provision in question is as follows:

> First Party and Second Party agree that the actual damages to First Party resulting from any breach of this non-compete agreement by Second Party will be and are uncertain, intangible and not readily or accurately ascertainable; that a fair **\*864** and reasonable estimate of the damages to First Party that will result therefrom under the circumstances is Ten Thousand Dollars ($10,000.00); and the parties desiring to dispense with the high costs to each of litigating the issue of actual damages; it is, therefore, agreed that in the event Second Party shall breach the above non-compete covenant, he (she) shall pay to First Party the sum of Ten Thousand Dollars ($10,000.00) as liquidated damages which shall be in addition to (and not in lieu of) First Party's right to specific performance of such covenant by Second Party and the right to pursue same in a court of equity (injunctive relief).

In support of the reasonableness of this provision, plaintiff argues that the trial court found that the average fee earned by plaintiff was about $3,000 per placement. Plaintiff insists: "It is not unreasonable to estimate that within a two-year period at least (four fees) from such placements ($12,000) would be lost due to the competition of an ex-employee." This argument assumes that defendant would not be restrained by injunction during the two-year period. Actually, defendant was free to compete less than three weeks, and there is no evidence that plaintiff has lost any business because of defendant's competition within that period or that defendant violated the injunction after the restraining order was issued. If enforceable, the contract would exact a payment of $10,000 for any breach of the restrictive covenant, whether the breach continues for only one day or for two years, and would authorize an injunction enforcing the restriction for any portion of the period remaining. Under these circumstances the $10,000 cannot be considered a genuine pre-estimate of the harm to be suffered by any single breach. 5A Corbin, Contracts, s 1071, at 401

(1964). Consequently, it falls within the condemnation of Stewart v. Basey, supra, and other Texas decisions holding that a stipulation for a liquidated damages should be treated as an unenforceable penalty if the contract contains several matters of different degrees of importance and the sum stipulated is payable for the breach of any, even the least. Accord: Krenek v. Wang Laboratories, Inc., 583 S.W.2d 454 (Tex.Civ.App. Waco 1979, no writ); Servisco v. Tramco, Inc., 568 S.W.2d 434, 437 (Tex.Civ.App. Texarkana 1978, writ ref'd n. r. e.).

 **[7]**    The present contract may be enforceable if it is regarded as giving plaintiff an option to elect between injunctive relief and liquidated damages. Also, if actual damages are proved, plaintiff may be entitled to damages for a breach that occurred before the suit was filed as well as to an injunction restraining subsequent breaches. Payment of damages, however, constitutes satisfaction for any injury that may be caused by the breach, whereas an injunction has the effect of a decree of specific performance restraining any breach that would otherwise cause damage. Therefore, if the court grants an injunction preventing the breach from continuing and becoming total, it should not at the same time give judgment for the full amount of liquidated damages specified in the contract. Wirth & Hamid Fair Booking, Inc. v. Wirth, 265 N.Y. 214, 192 N.E. 297, 300-01 (1934); 5A Corbin, Contracts, s 1071, at 401 (1964); see McMurray v. Faust, 224 Iowa 50, 276 N.W. 95, 100 (1937); Heatwole v. Gorrell 35 Kan. 692, 12 P. 135, 138-39 (1886). The inconsistency of these remedies is similar to that recognized by this court in Robert G. Beneke & Co. v. Cole, 550 S.W.2d 321, 322 (Tex.Civ.App. Dallas 1977 no writ), in which we held that liquidated damages could not be recovered in addition to actual damages, notwithstanding a provision in the contract purporting to authorize such a recovery.

Plaintiff relies on Mayhall v. Proskowetz, 537 S.W.2d 320 (Tex.Civ.App. Austin 1976, writ ref'd n. r. e.) as supporting its contention that a provision for liquidated damages for competition by a former employee is enforceable. In that case, however, there was no claim for injunction; thus liquidated damages were not, as here, recovered in addition to injunctive relief. Rather, the contract provided for a liquidated sum of $5,000 because of the difficulty of proving **\*865** damages, and that amount was presumably fixed in lieu of all other compensation as satisfaction for a breach that might continue for the entire three-year period. Consequently, we do not regard Mayhall as contrary to our holding in the present case.

 **[8]**    Plaintiff also argues in support of the reasonableness of the liquidated damage provision that the amount stipulated is based on anticipated expenses of litigation rather than loss of business and goodwill from defendant's breach. Plaintiff's president testified that he thought $10,000 was reasonable because of time already lost and attorney's fee already incurred, and that he chose the $10,000 figure because he knew that attorney's fees were expensive and that litigation would cause loss of time for him and other personnel involved. If the liquidated damage provision is based on an estimate of the attorney's fee, it does not conform to the requirement in Stewart, supra, 245 S.W.2d at 487, that the damages be difficult of accurate estimation, because attorney's fees are

routinely proved and recovered when authorized by contract or by statute. Regardless of whether a recovery of an attorney's fee would have been proper in this case if based on proper pleading and proof, which the present record does not show, we hold that an estimate of the attorney's fee and other expenses anticipated in enforcing a contract does not support the reasonableness of a provision for liquidated damages.

With respect to the injunction, the judgment is affirmed, and with respect to the recovery of damages, the judgment is reversed and judgment is rendered that plaintiff take nothing. Costs are divided equally.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

426 S.W.3d 59
Supreme Court of Texas.

FPL ENERGY, LLC, FPL Energy Pecos Wind I, L.P., FPL Energy
Pecos Wind II, L.P., and Indian Mesa Wind Farm, L.P., Petitioners,
v.
TXU PORTFOLIO MANAGEMENT COMPANY, L.P. n/
k/a Luminant Energy Company, LLC, Respondent.

No. 11–0050.    |    Argued Oct. 15, 2012.    |    Decided March 21, 2014.

## Synopsis

**Background:** Electrical wholesaler brought action against wind farm electrical generation facilities for breach of contract, seeking liquidated damages for facilities' alleged failure to deliver energy to wholesaler. Facilities filed counterclaims, alleging that wholesaler breached contract by failing to ensure electricity transmission capacity. Following jury trial, the 116th Judicial District Court, Dallas County, Bruce Priddy, J., entered declaratory judgment for wholesaler and take-nothing judgments for each party on damages claims. Wholesaler and facilities appealed. The Court of Appeals, Morris, J., 328 S.W.3d 580, reversed and remanded in part and reversed and rendered in part. Facilities sought review.

**Holdings:** The Supreme Court, Green, J., held that:

[1] transmission capacity term of contracts was unambiguous;

[2] contracts allocated the risk of curtailment and congestion to facilities; and

[3] liquidated damages provisions were unenforceable.

Affirmed in part and reversed in part.

## Attorneys and Law Firms

**\*60** Allen Ryan Paulsen, Anne McGowan Johnson, Ben L. Mesches, Nina Cortell, Haynes & Boone LLP, Jeffrey M. Tillotson, John D. Volney, Lynn Tillotson Pinker & Cox, LLP, Dallas, TX, for Petitioners.

Daniel Lee Gus, James W. Walker, Walker Sewell LLP, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas, Lawrence J.C. VanDyke, Office of the Attorney General Solicitor General's Office, TX, for Respondent.

Gene Grace, American Wind Energy Company LLC, Washington, DC, for Amicus Curiae.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this contract interpretation case, TXU Portfolio Management Company, L.P. (TXUPM) contracted to receive electricity and renewable energy credits (RECs) from wind farms owned by FPL Energy, LLC. FPL failed to provide the required electricity and RECs. TXUPM sued FPL for breach of contract; FPL counterclaimed, arguing TXUPM failed to provide FPL with sufficient transmission **\*61** capacity. The trial court granted two partial summary judgments. First, it issued a declaratory judgment that the contracts required TXUPM to provide transmission capacity. Second, it declared the contracts' liquidated damages provisions unenforceable. The remaining issues were tried to a jury, and the trial court entered take-nothing judgments for both parties. Both parties appealed. The court of appeals reversed both summary judgment rulings. 328 S.W.3d 580, 591 (Tex.App.-Dallas 2010, pet. granted).

We address the following issues: (1) did TXUPM owe FPL a contractual duty to provide adequate transmission capacity to FPL; (2) if FPL breached and TXUPM did not, do the liquidated damages provisions apply to energy *and* RECs or only to RECs; and (3) are the liquidated damages provisions in these contracts enforceable? We affirm the court of appeals' holding that TXUPM owed no contractual duty to provide transmission capacity. However, we hold the liquidated damages provisions apply only to RECs and are unenforceable as a penalty. Accordingly, we reverse the court of appeals' judgment in part and remand the case to the court of appeals to determine damages.

## I. Factual and Procedural Background

In Texas, the electric industry consists of three main components: power generation, power transmission, and power distribution. Electric producers own and operate generating facilities. The Electric Reliability Council of Texas, Inc. (ERCOT), with few exceptions, manages the transmission of electricity through an interconnected network—or grid—of transmission lines. Finally, retail electric providers distribute electricity directly to consumers.

In 1999, the Legislature created ambitious goals for renewable energy in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, sec. 39.904, 1999 Tex. Gen. Laws 2543, 2598–99. The Legislature charged the Public Utility Commission of Texas (PUC) with establishing minimum renewable energy production requirements for all Texas electric providers. TEX. UTIL.CODE § 39.904(c)(1). The Legislature also tasked the PUC with establishing a REC trading program. *Id.* § 39.904(b). A REC reflects one megawatt hour (MWh) "of renewable energy that is physically metered and verified in Texas." 16 TEX. ADMIN. CODE § 25.173(c)(13). Electric producers thus simultaneously create both electricity from renewable sources and the corresponding RECs, yet producers may choose to sell the two separately. *Id.* § 25.173(d). The REC trading program allows electric providers unable to satisfy the minimum renewable energy requirements to purchase and hold RECs "in lieu of capacity from renewable energy technologies." TEX. UTIL.CODE § 39.904(b); *see* 16 TEX. ADMIN. CODE § 25.173(d)(2).

TXU Electric, a retail electric provider (and a different entity than TXUPM), solicited proposals from renewable energy producers to meet the new renewable energy production requirements. In 2000, TXU Electric entered agreements with two wind farm subsidiaries of FPL: Pecos Wind I, L.P. and Pecos Wind II, L.P. Also in 2000, FPL acquired a third party's rights to a similar contract with TXU Electric for Indian Mesa Wind Farm, L.P. Under the contracts, FPL sells TXU Electric RECs and the renewable electric energy used to produce those credits. TXU Electric assigned the contracts to TXUPM, a power marketer and, importantly, not a retail electric provider. The contracts with Pecos Wind I and II are identical. The Indian Mesa contract largely contains the same provisions, but, as **\*62** explained below, the parties point to relevant differences in support of their claimed intent at the time of contracting. Two provisions of these contracts give rise to this dispute: one provision governing TXUPM's transmission responsibilities and one providing for liquidated damages in the event that FPL fails to meet certain production requirements.

For approximately four years, FPL failed to produce the agreed upon electricity and RECs. TXUPM filed suit seeking damages for FPL's breach of the contracts. FPL counterclaimed, arguing that it could not meet its obligations because of congestion on the ERCOT grid. When the grid lacks capacity to transmit all energy produced in an area, ERCOT issues curtailment orders instructing certain facilities to cease production. FPL claims it received curtailment orders from ERCOT which, along with an unexpected lack of wind in the area, caused it to produce less energy than promised. FPL blamed the congestion and resulting curtailment orders on TXUPM, insisting that TXUPM bore responsibility to ensure transmission capacity for all energy FPL could produce.

Both parties filed motions for partial summary judgment. Each sought declaratory judgment to clarify the portions of the contracts relating to transmission capacity and liquidated damages. The trial court issued several rulings. First, the court declared that the contracts unambiguously required TXUPM to provide all transmission services, including transmission capacity, to FPL. Second, the court determined that the liquidated damages provisions in the contracts were not

enforceable, and thus void, because a liquidated damages amount of $50 per REC was not a realistic forecast of damages.

Consistent with these rulings, the trial court's instructions to the jury indicated that TXUPM was required to provide transmission capacity and that the liquidated damages were unenforceable. The jury found that TXUPM should receive $8.9 million in compensatory damages for FPL's failure to deliver renewable energy, yet the jury determined that TXUPM secured cover for the missing electricity by acquiring substitute electricity. The jury also found that TXUPM owed no compensatory damages to FPL for TXUPM's alleged failure to ensure transmission capacity. The trial court entered judgment on the jury's verdict, ordering that (1) FPL take nothing on its claims; and (2) TXUPM take nothing, despite the jury's damage award, because TXUPM covered.

The court of appeals affirmed the take-nothing judgment for the damages claims but reversed and rendered judgment on the issues related to declaratory relief. 328 S.W.3d at 591. The court held that the contracts did not require TXUPM to provide the necessary transmission capacity. *Id.* at 587. As to liquidated damages, the court of appeals held that the provisions were enforceable because damages were difficult to estimate, the $50 rate was a reasonable estimate of just compensation, and FPL could not meet its burden to show that the $50 rate was disproportionate to TXUPM's actual damages. *Id.* at 587–90.

We granted FPL's petition for review and address the three issues before us-whether TXUPM was responsible for ensuring transmission capacity, whether the liquidated damages provisions apply to failure to deliver electricity, and whether the liquidated damages provisions are enforceable. 55 Tex.Sup.Ct.J. 320 (Feb. 17, 2012).

## II. Contract Interpretation

 [1]   [2]   [3]   [4]   [5]   Before deciding the enforceability of the liquidated damages provisions, we must resolve two matters of contract interpretation **\*63** —TXUPM's responsibility for transmission capacity and the scope of the liquidated damages provisions. Our analysis begins with the legal question of the contracts' ambiguity. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex.2009). If we can give a clear and definite legal meaning to a contract, it is not ambiguous as a matter of law. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 133 (Tex.2010). An ambiguous contract, however, has a doubtful or uncertain meaning or is reasonably susceptible to multiple interpretations; we will not find ambiguity simply because the parties disagree over a contract's meaning. *Dynegy Midstream Servs.,* 294 S.W.3d at 168. Our primary concern in contract interpretation is to "ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). We consider the entire writing to harmonize and effectuate all provisions such that

none are rendered meaningless. *Id.* Further, we "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)).

## A. Transmission Capacity

 **[6]**   We first consider whether the contracts require TXUPM to provide adequate transmission capacity to FPL. The trial court and the court of appeals found section 2.03 unambiguous, a finding the parties do not challenge. 328 S.W.3d at 584–85. We may, nonetheless, declare a contract ambiguous, *see J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 231 (Tex.2003), but we hold that section 2.03, when construed in light of the entire contracts, has a definite legal meaning and, thus, is unambiguous. *See Gilbert Tex. Constr.,* 327 S.W.3d at 133.

Section 2.03(a) of the contracts, entitled "Transmission," reads as follows:

> TXU Electric shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses except for line losses on [FPL's] side of the Delivery Point, and transaction fees, necessary to deliver Net Energy to TXU Electric's load from the Renewable Resource Facility throughout the Contract Term ("Required Transmission Services").

Section 1.02(a) of the contracts defines "Net Energy" as "the amount of electric energy in MWh produced by the Renewable Resource Facility and *delivered to the Connecting Entity.*" (emphasis added). Under section 2.02, a Connecting Entity owns any "transmission or distribution system with which the Renewable Resource Facility is interconnected." The Connecting Entity serves as the "Delivery Point."

FPL urges a broad view of TXUPM's responsibility for transmission services. FPL contends that TXUPM's obligation to provide transmission services "without limitation" encompasses the *capacity* to deliver electricity from the Renewable Resource Facility (i.e. FPL) to the load (i.e. TXUPM's customer base). In support, FPL argues that Net Energy can refer only to a quantity and has no bearing on how and when delivery occurs. FPL further argues that the more specific language, "from the Renewable Resource Facility," should trump Net Energy, which is defined elsewhere in the contracts. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994) (stating the rule that, in contract interpretation, a more specific provision will control over a general **\*64**  statement). FPL points to congestion beyond the Delivery Point, explaining that as electricity is generated and delivered virtually simultaneously, it cannot stop and wait at the Delivery Point

for congestion to clear. In a compelling visual, FPL suggests that the transmission towers might burn down if FPL generated and sent electricity without an available, guaranteed path to the consumer. FPL complains that TXUPM caused the grid congestion and thus prompted the resulting curtailment orders. [1]

TXUPM interprets the contracts as placing the risk of transmission system incapacity on FPL. TXUPM notes that the contracts identify "lack of transmission capacity" as an "Uncontrollable Force" outside the reasonable control of the parties. If capacity is beyond the control of the parties, TXUPM questions, how then can TXUPM bear responsibility for failure to provide capacity? Section 4.05 of the contracts reinforces this point by making clear that FPL must pay liquidated damages for failure to supply RECs *even if* the failure was the result of inadequate transmission capacity. Finally, TXUPM argues that the contracts' definition of Net Energy binds this Court; incorporating Net Energy, as defined, into section 2.03 means that TXUPM owes a duty to provide transmission services *only* after the Delivery Point. Under TXUPM's interpretation, if FPL could not deliver electricity because of congestion, FPL bore the risk and, thus, must bear the consequences. We agree with TXUPM's interpretation.

We begin by recognizing the apparent textual conflict. Read in isolation, section 2.03 contains language supportive of either a broad or narrow interpretation of TXUPM's transmission service responsibilities. "[F]rom the Renewable Resource Facility" implies that TXUPM would have to secure transmission capacity so FPL could deliver electricity. But the use of the term Net Energy, which exists only upon FPL's delivery to the Connecting Entity, suggests that TXUPM bears responsibility only if the grid possesses capacity for TXUPM to deliver any generated electricity.

We cannot interpret a contract to ignore clearly defined terms, *see Frost Nat'l Bank,* 165 S.W.3d at 313, and, thus, we must accord Net Energy its due meaning. The contracts assigned TXUPM responsibility only for transmission services required to deliver Net Energy, and Net Energy represents the amount of energy produced by FPL *and* delivered to the Connecting Entity. TXUPM's responsibility for transmissions services, then, begins once FPL-generated electricity reaches the Connecting Entity on the grid—the Delivery Point. The contracts' use of the phrase "from the Renewable Resource Facility" is simply a designation of where the energy originated. It does not alter the definition of Net Energy provided in section 1.02 or in other sections throughout the contracts.

**\*65** The placement of section 2.03 in the context of all interconnection requirements reinforces this conclusion. Section 2.02 requires FPL to "make all arrangements ... necessary to interconnect ... with a transmission or distribution system," i.e. the Connecting Entity. Transmission systems are owned and operated by transmission service providers. *See* 16 TEX. ADMIN. CODE § 25.5(143), (144). As between the original contracting parties, the contracts required a separate agreement to address interconnection if TXU Electric was the connecting

entity; the parties do not suggest any such agreement exists. Between TXUPM and FPL, no such agreement can exist because TXUPM, as a power marketer, cannot own transmission systems. *See id.* § 25.5(83) (defining "power marketer" to exclude owners of transmission systems). The contracts obligate FPL to secure interconnection with a Connecting Entity, or transmission service provider, which under the PUC rules cannot be TXUPM. *See id.* § 25.5(83), (143). Reading sections 2.02 and 2.03 together, FPL must make all interconnection arrangements so that electricity can reach the Delivery Point, and TXUPM must ensure that facilities exist beyond the Delivery Point to allow for delivery to consumers. These provisions do not speak to the situation here, where both parties claim to meet their responsibilities but congestion on the grid inhibits energy generation and delivery.

 **[7]**   Given these facts, then, we must consider which party is responsible for congestion beyond the Delivery Point. While FPL blames grid congestion on TXUPM, we believe the contracts recognize such congestion as beyond both parties' control. Section 6.02(a) of the contracts addresses "Uncontrollable Force," including "[e]vents or circumstances that are outside of a Party's reasonable control," which "may include ... lack of transmission capacity or availability." The contracts mention transmission capacity only in this section. Congestion and curtailment issues, which affect transmission capacity and availability, must fall within this provision. Section 6.02(b) goes on to excuse a party from performance in the event of an Uncontrollable Force if certain criteria are met; there is no dispute that FPL did not meet those criteria.

 **[8]**   Section 4.05, entitled "Effect of Outages and Uncontrollable Force," outlines the general rule that payment and other calculations in sections 4.01–.10 *are not* impacted by Uncontrollable Force. The exception to this rule, discussed below, applies to reduce the Annual Quantity of RECs that FPL must produce for TXUPM only when PUC substantive rules would excuse the shortfall. The exception does not excuse FPL from its obligation to deliver electricity. In essence, the contracts allocate the risk of curtailment and congestion to FPL by clearly establishing that such events affect contract obligations only in certain instances not found here. We must respect and enforce this assignment of risk. *See Gym–N–I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 912 (Tex.2007) ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

To summarize, the contracts obligate FPL to interconnect with a Connecting Entity, which cannot be TXUPM. TXUPM bears responsibility for providing transmission services from the Delivery Point at the Connecting Entity. To the extent that lack of transmission capacity impairs electricity generation at the wind farms, the contracts provide that such lack of capacity is an Uncontrollable Force and FPL, therefore, bears the risk.

We note that this analysis does not fail because of the unique nature of electricity,  **\*66**  despite FPL's assertions. Admittedly, electricity generation, transmission, and distribution occur almost

simultaneously. But even if electricity moves too fast to pinpoint its physical location, the parties certainly can conceptualize its location for the purpose of creating energy contracts like the ones in question today. Several contractual provisions make this clear: section 2.03(a) assigns FPL responsibility for any loss of electricity on its side of the Delivery Point; and section 3.01(b) makes FPL responsible for maintenance and operational compliance with ERCOT guidelines for facilities up to the Delivery Point. This conceptualization of electricity's location pervades the contracts, and the parties assigned different responsibilities and liabilities based upon that understanding.

Here, ERCOT issued curtailment orders, effectively constraining energy generation, rather than energy transmission. FPL was therefore prevented from generating electricity and meeting its contractual obligations. Although ERCOT made final curtailment decisions, that does not mean that neither party bore the risk in the event of congestion and curtailment.

We hold that the contracts did not require TXUPM to provide transmission capacity for FPL but rather allocated risk of inadequate transmission capacity to FPL.

## B. Liquidated Damages

We next consider the breadth of the liquidated damages provision in section 4.04. The court of appeals did not address the ambiguity of the section, and neither party argues the provision is ambiguous. We conclude that the provisions are unambiguous because we may discern a definite legal meaning by construing the provisions in light of each contract as a whole. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 133 (Tex.2010).

The provisions state in relevant part:

> If there is a Net Deficiency for a year.... [FPL] shall pay [TXUPM] a Deficiency Payment equal to the product of (i) the difference in MWh between (a) the Net Deficiency, and (b) the MWh of Transferred RECs, times (ii) the Deficiency Rate. The Deficiency Payment is intended to be liquidated damages and not a penalty.

Vastly simplified, a Net Deficiency occurs when FPL fails to meets its "Annual Quantity" REC quota, even taking into account past overproduction.

Section 4.04(f) sets the Deficiency Rate as follows:

> The initial Deficiency Rate is $50 per MWh, based upon the $50 per MWh number in [PUC] Substantive Rule § 25.173. If the $50 per MWh in that Rule is amended, then the Deficiency Rate is automatically adjusted to the amended

number stated in that Rule. If [PUC] Substantive Rule § 25.173 is amended or repealed without replacement so that the $50 number is no longer in the [PUC] Substantive Rules, then the Deficiency Rate is $50. To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC].... For a year for which there is a Deficiency Payment due, [TXUPM] shall make reasonable efforts to obtain a determination of the annual average market value of RECs by the [PUC], but nothing in this Section or in this Agreement obligates [TXUPM] to turn in fewer RECs than are required of **\*67** it by the [PUC] program administrator in order to obtain such a determination.

TXUPM argues that the contracts cover both energy and RECs, and, therefore, the liquidated damages clauses must apply to both. TXUPM reads subsections (d) and (f) in the context of contract Article IV (sections 4.01–.10), entitled "Payment, Records, and Billings." According to TXUPM, because FPL simultaneously produces RECs and energy, the parties simply use RECs as a counting mechanism for both, rather than a term limited strictly to RECs. In support, TXUPM references section 4.02, which provides the contracts' payment terms, whereby TXUPM must pay FPL a unified price for an Annual Quantity of MWhs of Renewable Energy comprised of both energy and RECs. Sections 4.03 and 4.04(a)-(c) outline a quarterly and annual reconciliation process to smooth any discrepancies based on the differences between continuous production of electricity and the quarterly issuance of RECs. Section 4.04(d), the argument goes, necessarily incorporates the language used in the other sections. That section states: "[FPL] may elect to obtain and transfer RECs to [TXUPM] that were not produced at the Renewable Resource Facility to completely or partially offset the Net Deficiency ... not to exceed the sum of (i) 20% of the Annual Quantity, and (ii) the Uncontrollable Force Deficiency for that year." Thus, TXUPM argues, Section 4.04(d) as a whole must refer to the Annual Quantity of both energy and RECs.

In response, FPL points to the absence of "Net Energy" or "Renewable Energy" anywhere in the liquidated damages provisions and highlights several clauses consistent with an exclusive focus on RECs. First, section 4.04(d), quoted above, contains a mechanism for FPL to deliver RECs from another source if FPL cannot produce the RECs at its own facilities. That provision deals only with RECs, and not electricity. Second, the Deficiency Rate is tied to the PUC's substantive rules on REC penalties. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(*o* )) (Pub. Util. Comm'n of Tex.). The PUC rules impose penalties for failure to retire sufficient RECs, not for failure to deliver electricity. *Id.* Third, the Indian Mesa contract more clearly limits the liquidated damages provision to RECs by eliminating the entire provision in the event that

RECs cease to exist. For the reasons below, we hold that the liquidated damages clauses apply only to RECs.

At the outset, we note that sophisticated parties have broad latitude in defining the terms of their business relationship. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 58 (Tex.2008) (articulating the principle that Texas courts should uphold contracts "negotiated at arm's length by 'knowledgeable and sophisticated business players' represented by 'highly competent and able legal counsel' " (quoting *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 180 (Tex.1997)). We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 811–12 (Tex.2012); *see also Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex.App.-Amarillo 2000, no pet.)) ("In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose."). Therefore, the lack of reference to electricity or energy in the liquidated damages provisions is critical.

Where the parties intended to address both energy and RECs, the contracts do **\*68** so. In section 4.02, the payments are based on "all RECs and Net Energy produced by [FPL]." Section 4.03 contains explicit references to section 4.02 and the payments under section 4.02. The liquidated damages provisions, in contrast, provide no such reference. We will not, as TXUPM urges, selectively import terms from other provisions to compensate for the absence of the term "energy"; rather, we conclude that the omission was intentional and deliberate. *See Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 646 (Tex.1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

This interpretation does not conflict with, or render meaningless, any other provision of the contracts. To the contrary, other provisions recognize that RECs often receive differential treatment. Section 3.03(b) provides that if TXUPM cannot take delivery of electricity, FPL may sell electricity to the Connecting Entity, but must then sell the REC so produced to TXUPM. Section 4.04(d) allows FPL to cover REC deficiencies with RECs from other sources. These distinctions make sense because an electricity provider may readily obtain RECs on the open market, whereas it is more difficult for providers to arrange for substitute electricity to meet their commitments.

Support for differential treatment of RECs also flows from the regulatory scheme incorporated by reference into the contracts. Section 4.04(f) incorporates a Deficiency Rate from the PUC rules, then found in Texas Administrative Code Title 16, section 25.173. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(*o* )) (Pub. Util. Comm'n of Tex.). Section 25.173,

at the time of contracting, assignment, and breach, contained a mechanism for excusing REC deficiencies due to events "beyond [the] reasonable control of the provider." *Id.* Such events included lack of transmission capacity or curtailment orders from ERCOT. *See id.* (former 16 TEX. ADMIN. CODE § 25.173(*o* )(4), (5)). The contracts incorporate this mechanism through section 4.05, which reduces the Annual Quantity to the extent that Administrative Code section 25.173 excused penalties for REC deficiencies. In sum, the contracts reduce FPL's REC obligations when the PUC provides an excuse for the deficiency.

The very inclusion of the Deficiency Rate, which reflects the *actual* penalty TXUPM would have to pay for a REC deficiency, suggests the liquidated damages clause was intended to compensate only for REC deficiencies. To underscore this point, we note that when the parties entered the contracts, TXU Electric was subject to regulatory penalties for REC deficiencies. *See id.* (former 16 TEX. ADMIN. CODE § 25.173(c)(1)). If FPL failed to deliver both electricity and RECs, and TXU Electric consequently could not meet its REC requirements, the PUC would assess a penalty against TXU Electric. The liquidated damages clause would yield $50 per REC, or the equivalent of the regulatory penalty. This would compensate TXU Electric for the undelivered REC, but what about the undelivered electricity? Liquidated damages would provide no compensation to TXU Electric for FPL's failure to deliver electricity. This belies TXUPM's assertion that the provisions were intended to compensate for both RECs and electricity. We conclude that the liquidated damages clauses compensate for REC deficiencies and leave common law remedies available for electricity deficiencies.

 **\*69** The Indian Mesa contract further solidifies our interpretation. Section 10.02 of the Indian Mesa contract provides that "if RECs cease to exist, then Section 4.03 and Section 4.04 of this Agreement will be automatically deleted." This section preserves the agreement as an electricity-only contract if RECs disappear. Because the liquidated damages provision becomes a nullity without RECs, we must conclude that the provision is intended to compensate only for REC deficiencies. To do otherwise would render the provision meaningless, and this we cannot do. *See Coker,* 650 S.W.2d at 393.

Limiting the liquidated damages provisions to their plain language also has the benefit of advancing stability in the renewable energy marketplace, including the vital role of RECs. Under the legislative scheme, RECs and energy are "unbundled." TEX. UTIL.CODE § 39.904(b); ERCOT Nodal Protocols § 14.3.2(1) (January 1, 2013). Electric providers may either generate their own renewable energy or purchase RECs on the open market. 16 TEX. ADMIN. CODE § 25.173(d), (*l* ). Though FPL and TXUPM chose to contract for both in this case, we should not allow that fact to cloud our analysis. As amici curiae REC stakeholders have pointed out, a contrary holding could impede the REC market, which facilitates renewable energy development by allowing prospective electric producers to secure a guaranteed long-term revenue stream. Yet if, as TXUPM urges, "REC" does not mean only REC, substantial uncertainty may arise regarding

the desirability of such investments, the meaning of existing contracts, the negotiation of future contracts, and the ease of regulatory compliance. We are loath to interfere with a functioning market when the language of the contracts does not so require.

The plain language of the liquidated damages provisions, the differential treatment of RECs and electricity in the contracts, and the separate provisions of the Indian Mesa contract all support a limited interpretation of a REC. We hold that the liquidated damages provisions apply only to REC deficiencies.

## III. Enforceability of Liquidated Damages

 **[9]**   We next consider the enforceability of the liquidated damages provisions when applied only to RECs. FPL contends that the provisions impose an unenforceable penalty when applied to compensate only for REC deficiencies. Although TXUPM argues primarily that the provisions reasonably forecast damages for electricity *and* RECs—a position foreclosed by our holding in this case—TXUPM's arguments regarding the difficulty of estimation of REC-based damages and the reasonableness of the forecast of damages still resonate. Because the liquidated damages provisions fail our test for enforceability, however, we hold the provisions unenforceable.

 **[10]**   **[11]**   **[12]**   The basic principle underlying contract damages is compensation for losses sustained and no more; thus, we will not enforce punitive contractual damages provisions. *See Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). In *Phillips v. Phillips,* we acknowledged this principle and restated the two indispensable findings a court must make to enforce contractual damages provisions: (1) "the harm caused by the breach is incapable or difficult of estimation," and (2) "the amount of liquidated damages called for is a reasonable forecast of just compensation." 820 S.W.2d 785, 788 (Tex.1991) (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979)). We evaluate both prongs of  **\*70**  this test from the perspective of the parties at the time of contracting. [2]  In *Phillips* we recognized that, under this test, a liquidated damages provision may be unreasonable "because the actual damages incurred were much less than the amount contracted for." 820 S.W.2d at 788. A defendant making this assertion may be required to prove the amount of actual damages before a court can classify such a provision as an unenforceable penalty. *Id.* While the question may require a court to resolve certain factual issues first, ultimately the enforceability of a liquidated damages provision presents a question of law for the court to decide. *Id.*

## A. Difficulty of Estimating Damages

We first consider the difficulty of estimating damages at the time of contracting. TXUPM emphasizes the uncertainty of the market for RECs. FPL counters that all parties knew a REC marketplace would soon exist and provide transparent pricing by the time the obligations under the contracts became due. We agree with TXUPM that damages for RECs were difficult to estimate at the time of contracting.

The implementing legislation for the REC scheme passed in 1999, Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, sec. 39.904, 1999 Tex. Gen. Laws 2543, 2598–99, but at the time of contract formation in 2000, the market for RECs did not yet exist. The nature of FPL's obligation compounded the difficulty. The contracts required FPL to deliver an annual quantity of RECs. TXUPM could not identify the specific time, and thus the spot price in the REC market, in order to calculate the damage for any specific REC deficiency. Even if the contracts anticipate a healthy marketplace for RECs, the uncertain success of a novel legislative scheme surely poses a challenge to predicting damages. Indeed, as explained previously, the Indian Mesa contract foresaw the potential disappearance of the REC scheme and provided for continuation of the contract in the event of the scheme's demise. The uncertain marketplace for RECs suffices to meet the "difficulty of estimation" prong of the contractual damages test.

## B. Reasonableness of Damage Forecast

We next turn to the second prong, the reasonableness of the forecast of damages. FPL argues that the liquidated damages provisions, which derive directly from the regulatory penalty scheme, impose the maximum penalty in all situations. FPL points to an ameliorative provision in the penalty regulations that excuses REC deficiencies due to lack of transmission capacity or the actions of a governmental authority, such as an ERCOT curtailment. *See* 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(*o* )) (Pub. Util. Comm'n of Tex.). Many of TXUPM's counter-arguments are inextricably tied to contractual damages provisions **\*71** based on RECs and electricity, and we need not acknowledge those arguments here. TXUPM does assert, however, that the liquidated damages provisions were not intended as indemnity clauses and therefore are not limited to application only if TXUPM were actually assessed a penalty.

We view the reasonableness of the forecast from the time of contracting. *E.g., Mayfield v. Hicks, 575 S.W.2d 571, 576 (Tex.Civ.App.-Dallas 1978, writ ref'd n.r.e.)*; *accord* RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981) (identifying the time of making a contract as the moment to measure the reasonableness of anticipated loss). We are not persuaded, as FPL urges, to attach a "penalty" label merely because the liquidated damages clause derives from a "penalty" scheme; that does not, standing alone, make it a penalty. *Stewart,* 245 S.W.2d at 486 ("[T]he courts will not be bound by the language of the parties.").

Although the initial per-REC deficiency rate is $50, the contracts also provide:

> To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC].

The contracts thus anticipate that the amount of damages may be tied to market value, rather than an arbitrary number. Further, section 4.05 of the contracts anticipates that the PUC substantive rules will affect the REC requirements:

> The exception ... is that the Annual Quantity for a year is decreased to the extent that [TXUPM] is excused from paying a penalty by reason of any event under Section 25.173(*o* )(4) and (5) of the [PUC] Substantive Rules that adversely affected production of RECs by the Renewable Resource Facility in that year.

As discussed above, former PUC rules, then found in Title 16, Section 25.173 of the Texas Administrative Code, excused REC deficiencies due to lack of transmission capacity or curtailment orders. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(*o* )) (Pub. Util. Comm'n of Tex.). The contracts therefore contemplate that REC obligations of the parties, and the resulting damages, are a product of and intertwined with the regulatory scheme. The liquidated damages provisions attempt to integrate these ameliorative processes, and thus, on their face, reasonably forecast damages.

Yet the facts of this case demonstrate the chasm between the liquidated damages provisions as written and the result of the provisions under the court of appeals' judgment. First, the number of deficient RECs varies significantly between TXUPM's assertion and what the regulatory scheme would indicate. FPL had a collective deficiency of 580,000 RECs, yet 62% (or about 360,000) were not produced because of transmission congestion and associated ERCOT curtailment orders, which are excused by the PUC rules. *Id.* TXU Electric was subject to PUC penalties for REC deficiencies at the time of contract formation. *Id.* (former 16 TEX. ADMIN. CODE § 25.173(c) (1)). Upon assignment to TXUPM, a power marketer, no party was subject to PUC penalties. *See* 16 TEX. ADMIN. CODE § 25.5(83) (defining power marketer as an wholesaler seller of electricity who does not own generation, transmission, or distribution facilities in Texas, which would exclude TXUPM from REC penalties). This change in relationship did **\*72** not undermine each contract, but it fundamentally changed the basis for the liquidated damages provisions. Those provisions presuppose that TXU Electric or its successors would respond to potential penalties for REC deficiencies. When those successors have no REC penalty obligations, they may, as

occurred here, fail to secure a regulatory excuse for deficiencies that would obviate any need for the liquidated damages provisions. If the PUC could assess a penalty against TXUPM, the penalty would be based on the 220,000 RECs attributable to lack of wind, not congestion.

Second, the Deficiency Rate calculation failed to tie the damages to market value as the contracts contemplate. Section 4.04(f) of the contracts allows for a Deficiency Rate of either $50 or twice the annual average market value of RECs "[t]o the extent that the [PUC] determines the annual average market value." The PUC expressly declined TXUPM's request for such a determination. The actual market value of a REC during the period in question ranged from $4 to $14. The fortuity of a PUC determination thus utterly controls the damages, irrespective of the actual market value. For instance, the appropriate amount of damages should fall in the range of $8 to $28 (twice the average market value), depending on what the PUC would have determined as the actual market value of a REC in each year.

In combination, this creates an unacceptable disparity. The court of appeals assessed damages at $29 million. If we use the REC deficiency of 220,000 (as reduced under PUC rules), and the reduced Deficiency Rate of $28 (the upper bound of the possible range), actual damages equal only $6,160,000. To reach damages of $29 million on a 220,000 REC deficiency would require an effective deficiency rate of $132 per REC. The disparity grows if we consider that TXUPM also avoided the contract price of $24 per MWh of Renewable Energy—which includes a REC and a MWh of electricity. Although only a portion of the $24 is attributable to the REC not purchased, it nonetheless would further diminish TXUPM's actual damages. In *Phillips,* we recognized that a liquidated damages provision may be unreasonable in light of actual damages. 820 S.W.2d at 788. The burden of proving unreasonableness falls to FPL. *See id.* The court of appeals held that FPL failed to meet this burden, yet the court's evaluation was based on evidence of damages for electricity *and* RECs. 328 S.W.3d at 589–90. Our holding on the scope of the liquidated damages clauses limits our consideration to damages for REC deficiencies. The evidence reviewed in this opinion demonstrates that FPL has met its burden.

*Phillips* did not create a broad power to retroactively invalidate liquidated damages provisions that appear reasonable as written. *See* 820 S.W.2d at 788. Nor do we create such a power here. But when there is an unbridgeable discrepancy between liquidated damages provisions as written and the unfortunate reality in application, we cannot enforce such provisions. The forecast of damages was flawed by its reliance on events that did not and perhaps cannot occur—a PUC determination of the market value of RECs and a failure to secure a regulatory excuse for curtailment-based REC deficiencies. When the liquidated damages provisions operate with no rational relationship to actual damages, thus rendering the provisions unreasonable in light of actual damages, they are unenforceable. *See id.* Because the liquidated damages provisions operate as a penalty, we hold the provisions unenforceable.

# IV. Conclusion

We hold that the contracts do not require TXUPM to provide transmission capacity **\*73** to FPL, and thus TXUPM did not breach the contracts. FPL may owe damages for its breach, but the liquidated damages provisions in the contracts are unenforceable as a penalty. Accordingly, we reverse in part the judgment of the court of appeals and remand the case to the court of appeals to determine damages consistent with this opinion.

## Parallel Citations

57 Tex. Sup. Ct. J. 325

## Footnotes

1   The record shows that FPL earlier claimed that TXUPM: (1) prioritized its own fossil fuel-derived energy; (2) knowingly overstated to ERCOT its intention to transmit fossil fuel energy, resulting in curtailment orders for wind-produced energy; and (3) exercised its authority as a "Qualified Scheduling Entity," whose responsibility is to report anticipated electricity generation to ERCOT, to influence ERCOT's schedule for energy transmission on the grid. FPL's briefs, however, do not pursue these arguments. FPL petitioned this Court to review the meaning of the contracts as to TXUPM's obligations to provide transmission services, not TXUPM's alleged role in creating congestion. Thus, we will not consider these arguments. *See Guitar Holding Co., L.P. v. Hudspeth Cnty. Underground Water Conservation Dist. No. 1,* 263 S.W.3d 910, 918 (Tex.2008) (holding issues waived if not presented in the petition for review or in the briefs).

2   *Polimera v. Chemtex Envtl. Lab., Inc.,* No. 09–10–00361–CV, 2011 WL 2135062, at \*4–5, 2011 Tex.App. LEXIS 3886, at \*12 (Tex.App.-Beaumont May 19, 2011, no pet.) (mem.op.); *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ); *Mayfield v. Hicks,* 575 S.W.2d 571, 576 (Tex.Civ.App.-Dallas 1978, writ ref'd n.r.e.); *Muller v. Light,* 538 S.W.2d 487, 488 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.); *Schepps v. Am. Dist. Tele. Co. of Tex.,* 286 S.W.2d 684, 690 (Tex.Civ.App.-Dallas 1955, no writ); *Zucht v. Stewart Title Guar. Co.,* 207 S.W.2d 414, 418 (Tex.Civ.App.-San Antonio 1947, writ dism'd); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981) (identifying the time of making a contract as the moment to evaluate the reasonableness of a liquidated damages clause).

## History (5)

### Direct History (2)

🚩 1.  TXU Portfolio Management Co., L.P. v. FPL Energy, LLC

328 S.W.3d 580 , Tex.App.-Dallas , July 27, 2010 , rehearing overruled ( Jan 14, 2011 ) , review granted ( Feb 17, 2012 )

*Judgment Affirmed in Part, Reversed in Part by*

2.  FPL Energy, LLC v. TXU Portfolio Management Co., L.P. 👓

426 S.W.3d 59 , Tex. , Mar. 21, 2014

### Related References (3)

3.  TXU Portfolio Management Co. LP v. FPL Energy Pecos Wind I, LP

2006 WL 5410356 , Tex.Dist. , July 10, 2006

4.  TXU Portfolio Management Co. LP v. FPL Energy Pecos Wind I, LP

2007 WL 4940272 , Tex.Dist. , June 15, 2007

5.  TXU Portfolio Management Co. LP v. FPL Energy Pecos Wind I, LP

2007 WL 4940273 , Tex.Dist. , June 15, 2007

403 S.W.3d 432
Court of Appeals of Texas,
Houston (14th Dist.).

GARDEN RIDGE, L.P., Appellant

v.

ADVANCE INTERNATIONAL, INC., and Herbert A. Feinberg, Appellees.

No. 14–11–00624–CV.   |   April 9, 2013.

**Synopsis**
**Background:** Buyer of lighted inflatable holiday snowmen brought action against seller for breach of contract. Seller brought counterclaim for breach of contract. The 164th District Court, Harris County, Alexandra Smoots-Hogan, J., directed verdict in favor of seller. Buyer appealed.

**Holdings:** The Court of Appeals, Tracy Christopher, J., held that:

[1] chargeback provisions in contract for purchase of lighted inflatable holiday snowmen were void as penalties under the Uniform Commercial Code (UCC);

[2] chargeback provisions were unreasonable in light of the actual harm suffered, and anticipated; and

[3] question of whether chargeback provisions were unreasonable and, thus, unenforceable as penalties, was a legal issue for the trial court, rather than the jury.

Affirmed.

Kem Thompson Frost, J., concurred in the judgment and filed opinion.

**Attorneys and Law Firms**

**\*434** Leif Alexander Olson, Jared Gregory LeBlanc, Houston, TX, for Appellant.

Constance H. Pfeiffer, Jeffrey Todd Bentch, Houston, TX, for Appellees.

Panel consists of Justices FROST, CHRISTOPHER, and JAMISON.

## OPINION

[TRACY CHRISTOPHER](), Justice.

Appellant Garden Ridge, L.P. (Garden Ridge) sued Advance International, Inc., and Herbert A. Feinberg (collectively, Advance) for breach of contract and a declaratory judgment that Garden Ridge had **\*435** complied with its contracts with Advance. Advance counterclaimed for breach of contract. The jury found in favor of Advance. Although Garden Ridge accepted two shipments of inflatable snowmen from Advance, Garden Ridge refused to pay anything for either shipment, claiming that one shipment was nonconforming. Garden Ridge based its refusal to pay on chargeback provisions outlined in the parties' contracts. Advance argued that the chargeback provisions are unenforceable penalties.

On appeal, Garden Ridge argues that the trial court committed reversible error when it (1) refused to submit a question on prior material breach, (2) improperly instructed the jury on damages, and (3) commented on the weight of the evidence in its instructions on breach of contract. We conclude that the chargeback provisions as applied in this case are unenforceable as a matter of law as penalties, and we overrule Garden Ridge's jury charge issues. We therefore affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Garden Ridge is a Houston-based chain of housewares and home décor stores. Advance International, a company owned by Feinberg, is one of Garden Ridge's vendors. In 2009, Advance sent Garden Ridge quote sheets for lighted inflatable holiday snowmen, which included a color photo of each item and described its cost, weight, dimensions, and packaging. The two snowmen on the quote sheets each wore a scarf, held a broom that stated "Merry Christmas" on it, and waved; one stood eight feet tall, and the other stood nine feet tall. We refer to this snowman as "waving snowman." Advance then sent two sample snowmen [1] to Garden Ridge; one of the samples did not match its quote sheet. The sample eight-foot snowman wore a Santa-type hat and held a "Merry Christmas" banner. We refer to this snowman as "banner snowman."

Garden Ridge sent Advance two purchase orders, one for approximately 950 nine-foot waving snowmen (PO #721), and the other for approximately 3,500 eight-foot waving snowmen (PO #743), based on the quote sheets. Garden Ridge planned to sell each nine-foot waving snowman for $59.99, and each eight-foot waving snowman for $39.00. Garden Ridge planned to mark down the eight-foot waving snowmen to $20.00 each during its one-day Thanksgiving Shop–a–Thon sale,

and it prepared and had printed an advertising circular promoting this special price and picturing the eight-foot waving snowman.

Five days before Thanksgiving, Garden Ridge realized that the eight-foot snowmen that Advance sent were not waving snowmen, but instead were banner snowmen. The nine-foot snowmen that Advance sent were waving snowmen. Garden Ridge decided to honor the $20.00 Shop–a–Thon price on the nine-foot waving snowmen. There were no customer complaints, and both the eight-foot banner snowmen and the nine-foot waving snowmen sold well.

The parties' contracts consist of the purchase orders, the vendor cover letter, and the vendor compliance manual. Based on liquidated-damages provisions outlined in the vendor compliance manual, Garden Ridge assessed chargebacks against Advance for its alleged noncompliance violations. For Advance's "purchase order" violation—by sending the eight-foot banner snowman instead of the waving snowman, Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on PO #743 as a "unauthorized substitution" chargeback, which totaled **\*436** $49,176.00. In addition to paying nothing for the eight-foot banner snowmen, Garden Ridge paid nothing for the nine-foot waving snowman despite the fact that those snowmen complied with PO #721. Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on the nine-foot waving snowmen as a "merchant initiated" chargeback, which totaled $29,178.00. Additionally, from September through November 2009, Garden Ridge assessed another $13,241.84 in noncompliance chargebacks to Advance on other merchandise for "ticketing/packing" violations involving not marking cartons sequentially or otherwise mislabeling them, and for "purchase order" violations involving short or incomplete orders.

Advance demanded payment for its snowmen and other items and staged protests at Garden Ridge's headquarters. Thereafter, Garden Ridge sued Advance for breach of contract and a declaratory judgment that Garden Ridge had complied with the contracts. Advance counterclaimed for breach of contract and asserted that Garden Ridge's claims were barred because the chargeback provisions are unenforceable as penalties. Garden Ridge defended against Advance's counterclaim by asserting that Advance breached the contracts first.

At trial, Garden Ridge's divisional merchandise manager/vice president Linda Troy admitted that Garden Ridge made approximately $113,000 in profit on the snowmen it received from Advance, and further testified that Garden Ridge made all the money it would have made if the snowmen were delivered exactly as ordered. One of Garden Ridge's buyers, Sheria Cole, admitted she did not know of any dollar amount that Garden Ridge was harmed by the snowmen shipment and that Garden Ridge had less-than-zero receipt cost for the snowmen. Cole also testified that she was unaware of anyone at Garden Ridge having done any actual-harm calculations from the unauthorized substitution of the eight-foot banner snowmen or any calculations to determine whether Garden Ridge's chargebacks were reasonably proportional to any actual harm it suffered.

Garden Ridge acknowledges that it did not argue any amount of actual damages other than zero and that the record reflects no actual damages resulting from Advance's noncompliance violations.

The trial court granted Advance's motion for directed verdict on Garden Ridge's breach-of-contract claim because of lack of evidence on damages resulting from Advance's noncompliance violations, but did not grant Advance's motion for directed verdict on Garden Ridge's declaratory-judgment claim or Advance's motion for directed verdict seeking to have Garden Ridge's chargeback provisions declared legally unenforceable as penalties.

The trial court submitted to the jury questions on Garden Ridge's declaratory-judgment claim and on Advance's breach-of-contract claim, but refused to submit a question on Garden Ridge's prior-material-breach defense. On Garden Ridge's declaratory-judgment claim, the jury found that Garden Ridge did not comply with the terms of the three listed agreements (to purchase the eight-foot snowmen, to purchase the nine-foot snowmen, and to purchase other items listed in the "summary of chargebacks" exhibit). On Advance's breach-of-contract claim, the jury found that Garden Ridge failed to comply with these agreements by failing to pay for the eight-foot snowmen, the nine-foot snowmen, and other items listed in the chargeback exhibit. The jury, in separate findings, awarded Advance damages in the amount of $49,176.00 for the eight-foot snowmen, $29,781.00 for the nine-foot snowmen, and $500.00 for other items listed in the chargeback exhibit. The trial **\*437** court rendered final judgment on the jury's verdict and on a stipulation for legal fees.

Garden Ridge appeals the trial court's final judgment, arguing in three issues that the trial court committed reversible error in its jury charge. First, Garden Ridge contends that the trial court erred in refusing to submit a jury question on Garden Ridge's affirmative defense of prior material breach. Second, Garden Ridge argues that the trial court erred by improperly instructing the jury in the damages question on the reasonableness of Garden Ridge's chargebacks. Third, Garden Ridge complains that the trial court's inclusion of instructions on acceptance and contract price in the breach-of-contract question were improper comments on the weight of the evidence.

## II. ANALYSIS

### A. Refusal to submit prior-material-breach question
Garden Ridge concedes that it is not entitled to a jury question on prior material breach if this court determines that the chargeback provisions are unenforceable as penalties. Thus, we first proceed to address the legal question of whether the chargeback provisions are enforceable.

## 1. Do the chargeback provisions at issue assess liquidated damages or penalties?

The parties agree that this case is governed by the Uniform Commercial Code, as adopted by Texas, which applies to transactions involving goods. TEX. BUS. & COM.CODE ANN. § 2.102 (West 2009).[2] The parties agree that section 2.718(a) of the UCC, on liquidation of damages, governs the enforceability of the chargeback provisions in this case. Section 2.718(a) provides:

> (a) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

*Id.* § 2.718(a). The parties also agree that if the chargeback provisions governing Advance's noncompliance violations at issue are unenforceable as penalties, Garden Ridge no longer has any basis to argue that Advance committed any prior material breach.[3] But what the parties do not agree on is the proper analysis by which courts determine the legal question of whether a liquidated-damages provision is unenforceable as a penalty.

### a. Determining whether a liquidated-damages provision constitutes a penalty

**[1]** **[2]** Whether a contractual provision is an enforceable liquidated-damages provision **\*438** or an unenforceable penalty is a question of law for courts to decide. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (citation omitted). The party asserting that a liquidated-damages clause is a penalty provision bears the burden of pleading and proof. *See id.* at 789 (citing TEX.R. CIV. P. 94).

**[3]** "Liquidated damages" ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach. *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005) (citing *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005)). "The common law and the Uniform Commercial Code have long recognized a distinction between liquidated damages and penalties." *Id.* (citing TEX. BUS. & COM.CODE § 2.718(a), and *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)). Section 2.718(a) codified the common-law distinction between liquidated damages and penalties as part of Texas' adoption of the UCC's article on sales. *Id.* at 432.

**[4]** In *Phillips v. Phillips,* the Texas Supreme Court restated the common-law test for determining whether to enforce a liquidated-damages provision. 820 S.W.2d at 788. "In order to enforce a liquidated damages clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable

forecast of just compensation." *Id.* (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979), and comparing to TEX. BUS. & COM.CODE § 2.718(a)). The *Phillips* court explained that one way a party can "show that a liquidated damages provision is unreasonable" is by showing that "the actual damages incurred were much less than the amount contracted for," which requires the party "to prove what those actual damages were." *Id.* Thus, in such a case, "factual issues must be resolved before the legal question can be decided." *Id. Phillips,* however, involved no fact issues because the contractual provision at issue "by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision." *Id.* at 789. The *Phillips* court therefore declared the provision at issue—which called for "liquidated damages ten times the amount [the limited partner] loses as a result of" a breach of trust—unenforceable as a penalty on its face. *Id.* at 787, 789.

The common-law test as described in *Phillips* closely tracks the language of section 2.718(a) of the UCC. The code allows damages to be liquidated "only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy." TEX. BUS. & COM.CODE ANN. § 2.718(a). It further states: "A term fixing unreasonably large liquidated damages is void as a penalty." *Id.* The first clause of section 2.718(a)—"reasonable in the light of the anticipated or actual harm caused by the breach"—correlates to "reasonable forecast of just compensation," from the common-law test. *See id.; Phillips,* 820 S.W.2d at 788. The second and third clauses of section 2.718(a)—"the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy"—correlate to "that the harm caused by the breach is incapable or difficult of estimation," from the common-law test. *See* TEX. BUS. & COM.CODE ANN. § 2.718(a); *Phillips,* 820 S.W.2d at 788. Further, the sentence that "[a] term fixing unreasonably large liquidated damages is **\*439** void as a penalty" under section 2.718(a) correlates to "a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for." *See* TEX. BUS. & COM.CODE ANN. § 2.718(a); *Phillips,* 820 S.W.2d at 788. We therefore conclude that the common-law test as described in *Phillips* and the UCC test as outlined in 2.718(a) reflect the same essential factors and the same type of reasonableness test. Thus, common-law case law continues to inform our analysis here.

### b. Do actual damages matter?

Garden Ridge argues that the test is conducted entirely on an *ex ante* basis. That is, if, at the time the contract is formed, actual damages are difficult to estimate and the amount specified in the contract is a reasonable forecast of just compensation, a liquidated-damages term is enforceable. Garden Ridge contends that the test contains no *ex post* actual-harm assessment to determine reasonableness. Thus, according to Garden Ridge, Advance could only show that the chargeback

provisions were unenforceable as penalties if, *ex ante,* actual damages are easy to estimate or the liquidated damages are based on an unreasonable forecast. Garden Ridge asserts that Advance did not meet its burden because Garden Ridge's CFO, Bill Uhrig, testified that the chargeback schedule was created because actual damages from noncompliance violations are difficult to calculate, and that the schedule was based on computations and estimations by Garden Ridge's executive and purchasing staff.

Garden Ridge primarily relies on two cases from the Dallas Court of Appeals. *See GPA Holding, Inc. v. Baylor Health Care Sys.,* 344 S.W.3d 467 (Tex.App.-Dallas 2011, no pet.); *Baker v. Int'l. Record Syndicate, Inc.,* 812 S.W.2d 53 (Tex.App.-Dallas 1991, no writ). Neither of these cases, however, supports Garden Ridge's position that the test is to be conducted solely on an *ex ante* basis.

In *GPA Holding,* the appellate court found that GPA, a third-party administrator for self-funded health plans, did not meet its burden to establish that a "clause requiring payment of normal billed charges [instead of the original provider discounted rates] after 45 days" in GPA's hospital services agreement with Baylor was an unenforceable penalty. 344 S.W.3d at 476. GPA did not prove that "the harm from late payment is [not] difficult to estimate, or that the normal billed charges were an unreasonable forecast of the *loss actually sustained.*" *Id.* (emphasis added). Nothing in the *GPA Holding* court's analysis precludes a consideration of reasonableness based on actual damages; and in fact, the court assessed Baylor's actual damages, i.e., whether the normal billed charges were a "reasonable amount for the health care services and supplies provided in the charges at issue in this case." *Id.*

In *Baker,* while the appellate court noted that evidence related to the difficulty of estimation and the reasonableness of the damages forecast should be viewed as of the time the contract was executed, or the "anticipated harm" test, the court also expressly stated: "Additionally, liquidated damages must not be disproportionate to actual damages. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty...." 812 S.W.2d at 55. The *Baker* court called this the "actual harm" test: "The party asserting this defense is required to prove the amount of the other party's actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum." *Id.* This "actual harm" test is entirely consistent with what the Texas **\*440** Supreme Court stated in *Phillips,* that a party can show unreasonableness based on "the actual damages incurred [being] much less than the amount contracted for." 820 S.W.2d at 788.

This court also has recognized that actual harm factors into the test to determine whether a liquidated-damages provision is an enforceable penalty. In *Chan v. Montebello Development Co.,* we described the *Phillips* test as follows: "The test for determining whether a provision is valid and enforceable as liquidated damages is (1) if the damages for the prospective breach of the

contract are difficult to measure; and (2) the stipulated damages are a reasonable estimate of actual damages." *Chan v. Montebello Dev. Co.,* No. 14–06–00936–CV, 2008 WL 2986379, at \*3 (Tex.App.-Houston [14th Dist.] July 31, 2008, pet. denied) (citing *Phillips,* 820 S.W.2d at 788). Further, we stated:

> In order to meet this burden, the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages must be declared a penalty....

*Id.* at \*3–4 (citations omitted).

Most importantly, the UCC reasonableness test explicitly refers to actual harm, providing that one way a liquidated-damages provision can be invalidated is where the stipulated amount proves unreasonable in light of "the anticipated or *actual* harm caused by the breach." TEX. BUS. & COM.CODE ANN. § 2.718(a) (emphasis added). In addition, the UCC expressly provides that "[a] term fixing unreasonably large liquidated damages is void as a penalty." *Id.; see id.* cmt. 1. In order to determine whether a term fixes unreasonably large liquidated damages, it follows that courts would need to consider what actual harm, if any, was caused by the breach and then compare it to the stipulated amount of liquidated damages.

 **[5]**   Thus, both the common law and the UCC allow for courts to determine the reasonableness of a liquidated-damages clause by considering whether the defendant has shown that the stipulated amount was "unreasonably large" compared to the actual damages. *See* TEX. BUS. & COM.CODE ANN. § 2.718(a); *Phillips,* 820 S.W.2d at 788.

### c. Comparing the amount of the chargebacks to Garden Ridge's actual damages

 **[6]**   Advance argues that it proved that the harm anticipated from its alleged noncompliance was not difficult to estimate, that Garden Ridge did not even attempt to determine a chargeback amount that was reasonable in light of the anticipated or actual harm, and that the liquidated damages Garden Ridge assessed are disproportionate to its actual damages. We conclude Advance met its burden to show that the chargeback amounts constituted a disproportionate estimation of Garden Ridge's actual damages; therefore, the chargeback provisions are void as penalties under the UCC.

Advance elicited evidence from Garden Ridge employees Troy and Cole sufficient to prove that Garden Ridge suffered no actual damages as a result of Advance's substitution of the eight-foot banner snowmen. The trial court also determined that Garden Ridge suffered no actual

damages from any of Advance's noncompliance violations when the court directed a verdict against Garden Ridge on its breach-of-contract claim; Garden Ridge does not challenge that ruling. And Garden Ridge **\*441** itself acknowledges it argued no amount of actual damages other than zero and the record shows that Garden Ridge suffered no actual damages resulting from Advance's noncompliance violations.

Thus, Advance has shown that the chargebacks assessed by Garden Ridge for Advance's "unauthorized substitution" and "merchant initiated" noncompliance violations—100% of the invoiced merchandise cost plus freight for the eight-foot banner snowmen and the nine-foot waving snowmen, for a total of $79,457.00—were unreasonably large when compared to Garden Ridge's actual damages of zero. Advance also has shown that the additional chargebacks assessed by Garden Ridge for Advance's "short or incomplete order," "carton markings," and "cartons not numbered correctly" noncompliance violations on other merchandise—totaling approximately $13,000—were unreasonably large when compared to Garden Ridge's actual damages of zero.

Therefore, as a matter of law, we conclude that, under these circumstances, [4] the chargeback amounts were unreasonable, and that the chargeback provisions are unenforceable as penalties under the UCC because they fixed unreasonably large liquidated damages. Accordingly, we overrule Garden Ridge's first issue.

### d. Whether the amount of the chargebacks is reasonable in light of Garden Ridge's anticipated harm

 **[7]**   Even if the concurring opinion is correct that Advance also had to prove the stipulated damages were unreasonable in light of the anticipated harm in order for us to conclude that the chargeback provisions are unreasonable under section 2.718(a), we conclude that Advance has done so in this case. As explained in subsection II.A.1.c., Advance has shown that the stipulated amounts are unreasonable in light of the *actual* harm—zero—suffered by Garden Ridge. Further, Advance has shown that the stipulated amounts are unreasonable in light of the harm *anticipated* by Garden Ridge.

Here, according to the challenged liquidated-damages provisions, Garden Ridge anticipated at the time of contract that an unauthorized substitution of any type would result in harm of 100% of the cost of the merchandise, plus freight. In fact, Garden Ridge's buyer Cole testified that Garden Ridge had the discretion to assess the full 100% chargeback, even if the only deviation in the snowmen had been green versus red buttons. Cole further testified that she was not aware of any instance where Garden Ridge had decided not to issue a chargeback because there was "no harm, no foul" or where Garden Ridge had exercised its discretion to not charge back "fully" for an unauthorized substitution. Garden Ridge's CFO Uhrig agreed that a button-color substitution would constitute noncompliance, for which Garden Ridge could charge back the full 100% of merchandise cost.

In other words, no matter what the degree of substitution, and no matter whether the substitution is even anticipated to result in any harm, Garden Ridge's unauthorized-substitution rule provides that Garden Ridge keeps the merchandise without paying the vendor anything **\*442** and makes the vendor cover the freight.

Even though, according to Uhrig, Garden Ridge is "very good at estimating our costs," he admitted that at the time it was developing the chargeback schedule Garden Ridge did not perform any actual studies on what costs it would incur due to vendor noncompliance. Further, Uhrig could not explain any specifics on how Garden Ridge "figure[d] out what the costs are and what would be appropriate charge-backs." Cole also testified that she was not aware of Garden Ridge having performed any analysis as to whether the 100% chargeback amount reasonably approximates the anticipated harm that Garden Ridge would suffer from an unauthorized substitution. Despite this lack of detail regarding the 100% chargeback amount for anticipated harm from vendor violations, Uhrig testified that "on average" charging back 100% somehow reflected Garden Ridge's costs for unauthorized substitutions. Uhrig further indicated that Garden Ridge's chargebacks communicate to vendors, "Don't do this"; and Garden Ridge's CEO, Tim Kibarian, agreed that chargebacks are the "penalty" if its vendors do not follow its rules.

We therefore conclude that Advance has proven that Garden Ridge's liquidated-damages provisions do not reasonably reflect Garden Ridge's anticipated harm for an unauthorized substitution, where the challenged provisions allowed Garden Ridge to charge back 100% of merchandise cost plus freight for any unauthorized substitution, no matter how slight and no matter if Garden Ridge even anticipated incurring any harm.

## B. Instruction on damages

 **[8]**   Garden Ridge next argues that the trial court committed reversible error by including the following instruction as part of its question on Advance's damages:

> The unauthorized substitution provision in the Vendor Compliance Manual is unreasonable if the actual damages that Garden Ridge incurred were much less than the charge-back amount.

During the charge conference, Garden Ridge objected to the inclusion of this instruction as improper because whether the chargeback provisions constitute penalties was a question reserved for the court, not the jury. Garden Ridge further objected that the trial court should not include this instruction because it would permit the jury to assess damages on a basis that is not permitted in the law—that is, there is no actual-damages component to whether a liquidated damages provision is unreasonable and thus constitutes a penalty. [5] The trial court overruled Garden **\*443** Ridge's objections, which properly are preserved for our review. *See Thota v. Young,* 366 S.W.3d 678, 689 (Tex.2012).

 **[9]** **[10]** **[11]** **[12]** We review a trial court's decision whether to submit a particular instruction in its charge for abuse of discretion. *Id.* at 687 (citing *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000)); *City of Houston v. Proler,* 373 S.W.3d 748, 760 (Tex.App.-Houston [14th Dist.] 2012, no. pet. h.) (citing *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex.2006)). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Thota,* 366 S.W.3d at 687 (quoting *La.-Pac. Corp. v. Knighten,* 976 S.W.2d 674, 676 (Tex.1998)). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Id.* (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 855–56 (Tex.2009)). We will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." *Id.* (citing Tex.R.App. P. 44.1(a) and 61.1); *Proler,* 373 S.W.3d at 760 (citing *La.-Pac. Corp.,* 976 S.W.2d at 676 (Tex.1998)); *see also Bed, Bath & Beyond, Inc. v. Urista,* 211 S.W.3d 753, 757 (Tex.2006). We examine the entire record to determine whether the instruction probably caused an improper judgment. *Thota,* 366 S.W.3d at 686–87; *Urista,* 211 S.W.3d at 757.

 **[13]** As discussed above in subsection II.A.1.b, a party can prove that a liquidated-damages clause is unenforceable and void as a penalty if it shows that the actual damages incurred by the other party are much less than or disproportionate to the contracted-for amount. The complained-of instruction here essentially tracks the language from *Phillips*—that a liquidated-damages provision is unreasonable and unenforceable as a penalty "because the actual damages incurred were much less than the amount contracted for." *See* 820 S.W.2d at 788. Therefore, the instruction properly stated the "actual harm" portion of the common-law test. *Id.; see also Chan,* 2008 WL 2986379, at *3. Further, the complained-of instruction correlates to the equivalent portion of the UCC test that "[a] term fixing unreasonably large liquidated damages is void as a penalty." TEX. BUS.CODE ANN. § 2.718(a).

 **[14]** However, because the instruction concerns whether the chargeback provisions are unreasonable and thus unenforceable as penalties, which is a legal issue for the trial court to decide, *Phillips,* 820 S.W.2d at 788, we conclude that the trial court improperly submitted this instruction [6] to the jury. The complained-of instruction describes a reasonableness **\*444** analysis that the trial court itself was supposed to conduct—this instruction, despite its proper statement of the law, would not assist the jury. *See Thota,* 366 S.W.3d at 687. Moreover, although the *Phillips* court indicated that in some cases the jury might have to resolve a factual issue before the trial court can decide the ultimate legal question of enforceability, here, no fact issues remained; the trial court already had found that Garden Ridge suffered no breach-of-contract actual damages due to Advance's noncompliance violations when the court directed a verdict against Garden Ridge on that claim. *See* 820 S.W.2d at 788. As a matter of law, these chargebacks were unreasonable and

void as penalties; "consequently, [the instruction] w[as] surplusage, expressly prohibited by the Texas Supreme Court in *Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984)." *Bean v. Baxter Healthcare Corp.,* 965 S.W.2d 656, 664 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *see also Elloway v. Pate,* 238 S.W.3d 882, 896 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *Acord,* 669 S.W.2d at 116). The trial thus abused its discretion by unnecessarily instructing the jury on the reasonableness of Garden Ridge's chargebacks.

**[15]** **[16]** Our review of the record reveals, however, that this abuse of discretion was harmless.[7] Including a surplus instruction on the law is only harmful when it amounts to a comment on the weight of the evidence. *Bean,* 965 S.W.2d at 664 (discussing *Acord,* 669 S.W.2d at 113, 116). Although the trial court instructed jurors about a potential situation where Advance's damages may be reduced to essentially nothing—that is, if Garden Ridge's chargebacks actually were reasonable and thus enforceable as a matter of law—including this instruction was not "reasonably calculated to cause [nor] probably did cause prejudicial harm to appellant[ ]" Garden Ridge. *See Acord,* 669 S.W.2d at 116 (citation omitted). Moreover, by including this instruction, the trial court "did not offer [its] opinion, assume the truth of a material fact, exaggerate, minimize, or withdraw relevant evidence." *See Bean,* 965 S.W.2d at 664. Therefore, including the surplus instruction did not constitute a comment on the weight of the evidence.

Nor did including the improper instruction mislead or confuse the jury in its determination of damages on Advance's breach-of-contract claim. Advance presented evidence relating to over $92,000 in chargebacks Garden Ridge assessed, and evidence that these chargebacks reflected what Garden Ridge deducted from Advance's merchandise invoices. The jury's answers to what was "the difference between what Garden Ridge agreed to pay and what it actually paid for [the] snowmen" reflect that the jury considered the contract rate as what Garden Ridge agreed to pay for the nine-foot and eight-foot snowmen within PO #721 and PO #743, which included collection of freight, and that Garden Ridge actually paid nothing whatsoever to Advance for these snowmen. Thus, the jury found that for the snowmen Advance had proven its full amount of damages—that the differences reflected the exact amounts Garden Ridge charged **\*445** back. The jury's answer to what was "the difference between what Garden Ridge agreed to pay and what it actually paid for other items charged back on [Advance's] Exhibit" reflects that the jury considered the evidence presented on the remaining approximately $13,000 in chargebacks and determined that Advance had proven damages on $500 of these other chargebacks. Therefore, the erroneous instruction did not probably cause the rendition of an improper judgment; and we overrule Garden Ridge's second issue.

**C. Instructions on breach of contract**

In its final issue, Garden Ridge argues that the trial court's inclusion of the UCC's definition regarding what constitutes the acceptance of goods—section 2.606(a)[8]—and the UCC's provision

that the buyer must pay the contract rate for goods it accepts—section 2.607(a)[9]—in its instructions to the jury on Advance's breach-of-contract claim constituted an impermissible comment on the weight of the evidence. During the charge conference, Garden Ridge objected to the inclusion of these instructions as unnecessary because Garden Ridge did not dispute that it accepted the goods. Garden Ridge thus contends that these "surplusage" instructions improperly "nudged" the jury toward Advance's theory of the case. The trial court overruled Garden Ridge's objections, which properly are preserved for our review. *See Thota,* 366 S.W.3d at 689.

This is a UCC breach-of-contract case in which Advance pleaded, and presented evidence, that Garden Ridge breached by accepting and then not paying the contract price for the snowmen and other goods at issue. The parties do not dispute that their contracts are governed by the UCC. Section 2.606(a) and section 2.607(a), the sources of the trial court's instructions, are located in the UCC subchapter concerning "Breach, Repudiation, and Excuse." Further, both of these instructions properly state the law. TEX. BUS. & COM.CODE ANN. § 2.606(a) & 2.607(a) (West 2009). These instructions thus are proper because they (1) assisted the jury in answering the breach question, (2) accurately stated the law, and (3) found support in the pleadings and evidence. *See Thota,* 366 S.W.3d at 687 (citing *Hawley,* 284 S.W.3d at 855–56). We therefore conclude that the trial court did not abuse its discretion by submitting the complained-of trial instructions.

### III. CONCLUSION

Accordingly, having overruled all of Garden Ridge's issues, we affirm the trial court's judgment.

FROST, J., concurring.

**\*446  Appendix A**



KEM THOMPSON FROST, Justice, concurring.

In an issue of first impression in this court, the majority construes Texas Business and Commerce Code Section 2.718(a) in a manner that conflicts with the unambiguous language of that provision and with opinions from two sister courts of appeals. By allowing a breaching party to show that a liquidated-damages provision is unreasonable based only upon a comparison between the amount of the stipulated damages and the amount of the actual damages incurred, the majority exposes liquidated-damages provisions in sale-of-goods contracts to a legal standard that may bar enforcement of many such provisions based upon a hindsight analysis that the Texas Legislature never intended.

## Text of the Applicable Statute

Appellant/plaintiff Garden Ridge, L.P. asserts that the liquidated-damages provisions in its contracts for the sale of goods with appellee/defendant Advance International, Inc. are enforceable. Advance maintains that these provisions are void as penalties and unenforceable. Both sides agree, and the law provides, that this issue is governed by Texas Business and Commerce Code section 2.718(a), which provides in its entirety as follows:

> (a) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or

actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

TEX. BUS. & COMM.CODE ANN. § 2.718(a) (West 2013).

We review the trial court's interpretation of applicable statutes de novo. *See* **\*447** *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l. Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). If possible, we must ascertain that intent from the language the Legislature used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.* If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997). We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. *See id.*

### Interpretation of the Statutory Text

Advance, as the party asserting that the liquidated-damages provisions are penalties, had the burden of proving that these provisions do not satisfy the applicable legal standard for an enforceable liquidated-damages provision under Section 2.718(a). *Baker v. International Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ). Under the plain meaning of Section 2.718(a), it was incumbent upon Advance to establish that the amount of damages set by the provisions in question was not reasonable in light of the anticipated harm and the actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. *See* TEX. BUS. & COMM.CODE ANN. § 2.718(a).

Both Section 2.718(a) and Texas common law provide that a liquidated-damages provision is enforceable as long as it is not a penalty. *See id.; Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (discussing legal standard under Texas common law). But, to prove that a provision is a penalty under Texas common law, a party must prove that (1) the harm caused by the breach is not incapable or difficult of estimation, or (2) that the amount of liquidated damages called for is not a reasonable forecast of just compensation. *See Phillips,* 820 S.W.2d at 788. The Supreme Court of Texas has indicated that a party may prove that the amount of liquidated damages is not a reasonable forecast of just compensation under the common-law test only by showing that the actual damages incurred were much less than the liquidated-damage amount. *See id.*

As can be seen by comparing the legal standard under Section 2.718(a) and the legal standard under Texas common law, the two legal standards are significantly different. *See McFadden*

*v. Fuentes,* 790 S.W.2d 736, 737–38 (Tex.App.-El Paso 1990, no writ) (holding that the legal standard under Section 2.718(a) is different from and supersedes the legal standard under Texas common law in sales-of-goods cases); George E. Henderson, *A New Chapter 2 for Texas: Well–Suited or Ill–Fitting?* 41 TEX. TECH. L.REV. 235, 488–91 (2009) (attaching law professor's analysis concluding that the legal standard under Section 2.718(a) is different from the legal standard under Texas common law). *See also Phillips,* 820 S.W.2d at 788 (reciting the legal standard from Texas common law and then citing Section 2.718(a) with a "*Cf.*" signal, indicating that the statute is different from the common law but deals with an analogous subject matter).

Under Section 2.718(a), Advance had the burden of proving that the amount of damages set by the provisions in question was not reasonable in the light of both the anticipated harm and actual harm caused by the breach. *See* Tex. Bus. & Comm.Code Ann. § 2.718(a); Henderson, *supra,* 41 TEX. TECH. L.REV. at 491 (attaching law **\*448** professor's analysis concluding that under Section 2.718(a) a liquidated-damages provision is valid if reasonable with respect to *either* anticipated harm *or* actual harm caused by the breach). Under the unambiguous meaning of the word "or" in the statute, a liquidated-damages provision may be reasonable based upon *either* anticipated harm *or* actual harm caused by the breach. *See Comdisco, Inc. v. Tarrant County App. Dist.,* 927 S.W.2d 325, 327 (Tex.App.-Fort Worth 1996, writ ref'd) (holding, in Supreme Court of Texas precedent, that unambiguous meaning of "or" in statute was the disjunctive). [1] If a liquidated-damages provision may be reasonable based upon *either* anticipated harm *or* actual harm caused by the breach, then Advance, as the party with the burden of proving the provision is unenforceable, had to establish unreasonableness under *both* anticipated harm *and* actual harm caused by the breach. *See* Tex. Bus. & Comm.Code Ann. § 2.718(a).

The majority concludes that the legal standard under Section 2.718(a) is the same as the legal standard under Texas common law and that Advance did not have to show that the liquidated-damages provision was not reasonable in light of the anticipated harm. *See ante* at pp. 437–40. This conclusion is contrary to the plain meaning of the statutory text, under which the liquidated-damages amount may be reasonable based upon either anticipated harm or actual harm caused by the breach. *See id.* The majority treats the statutory sentence "[a] term fixing unreasonably large liquidated damages is void as a penalty" as equivalent to the following sentence from *Phillips's* articulation of the common law rule: "a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for." *See ante* at p. 439 (considering second sentence from Section 2.718(a) as equivalent to this sentence from *Phillips* ); Tex. Bus. & Com.Code Ann. § 2.718(a); *Phillips,* 820 S.W.2d at 788. In the second sentence of Section 2.718(a), the Legislature did not address the legal standard by which courts are to determine whether a liquidated-damages provision is void as a penalty; that standard is addressed in the first sentence of Section 2.718(a). *See* Tex. Bus. & Com.Code Ann. § 2.718(a).

The majority relies upon the Supreme Court of Texas's decision in *Flores v. Millennium Interests, Ltd. See* 185 S.W.3d 427 (Tex.2005). The *Flores* court addressed the circumstances under which a seller of real property under a contract for deed may be liable for the statutory "liquidated damages" afforded in Texas Property Code section 5.077(c). *See id.* at 429–33. In a general discussion of the meaning of the term "liquidated damages," the *Flores* court correctly stated that both Texas common law and Section 2.718(a) recognize a distinction between an enforceable liquidated-damages provision and a void penalty. *See id.* at 431. The *Flores* court did not state that the legal standards under Section 2.718(a) and the common law are the same, nor did the *Flores* court address the legal standard a party must satisfy to show that a liquidated-damages provision is a penalty under Section 2.718(a). *See id.* at 429–33. The *Flores* case does not support the majority's analysis.

The majority also relies upon the Supreme Court of Texas's decision in **\*449** *Phillips. See* 820 S.W.2d at 788. The *Phillips* court addressed the legal standard under Texas common law. *See id.* Determining the proper legal standard under Section 2.718(a) was not before the *Phillips* court, and the court did not address this issue. *See id.* The *Phillips* court did not state that the legal standards under Section 2.718(a) and the common law are the same. *See id.* Instead, after reciting the legal standard under Texas common law, the *Phillips* court cited Section 2.718(a) with a "*Cf.*" signal, indicating that the statute is different from the common law but deals with an analogous subject matter. *See id.* The *Phillips* court did not address the difference between the two legal standards, and this difference was not necessary to the disposition of that case. *See id.* The *Phillips* case does not support the majority's analysis regarding the legal standard under Section 2.718(a).

The majority further relies upon this court's opinion in *Chan v. Montebello Development Company. See* No. 14–06–00936–CV, 2008 WL 2986379, at \*3–6 (Tex.App.-Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.). The *Chan* court addressed the legal standard under Texas common law. *See id.* Because the determination of the proper legal standard under Section 2.718(a) was not before the *Chan* court, the court did not address this issue. *See id.* Nor did the *Chan* court state that the legal standards under Section 2.718(a) and the common law are the same. *See id.* The *Chan* case does not support the majority's analysis regarding the legal standard under Section 2.718(a).

## An Unwarranted Hindsight Analysis

Under the legal standard the majority adopts today, parties breaching sale-of-goods contracts may avoid enforcement of liquidated-damages provisions based upon a hindsight analysis. This approach not only contravenes the statutory text but also undermines important freedom-of-contract values that are a cornerstone of Texas jurisprudence.

Texas has a fundamental public policy in favor of a broad freedom of contract. *See Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 95 (Tex.2011) (stating that "[a]s a fundamental matter, Texas law recognizes and protects a broad freedom of contract"). Liquidated-damages provisions in commercial transactions benefit both sides by providing certainty and predictability. By including Section 2–718(a) in Texas's version of the Uniform Commercial Code, the Texas Legislature recognized the utility of liquidated-damages clauses and parties' willingness and desire to choose this remedy in transactions involving the sale of goods. *See* Tex. Bus. & Com.Code Ann. § 2.718(a). The Legislature also recognized that in certain situations, liquidated-damages provisions should not be enforceable, and the Legislature crafted a specific legal standard for making this determination. *See id.*

When a buyer and a seller agree to a liquidated-damages provision, both parties have a potential upside and a potential downside. The idea is that, even though the non-breaching party's expectation damages may be far greater than the amount specified in the liquidated-damages clause, the non-breaching party's recovery is capped at the amount of specified liquidated damages. Under freedom-of-contract principles, courts must honor the parties' agreement unless the stipulated amount is shown to be unreasonable under Section 2.718(a). *See id.* Under this standard, as discussed above, the party asserting that the provision is void as a penalty must prove that the stipulated amount is unreasonable based both on the harm anticipated at the time of contracting and the actual harm caused by the breach. At the **\*450** time of contracting, unknown factors often make estimation and calculation of potential damages uncertain.[2] This uncertainty at the time of contracting is often what makes the determination of liquidated damages difficult. Hindsight has a way of making estimations that were reasonable at the time seem unreasonable after a breach. By the time a breach has occurred and the dispute has come to court, the costs and valuations are often easier to estimate and, with hindsight, honest estimates made at the inception of the contract might prove to be too high or too low. This is part of the risk of doing business that parties embrace when agreeing to a liquidated-damages provision. In evaluating these provisions, courts should not lose sight of important principles of freedom of contract and must uphold the sanctity of contract unless the liquidated-damages provision is shown to be a penalty under the standard articulated by the Legislature in Section 2.718(a). *See id.*

With the legal standard adopted by the majority today, the court fails to honor the Legislature's intent of providing leeway for the parties to have stipulated to an amount of liquidated damages that was reasonable under conditions prevailing at the time of contracting but that ends up not measuring damages in a completely accurate manner in a particular case. Enforcing liquidated-damages provisions when they accurately gauge actual damages and not enforcing them when they do not deprives the non-breaching party of the remedy it bargained to receive, contrary to Section 2.718(a). *See id.*

### A Possible Resolution on the Horizon

The Supreme Court of Texas has yet to address the legal standard a party must satisfy to show that a liquidated-damages provision is a penalty under Section 2.718(a). With today's opinion from this court, there are now three different and conflicting views on this question from the three intermediate appellate courts that have addressed this issue. *Compare ante* at pp. 437–40, *with TXU Portfolio Management Co. v. FPL Energy, LLC,* 328 S.W.3d 580, 587–88 (Tex.App.-Dallas 2010, pet. granted), *and with McFadden,* 790 S.W.2d at 737–38. The Supreme Court of Texas has granted review in a case in which this issue has been presented. *See* Petition for Review, *FPL Energy, LLC v. TXU Portfolio Management Co.,* No. 11–0050 (Tex. granted Feb. 17, 2012). If this issue is not addressed in the Supreme Court of Texas's opinion in the *FPL Energy* case, uniformity and predictability in the application of Section 2.718(a) would be served by high-court review of this issue in this case or another.

### Conclusion

The majority's interpretation of Section 2.718(a) is more restrictive than the legal standard provided by the Legislature under the plain meaning of that statute. But, because no error asserted by Garden Ridge probably caused the rendition of an improper judgment or probably prevented Garden Ridge from properly presenting this case on appeal, the trial court's judgment should be affirmed. Accordingly, **\*451** though I respectfully decline to join the majority opinion, I concur in the court's judgment.

### Parallel Citations

80 UCC Rep.Serv.2d 548

### Footnotes

1     *See* App. A.

2     Under the UCC, a buyer can reject, accept, or partially accept nonconforming goods. TEX. BUS. & COM.CODE ANN. § 2.601 (West 2009). The buyer must pay at the contract rate for goods it accepts. *Id.* § 2.607(a). A buyer who notifies the seller of his intention to do so may deduct damages resulting from any breach of the contract from any part of the price still due under that contract. *Id.* § 2.717. Garden Ridge does not dispute that it accepted the snowmen, and there is no evidence that its actions fall within section 2.717.

3     Advance further contends that prior material breach never can be asserted in any UCC case that concerns nonconforming goods. *See Glenn Thurman, Inc. v. Moore Constr., Inc.,* 942 S.W.2d 768, 771–72 (Tex.App.-Tyler 1997, no writ). However, we need not decide this issue to finally dispose of this appeal. *See* TEX.R.APP. P. 47.1.

4     Advance further argues that the chargeback provisions are unenforceable on their face, as in *Phillips.* However, while Advance was able to prove that Garden Ridge suffered no actual damages here, perhaps there may exist circumstances whereby the nature of the unauthorized substitution, short or incomplete order, mismarked carton, or other noncompliance issue leading to a merchant-initiated

chargeback would not result in actual damages of zero and whereby the chargeback amounts *when compared to* those actual damages would not be disproportionate.

Advance argues that Garden Ridge failed to preserve this particular complaint about the allegedly *ex ante* nature of the liquidated-damages determination. Garden Ridge specifically objected to the inclusion of this particular instruction. The context of the charge conference also reveals that although Garden Ridge requested and the trial court allowed an instruction paraphrasing the first sentence of section 2.718(a) to indicate when liquidated damages were reasonable, Garden Ridge did not agree to the trial court's inclusion of the instruction addressing reasonableness with regard to "actual damages" because that particular instruction, in contrast with the previous instruction Garden Ridge requested and the court allowed, did not reflect a "legally permissible" basis for the jury to award damages to Advance. Thus, Garden Ridge sufficiently made the trial court aware of its complaint that its actual incurred damages should not be included in any reasonableness assessment by the jury of whether the chargebacks constituted penalties, and the trial court overruled Garden Ridge's complaint. *See Thota v. Young,* 366 S.W.3d 678, 689 (Tex.2012) ("[T]he procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: 'whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.' " (quoting *State Dep't. of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992))).

The trial court also improperly submitted the previous instruction, which Garden Ridge requested and which essentially tracks the first sentence of section 2.718:

> Parties may agree in a contract to damages payable upon a breach if that contractual amount is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

*See* TEX. BUS. & COM.CODE ANN. § 2.718(a). We note that this instruction also properly references "actual harm" as a component of the reasonableness test.

Garden Ridge insists that we must presume harm pursuant to *Harris County v. Smith,* 96 S.W.3d 230 (Tex.2002), and *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000). The Texas Supreme Court, however, has refused to extend the presumed-harm scenario to instruction error. *See Thota,* 366 S.W.3d at 692–93 (concluding that "even assuming the new and independent cause instruction in this charge constituted error, it does not raise a *Casteel* issue"); *Urista,* 211 S.W.3d at 756–57 (declining to extend *Casteel's* presumed-harm analysis to trial court's submission of an erroneous unavoidable-accident instruction).

Section 2.606(a) provides:

> (a) Acceptance of goods occurs when the buyer
>
> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

TEX. BUS. & COM.CODE ANN. § 2.606(a).

"The buyer must pay at the contract rate for any goods accepted." TEX. BUS. & COM.CODE ANN. § 2.607(a).

In cases decided after June 14, 1927, the Supreme Court of Texas's notation of "writ refused" or "petition refused" denotes that the court of appeals's opinion is the same as a precedent of the Supreme Court of Texas. *See Yancy v. United Surgical Partners Int'l., Inc.,* 236 S.W.3d 778, 786 n. 6 (Tex.2007).

A retail merchant that advertises its products in mass media has a distinct need for the seller to provide conforming goods because the retail merchant must be able to furnish conforming goods to the public. Patrons who see an advertisement and come to the retail merchant's store reasonably may expect to be able to purchase the item advertised. Garden Ridge testified that when the product is not as advertised, the merchant suffers loss of customer goodwill. It may often be difficult to estimate the amount of damages from the loss of goodwill and patronage accompanying the breach of a seller who fails to deliver conforming goods the retail merchant had advertised.

---

## History (5)

### Direct History (3)

1. Ridge, L.P. v. Advance Intern. Inc.
2011 WL 8000886 , Tex.Dist. , May 06, 2011

*New Trial Denied by*

2. Garden Ridge, L.P. v. Advance Intern. Inc.
2011 WL 10842902 , Tex.Dist. , July 15, 2011

*AND Judgment Affirmed by*

3. Garden Ridge, L.P. v. Advance Intern., Inc. ᴓ
403 S.W.3d 432 , Tex.App.-Hous. (14 Dist.) , Apr. 09, 2013 , review denied ( Oct 03, 2014 )

### Related References (2)

4. Garden Ridge, L.P. v. Advance Intern. Inc.
2010 WL 9506704 , Tex.Dist. , Nov. 15, 2010

5. Garden Ridge, L.P. v. Advance Intern. Inc.
2011 WL 10773390 , Tex.Dist. , Mar. 24, 2011

344 S.W.3d 467
Court of Appeals of Texas,
Dallas.

GPA HOLDING, INC., Appellant,

v.

BAYLOR HEALTH CARE SYSTEM [1], Appellee.

No. 05–09–00586–CV. | May 18, 2011. | Rehearing Overruled Aug. 9, 2011.

**Synopsis**

**Background:** Health care services provider brought action against third party administrator that provided claims handling services and administrative support to health plans for failure to pay for health care services it provided to members of certain health care plans that were administered by administrator. The 298th Judicial District Court, Dallas County, Emily Tobolowsky, J., entered summary judgment in favor of provider. Administrator appealed.

**Holdings:** The Court of Appeals, Moseley, J., held that:

[1] administrator was a payor under, and, thus, bound by, hospital services agreement (HSA) between provider and operator of preferred provider organization (PPO);

[2] administrator did not meet its burden of establishing that damages clause was an unenforceable penalty; and

[3] administrator's obligation did not change when subscriber acknowledgment form was amended.

Affirmed.

**Attorneys and Law Firms**

**\*470** David Michael Walsh, IV, Chamblee & Ryan, P.C., Dallas, TX, for Appellant.

Ben Taylor, Jeff Cody, Melissa A. Davis, Tate A. Seideman, Fulbright & Jaworski L.L.P., Dallas, TX, for Appellee.

Before Justices MORRIS, MOSELEY, and MYERS.

## OPINION

Opinion By Justice MOSELEY.

In this breach of contract case, appellant GPA Holding, Inc. challenges the trial court's summary judgment awarding damages to appellee Baylor Health Care System based on GPA's obligation to pay certain health care claims. Because we conclude the trial judge correctly interpreted the three written contracts governing the parties' relationship, we affirm the trial court's judgment.

## I. BACKGROUND

Baylor provides health care services to individual patients. Many of Baylor's patients are members of health plans. Baylor has many contracts with health benefit entities, including insurance companies and preferred provider organizations (PPOs), through which individual patients gain access to Baylor's hospitals and services at discounted rates.

Private Healthcare Systems, Inc. (PHCS) operates a network of PPOs. PHCS enters into contracts known as preferred provider agreements with health care providers (such as Baylor) to negotiate discounts from the providers' full charges for health care services. PHCS also enters into contracts known as subscriber services agreements with insurance companies, employer health plans, managed care organizations, and third-party administrators, to provide them and their members access to health care services at the discounted rates established by the preferred provider agreements.

GPA is a third-party administrator; its customers are self-funded health plans. Third-party administrators provide claims handling services and administrative support to health plans. By contracting with various PPO networks, such as PHCS, GPA also offers its customers—and their members—access to medical services from a network of providers (e.g. Baylor) at discounted rates.

Baylor sued GPA for failure to pay for health care services Baylor provided to members of certain health care plans administered by GPA. GPA in turn filed a third-party action against PHCS. Both Baylor and GPA moved for summary judgment; Baylor in fact filed several motions for partial summary judgment. The trial judge granted Baylor's motions and denied GPA's motion. The parties then entered into an agreed final judgment and severance, by which GPA's third-

party claims against PHCS were severed into a separate cause, and final judgment was entered for Baylor. GPA appeals the judgment in favor of Baylor. PHCS is not a party to this appeal.

## II. STANDARD OF REVIEW

**[1]** **[2]** The standards for reviewing summary judgments are well-established, **\*471** and we follow them in reviewing this appeal. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985) (summary judgment standards of review). When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id.*

**[3]** **[4]** If a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each essential element of the affirmative defense. *Selz v. Friendly Chevrolet, Ltd.,* 152 S.W.3d 833, 836 (Tex.App.-Dallas 2005, no pet.) ("To prevail on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action."). Similarly, if a party seeks to avoid summary judgment by way of an affirmative defense, it must come forward with summary judgment evidence sufficient to raise a fact issue on each element of its affirmative defense. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). Whether a contractual provision is an unenforceable penalty and not a liquidated damage clause is an affirmative defense. *See* TEX.R. CIV. P. 94; *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991) ("Although penalty is not among the affirmative defenses enumerated in Rule 94, TEX.R. CIV. P., the listing in that rule is not exclusive. Penalty is, in the language of the rule, a 'matter constituting an avoidance or affirmative defense' [citations omitted].")

**[5]** **[6]** **[7]** **[8]** **[9]** **[10]** The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). The court's primary concern in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The parties' intent must be taken from the agreement, and the agreement must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.,* 194 S.W.3d 723, 726 (Tex.App.-Dallas 2006, pet. denied). We favor an interpretation that affords some consequences to each part of the agreement so that none of the provisions will be rendered meaningless. *Coker,* 650 S.W.2d at 394. Unless the agreement shows that the parties used a term in a technical or different sense,

we give the terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *DeWitt Cnty. Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). This rule, however, is a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily. *Id.*

## III. DISCUSSION

### A. The Contracts

Baylor relies on three written contracts to establish its claim against GPA. First, Baylor relies on a Subscriber Services Agreement between PHCS and GPA dated April 17, 1998, amended by an Amendment, **\*472** Assignment, and Assumption of the Subscriber Services Agreement with effective dates of September 1, 2002 and January 1, 2003. Under the Subscriber Services Agreement, GPA [2] became a subscriber to PHCS's "comprehensive medical management system." [3] As a subscriber to PHCS's network, GPA could offer its customers access to PHCS's network of medical care providers at the discount rates negotiated by PHCS.

Second, Baylor relies on a Hospital Services Agreement (HSA) between Baylor and PHCS dated January 1, 2002. Under the HSA, Baylor became a "Preferred Provider" in PHCS's network. It agreed to provide—at discounted rates [4]—health care services ("Covered Services") to persons ("Members") covered by "Health Plans" (including PPOs) created or sponsored by a "Payor" (a defined term in the HSA). As part of the HSA, PHCS warranted that its contracts with each Payor obligate the "Payor (or its designee) to comply with the duties and obligations of [the HSA], including, but not limited to, paying for Covered Services rendered to Members in accordance with the provisions of Article IV of [the HSA]."

Third, Baylor relies on a Subscriber Acknowledgment between GPA and PHCS effective January 1, 2003. The Subscriber Acknowledgment refers to both the Subscriber Services Agreement and the HSA, reciting that GPA and PHCS have entered into the Subscriber Services Agreement and that PHCS has entered into contracts with health care providers for participation in its network. The Subscriber Acknowledgment requires GPA "to pay or arrange to pay PHCS Preferred Providers [which would include Baylor] in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider, for the markets and the networks for which [GPA] has purchased provider network Services from PHCS." (First brackets added.)

### B. Is GPA a "Payor"?

In its first issue, GPA contends the trial court erred in granting Baylor's motion for summary judgment because GPA is not a "payor" under the HSA. At the outset, GPA makes a procedural argument that summary judgment was improper because Baylor did not move for summary judgment on this issue. We disagree.

**\*473** Baylor filed four motions for partial summary judgment. In its first motion, Baylor requested that the trial court interpret the three contracts at issue and "find, as a matter of law, that GPA is bound by the terms and conditions of the HSA with respect to the health care claims at issue in this case, including the requirements of Section 4.4(a)." In its own motion for summary judgment, GPA argued, "GPA is not a 'Payor' obligated to pay under the terms of the Baylor/PHCS Agreement," and Baylor filed a summary judgment response again arguing that GPA was bound by the terms of the agreement.

**[11]** The trial court granted Baylor's motion and denied GPA's, necessarily deciding that GPA was a "Payor" bound by the provisions of the HSA, including section 4.4(a). We reject GPA's argument that the issue was not presented to and decided by the trial court.

Turning to GPA's substantive argument, GPA asserts the HSA defines "Payor" very narrowly. It argues the evidence established that GPA's clients—and not itself—were "Payors" under the HSA. It contends that as a third party administrator, it did not actually pay claims but only offered administrative services to facilitate payment of claims by the employer-funded health plans that were GPA's clients. Because the HSA's payment provisions apply only to "Payors" and GPA is not a Payor, GPA contends it is not responsible to pay for Baylor's services, and thus that the trial court erred in entering summary judgment in favor of Baylor.

The HSA defines a "Payor" as

> an insurance company, employer health plans, Taft–Hartley fund, plan sponsors or other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans.

GPA offered the affidavits of Kathy Enochs, the chief operating officer of GPA, and Madalyn Straughn, the vice president of operations for GPA, to establish that GPA is not an insurance company, employer health plan, Taft–Hartley fund, or plan sponsor. Enochs also testified that GPA was not a "payor" under the definition in the contract.

GPA does not dispute it is a party to the Subscriber Services Agreement and the Subscriber Acknowledgment. In fact, Enochs testified GPA could not access PHCS's preferred providers at a discount without the Subscriber Services Agreement and the Subscriber Acknowledgment. She

testified GPA entered into the agreement with PHCS "to market their network to our plans that we administer."

In Exhibit J to the Subscriber Services Agreement, under "Duties of the Subscriber," paragraph 2(b) provides, "The Subscriber [i.e. GPA] shall abide by the terms of any agreement with a Participating Provider [e.g. Baylor] entered into by PHCS on behalf of the Subscriber with regard to the provision of PPO services." (Brackets added.) In the Subscriber Acknowledgment, GPA "agrees to pay or arrange to pay PHCS Preferred Providers in accordance with the PHCS Preferred Provider Agreement for each such Preferred provider, for the markets and the networks for which Subscriber has purchased provider network Services from PHCS."

The discounts offered to GPA's customers were the result of the relationships among the parties to all three agreements. If PHCS did not contract with Baylor under the HSA, there would be no discount to PHCS's subscribers on the fees for Baylor's services. If GPA did not in turn contract with PHCS to take advantage of the discounts offered in the HSA, those **\*474** discounts would not have been available to GPA's customers.

 **[12]**    In *Baylor University Medical Center v. Epoch Group, L.C.,* 340 F.Supp.2d 749, 755 (N.D.Tex.2004), similar contracts were held to "constitute a single, unified contract" requiring a claims supervisor to timely pay Baylor's clean claims. While we are not bound by a decision of a federal district court, we may consider federal precedent when it is well-reasoned and helpful. *See Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex.1992) ("With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary.").

As here, there were three contracts in *Epoch Group:* a HSA between PHCS and Baylor, a subscriber services agreement between PHCS and Epoch, and a payor acknowledgment between PHCS and Epoch. *Epoch Group,* 340 F.Supp.2d at 752. Discussing its conclusion that the three documents constituted a single, unified contract, the court reasoned:

> Indeed, all three instruments were required to complete the relationship between the parties. The Subscriber Services Agreement, which provided discounts from PHCS to Payors, could not operate effectively without PHCS contracting with providers through hospital services agreements. The very foundation of the discounts offered in [the] Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements.

*Id.* at 755 (citation omitted).

GPA distinguishes *Epoch Group,* arguing the court did not decide the question whether Epoch was a "payor" under the HSA. Perhaps because Epoch signed a document called "payor acknowledgment" instead of "subscriber acknowledgment," the issue whether Epoch was a "payor" for purposes of the agreements was not presented to the *Epoch Group* court. Regardless of the titles of the two agreements, however, their substance was the same: to commit the payor or subscriber "to comply with the terms and conditions of the provider agreements," so that provider discounts set forth in hospital services agreements could be extended to the subscriber's customers. *See id.* at 755.

 **[13]**   We conclude, as did the trial court, that GPA is bound by the HSA. Reading the three agreements together, GPA committed to abide by the terms of the HSA and to pay or arrange to pay Baylor in accordance with the HSA. Even though the summary judgment evidence showed that GPA was not an "insurance company, employer health plan[ ], Taft–Hartley fund, [or] plan sponsor[ ]," we conclude the evidence (i.e. the three contracts) proves as a matter of law that GPA falls within the contractual definition of "other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans." We overrule GPA's first issue.

## B. "Liquidated Damages" or "Penalty"?

The HSA also contains terms regarding payment of claims:

### 4.4 *Claim Processing*

(a) Payor (or its designee) shall pay all Clean Claims for Covered Services **\*475**  within forty-five (45) calendar days of receipt of a Clean Claim containing the information set out in *Section 4.3* from Hospital in accordance with the applicable reimbursement rates attached on *Schedule 1. ...* If Payor (directly or through its designee) does not pay within forty-five (45) days of receipt of a Clean Claim, Payor shall no longer be eligible for the rates set forth on *Schedule 1* and shall be obligated to pay Hospital at Hospital's Normal Billed Charges and hospital may elect to terminate this Agreement....

In its second issue, GPA contends the trial court erred in denying its motion for summary judgment because the amount of damages awarded against it under this provision constituted an unenforceable liquidated damages penalty.

GPA complains that the above section, by requiring payors to pay the hospital's "Normal Billed Charges" unless the payor pays a Clean Claim within 45 days, "fixes compensation for breach in advance of the breach," and is thus an impermissible penalty.

[14]  [15]  "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005); *see also Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005) ("[l]iquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations"). Whether a contract term is a liquidated damages clause is a question of law for the court. *Valence Operating Co.,* 164 S.W.3d at 664.

[16]  [17]  If a court determines that a contract term is a liquidated damages clause, the court may then determine whether the clause is enforceable, or whether it is an unenforceable penalty. The policy underlying the prohibition against penalties is to ensure that a party to a contract receives "just compensation," that is, "neither more nor less than his actual damages." *Phillips,* 820 S.W.2d at 788 (quoting *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)). In order to enforce a liquidated damages provision and determine the provision is not a penalty, "the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips,* 820 S.W.2d at 788 (quoting *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979)).

Baylor argues that section 4.4 is neither a liquidated damages provision nor a penalty. Baylor asserts that section 4.4 "does not fix in advance compensation for GPA's failure to perform," but rather "provides a two-tiered pricing structure that grants GPA discounts (often substantial) if claims are paid within forty-five days." Baylor further contends that even if section 4.4 is a liquidated damages provision, it is enforceable under Texas law and is not a penalty because damages are difficult or impossible to estimate, and Baylor's normal billed charge is a reasonable forecast of just compensation.

For purposes of this opinion, we will assume without deciding that section 4.4(a) of the HSA is a liquidated damages provision, and examine whether the clause is also an unenforceable penalty under the factors set forth in *Phillips.*

[18]  [19]  The party asserting that a liquidated damages clause is an unenforceable penalty (here, GPA) bears the burden of proof. *Urban Television Network Corp.* **\*476** *v. Liquidity Solutions, L.P.,* 277 S.W.3d 917, 919 (Tex.App.-Dallas 2009, no pet.) (citing *Murphy v. Cintas Corp.,* 923 S.W.2d 663, 665–66 (Tex.App.-Tyler 1996, writ denied)). GPA moved for summary judgment on the issue whether section 4.4(a) of the HSA is an unenforceable penalty. To obtain summary judgment on the affirmative defense of penalty, GPA must prove each element of the defense. *See Brownlee,* 665 S.W.2d at 112; *Selz,* 152 S.W.3d at 836; *see also Phillips,* 820 S.W.2d at 789. GPA argues the payment of "Normal Billed Charges" is not a reasonable forecast of just compensation, and the harm caused by late payment is not incapable or difficult of estimation. *See Phillips,* 820

S.W.2d at 788. In support of its motion for summary judgment, GPA offered evidence comparing the discounted rates to the hospital's normal billed rates for the charges at issue. GPA offered a chart attached to the affidavit of Madalyn Straughn that showed the percentage difference between the discounted rate and the normal billed charge for each of the charges at issue. GPA notes "the overwhelming majority of the percentage charges are 33% or more."

In response to GPA's motion for summary judgment, Baylor offered evidence regarding the difficulty of estimation and the reasonableness of the charges. Baylor offered the affidavit of Janda Edwards to explain that Baylor's normal billed charge "is the amount Baylor charges for services and supplies to entities or individuals who do not have access to a discount through a contract with Baylor." Edwards explained Baylor's normal billed charge "is established by each facility and is based upon an analysis of many factors including the service provided, the amount of personnel time needed to provide the service, the amount of capital equipment needed to provide the service, the amount of routine equipment needed to provide the service, the overhead, and market value." Edwards also testified that Baylor's normal billed charge is a reasonable amount for the health care services and supplies provided in the charges at issue in this case.

[20] [21] GPA quotes from Edwards's affidavit and argues, "Baylor offered no justification attempting to show how the changed billing rate was a reasonable estimate of the cost associated with payments being untimely." GPA posits that a "more reasonable" calculation would be "a $30 service fee and 18% annual interest," and argues, "our society routinely deals with late payments by a modest service fee and interest, and thus Baylor's damages were calculable." GPA does not offer evidence to support these arguments, however. The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate were GPA's to prove. *Urban Television Network Corp.,* 277 S.W.3d at 919. General statements about a "more reasonable" or "modest" rate are not evidence that the harm from late payment is difficult to estimate, or that the normal billed charges were an unreasonable forecast of the loss actually sustained. *See Phillips,* 820 S.W.2d at 788. GPA also emphasized that Baylor itself referred to the normal billed charge as a "penalty." The substance of the provision controls, however. *See Arthur's Garage, Inc. v. Racal–Chubb Security Systems, Inc.,* 997 S.W.2d 803, 810 (Tex.App.-Dallas 1999, no pet.) (provision entitled "liquidated damages" was actually a limitation of liability provision, so penalty analysis was not appropriate). Because GPA did not meet its burden of establishing that the clause requiring payment of normal billed charges after 45 days was an unenforceable penalty, the trial judge did not err in denying GPA's motion for summary judgment on this issue. We overrule GPA's second issue.

**\*477 C. Claims arising before 2003**

In its third issue, GPA argues the trial judge erred by awarding damages for the period of time before GPA signed the Subscriber Acknowledgment Form. While GPA admits signing the Subscriber Services Agreement in 1998, it argues that it did not agree to "pay or arrange to pay"

until the 2003 amendments set forth in the Subscriber Acknowledgment. Therefore, GPA argues, any claims arising in 2002 or before were included improperly in the trial court's judgment.

Baylor counters that GPA's obligations were set forth in the Subscriber Services Agreement, including the agreement to abide by any agreement between PHCS and a hospital, and those obligations did not change in 2003. Because GPA accepted the benefits of the agreements before 2003, Baylor argues, it must also accept the obligations.

 **[22]**   We agree with Baylor that GPA's obligation to abide by the HSA did not change in 2003. While the "pay or arrange to pay" language does not appear in the Subscriber Services Agreement, GPA did agree at that time to abide by the provisions of the HSA, and, as noted in *Epoch Group,* "the very foundation" of the discounts offered to GPA's customers are "the agreements between PHCS and providers such as Baylor." *Epoch Group,* 340 F.Supp.2d at 755. The *Epoch Group* court commented that the payor acknowledgments "serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements." *Id.* The contractual relationship among the parties was established when GPA signed the Subscriber Services Agreement and began to take advantage of the discounted rates offered under the HSA. The trial court did not err in awarding damages for the period of time before GPA signed the Subscriber Acknowledgment. We overrule GPA's third issue.

## CONCLUSION

We overrule GPA's issues and affirm the trial court's judgment.

Footnotes

1    The trial court's judgment recites that the full name of the plaintiff is "Baylor Health Care System, on behalf of Baylor All Saints Medical Center, Baylor Heart and Vascular Hospital, Baylor Specialty Hospital, Baylor Institute for Rehabilitation, Baylor University Medical Center, Baylor Medical Center at Garland, Baylor Regional Medical Center at Grapevine, Baylor Medical Center at Irving, Our Children's House at Baylor, Baylor Regional Medical Center at Plano, and Baylor Medical Center Ellis County."

2    The Subscriber Services Agreement was actually between PHCS and a Texas corporation named "Group & Pension Administrators, Inc." The parties entered into a Rule 11 agreement that "[f]or purposes of this case, G & P Administrators, Inc, and GPA Holding, Inc. agree that they can be treated as one entity for the purpose of discovery and liability." In accordance with this agreement, in this opinion we will refer only to GPA.

3    The Subscriber Services Agreement recites its purpose:
    A. PHCS is in the business of providing provider networks and a comprehensive medical management system, including utilization review, quality assurance, and other cost containment related services throughout the United States.
    B. Plans offered and managed by Subscriber [GPA] provide health benefits and/or services to eligible participants under health benefit plans.
    C. Plans offered and managed by Subscriber generally include financial incentives to encourage eligible participants to choose treatment from providers who have contracted with entities, such as preferred provider organizations and exclusive provider organizations, who are in the business of offering provider discounts and other managed medical benefits.

D. Subscriber is interested in and intent upon becoming a subscriber for services of PHCS, thus availing itself of the PHCS comprehensive medical management system.

4    Except as discussed herein.

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (9)

### Direct History (2)
1. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489945 , Tex.Dist. , Apr. 23, 2009


*Affirmed by*

2. GPA Holding, Inc. v. Baylor Health Care System 👓
344 S.W.3d 467 , Tex.App.-Dallas , May 18, 2011 , rehearing overruled ( Aug 09, 2011 ) , review denied ( Dec 14, 2012 ) , rehearing of petition for review denied ( Mar 01, 2013 )


### Related References (7)
3. Baylor Health Care System v. GPA Holding, Inc.
2006 WL 6267271 , Tex.Dist. , Dec. 27, 2006


4. Baylor Health Care System v. GPA Holding, Inc.
2008 WL 6150217 , Tex.Dist. , Dec. 17, 2008


5. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489941 , Tex.Dist. , Jan. 12, 2009


6. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489943 , Tex.Dist. , Apr. 03, 2009


7. Baylor Health Care System v. GPA Holding, Inc.
2009 WL 1489944 , Tex.Dist. , Apr. 23, 2009


8. Baylor Health Care System v. GPA Holding, Inc.
2010 WL 7086831 , Tex.Dist. , Oct. 05, 2010

9. Baylor Health Care System v. AssureCare Claims
2011 WL 3022149 , Tex.Dist. , Feb. 08, 2011

2003 WL 22411873
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**Memorandum Opinion**
**Not designated for publication.** *See***TEX.R.APP.P. 47.2(a) .**
Court of Appeals of Texas,
Eastland.

HEALIX INFUSION THERAPY, INC., Appellant,

v.

Nicholaos C. BELLOS, M.D., P.A., Appellee.

No. 11–02–00346–CV.   |   Oct. 23, 2003.

Doctor brought action against corporation for breach of settlement agreement. The trial court, Dallas County granted summary judgment in favor of doctor. Corporation appealed. The Court of Appeals, Jim R. Wright, J., held that doctor was entitled to liquidated damages from corporation for breach of confidentiality in settlement agreement.

Affirmed.

Appeal from Dallas County.

**Attorneys and Law Firms**

Murphy Klasing, Kenneth Moursund Jr., for Healix Infusion Therapy, Inc.

Cathy Hendrickson, Kevin A. Kinnan, Jeffrey Hellberg Jr., Ryan Downton, Bruce Howell, for Nicholaos C. Bellos, M.D.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

**Memorandum Opinion**

JIM R. WRIGHT, Justice.

**\*1** The trial court granted a motion for summary judgment filed by Nicholaos C. Bellos, M.D., P.A. and enforced a contractual liquidated damages clause against Healix Infusion Therapy, Inc. The trial court awarded Dr. Bellos $10,000.00 in his suit against Healix. The trial court also awarded attorney's fees to Dr. Bellos. In two issues on appeal, Healix argues that the liquidated damages clause is an unenforceable penalty and that there are genuine issues of material fact regarding damages. [1] We affirm.

Dr. Bellos sued Healix in another lawsuit; the parties reached a settlement in that suit. Both parties agreed not to disclose the nature of the settlement agreement. The agreement provided for $10,000.00 in liquidated damages in the event of a breach by either party. After the settlement agreement was signed, Methodist Hospitals of Dallas (Methodist), where Dr. Bellos practiced, sent $6,385.13, which it owed to Dr. Bellos, because it mistakenly believed that Healix held a lien against Dr. Bellos. Healix sent a letter and a copy of the settlement agreement to Methodist to show that there was no lien. Dr. Bellos claimed that Healix breached the settlement agreement when Healix furnished the agreement to Methodist, and he sued Healix to recover under the liquidated damages provision of the agreement.

A trial court must grant a motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). Once the movant establishes a right to a summary judgment, the non-movant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678–79 (Tex.1979). When reviewing a summary judgment, the appellate court takes as true evidence favorable to the non-movant. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *American Tobacco Company, Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Nixon v. Mr. Property Management Company, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). In order to succeed on an affirmative defense in a summary judgment proceeding, a defendant must establish every element of the affirmative defense. *American Tobacco Company, Inc. v. Grinnell, supra.*

Courts will enforce liquidated damages provisions in contracts when the court finds that the harm resulting from a breach of the contract is incapable or difficult to estimate and when it also finds that the amount provided as liquidated damages is a reasonable forecast of just compensation. *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979). The "difficulty of estimation" and "reasonable forecast" questions must be determined from evidence of the circumstances which existed at the time the parties executed the agreement. *Baker v. International Record Syndicate, Inc.,* 812 S.W.2d 53 (Tex.App.-Dallas 1991, no writ). Courts will not enforce liquidated damages clauses which do not meet those criteria because the clauses would constitute unenforceable penalties. *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991). Determining

whether a liquidated damages clause is enforceable or whether it is an unenforceable penalty is a question of law. *Phillips v. Phillips, supra.*

 **\*2**  In this case, the initial burden was on the movant. However, when a party raises the affirmative defense of penalty, that party assumes the burden to conclusively establish the defense. *Baker v. International Record Syndicate, Inc., supra.* Therefore, the burden was upon Healix to prove that the contractual liquidated damages was an unenforceable penalty.

The settlement agreement offered as summary judgment evidence by Dr. Bellos showed that the parties agreed to keep the nature of the settlement agreement confidential. The parties further agreed that a breach of the confidentiality clause would result in imminent and irreparable harm and that the damages for a breach of confidentiality would be $10,000.00. Healix admitted in its response to Dr. Bellos's request for admissions that it agreed to the confidentiality of the agreement and that it agreed to the $10,000.00 liquidated damages clause. Dr. Bellos's affidavit reflected that he agreed to the confidential nature of the agreement and that he had performed all acts required of him under the settlement agreement. His affidavit further showed that Methodist subjected him to a re-credentialing process every two years. He was unaware of how the disclosure of the agreement would affect the re-credentialing process, but states that he has been harmed in a manner that is "incapable of or difficult of estimation."

As part of its proof, Healix attached the affidavit of Heather Hughes–Glass, the corporate risk manager for Healix. In her affidavit, Heather Hughes–Glass stated that, as soon as she became aware of the confidentiality provision of the agreement that was sent to Methodist, she contacted Dean Matthys, the corporate risk manager for Methodist, to have him destroy the agreement. She further stated that Matthys indicated that only he and his assistant were aware of the settlement agreement. Also included in the summary judgment evidence was an affidavit given by Matthys as well as a letter from Matthys to Healix. These documents indicated that the copy of the settlement agreement was destroyed soon after it was received by Methodist and that the only two people to see the agreement, Matthys and his assistant Lisa Irby, were not involved with the re-credentialing process at Methodist. Finally, Healix offered as summary judgment evidence Dr. Bellos's response to a request for disclosure that any economic damages suffered by Dr. Bellos were difficult to estimate.

This evidence does not meet the burden Healix must bear: that at the time the agreement was made damages could be easily ascertained and that the amount of the liquidated damages award was not a reasonable forecast of just compensation. Healix contends that the award of liquidated damages is disproportionate to the actual damages suffered by Dr. Bellos because Dr. Bellos did not have any actual damages. To emphasize this point, Healix relies on *Baker.* "If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty and recovery limited to actual damages proven." *Baker v. International Record Syndicate,*

*Inc., supra* at 55.Healix still must show that, at the time the agreement was made, the amount of the liquidated damages was not a reasonable forecast. To prove this defense, Healix must prove actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum.*Baker v. International Record Syndicate, Inc., supra.*That damages are not yet ascertainable is not tantamount to evidence of "zero" damages.

**\*3** The summary judgment evidence establishes that there was an agreement between Healix and Dr. Bellos that prohibited the disclosure of the nature of the settlement agreement and that Dr. Bellos performed all the required acts under the agreement. Healix breached the agreement by sending a copy of the agreement to Methodist. Because we find that Healix failed to meet its burden of proof on the penalty issue and because Healix failed to raise a genuine issue of material fact, we hold that the trial court did not err when it granted Dr. Bellos's motion for summary judgment. Healix's issues on appeal are overruled.

The judgment of the trial court is affirmed.

Footnotes

1    The award of attorney's fees is not contested in this appeal.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

964 S.W.2d 89
Court of Appeals of Texas,
El Paso.

Margaret Hunt HILL, Individually, Margaret Hunt Hill, Executrix (of the Estate of Al G. Hill, Deceased), Margaret Hunt Hill, Trustee (of the Margaret Hunt Hill Marital Trust), Chester J. Donnally, Jr., Trustee (of the Margaret Hunt Hill—Albert G. Hill, III, Trust, Heather Victoria Hill Trust, Elisa Margaret Hill Trust, Michael Busch Wisenbaker, Jr. Trust, Wesley Hill Wisenbaker Trust, Cody McArthur Wilert Trust and the Margretta Hill Wilkert Trust), Lyda Hill, U.S. Financial Corp., Seven Falls Co., Stuart Hunt, Sherman Hunt, Hara Hunt, Hilre Hunt, and The Kickham Group, Inc., Appellants,
v.
HERITAGE RESOURCES, INC., Wise Oil Ventures, Crittendon Acquisition Co., Michael B. Wisenbaker and The Chase Avenue Corp., and Van Oliver, As Trustee for Certain Trade Creditors of Heritage Resources, Inc., Appellees.

No. 08–93–00266–CV.  |  Dec. 31, 1997.  |  Rehearing Overruled Feb. 18, 1998.

Oil and gas operator under joint operating agreement and operator's affiliates brought action against working interest owners, alleging tort and breach of contract claims, including tortious interference with contract and prospective business relationship, slander of title, and fraud, arising from owners' attempts to remove operator under agreement and to prevent subsequent well operations. Owners counterclaimed for breach of contract and injunctive relief to remove operator. The 109th District Court, Winkler County, James Rex, J., entered judgment for operator. On appeal, the Court of Appeals, Chew, J., held that: (1) operator's tort claims were sufficiently independent from its breach of contract claims to allow it to recover on tort claims; (2) execution by fewer than all owners of authorizations for expenditures to drill well beyond depth restrictions of agreement did not modify agreement to cover well that exceeded restrictions; (3) absence of valid nonconsent interests respecting well which exceeded agreement's depth and formation restrictions precluded operator from prevailing on claims for tortious interference with contract and prospective business relationship and for slander of title; (4) claims in operator's amended petition alleging tortious interference with prospective business relationship and slander of title respecting operator's alleged transactions to sell oil and gas interests and gas did not relate back to date of original petition for limitations purposes; (5) evidence supported jury finding of tortious interference with contract based on owners' act of interference with operator's participation agreement with well interest assignee; (6) identical awards for both tortious interference with contract and business relationship and slander of title claims for same transactions were duplicative; (7) evidence supported jury finding of fraudulent intent of owners; and (8) statute of frauds barred enforcement of owners' alleged oral agreement to participate in well.

Affirmed in part, reversed in part, and remanded.

**Attorneys and Law Firms**

**\*101** W. Alan Wright, Thomas E. Kurth, Haynes & Boone, Dallas, Michael L. Fostel, Dist. Atty., Kermit, Ronald Holman, Holman, Robertson, Eldridge, Biddle & McCorkindale, Dallas, Ken Slavin, Brower & Slavin , El Paso, Julia E. Vaughan, Cotton, Bledsoe, Tighe & Dawson, Midland, for Appellants.

Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, Stephen F. Malouf, Edward Wayne Malouf, Marcellene Malouf, Dallas, L. Wayne Scott, San Antonio, Steve Cundra, Thompson, Hine & Flory, Washington, DC, D. Ronald Reneker, Douglas James Buncher, Craig Madison Patrick, Bush Craddock & Reneker, L.L.P., Dallas, for Appellees.

Before LARSEN, McCLURE and CHEW, JJ.

## *OPINION*

CHEW, Justice.

This is yet another oil and gas case originating from the attempted removal of the Operator of a Joint Operating Agreement. In this case, the Operator and its affiliates filed suit against a confederated group of the largest Non–Operators alleging multiple tort and breach of contract claims. The Non–Operators responded with counterclaims for breach of contract by the Operator and injunctive relief to remove the Operator. The case was tried to a Winkler County jury, and the Operator won on all issues and was awarded a judgment of over $83 million dollars in damages and prejudgment interest and approximately $21 million dollars in attorneys' fees. In this appeal, the Non–Operators have challenged the jury's findings on all issues and the Operator has cross-appealed on the issues of prejudgment interest and attorney's fees.

### I.

### Summary of the Facts

**A. The Parties.**

The Operator and its affiliates, plaintiffs below and Appellees here, are Heritage Resources, Inc., Wise Oil Ventures, Michael B. Wisenbaker, Chase Avenue Corporation, and Crittendon Acquisition Company. They are also joined by Van Oliver, as trustee for trade creditors of Heritage Resources, Inc., an intervening party. Michael Wisenbaker is the principal of all the corporations except for Wise Oil Ventures, which is owned by his father. Wisenbaker, a self-described oilman, has been an independent oil and gas venturer since the early 1970s. He was once married to the daughter of Mr. A.G. Hill, Sr. and Mrs. Margaret Hunt Hill. The Appellees are hereafter referred to as "Heritage."

The Non–Operators, defendants below and Hunt/Hill here, principally consist of two related families. The first family was headed by A.G. Hill, Sr., a prominent oil and gas businessman, who died shortly after this litigation began. He was survived by his wife, Margaret Hunt Hill, who was named a defendant, individually and as Executrix and Trustee of her husband's estate. Also named in the suit were the trusts of the Hills' seven grandchildren and their daughter, Lyda Hill. They comprise, together with two closely held family corporations, Seven Falls Company and U.S. Financial Corporation, what will be referred to as the "Hill Group." The other family includes the brothers, Sherman and Stuart Hunt, and their closely held corporation, the Kickham Group, Inc., and two Hunt daughters, Hara and Hilre. They are collectively referred to as the "Hunt Group." The Appellants as a whole will be referred to as "Hunt/Hill."

## B. The Dispute.

In the early 1980s, Heritage acquired oil and gas leases in several sections of the **\*102** Crittendon Field in Winkler County, Texas. Heritage sold substantial, partial interests in these leases to A.G. Hill, Tribal Drilling (a Hunt family partnership), and the Hunt brothers individually. In November 1984, Heritage, as the Operator, entered into a Joint Operating Agreement ("22 J.O.A.") for Section 22 of the Crittendon Field with Tribal Drilling Company and A.G. Hill and a number of other smaller working interest owners, using A.A.P.L. Form 610–1982 Model Form Operating Agreement. The contract area defined by Exhibit "A" of the 22 J.O.A. was for all of Section 22 "[t]o a depth of 20,000' or to a depth sufficient to thoroughly test the Fusselman formation, whichever is the lesser depth."

From our review of the 14,000 plus page record, we have distilled the facts of the case to the following narrative chronology beginning in 1985:

**1985**

> October 23 A Joint Operating Agreement for the adjacent Section 21 was entered into by essentially the same parties as the 22 J.O.A.

**1986**

August Heritage circulated an Authorization for Expenditures "AFE," which proposed the 22–2 well. The AFE requested consent for drilling a new well with an objective depth limitation of the lesser of 22,000 feet or depth sufficient to test the **Ellenburger** formation (a geological stratum located in the Crittendon Field at an approximate depth of 21,500 to 22,000 feet below the surface and approximately 1000 feet thick). Heritage and all the Non–Operators, except Hunt/Hill, consented to the AFE. For their part, Hunt/Hill agree to a second AFE which provided for a depth limitation of the lesser of 20,000 feet or depth necessary to test the **Fusselman** formation (a geological stratum located in the Crittendon Field at a depth of approximately 19,300 feet below the surface and approximately 800 feet thick).

November 2 The 22–2 well was spudded.

November 18 Heritage and the two Hunt brothers entered into a Letter Agreement for 22–2 well and "subsequent" wells which authorizes deeper drilling, in stages, of the 22–2 well beyond 20,000 feet, with the Hunts' prior consent.

**1987**

April 29 Tribal Drilling Company, Sherman Hunt, Stuart Hunt, and other members of the Hunt Group entered into a letter of agreement stipulating their proportionate shares of the drilling, testing, and completing costs attributable to the proposed 22–2 well and any subsequent wells in Section 22. The letter acknowledged that Sherman and Stuart Hunt agreed to pay 37.5 percent of all costs attributable to the 22–2 well and 18.75 percent of all costs attributable to any subsequent wells drilled in Section 22 pursuant to their letter of agreement with Heritage dated November 18, 1986.

May As drilling on the 22–2 well neared 19,000 feet, the operations became more tenuous. Hunt/Hill requested that the 22–2 well's drilling cease and that the well be put into production, but Heritage continued the drilling.

May 10 Heritage and Oxford Oil and Gas, Inc. "Oxford" entered into a letter of agreement whereby Oxford agreed to pay 64.5 percent of the drilling costs of the 22–3 well in exchange for an assignment of a 33.333334 percent working interest in the 22–3 well. Oxford had the option to quit paying at any time and to receive a proportionately reduced interest once the well was completed. The agreement was expressly subject to the terms of the 22 J.O.A. (This document was dated May 10, 1987. There was some testimony, however, that the letter of agreement was not actually executed until September 1987).

May 19 The 22–2 well blew out, but drilling operations were restored within several days. A meeting of interest owners was held and the Hills and Hunts orally agreed to participate in a subsequent well, the 22–3 well, provided that the drilling on the 22–2 well stopped and it was put into production.

May 22 The 22–2 well reached the **Silurian** formation (a geological stratum located **\*103** in the Crittendon Field at an approximate depth of 18,900 to 19,300 feet below the surface and approximately 300 feet thick).

June 20 The 22–2 well was completed at a depth of 19,062 feet below the surface and placed in production. Production pressure tests indicated a potential Texas record for gas reserves.

June 30 Heritage issued an AFE proposal for the new or substitute well—the 22–3. The AFE was for a new location and a depth of 22,000 feet or a depth sufficient to test the **Ellenburger** formation, whichever was less. Hills and Hunts did not respond to the AFE. The Hunts began an analysis of their investment in the Crittendon Field and began negotiations with Lyco Energy Corp. to sell their entire interest in the Crittendon Field.

September 25 The Hunt Brothers secretly recorded a conversation with Michael Wisenbaker. The Hunts told Wisenbaker that: (1) they were not contemplating the sale of their interests in the Crittendon Field; (2) they wanted a Joint Operating Committee to oversee Crittendon Operations with J.R. Latimer as Operator for the committee; (3) they wanted to stop all drilling activities in Section 22; and (4) they had the requisite votes to remove Heritage as Operator and would do so unless Wisenbaker agreed with the Hunts. They were informed that Heritage was in negotiations with Enserch Gas Company and Lone Star Gas Company "Enserch/Lone Star" for prepayment gas contracts, and that Heritage was going forward with the 22–3 well and would not resign as Operator.

September 25 Heritage sent the working interest owners an **Ellenburger** AFE for the proposed 22–3 well. The AFE proposed a total depth of 22,000' or to a depth sufficient to test the **Ellenburger** formation whichever was shallower.

September 27 Tribal Drilling notified Heritage that it is opposed to the 22–3 well.

September 28 The Hunts notified Heritage that a "vote" of the Non–Operators had been taken, and that a majority voted to remove Heritage for "failure and/or refusal to carry out its duties as Operator" of Sections 21, 22, and 23, but that there was not a majority voting for removal with respect to the other two wells. The letter stated that Tribal Drilling would take over operations and that Heritage should only perform "routine and necessary production, operating, and maintenance operations" until Tribal Drilling took over. Wisenbaker telephoned Sherman Hunt and told him that Heritage will not resign as the Operator.

September 29 Heritage informed the Hunt Brothers by letter that Heritage properly carried out its duties as Operator and that it would not resign.

October 1 J.R. Latimer reported large gas reservoir in the **Ellenburger** formation.

October 5 The Hunt brothers sent a letter to Heritage requesting that no further operations be conducted until they sold their interests.

October 14 Heritage distributed a second AFE, an **Ellenburger** AFE for the 22–3 well, to the Hunts, Hills, and to all the other Section 22 working interest owners.

October 26 An Operator's meeting was held to discuss the 22–3 well. Heritage confirmed that the proposed 22–3 well's formation objective was the **Ellenburger**. The Hunts objected to the drilling of the 22–3 well on the basis that Heritage was "selling out" and the working interest owners would not know "who they are going to be in bed with."

November 10 Hill signed an **Ellenburger** AFE for the 22–3 well, conditioned upon: (1) the 22 J.O.A. be amended to 22,000 feet; (2) Hill retain an option of waiting until the well reached the **Woodford** Shale before deciding to go "consent" to the **Ellenburger**; (3) costs be billed in accordance with a revised ownership schedule; and (4) all working interest owners received title opinion in time to review prior to spudding the 22–3 well.

Gregg Ewing of A.G. Hill Oil Producer sent a letter to Heritage. The letter stated that pursuant to the October 26, **\*104** 1987 meeting, A.G. Hill reviewed the AFE dated September 25, 1987, for the 22–3 well and determined that the proposed 22–3 well is outside the contract area of the Section 22 J.O.A. Ewing advised Heritage that the J.O.A. must be amended to cover the 22–3 well and that A.G. Hill's execution of the AFE was subject to Heritage's agreement to amend the Section 22 J.O.A.

November 23 Heritage furnished the Hunts with an executed depth-limited assignment.

November 30 The Hunts signed a sale agreement with Lyco for the sale of Tribal Drilling's interest in the Crittendon Fields for $20 million and part of future production.

November 25 The Hunts then directed their attorneys to contact Heritage and advise it that since the contract area for the 22 J.O.A. was 20,000 feet, or a depth sufficient to test the **Fusselman**, the objective depth of the proposed 22–3 well was outside the contract area. Attorneys for the Hunts sent Heritage a letter stating: (1) the 22–3 well is a proposed operation outside the "contract area" of the J.O.A.; (2) the J.O.A. does not govern operations outside the "contract area;" (3) the Hunts demand a full and complete accounting for all costs and revenues attributable to the 22–3 well; (4) Heritage and the Hunts are tenants-in-common as to the 22–3 well; and (5) if it

is ever determined that the 22–3 well is governed by the J.O.A. (i.e. within the "contract area"), the Hunts will elect to be either "consent" or "non-consent" at that time.

December The Hunts then hired Newton Ballou to audit Heritage's books and operations from 1985 through 1987. The auditor concluded that Heritage was in good to excellent condition and that out of $4 million in expenses, only $8,000 had been improperly coded.

December 1 Heritage sent a third AFE for the 22–3 well with an objective depth of 20,000 feet, or a depth sufficient to test the **Fusselman** formation, whichever was the lesser depth.

December 2 Sherman Hunt and Virgil St. Clair, Exploration and Development Manager for A.G. Hill, met to discuss how the Hills could help in stopping the drilling of the 22–3 well.

December 8 Hunts' lawyer sent a letter to Heritage demanding an assignment of interest from Heritage under all of Section 22 from the surface down to 19,164 feet below the surface. The letter further stated that the Hunts rejected the proposed assignment of interest that Heritage delivered on November 23, 1987.

December 9 Mike Wisenbaker met with A.G. Hill, Jr. at the latter's offices. Hill advised Wisenbaker that if he attempted to drill the 22–3 well, that Hunt/Hill would claim that Heritage was a bad faith trespasser and seize all gas production should the well be successful. Mike Wisenbaker alleged that Hill warned that Heritage would be "squashed ... like a bug" if he did not accept a new Operator.

December 10 Virgil St. Clair sent Heritage a letter on behalf of the Hills stating that they had "discovered that Heritage does not have a working interest" in Section 22, which is a deemed resignation of operatorship under the terms of the 22 J.O.A. The letter further stated that Hill was nominating Tribal Drilling to assume operatorship and they would poll the other working-interest owners. The letter was a collaborative effort between the Hunts and Hills.

December 15 Virgil St. Clair, on behalf of A.G. Hill, sent a letter to Heritage stating that Tribal Drilling received a majority of the working interest vote to operate the 22–2 well.

December 16 Anadarko Petroleum Corporation's memo indicated that Hunt/Hill advised Anadarko Petroleum Corporation that Heritage did not have an interest in the Crittendon Field. The memo referenced a letter from A.G. Hill that stated it was unnecessary for Anadarko to respond to the 22–3 well AFE because the 22–3 well was outside the Section 22 J.O.A.'s parameters and Heritage "has **\*105** no revenue interest, which is interpreted to read that it has no *economic interest* ... therefore, no interest" [emphasis added] in Section 22.

December 17 Virgil St. Clair, on behalf of A.G. Hill sent Heritage a reply to Heritage's December 17 letter stating that although Heritage Resources, Inc. was record title owner, a Supplemental

Division Order Title Opinion showed that Heritage Resources, Inc. did not have actual ownership.

December 18 Hunt/Hill published a letter, on behalf of Tribal Drilling and all working interest owners claiming that Heritage was a bad faith trespasser on Section 22. Tribal Drilling filed suit against Heritage in state court in Dallas, County. Tribal Drilling sought a declaratory judgment that Heritage had no interest in the field and a temporary restraining order to cease Heritage's operations and turn them over to Tribal Drilling. Three hours later Heritage filed this instant suit in Winkler County alleging: (1) breach of contract; (2) slander of title; (3) cloud on title; (4) tortious interference with contract; (5) tortious interference with business relations; and (6) intentional/negligent infliction of emotional distress.

December 18 Wisenbaker and Wisenbaker Production Company transferred their interests in Section 22 to Heritage.

December 23 Hunt lawyers sent a letter to Heritage lodging objections to 22–3 well.

December 28 Heritage began drilling the 22–3 well.

**1988**

January 29 Hunt lawyers sent a letter to Heritage that they had opinion that the 22–2 well had been drilled to depth sufficient to test the **Fusselman** formation. The letter demanded that Heritage assign all deep rights under the letter agreement to the Hunt Group.

March 21 Heritage notified the Non–Operators by letter that it was going to market the non-consent interests to the 22–3 well. Immediately, the Non–Operators protest the sale of the non-consent interests. Attorneys for A.G. Hill, U.S. Financial, and Lydia Hill sent a letter to all working interest owners advising of the Dallas litigation seeking to obtain a declaratory judgment that Heritage had been removed as Operator and detailing the alleged improprieties by Heritage in continuing operations to drill the 22–3 well. The letter further stated the consent or non-consent requirements of the 22 J.O.A. were not applicable because of Heritage's status of title, and opined that Heritage's actions in drilling the 22–3 well put Heritage in either a cotenancy or bad faith trespass.

April 8 Heritage sent a letter to Jack Bestrom and Jerry Anderson notifying them that Best Energy Corporation, Insured Energy Production, Inc., and Oxford owed Heritage $1,072,211.05 as their proportionate share of the drilling operations for the 22–3 well. More than $200,000 of this amount was over 90 days past due. Oxford's share of the total amount due was $702,390. Heritage suspended revenue to all three companies until the balance due was paid.

May 17 Heritage filed a second suit in Winkler County seeking damages and declarations that it was the rightful Operator.

Heritage sent a letter to the "consenting" working interest owners regarding the "Non–Consent Interests." Heritage takes the position that those parties who have failed to respond to Heritage's proposal to drill the 22–3 well, most notably the Hunt and Hill Groups, are now "Non–Consent Interests" and that Heritage has the right under the J.O.A. to market these "Non–Consent Interests." Heritage asserted that these interests were "Non–Consent" since March 20, 1988.

May 26 Heritage and Best Energy Corporation (Jack Bestrom) entered into a contract for the sale and purchase of a portion of the non-consent interests. Best Energy Corporation contracted to purchase 28 percent of the working interest to the 22–3 well. The estimated drilling costs attributable to this working interest were $2,000,000. The sale was **\*106** made subject to the successful removal of the cloud on Best's acquired title. The cloud was the claim by Hunt/Hill that there were no non-consent interests to market.

August 25 Oxford made its last payment of costs for the 22–3 well in the first week of August. At approximately this time, Oxford decided that it would no longer pay for any of the drilling costs of the 22–3 well that are attributable to the non-consent interests that were marketed by Heritage. Oxford also ceased any attempts to sell a portion of the non-consent interests.

August Heritage informed Jerry Anderson, president of Oxford, and Oxford that it believed Oxford's conduct was fraudulent. Heritage informed Anderson that Heritage would have no further business involvements with Oxford.

November 2 J.D. Ochsner, the District Manager of the Western Division of the Gas Purchases Department of Lone Star Gas Co., sent a letter to the president and vice-president of Lone Star Gas Co. seeking approval for revisions to the proposed prepayment gas purchase contracts between Enserch/Lone Star and Heritage.

December 6 J.D. Ochsner sent Heritage a letter confirming the status of ongoing negotiations between Heritage and Enserch/Lone Star. Enserch/Lone Star forwarded revised prepayment gas purchase contracts to Heritage's New York counsel for review. Enserch Gas Co. also sent Heritage's counsel proposed loan agreements between Wise Oil Ventures and Enserch Gas Co.

December 7 Ochsner sent the president of Lone Star Gas Co. a memo stating that Heritage hopes to be able to sign the prepayment gas purchase agreements within two to four working days.

**1989**

January 31 Heritage and Sun Exploration and Production "Sun" began to negotiate a contract for the sale and purchase of all or a portion of Heritage's interests in the Crittendon Field.

March 9 A verbal commitment was made by Sun to purchase Heritage's interests. The 22–2 well began coning or producing water in large quantities; gas production was significantly reduced.

March 13 Heritage informs Sun that the 22–2 well began to produce significant amounts of water. Sun withdrew its offer to purchase Heritage's interests.

July 14 Heritage sent a letter to the Hunt brothers stating that the Hunts failed to earn any interests in Section 22. Heritage stated that the Hunts were required to pay 37.5 percent of all costs for the 22–2 well and 18.75 percent of all costs on subsequent wells in Section 22. Heritage alleged that the Hunts failure to pay 18.75 percent of the costs for the 22–3 well caused the Hunt's purported interests in Section 22 to revert to Heritage. Heritage offered to reinstate the Hunts' interests if the Hunts tendered payment for 18.75 percent of the costs associated with the 22–3 well.

August 4 Heritage filed Plaintiff's First Supplemental Original Petition seeking recovery of the 22–2 well revenues previously paid to the Hunts on the grounds that the Hunts failed to meet the required conditions to earn the 3/16ths interest in Section 22 under the terms of the November 1986 letter of agreement.

December 20 Dan Ryser, executive vice-president of Enron Gasbank "Enron," sent Heritage a Letter of Intent. The letter expressed the parties' intent to enter into good faith negotiations for Enron's purchase of interests from the Heritage group. Enron and Heritage expressed an intent to close negotiations and enter into an agreement by January 15, 1990.

**1990**

January 24 Steve Wisenbaker notified Bank One that Enron was unable to complete the transaction with Heritage. After six months of negotiations, the parties scheduled a closing date for the purchase of Heritage's interests. However, prior to the closing date, the president of Enron was terminated. Enron notified **\*107** Heritage that it would be unable to proceed with the closing schedule.

**1992**

May 1 Heritage filed its First Amended Petition alleging that Hunt/Hill: (1) breached their obligations under the J.O.A. by both refusing to participate in the 22–3 well and refusing to go "non-consent;" (2) wrongfully received production payments from the 22–2 well that were contingent upon participation in the 22–3 well; (3) conspired to wrongfully remove Heritage as Operator of Sections 21, 22, and 23; (4) breached their obligations under the J.O.A. by attempting to

wrongfully remove Heritage as Operator; (5) willfully and maliciously violated a court order by interfering with Heritage's ability to continue as Operator; (6) tortiously interfered with the business relations of Heritage and third parties as Heritage was attempting to enter gas sales agreements and negotiating for the sale of its interests in the Crittendon Field; (7) breached their duty under the J.O.A., or alternatively tortiously interfered with contracts or business relations between Heritage, the consenting working interest owners, and third parties by refusing to pay their share of the drilling costs of the 22–3 well and interfering with Heritage's right to sell the non-consent interests; (8) slandered Heritage's title to interests in the Crittendon Field; and (9) failed to earn any additional interests in Section 22.

## II.

### Introduction to the Discussion

Hunt/Hill's futile attempts to remove Heritage as the Operator of the 22 J.O.A. and their opposition to well operations subsequent to the 22–2 well are the evident origins of this marathon litigation. It also appears clear that the Hunts were motivated by their desire to sell their interests in the Crittendon Field and that the marketability of those interests were restricted by Heritage's position as the Operator. The Hills' motivation is less clear, though it seems more focused on their concerns with the conduct of field operations by Heritage. Nonetheless, the essential facts of this case are largely undisputed and relatively uncomplicated. These facts, however, are enveloped within the mass and maze of a record typical of oil and gas cases, and groaning further from the Byzantine nature of joint operating agreements. Not surprisingly, the author has spent many months wandering in strange and mostly wrong valleys searching for the answers to the imponderables presented in this case.

Basically, this is a case where the Joint Operating Agreement Operator has alleged commercial and tort causes of action arising as a consequence of the actions of Non–Operators in attempting to remove him as the Operator and to prevent subsequent well operations. These causes of action include tortious interference, slander of title, and fraud. On the other side, the Hunt/Hill's claim that Heritage breached the Joint Operating Agreement ("J.O.A.") and was not legally qualified to serve as the Operator under the J.O.A. The jury generally found for Heritage and rejected all of Hunt/Hill's claims.

Heritage, recovered under three theories of tort liability: (1) tortious interference with contract and business relationship; (2) slander of title; and (3) fraud. Each of these causes of action were premised upon essentially six distinct actions alleged and proven. These were:

- the negotiations and agreement between Hunt and Lyco Energy regarding the sale of Hunt's interest in the Crittendon Field, which included contingencies that there be no further drilling operations after the 22–2 well and that Heritage be replaced as the Operator by Lyco Energy;

- the purported September 28, 1987 vote of the Non–Operators to remove Heritage as the Operator and replace it with Tribal Drilling;

- the December 10, 1987 vote of the Non–Operators conducted by Hunt/Hill to remove Heritage as the Operator on the basis that Heritage lacked a proper ownership interest in the 22 J.O.A.; and publication of Hill's letter of December 1987 stating that Heritage had no legal interest in the 22 J.O.A.;

- **\*108** • Hill's attorney's letter of December 18, 1987, which stated that Heritage was at best a co-tenant in the 22–3 well or worst a "bad faith trespasser;"

- the declaratory litigation initiated by Hunt/Hill against Heritage in Dallas County shortly before the instant action was filed by Heritage; and

- the Hunts' oral agreement with Heritage to participate in the 22–3 well in exchange for Heritage stopping and completing the 22–2 well short of the objective depth and formation.

The jury concluded that as consequences of these actions:

- Heritage's title in the 21 and 22 J.O.A.s was slandered;

- Heritage's agreements to sell to third parties the non-consent interests which Heritage carried in the 22–3 well were tortiously interfered with;

- the gas purchase agreement that Heritage had with Oxford was tortiously interfered with;

- the agreement Heritage had with Sun for the sale of Heritage's interest in the Crittendon Field was tortiously interfered with;

- Heritage's prospective business relationship with Enserch/Lone Star and Enron oil companies was tortiously interfered with; and

- the Hunts' promise and failure to pay their share of costs of the 22–3 well constituted a fraud against Heritage.

Hunt/Hill raise sixty-three cardinal points of error, most containing two to six sub-points. We have chosen to consider together those points that are the same, similar, or related and are divided into the following categories:

• that the claims sound in contract not tort;

• that no non-consent interests were created;

• that some or all claims are barred by the statute of limitations;

• that the evidence was legally and factually insufficient;

• that Hunt/Hill's conduct was justified;

• that Hunt/Hill's conduct constituted fraud;

• that Hunt/Hill breached an oral contract to develop the 22–3 well;

• the remainder of points and cross-points of error.

## III.

### Contract or Tort?

#### *Points of Error 1a, 5a, 9a, 13a, 17a, 23a, 27a, 31a, 35a, 39a, and 53a.*

 **[1]**   We consider first Hunt/Hill's complaints that Heritage is barred as a matter of law from any tort recovery in this suit because all of the latter's claims sound only in contract and the jury made no findings of breach of contract. Hunt/Hill also claim that Heritage did not submit breach of contract to the jury; however, we immediately disagree with that claim. In response to jury Question 8, the jury found that the 22–3 well was covered by the 22 J.O.A. Further, in response to jury Question 11, the jury found that Hunt/Hill's failure to comply with the 22 J.O.A. was not excused. Thus, we find that jury implicitly found that Hunt/Hill breached the 22 J.O.A. This finding does not, however, extinguish Hunt/Hill's complaint.

 **[2]**    **[3]**   Hunt/Hill has broadly argued that Heritage's claims only sound in contract and not in tort. On the other side of this looking glass, Heritage counters just as broadly that this is simply a tort case. Justice Larsen has noted that the "law of 'contorts' is a muddy area, devoid of bright line rules or easy answers as to what conduct constitutes a tort, and what a breach of contract. The acts of a party may breach duties in tort or contract alone, or simultaneously in both." *Airborne Freight Corp., Inc. v. C.R. Lee Enterprises, Inc.,* 847 S.W.2d 289, 293 (Tex.App.—El Paso 1992, writ denied). The practical importance of "contorts" or business torts is the fact that one cannot recover exemplary damages for the mere breach of contract, but if the claim is accompanied by

an independent tort then exemplary damages can be recovered. Under such circumstances, in addition to the exemplary damages awardable because of the tort claim, **\*109** attorney's fees are recoverable because of the breach of contract claim.

## A. Standard of Review

The legal issue presented by these points of error, the theory of recovery or defense, involve several rulings by the trial court: overruling objections to questions in the jury charge; and motions for a directed verdict; to disregard jury findings; for judgment n.o.v.; and for new trial. These are all predicated upon a question of law reviewable by this Court *de novo. Phillips Pipeline Co. v. Richardson,* 680 S.W.2d 43, 48 (Tex.App.—El Paso 1984, no writ)(jury questions); *State Nat'l Bank of El Paso v. Farah Mfg. Co., Inc.,* 678 S.W.2d 661, 669 (Tex.App. —El Paso 1984, writ dism'd by agr.) (directed verdicts); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990)(judgment n.o.v.); *Kraus v. Alamo Nat'l Bank of San Antonio,* 586 S.W.2d 202, 208 (Tex.Civ.App.—Waco 1979), *aff'd and cited with approval,* 616 S.W.2d 908, 910 (Tex.1981)(disregarding jury findings). Ordinarily, we review the record in the light most favorable to the findings, considering only the evidence and reasonable inferences that support the finding and rejecting all evidence and inferences contrary to the finding. *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 201 (Tex.1980); *Best,* 786 S.W.2d at 671. Here, however, the issue is presented and considered as a pure question of law reserving the evidentiary factors necessary to sustain or dismiss the legal theory under the sufficiency evidence points which are considered below. Thus presented, the scope of our review is truly plenary and includes the entire non-evidentiary portion of the record. We consider therefore the causes of actions pleaded and the contract to determine as a question of law whether Heritage's claim sounds only in contract and not tort.

## B. Heritage's Business Tort Causes of Action ("Contorts").

### 1. Tortious Interference with a Contract or Prospective Business Relationship.

 **[4]**   Texas law protects existing and prospective contracts from interference. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 665 (Tex.1990). The principal difference between the two involves the requirement of a contract as opposed to a potential for a contract and the question of justification or defense which is borne by the defendant in a tortious interference with contract case. To recover for tortious interference with an existing contract, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that the act was the proximate cause of the plaintiff's damage; and (4) that actual damage or loss occurred. *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995); *Juliette Fowler Homes,* 793 S.W.2d at 664; *Armendariz v. Mora,* 553 S.W.2d 400, 404 (Tex.Civ.App.— El Paso 1977, writ ref'd n.r.e.).

[5] [6] [7] To establish a cause of action for a prospective business relationship, the plaintiff must show: (1) the reasonable probability that a contractual relationship would have been entered; (2) an intentional, malicious intervention with the formation of that relationship; (3) without privilege or justification; and (4) resulting in actual damage or loss. *Gonzalez v. San Jacinto Methodist Hosp.,* 905 S.W.2d 416, 421 (Tex.App.—El Paso 1995), *rev'd on other grounds sub nom., Calvillo v. Gonzalez,* 922 S.W.2d 928 (Tex.1996). It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). More than mere negotiations must have taken place. *Caller–Times Publ'g Co., Inc. v. Triad Communications, Inc.,* 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ); *Grace v. Zimmerman,* 853 S.W.2d 92, 95 (Tex.App.—Houston [14th Dist.] 1993, no writ).

## 2. Slander of Title.

[8] [9] Slander of title is defined as a false and malicious statement made in disparagement of a person's title to property which causes him special damage. **\*110** *Hauglum v. Durst,* 769 S.W.2d 646, 653 (Tex.App.—Corpus Christi 1989, no writ); *Sadler v. Duvall,* 815 S.W.2d 285, 293 (Tex.App.—Texarkana 1991, writ denied). The elements are: (1) the uttering and publishing of the disparaging words; (2) that they were false; (3) that they were malicious; (4) that the plaintiff sustained special damages thereby; and (5) that the plaintiff possessed an estate or interest in the property disparaged. *American Nat'l Bank & Trust Co. v. First Wisconsin Mortg. Trust,* 577 S.W.2d 312, 316 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.).

## 3. Fraud.

[10] To prove fraud, a plaintiff must establish that (1) a material misrepresentation was made, (2) the speaker knew it was false when made or made it recklessly without any knowledge of its truth, (3) the representation was made with the intent that it should be acted upon by the party, and (4) the party acted in reliance upon the representation to its damage. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688–89 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). *See also Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex.1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971); *Schindler v. Austwell Farmers Coop.,* 829 S.W.2d 283, 286 (Tex.App.—Corpus Christi 1992), *aff'd as modified on other grounds,* 841 S.W.2d 853 (Tex.1992).

## C. The Contract—The Joint Operating Agreement.

This case features the 1982 version of the operating agreement form promulgated by the American Association of Petroleum Landmen ("A.A.P.L. Form 610–Model Form Operating Agreement

1982"). The basic and stated purpose of these operating agreements is for the exploration and development of designated oil and gas within the prescribed geographical area described in Exhibit "A" to the J.O.A. A single party is appointed "operator" who is responsible for the management and control of drilling, development, and production activities. The parties agree to share the costs and liabilities, to own equipment, and to share in production in proportion to their respective percentage of ownership and burdens, which is also set out in Exhibit "A" of the J.O.A.

The drilling of an initial well on the contract area is the only operation mandated in which all the parties must participate. After the initial well, any party may propose subsequent drilling operations, but such operations must be conducted by mutual consent of all the parties or pursuant to the consent/non-consent provisions. A.A.P.L. Form 610, 1982, Art. VI, B. Notice of a proposal triggers the consent/non-consent provisions for subsequent drilling operations. Those parties who decline to participate are "non-consenting parties." Those who agree to participate are consenting and bear all costs and risks of that operation. A consenting party may opt to limit its participation to its original working interest or to "carry its proportionate part of Non–Consenting Parties' interests...."

When the operations begin, the non-consenting parties are deemed to have relinquished all interest in the well, operating rights, and production until the carrying parties are reimbursed for 100 percent of what would have been the non-consenting party's share of the operating costs and surface equipment and a substantial risk penalty, a multiple (500 percent in this case) of most other costs carried. A.A.P.L. Form 610, 1982, Art. VI, B(2).

Typically, any party desiring to drill a subsequent well or to rework, deepen, or plug back a nonproducing well is required to give written notice to each participant, specifying the operation proposed, the location, objective depth and formation, and the estimated cost. Upon receipt of the notice, the election to participate must be exercised within a specified period of time. The failure to respond is deemed a negative election. A.A.P.L. Form 610, 1982, Art. VI, B(1).

An election to participate applies to the full extent of a party's interest. However, a party may increase its participation by assuming responsibility for a non-consenting party's interest. If less than all parties elect to participate, the proposing party must inform all the consenting parties of the total **\*111** interest committed to the project. Each party that elects to participate may then further elect to limit its participation to its original interest or to carry its proportionate part of the non-consenting parties' interests in addition to its original interest. Despite a non-consenting party's relinquishment of control and share in the subsequent operation, the non-consenting party remains a party in the overall venture and continues to have a substantial degree of control even over the project in which it is not participating. The non-consent party retains the right of access to all portions of the contract area. Most significant to this case, the non-consent party continues to have voting rights in the removal and appointment of the operator, which provides a forum for

voicing complaints on the nature of operations for any well in the contract area. Voting rights are undiluted by a non-consent position.

**D. Independent Causes of Action.**

Hunt/Hill contends that Heritage's claims are totally dependent upon the Joint Operating Agreements entered into by the parties for operations in the Crittendon Field. Focusing on the source of duty and the type of damages claimed and proven, Hunt/Hill argues that without the 22 J.O.A. and its attendant relationships, interests, and obligations, no tort obligations rise, and that all of Heritage's claims sound only in contract. They cite *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991), arguing that because the injuries claimed by Heritage are economic losses premised solely upon the subject of the 22 J.O.A., Heritage's action sounds in contract alone. *Id., quoting Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986).

 **[11]** The gist of this issue is really that many of the same operative facts that can give rise to a cause of action for breach of contract may also give rise to causes of action for business torts. While the concept that contractual obligations arise from an agreement between the parties whereas a tort obligation is imposed by law separate from any contractual undertaking seems quite evident, application of the concept is not so clear cut. *Compare Airborne Freight Corp., Inc.,* 847 S.W.2d at 295–96, *with Beneficial Personnel Servs. of Texas, Inc. v. Rey,* 927 S.W.2d 157, 167–68 (Tex.App. —El Paso 1996)(vacated pursuant to settlement without reference to the merits). Minimally, any analysis must consider the source of the duty and the nature of the remedy sought to determine the independence of tort claims from their associated contract claims. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 41 Tex. Sup. Ct. J. 289, 291, 960 S.W.2d 41, 43 (Tex.1998). Most significant to this case, however, is that the Texas Supreme Court has clearly recognized the propriety of fraud and tortious interference with contract claims notwithstanding the fact that damages were only economic losses recoverable under a breach of contract claim. *Id.* at 293, at 44 *citing Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex.1992) and *American Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990).

**E. Conclusion.**

 **[12]** Thus, the question before us simply comes down to whether Heritage's tort claims are sufficiently independent from the breach of contract claims in the pleadings, in the proof, and in the damages questions submitted to the jury.

The tortious interference and slander of title claims relate to:

- the non-consent interests which Heritage claims it derived from Hunt/Hill's non-participation in the 22–3 well and which Heritage sought to sell to third parties;

- a buy-in agreement that Heritage had with Oxford;

- gas purchase agreements which Heritage sought with Enron and Enserch/Lone Star; and

- a proposal by Sun to buy all of Heritage's interest in the Crittendon Field.

The fraud cause of action depends on the allegation that:

- the Hunts orally promised Heritage that the Hunts would pay for their share of the drilling of the 22–3 well, as well as substitute or subsequent well operations, **\*112** in exchange for Heritage putting the 22–2 well into production.

While it is clear that the right to remove an operator under a J.O.A., and participation or non-participation in a subsequent J.O.A. operation are undoubtedly contractual rights, it does not necessarily follow that a party's actions regarding the J.O.A. contract can never rise to the level of a tort. *See American Nat'l Petroleum Co.,* 798 S.W.2d at 278 (breach of one's own contract, while only giving rise to contract claims as regards to that contract, can also constitute claim in tort for tortious interference with the contract of a third party). As noted above, the Texas Supreme Court recently reaffirmed, at least conceptually, that concept, holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa Plastics Corp. USA,* 41 Tex.Sup.Ct.J. at 293, 960 S.W.2d at 44.

Furthermore, we are not dealing with an ordinary contract. Joint Operating Agreements, standardized forms developed over years by the industry to govern ventures in the development of oil and gas properties, are simply not everyday fixtures of life. They govern operations involving immense financial risk and reward; the parties to J.O.A. are experienced and sophisticated and generally have balanced bargaining positions. These are agreements which involve liabilities and obligations unique to the legal and technical peculiarities of the oil and gas industry. Nevertheless, this case highlights that they are still basic structures with minimal safeguards and protections from the misconduct of a party.

We conclude the pleadings and jury submissions sufficiently distinguish independent claims of breach of contract and tort causes of action. The specific facts forming the basis for breach of contract establish at least some degree of independence from the facts forming the basis for the tortious interference, slander of title, and fraud. The tort causes of action pled and proven by Heritage were independent of the 22 J.O.A. Rather, the contracts or business relationships alleged by Heritage relate to the non-consent interests Heritage sought to sell to third parties, the gas purchase agreements, and Heritage's attempt to sell its entire Crittendon interests which are clearly independent of the obligations and duties imposed under the 22 J.O.A. Consequently, we find that

Heritage's recovery in tort is not barred as a matter of law. Points of Error 1a, 5a, 9a, 13a, 17a, 23a, 27a, 31a, 35a, 39a and 53a are overruled.

## IV.

## Non–Consent Interests.

### *Points of Error 1b, c, 2a, 4, 22, 23b, c, d, e, f, 24a, and 44.*

We next consider whether there were non-consent interests. Heritage alleged that Hunt/Hill were non-consenting parties to the drilling of the 22–3 well and that they tortiously prevented Heritage from marketing the non-consent interests of Hunt/Hill that Heritage carried in accordance with the 22 J.O.A. Hunt/Hill counter that there were no non-consent interests to be carried by Heritage because the 22 J.O.A. did not cover the 22–3 well. We find that the 22 J.O.A. did not cover the 22–3 well.

## A. Standard of Review.

None of the parties argue that the terms of their joint operating agreement are ambiguous; they simply disagree over the construction and interpretations of its terms. A disagreement over the meaning of a contract does not render the provision ambiguous. *Purvis Oil Corp. v. Hillin and MS Oil Properties, Inc.,* 890 S.W.2d 931, 935 (Tex.App.—El Paso 1994, no writ); *First City Nat'l Bank of Midland v. Concord Oil Co.,* 808 S.W.2d 133, 136 (Tex.App.—El Paso 1991, no writ). When parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Purvis Oil Corp.,* 890 S.W.2d at 935; *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.,* 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Where a contract is unambiguous, **\*113** it need only be enforced as a matter of law and as it is written. *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983); *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518–19 (Tex.1980).

As we discussed before, and as we will discuss several more times, Joint Operating Agreements are familiar, standardized legal documents developed by the oil and gas industry to conduct the complex and risky business of drilling and producing oil and gas. Basic to the purpose of the J.O.A. is the identification of what oil and gas properties are subject to the J.O.A. and what the proportional obligations and interests are borne by the respective working interest owners in the development of those properties, both of which are detailed in Exhibit "A" to the J.O.A. These are essential to a J.O.A. because participation in the first well is the only operation in which all the

J.O.A. parties must participate, and thereafter, any J.O.A. party may propose subsequent drilling operations which must be conducted by mutual consent of all the parties or pursuant to the consent/non-consent provisions. A.A.P.L. Form 610, 1982, Art. VI, B.

Heritage claims that it properly proposed the development of the 22–3 well under the terms of the 22 J.O.A., and because Hunt/Hill elected not to participate in the 22–3 well operation, Heritage carried the 22–3 well non-consenting interests of Hunt/Hill. In Question 8 of the trial court's charge, the jury found that the 22–3 well was covered by the 22 J.O.A. It is, however, clear from the record and undisputed that the 22–3 well was proposed, engineered, and drilled to a target depth of 22,000 feet or the Ellenburger formation. Thus, the first problem with the jury's verdict is that the 22 J.O.A. on its face does not cover the 22–3 well. Exhibit "A" of the 22 J.O.A. reads, in pertinent part:

1. *LANDS SUBJECT TO THIS AGREEMENT:*

   All of Section 22, Block C–23, PSL Survey, Winkler County, Texas

2. *RESTRICTIONS AS TO DEPTHS OR FORMATIONS:*

   To a depth of 20,000' or to a depth sufficient to thoroughly test the Fusselman formation, whichever is the lesser depth.

In the face of this contradiction, Heritage makes two alternative arguments. First, that whether or not the J.O.A. covers a well is determined at the time the well is proposed and not after the well has already been drilled. Secondly, the J.O.A. parties modified the depth restrictions of the 22 J.O.A. to cover the deeper depths to which they actually drilled the 22–3 well.

 **[13]**   We find their first argument that the actual depth or formation to which a well is drilled is immaterial so long as the depth and formation initially proposed were within the "contract area," unpersuasive, either as a general proposition or as applied to this case. The argument is especially flawed as for drilling operations that go beyond or deeper than the limitations defined by the J.O.A. It also trivializes the import of the defined contract area and subjects the non-operators to the whim of the operator. *Cf. Hamilton v. Texas Oil & Gas Corp.,* 648 S.W.2d 316, 323–24 (Tex.App.—El Paso 1982, writ ref'd n.r.e.). Conversely, it makes almost no sense to require or to allow an operator to drill deeper than is necessary to bring a well into proper production. In other words, the depth and formation expressed in the J.O.A. define the outer or maximum boundaries covered by a J.O.A. and not minimum mandatory objectives. We therefore reject Heritage's first argument.

 **[14]**    **[15]**   It is axiomatic that a J.O.A. contract and specifically the contract areas may be contractually amended, and Heritage's alternative argument is that the 22 J.O.A. was modified to authorize drilling the 22–3 well to the actual completion depth of 22,000 feet. To conclude

that there was a valid modification, the jury had to favorably determine two elements. The first is that the modification is based upon new consideration. *Hovas v. O'Brien,* 654 S.W.2d 801, 803 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Barnhill v. Moore,* 630 S.W.2d 817, 820 (Tex.App.—Corpus Christi 1982, no writ). The second is that there existed the same degree of mutuality and meeting of the minds as was present for the original contract. *Mid Plains Reeves, Inc. v. Farmland Indus.,* **\*114** *Inc.,* 768 S.W.2d 318, 321 (Tex.App.—El Paso 1989, writ denied); *Mandril v. Kasishke,* 620 S.W.2d 238, 244 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). One party alone cannot modify a contract after it has been entered into and all parties to the agreement must assent to the modification for the modification to be valid. *Mandril,* 620 S.W.2d at 244.

The 22 J.O.A. was entered into by sixteen entities, besides Heritage. Accordingly, any modification of the contract would require the mutual assent of all the parties. It is clear from the record that the parties contemplated a modification of the contract area. Indeed, the attempted modification of the 22 J.O.A. contract area did not begin with the 22–3 well, but rather with the 22–2 well. Consequently, we must consider two instances in order to decide if there was, as Heritage argues, a valid modification to the 22 J.O.A. to extend the contract area deeper: (1) the issuance and execution of AFEs on the 22–2 well; and (2) the issuance and execution of AFEs on the 22–3 well.

### 1. The 22–2 Well.

 **[16]**   The undisputed evidence shows that all the working interest owners, except the Hills and Tribal Drilling Company, signed an Ellenburger AFE for the 22–2 well. This contemplated and authorized drilling beyond 20,000 feet and the shallower Fusselman formation. The undisputed evidence shows, however, that the Ellenburger AFE was accompanied by a cover letter from Heritage to the working interest owners that stated, that despite the language in the AFE, Heritage only intended to drill to a depth sufficient to test the Fusselman formation, or to 20,000 feet, whichever was less. Hunt/Hill objected and demanded a Fusselman AFE for the 22–2 well.

Consequently, as a matter of law, a modification of the 22 J.O.A. could not have occurred via the 22–2 well Ellenburger AFE. As evidenced by Heritage's cover letter, there is legally no evidence of a meeting of the minds between Heritage and the other working interest owners. Moreover, there is no evidence of a clear intent on behalf of the parties to modify the J.O.A. Indeed, formal modification of the 22 J.O.A. was never expressly addressed or requested. Finally, because of the conflicting language of the accompanying cover letter, we do not find any intent by implication that the signing of the Ellenburger AFE by the working interest owners would modify the 22 J.O.A.

The Hunts and Tribal Drilling's refusal to sign an Ellenburger AFE for the 22–2 well, and their demand for and execution of a Fusselman AFE clearly negates any finding of a modification of the 22 J.O.A. because of the 22–2 well operations.

**2. The 22–3 Well.**

**[17]** On May 19, 1987, Heritage encountered problems in the drilling of the 22–2 well. Heritage alleged that it halted drilling on the 22–2 well, which was well short of the target depth in exchange for Hunt/Hill's oral promise to pay their share of the costs for a substitute well, the 22–3 well. Both Heritage and Hunt/Hill understood that the 22–3 well was to be drilled to a depth of 22,000 feet, or a depth sufficient to test the Ellenburger formation. No part of that agreement was ever put into writing and no evidence was offered of the essential terms of the agreement. Once it had the oral agreement with Hunt/Hill to stop drilling on the 22–2 well, Heritage polled the other interest owners to secure unanimous consent of all working interest owners to stop short the drilling operations on the 22–2 well.

Heritage then issued three AFEs in series for the 22–3 well. The first AFE issued on June 30, 1987, proposed drilling to a depth of 22,000 feet. The second AFE issued on October 14, 1987, proposed a different location and a depth of 22,000 feet. The third AFE issued on December 1, 1987, proposed the same location as the June AFE but proposed drilling only to a depth of 20,000 feet.

Heritage has not cited, and we have not found any evidence that any one of these AFEs was executed by all the working interest owners. There is evidence that the Hills, in a letter to Heritage, conditionally agreed to the drilling of the 22–3 well to a depth of 22,000 feet upon the occurrence of several conditions, two of which included that Heritage **\*115** formally amend the 22 J.O.A. to cover the proposed drilling depth and that Heritage secure a title opinion on the drill site in accordance with the 22 J.O.A. The evidence reflects that Heritage tried but failed to secure the other Non–Operators' consent to amend the Section 22 J.O.A. to eliminate the depth restrictions. We simply fail to see how Heritage can now hold Hunt/Hill liable under the unmodified contract. *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992); *Tubb v. Bartlett,* 862 S.W.2d 740, 746 (Tex.App.—El Paso 1993, writ denied).

Heritage has failed to present sufficient evidence of a meeting of the minds of all parties to the Section 22 J.O.A. sufficient to effect a modification. We find that as a matter of law, the Section 22 J.O.A. did not cover the 22–3 well. This finding requires that we sustain Points of Error 22 and 44.

**B. Claims Based on Non–Consent Sales.**

**1. Tortious Interference with a Contract/Prospective Business Relationship.**

**[18]** Because the 22 J.O.A. did not govern the 22–3 well, there was no obligation by any of the working interest owners to make a consent or non-consent election when the 22–3 well was proposed by Heritage. Consequently, there were no non-consent interests in the 22–3 well for Heritage to carry or be able to sell. Nonetheless, the jury found that Heritage had both an agreement

to sell the non-consent interest to the five different third parties and a reasonable probability of making such an agreement. These findings are unsupportable.

The cause of action for tortious interference with a contract is qualified with the requirement that the contract be "subject to interference." *Juliette Fowler Homes Inc.,* 793 S.W.2d at 664. All contracts are not subject to interference. There must at least be a "valid" contract. *Id.* Unsupported by any valuable consideration, i.e., the non-consent interests, these contracts were void and not simply unenforceable. *Armendariz v. Mora,* 553 S.W.2d 400, 404–05 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.).

 **[19]**    Similarly, an element of tortious interference with a prospective business relationship is that there is a reasonable probability of entering into a business relationship. Since Heritage had no non-consent interests to sell, there was "no interest with which [Hunt/Hill] could tortiously interfere." *Grace v. Zimmerman,* 853 S.W.2d 92, 96 (Tex.App.—Houston [14th Dist.] 1993, no writ). With nothing to sale, there could be no actual damages.

 **[20]**    **[21]**    **[22]**    We also note the general rule that an interfering party is justified in his or her interference if the interference is done in a bona fide exercise of his or her own rights and if he or she has an equal or superior right in the subject matter to that of the other party. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). Justified action includes the filing of a lawsuit, as long as it is done in good faith with the belief that there is a colorable claim. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996); *Tidal Western Oil Corp. v. Shackelford,* 297 S.W. 279, 280–81 (Tex.Civ.App.—Fort Worth 1927, writ ref'd). The courts have also recognized the privilege that an interfering party can act to protect its own legitimate financial interest; the invalid selling of non-existing interests pursuant to a joint operating agreement is certainly such an adequate financial interest. *Central Sav. and Loan Ass'n v. Stemmons Northwest Bank,* 848 S.W.2d 232, 241 (Tex.App.—Dallas 1992, no writ). Such justification would apply to both causes of action—actual and prospective agreements.

We thus find that all claims of tortious interference with contract or with prospective business relationships regarding the non-consent interests Heritage claimed to be carrying must fail as a matter of law. Points of Errors 1b, c, 2a, and 4 are sustained.

## 2. Slander of Title.

 **[23]**    Slander of title is a tort action with stringent pleading and proof requirements. The plaintiff must prove that the defendant made a false and malicious statement, disparaging property in which the plaintiff holds an interest, and causing special damages. **\*116** *Clark v. Lewis,* 684 S.W.2d 161, 163 (Tex.App.—Corpus Christi 1984, no writ). A plaintiff must also prove the loss of a specific sale in order to recover. *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 145–46 (Tex.1982).

**[24]**   Since there were no non-consent interests for Heritage to carry or sell, Heritage could not possess any interest or estate which could be disparaged; Hunt/Hill's publications or utterances complaining about Heritage's attempts to sell or otherwise market those interests were not false; and finally, it is impossible for Heritage to prove the loss of a specific sale or any special damage. All of Heritage's claims for slander of title premised on the non-consent sales must fail as a matter of law. Heritage is, therefore, precluded from recovery on any theory involving non-consent interests in the transactions involving: (1) Craig Sandahl; (2) Jack Bestrom; (3) Bruce Heafitz; (4) Mobil Producing; and (5) E.R. Duke. We sustain Points of Error 23b, c, d, e, f, and 24a.

# V.

## Statute of Limitations.

### *Points of Error 3, 7, 11, 15, 19, 25, 29, 33, 37, and 41.*

**[25]**   Hunt/Hill challenge the award of damages based on tortious interference with contract and prospective business relations and slander of title on the ground that all such claims were barred by the statutes of limitations. Actions based upon tortious interference with an existing contract, tortious interference with business relations, and slander of title are all controlled by a two-year statute of limitations. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986); *Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 584 (Tex.App.—Dallas 1991, writ denied)(tortious interference with existing contract); *Atomic Fuel Extraction Corp. v. Estate of Slick,* 386 S.W.2d 180, 191 (Tex.Civ.App.—San Antonio 1964), *writ ref'd n.r.e. per curiam,* 403 S.W.2d 784 (Tex.1965)(tortious interference with existing contract); *First Nat'l Bank of Eagle Pass v. Levine,* 721 S.W.2d 287, 289 (Tex.1986)(tortious interference with business relations); *Kidd v. Hoggett,* 331 S.W.2d 515, 520 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.)(slander of title).

**[26]**   For purposes of applying a statute of limitation to a tort, the cause of action accrues when facts come into existence which authorize a claimant to seek a judicial remedy or when the wrongful act effects an injury. *Hughes v. Mahaney & Higgins,* 821 S.W.2d 154, 156 (Tex.1991); *Brown v. KPMG Peat Marwick,* 856 S.W.2d 742, 746 n. 4 (Tex.App.—El Paso 1993, writ denied). The determination of when a cause of action accrues is a question of law. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988).

**[27]   [28]   [29]**   A cause of action for tortious interference with an existing contract does not accrue until the contract is interfered with and harm caused to the plaintiff. *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967). Similarly, a cause of action for tortious interference with business relations does not accrue until existing negotiations, which are reasonably certain of resulting in a

contract, are interfered with such that the negotiations terminate and harm to the plaintiff results. Likewise, a claim for slander of title does not accrue until there has been a loss of a specific sale. *Ellis v. Waldrop,* 656 S.W.2d 902, 904–05 (Tex.1983); *Shell Oil Co., Inc. v. Howth,* 138 Tex. 357, 159 S.W.2d 483, 490 (1942).

 **[30]**   Until a cause of action accrues, a lawsuit is premature. *Tectonic Realty Inv. Co. v. CNA Lloyd's of Texas Ins. Co.,* 812 S.W.2d 647, 654 (Tex.App.—Dallas 1991, writ denied). If the plaintiff is not yet harmed, even in the face of a breach of duty, then the cause of action has not yet accrued and any suit filed thereupon is premature. *Philips v. Giles,* 620 S.W.2d 750, 751 (Tex.Civ.App.—Dallas 1981, no writ). Moreover, if a claim is not yet ripe, a trial court has no jurisdiction to render an opinion thereon. *City of Garland v. Louton,* 691 S.W.2d 603, 605 (Tex.1985). To the extent that a plaintiff seeks relief based upon facts that have not yet occurred, there is no live controversy between the parties and a trial court lacks subject matter jurisdiction over such claims. *State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994); **\*117** *Jones v. Westergren,* 771 S.W.2d 669, 671 (Tex.App.—Corpus Christi 1989, no writ). Consequently, if the trial court lacks subject matter jurisdiction, the appellate court can make no order other than to reverse the case and dismiss. *Gomez,* 891 S.W.2d at 244; *City of Garland,* 691 S.W.2d at 605.

Heritage's Original Petition was filed on December 18, 1987, and joined as defendants, A.G. Hill, Virgil St. Clair, Lyda Hill, Tribal Drilling Company, Stuart Hunt, Sherman Hunt, The Kickham Group, Inc., Hara Hunt, Hilre Hunt, and U.S. Financial Corporation. The original petition alleged various breaches of the J.O.A., interference with actual and prospective business relationships, and cloud of title. The petition contained a brief statement of facts pertaining to Hunt/Hill's challenge of Heritage's status as Operator under the Section 22 J.O.A. and how those actions constituted a breach of the 22 J.O.A. Heritage filed its First Amended Petition on May 1, 1992, adding a number of new plaintiffs and new defendants. At trial in 1992, Heritage presented evidence in support of its claims for tortious interference, slander of title, breach or impaired contract, and lost sales.

In jury Questions 23, 27, 34, and 39, the jury found that Heritage's negotiations with various individuals for the sale of the alleged non-consent interests in the 22–3 well and Heritage's negotiations with Oxford, Sun, Enserch/Lone Star, and Enron did not end before April 30, 1990 (the date two-years prior to the filing of the First Amended Petition), and that Heritage's claims for tortious interference and slander of title based upon the non-consent, Oxford, Sun, Enserch/Lone Star, and Enron transactions were not barred by the statute of limitations period for these causes of action. Hunt/Hill challenge this finding as being legally insufficient as a matter of law and factually insufficient as being against the great weight and preponderance of the evidence.

### A. Standard of Review

When attacking the legal sufficiency of an adverse jury finding to an issue on which the appellant had the burden of proof, the appellant must demonstrate that all vital facts were conclusively

established in support of the issue as a matter of law. *Chandler v. Chandler,* 842 S.W.2d 829, 832 (Tex.App.—El Paso 1992, writ denied)(*citing Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 [Tex. 1989] ); *see also Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Montes v. Texas Employers' Ins. Ass'n,* 779 S.W.2d 485, 487 (Tex.App.—El Paso 1989, writ denied). This Court employs a two-prong test when reviewing a "matter of law" challenge on an adverse jury finding. *Chandler,* 842 S.W.2d at 832. First, the record is examined for evidence which supports the finding while ignoring all evidence to the contrary. *Chandler,* 842 S.W.2d at 832; *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696; *Montes,* 779 S.W.2d at 487. If there is no evidence to support the finding, we then examine the whole record to determine if the contrary position is established as a matter of law. *Chandler,* 842 S.W.2d at 832; *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696–97; *Montes,* 779 S.W.2d at 487. Only if the contrary position is conclusively established will the point of error be sustained. *Chandler,* 842 S.W.2d at 832; *Meyerland Community Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

When attacking the factual sufficiency of the failure of the fact finder to find an issue on which the appellant had the burden of proof, it must demonstrate on appeal that the failure to find is so clearly against the great weight and preponderance of the evidence as to be manifestly unjust. This standard requires us to first consider whether there is some evidence that supports the failure to find the issue, and then determine, in light of the entire record, whether the failure to find the issue is manifestly unjust. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence Points of Error"*, 38 Texas L.Rev. 361, 364–68 (1960).

## B. Transactions.

### 1. Non–Consent Interests.

 [31]    Hunt/Hill complain that the evidence shows that Heritage did not attempt to sell **\*118** the non-consent interests in the 22–3 well until May 1988 and that the efforts to sell those interests had failed by June 1988. Since these claims were not specifically asserted until Heritage filed its First Amended Petition on May 1, 1992, Hunt/Hill argue that they are barred by limitations. We find, however, that Texas Civil Practice & Remedies Code § 16.068 governs the application of the statute of limitations in situations such as this. It provides:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence. TEX.CIV.PRAC. & REM.CODE ANN. § 16.068 (Vernon 1997).

Heritage's original petition complained of the original defendants' conduct in challenging Heritage's working interest in the 22 J.O.A. and sought damages for breach of contract, intentional interference with business relations, and interference with arrangements to promote interests in the 22–3 well. When an amended pleading sets up a new cause of action under Section 16.068, it will relate back to the date of the original pleading for the purposes of limitations, so long as the amended pleading does not allege a wholly new, distinct, or different transaction. *Ex parte Goad,* 690 S.W.2d 894, 896–97 (Tex.1985); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 791 (Tex.App.—El Paso 1996, writ denied). The amended claim simply does not allege a wholly new, distinct, or different transaction. Both the earlier and later claims involve the 22 J.O.A. and the parties to that operating agreement. Non-consent interests are an integral feature of Joint Operating Agreements, and critical to this point, they are the core of this litigation.

Consequently, even though Heritage's attempts to sell the non-consent interests may have occurred after the filing of the original petition, the causes of action involving those interests do not arise from a wholly different transaction separate and apart from the originally pled breach of contract action. Heritage's first amended petition relates back to its original petition. Finding some evidence to support the jury's finding that the non-consent transactions were not barred by the statute of limitations, we reject the legal sufficiency complaint. We also find that the great weight of the evidence does not support a finding that the complaint involving non-consent interest is barred by limitations. Accordingly, we overrule both portions of Points of Error 3 and 25.

## 2. Oxford.

 **[32]** **[33]** Heritage's claim for tortious interference and slander of title in connection with its agreement with Oxford were not specifically pleaded until May 1, 1992. The evidence in the record establishes that the Oxford contract was dated May 10, 1987, but apparently executed in either late September or early October of 1987, prior to Heritage filing suit. Thus, at the time Heritage filed its original petition there appears in the record at least some basis that a ripe claim existed for which it could seek recovery. Heritage's petition, although not specific as to the third party transaction that had failed, did allege causes of action for tortious interference and cloud on title arising from Hunt/Hill's attempts to remove Heritage as Operator. We find that Heritage's original petition was sufficient to vest the trial court with subject matter jurisdiction over the Oxford claim and the First Amended Petition filed on May 1, 1992 relates back to the original petition to preserve the cause of action. Further, Hunt/Hill did not specially except to Heritage's pleading and, therefore, any defect in pleading was waived. TEX.R.CIV.P. 90; TEX.CIV.PRAC. & REM.CODE ANN. § 16.068; *Service Lloyds Ins. Co. v. Slay,* 800 S.W.2d 359, 362 (Tex.App.—El Paso 1990, writ denied).

Though we can find no evidence to support the jury's finding that the Oxford transaction did not terminate before April 30, 1990, that date is not a vital fact because of the foregoing rule of law regarding relation back. We conclude that there is legally and factually sufficient evidence in

the record to find that **\*119** Heritage's causes of action with respect to the Oxford participation agreement were not barred by the statute of limitations. We therefore overrule both portions of Points of Error 7 and 29.

### 3. Sun, Enserch/Lone Star, and Enron Transactions.

 [34]   The evidence presented at trial with respect to the Sun transaction, the Enserch/Lone Star transaction, and the Enron transaction conclusively established that they did not exist as causes of action at the time of Heritage's filing of its original petition. Instead, the evidence shows that the Sun and Enron transactions came into existence and failed after December 18, 1987. While Heritage entered into negotiations with Enserch/Lone Star as early as September 1987, the evidence also shows that the transaction did not fail until after December 18, 1987. We determine these transactions to be wholly new, distinct, and different transactions from the causes of action pled in the original pleading, and as a result, the amended pleading may not relate back, pursuant to Section 16.068, to the date of the original pleading for the purposes of limitations. *Ex parte Goad,* 690 S.W.2d at 896–97; *Duran,* 921 S.W.2d at 791–92. Therefore, Heritage's claims based upon these transactions were, unlike the non-consent interests or Oxford, not ripe at the time of Heritage's filing of its original petition and were wholly different from the causes of actions raised in the original petition. Consequently, the trial court could not, as a matter of law, obtain subject matter jurisdiction over these claims and the statute of limitations on these claims could not have been tolled as the claims did not exist. Thus, Heritage's first amended petition must be treated as its original petition for purposes of the subsequently arising causes of action. Under the applicable statute of limitations, Heritage was required to file suit upon these claims within two years of the date that such causes of action accrued, i.e., the date that injury to Heritage resulted.

### a. The Sun Transaction.

 [35]   Heritage has failed to cite to any evidence in the record, and we have found none, which supports the jury finding that the Sun negotiations continued until April 30, 1990. Finding no evidence in the record to support the jury finding, we examined the record to determine if the evidence conclusively established an earlier date for the failure of the Sun transaction and accrual of Heritage's cause of action.

Rick Baldwin, manager of corporate acquisitions in 1988 and 1989, testified that Sun's involvement with Heritage began in 1988. Sun made two offers of contract to purchase Heritage's interests in the Crittendon Field in February 1989 and March 1989. Michael Wisenbaker testified that in December of 1987, there was no pending transaction between Heritage and Sun regarding Heritage's sale of its Crittendon Field interests. Furthermore, Heritage admitted in its brief that the Sun transaction did not exist, either in contract or negotiation, in December of 1987, when Heritage's original petition was filed. The evidence is clear, unequivocal and convincing that Sun terminated its contract with Heritage on March 13, 1989. We, therefore, find that the jury's

answer to Question 34 was not supported by legally sufficient evidence and that the evidence conclusively established an earlier date for the accrual of Heritage's cause of action based upon the Sun transaction.

Heritage's causes of action for tortious interference with contractual relations and slander of title as to Sun began to run as of March 13, 1989. Heritage should have filed suit on those causes of action not later than March 14, 1991. The first amended petition was not, however, filed until May 1, 1992. Heritage is, therefore, precluded from recovery on the Sun transaction for tortious interference with contract and slander of title as it failed to timely file suit on those claims.

### b. The Enserch/Lone Star Transaction.

 **[36]**   Heritage, again, has not cited any evidence in the record and we have not found any evidence which supports the jury finding to Question 39 that the Enserch/Lone Star negotiations continued until April 30, 1990. Finding no evidence in the record to support the jury's finding that the Enserch/Lone Star negotiations continued until April 30, 1990, **\*120**  we examined the record to determine if the evidence definitively established an earlier date for the failure of the Enserch/Lone Star transaction and accrual of Heritage's cause of action.

Michael Wisenbaker testified that there was no transaction between Heritage and Enserch/Lone Star that could have been interfered with in December of 1987. The evidence presented at trial of negotiations between Heritage and Enserch/Lone Star establishes that the negotiations began in September 1987 and continued until December 1988.

Heritage entered into evidence a November 2, 1988 memo and copies of three contracts and one loan agreement that were to be executed between Heritage and Enserch/Lone Star. In a December 7, 1988 memo, the parties contemplated execution of the contracts within two to four working days. The contracts were never signed, evidencing the failure of negotiations between Heritage and Enserch/Lone Star in December 1988. Heritage's cause of action accrued at that time. The jury's answer to Question 39 was not supported by legally sufficient evidence and we conclude that the evidence conclusively established an earlier date for the failure of the Enserch/Lone Star transaction.

We find the evidence to be clear, unequivocal, and convincing that Heritage's claims for tortious interference and slander of title in the Enserch/Lone Star transaction accrued no later than December 1988. Heritage was required to file suit upon this cause of action not later than January 1, 1991; the First Amended Petition was not filed until May 1, 1992. Therefore, Heritage is precluded from recovery on the Enserch/Lone Star transaction for tortious interference with contract and slander of title as it failed to timely file suit upon these claims.

**c. The Enron Negotiations.**

 **[37]**   Once again, Heritage has not cited any evidence in the record, and we have not found any, which supports the jury finding that the Enron negotiations continued until April 30, 1990. As with the Sun and Enserch/Lone Star transactions, we have examined the record to determine if the evidence conclusively established an earlier date for the failure of the Enron transaction.

Michael Wisenbaker testified that there were no transactions or negotiations with Enron that could have been interfered with in December of 1987. Negotiations between Enron and Heritage began in the summer of 1989. A representative of Enron testified that the last correspondence between the parties occurred in February of 1990. Heritage has also admitted in its pleadings that negotiations between Enron and Heritage were over as of January 10, 1990, and the last correspondence between the two parties was a February 9, 1990 letter from Heritage to Enron. The evidence presented on the issue is clear and unequivocal that negotiations between the parties ended no later than February 9, 1990, the date of the last correspondence. Consequently, Heritage's cause of action for the failed Enron transaction accrued no later than February of 1990 and Heritage was obligated to file suit on this claim certainly no later than March 1, 1992. The First Amended Petition was filed on May 1, 1992. Heritage is, therefore, precluded from recovery for tortious interference and slander of title claims as to Enron as it failed to timely file suit upon these claims.

**d. Application of the Extension Statute.**

Heritage nonetheless argues that its original petition filed on December 18, 1987, was broad enough to place in issue all the conduct raised in subsequent pleadings. Heritage's contention is that since the original petition was timely filed, the first amended petition properly relates back to the original petition because the causes of action relate to the same transaction or occurrence. We disagree.

Heritage has cited various cases, [1] including a number we have relied upon, which allow **\*121** for the addition of claims or damages sought through post limitation amendments. We find the argument wide of the target. In all cases cited by Heritage there existed, at the time of the original filing, a cause of action upon which the plaintiff could recover, and in each case the amendment only altered the theory of recovery, added an additional claim of relief upon the same facts, changed certain factual assertions, or sought to add to the amount claimed in damages.

 **[38]**   The controlling issue is the definition of the term "transaction." Heritage seeks to define the term "transaction" as it is used in Texas Civil Practice and Remedies § 16.068 simply as the wrongful act. However, it is fundamental that torts stem from the consequence of acts, not from the acts themselves. There must be some sort of injury in order for a plaintiff's cause of action to accrue. For slander of title, there must be the loss of a specific sale; for tortious interference with contract, there must be an existing contract and then interference with the contract which results

in harm. Without injury there are no damages, and without them both there is no recovery. We, therefore, interpret the term "transaction" as it is used in Section 16.068, as that set of facts which gives rise to the cause of action premised thereon; in other words, as the totality of events which entitle a plaintiff to bring suit.

The case of *Goad* and its progeny provide useful interpretations of the extension statute which support our interpretation. In *Goad,* the Supreme Court explained that if the amended motion "does not allege a *wholly* new, distinct or different transaction, then it relates back to the original filing and is not subject to a limitations defense." *Ex parte Goad,* 690 S.W.2d at 896. In the instant issue, there was no claim or cause of action upon which Heritage could seek recovery at the time of filing its original petition. The evidence is clear that the Sun, Enserch/Lone Star, and Enron transactions all came into existence and failed after the filing of the original petition. Most significant, however, is what they involved. The Sun transaction involved the negotiations for the sale of Heritage's entire interest in the Crittendon Field. While that would have obviously included Heritage's working interest in the 22 J.O.A., it is unrelated to the basic nature of the dispute or to the causes of action originally pleaded. The Enserch/Lone Star and Enron transactions involved gas purchase agreements. The "transaction" upon which Heritage sought recovery in its original petition was clearly a different "transaction" from the "transactions" it sought recovery for in its amended petition. The facts which would give rise to claims as to the Sun, Enserch/Lone Star, and Enron transactions simply did not exist at the time of the filing of the original petition. The causes of action alleged in the first amended petition regarding the Sun, Enserch/Lone Star, and Enron transactions arose from wholly new, distinct, or different transactions than that alleged in the original petition. In either instance, we find that Heritage's claims for tortious interference and slander of title premised upon the Sun, Enserch/Lone Star, and Enron transactions are barred by limitations.

**e. Automatic Stay Due to Bankruptcy.**

 [39]    [40]    Heritage lastly argues that its involuntary bankruptcy in late August of 1989 stayed all proceedings against it until it emerged from bankruptcy in January of 1991. Relying on 11 U.S.C.A. § 108 (1993), Heritage asserts that eighteen months must be added to the period in which it had to file its first amended petition. We simply do not read the statute that way. Section 108 provides that the limitations period includes any suspension occurring on or after commencement of the case in bankruptcy. The suspension referred to in Section 108 is that provided for in 11 U.S.C.A. § 362 (1993) which is the automatic stay of all judicial proceedings that were or could have been commenced before the case in bankruptcy *against the debtor.* Section 362 does not apply to actions filed *by the debtor. McMillan v. MBank Fort Worth, N.A.,* 4 F.3d 362, 366 (5th Cir.1993); *Freeman v. Commissioner of Internal* **\*122** *Revenue,* 799 F.2d 1091, 1092–93 (5th Cir.1986). We find that Heritage cannot avail itself of the protection afforded by Sections 108 and 362 on claims it initiated.

We sustain both portions of Points of Error 11, 15, 19, 33, 37, and 41.

## VI.

### Legal and Factual Sufficiency of the Evidence.

*Points of Error 1b, c, d, e, 2, 5b, c, 6, 9b, c, d, e, 10, 13b, c, d, e, 14, 17b, c, d, e, 18, 23b, c, d, e, f, 24, 27b, c, d, e, f, 28, 31b, c, d, e, f, 32, 35b, c, d, e, f, 36, 39b, c, d, e, f, 40,and 43b.*

### A. Standard of Review.

Hunt/Hill have challenged the legal and factual sufficiency of the jury findings of tortious interference, slander of title, and fraud. Although we have already determined that the statute of limitations bars many of Heritage's claims, and that there were no non-consent interests in the 22–3 well to be carried by Heritage, in the interest of judicial economy, considering the merits of the principal points of error raised here is appropriate. In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 83 (Tex.App.—El Paso 1992, no writ). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEXAS L.REV. 515 (1991).

A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661; *Worsham Steel Co.,* 831 S.W.2d at 83. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951); *Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 821 (1947); *Provident Am. Ins. Co. v. Castaneda,* 914 S.W.2d 273, 279 (Tex.App.—El Paso 1996, no writ).

Liability for tortious interference with a contract or business relations and slander of title were found in connection with:

- negotiations for the sale of non-consent interests in the 22–3 well claimed by Heritage;

- letter agreement with Oxford for Oxford to invest 64.5 percent of the drilling costs in exchange for a 33.3 percent working interest in the 22–3 well;

- Heritage's negotiations with Sun for the sale of their entire interest in the Crittendon Field;

- negotiations with Enserch/Lone Star and Enron for gas purchase agreements.

Finally, liability for fraud was found in connection with the alleged oral promise by Hunt/Hill to share in expenses of a substitute or subsequent wells if Heritage ceased drilling on the 22–2 well.

We have concluded, and both sides seem to largely agree, that the foregoing causes of action were premised upon essentially seven distinct acts:

- the negotiations and ultimate agreement between Hunt and Lyco Energy regarding the sale of Hunt's interest in the Crittendon Field, which was contingent on cessation of further drilling operations after the 22–2 well and replacement of Heritage as Operator by Lyco Energy;

- **\*123** the purported September 28, 1987 removal vote of the Non–Operators to replace Heritage as the J.O.A. Operator;

- the December 10, 1987 removal vote of the Non–Operators conducted by Hunt/Hill to remove Heritage as the Operator on the basis that Heritage lacked a proper ownership interest in the 22 J.O.A.;

- Hill's letter of December 1987 that stated that Heritage had no interest in the 22 J.O.A.;

- Hill's attorney's letter of December 18, 1987 which stated that Heritage was at best a co-tenant in the 22–3 well or worst a "bad faith trespasser;"

- the declaratory litigation initiated by Hunt/Hill against Heritage in Dallas County; and

- the Hunt's oral agreement with Heritage to participate in the 22–3 well in exchange for Heritage stopping and completing the 22–2 well short of the objective depth and formation.

The jury concluded that the consequences of these acts were:

- that Heritage's title in the 21 and 22 J.O.A.s was slandered;

- that Heritage's agreements to sell to third parties the non-consent interests which Heritage carried in the 22–3 well were tortiously interfered with;

• that the participation agreement that Heritage had with Oxford was tortiously interfered with;

• that the agreement Heritage had with Sun for the sale of all Heritage's interest in the Crittendon Field was tortiously interfered with;

• that Heritage's prospective business relationship with Enserch/Lone Star and Enron oil companies was tortiously interfered with; and

• that the Hunt's promise and failure to pay their share of costs of the 22–3 well constituted a fraud against Heritage.

**B. Tortious Interference with a Contract or Prospective Business Relationship.**

Texas law protects existing and prospective contracts from interference. *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 665. The principal difference between the two involves the requirement of a contract as opposed to a potential for a contract and the question of justification or defense which is borne by the defendant in a tortious interference with contract case. The elements are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was the proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *Holloway,* 898 S.W.2d at 795–96; *Armendariz,* 553 S.W.2d at 404. Like all business torts, these elements may seem simple but there are numerous exceptions.

 **[41]   [42]   [43]   [44]   [45]**   The first requirement is essentially a qualification that there must be a "contract subject to interference." All contracts are not subject to interference. There must be a valid contract. *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 665. The second requirement concerning "willful and intentional" is dependent upon a strict requirement of adequate proof to demonstrate this requirement. There must be some direct evidence of a willful act of interference. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993). The interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed. *Armendariz,* 553 S.W.2d at 406. The interference must proximately cause damage or harm. *State Nat'l Bank of El Paso,* 678 S.W.2d at 689. The measure of damages for tortious interference is the same for breach of contract; the plaintiff is to be put in the same economic position as if the contract had not been breached. *Armendariz,* 553 S.W.2d at 406.

 **[46]**   Generally, the interfering party is justified in interfering if the actions are done in a bona fide exercise of the party's own rights or if the party has an equal or superior right in the subject matter. *Victoria Bank & Trust v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). Justification may include the right to file a lawsuit provided this is done in good faith with the belief that there is a colorable claim.  **\*124** *Texas Beef Cattle Co.,* 921 S.W.2d at 211; *Tidal Western Oil Corp.,* 297 S.W. at

281. An interfering party is privileged to protect its own legitimate financial interest. *Central Sav. and Loan Ass'n,* 848 S.W.2d at 241.

[47] In an action concerning a prospective business relationship, the elements are: (1) the reasonable probability that a contractual relationship would have been entered; (2) an intentional, malicious intervention with the formation of that relationship; (3) without privilege or justification; (4) resulting in actual damage or loss. *Gonzalez,* 905 S.W.2d at 421. It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). More than mere negotiations must have taken place. *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 855 S.W.2d 18, 24 (Tex.App.—Corpus Christi 1993, no writ); *Grace,* 853 S.W.2d at 96. The act of interference must be purposefully done with the intent to harm the plaintiff.

[48] [49] The plaintiff has the burden of proving lack of justification or excuse in a tortious interference with prospective business relationship cause of action. *Tarleton State Univ. v. Rosiere,* 867 S.W.2d 948, 952 (Tex.App.—Eastland 1993, writ dism'd by agr.). However, other than the difference in burden of proof, justification involves the same type of proof as in a tortious interference with contract. A superior financial interest, for example, is recognized as justification or excuse. *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 566 (Tex.App.—Dallas 1989, no writ). Lastly, it must be demonstrated that the plaintiff suffered some actual damage or harm. The measure of such damages is, however, different from tortious interference with contract as the damages are not strictly based upon contract rules. *Allsup,* 808 S.W.2d at 660.

### 1. Non–Consent Interests.

Heritage claims that the development of the 22–3 well was properly proposed under the terms of the 22 J.O.A., that Hunt/Hill elected not to participate in the operation, and that Heritage carried the non-consenting interests of Hunt/Hill. The jury found that Heritage had both an agreement and a reasonable probability of making such an agreement to sell the non-consent interests that it claimed it carried in the 22–3 well to Craig Sandahl, Bruce Heafitz, Jack Bestrom, Mobil Producing Texas and New Mexico, and E.R. Duke.

[50] [51] Because there were no non-consent interests created in the 22–3 well, any contracts or probability of entering into such contracts were void and not subject to interference. We find from the record before us that not only is there a complete absence of evidence to support the vital fact that there were non-consent interests in the 22–3 well, but that the evidence conclusively establishes the opposite of that fact. Consequently, the first element of tortious interference with a contract or prospective business relationship could not be legally or factually proven. We do find, however, that considering only the evidence and inferences which support the remainder of the jury's findings, the remaining elements of willful and intentional acts, proximate cause of damage,

and actual damage or loss was legally and factually sufficient. *See Holloway,* 898 S.W.2d at 795–96; *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 665; *Armendariz,* 553 S.W.2d at 404. There is clear, probative evidence that Hunt/Hill were aware and had actual knowledge of Heritage's attempts to market the claimed non-consent interests and sufficient evidence for a reasonable person to conclude Hunt/Hill's actions protesting Heritage's claim were actionable acts of interference which was the proximate cause of damages suffered by Heritage. *See State Nat'l Bank of El Paso,* 678 S.W.2d at 691. We finally note that the measure of damages for tortious interference with contract is the same as for breach of contract, that objective being to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz,* 553 S.W.2d at 404. Loss of the benefit of the bargain damages are also recoverable under a fraud cause of action. **\*125** *Peco Const. Co. v. Guajardo,* 919 S.W.2d 736, 738–39 (Tex.App.—San Antonio 1996, writ denied), *citing W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988). We find the jury's award of 7.9 million dollars to be legally sufficient as there is some evidence that the amount awarded was a reasonable measure of actual damage suffered as a result of the loss of the non-consent sales, and factually sufficient because the evidence was not clearly against the great weight and preponderance of the evidence to be manifestly unjust. As a result, if there had been non-consent interests to market, we would have sustained Points of Error 1b, c, and overruled Points of Error 1d, e, and 2a. We need not address Point of Error 2b.

## 2. Oxford.

Hunt/Hill complain that there is no or insufficient evidence to support the jury's finding of tortious interference with the participation agreement Heritage had with Oxford. Oxford entered a letter agreement dated May 10, 1987 with Heritage for Oxford to participate in the 22–3 well. Oxford agreed to bear 64.5 percent of all drilling and testing costs and 58.3 percent of the casing costs at completion in exchange for the assignment of an undivided working interest of 33.33 percent in the 22–3 well. Jerry Anderson, the president of Oxford, testified that Oxford received letters in March 1988 from attorneys representing Hunt/Hill asserting that Hunt/Hill were not non-consenting and that their interests were not subject to being carried. He further testified that in August 1988, Oxford, which to that point had paid approximately four million dollars, decided to take a proportional reduction in the working interest to be earned and ceased making payments to Heritage.

 **[52]**   Considering only the evidence and reasonable inferences that tend to support the finding and ignoring all evidence and inferences contrary to the jury's findings, we must conclude that there is at least some evidence of probative force to support the finding. It is clear from the record and uncontested that there was a valid and enforceable contract between Oxford and Heritage. There is also direct evidence of actions by Hunt/Hill which establish evidence of acts of interference. What Hunt/Hill do contest is whether there is any evidence or sufficient evidence to establish the element of willful intent and actual damages. We conclude that there was legally and factually sufficient proof for the jury to conclude that the act of interference by Hunt/Hill was the proximate cause of

the damages suffered. Though Oxford's president testified that the reason for stopping payments on the participation agreement with Heritage was that of concerns that Heritage was diverting Oxford's investment to other wells and uncertainty and lack of information about operations at the 22–3 well, his testimony was contradicted, his credibility strongly challenged, and in particular, his subsequent cooperation with Hunt/Hill could reasonably be considered suspect. Simply stated, the evidence in this record furnishes some reasonable basis for differing conclusions by reasonable minds as to the existence of the essential facts. Moreover, in a no evidence challenge, the appellate court may not substitute its view of the credibility of witnesses for that of the jury. *Benoit,* 239 S.W.2d at 797. We may not substitute our view of the credibility of witnesses for that of the jury in a no evidence challenge, and as a result, that challenge here must fail. In light of all the evidence, we are also unable to find the jury's verdict to be clearly wrong and manifestly unjust, so that there is factually sufficient evidence to support the jury's finding that Hunt/Hill's acts of interference willful and knowing and proximately caused actual damage to Heritage.

 **[53]**   The jury awarded 3.16 million dollars in actual damages for the tortious interference with the Oxford contract. Though we are unable, from the record before us, to understand exactly what interest in the 22–3 well that Oxford had bargained for, it is clear from the testimony elicited by all sides that Heritage's claimed non-consent interests formed at least part of the undivided interest to be earned by Oxford. Given the evidence that Oxford had contributed approximately four million dollars before it ceased participating and evidence of the total drilling and production costs of the 22–3 well, the jury's award for actual damages was both legally **\*126**  and factually sufficient. We, therefore, overrule Points of Error 5b, c, and 6a.

### 3. Sun.

This transaction involved Sun negotiations to acquire all interests in the Crittendon Field. We have found that Heritage's cause of action related to this transaction, and also the next two, Enserch/ Lone Star and Enron, are barred by the statute of limitations. We will, however, at least briefly, address the merits of the points of error raised as a matter of judicial prudence.

Hunt/Hill challenge the legal and factual sufficiency of the evidence to support the jury finding that they tortiously interfered with the Sun contract or probable contract to purchase all of Heritage's interest in the Crittendon Field and the resulting jury award of more than $27.5 million. Beginning sometime in 1988 and culminating in the first quarter of 1989, Sun began negotiations to acquire the Crittendon Field oil and gas interests which included the 21 and 22 J.O.A. interests. Sun made two offers to Heritage and Heritage verbally accepted the second offer made on March 9, 1989. At approximately the same time, Sun also offered to purchase the interests of Hunt/Hill, and was aware of pending litigation between Heritage and Hunt/Hill. On March 13, 1989, Heritage advised Sun that the 22–2 well had begun producing water and Sun withdrew its offer of purchase.

Hunt/Hill have separately challenged the legal and factual sufficiency of evidence necessary to prove every element of tortious interference, those being: (1) a contract subject to interference or a probable business relationship; (2) knowledge of the contract or proposed contract and intent to interfere; (3) proximate cause; and (4) actual damages. We conclude that the only issues which merit discussion are whether there was a contract subject to interference and proximate cause as we find that the record establishes both legally and factually sufficient evidence to support the jury's favorable findings of the other required elements and damages.

 **[54]**    **[55]**    It is clear and uncontradicted that at the same time Sun was negotiating with Heritage, it was also negotiating with Hunt/Hill. Indeed, it is evident that Sun was only interested in the acquisition of all working interests in the Crittendon Field. Hunt/Hill argue that because Sun was negotiating with both sides here that as a matter of law, Hunt/Hill could not interfere with their own contract with Sun. We agree. Whatever the claimed actions of Hunt/Hill were or might have been, and notwithstanding the fact that Sun would have to acquire by separate contracts all various working interests necessary to acquire the entire interest, because the financial interests of Heritage and Hunt/Hill were identical with respect to their business relationship to Sun, there can be no liability for the actions of Hunt/Hill. A party to a business relation cannot tortiously interfere with itself. *Coastal Corp. v. Atlantic Richfield Co.,* 852 S.W.2d 714, 720 (Tex.App.—Corpus Christi, 1993, no writ).

 **[56]**    **[57]**    Finally, we are unable to find any evidence of proximate causation. It is clear that Sun withdrew its offer to purchase interests in the Crittendon Field because the 22–2 well had begun to water. We understand Heritage's argument to be that the reason why the business relationship was terminated is not the issue, but rather delaying or hindering the negotiations. In other words, Hunt/Hill prevented the sale of Crittendon Field before the 22–2 well watered out. A plaintiff must be able to show that the act of interference was the proximate cause of the damages suffered by it. This is the classic proximate cause test with the component elements of cause in fact and foreseeability. *State Nat'l Bank of El Paso,* 678 S.W.2d at 691. We find that evidence is legally insufficient to support a finding that Hunt/Hill's actions, if any, were the proximate cause of any damages suffered by Heritage.

We overrule Points of Error 9d and 10a, and sustain Points of Error 9b, c, and e. We need not address Point of Error 10b.

### 4. Enserch/Lone Star and Enron.

 **[58]**    We consider the last two transactions upon which Heritage recovered for tortious interference together. Heritage sought to obtain a prepayment gas contract with Enserch/Lone Star. Heritage also negotiated **\*127** without success with Enron for a gas purchase agreement. The jury found that Hunt/Hill tortiously interfered with those negotiations in each situation and awarded Heritage damages more than $23.2 million in connection with Enserch/Lone Star and

$4.5 million on account of Enron. Hunt/Hill have challenged the legal and factual sufficiency of evidence with respect to all of the elements necessary under each claim of tortious interference. Recalling that we have held that Heritage's causes of action regarding this transaction are barred by the statute of limitations, we have nonetheless considered the merits of Hunt/Hill's points of error regarding the sufficiency of evidence. With regard to the "no evidence" points, considering only the evidence and reasonable inferences that tend to support the findings and ignoring all contrary evidence and inferences, we find that there is some evidence to support those findings. There was testimony and documentary evidence of negotiations which a reasonable person might conclude would result in a contractual business relationship. There was at least some evidence that Hunt/Hill had knowledge of the negotiations, that there was an intent on the part of Hunt/Hill to interfere with those negotiations, and that Hunt/Hill's actions were the proximate cause of the damages suffered by Heritage. As for the damages awarded, there is some evidence in the form of Michael Wisenbaker's testimony and various pricing and cost documents in the record.

Considering Hunt/Hill's challenge to the factual sufficiency, we have likewise concluded that after examination of all the evidence, that we are unable to say that the evidence is so weak as to be clearly wrong and manifestly unjust. Though our own view of the evidence is different, we will not substitute our view for that of the jury where much of this case weighed upon the credibility of the principal witnesses on each side, moreover, we are mindful that a preponderance of the evidence unanimously convinced the jury in this case. We overrule Points of Error 13b, c, d, e, 14a, 17b, c, d, e, and 18a. We need not address Points of Error 14b and 18b.

## C. Slander of Title.

The issues involved in these series of points involve Heritage's position as the Operator under the 22 J.O.A., that is, whether Heritage had the requisite interest to hold that position. Heritage's claims arise from utterances and publishing challenges to Heritage's interest in the 22 J.O.A., that Heritage had been removed as Operator, that Heritage was a bad faith trespasser, and illegally drilled the 22–3 well. The jury found that Hunt/Hill slandered Heritage's title to Sections 21 and 22, and awarded actual damages of approximately $7.988 million with respect to the non-consent sales and $3.1 million with respect to the Oxford agreement. The jury found zero damages with respect to Sun, Ensersch/Lone Star, and Enron transactions; however, the trial court disregarded the jury's verdict and awarded the same, respective damages as were awarded under the tortious interference claims.

 [59]    To prove slander of title, Heritage was required to show that Hunt/Hill published false statements maliciously, and these statements caused special damages to Heritage's interest in land. "Malice," for purposes of this tort, is defined as making false statements regarding title in absence of color of title or a reasonable belief that parties have title. *Santa Fe Energy Operating Partners v. Carrillo,* 948 S.W.2d 780, 785 (Tex.App.—San Antonio 1997, n.w.h.); *Storm Assoc.'s, Inc. v.*

*Texaco, Inc.,* 645 S.W.2d 579, 588–89 (Tex.App.—San Antonio 1982), *aff'd sub nom., Friedman v. Texaco, Inc.,* 691 S.W.2d 586 (Tex.1985).

## 1. Non–Consent Interests.

 **[60]**   Heritage's claim of slander of title and the award of damages with respect to the non-consent interests fails as a matter of law because there were no non-consent interests to be sold. A plaintiff seeking to recover damages in a slander of title action must prove the loss of a specific sale in order to recover. *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex.1982). Though the title or interest claimed to have been maliciously disparaged is evidently distinct from the issue of whether or not there were non-consent interest carried by Heritage, the fact remains  **\*128**  that Heritage had no non-consent interests to sell. Thus, we find that the evidence in the record conclusively establishes the opposite of a vital fact and Hunt/Hill's no evidence challenge must be sustained with respect to the non-consent interests. Points of Error 23b, c, d, e, f, and 24a are again sustained; we need not address Point of Error 24b.

## 2. Oxford.

 **[61]**   As we have stated before, it is unclear what interests Oxford expected to earn in return for its participation in the 22–3 well. Certainly, there is some evidence that Oxford expected that it was indeed earning some of the non-consent interests which it understood that Heritage was carrying. However, the evidence is not conclusive that those interests were the exclusive consideration for Oxford's participation agreement. As a consequence, we are unable to say that there is either a complete absence of evidence or that the evidence supporting the jury's finding is so weak as to be clearly wrong and manifestly unjust.

 **[62]**    **[63]**    **[64]**   We also find it clear from the record that the identical awards for both tortious interference and slander of title for the same transactions are duplicative as a matter of law. Texas law does not permit double recovery. *Southern County Mut. Ins. Co. v. First Bank and Trust of Groves,* 750 S.W.2d 170, 173–74 (Tex.1988). When the prevailing party fails to elect between alternative measures of damages, the court should render the judgment affording the greatest recovery. *See, e.g., Kish v. Van Note,* 692 S.W.2d 463, 468–69 (Tex.1985)(rendering judgment for each separate element of damages in order to give the plaintiffs complete compensation for their losses). Points of Error 27b, c, d, e, f, and 28a are overruled. We sustain Point of Error 28b, and dismiss Point of Error 6b as moot.

## 3. Sun, Enserch/Lone Star, and Enron.

We have earlier concluded that these claims are barred by the statute of limitations. As a result it is not necessary to reach the merits of the sufficiency points raised. We do note, however, that it appears clear from the record before us that the identical awards for both tortious interference and

slander of title for the same transactions are duplicative as a matter of law. As we noted above, Texas law does not permit double recovery. *Southern County Mut. Ins. Co.,* 750 S.W.2d at 173–74. Points of Error 32b, 36b, 40b, and 43b are sustained; it is unnecessary to consider Points of Error 31b, c, d, e, f, 32a, c, 35b, c, d, e, f, 36a, c, 39b, c, d, e, f, 40a, and c.

## VII.

## Were Hunt/Hill "justified" in their actions for which they might otherwise be liable for tortious interference or slander of title?

## *Points of Error 8, 12, 16, 20, 26, 30, 34, 38, 42.*

### A. Standard of Review.

The jury found in each instance submitted that Hunt/Hill were not justified in their actions in connection with each alleged instance of tortious interference and slander of title.

[65] [66] The jury was instructed that:

> You are instructed that the conduct of the Defendants was justified or excused if (1) it was done in the good faith exercise of their own rights, or (2) if they had equal or superior rights in the subject matter of the potential transactions to that of Heritage. One is justified in asserting a claim, even if the validity of that claim is doubtful, so long as it is possible that the claim may have merit.

Hunt/Hill have challenged each of these adverse findings as being legally and factually insufficient. Their challenges have been framed as if Hunt/Hill had the burden of proof, i.e. "as a matter of law" and "against the great weight and preponderance" even though, as earlier discussed, they had the burden of proof only with respect to the tortious interference claims. A legal sufficiency challenge of "as a matter of law" applies when the challenging party has the burden of proof. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). We **\*129** must first examine the record for evidence that supports the adverse finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the failure to find, then we examine the entire record to determine whether the proposition is established as a matter of law. The challenger must then demonstrate that the evidence conclusively establishes all vital facts in support of the issue as a matter of law. *Worsham Steel Co.,* 831 S.W.2d at 81. A factual sufficiency point requires examination of all the evidence in determining whether the adverse finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661.

## B. Justification.

[67]  [68]  The general rule is that a party's interference is justified if the interference with the contractual relations of another is done in a bona fide exercise of its own rights, or if the actor has an equal or superior right in the subject matter to that of the other party. *Victoria Bank & Trust Co.,* 811 S.W.2d at 939. In a tortious interference with a contract case, the privilege of justification or excuse is an affirmative defense on which the defendant has the burden of proof. *Sterner,* 767 S.W.2d at 691. In a tortious interference with prospective business relationship case privilege or justification is an element of the action; hence, the burden of pleading and proof is on the plaintiff. *Tarleton State Univ.,* 867 S.W.2d at 952.

[69]  [70]  [71]  Factors to be considered in determining whether a privilege exists include: (1) the nature of the conduct; (2) the interests of the injured party; (3) the actor's motive; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity of the actor's conduct to the interference; and (7) the relations between the parties. *Maynard v. Caballero,* 752 S.W.2d 719, 721 (Tex.App.—El Paso 1988, writ denied). Justification includes the filing of a lawsuit, so long as it is done in good faith with the belief that there is a colorable claim. *Texas Beef Cattle Co.,* 921 S.W.2d at 211; *Tidal Western Oil Corp.,* 297 S.W. at 281. It may also cover the actions of the interfering party to protect its own legitimate financial interests. *Central Sav. and Loan Ass'n,* 848 S.W.2d at 241. A superior financial interest is recognized as justification or excuse. *Gillum,* 778 S.W.2d at 566. Apart from the difference in burden, the justification or excuse, in either of the foregoing actions, involves the same type of proof and the question is one for the jury. *Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.,* 843 S.W.2d 470, 472 (Tex.1992).

[72]  [73]  In an action for slander of title, the party must allege and prove, *inter alia,* the utterings and publishing of disparaging words; however, communications in the due course of a judicial proceeding may not serve as the basis of a civil action for slander of title, and consequently, constitutes a privilege of justification or excuse. *See Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 912 (1942); *James v. Brown,* 637 S.W.2d 914, 916 (Tex.1982). This privilege encompasses all aspects of the judicial proceedings including statements made in open court, depositions, affidavits and pleadings, and papers of the case. *Id.* at 916–17.

## C. Application to facts.

### 1. Non–Consent Interests.

[74]  [75]  As we have determined that there were no non-consent interests to be carried by Heritage, it necessarily follows that Hunt/Hill had a superior right in the subject matter to that of Heritage and that its interference with either the contractual or prospective business relations

regarding the non-consent interest was justified as a bona fide exercise of their own rights. *Victoria Bank & Trust Co.,* 811 S.W.2d at 939. In a slander of title action, however, and unlike tortious interference, the only privilege accorded defamatory remarks are for those remarks published as a part of judicial proceedings. *James,* 637 S.W.2d at 916–17. Hunt/Hill nevertheless argue that because all communications regarding the non-consent interest were uttered or published after both their own lawsuit in Dallas County and this suit in Winkler that all communications are protected under the judicial proceedings **\*130** privilege. We conclude, however, that there is some evidence that Hunt/Hill's communications were neither preliminary to nor in contemplation of any judicial proceeding, and their utterance or publication, even though after the institution of the law suits, is not absolutely privileged. We accordingly overrule both portions of Point of Error 26.

### 2. Oxford.

 [76]   As was noted earlier, it is not entirely clear from the record exactly what working interests in the 22–3 well Oxford sought to acquire as consideration for its participation agreement with Heritage. From the testimony of Oxford's president, Jerry Anderson, and the questions presented to him by all sides, it does seem clear that Oxford thought it was participating to gain the non-consent interests that Heritage maintained it was carrying, but we also find it evident that more than just non-consent interests were involved. As a consequence, we cannot say, as we did above, that there is no evidence in the record to conclusively establish that Hunt/Hill were justified or excused in their interference, nor do we find that the great weight of the evidence in favor of justification to be so contrary to the jury's adverse finding on the issue as to be manifestly unjust.

Finally, we have also found sufficient evidence in the record of utterances and publications that were outside and beyond the protection and privilege accorded judicial proceedings. Accordingly, we overrule Points of Error 8 and 30.

### 3. Sun, Enserch/Lone Star, and Enron.

 [77]   Considering the same factors as this Court did in *Maynard,* 752 S.W.2d at 721, and comparing those factors to the record before us, we are unable to find that the evidence with regard to the Sun, Enserch/Lone Star, and Enron transactions was either legally or factually insufficient. The same result is reached whether the burden of establishing a privilege is on Hunt/Hill or Heritage. Hunt/Hill's principal argument relies upon the absolute privilege accorded judicial proceedings; however, there are pleadings and evidence of probative force in the record which we find to be neither preliminary to nor in contemplation of a judicial proceeding. As a result, Hunt/Hill's no evidence and insufficient evidence challenges, as to the tortious interference and slander of title actions involving the Sun, Enserch/Lone Star, and Enron transactions must fail. We overrule Points of Error 12, 16, 20, 34, 38, and 42.

# VIII.

## Fraud.

### *Points of Error 53.*

Heritage brought a cause of action for fraud in connection with the representation of the Hunt brothers and Virgil St. Clair to Michael Wisenbaker that they would participate in the drilling of a substitute well, the 22–3 well, if Heritage ceased drilling on the 22–2 well, short of its target depth or formation. The jury agreed. Hunt/Hill's complaint here is three-fold: first, that the claim sounds in contract, not tort; second, that any recovery for fraud is waived by the failure of Heritage to obtain a finding of damages for fraud; and thirdly, that there is no evidence or insufficient evidence to support a finding of fraud.

 **[78]**   We have already rejected the argument that Heritage's claims sound only in contract, not tort. Indeed, the claim here is precisely the situation where a party's actions regarding a contract may rise to the level of a tort. *See American Nat'l Petroleum Co.,* 798 S.W.2d at 278. Every contract, including J.O.A.s, carries the common law duty to perform the agreed tasks with care, skill, reasonable expedience, and faithfulness so that a breach thereof constitutes a tort as well as a breach of contract. *Montgomery Ward & Co.,* 204 S.W.2d at 510. As we earlier noted, the Texas Supreme Court reaffirmed that concept, holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa* **\*131** *Plastics Corp. USA,* 41 Tex.Sup.Ct.J. at 293, 960 S.W.2d at 44.

 **[79]**   The jury was first asked, in Question 8, to decide whether the 22–3 well was covered by the 22 J.O.A.; an affirmative answer then required them to decide in Question 11 that Hunt/ Hill's failure to comply with the 22 J.O.A. was not excused. Question 12 then asked if Hunt/Hill agreed to participate in the 22–3 well in exchange for Heritage's stopping drilling of the 22–2 well. Again the jury responded affirmatively, requiring them to answer Question 13, which was whether those actions constituted a fraud on Heritage, and again, the jury said "yes." Conditioned upon an affirmative finding in Question 12, the jury was then asked, in Question 14, to assess damages for Hunt/Hill's "failure to pay their shares of the 22–3 well costs." Hunt/Hill now contend that no damages question was submitted in connection with the fraud found; hence, any recovery for fraud was waived. We do not construe the jury findings so narrow as to find that Heritage is precluded from any recovery for fraud. Though the question of damages was predicated upon an affirmative answer to the action described in Question 12, which the jury found to constitute fraud in Question 13, we conclude that there was a proper finding of actual tort damages by the jury.

The last remaining issue is whether there was legally or factually sufficient evidence to support the finding of fraud. In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza,* 395 S.W.2d at 823; *Worsham Steel Co.,* 831 S.W.2d at 83. If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate,* 244 S.W.2d at 661–62; *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEXAS L.REV. 515 (1991). A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661; *Worsham Steel Co.,* 831 S.W.2d at 81. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco,* 623 S.W.2d at 772.

**[80]** The elements of common law fraud have long been recognized in Texas as:

- that a material representation was made;

- that it was false;

- that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

- that he made it with the intention that it should be acted upon by the party;

- that the party acted in reliance upon it; and

- that the party thereby suffered injury.

*State Nat'l Bank of El Paso,* 678 S.W.2d at 681. Another key factor is whether the Hunt/Hill's promise to participate in the 22–3 well is actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. *Spoljaric,* 708 S.W.2d at 434.

**[81]  [82]  [83]  [84]**  We first note that the 22 J.O.A. unambiguously provides circumstances in which a well can be stopped short of its contract depth: (1) if further drilling is rendered impractical by granite or any other impenetrable substance or condition in the hole; or (2) if all parties agree to complete or abandon the well at a lesser depth. It also, as previously discussed, specifically delineates the procedures to follow for proposing a new well. Once a new well is proposed in writing, a party to the J.O.A. can then elect to take a consent position which then results in the obligation to pay the new well costs. But notwithstanding the contractual rights to consent or not consent to the stopping of the 22–2 well, and subsequently, the right to consent or not consent to participate in the 22–3 well, we find that the record amply supports a jury finding of an independent

tort. It is clear from the record the Hunt/Hill wanted drilling on the 22–2 well stopped because of negotiations for the sale of their interest in the Crittendon Field. That, however, required unanimity by all working interest **\*132** owners under the terms of the J.O.A. There is also ample probative evidence for the jury to conclude that Hunt/Hill never intended to consent to a subsequent drilling operation which they were obligated to do under the terms of the J.O.A., or take a non-consent interest. The critical focus being whether there is sufficient evidence for a rational jury to find that Hunt/Hill's promise to participate in the 22–3 well is actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. *Spoljaric,* 708 S.W.2d at 434. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Id.* Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* at 435. Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient proof to support a finding of fraudulent intent. *Id.* The record contains sufficient evidence from which a reasonable jury could have inferred fraudulent intent. One example of this evidence is the transcript of the conversation between the Hunt brothers and Michael Wisenbaker that took place on September 25, 1987. Unbeknownst to Wisenbaker, the Hunts secretly recorded the conversation in which they told Wisenbaker: (1) that they were not contemplating the sale of their interests in the field, even though they had already initiated negotiations with Lyco Energy Corp; (2) that they wanted Wisenbaker to cease all drilling operations in Section 22, though for obvious reasons, they did not disclose to Wisenbaker that this was a condition precedent to the sale of their interests to Lyco Energy Corp; (3) that they had the requisite votes to remove Heritage as Operator, another misrepresentation; and (4) that they would remove Heritage as Operator if Heritage did not immediately cease all drilling operations in Section 22, notwithstanding their agreement to participate in the 22–3 well as a substitute well. Another example of this evidence is Virgil St. Clair's assertion that the 22–2 well had reached a depth sufficient to test the Fusselman formation when he was fully aware that the 22–2 well had not penetrated the Fusselman formation. Other examples of evidence supporting the jury's finding of fraudulent intent are the Hunt brothers' denials at trial. At trial, both Hunt brothers denied that they had promised to participate in the 22–3 well once Heritage agreed to stop drilling the 22–2 well. Ample evidence was produced to the contrary. A party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise. *Spoljaric,* 708 S.W.2d at 435. We conclude that there was sufficient evidence for a rational jury to find that Hunt/Hill's promise to participate in the 22–3 well was actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. We also note that Hunt/Hill have never seriously disputed the factual sufficiency of the allegation and only tried to classify it as being legally insufficient as a claim sounding only in contract, not tort. Consequently, we overrule Point of Error 53.

## IX.

**Breach of Oral Contract to participate in the 22–3 well.**

***Point of Error 54 and 55.***

The jury, in response to Questions 12 and 14, found that Hunt/Hill had breached an oral agreement with Heritage to pay their share of the 22–3 well costs and awarded Heritage $6,343,532.71 in damages. Specifically, Question 12 asked if any of the Defendants or their agents, "agree to pay their share of the 22–3 well costs in May, 1987 in exchange for Heritage's stopping the drilling of the 22–2 well?" Since the jury answered Question 12 in the affirmative, they proceeded to answer Question 14 awarding Heritage damages for the defendants' failure to pay their share of the 22–3 well costs. Hunt/Hill challenge this recovery on legal and factual sufficiency grounds and on the theory of Statute of Frauds.

**A. Standard of Review**

Neither of the parties argue that the terms of the J.O.A. are ambiguous, they merely disagree as to the form of consent necessary under the J.O.A. to accept the proposal of a **\*133** new well. Hunt/Hill argue that the J.O.A. is subject to the Statute of Frauds because it involves contracts for the sale of real estate. Heritage contends that the ultimate question regarding this issue is whether Hunt/Hill consented to participate in the 22–3 well. In arguing this point, Heritage urges that under the requirements of the J.O.A., the parties can orally consent to participate in drilling a well and, even if the J.O.A. is subject to the Statute of Frauds, the oral agreement comes within the partial performance exception to the Statute of Frauds and is therefore enforceable. Because of the unambiguous language of the J.O.A., we must disagree with Heritage.

**B. Unambiguous Contract Enforced as a Matter of Law.**

It is undisputed that the 21 and 22 J.O.A.s were written binding contracts between the parties. Where a contract is unambiguous it is to be enforced as a matter of law and as it is written. *Coker,* 650 S.W.2d at 393–94; *R & P Enterprises,* 596 S.W.2d at 518–19. All the provisions of the agreement should be considered and construed together to ascertain the meaning and effect of the entire instrument. *Steeger v. Beard Drilling, Inc.,* 371 S.W.2d 684, 688 (Tex.1963); *Eagle Life Ins. Co. v. G.I.C. Ins. Co.,* 697 S.W.2d 648, 651 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). Furthermore, a contract is to be interpreted in accordance with its plain language. *Eagle Life Ins. Co.,* 697 S.W.2d at 650.

As stated by Heritage in their brief, consent to participate in a proposed operation is governed by Article VI.B.1. of the 22 J.O.A. which reads:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., ... the party desiring to drill ... such a well shall give the other parties *written notice* of the proposed operation, specifying the work to be performed, the location, proposed depth, objection formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to *rework, plug back or drill deeper* may be given by telephone and the response shall be limited to forty-eight (48) hours.... Any notice or response given by telephone shall be promptly confirmed in writing. [Emphasis added].

This portion of the Article is clearly written in accordance with Article XII. of the J.O.A. which expressly requires that "notices authorized or required between the parties and required by any of the provisions of this agreement, *unless otherwise specifically provided,* shall be given *in writing* by mail or telegram...." [Emphasis added].

## 1. Consent.

 **[85]**   Heritage argues that the case of *C & C Partners v. Sun Exploration and Prod.Co.,* 783 S.W.2d 707 714–15 (Tex.App.—Dallas 1989, writ denied) stands for the proposition that written consent to participate in a well is not required under the terms of a joint operating agreement. [2] The Court in *C & C Partners* held that because that contract was unambiguous and did not specify a particular form of consent, the Court was required to give effect to the intention of the parties as expressed in their writing. *C & C Partners,* 783 S.W.2d at 714–15. That Court then found that oral consent was sufficient to obligate the parties to participate in the well. *Id.* at 715.

The Dallas Court's conclusion is, however, only dicta, as the question in that case was whether or not consent had to be evidenced by means of a AFE. We certainly agree that consent or non-consent to participate in the drilling of a new well does not need to be in any particular form; however, we disagree that it can be oral. The *C & C Partners* Court concluded that the contract provisions only required written confirmation of responses to telephonic notices, and that since confirmation of consent was distinct and separate  **\*134**  from consent, there was no requirement of a writing. This logic fails for two reasons. First, telephonic notices and responses are limited by the operating agreement to "rework, plug back or drill deeper" operations and then only when the drill rig is on location. Article VI.B.1. Second, Article XII of the operating agreement provides:

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall

be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier....

We find Article XII to plainly require written consent or non-consent to a proposal to drill a subsequent well.

## 2. Proposal.

Even if oral consent to the drilling proposal were authorized, Heritage's oral proposal to drill a substitute well for the failing 22–2 well failed to satisfy the initial proposal requirements under the 22 J.O.A. Heritage was required, under Article XII. of the J.O.A., to propose the drilling of the new well by notice in writing, specifying the details of its development as required by Article VI.B.1. Such an oral proposal also violates the 22 J.O.A. by (1) proposing the well to fewer than all of the parties to the J.O.A., and (2) by failing to specify the details surrounding the development of the new well including location, depth, objective formation, and estimated cost.

Thus, Appellees' oral proposal for drilling the 22–3 well violated the provisions of the J.O.A. For the foregoing reasons, the alleged oral agreement to pay the 22–3 well costs in exchange for stopping drilling the 22–2 well fails as a matter of law.

## C. Statute of Frauds.

Hunt/Hill have also asserted that the J.O.A. is subject to the Statute of Frauds because it involves contracts for the sale of real estate. Heritage counters that even if the Statute of Frauds applies, the oral agreement is enforceable under the partial performance exception. We believe that Statute of Frauds does apply and the oral agreement does not come within the partial performance exception to the doctrine because Heritage could not have relied on the oral agreement to its detriment.

## 1. The Rule.

 **[86]**   **[87]**   **[88]**   Generally, mineral interests and oil and gas leaseholds are treated as real property interests. *Cherokee Water Co. v, Forderhause,* 641 S.W.2d 522, 525 (Tex.1982); *Mobil Exploration & Producing U.S., Inc. v. W.R. McDonald,* 810 S.W.2d 887, 890 (Tex.App.—Beaumont 1991, writ denied). As such, they are subject to the rules relating to real property including the Statute of Frauds. TEX.BUS. & COM.CODE ANN. § 26.01 (Vernon 1987); *EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 267 (Tex.App.—Corpus Christi 1994, writ denied); *Vela v. Pennzoil Producing Co.,* 723 S.W.2d 199, 206 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). Specifically, the Statute of Frauds has been held to require that oil and gas leases and contracts for their transfer be in writing. *EP Operating Co.,* 883 S.W.2d at 267; *Vela,* 723 S.W.2d at 206. The joint operating agreement, in this case, also requires compliance with the Statute of Frauds. There are numerous sections within the agreement which make the Section 22

leases "subject to" its terms and vice versa. Specifically, the 22 J.O.A. states under Article VIII.A. that the "leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto." Thus, the 22 J.O.A. necessarily governs the transfer of interests in the oil and gas leases subject to the agreement. The incorporation by reference of the lease interests makes the J.O.A. a part of the real property leases. *See S & D Group, Inc. v. Talamas,* 710 S.W.2d 680, 683 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Thus, both agreements must be read and construed together. *Id.; Estrada v. River Oaks Bank & Trust Co.,* 550 S.W.2d 719, 726 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Volunteer State Life Ins. Co. v. Snipes,* 209 S.W.2d 935, 936 (Tex.Civ.App.—San Antonio 1948, no writ). As such, the **\*135** leases and the J.O.A. are subject to the Statute of Frauds.

 **[89]**  Finally, the oral agreement which is the basis for Heritage's breach of contract claim involves more than just the obligation of Hunt/Hill to pay a share of the costs of the 22–3 well. Because the objective of the 22–3 well was to reach the Ellenburger formation at a depth of approximately 22,000 feet, and since the 22 J.O.A. was limited to maximum depth of 20,000 feet, the oral agreement would also constitute a material amendment of the J.O.A. depth limitations requiring it to be in writing. *Dracopoulas v. Rachal,* 411 S.W.2d 719, 721 (Tex.1967); *Lone Star Steel Co. v. Reeder,* 407 S.W.2d 28, 31 (Tex.Civ.App.—Texarkana 1966, writ ref'd n.r.e.). There is no evidence that the parties made a written, or oral, modification of the depth limitation as contained in the J.O.A. Consequently, the Statute of Frauds bars enforcement of the this agreement and precludes any recovery for its breach.

## 2. Partial Performance Exception.

 **[90]**    **[91]**   The Statute of Frauds will not bar the enforcement of an oral contract where there is partial performance by the party seeking to enforce the contract. *Leon Ltd. v. Albuquerque Commons Partnership,* 862 S.W.2d 693, 702 (Tex.App.—El Paso 1993, no writ); *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.—Texarkana 1989, no writ); *Oak Cliff Realty Corp. v. Mauzy,* 354 S.W.2d 693, 695 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n.r.e.). However, in order to take the oral contract out of the Statute of Frauds, one party must perform *in reliance* upon the contract so that failure to enforce the contract would result in a "virtual fraud" as one party has incurred a substantial detriment and the other has reaped an unearned benefit. *Central Power and Light Co. v. Del Mar Conservation Dist.,* 594 S.W.2d 782, 790 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.); *Manzell v. Hightower,* 159 S.W.2d 552, 554 (Tex.Civ.App.—Texarkana 1942, no writ).

 **[92]**   The oral agreement upon which Heritage premises its recovery was entered into in May of 1987. As early as September 1987, the Hunts had advised Heritage that they wanted Heritage to bring operations to a stand still and not conduct any further drilling activities. In a September 28, 1987 letter from Hunt/Hill, Heritage was notified by the Hunts that a "vote" of the Non–Operators had been taken and that Heritage had been removed as Operator. Heritage was further

advised that Tribal Drilling would be taking over operations and that Heritage should perform only "routine and necessary production, operating, and maintenance operations" until that time. On October 26, 1987, Heritage held an Operator's meeting discussing the 22–3 well. The Hunts, in attendance, contested the drilling of the 22–3 well and asserted that no wells should be drilled pending Heritage's sale of its own interests in the wells. In November, the Hunts' attorney advised Heritage that the 22–3 well, was outside the contract area as contemplated by the J.O.A. because it was proposed to a depth of 22,000 feet. Finally, on December 18, 1987, Tribal Drilling filed an action in Dallas County seeking judgment that Heritage owned no interest in the contract area and requesting a temporary restraining order to cease Heritage's operations. On December 28, 1987, Heritage began drilling operations on the 22–3 well.

In light of the numerous repudiations of the alleged oral agreement between the Hunts and Heritage, as well as the initiation of drilling operations on the 22–3 well *after* suit was brought to enjoin Heritage from such drilling, we do not find that Heritage's performance under the oral contract was done in reliance upon the oral contract. Consequently, there is no performance such that refusal to enforce the agreement would result in a "virtual fraud" upon Heritage as its actions, as a matter of law, were not done in good faith reliance upon the May oral agreement. In light of our determination that the performance exception to the Statute of Frauds does not apply in this instance, we find that Heritage's claim for breach of the 22 J.O.A. is barred as a matter of law.

Point of Error 54b is sustained and because of this resolution, we do not address the remaining Points of Error 54a, c, and 55.

## *136  X.

## Remainder of Points of Error.

### *Points of Error 21, 43a, 45, 46, 47, 48, 49, 50, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63.*

### A. Exclusion of Findings of the Railroad Commission.
Hunt/Hill challenge the trial court's refusal to admit into evidence or judicially notice the Railroad Commission's Proposal for Decision on Heritage's Field Designation Application. At trial, Hunt/Hill admitted into evidence the Texas Railroad Commission's Final Order which denied Heritage's request for authorization from the Commission to complete the 22–3 well in the same reservoir as the 22–2 well. The Commission's Final Order adopted as its own the findings of fact and conclusions of law of the Examiner's Proposal for Decision ("PFD"). The PFD stated in Findings of Fact 33 that Heritage intended the 22–3 well to be a test of the Silurian interval already being produced by the 22–2 well.

Hunt/Hill attempted to enter into evidence the entire PFD, or alternatively, Findings of Fact 33. The trial court refused to admit either. Hunt/Hill then requested that the trial court take judicial notice of the PFD; the request was denied. Hunt/Hill now contend that the excluded evidence conclusively establishes that Heritage breached its duties under the Section 22 J.O.A. and that the Railroad Commission's findings of fact give rise to collateral estoppel.

### 1. Trial Court's Refusal to Admit PFD into Evidence.

 **[93]** **[94]** Admission or exclusion of evidence is a matter within the trial court's discretion. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ). To obtain a reversal of judgment based upon a trial court's decision to admit or exclude evidence, the appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP.P. 81(b), 49 TEX.B.J. 561 (Tex.1986, superseded 1997). Because it is impossible to prescribe a specific test for making the latter determination, it is a "judgment call entrusted to the sound discretion and good senses of the reviewing court" which must be made by an evaluation of the entire case. *Lorusso v. Members Mut. Ins. Co*., 603 S.W.2d 818, 821 (Tex.1980).

 **[95]** It has been held that when evidence is sharply conflicting and the case is hotly contested, any error of law by the trial court will be reversible error under Rule of Appellate Procedure 81(b)(1), 49 TEX.B.J. 561 (Tex.1986, superseded 1997). *Lorusso,* 603 S.W.2d at 821; *Nix v. H.R. Management Co.,* 733 S.W.2d 573, 576 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.)(reversing hotly contested case for erroneous admission of evidence). But, the Supreme Court has also stated that error in admitting evidence will not require reversal unless that evidence controlled the judgment. *Gee,* 765 S.W.2d at 396. If other competent evidence of the fact in question appears in the record, improper admission of evidence will not constitute reversible error. *Id.* at 397. Thus, evidentiary rulings will not cause reversal unless the appellant demonstrates that the whole case turns on the evidence improperly admitted or excluded. *Superior Derrick Servs., Inc. v. Anderson,* 831 S.W.2d 868, 876 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Shenandoah Assoc. v. J & K Properties, Inc.,* 741 S.W.2d 470, 493 (Tex.App.—Dallas 1987, writ denied).

 **[96]** The record reflects that the facts contained within the PFD were introduced at different times through the trial by various witnesses. Furthermore, the subject matter of Findings of Fact 33 was the basis of testimony by more than one witness at trial and evidence contradicting Findings of Fact 33 was even introduced. Findings of Fact 33 and the PFD, were therefore, merely cumulative evidence and the trial court committed no error in excluding it as evidence at trial. Hunt/Hill's Points of Error 59a and 59c are overruled.

**\*137 2. Trial Court's Refusal to Take Judicial Notice of the PFD.**

[97]    Texas Rule of Civil Evidence § 201 imposes a mandatory obligation upon a trial court to judicially notice facts: (1) if properly requested by a party; (2) if the court is supplied with the appropriate information; and (3) if the fact is of a kind that may properly be noticed. TEX.R.CIV.EVID. 201(b) & (d). Since it is undisputed that Hunt/Hill properly requested judicial notice and supplied the court with the appropriate information, we need only address whether the PFD of the Railroad Commission was the proper subject matter for judicial notice. A judicially noticed fact must be one that is not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. TEX.R.CIV.EVID. 201(b). Matters that may be judicially noticed are often divided into three categories: adjudicative facts; legislative facts; and law. 2 Kenneth S. Brown, et al., MCCORMICK ON EVIDENCE § 328, at 385–88 (John W. Strong ed., 4th ed.1992). Adjudicative facts are those to which the law is applied in the process of adjudication. Thus, when a court or an agency finds facts concerning the immediate parties, including who did what, where, when, how, and with what motive or intent, the court or agency is performing an adjudicative function, and the facts are called adjudicative facts. 2 Kenneth S. Brown, et al., MCCORMICK ON EVIDENCE at 385.

[98]    The Railroad Commission conducted a five day hearing where the parties were represented by counsel and witnesses testified to the circumstances concerning Heritage's application to drill the 22–3 well. After the contested evidentiary proceeding, the Commission made its findings of fact and conclusions of law and executed a final order prohibiting the drilling of the 22–3 well. The final order and its accompanying PFD were duly published and are matters of public record. As such, the trial court erred in refusing to take judicial notice of the published order and PFD of the Railroad Commission. *See Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Texas,* 878 S.W.2d 598, 600 (Tex.1994)(holding that the court of appeals erred by failing to take judicial notice of readily determinable facts contained in a published PUC order). However, because of the cumulative nature of the evidence contained in the PFD, we find that the trial court's error in refusing to judicially notice the PFD constitutes harmless error. There was other competent evidence of Heritage's intentions of drilling the 22–3 well such that the omitted evidence could not have controlled the judgment. Point of Error 60a is overruled.

**3. Collateral Estoppel.**

[99]    Hunt/Hill argue that Findings of Fact 33 of the Railroad Commission PFD collaterally estops Heritage from denying that it intended the 22–3 well to be a test of the Silurian interval already being produced by the 22–2 well. This fact, Hunt/Hill aver, establishes that Heritage breached the 22 J.O.A. because Heritage was attempting to complete the 22–3 well in the same source of supply

as the 22–2 well without the mutual consent of all parties to the J.O.A. Heritage's removal as Operator of Section 22 would therefore have been warranted because of this breach of the J.O.A.

 **[100]**    **[101]**    Collateral estoppel is an affirmative defense and as such, the party asserting such a defense has the burden of pleading and proving its elements. *Williams v. National Mort. Co.,* 903 S.W.2d 398, 401 (Tex.App.—Dallas 1995, writ denied). Under a plea of collateral estoppel, essential issues of fact previously determined and adjudged by a court of competent jurisdiction are binding in a subsequent action between the same parties. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). The doctrine not only applies to judgments but also to the decisions of an administrative agency where the administrative agency has acted in a judicial capacity and resolved disputed issues of fact properly before it where the parties had adequate opportunity to litigate. *Muckelroy v. Richardson Indep. Sch. Dist.,* 884 S.W.2d 825, 830 (Tex.App.—Dallas 1994, writ denied) (*citing*  **\*138** *Bryant v. L.H. Moore Canning Co.,* 509 S.W.2d 432, 434 (Tex.Civ.App. —Corpus Christi), *cert. denied,* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 74 [1974] ); *Railroad Comm'n v. Phillips,* 364 S.W.2d 408, 411 (Tex.Civ.App.—Austin 1963, no writ). Finally, the issue of the application of the doctrine of collateral estoppel is a question of law for the court. *Price v. Texas Employers' Ins. Ass'n,* 782 S.W.2d 938, 940 (Tex.App.—Tyler 1989, no writ).

In the instant case, Hunt/Hill urge that they pled in their answer to plaintiff's petition that the Railroad Commission's findings of fact gave rise to collateral estoppel. However, the record before us is void of any motion for summary judgment or motion to dismiss the issues previously decided by the Commission on the basis of res judicata or collateral estoppel. Therefore, there is no order from the trial court denying such motion and preserving such error. Furthermore, during trial, Hunt/Hill attempted to prove the admissibility of the Commission's Order and PFD apparently on the basis of relevancy to the proceedings, not on the basis of collateral estoppel. Bearing the burden of establishing their affirmative defense of collateral estoppel, Hunt/Hill were obligated to plead and prove its elements. Having failed to obtain a ruling, not on the admissibility as evidence, but on the issue of collateral estoppel of the issues litigated before the Railroad Commission, we find there can be no error in this regard.

 **[102]**    Moreover, any error in failing to admit into evidence, or judicially notice, the Commission's PFD is harmless error. Findings of Fact 33 specifically found that Heritage *intended* that the 22–3 well be a test of the Silurian interval. Hunt/Hill contend that this "intention" finding establishes that Heritage breached the provision of the J.O.A. which provides that "without the mutual consent of all parties, no well shall be *completed in or produced* from a source of supply from which a well located elsewhere on the Contract Area is producing...." [Emphasis added]. However, Findings of Fact 23 of the PFD found that "it was never the *intention* of Heritage Resources, Inc., to *complete* the No. 22–3 well in the Crittendon (Silurian) Field. Heritage knew that the existence of the No. 22– 2 well in that field on a 640 acre lease prevented a regular permit for the No. 22–3 well." [Emphasis added]. Thus, Findings of Fact 23 clearly negates Hunt/Hill's position as to Heritage's breach of

the J.O.A. provision. Accordingly, we find that any error by the trial court in failing to admit the PFD was harmless. Points of Error 59b and 60b are overruled.

## B. Declaratory relief by Hill that:

Hunt/Hill contend in Points of Error 48 thru 52 that the trial court erred in awarding Heritage declaratory relief and denying Hunt/Hill's requested declaratory relief. The only declaratory relief granted by the trial court was as follows:

> IT IS FURTHER ORDERED and DECLARED that Heritage Resources, Inc. has since on or before December 17, 1987 owned an interest in Sections 21 and 22 of Block C–23, PSL Survey, Winkler County, Texas and that such interest was sufficient for Heritage to serve as operator of those Sections under the Joint Operating Agreements to those Sections. ("Declaration One")

> IT IS FURTHER ORDERED and DECLARED that Heritage Resources, Inc. has not breached any of its duties under the Joint Operating Agreements to Sections 21 and 22, Block–23, PSL Survey, Winkler County, Texas. ("Declaration Two")

Hunt/Hill challenge the trial court's granting of declaratory relief claiming that the court erred in submitting questions of law, or questions which were the subject of undisputed evidence, to the jury. Specifically, Hunt/Hill challenge five of the jury's findings upon which such declaratory relief was premised. First, Hunt/Hill challenge the jury's finding in response to Questions 1 and 3, that Heritage did not breach any of its duties under the Section 21 and 22 J.O.A.s before or after September 1987. Secondly, Hunt/Hill challenge the jury's finding in response to Question 8, that the 22–3 well was covered by the Section 22 J.O.A. Thirdly, Hunt/Hill challenge the jury's finding in response to Question 11, that the Defendant's failure to comply with the Section 22 J.O.A. was not excused. Lastly, Hunt/Hill challenge the **\*139** jury's finding in response to Question 46, that Heritage owned an interest in the Section 21 and 22 Contract Areas on or before December 17, 1987.

A disagreement over the interpretation of a contract clause does not render the clause ambiguous. *First City Nat'l Bank of Midland v. Concord Oil Co.,* 808 S.W.2d 133, 136 (Tex.App.—El Paso 1991, no writ).* When the parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731–732 (Tex.1981); *First City Nat'l Bank of Midland,* 808 S.W.2d at 136; *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.,* 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Where a contract is unambiguous it need only be enforced as a matter of law. *R & P Enters.,* 596 S.W.2d at 518. In construing an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so that none is rendered meaningless. *First City Nat'l Bank of Midland,* 808 S.W.2d at 137 (*citing Coker v. Coker,* 650 S.W.2d 391, 393 [Tex. 1983] ).

## 1. Declaration One—Interest to Serve as Operator.

 **[103]**   In order to properly serve as operator under the J.O.A., the operator must own an "interest" in the contract area. However, neither the Section 21 J.O.A. nor the Section 22 J.O.A. contains a definition of the term "interest." Hunt/Hill argue that Heritage had to possess a cost bearing interest. Heritage argues record title is sufficient. Thus, the issue becomes whether record title qualifies as an interest sufficient to satisfy the J.O.A.

 **[104]**   Interpretation of an unambiguous contract term is a question of law for the trial court. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *C & C Partners,* 783 S.W.2d at 715. Consequently, it was improper for the trial court to submit the question to the jury. In reviewing questions of law, we grant no deference to the judgment of the trial court, rather we independently review the decision. *In the Matter of Humphreys,* 880 S.W.2d 402, 404 (Tex.1994).

Hunt/Hill had the burden to prove that Heritage did not own an interest at a time that two or more working interest owners voted for its removal. Exhibit A to the 22 J.O.A. contains a listing of all "Interests of the Parties." Within this listing are seventeen names and two columns of percent interests labeled "Before Payout Working Interest" and "After Payout Working Interest." Heritage is at the very top of the list with a significant percent interest before and after payout. Thus, at the time of the signing of the J.O.A., Heritage was disclosed as an interest owner. Hunt/Hill presented no evidence that Heritage's entire interest under the Section 22 J.O.A. had been transferred or conveyed after the signing of the J.O.A.

Citing to several property cases, Hunt/Hill argue that there is a distinction between "record title" and "ownership." However, this argument is futile in light of unequivocal trial testimony. Hunt/Hill's own attorney, Michael Nugent, testified that by signing the J.O.A., Heritage assumed a cost-bearing interest which obligated them to pay a proportionate share of the costs of drilling wells on Section 22. Moreover, there was expert testimony from Marvin Wigley, a member of the committee of the American Association of Petroleum Landmen that drafted the A.A.P.L. Form 610, used for the Section 21 and 22 J.O.A.s, that record title is a sufficient interest to satisfy the ownership interest requirement for operator status under the J.O.A.

The sum total of Hunt/Hill evidence in support of their contention that Heritage had to possess a cost bearing interest is the argument that without such a requirement the operator would have no incentive to minimize costs and that non-operators would be left unprotected. In light of the testimony of Hunt/Hill's own attorney stating that Heritage did possess a cost-bearing interest, Hunt/Hill's argument must fail. Furthermore, given the fact that Heritage was listed as a working interest owner, and that expert testimony revealed that record title is sufficient under the J.O.A., we

conclude, as a **\*140** matter of law, that record title is sufficient to satisfy the interest requirement for operator status under the Section 21 and 22 J.O.A.s.

## 2. Declaration Two—Breach of the J.O.A.

**[105]** **[106]** **[107]** **[108]** The jury found that Heritage had not breached the J.O.A. The trial court entered a declaratory judgment that "Heritage ... has not breached any of its duties...." Whether or not Heritage did in fact breach any of its duties under the J.O.A. was a question of fact and was therefore, properly submitted to the jury. The jury found that Heritage had not breached the J.O.A.s. In a suit for declaratory judgment "a court ... has power to declare rights, status, and other legal relations...." TEX.CIV.PRAC. & REM.CODE ANN. § 37.003. Furthermore, a trial court having jurisdiction to render a declaratory judgment has the power to determine issues of fact. *United Servs. Life Ins. Co. v. Delaney,* 396 S.W.2d 855, 858 (Tex.1965); *Bexar–Medina– Atascosa Counties Water Control and Improvement Dist. No.1 v. Medina Lake Protection Ass'n,* 640 S.W.2d 778, 779 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). However, the power to determine an issue of fact does not concomitantly carry with it the power to render such a finding of fact as a declaratory judgment. The determination of whether a party has breached a contract, while affecting a party's rights or status, is not a declaration of a right or status and therefore, is not the proper subject of a declaratory judgment. The only matter that was to be resolved was the purely factual question of whether or not Heritage breached the J.O.A. If a factual dispute is the only issue to be resolved, a declaratory judgment is not the proper remedy. *Emmco Ins. Co. v. Burrows,* 419 S.W.2d 665, 671 (Tex.Civ.App.—Tyler 1967, no writ); *Lincoln v. Harvey,* 191 S.W.2d 764, 766 (Tex.Civ.App.—Dallas 1945, no writ). Accordingly, we find that Declaration Two was not the proper subject matter for a declaratory judgment.

**[109]** Hunt/Hill next contend that there was legally insufficient evidence, or alternatively, it was against the great weight and preponderance of the evidence, for the jury to find that Heritage did not breach any of its duties under the J.O.A.s. Hunt/Hill proffer three instances which they claim unequivocally establish Heritage's breach of the J.O.A.s. First, Hunt/Hill argue that Heritage's insolvency resulted in its automatic deemed resignation. However, Hunt/Hill drafted the jury questions regarding Heritage's status as Operator. Broad form questions were used and Hunt/Hill did not request an issue on Heritage's bankruptcy as it affected its status as Operator. Therefore, any error is waived. *See* TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997). Additionally, there is evidence that there was never a vote to remove Heritage as Operator during pendency in bankruptcy which is required for removal under the J.O.A.

Second, Hunt/Hill contend that Heritage engaged in wrongful billing practices. However, there is substantial evidence that the Hunts and Hills knew of and agreed to "vendor deals." Furthermore, expert testimony revealed that the J.O.A. would not prohibit "vendor deals." Finally, Hunt/Hill argue that Heritage failed to obtain the requisite consent for the perforation of the 21–1 well. In support of this argument, Hunt/Hill claim that there had to be written authorization. Noting our

previous discussion on breach of contract, written consent was required for the proliferation of the 21–1 well. However, there was some evidence presented on this issue indicating that a request was made by the Hunts for Heritage to conduct further activity on the 21–1 well. Thus, considering all three points of dispute, we cannot hold that the jury's finding that Heritage did not breach its duties under the J.O.A. was against the great weight and preponderance of the evidence. There was sufficient evidence to support the jury's finding that Heritage did not breach its duties under the J.O.A. Therefore, the trial court was proper in granting Heritage's declaratory relief with respect to Declaration One but not with respect to Declaration Two. Furthermore, in light of this analysis, the trial court was correct in denying all of Hunt/Hill's requests for declaratory relief relating to Heritage's performance as Operator. Also, due to our disposition of the other points of error regarding the 22–2 well and the Section 22 J.O.A. and our analysis of the other issues of **\*141** declaratory judgment, we cannot find that the trial court erred in denying Hunt/Hill other requests for declaratory relief as they relate to the 22–2 well. Points of Error 48, 49, 50, 51, and 52 are overruled.

## C. Recovery Against Distributees of A.G. Hill and the Hill Group.

Hunt/Hill further complain of the trial court's granting of relief against A.G. Hill's successors in interest on two grounds. First, Hunt/Hill contend that as of the filing of the May 1, 1992 First Amended Petition, the statute of limitations on all claims asserted against these defendants had run and that therefore, any recovery was precluded as a matter of law. Secondly, Hunt/Hill argue that these parties were not properly substituted into the lawsuit. A.G. Hill was a named defendant in Heritage's original petition filed on December 18, 1987. Mr. Hill died in June of 1988, during the pendency of this litigation. On May 1, 1992, Heritage added Margaret Hunt Hill, Executrix of the Estate of A.G. Hill, and the Margaret Hunt Hill Martial Trust, the Albert G. Hill, III Trust, the Heather Victoria Hill Trust, the Elisa Margaret Hill Trust, the Michael Bush Wisenbaker, Jr. Trust, the Wesley Hill Wisenbaker Trust, Cody McArthur Wikert Trust, and the Margretta Hill Wikert Trust, as defendants in its first amended petition as A.G. Hill's successors-in-interest.

## 1. Statute of Limitations.

 [110]   Heritage's original petition was sufficient to put in issue a cause of action against A.G. Hill for fraud. The fraud upon which Heritage sought recovery was the alleged May 1987 oral agreement whereby the Hunts agreed to pay their share of the drilling costs of the 22–3 well. Since the cause of action preceded the filing of Heritage's original petition, it was therefore a ripe claim and the trial court was properly vested with subject matter jurisdiction as of the date of filing the Original Petition. Accordingly, Heritage's first amended petition, which was based in part upon this same transaction relates back to the original petition in accordance with TEX.CIV.PRAC. & REM.CODE ANN. § 16.068. Therefore, Heritage's recovery against these defendants, if properly substituted as A.G. Hill's successors in interest, will not be precluded on the basis of statute of limitations.

## 2. Proper Parties.

 **[111]**   Hunt/Hill next argue that there is absolutely no evidence that either the distributees of A.G. Hill or anyone else in the Hill Group, other than Virgil St. Clair and A.G. Hill, engaged in any actionable misconduct and that therefore, recovery against them is improper. However, with regard to the joinder of A.G. Hill's distributees as proper party defendants, Hunt/Hill did not file a Verified Answer denying liability in the capacity in which they were being sued or asserting the existence of a defect in parties. TEX.R.CIV.P. 93. Additionally, the parties voluntarily entered the lawsuit by joining in the counterclaim. Furthermore, Hunt/Hill wholly failed to object to their inclusion in the jury questions. Consequently, any error based upon this theory is waived by failure of the parties to object. TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997); *Lemons v. EMW Mfg. Co.,* 747 S.W.2d 372, 373 (Tex.1988). Hunt/Hills' Points of Error 61a and 61b are overruled.

Likewise, the record reflects that Heritage's Second Amended Petition alleged that A.G. Hill and Virgil St. Clair were the apparent ostensible agents of the entire Hill group. The Hill Group's answer failed to deny any of these agency allegations. Furthermore, Hunt/Hill did not object to any jury question or jury issue which included them as defendants on the grounds of lack of evidence of agency, or any other grounds. Consequently, any error based upon this theory is waived by the parties' failure to object. TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997); *Lemons,* 747 S.W.2d at 373. Accordingly, Hunt/Hill's Points of Error 56, 57, and 58 are overruled.

## D. Duplication of Damages.

Hunt/Hill allege in Points of Error 21 and 43a that the trial court erred in overruling their motions for new trial, motions to disregard jury answers, and for judgment notwithstanding the verdict, and in entering  **\*142**  judgment against them because the damages awarded by the jury in Questions 21, 25, 32, 37a, and 37b are duplicative of one another. In light of our holding that Heritage is not entitled to recover on any of its tortious interference or slander of title claims, with the sole exception of the claims regarding the Oxford transaction, and in light of our disposition of Point of Error 28b, we need not address Points of Error 21 and 43a.

## E. Damages Awarded to Van Oliver, Trustee.

In Point of Error 62, Hunt/Hill urge that the trial court erred in awarding damages in favor of the Intervenor Van Oliver, Trustee because the Trustee's claims and damage award are derivative of Heritage's claims and damages. It appears from the record that all parties to the action stipulated to an agreement whereby Van Oliver, Trustee, for the benefit of certain trade creditors of Heritage, would receive 15 percent of any award Heritage received in the suit. Appellees agree that the Trustee's recovery is derivative of Heritage's recovery and as such, is directly portional to

Heritage's award. It therefore appears that the judgment must be reformed to reflect that Van Oliver's award is to be recovered from Heritage's award. We sustain Point of Error 62.

## F. Seven Falls Company.

 **[112]**   Hunt/Hill claim in Point of Error 63 that the trial court erred in entering judgment against Seven Falls Company and in denying the corporation's motion to strike all claims against it. Seven Falls Company was first named as a party to the suit by the Hill Group's counterclaim filed August 17, 1992. However, it is undisputed that Seven Falls was not named as a party in either the First Amended Counterclaim or Second Amended Counterclaim filed by the Hill Group Hunt/Hill on August 19, 1992 and September 22, 1992, respectively. Appellees argue that Seven Falls remained a party after the filing of the Hill Group's counterclaim on August 17, 1992, despite the omission of Seven Falls from the first and second amended counterclaims because Seven Falls did not file nonsuit after that date.

Under Texas Rule of Civil Procedure 65, an amended pleading supersedes and supplants the original pleading. In *Burton v. Bridges,* 641 S.W.2d 635, 637 (Tex.App.—El Paso 1982, writ ref'd n.r.e.), we held that under Rule 65 "[p]arties to a suit are just as effectively dismissed from a suit by omitting their names from an amended pleading as where a formal dismissal order is entered." *See Evans v. Hoag,* 711 S.W.2d 744, 746 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Dingman v. Spengler,* 371 S.W.2d 416, 423–424 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.). Thus, as Hunt/Hill have correctly argued, Seven Falls Corporation was not a party to the action once the first amended counterclaim omitted them as a defendant.

Upon filing their second amended original petition and original answer, Heritage included Seven Falls as a defendant. However, Hunt/Hill argue that Seven Falls was never served with process. Heritage does not contend that Seven Falls was served with process but instead relies on Seven Falls' voluntary joinder in the suit by way of the original counterclaim. Because we find that the omission of Seven Falls from the amended counterclaims effectively dismissed them from the suit, it was Appellees' burden to serve Seven Falls with citation in accordance with Texas Rule of Civil Procedure 99. *See Evans,* 711 S.W.2d at 746. Appellees failed to comply with such rules. Hunt/Hill made a motion to strike all claims against Seven Falls Company and obtained an unfavorable ruling from the trial judge. However, regardless of the title of the motion, Hunt/Hill substantively argued the improper joinder of Seven Falls as a defendant. *See Cherry v. North Am. Lloyds of Texas,* 770 S.W.2d 4, 6 (Tex.App.—Houston [1st Dist.] 1989, writ denied)(opin. on motion for reh'g). For the foregoing reasons, we sustain Hunt/Hill's Point of Error 63 and find that the trial court erred in denying the motion to strike and in entering judgment against Seven Falls Company.

## G. Attorney's Fees.

**[113]** **[114]** Hunt/Hill challenge the trial court's award of attorney's fees in Points of Error 45, 46, and 47. The trial court awarded **\*143** Heritage attorney's fees based upon a percentage of Heritage's total recovery at trial. There is no common law right to attorney's fees. Instead, the recovery of attorney's fees must be authorized by statute or contract. *Dallas Cent. Appraisal Dist. v. Seven Invest. Co.,* 835 S.W.2d 75, 77 (Tex.1992); *New Amsterdam Cas. Co. v. Texas Indus., Inc.,* 414 S.W.2d 914, 915 (Tex.1967). Additionally, if a case involves more than one claim, then only those fees attributable to the claim falling within the scope of such statute or contract are recoverable. *International Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546–547 (Tex.1973); *4M Linen Supply Co., Inc. v. W.P. Ballard & Co., Inc.,* 793 S.W.2d 320, 327 (Tex.App.—Houston [1st Dist.] 1990, writ denied). "[T]he plaintiff is required to show that the fees were incurred while suing ... on a claim which allows recovery of such fees." *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991); *Harmes v. Arklatex Corp.,* 615 S.W.2d 177, 180 (Tex.1981). However, segregation is not required if services are rendered "in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.' " *Stewart Title Guar. Co.,* 822 S.W.2d at 11.

**[115]** Heritage asserts three bases for upholding the award of attorney's fees: (1) contract; (2) declaratory judgment; and (3) real estate fraud. Since no jury issue or question was either requested or presented on the real estate fraud question, and no recovery was had on a claim of real estate fraud, the fees are unsupportable under this theory. Likewise, because we have determined that the Statute of Frauds bars enforcement of the May oral agreement, Heritage's claim for breach of contract fails as a matter of law and consequently, there can be no recovery of attorney's fees based upon this ground. Therefore, only Heritage's suit for declaratory judgment will support the trial court's award of attorney's fees.

**[116]** **[117]** **[118]** The trial court granted Heritage two forms of declaratory relief. "In any proceeding [for declaratory judgment] the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX.CIV.PRAC. & REM.CODE ANN. § 37.009. The award of such costs and fees is within the discretion of the trial court and such an award premised upon an action for declaratory judgment will not be disturbed on appeal absent a clear showing of an abuse of discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985); *Knighton v. International Bus. Mach. Corp.,* 856 S.W.2d 206, 210 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Where a plaintiff pleads several causes of action including a request for a declaratory judgment and for an award of attorney's fees and is subsequently awarded declaratory relief but denied other relief, he is only entitled to those attorney's fees attributable to the declaratory judgment action. *Leon Ltd. v. Albuquerque Commons Partnership,* 862 S.W.2d 693, 708 (Tex.App.—El Paso 1993, no writ); *Canales v. Zapatero,* 773 S.W.2d 659, 662 (Tex.App.—San Antonio 1989, writ denied). Accordingly, because we find that Heritage's tort causes of action entailed proof of facts unnecessary for the declaratory judgment and considering the percentage basis of the award which did not segregate the fees attributable to the declaratory action,

we must reverse the trial court's award of attorney's fees and remand for new trial on the issue of reasonable and necessary attorney's fees under TEX.CIV.PRAC. & REM.CODE ANN. § 37.009. Accordingly, we overrule Point of Error 45a, and we sustain Points of Error 45b, c, and 46, and we need not address Point of Error 47.

## XI.

## Cross Points of Appeal.

### *Cross Points of Error 1 and 2.*

On cross-appeal, Heritage complains of the trial court's actions of: (1) not awarding prejudgment interest compounded on a daily basis rather than compounded as simple interest and failing to award prejudgment interest for the period Heritage was in bankruptcy; and (2) failing to award attorney's fees for the law firm of Gibson, Dunn & Crutcher in the amount of $1,172,038.30. Because of our disposition of Hunt/Hill's points of error, there remains no economic recovery for Appellees which would require the award **\*144** of prejudgment interest, and therefore, we decline to address Appellees' Cross Point One. Furthermore, in light of the determination to remand the case for retrial on the issue of attorney's fees, we also decline to address Cross Point Two.

## CONCLUSION

We sustain the following Points of Error: 1b, c, 2a, 4, 9b, c, e, 11a, b, 15, 19, 22, 23b, c, d, e, f, 24a, 28b, 32b, 33, 36b, 37, 40b, 41, 43b, 44, 45b, c, 46, 54b, 62, and 63.

We overrule the following Points of Error: 1a, d, e, 3, 5, 6a, 7, 8, 9a, d, 10a, 12, 13, 14a, 16, 17, 18a, 20, 23a, 25, 26, 27, 28a, 29, 30, 31a, 34, 35a, 38, 39a, 42, 45a, 48, 49, 50, 51, 52, 53, 56, 57, 58, 59, 60, and 61.

The following Points of Error are either dismissed or not considered: 2b, 6b, 10b, 14b, 18b, 21, 24b, 31b, c, d, e, f, 32a, c, 35b, c, d, e, f, 36a, c, 39b, c, d, e, f, 40a, c, 43a, 47, 54a, c, and 55. Further, it is not necessary to consider any of the Appellees' Cross Points of Error.

We therefore:

- affirm the trial court's judgment of fraud and award of actual damages in the amount of $4,989,347.21;

- affirm the trial court's judgment of tortious interference with the Oxford transaction and award of actual damages in the amount of $3,160,031.69, but reverse and render that Appellees take-nothing on their claim of slander of title regarding the Oxford transaction;

- reverse and render that Appellees take-nothing on their claims of tortious interference and slander of title regarding: the non-consent interests pertaining to the 22–3 well, the Sun, Enserch/Lone Star, and Enron transactions;

- reverse and render that Appellees take-nothing from Seven Falls Corporation;

- reverse and remand for new trial on attorney's fees, if any; and

- reverse and remand for reformation of the trial court's judgment as to the intervenor, Van Oliver, Trustee, in accordance with this opinion.

## Footnotes

1  *Ex Parte Goad,* 690 S.W.2d 894 (Tex.1985); *Dillard's Depart. Stores, Inc. v. Strom,* 869 S.W.2d 654, 658 (Tex.App.—El Paso 1994, writ dism'd by agr.); *Barrett v. United States Brass Corp.,* 864 S.W.2d 606 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds,* 919 S.W.2d 644 (Tex.1996); *City of Odessa v. Bell,* 787 S.W.2d 525 (Tex.App.—El Paso 1990, no writ); *Kennedy v. Hyde,* 666 S.W.2d 325 (Tex.App.—Fort Worth), *rev'd on other grounds,* 682 S.W.2d 525 (Tex.1984).

2  The exact version of the operation agreement in question in *C & C Partners* is not identified but it appears to be the 1982 version, as in the instant case.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (3)

### Direct History (2)

🚩 1. Hill v. Heritage Resources, Inc. 🔍
964 S.W.2d 89 , Tex.App.-El Paso , Dec. 31, 1997 , rehearing overruled ( Feb 18, 1998 ) , review denied ( Oct 01, 1998 ) , rehearing of petition for review overruled ( Dec 03, 1998 )

*Appeal After Remand*

🚩 2. Heritage Resources, Inc. v. Hill
104 S.W.3d 612 , Tex.App.-El Paso , Feb. 13, 2003

### Related References (1)
3. Heritage Resources, Inc. v. Hill
1998 WL 252156 , Tex.App.-Dallas , May 20, 1998

419 F.3d 543
United States Court of Appeals,
Sixth Circuit.

In re: DOW CORNING CORP., Debtor.
Bear Stearns Government Securities, Inc., et al., Appellants,

v.

Dow Corning Corp., et al., Appellees.

No. 04–1916.　|　Argued: July 27, 2005.　|　Decided and Filed: Aug. 22, 2005.

**Synopsis**
**Background:** Claimant, the assignee of settlement payments that Chapter 11 debtor-silicone breast implant manufacturer had agreed to make prepetition to Texas personal injury plaintiffs, filed claim seeking $8.75 million in "liquidated damages," based on settlement agreement clause requiring payments of $100 per day to each plaintiff for any time during which settlement payments were late. Debtor objected. The United States Bankruptcy Court for the Eastern District of Michigan sustained the objection and disallowed the liquidated damages portion of the claim. Claimant appealed. On the parties' cross-motions for summary judgment, the District Court, Denise Page Hood, J., granted debtor's motion and denied claimant's motion. Claimant appealed.

**Holdings:** The Court of Appeals, R. Guy Cole, Jr., Circuit Judge, held that:

[1] the $100 per day figure was not a reasonable estimate of anticipated damages and, thus, under Texas law, the liquidated damages clause was an unenforceable "penalty" provision, and

[2] under Texas law, debtor could not be estopped from asserting the affirmative defense of illegality.

Affirmed.

**Attorneys and Law Firms**

**\*546 ARGUED:** Abraham Singer, Pepper Hamilton, Detroit, Michigan, for Appellants. David L. Ellerbe, Neligan, Tarpley, Stricklin, Andrews & Foley, Dallas, Texas, for Appellees. **ON BRIEF:** Abraham Singer, Mary K. Deon, Pepper Hamilton, Detroit, Michigan, for Appellants. David L. Ellerbe, Neligan, Tarpley, Stricklin, Andrews & Foley, Dallas, Texas, for Appellees.

Before: MOORE and COLE, Circuit Judges; and WISEMAN, District Judge. [*]

**OPINION**

R. GUY COLE, Circuit Judge.

Twenty-seven Texas plaintiffs seeking recovery for injuries resulting from allegedly faulty breast implants engaged in settlement negotiations with the implants' manufacturer, Dow Corning Corp., a Michigan company. After the discussions reached an impasse over terms covering the consequences in the event settlement payments were not timely, Dow Corning suggested a clause requiring payments of $100 per day to each plaintiff for any time during which settlement payments were late. The plaintiffs agreed to this clause, and entered into the settlement agreement, later selling their right to settlement payments to Appellant Bear Stearns. When Dow Corning declared bankruptcy and began to miss payments under the settlement agreement, Bear Stearns attempted to enforce the clause via a bankruptcy claim. The district court, on Dow Corning's motion for summary judgment, held that the clause was a penalty unenforceable under Texas law, and also found that a condition precedent to the contractual provision of liquidated damages had not been met. Bear Stearns now appeals, arguing that the condition precedent was in fact met, and that Dow Corning should be estopped from asserting that the clause is a penalty. Because the clause is a penalty unenforceable under Texas law, and because Texas courts preclude parties from being estopped from asserting an illegality defense, we AFFIRM the decision below.

**I.**

Following revelations that many of Dow Corning's silicone-based breast implants were faulty, numerous suits were filed against Defendant–Appellee Dow Corning Corp. ("Dow Corning"). Twenty-seven Texas residents ("Plaintiffs") filed suit in Texas state court in 1994, alleging various claims against Dow Corning. Dow Corning found itself "under significant pressure" to settle these twenty-seven cases, especially since any findings of fact made in these cases (the "Texas cases") could have significant adverse effects upon Dow Corning's position in a related multi-district case and related global settlement discussions then pending in federal court in Alabama. Dow Corning was also motivated to settle because of its view that the Texas cases were filed in a "plaintiff-friendly" forum. Dow Corning thus hired Ken Feinberg, a noted expert in settlement practice, to engage in settlement negotiations with the Plaintiffs.

**\*547** But for one sticking point, the negotiations went smoothly. Both parties agreed that Texas law would control the settlement agreement. Dow Corning would pay the Plaintiffs a total of

$17 million over the course of several years, in a series of seven installments. This payment would be secured by an "Agreed Judgment" filed in Texas court, though the judgment would be enforced only if Dow Corning failed to make a timely settlement payment. Plaintiffs' counsel would be responsible for determining what portion of the $17 million each individual Plaintiff would receive. Further, if Dow Corning ever were late on an installment payment, the entire settlement amount would come due. However, near the end of negotiations, Plaintiffs' counsel insisted on a clause (the "no credit clause") which provided that if Dow Corning ever failed to make a timely payment, it would not receive credit against the judgment for previously made payments. For example, under this clause, if Dow Corning failed to make a required final payment of $200,000 to a particular Plaintiff, that Plaintiff would be able to enforce the "agreed judgment" against Dow Corning for the full settlement amount of $1,400,000, rather than merely for the $200,000 portion of the judgment remaining unpaid. This would occur despite the fact that the Plaintiff in this example would already have received $1,200,000 of the $1,400,000 due. Plaintiffs' counsel justified this clause by stating that it would provide a significant incentive for Dow Corning to pay scheduled payments on time.

Not wishing to place itself in a position where it could potentially be required to "double-pay" a significant portion of the settlement, Dow Corning steadfastly objected to the no credit clause. However, Dow Corning by its own admission at this time felt "a tremendous sense of urgency to finalize the settlement." Accordingly, Dow Corning's attorneys proposed replacing the no credit clause in each Plaintiff's agreement with language requiring a "penalty" of $100 to be paid for each day that Dow Corning was late in paying a particular Plaintiff. After insisting that all uses of "penalty" be changed to "liquidated damages," and after making some insignificant stylistic changes, Plaintiffs' attorneys agreed to insert the following language proposed by Dow Corning:

> In the event that [Dow Corning] fails to make any payment in accordance with [the] Agreement, and Plaintiff must seek enforcement of the judgment to obtain the amounts due, then [Dow Corning] will pay to Plaintiff, as liquidated damages, the sum of One Hundred Dollars ($100.00) per day for each day that payment is not made from the date payment was due until the date Plaintiff receives the full amount due and owing under the terms of this agreement. These liquidated damages shall be in addition to the assessment of costs and interest as provided in the agreed judgment and the acceleration of installment payments as provided in [ ] the Agreement.

The Plaintiffs' attorneys noted at that time that if the new provision provided for a "penalty," the provision would not be enforceable under Texas law.

The parties agreed on this language, and inserted the clause into each settlement agreement. Dow Corning paid the first installment payment, totalling $4 million, on December 1, 1994. However, on May 15, 1995, Dow Corning filed for bankruptcy in the Eastern District of Michigan,

and thereafter failed to make any further payments under the settlement agreement—the second installment having been due on July 1, 1995. All of the Plaintiffs timely filed claims in bankruptcy court for the amounts due under the settlement agreement. In February 1997, while the bankruptcy **\*548** case was pending, the Plaintiffs all sold their claims to Appellant Bear Stearns Investment Products, Inc., and related entities (collectively, "Bear Stearns"). Bear Stearns was then substituted for the Plaintiffs in the bankruptcy case.

Years later, a reorganization plan was approved for Dow Corning. The plan included payment to Bear Stearns of the full remaining settlement amount of $13 million, plus post-petition interest of $9.6 million.[1] During bankruptcy proceedings, Bear Stearns also claimed liquidated damages in the amount of $8.75 million pursuant to the settlement agreement. Dow Corning filed an objection to this portion of Bear Stearns's claim, and the bankruptcy court, without any written findings, sustained the objection and disallowed the liquidated damages portion of the claim. Bear Stearns appealed to the district court. Since Dow Corning was fully solvent and had agreed to pay whatever the district court determined was due, the court allowed the confirmed plan to become effective while the liquidated damages appeal was pending. As a result, just after the plan's effective date, on June 1, 2004, Bear Stearns was paid the $22.6 million both parties agreed was due under the plan. Meanwhile, Bear Stearns and Dow Corning each had filed a motion for summary judgment in district court with regard to the additional liquidated damages. The district court denied Bear Stearns's motion, and granted summary judgment to Dow Corning, finding that the liquidated damages clause was a penalty unenforceable under Texas law, and that even if it were not, a condition precedent to any award of liquidated damages had not been met. The district court then certified the grant of summary judgment as final, under Fed.R.Civ.P. 54(b), since the ruling conclusively resolved all claims with regard to the liquidated damages clause. This timely appeal followed.

## II.

### A. Choice of Law and Standard of Review

[1] Both parties agree that, pursuant to the settlement agreement's choice-of-law provision, the construction and enforcement of terms of the settlement agreement is governed by the laws of Texas. Though there is a circuit split over what choice-of-law provisions a federal court exercising bankruptcy jurisdiction should apply, *compare, e.g., In re Vortex Fishing Sys., Inc.,* 277 F.3d 1057, 1069 (9th Cir.2002) (requiring use of federal choice-of-law principles) *with, e.g., In re Gaston & Snow,* 243 F.3d 599, 604–07 (2d Cir.2001) (describing this split in great detail and requiring use of the forum state's choice-of-law principles); *see also, e.g., In re S.W. Equip. Rental Inc.,* No. CIV 1–90–62, 1992 WL 684872, at \*9 n. 48 (E.D.Tenn. Jul.9, 1992), both Michigan choice-of-law rules and general equitable choice-of-law policies support enforcing parties' agreed-upon choice-of-law clauses absent any strong public policy concerns to the contrary. *See, e.g., Mill's*

*Pride, Inc. v. Cont'l Ins. Co.,* 300 F.3d 701, 705 (6th Cir.2002) ("Michigan choice of law rules ... require a court to balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." (citations omitted)); **\*549** Restatement (Second) of Conflicts of Law § 302 (1971) (suggesting similar principles in the non-state-specific context). As we are aware of no public policy disfavoring application of Texas law in the instant case, we agree with the parties and the district court, and apply Texas law in determining the enforceability of the subject contract terms.

**[2]** **[3]** **[4]** Since the instant claims were brought in bankruptcy court pursuant to federal bankruptcy jurisdiction, federal procedural rules apply. Therefore, we review the district court's legal conclusions *de novo. In re Batie,* 995 F.2d 85, 88 (6th Cir.1993); *In re Dow Corning Corp.,* 280 F.3d 648, 656 (6th Cir.2002). In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court. *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc.,* 249 F.3d 450, 454 (6th Cir.2001). Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently. *Id.*

**[5]** Under federal procedural law, in deciding a motion for summary judgment in a bankruptcy proceeding, this Court must determine if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ P. 56(c); *see also* Fed. R. Bankr.P. 7056 ("Rule 56 F.R.Civ.P. applies in adversary proceedings."). As usual, we view the evidence in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, since the instant appeal is from both the grant of summary judgment to Dow Corning *and* the denial of summary judgment to Bear Stearns, it is appropriate to consider the evidence in the light most favorable to each party.

**[6]** Finally, under Texas law, the determination of whether a contract term is properly a liquidated damages provision or instead an unenforceable penalty is purely a question of law. *See, e.g., Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005) ("Whether a contract term is a liquidated damages provision is a question of law for the court to decide."); *S. Union Co. v. CSG Sys., Inc.,* No. 03–04–00172–CV, 2005 WL 171349, at \*4 (Tex.Ct.App. Jan. 27, 2005) ("Whether the liquidated damages provision is enforceable is a question of law."). "Sometimes, however, factual issues must be resolved before the legal question can be decided. For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991).

## B. Liquidated Damages

 **[7]**    **[8]**    **[9]**    **[10]**    Bear Stearns first argues that the $100 per day provision is a valid liquidated damages clause. Under Texas law, a "liquidated damages" term is treated as a penalty, unenforceable for reasons of public policy, except when all three of the following conditions are met:

> First, [ (1) ] the anticipated damages for a breach must be difficult or impossible to estimate. Also, [ (2) ] the amount of liquidated damages must be a reasonable forecast of the amount necessary to render just compensation. In addition, [ (3) ] 'liquidated damages must not be disproportionate to actual damages,' as measured at the time of the breach. Thus, if the liquidated damages are disproportionate **\*550** to the actual damages, the clause will not be enforced and recovery will be limited to the actual damages proven.

*Thanksgiving Tower Partners v. Anros Thanksgiving Partners,* 64 F.3d 227, 232 (5th Cir.1995) (footnotes omitted) (quoting *Baker v. Int'l Record Syndicate,* 812 S.W.2d 53, 55 (Tex.Ct.App.1991)). Further, "[t]he party seeking to prevent enforcement bears the burden of proof on these [three] issues." *Id.; see also Fluid Concepts, Inc. v. DA Apartments Ltd. P'ship,* 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005) (concluding that trial court had erred in granting summary judgment to defendant where defendant had presented no evidence supporting denial of liquidated damages, despite plaintiff's failure to provide any proof in support of such damages). Accordingly, to defeat Bear Stearns's motion for summary judgment and to prevail on its own summary judgment motion, Dow Corning bore the burden of proving that any one of the preceding conditions had not been met. Finally, Texas law grants strong deference to enforcement of contract terms, including liquidated damages terms, shown to be mutually bargained for by equally competent parties. *S. Union,* 2005 WL 171349, at \*5 (citing *Shel-al Corp. v. Am. Nat'l Ins. Co.,* 492 F.2d 87, 94 (5th Cir.1974)). The district court ruled against Bear Stearns, finding that none of the prongs of the liquidated damages test were met.

### 1. Were Future Damages Stemming From Breach Difficult to Estimate?

 **[11]**    Bear Stearns first argues that the district court erred when it determined that all liquidated damages clauses in contracts for the payment of money are unenforceable penalties. The district court concluded that since interest can be paid to offset any delay in receiving money due under a contract, damages for such contracts will always be easy to estimate. For this proposition, the district court relied significantly on language from *Langever v. R.G. Smith & Co.,* 278 S.W. 178, 179 (Tex.Ct.App.1925):

> In determining the intention of the parties to such stipulation, certain well-recognized rules of construction enter into the consideration, an important one of which is, the certainty or uncertainty of the actual damages which a breach will occasion, and the ease or difficulty of ascertaining or proving such damages; hence, in a case of a contract for the payment of money simply, a stipulation to

> pay a fixed sum, in default of performance, will be regarded as an agreement for a penalty and not as a covenant for liquidated damages—the reason for this rule being that, for the nonpayment of money, the law awards damages measured by interest, and hence there is no difficulty in ascertaining the damages in such a case.

*Id.* While this passage from *Langever,* taken alone, is supportive of the district court's holding, the district court ignored the fact that this was only one factor to be considered under Texas law. The plaintiff in *Langever* alleged that, due to non-payment on the contract at issue, he had lost significant profits (as, presumably, he was intending to reinvest the money once received), and that the liquidated damages term had been an attempt to estimate the result of his not having been paid. Despite the dicta cited by the district court in the instant case, the *Langever* court went on to state first that, "Where it is certain that damages will flow, and where it is certain they cannot be accurately measured, or where it appears their ascertainment, if possible, will be difficult, the best reasons exist for respecting the agreement of the parties in advance upon a sum mutually satisfactory." *Id.* The *Langever* **\*551** court then granted enforcement of the clause, despite its dicta, noting that "Any effort to establish the actual damages for a breach of a contract such as the one under consideration here would be attended with such unusual considerations and surrounded with such uncertainty and difficulties as to take the case out of the usual class of cases of mere default in the payment of money, and thus to afford fair grounds for sustaining an agreement for liquidated damages." *Id.*

Accordingly, *Langever* merely stands for Texas's consistent law that liquidated damages clauses in contracts for payment of money are unenforceable *except* when damages are particularly difficult to estimate. Bear Stearns argues that the liquidated damages clauses in the instant case were intended to compensate for difficulties encountered by the Plaintiffs were they not to receive the settlement monies they were expecting to receive. According to Plaintiffs' attorneys, such damages specifically included losses sustained by the Plaintiffs' inabilities to meet obligations they had made based on the promise of Dow Corning to make payments under the settlement agreement. Bear Stearns alleges that such difficulties would have been particularly difficult to estimate here, because Plaintiffs' difficulties included damages beyond the usual "lost investment opportunities" and inabilities to make house and car payments. Rather, Bear Stearns asserts that the clause was also intended to compensate for difficulties resulting from a failure to be able to meet future obligations incurred in expectation of receiving settlement payments, including obligations such as future (and inherently unpredictable) medical services required due to illness caused by the allegedly faulty implants, and also Plaintiffs' "decisions to discontinue working if they could afford to do so."

On this prong, Dow Corning raises two arguments in addition to that relied upon by the district court. First, Dow Corning argues that the items Bear Stearns claims would be "damages" following non-payment are actually damages that the initial settlement itself had contemplated, and thus the

liquidated damages clause effectively would double-pay for these amounts. Bear Stearns responds by noting that the liquidated damages provision was *not* intended to cover medical expenses resulting from the faulty implants, but rather to compensate for additional costs associated with receiving late payments from Dow Corning. We agree with Bear Stearns that this conclusion is reasonable in light of *Langever,* which specifically allowed liquidated damages in a situation in which future damages resulting from non-payment were likely to be more than the time-value of monies owed under the original contract.

Dow Corning's second argument is that the parties simply were not anticipating any additional damages from non-payment, difficult to calculate or otherwise. Dow Corning cites to the fact that the liquidated damages clause was initially proposed as a "penalty," and that none of the attorneys in the case from either side could remember any discussions regarding difficult-to-calculate damages. In contrast, Bear Stearns notes that at least one of the Plaintiffs' attorneys stated specifically that "the liquidated damages provision was to recognize that [Plaintiffs] would have losses sustained by their inability to meet the obligations that they had made based on the promise of Dow Corning to make payments under this Agreement." These duelling assertions, however, go to the question of whether the provision was *actually* a just forecast of any damages, and not to whether such damages, if contemplated, would be difficult to calculate. Dow Corning does not argue that the damages **\*552** resulting from non-payment of settlement monies, including inability to meet future medical and other obligations, would be easy to calculate. Obviously, the twenty-seven Plaintiffs would each face differing levels of such damages, and in this particular case, no party has argued that the Plaintiffs' medical or other obligations were uniform or predictable. Accordingly, Dow Corning has failed to show that the anticipated damages would not be difficult to estimate.

### 2. Was the Liquidated Damages Clause a Reasonable Forecast of Just Compensation for Such Damages?

 [12]   The district court also gave two reasons for concluding that Bear Stearns ought to lose on prong two, regarding whether the amount of liquidated damages was a reasonable forecast of the amount necessary to render just compensation. Unsurprisingly, Dow Corning agrees with both. First, the district court found that the $100 per day simply was not a forecast of compensation for any damages, but rather was initially intended as a penalty. Second, the district court concluded that even if the Plaintiffs' attorneys had intended this clause as compensation for damages, there was no evidence that the likely amount of such damages was ever estimated at all or that it was compared with $100 per day, nor was any evidence provided that any negotiations over what amount would be reasonable compensation had ever occurred. The district court concluded that the clause thus was not a "reasonable forecast of just compensation."

Bear Stearns argues that the burden was on Dow Corning to prove that the clause was not a reasonable forecast, and that Dow Corning simply has not presented any evidence that the clause

was not a reasonable forecast of damages. However, this argument both discounts the evidence Dow Corning has presented and overstates Dow Corning's burden. Dow Corning has presented evidence that the parties did not discuss potential uncertain damages resulting from breach, and has also presented evidence that the clause was initially proposed as a penalty untied to any potential damages.

Bear Stearns argues that the district court unfairly shifted the burden of proof to Bear Stearns. However, such a shifting was not improper in light of evidence presented by Dow Corning that is probative of a lack of both intent to provide just compensation and the existence of any consideration of any estimates of what just compensation would be. Bear Stearns's only statement to counter Dow Corning's evidence of a lack of connection between the clause and any estimate of damages is that "[g]iven the large number of individual Plaintiffs and the difficulty in estimating each Plaintiff's actual damages in the event of a breach by Dow, the $100 per day figure was a reasonable estimate of those damages." This argument may reasonably rebut one of Dow Corning's other arguments, that the damages were not reasonably predictive of damages potentially or actually incurred by any one specific Plaintiff. Regardless, however, the fact that there are numerous Plaintiffs or that each Plaintiff's damages were uncertain does not logically imply that $100 per day *was* a reasonable estimate of damages.

Bear Stearns further argues that "[h]aving proposed the $100 per day figure, Dow clearly believed it was reasonable at the time." However, such an inference cannot be made. When Dow Corning proposed the $100 figure, the uncontradicted evidence shows that it intended the figure as a penalty, and *not* as a reasonable estimation of some set of damages. Bear Stearns cites no evidence tying the $100 figure to any of the types of damages it claims Plaintiffs were estimated to face **\*553** post-breach, while Dow Corning cites evidence probative of an absence of a concern for whether $100 was just compensation. For this reason alone, Bear Stearns's arguments fail. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (requiring a party defending against a motion for summary judgment to provide more than a "scintilla" of evidence to support the conclusion that there is a genuine issue of material fact for trial).

The district court also held that the $100 per day provision was not a reasonable estimate of just compensation for the anticipated damages because such liquidated damages would constitute double recovery for damages already compensated by the base settlement payments. *See, e.g., Eberts v. Businesspeople Personnel Servs., Inc.,* 620 S.W.2d 861 (Tex.Ct.App.1981) (disallowing double recovery via liquidated damages); *Robert G. Beneke & Co., Inc. v. Cole,* 550 S.W.2d 321 (Tex.Ct.App.1977) (same). However, Bear Stearns properly notes that the damages for which it is claiming liquidated damages are *not* damages contemplated by the underlying contract, since the damages at issue here are those resulting from a breach of the settlement agreement itself (*e.g.* difficulties or other costs resulting from inability to pay medical bills or other bills

which Plaintiffs had incurred relying on the availability of settlement money), and *not* those for which the settlement payments are supposed to compensate the Plaintiffs (*e.g.* expenses resulting directly from potentially faulty implants). Accordingly, the district court should not have concluded that enforcement of the liquidated damages clause would constitute double recovery. Nonetheless, because Dow Corning provided evidence that the provisions were not actually reasonable estimations of any anticipated damages from breach, the second prong of the liquidated damages test, and thus the result of the entire test, was properly resolved in Dow Corning's favor.

### 3. Are the Liquidated Damages Disproportionate to the Actual Damages Incurred by Plaintiffs?

Because Dow Corning has met its burden of proving that the clause was not a reasonable estimation of any anticipated damages, the entire three-part test must be resolved in its favor. *See, e.g., Baker, 812 S.W.2d at 55.* Therefore, we need not determine whether the "liquidated damages" under the clause would be disproportionate to any actual damages incurred by Plaintiffs.

### C. Quasi–Estoppel and Unenforceable Liquidated Damages Clauses

[13]  [14]  [15]  Under Texas law, the illegality of a liquidated damages clause is an affirmative defense that must be asserted by a defendant when it is not clear from the face of the agreement that the clause is illegal. *See, e.g., Phillips v. Phillips,* 820 S.W.2d 785, 789–90 (Tex.1991). Bear Stearns argues that the doctrine of quasi-estoppel should prevent Dow Corning from being able to assert this affirmative defense, and therefore that the liquidated damages clause should be enforced. Quasi-estoppel is appropriate where "it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Muñoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 864 (Tex.2000) (citing *Atkinson Gas Co. v. Albrecht,* 878 S.W.2d 236, 240 (Tex.Ct.App.1994)). Bear Stearns argues that since Dow Corning proposed the clause in order to induce settlement with the Plaintiffs, thereby avoiding costly litigation, Dow Corning cannot now assert that the clause is illegal. However, regardless of whether quasi-estoppel would be appropriate here,  **\*554**  Texas courts have clearly stated that one cannot be estopped from arguing that a contract term is illegal for public policy reasons. *See, e.g., In re Kasschau,* 11 S.W.3d 305, 312–14 (Tex.Ct.App.1999); *see also In re Calderon,* 96 S.W.3d 711, 719–20 (Tex.Ct.App.2003). Accordingly, under Texas law, Dow Corning simply cannot be estopped from asserting the affirmative defense of illegality, even if quasi-estoppel would otherwise be applicable. Because Dow Corning did indeed assert this defense, and because we conclude that this defense has merit, Bear Stearns's argument fails.

### III.

Because we conclude that Dow Corning met its burden of showing that the liquidated damages clause at issue is a penalty clause unenforceable under Texas law for reasons of public policy, we need not address whether a condition precedent to enforcement of the clause was met. We therefore **AFFIRM** both the district court's denial of Bear Stearns's summary judgment motion and the grant of summary judgment to Dow Corning.

## Parallel Citations

45 Bankr.Ct.Dec. 46, 2005 Fed.App. 0360P

## Footnotes

*       The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

1       Bear Stearns is also an appellant in another Dow Corning appeal currently pending before this Court. All parties agree that the legal issues presented by the two appeals are effectively unrelated and that Dow Corning will pay additional post-petition interest on all money due under the settlement agreement if such additional interest is awarded to Bear Stearns as a result of the other appeal.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**History (132)**

**Direct History (1)**

1. In re Dow Corning Corp. 👓
419 F.3d 543 , 6th Cir.(Mich.) , Aug. 22, 2005

**Related References (131)**

2. In re Silicone Gel Breast Implants Products Liability Litigation
793 F.Supp. 1098 , Jud.Pan.Mult.Lit. , June 25, 1992

3. In re Silicone Gel Breast Implants Products Liability Litigation
1993 WL 89049 , Jud.Pan.Mult.Lit. , Mar. 10, 1993

4. In re Silicone Gel Breast Implants Products Liability Litigation
1993 WL 188223 , Jud.Pan.Mult.Lit. , Apr. 16, 1993

5. In re Silicone Gel Breast Implants Products Liability Litigation
1993 WL 199129 , Jud.Pan.Mult.Lit. , May 04, 1993

6. In re Silicone Gel Breast Implant Products Liability Litigation
1993 WL 795477 , N.D.Ala. , June 02, 1993

7. In re Silicone Gel Breast Implants Products Liability Litigation
1993 WL 223106 , Jud.Pan.Mult.Lit. , June 03, 1993

8. In re Silicone Gel Breast Implants Products Liability Litigation
837 F.Supp. 1123 , N.D.Ala. , Nov. 29, 1993

🚩 9. In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
837 F.Supp. 1128 , N.D.Ala. , Dec. 02, 1993

*Vacated in Part by*

10. In re Silicone Gel Breast Implants Products Liability Litigation
887 F.Supp. 1455 , N.D.Ala. , Apr. 25, 1995

11. In re Silicone Gel Breast Implant Products Liability Litigation
1994 WL 114580 , N.D.Ala. , Apr. 01, 1994

12. In re Silicone Gel Breast Implant Products Liability Litigation
1994 WL 578353 , N.D.Ala. , Sep. 01, 1994

13. In re Silicone Gel Breast Implants Products Liability Litigation
887 F.Supp. 1447 , N.D.Ala. , Apr. 25, 1995

14. In re Silicone Gel Breast Implants Products Liability Litigation
887 F.Supp. 1463 , N.D.Ala. , Apr. 25, 1995

15. In re Silicone Gel Breast Implants Products Liability Litigation
887 F.Supp. 1469 , N.D.Ala. , Apr. 25, 1995

16. In re Dow Corning Corp.
1995 WL 495978 , Bankr.E.D.Mich. , Aug. 09, 1995

17. In re Dow Corning Corp.
187 B.R. 919 , E.D.Mich. , Sep. 12, 1995 , decision supplemented ( Sep 14, 1995 )

*Order Reversed by*

18. In re Dow Corning Corp.
103 F.3d 129 , 6th Cir.(Mich.) , Nov. 18, 1996

19. In re Dow Corning Corp.
187 B.R. 934 , E.D.Mich. , Sep. 12, 1995

*Reversed by*

20. In re Dow Corning Corp.
86 F.3d 482 , 6th Cir.(Mich.) , Apr. 09, 1996 , as amended on denial of rehearing and rehearing en banc ( Jun 03, 1996 )

*On Remand to*

21. In re Dow Corning Corp.
1996 WL 511646 , E.D.Mich. , July 30, 1996

*Reversed by*

22. In re Dow Corning Corp.
113 F.3d 565 , 6th Cir.(Mich.) , May 08, 1997

*Certiorari Denied by*

23. Official Committee of Tort Claimants v. Dow Corning Corp.
522 U.S. 977 , U.S. , Nov. 10, 1997

24. In re Dow Corning Corp.
86 F.3d 482 , 6th Cir.(Mich.) , Apr. 09, 1996 , as amended on denial of rehearing and rehearing en banc ( Jun 03, 1996 )

*Certiorari Denied by*

25. Official Committee of Tort Claimants v. Dow Corning Corp.
519 U.S. 1071 , U.S. , Jan. 06, 1997

*AND Certiorari Denied by*

26. Breast Implant Tort Claimants Represented By O'Quinn, Kerensky, McAninch & Laminack v. Dow Corning Corp.
519 U.S. 1071 , U.S. , Jan. 06, 1997

27. In re Dow Corning Corp.
192 B.R. 415 , Bankr.E.D.Mich. , Jan. 25, 1996

28. In re Dow Corning Corp.
192 B.R. 428 , Bankr.E.D.Mich. , Feb. 15, 1996

29. In re Dow Corning Corp.
194 B.R. 121 , Bankr.E.D.Mich. , Mar. 21, 1996

*Order Reversed by*

30. In re Dow Corning Corp.
212 B.R. 258 , E.D.Mich. , June 25, 1997

31. In re Dow Corning Corp.
194 B.R. 147 , Bankr.E.D.Mich. , Apr. 02, 1996

32. In re Silicone Gel Breast Implants Prod. Liabil. Lit.
1996 WL 1358526 , N.D.Ala. , Apr. 11, 1996

33. In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401813 , N.D.Ala. , May 31, 1996

*Order Amended by*

34. In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401762 , N.D.Ala. , June 10, 1996

*Subsequent Determination*

35.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401763 , N.D.Ala. , June 13, 1996

*AND Order Vacated in Part by*

36.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401764 , N.D.Ala. , Aug. 23, 1996

*Order Supplemented by*

37.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401766 , N.D.Ala. , Oct. 31, 1996

38.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401762 , N.D.Ala. , June 10, 1996

*Order Supplemented by*

39.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401766 , N.D.Ala. , Oct. 31, 1996

40.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401813 , N.D.Ala. , May 31, 1996

*Order Supplemented by*

41.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401766 , N.D.Ala. , Oct. 31, 1996

42.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401765 , N.D.Ala. , Sep. 18, 1996

*Order Supplemented by*

43.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1996 WL 34401766 , N.D.Ala. , Oct. 31, 1996


44.  In re Dow Corning Corp.
198 B.R. 214 , Bankr.E.D.Mich. , July 16, 1996


45.  In re Dow Corning Corp.
1996 WL 580043 , E.D.Mich. , Aug. 12, 1996


46.  In re Dow Corning Corp.
199 B.R. 896 , Bankr.E.D.Mich. , Aug. 16, 1996


47.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1997 WL 34633291 , N.D.Ala. , Jan. 13, 1997


48.  In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
1997 WL 34633292 , N.D.Ala. , Feb. 20, 1997


49.  In re Dow Corning Corp.
208 B.R. 661 , Bankr.E.D.Mich. , May 27, 1997


50.  In re Dow Corning Corp.
211 B.R. 545 , Bankr.E.D.Mich. , July 29, 1997


51.  In re Silicone Gel Breast Implants Products Liability Litigation
996 F.Supp. 1110 , N.D.Ala. , Aug. 22, 1997


52.  In re Dow Corning Corp.
215 B.R. 346 , Bankr.E.D.Mich. , Nov. 20, 1997

*Opinion Supplemented by*

53.  In re Dow Corning Corp.
215 B.R. 526 , Bankr.E.D.Mich. , Dec. 19, 1997


54.  In re Dow Corning Corp.
142 F.3d 433 , 6th Cir.(Mich.) , Apr. 06, 1998


55.  In re Dow Corning Corp.
--- Fed.Appx. ---- , 6th Cir.(Mich.) , Apr. 06, 1998


56.  In re Dow Corning Corp.
227 B.R. 111 , Bankr.E.D.Mich. , Nov. 12, 1998 , as amended ( Dec 28, 1998 ) , as amended ( Jan 25, 1999 )


57.  In re Silicone Gel Breast Implant Products Liability Litigation (MDL 926)
1998 WL 35223618 , N.D.Ala. , Dec. 16, 1998


58.  In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
1998 WL 35223619 , N.D.Ala. , Dec. 22, 1998


*Order Supplemented by*

59.  In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
1999 WL 34815586 , N.D.Ala. , Jan. 11, 1999


60.  Lindsey v. Dow Corning Corp.
174 F.3d 203 , 11th Cir.(Ala.) , Feb. 26, 1999


61.  In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
1999 WL 34815587 , N.D.Ala. , Mar. 10, 1999

62.  In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
1999 WL 34815588 , N.D.Ala. , Apr. 26, 1999


🚩 63.  In re Dow Corning Corp.
1999 WL 551343 , Bankr.E.D.Mich. , July 13, 1999


*Opinion Amended and Superseded by*

🚩 64.  In re Dow Corning Corp.
237 B.R. 380 , Bankr.E.D.Mich. , July 30, 1999


65.  In re Dow Corning Corp.
237 B.R. 364 , Bankr.E.D.Mich. , July 23, 1999


🚩 66.  In re Dow Corning Corp.
237 B.R. 374 , Bankr.E.D.Mich. , July 29, 1999


67.  In re Dow Corning Corp.
244 B.R. 718 , Bankr.E.D.Mich. , Nov. 30, 1999


*Order Affirmed by*

🚩 68.  In re Dow Corning Corp.
255 B.R. 445 , E.D.Mich. , Nov. 13, 2000


*Reconsideration Denied by*

69.  In re Dow Corning Corp.
2001 WL 278271 , E.D.Mich. , Feb. 05, 2001


*AND Affirmed and Remanded by*

70. In re Dow Corning Corp.
280 F.3d 648 , 6th Cir.(Mich.) , Jan. 29, 2002 , rehearing and suggestion for rehearing en banc denied ( May 03, 2002 )

*Certiorari Denied by*

71. Class Five Nevada Claimants v. Dow Corning Corp.
537 U.S. 816 , U.S. , Oct. 07, 2002

*AND On Remand to*

72. In re Dow Corning Corp.
287 B.R. 396 , E.D.Mich. , Dec. 11, 2002

73. In re Dow Corning Corp.
244 B.R. 673 , Bankr.E.D.Mich. , Dec. 01, 1999

*Affirmed by*

74. In re Dow Corning Corp.
255 B.R. 445 , E.D.Mich. , Nov. 13, 2000

*Reconsideration Denied by*

75. In re Dow Corning Corp.
2001 WL 278271 , E.D.Mich. , Feb. 05, 2001

*AND Affirmed and Remanded by*

76. In re Dow Corning Corp.
280 F.3d 648 , 6th Cir.(Mich.) , Jan. 29, 2002 , rehearing and suggestion for rehearing en banc denied ( May 03, 2002 )

*Certiorari Denied by*

77.  Class Five Nevada Claimants v. Dow Corning Corp.
537 U.S. 816 , U.S. , Oct. 07, 2002


*AND On Remand to*

78.  In re Dow Corning Corp.
287 B.R. 396 , E.D.Mich. , Dec. 11, 2002


79.  In re Dow Corning Corp.
244 B.R. 705 , Bankr.E.D.Mich. , Dec. 01, 1999


*Affirmed by*

🚩 80.  In re Dow Corning Corp.
255 B.R. 445 , E.D.Mich. , Nov. 13, 2000


*Reconsideration Denied by*

81.  In re Dow Corning Corp.
2001 WL 278271 , E.D.Mich. , Feb. 05, 2001


*AND Affirmed and Remanded by*

🚩 82.  In re Dow Corning Corp.
280 F.3d 648 , 6th Cir.(Mich.) , Jan. 29, 2002 , rehearing and suggestion for rehearing en banc denied ( May 03, 2002 )


*Certiorari Denied by*

83.  Class Five Nevada Claimants v. Dow Corning Corp.
537 U.S. 816 , U.S. , Oct. 07, 2002


*AND On Remand to*

84. In re Dow Corning Corp.
287 B.R. 396 , E.D.Mich. , Dec. 11, 2002

85. In re Dow Corning Corp.
244 B.R. 634 , Bankr.E.D.Mich. , Dec. 02, 1999

*Affirmed by*

⚑ 86. In re Dow Corning Corp.
255 B.R. 445 , E.D.Mich. , Nov. 13, 2000

*Reconsideration Denied by*

87. In re Dow Corning Corp.
2001 WL 278271 , E.D.Mich. , Feb. 05, 2001

*AND Affirmed and Remanded by*

⚑ 88. In re Dow Corning Corp.
280 F.3d 648 , 6th Cir.(Mich.) , Jan. 29, 2002 , rehearing and suggestion for rehearing en banc denied ( May 03, 2002 )

*Certiorari Denied by*

89. Class Five Nevada Claimants v. Dow Corning Corp.
537 U.S. 816 , U.S. , Oct. 07, 2002

*AND On Remand to*

90. In re Dow Corning Corp.
287 B.R. 396 , E.D.Mich. , Dec. 11, 2002

⚑ 91. In re Dow Corning Corp.
244 B.R. 721 , Bankr.E.D.Mich. , Dec. 21, 1999

*Reversed by*

🚩 92.   In re Dow Corning Corp.
255 B.R. 445 , E.D.Mich. , Nov. 13, 2000

*Reconsideration Denied by*

93.   In re Dow Corning Corp.
2001 WL 278271 , E.D.Mich. , Feb. 05, 2001

*AND Affirmed and Remanded by*

🚩 94.   In re Dow Corning Corp.
280 F.3d 648 , 6th Cir.(Mich.) , Jan. 29, 2002 , rehearing and suggestion for rehearing en banc denied ( May 03, 2002 )

*Certiorari Denied by*

95.   Class Five Nevada Claimants v. Dow Corning Corp.
537 U.S. 816 , U.S. , Oct. 07, 2002

*AND On Remand to*

96.   In re Dow Corning Corp.
287 B.R. 396 , E.D.Mich. , Dec. 11, 2002

97.   In re Dow Corning Corp.
244 B.R. 678 , Bankr.E.D.Mich. , Dec. 01, 1999

98.   In re Dow Corning Corp.
244 B.R. 696 , Bankr.E.D.Mich. , Dec. 01, 1999

99. In re Dow Corning Corp.
250 B.R. 298 , Bankr.E.D.Mich. , June 22, 2000

100. In re Dow Corning Corp.
2000 WL 33321424 , E.D.Mich. , Nov. 13, 2000

101. In re Dow Corning Corp.
263 B.R. 544 , Bankr.E.D.Mich. , June 21, 2001

102. In re Silicone Gel Breast Implants Products Liability Litigation (MDL 926)
174 F.Supp.2d 1242 , N.D.Ala. , Sep. 26, 2001

*Affirmed in Part, Reversed in Part and Remanded by*

103. U.S. v. Baxter Intern., Inc.
345 F.3d 866 , 11th Cir.(Ala.) , Sep. 15, 2003

*Certiorari Denied by*

104. Baxter Intern. Inc. v. U.S.
542 U.S. 946 , U.S. , June 28, 2004

105. In re Dow Corning Corp.
270 B.R. 393 , Bankr.E.D.Mich. , Oct. 30, 2001

106. In re Silicone Gel Breast Implants Products Liability Litigation
173 F.Supp.2d 1381 , Jud.Pan.Mult.Lit. , Nov. 02, 2001

107. In re Dow Corning Corp.
2002 WL 551020 , E.D.Mich. , Mar. 29, 2002

108. In re Dow Corning Corp.
2002 WL 551022 , E.D.Mich. , Mar. 29, 2002

109. In re: DOW CORNING CORPORATION, Debtor.
2002 WL 32151839 , Bankr.E.D.Mich. , Sep. 19, 2002

110. In Re: DOW CORNING CORPORATION, Debtor.
2003 WL 22218449 , Bankr.E.D.Mich. , July 17, 2003

111. In Re: DOW CORNING CORPORATION, Debtor.
2004 WL 764654 , E.D.Mich. , Mar. 31, 2004

*Reversed and Remanded by*

112. In re Dow Corning Corp.
456 F.3d 668 , 6th Cir.(Mich.) , July 26, 2006 , rehearing and suggestion for rehearing en banc denied ( Oct 31, 2006 )

*Certiorari Denied by*

113. Dow Corning Corp. v. Official Committee of Unsecured Creditors
549 U.S. 1317 , U.S. , Mar. 26, 2007

114. In re Settlement Facility Dow Corning Trust, Mary O'Neil
2008 WL 907433 , E.D.Mich. , Mar. 31, 2008

115. In re Settlement Facility Dow Corning Trust, Clients of Weitz & Luxenberg
2008 WL 907435 , E.D.Mich. , Mar. 31, 2008

116. In re Settlement Facility Dow Corning Trust, Clients of Siegel, Kelleher & Kahn
2008 WL 907437 , E.D.Mich. , Mar. 31, 2008

117.  In re Dow Corning Corp.
2008 WL 4585249 , E.D.Mich. , Oct. 14, 2008

118.  In re Dow Corning Corp.
2009 WL 891692 , E.D.Mich. , Mar. 31, 2009

119.  In re Dow Corning Corp.
2010 WL 750200 , E.D.Mich. , Mar. 03, 2010

120.  In re Dow Corning Corp.
2010 WL 3927738 , E.D.Mich. , June 09, 2010

121.  In re Dow Corning Corp.
2010 WL 3927728 , E.D.Mich. , June 15, 2010

122.  In re Settlement Facility Dow Corning Trust
628 F.3d 769 , 6th Cir.(Mich.) , Dec. 17, 2010 , rehearing and rehearing en banc denied
( Jan 24, 2011 )

*On Remand to*

123.  In re Settlement Facility Dow Corning Trust
2013 WL 5550992 , E.D.Mich. , Oct. 08, 2013

*Affirmed by*

124.  In re Settlement Facility Dow Corning Trust
574 Fed.Appx. 708 , 6th Cir.(Mich.) , July 31, 2014

125.  In re Dow Corning Corp.
2011 WL 4537061 , E.D.Mich. , Sep. 30, 2011

126. In re Settlement Facility Dow Corning Trust
517 Fed.Appx. 368 , 6th Cir.(Mich.) , Mar. 08, 2013 , as amended ( Apr 18, 2013 )

127. In re Dow Corning Corp.
531 Fed.Appx. 563 , 6th Cir.(Mich.) , July 29, 2013

128. In re Settlement Facility Dow Corning Trust
2013 WL 6884990 , E.D.Mich. , Dec. 31, 2013

*Stay Denied by*

129. In re Settlement Facility Dow Corning Trust
2014 WL 764611 , E.D.Mich. , Feb. 25, 2014

*AND Stay Denied by*

130. In re Settlement Facility Dow Corning Trust
2014 WL 4824822 , 6th Cir. , Mar. 31, 2014

*AND Reversed in Part by*

131. In re Settlement Facility Dow Corning Trust
592 Fed.Appx. 473 , 6th Cir.(Mich.) , Jan. 27, 2015

132. In re Dow Corning Corp.
--- F.3d ---- , 6th Cir.(Mich.) , Feb. 20, 2015

2013 WL 3336874
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

Liaquat Ali KHAN, Appellant
v.
Nizarali MEKNOJIYA, Appellee.

No. 03–11–00580–CV. | June 28, 2013.

From the District Court of Travis County, 200th Judicial District, No. D–1–GN–08–001931; Lora J. Livingston, Judge Presiding.

**Attorneys and Law Firms**

D. Todd Smith, Smith Law Group, P.C., Austin, TX, for Liaquat Ali Khan.

Timothy J. Herman, Howry Breen & Herman, L.L.P., Austin, TX, for Nizarali Meknojiya.

Before Chief Justice JONES, Justices GOODWIN and FIELD.

*MEMORANDUM OPINION*

SCOTT K. FIELD, Justice.

 **\*1** Landlord Liaquat Ali Khan sued tenant Nizarali Meknojiya for breach of the parties' commercial lease. In the suit, Khan sought damages pursuant to the lease's holdover provision, contending that Meknojiya became a holdover tenant as a result of Khan's termination of the lease. Meknojiya moved for summary judgment on the sole ground that Khan's recovery under the holdover provision is barred as a matter of law because it represents an unenforceable penalty in the form of "double-rent." The trial court granted partial summary judgment in favor of Meknojiya, and following a bench trial only on attorney's fees, the court rendered a final judgment that Khan take nothing on his claims and that Meknojiya recover attorney's fees. Because we conclude that the holdover provision is not an unenforceable penalty, we reverse the trial court's judgment and remand the case for further proceedings.

## BACKGROUND

Khan owns commercial property located in Austin, Texas. In 1996, Khan and Meknojiya entered into a written lease agreement, and Meknojiya began operating a convenience store on the leased premises. The parties renegotiated their lease ("the lease") in March 2002. The renegotiated lease required Meknojiya to pay $4,500 per month in "base rent" and included the following paragraph, which the parties refer to as a "holdover provision":

> 2.07 *Holding Over.*If Tenant does not vacate the Leased Premises upon the expiration or earlier termination of the Lease, Tenant shall be a tenant at sufferance for the holdover period and all of the terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord (in addition to additional rent payable under this Lease and any other sums payable under this Lease) as base rental for the period of such holdover an amount equal to two times the base rent which would have been payable by Tenant had the holdover period been a part of the original terms of the Lease (without waiver of Landlord's right to recover damages as permitted by law).

According to Khan, Meknojiya committed a series of breaches following execution of the 2002 lease. For instance, Khan contends that Meknojiya (1) failed to obtain or renew required insurance, (2) failed to provide the required insurance documentation, and (3) permitted a corporation owned by other individuals to operate the convenience store without obtaining Khan's prior written consent. Khan notified Meknojiya in writing, through counsel, that Meknojiya was in default of the lease and that Khan was exercising his option to terminate the lease effective May 1, 2002. Nevertheless, despite additional notices of default, Meknojiya continued to occupy the premises and to pay $4,500 per month until January 2, 2007, the date the lease was set to have expired by its own terms.

Khan subsequently sued Meknojiya for breach of the lease, asserting that upon Meknojiya's breach of the lease and Khan's notification that the lease was terminated, Meknojiya occupied the property as a tenant at sufferance. *See ICM Mortg. Corp. v. Jacob,* 902 S.W.2d 527, 530 (Tex.App.-El Paso 1994, writ denied) (citing Restatement (First) of Property § 22 (1936)) ("A tenant at sufferance is a person who has been in lawful possession of property but who wrongfully remains as a holdover after his right to possession has expired."). Khan sought damages in an amount equal to the difference that Meknojiya actually paid during the alleged holdover period and the amount that Meknojiya was required to pay for the same time period under paragraph 2.07.

**\*2** Khan moved for partial summary judgment, asserting that he conclusively established all elements of his claim for breach of the lease. [1] Meknojiya filed a response and subsequently moved for summary judgment asserting that Khan's recovery was barred as a matter of law because the double-rent rate under paragraph 2.07 constitutes an unenforceable penalty. After conducting a hearing, the trial court granted Meknojiya's motion for summary judgment but denied Khan's motion. Following a bench trial on Meknojiya's remaining counterclaim for attorney's fees, the trial court rendered a final judgment incorporating the trial court's order granting summary judgment in favor of Meknojiya and ordering Khan to pay $60,191.71 in attorney's fees. [2] In three issues on appeal, Khan argues that the trial court erred in granting summary judgment in favor of Meknojiya and consequently, in awarding Meknojiya attorney's fees as the prevailing party.

## STANDARD OF REVIEW

We review a trial court's ruling on summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). A moving party is entitled to summary judgment if (1) there are no genuine issues of material fact and (2) the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). A party who moves for traditional summary judgment on another party's claim is entitled to summary judgment when he negates at least one essential element of that claim or conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). When reviewing the trial court's summary judgment ruling, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.*Valence Operating Co.,* 164 S.W.3d at 661.

In part, Khan's arguments on appeal raise matters of contract construction. In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam). We consider the agreement as a whole and attempt to harmonize and give effect to all provisions of the contract. *Id.* If the contract language can be given a certain or definite legal meaning, then the language is not ambiguous, and this Court will construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex.2005) (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)).

## DISCUSSION

Meknojiya moved for traditional summary judgment on the sole ground that the lease's holdover provision, calling for double rent, is an unenforceable liquidated-damages provision, i.e. a penalty.

This assertion by Meknojiya is an affirmative defense that he had the burden of pleading and proving. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). As a result, to be entitled to summary judgment, Meknojiya had to conclusively establish every element of this defense. *See Ryland Grp., Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam).

**\*3** "The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained."*Phillips,* 820 S.W.2d at 788. Accordingly, a liquidated-damages provision is not enforceable if, in effect, it is a penalty. *See id.*("Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide."). A liquidated-damages provision is enforceable only if a court finds that (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation.*Id.* Whether a liquidated-damages provision is an unenforceable penalty is a question of law for the court, although sometimes factual issues must be resolved before the court can decide the legal question. *Id.*

In his first and second issues on appeal, Khan argues that the trial court erred in granting Meknojiya's summary-judgment motion because Meknojiya failed to conclusively establish the essential elements of his affirmative defense of penalty. Specifically, Khan argues that, as a matter of law, paragraph 2.07 is not an unenforceable penalty provision because it is not a liquidated-damages provision at all. Instead, according to Khan, paragraph 2.07 simply sets forth the parties' agreed rental rate for any holdover period. Based on the unambiguous language of the lease, we agree.

Whether a contract term is a liquidated-damages provision is a question of law for the court. *Valence Operating Co.,* 164 S.W.3d. at 644. "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach."*Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex.2005). Here, paragraph 2.07 sets an agreed-upon rental rate for situations in which the tenant has failed to surrender the leased premises upon expiration of the lease term or earlier termination by one of the parties. The provision itself describes the amount due during the holdover period as "base rental for the period of such holdover."Further, paragraph 2.07 states that payment of such rental amounts do not waive the landlord's right to recover "damages as permitted by law." In other words, based on the plain language of the lease, there is no indication that the parties intended the amounts owed under paragraph 2.07 as a means of forecasting damages in the event of a breach. And, while rent under paragraph 2.07 may, in certain circumstances, form the basis of measuring damages, it does not independently set a damages amount or attempt to calculate damages. Simply put, any amount owed under paragraph 2.07 does not equate to a stipulated measure of damages; rather, it is an agreed-upon rental amount that is due under particular circumstances.

Our conclusion that paragraph 2.07 of the lease is not a liquidated-damages provision, and therefore is not a penalty, is consistent with that of our sister court of appeals in Dallas in analyzing whether a similar clause operated as a penalty provision. *See Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P.,* 255 S.W.3d 807 (Tex.App.-Dallas 2008, no pet.). In *Meridien Hotels,* the landlord leased hotel space to the tenant under a lease that required the tenant to pay 1.5 times the base rental amount if the tenant remained in the space upon termination of the lease by one of the parties or the lease term's expiration. [3] *Id.* at 822.The landlord sent the tenant a notice of termination of the lease, but the tenant remained in the hotel space anyway. *Id.* at 814.The landlord eventually sued the tenant, seeking multiple types and amounts of damages, including $2,130,136 in holdover rent, plus prejudgment interest, all of which the trial court awarded. *Id.*

 **\*4** The tenant appealed, claiming that the holdover rent provision was an unlawful penalty and that, as a result, the trial court erred in awarding pre-judgment interest on that amount. *Id.* at 822.Concluding that the holdover rental rate did not constitute a penalty, the court of appeals concluded that the provision "does not punish appellants; it instead requires that if appellants make the decision to hold over beyond the term of the lease, they must pay a higher rate for doing so. Appellants were on notice that [the landlord] considered the lease terminated, yet they chose to stay, having agreed in the lease to pay 1.5 times the usual rent for doing so."*Id.*

Likewise, in this case, paragraph 2.07 of the parties' lease agreement sets out in advance the rent to be paid should the tenant choose to remain on the premises after one of the parties terminates the lease or the lease expires by its own terms, creating a tenancy at sufferance. Upon expiration or termination of the lease, the tenant must decide whether to (1) leave the leased premises (assuming he is not forcibly removed) or (2) hold over under the lease as a tenant at sufferance and pay additional rent at the agreed holdover rate. Such additional rent is not a penalty; in fact, it does not represent liquidated damages at all. Rather, the additional rent is the agreed-to, bargained-for amount of rent due and owing in the event of a holdover. [4]

Because paragraph 2.07 of the parties' lease agreement is not a liquidated-damages provision, it cannot be an unenforceable penalty, as a matter of law. We therefore conclude that the trial court erred in granting summary judgment in favor of Meknojiya on this ground. In addition, because Meknojiya should not have prevailed on summary judgment, it follows that he was not entitled to attorney's fees. We sustain appellant's first and second issues on appeal. [5]

## CONCLUSION

Because we conclude that the trial court erred in granting summary judgment, we reverse the trial court's judgment and award of attorney's fees in favor of Meknojiya. We remand the case to the trial court for further proceedings consistent with this opinion.

## Footnotes

1     Khan also asked the trial court to render summary judgment that he was entitled to attorney's fees, but to reserve judgment on the amount of fees for a separate hearing.

2     Paragraph 13.03 of the lease states:

> *Attorney's Fees.*The prevailing party in any legal proceeding brought under or with a relation to this agreement shall be entitled to recover form the non-prevailing party, their reasonable attorney['s] fees, court costs and expenses, including but not limited to travel and witness costs.

3     Specifically, the lease at issue in *Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.,* contained the following provision:

> Any holding over by Tenant after the expiration or sooner termination of this Agreement shall be treated as a daily tenancy at sufferance at a rate equal to one and one-half (1.5) times the Rent and other charges herein provided (prorated on a daily basis).
>
> 255 S.W.3d 807, 822 (Tex.App.-Dallas 2008, no pet.)

4     Meknojiya relies on *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991), for the proposition that a contractual provision in which one party agrees to pay the other some multiple of damages is an unenforceable penalty. *Phillips* is a classic illustration of a liquidated-damages provision that constitutes an unlawful penalty. In the midst of divorce proceedings, a husband and wife agreed to create a limited partnership rather than divide their substantial assets. *Id.* at 786–87.The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust."*Id.* at 787.In other words, once actual damages were established for breach of the parties' contract, they would be multiplied by ten to reach the damages award. *Id.* at 789.The supreme court held that this provision was an unenforceable penalty provision, rather than an enforceable liquidated damages provision. *Id.*

> Meknojiya's reliance on *Phillips* in this case is misplaced. First, unlike paragraph 2.07, the provision at issue in *Phillips* was undisputedly a liquidated-damages provision. As previously discussed, paragraph 2.07 is not a liquidated-damages provision at all, but instead is a rental amount that is triggered if and when the lease expires or is terminated. Second, the liquidated-damages provision at issue in *Phillips* was an unenforceable penalty on its face because the amount awarded by the provision was computed by multiplying actual damages (once established).*See id.* at 789.Here, paragraph 2.07 does not require a separate determination of damages or the application of any multiplier to that amount. Thus, even if we were to conclude that paragraph 2.07 is a liquidated-damages provision, unlike the court in *Phillips* we could not conclude that it constitutes a penalty on its face.

5     In his third issue on appeal, Khan argues that, even if the double-rent rate set forth in paragraph 2.07 represents liquidated damages, Meknojiya failed to satisfy his burden to establish that it is an unenforceable penalty. Having sustained Khan's first and second issues on appeal, we do not address this issue. *See*Tex.R.App. P. 47.1.

---

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

## Direct History (4)

🚩 1. Khan v. Meknojiya
2011 WL 11671835 , Tex.Dist. , May 11, 2011

*Reversed and Remanded by*

2. Khan v. Meknojiya 👓
2013 WL 3336874 , Tex.App.-Austin , June 28, 2013

---

🚩 3. Khan v. Meknojiya
2011 WL 11671836 , Tex.Dist. , Aug. 10, 2011

*Reversed and Remanded by*

4. Khan v. Meknojiya 👓
2013 WL 3336874 , Tex.App.-Austin , June 28, 2013

409 S.W.3d 673
Court of Appeals of Texas,
Houston (1st Dist.).

Albert E. MAGILL and Jennifer T. Magill, Appellants

v.

William Hugh WATSON, Jr., as Trustee of the William Watson, Jr. Trust–
Non–Exempt and Robin Watson Livesay and James J. Livesay, Co–
Trustees of the Robin Watson Livesay Trust–Non–Exempt, Appellees.

No. 01–12–00051–CV. | July 9, 2013.

**Synopsis**
**Background:** Assignees of estate's interest in earnest money contract sued purchasers for breach of contract. After jury trial, the 151st District Court, Harris County, Michael Engelhart, J., awarded seller earnest money and liquidated damages as provided in contract. Purchasers appealed.

**Holdings:** The Court of Appeals, Sherry Radack, C.J., held that:

[1] cause of action existed and was capable of assignment;

[2] liquidated damages clause of contract was unlawful penalty; but

[3] evidence was sufficient to supported jury's finding that purchasers breached contract.

Affirmed in part, reversed in part, and rendered in part.

**Attorneys and Law Firms**

**\*676** Jay W. Dale, Donald J. Larkin, Houston, TX, for Appellants.

Robert G. Bailey, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

**OPINION**

SHERRY RADACK, Chief Justice.

After a jury trial on a seller's claim arising out of the breach of an earnest money contract, the trial court signed a judgment awarding the seller of real property the earnest money, plus liquidated damages in an amount equal to three times the earnest money, as provided in the contract, and attorney's fees, interest, and costs. On appeal, the buyer (1) challenges the plaintiffs' standing to bring the suit, (2) contends that the liquidated damages clause of the contract is an unenforceable penalty, and (3) argues that the evidence that the buyer breached the contract is insufficient to support the trial court's judgment. We affirm in part and reverse and render in part.

**BACKGROUND**

Albert and Jennifer Magill entered into a contract to purchase residential real estate from the Estate of William H. Watson, Sr. ("the Estate"). The original closing date of the contract was November 25, 2008, and, by amendment, was extended by agreement of the parties until January 25, 2009. The Magills deposited $8,000 in earnest money with the title company in connection with the contract and amendment.

The contract provided that the "Buyer may object in writing to defects, exceptions, or encumbrances to title ... which prohibit the following use or activity: Construction of a new, single family residential home to be two stories containing approximately 5,000 square feet."

The garage on the house that the Magills wished to build encroached on the rear set back line of the property, and the Magills were unable to obtain a variance from the homeowner's association to allow the construction of the garage as planned. On January 23, 2009, two days before the closing date, the Magills terminated the contract. The escrow agent sent two forms authorizing release of the earnest money; one form released the earnest money to the Magills and one form released the earnest money to the Estate. The Magills signed the form authorizing the release of the earnest money to themselves.

After obtaining an assignment from the Estate on January 27, 2009, the trustees of the William Hugh Watson, Jr. Trust–Non–Exempt and the Robin Watson Livesay Trust–Non–Exempt, filed suit against the Magills on August 26, 2009, alleging breach of the contract. On June 29, 2009, the trustees sent the Magills a letter demanding that they execute a release of the earnest money. The Magills did not do so. The trustees filed suit against the Magills on August 26, 2009, alleging

that they had breached the contract and seeking recovery of the earnest money, plus three times the amount of the earnest money, based on the following contractual provisions:

> 15. DEFAULT: If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages ....

> 18.D. DAMAGES: Any party who wrongfully fails or refuses to sign a release **\*677** acceptable to the escrow agent ... will be liable to the other party for liquidated damages in an amount equal to the sum of (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.

The case was tried to a jury, which found that the Magills had breached the contract. Thereafter, the trial court entered a final judgment awarding the trustees $32,000.00, which represents the earnest money and liquidated damages in an amount of three times the earnest money, plus attorney's fees, interest, and costs.

## STANDING

On January 27, 2009, before suit was filed by the Estate, the Estate executed the following assignment to the trusts:

> For and in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Estate of William H. Watson, Sr., Deceased (the "Estate") does hereby bargain, sell, transfer and convey to the Williams Watson, Jr. Trust—Non–Exempt and the Robin Watson Livesay Trust—Non–Exempt, in equal, undivided shares, (a) all of the right, title and interest of the Estate in, to and under that certain One to Four Family Residential Contract (Resale) (the "Contract" between the Estate, as Seller, and Albert E. Magill and Jennifer T. Magill (collectively, the "Magills")), as Buyer dated effective August 25, 2008, and (b) all claims and causes of action of the Estate against the Magills pertaining in any way to the Contract and defenses of the Estate to any claims of the Magills pertaining in any way to the contract.

In their first issue, the Magills contend that appellees Watson and Livesay, as trustees of the William Watson, Jr. Trust and the Robin Watson Livesay Trust, did not have standing to bring a breach-of-contract claim against them. Specifically, the Magills argues that "the estate's assignment to appellees of the estate's causes of action against appellants is void when no cause of

action is filed by the estate or is pending at time of the assignment[.]" The Magills further argue that, absent a valid assignment, only the executor of the estate has standing to bring the suit.

 **[1]**    **[2]**    **[3]**    Standing is a component of subject-matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445–46 (Tex.1993). A plaintiff has standing to sue when it is personally aggrieved by the alleged wrong. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex.1996). A plaintiff may also have standing by assignment of a cause of action. *See State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 706 (Tex.1996). A claim may be assigned except when such an assignment is invalid as against public policy. *Id.* at 707.

 **[4]**    **[5]**    **[6]**    **[7]**    **[8]**    The five instances in which assigned causes action are void as against public police are as follows: (1) The assignment of an interest in an estate is void if used to contest a will. *Trevino v. Turcotte,* 564 S.W.2d 682, 690 (Tex.1978); (2) The assignment of plaintiff's claim to a tortfeasor in settlement is void when tortfeasor asserts the claim against a joint tortfeasor. *Int'l Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988); (3) "Mary Carter" agreements are void. *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992); (4) The assignment of a defendant's claims against his insurer to the plaintiff is void under certain circumstances. *Gandy,* 925 S.W.2d at 705; and (5) The assignment of client's legal malpractice claim arising out of litigation is **\*678** void. *Zuniga v. Groce, Locke, & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.-San Antonio 1994, writ ref'd). The Magills do not contend that the assignment in this case falls within one of these prohibited categories.

 **[9]**    To recover on an assigned cause of action, the party claiming the assigned rights must prove (1) a cause of action existed that was capable of assignment and (2) the cause was in fact assigned to the party seeking recovery. *Ceramic Tile Int'l Inc. v. Balusek,* 137 S.W.3d 722, 724 (Tex.App.-San Antonio 2004, no pet.); *Delaney v. Davis,* 81 S.W.3d 445, 448–49 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Texas Farmers Ins. Co. v. Gerdes, By and Through Griffin Chiropractic Clinic,* 880 S.W.2d 215, 217 (Tex.App.-Fort Worth 1994, writ denied).

 **[10]**    The Magills argue that there was no cause of action that existed and was capable of assignment because no lawsuit had yet been filed. In support, the Magills rely on section 12.014 of the Property Code, which provides:

> (a) A judgment or a part of a judgment of a court of record or an interest in a cause of action on which suit has been filed may be sold, regardless of whether the judgment or cause of action is assignable in law or equity, if the transfer is in writing.

> (b) A transfer under this section may be filed with the papers of the suit if the transfer is acknowledged or sworn to in the form and manner required by law for acknowledgement or swearing of deeds.

(c) If a transfer of a judgment is filed, the clerk shall record the transfer appropriately. If a transfer of a cause of action in which a judgment has not been rendered is filed, the clerk shall note and briefly state the substance of the transfer on the court docket at the place where the suit is entered.

(d) A transfer filed under this section is notice to and is binding on a person subsequently dealing with the judgment or cause of action.

TEX. PROP.CODE ANN. § 12.014 (Vernon 2004).

 **[11]**   However, the purpose of the statute is to give parties dealing with a cause of action notice that it has been assigned and is not intended to affect the validity of any sale of a cause of action. *See Mallios v. Baker,* 11 S.W.3d 157, 171 (Tex.2000) (J. Hecht, concurring) (citing *Mitchell, Gartner & Thompson v. Young,* 135 S.W.2d 308, 311 (Tex.Civ.App.-Fort Worth 1939, writ ref'd)). Section 12.014 was not intended thereby to prevent the acquisition of title to a judgment, cause of action, or an interest therein, either legal or equitable, in any other lawful manner. *HSBC Bank USA, N.A. v. Watson,* 377 S.W.3d 766, 776 (Tex.App.-Dallas 2012, pet. filed.) (citing *Hunter v. B.E. Porter, Inc.,* 81 S.W.2d 774, 775 (Tex.Civ.App.-Dallas 1935, no writ); *Sw. Bell Tel. Co. v. Mktg. on Hold, Inc.,* 170 S.W.3d 814, 824–25 (Tex.App.-Corpus Christi 2005), rev'd on other grounds, 308 S.W.3d 909 (Tex.2010) (holding "nothing in [section 12.014] precludes or invalidates the assignments at issue in this matter simply because they were made prior to the filing of suit")). Therefore, we conclude that section 12.014 has no bearing on the validity of the Estate's assignment to the trusts.

The Magills also rely on *Briargrove Shopping Center Joint Venture v. Vilar, Inc.,* 647 S.W.2d 329, 337–38 (Tex.App.-Houston [1st Dist.] 1982, no writ) for the proposition that a suit affecting the assignor's rights must be pending at the time an assignment is executed. However, that language in *Briargrove* is dicta because in that case it was undisputed that a suit had **\*679** been filed before the assignment. *Id.* Furthermore, the case that *Briargrove* cites as authority involves the assignability of a wrongful death cause of action under the terms wrongful death statute at the time, thus is distinguishable. *See Lowe v. Emp'rs Cas. Co.,* 479 S.W.2d 383, 389–90 (Tex.Civ.App.-Fort Worth 1972, no writ).

 **[12]**    **[13]**   The Magill's position is based on the false premise that a "cause of action" applies only to claims that have already been filed in court. At common law, a "cause of action" ordinarily consists of two distinct and separate elements, the primary right and duty of the parties respectively and the wrongful act or omission violating it. *Mercantile Bank & Trust Co. v. Schuhart,* 115 Tex. 114, 277 S.W. 621, 623–24 (Tex.Com.App.1925). A "cause of action" has also been said to consist of those facts entitling one to institute and maintain an action at law or in equity. *A.H. Belo Corp. v. Blanton,* 133 Tex. 391, 396, 129 S.W.2d 619, 621 (1939); *F.D.I.C v. Bodin Concrete Co.,* 869

S.W.2d 372, 378 (Tex.App.-Dallas 1993, writ denied). Thus, a "cause of action" encompasses every essential fact that a plaintiff must prove to obtain a judgment. *F.D.I.C.,* 869 S.W.2d at 378. Thus, by definition, a cause of action may exist before a suit is instituted.

 **[14]**    Therefore, we hold that the fact that the Estate had not filed suit before it assigned its cause of action to the trusts is not a ground for concluding that the trustees lack standing. And, to the extent that the Magills are complaining that the trustees pleadings did not set forth the basis for their interest in the petition, we note that the Magills did not specially except to the petition on that ground, thus the issue is waived. TEX.R. CIV. P. 90.

Accordingly, we overrule issue one.

## LIQUIDATED DAMAGES

In issue two, the Magills contend that the following liquidated damage provision is unenforceable because it is an illegal penalty. The contract provided as follows:

> 18.D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent ... ***will be liable to the other party for liquidated damages in an amount equal to the sum of (i) three times the amount of the earnest money,*** (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit. (Emphasis added).

 **[15]    [16]    [17]    [18]**    We enforce a liquidated damages clause if (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). An assertion that a liquidated damages provision constitutes an unenforceable penalty is an affirmative defense, and the party asserting penalty bears the burden of proof. *Urban Television Network Corp. v. Liquidity Solutions,* 277 S.W.3d 917, 919 (Tex.App.-Dallas 2009, no pet.); *Fluid Concepts, Inc. v. DA Apts., LP,* 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005, no pet.). Generally, that party must prove the amount of actual damages, if any, to demonstrate that "the actual loss was not an approximation of the stipulated sum." *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ). If the amount stipulated in the liquidated damages clause is "shown to be disproportionate to actual damages," we should declare that the clause is a penalty and limit recovery to actual damages. *Johnson Eng'rs, Inc. v. Tri–Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.-Texarkana 1979, no writ); *see also* TEX. BUS. & COM.CODE ANN. § 2.718(a) (Vernon 2009)  **\*680**  ("A term fixing unreasonably large liquidated damages is void as a penalty."). Whether a liquidated damages clause is an unenforceable penalty is a question of law for the court, but sometimes factual issues must be resolved before the court can decide the legal

question. *See Phillips,* 820 S.W.2d at 788. For example, in *Phillips,* the Texas Supreme Court observed that "to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Id.*

The Magills, relying on *Phillips,* 820 S.W.2d at 788, contend that the liquidated damage provision is void on its face and no further evidence of the actual damages was required. We agree.

In *Phillips,* a partnership agreement contained the following liquidated damage provision in the event of a breach of trust by the general partner to the limited partner: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust." *Id.* at 787. The supreme court granted an application for writ of error "to decide whether a contractual provision that requires payment of a multiple of actual damages for breach of trust is an unenforceable penalty[,]" and held as follows:

> The enforceability of the contractual provision in this case involves no fact issues. A contractual provision like the one here by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision. It cannot meet the first prong of the test because the harm caused by the breach of the contract is not incapable or difficult of estimation. The provision assumes actual damages can and will be determined, indeed must be determined, before the prescribed multiplier can be applied. The provision cannot meet the second prong of test because, instead of attempting to forecast actual damages, it calls for them to be determined and then multiplied. A contractual provision like the one in this case is thus, on its face, an unenforceable penalty.

*Id.* at 789 (internal citations omitted).

 **[19]**    Here, the breach triggering the liquidated damage provision is the "wrongful[ ] fail[ure] or refus[al] to sign a release acceptable to the escrow agent." However, the liquidated damage provision makes no attempt to quantify the actual damages that would be caused by a failure to release the earnest money. Instead, the provision merely assumes that the earnest money, which the parties have agreed will constitute actual damages for breach of the agreement in general, should be trebled and added to the earnest money in the event that the obligation to release the earnest money is breached.

The trustees argue that "it is only natural that the liquidated damages for which paragraph 18.d provides would be greater than [the earnest money] for which paragraph 15 provides, for the party entitled to the earnest money is forced to go through additional hoops it would not otherwise have had to go through to ultimately obtain a recovery." However, the damages suffered as a result of

going through such "additional hoops," i.e., attorney's fees, interest, and costs, are already elements of damages that can be recovered in a suit to obtain the earnest money. Likewise, the $80,000 the trustees claim that they suffered as a result of selling the property at a lower purchase price is not damage caused by the failure to release the earnest **\*681** money, but by the failure to close on the real estate transaction.

Thus, we conclude that, because the contract provision simply takes the value of the earnest money, which the parties have agreed represents the actual damages caused by the breach of the agreement, and multiplies it times three if there is an additional breach of the obligation to turn over the earnest money, the provision is an unlawful penalty and does not attempt to forecast actual damages. This conclusion is supported by the comment promulgated by the Texas Real Estate Commission when it drafted the form upon which the clause is based, wherein the Commission stated that the purpose of the clause was to "provide for additional incentives for prompt release of the earnest money." 31 Tex. Reg. 1446, Comment on Amendment to 22 TEX. ADMIN. CODE § 537.28 (2008) (Tex. Real Estate Comm'n) (Standard Contract Form TREC No. 20–7).

We are not holding, however, that a contract can never provide liquidated damages for the failure to release earnest money. We hold only that the clause in this case, on its face, did not attempt to reasonably forecast a just compensation for a breach of the agreement to release the earnest money.

Accordingly, we sustain issue two.

## SUFFICIENCY OF THE EVIDENCE

In issue three, the Magills contend the trial court erred in denying their motion for directed verdict because there was no evidence that they wrongfully failed or refused to sign a release of the earnest money.

**[20]** **[21]** **[22]** A complaint about the denial of a motion for directed verdict is the same as a challenge to the legal sufficiency of the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). Under this standard, we must view the evidence and inferences in the light most favorable to the jury's findings. *Id.* When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). Such a challenge will be sustained only when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital

fact. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *see also City of Keller,* 168 S.W.3d at 810.

 **[23]** We have already held that recovery of treble the amount of the earnest money was unenforceable, thus the issue of whether there is sufficient evidence that the Magills wrongfully failed or refused to release the earnest money is irrelevant. However, to the extent that the Magills are also contesting the jury's finding them liable for breaching the agreement, we note that there is evidence that the Magills could have built a 5000 square foot house on the lot, but chose instead to terminate the contract because they could not get a variance to permit them to build their garage so that it encroached on the setback. Thus, the evidence is legally sufficient to support the jury's finding that the Magill's breached the agreement, thus giving rise to damages in the amount of the earnest money.

We overrule issue three.

## CONCLUSION

Because section 18.D of the contract imposed an unlawful penalty, the trial court **\*682** erred by awarding three times the earnest money, in addition to the earnest money, plus attorney's fees, interest, and costs. However, the evidence is legally sufficient to support an award of liquidated damages in the amount of the earnest money, plus attorney's fees, interest, and costs. Therefore, we reverse the judgment awarding the trustees "actual damages of $32,000.00, together with interest thereon at the rate of 6% per annum" and render judgment awarding the trustees "actual damages of $8,000.00, together with interest thereon at the rate of 6% per annum." We affirm the remaining portions of the judgment.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (5)

### Direct History (2)

⚑ 1.  Watson v. Magill

2011 WL 10961468 , Tex.Dist. , Oct. 17, 2011

*Judgment Affirmed in Part, Reversed in Part by*

2.  Magill v. Watson 👓

409 S.W.3d 673 , Tex.App.-Hous. (1 Dist.) , July 09, 2013

### Related References (3)

3.  Watson v. Magill

2010 WL 9554900 , Tex.Dist. , June 18, 2010

4.  Watson v. Magill

2010 WL 9554899 , Tex.Dist. , Oct. 25, 2010

5.  Watson v. Magill

2011 WL 10961469 , Tex.Dist. , Sep. 09, 2011

575 S.W.2d 571
Court of Civil Appeals of Texas, Dallas.

Cecil W. MAYFIELD, David Hughes, Margaret H.
O'Neal and John Robert Trimmier, Appellants,
v.
Dave HICKS and Dave Hicks Company, Inc., Appellees.

No. 19540. | Oct. 24, 1978. | Rehearing Denied Nov. 28, 1978.

Suit was instituted to recover against guarantors of two equipment leases. The 134th District Court, Dallas County, Joe B. Burnett, J., instructed a verdict in favor of plaintiffs, and defendants appealed. The Court of Civil Appeals, Akin, J., held that: (1) provision in equipment leases entitling lessor to repossess equipment and sue for unpaid rentals was an unenforceable penalty rather than a liquidated damage provision and, hence, was not a basis for determining actual damages since, upon occurrence of even a minor default, lessor could declare lessee in default, take possession of equipment and, in addition, demand payment of all lease payments called for in lease, and (2) summaries of accounts relating to payment made to plaintiffs on equipment leases guaranteed by defendants and pertaining to certain payments made and credits due were inadmissible hearsay in absence of a showing that original records were voluminous or that defendants had had access to original underlying records.

Reversed and remanded.

**Attorneys and Law Firms**

 **\*573** Philip C. McGahey, Bagby, McGahey, Ross & DeVore, Arlington, for appellants.

Don R. Hanmer, Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, for appellees.

**Opinion**

AKIN, Justice.

This is an appeal from an instructed verdict rendered against the guarantors of two equipment leases. Dave Hicks Company sued Four C Corporation, the primary obligor, for amounts due under the first equipment lease agreement and sued Mayfield, Hughes, O'Neal and Trimmier, the guarantors, on a guaranty of Four C Corporation's obligations under this lease. Dave Hicks, individually, also sued Four C Corporation for the amounts due under a second equipment lease and sued the guarantors under the terms of a similar guaranty. Four C Corporation neither filed an

answer nor participated at trial. The trial judge, acting on the provisions of an alleged liquidated damage clause in each lease, granted a default judgment in favor of Dave Hicks Company against Four C Corporation for $289,401.08, plus $15,000 in attorneys' fees and also granted a default judgment in favor of Dave Hicks, individually, against Four C Corporation for $20,765.51 and attorneys' fees of $2,500. [1] Both plaintiffs were then granted an instructed verdict against the guarantors.

Only the guarantors appeal from the trial court's judgment asserting, among other grounds, certain defenses to the leases that go to the question of the liability of Four C **\*574** Corporation on the leases. In response, appellees argue that guarantor-appellants are collaterally estopped from asserting any defenses going to questions relating to the liability of the primary obligor, Four C, or to the extent of that liability, since the judgment against Four C is now final. Additionally, guarantor-appellants contend that the guaranties were ambiguous, that consideration for the guaranties had failed, that attorneys' fees were not recoverable under the guaranties, that all offsets and credits had not been allowed them, and that the liquidated damage provision of the lease was a penalty. With respect to the defenses to the leases, we hold that these guarantors are not collaterally estopped and, thus they may assert all defenses available to the primary obligor. We also hold that the "liquidated damage" provision of the lease is a penalty rather than a provision for just compensation. Accordingly, we reverse and remand so that appellees may prove their actual damages.

### *Collateral Estoppel*

 **[1]** **[2]** **[3]** **[4]** **[5]** **[6]** Appellees argue that the trial court properly instructed a verdict for the appellees because the liability of the primary obligor on the leases had been finally determined by the default judgments and that the appellants, as guarantors, are collaterally estopped from asserting any defenses to the liability of the primary obligor, Four C Corporation, under the leases. In this respect, they contend that since the judgment is final as to Four C, the rule applies that a judgment against the principal obligor conclusively establishes the extent of the principal's liability with respect to a guarantor, if that judgment is obtained in a suit of which the guarantor had full knowledge and an opportunity to defend, citing R. G. McClung Cotton Co. v. Cotton Concentration Co., 479 S.W.2d 733, 742 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.); Empire Steel Corp. v. Omni Steel Corp., 378 S.W.2d 905 (Tex.Civ.App.-Fort Worth 1964, writ ref'd n.r.e.); Latimer v. Texas & N. O. R. Co., 56 S.W.2d 933 (Tex.Civ.App.-Beaumont 1933, writ ref'd); Young v. Bank of Miami, 175 S.W. 1102 (Tex.Civ.App.-Amarillo 1915, writ ref'd). Although we agree with the principle asserted by appellees, it is not applicable to the facts in this case because the guarantors have not had an opportunity to defend which is a predicate to the application of collateral estoppel. 1 Freeman on Judgments s 447, at 978 (5th ed. 1925). Indeed, in the cases cited by appellees, those courts applied the rule where the primary obligor's liability had been established in an action where the guarantor had an opportunity to defend but either did not so do or did so unsuccessfully

as in Young v. Bank of Miami, supra, and subsequently attempted to attack that judgment in a later action by the obligee against the guarantor. It is only in this situation that courts have applied collateral estoppel. Here, the guarantors attempted to assert the defenses available to their principal in the trial court rather than consciously ignore the opportunity to present such defenses. There was no other opportunity to defend because there had been no prior action. Thus, the general rule that guarantors have the right to raise any defenses to the guaranteed obligation that the principal may have applies. Accordingly, we hold that where a guarantor has notice of the action against his principal and he takes part in the suit, he is not bound by the adjudication of the principal's liability by a default judgment against his principal in the same action. This is true because the guarantor may have had no authority to answer in the principal's behalf or to defend in the name of his principal. Indeed, before collateral estoppel applies, the opportunity to defend must be such that the guarantor can actually control the suit with respect to any defenses including those available to the primary obligor. U. S. Wire & Cable Corp. v. Ascher Corp., 34 N.J. 121, 167 A.2d 633, 637 (1961). Thus, where the guarantor is merely given notice that the primary obligor expects the guarantor "to assist" in the conduct of the defense, it is insufficient notice or control so as to preclude the guarantor from asserting the same defenses in a subsequent suit or in the same suit. 1 Freeman on Judgments s 449, at 984-85  **\*575**  (5th ed. 1925). Accordingly, we must now turn to all points of error asserted by appellants.

### *Liquidated Damages or Penalty*

 **[7]**   Appellants contend that the clauses in both leases which entitle the lessor to repossess the equipment and sue for unpaid rentals is an unenforceable penalty, and thus no basis for appellees' actual damages. The lessors argue, however, that the provision is a valid stipulation of liquidated damages, for which the lessee became liable upon default. We agree with appellants that the provision is a penalty rather than a liquidated damage provision and that the question of actual damages should be submitted to the jury. The provision in each lease provides:

> Upon the occurrence of an event of Default, and at any time thereafter, Lessor, in addition to any other rights and remedies he may have, Shall have the right to . . . Take possession of the Equipment, whereupon Lessee's right to use the same under and subject to the terms and provision of this Lease, and any other right or interest of Lessee to or in the Equipment shall absolutely cease, But such taking by Lessor shall not relieve Lessee of its obligations and liabilities hereunder . . . . If Lessor repossesses the Equipment, Lessor shall have the right, at his option, to lease the Equipment to any other party . . . or Lessor may sell the Equipment or salvage the valuable components thereof. In the event of any such leasing or sale, There shall be due from Lessee, and Lessee will immediately pay to Lessor, the difference between the amount of rentals to be received from any third person, or the purchase price at said sale, as the case may be, And the total unpaid rental

and other amounts to be paid herein, plus all costs and expenses of Lessor in repossessing, transporting, repairing, releasing, selling or otherwise handling the equipment. (Emphasis added)

The vice in this provision that makes it a penalty rather than a liquidated damage provision is that upon the occurrence of even a minor default by the lessee, the lessor may then declare the lessee in default, take possession of the equipment, and, in addition, demand payment of all lease payments called for in the lease. The coupling of repossession with acceleration of rent, irrespective of the type of breach, is the defect in this provision. It is immaterial that the actual breach was for nonpayment of rentals. A provision is a penalty if it provides for unreasonable payments for a minor breach. For example, the leases here provide that an event of default occurs if the lessee does not punctually perform any of the obligations contained in the leases and the leases obligate the lessee to keep the equipment in good appearance. Conceivably, if the lessee did not punctually keep the equipment in good appearance, then the lessor could declare the lessee to be in default. Such a minor breach could then lead to draconian penalties disproportionate to any actual damage that the lessors may suffer. In Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 487 (1952), the supreme court condemned a similar provision as a penalty because the lease provided the same reparation for breach of each and every covenant in the lease, thus violating the principle of just compensation. Consequently, that court concluded that the provision in that case to be a penalty rather than a provision for liquidated damages. Since the clause in our case subjects the lessee to the same reparation for the breach of any covenant, we likewise hold that the provision is a penalty rather than one for liquidated damages. United States Leasing Corp. v. Smith, 555 S.W.2d 766, 770 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.); Annot., 104 A.L.R. 132 (1936); 5 Williston on Contracts s 779 (3rd ed. 1961).

 **[8]**   Although appellees pleaded that the breach was for unpaid rentals, it does not save the provision from being a penalty because that question turns on whether the provision provides for reasonable compensation. Of course, it would be unreasonable to permit the lessor to repossess and to require the lessee or its guarantors to pay the entire rentals set forth in the lease for **\*576** any insignificant, technical breach. Thus, the question of whether the provision is a penalty or a liquidated damage clause is determined by the reasonableness of the provision with respect to just compensation. Since we have held this provision to be a penalty, it will not support the damages in the judgment instructed by the trial court. On remand the question of actual damages is one of proof to be determined by the jury.

 **[9]**   Nevertheless, appellees argue that the instructed verdict was proper because appellants failed to request proper special issues inquiring whether the liquidated damage clause was a penalty. We cannot agree because any jury issues pertaining to whether a contractual clause is enforceable as a liquidated damage provision or void as a penalty are immaterial since this determination is a

question of law for the trial court, rather than a jury question and must be viewed as of the time the contract was executed. Schepps v. American District Telegraph Co. of Texas, 286 S.W.2d 684, 690 (Tex.Civ.App.-Dallas 1955, no writ); Zucht v. Stewart Title Guaranty Co., 207 S.W.2d 414, 418 (Tex.Civ.App.-San Antonio 1947, writ dism'd ); Muller v. Light, 538 S.W.2d 487, 488 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.). Thus, appellees' contention lacks merit. Since we have held that the trial court erred in instructing a verdict, we turn now to other questions that may arise upon retrial.

### *Attorneys' Fees*

 **[10]**    Appellants contend next that the trial court erred in granting judgment against them for attorneys' fees under the guaranties. They assert that although the lease obligated Four C Corporation to pay attorneys' fees, since the guaranty agreement does not expressly provide for attorneys' fees, the guarantor is not liable for them, citing Miller v. Bush, 42 S.W.2d 156, 159 (Tex.Civ.App.-Waco 1931, writ ref'd). Miller is not, however, controlling because in that case the attorneys' fees were not allowed because neither the guaranty nor the obligation guaranteed provided for attorneys' fees. Consequently, that court applied the rule that guarantors are not liable for attorneys' fees, unless they are provided for in the contract guaranteed, or, if that contract is silent with respect to attorneys' fees, unless the guaranty so provides. In this case the contract guaranteed expressly provides for attorneys' fees and the guaranty agreement specifically binds the guarantor to pay all indebtedness incurred by the lessor by reason of the lessor's default. This, of course, includes attorneys' fees incurred in asserting the rights of the obligee. Since the lease agreements provide for attorneys' fees against the principal obligor, and since the guaranties cover any and all indebtedness that the primary obligor may owe, the attorneys' fees are included as a part of the guaranteed debt. Gubitosi v. Schoellkopf Products, Inc., 545 S.W.2d 528, 538 (Tex.Civ.App.-Tyler 1976, no writ); Young v. J. F. Zimmerman & Son, Inc., 434 S.W.2d 926, 927 (Tex.Civ.App.-Waco 1968, writ dism'd); McGhee v. Wynnewood State Bank, 297 S.W.2d 876, 884 (Tex.Civ.App.-Dallas 1957, writ ref'd n.r.e.). Accordingly, we hold that trial court properly concluded that attorneys' fees were recoverable from the guarantors.

### *Interest*

 **[11]**    Additionally, appellants complain of the refusal of the trial court to admit evidence showing that certain sums allegedly guaranteed by appellants Wharton and Mayfield were interest, and, therefore, not within the guaranty. In this respect, they contend that, as a matter of law, these guarantors cannot be made liable for interest. We cannot agree. Since the lease provides for interest and since that is the contract guaranteed, the trial court properly permitted recovery of interest on the same rationale as that of attorneys' fees, discussed Supra.

### *Admission of Summaries*

**[12]**   Appellants next argue that the trial court erred in admitting into evidence certain appellees' exhibits which were summaries of accounts relating to payment **\*577** made to appellees on the leases and pertain to certain payments made and credits due. They assert that these summaries were hearsay since the proper predicate for their admission into evidence under Tex.Rev.Civ.Stat.Ann. art. 3737e (Vernon Supp.1978) was not laid. We agree because it was not shown that the original records were voluminous or that appellants had had access to the original underlying records. Black Lake Pipe Line Co. v. Union Construction Co., 538 S.W.2d 80, 93-94 (Tex.1976); Hanson Southwest Corp. v. Dal-Mac Construction Co., 554 S.W.2d 712, 723 (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.).

### *Consideration*

**[13]**   Appellants also assert that the instructed verdict was improper because there were issues raised by the evidence as to whether the guaranty agreements were supported by consideration. In this respect, they contend that they presented evidence that the guarantors were to receive stock or stock options in Four C Corporation as consideration for acting as guarantors and that since the guarantors failed to receive this stock, there was no consideration for the execution of the guaranties. Whether appellants failed to receive stock from the primary obligor is immaterial. Rather, our question is whether consideration exists between the plaintiffs and the guarantors. In this respect sufficient consideration exists if the primary obligor receives some benefit. Bonner Oil Co. v. Gaines, 108 Tex. 232, 191 S.W. 552 (1917); Hargis v. Radio Corp. of America, Electronic Components, 539 S.W.2d 230, 232 (Tex.Civ.App.-Austin 1976, no writ); Estes v. Oilfield Salvage Co., 284 S.W.2d 201, 204 (Tex.Civ.App.-Dallas 1955, no writ). Here it is undisputed that the equipment covered by both of these leases was delivered to Four C in reliance on the guaranties and that the primary obligor received the benefit of its bargain. We conclude, therefore, that this contention is without merit.

**[14]**   Appellants next contend that since the guaranties were executed after the leases, the consideration for the leases cannot also serve as consideration for the guaranties. We cannot agree. Before addressing the merits of this contention, we first note that all written contracts are presumed to be supported by consideration. Tex.Rev.Civ.Stat.Ann. art. 27 (Vernon 1969); Unthank v. Rippstein, 386 S.W.2d 134, 138 (Tex.1964); Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396 (Tex.Civ.App.-Dallas 1977, no writ); Waters v. Waters, 498 S.W.2d 236, 240-41 (Tex.Civ.App.-Tyler 1973, writ ref'd n.r.e.). Thus the guaranties themselves import

consideration and the burden is on appellants to show lack of consideration. Maykus, Supra, at 398. This appellants have failed to do.

 **[15]** **[16]** Finally, appellants urge that since there were questions of fact as to whether the lease agreements and guaranties were executed several months apart, consideration for the leases cannot serve as consideration for the guaranties. One guaranty shows that it was executed six days after the lease; however, the date on the other guaranty was identical to the date of the lease. Some testimony was to the effect that some of the guarantors actually signed the guaranties as long as several months after the lease. The evidence is, however, undisputed that the guarantors would execute the guaranties and that without the guaranties the lessors would not furnish the equipment. We conclude that appellants' contention lacks merit. In Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396, 398 (Tex.Civ.App.-Dallas 1977, no writ), the promissory note was dated August 8, 1973, and the guaranty was dated August 15, 1973, and the argument was advanced by appellant that this shifted the burden to appellee to show new consideration. In rejecting this contention, we stated that this apparent discrepancy did not refute the presumption of consideration inherent in the guaranty agreement, and, therefore, held that:

> (M)ere evidence of a time discrepancy in execution between a note and a written guaranty agreement is legally insufficient to rebut the statutory presumption of consideration which supports a separate guaranty accord.

 **\*578** Thus, the mere fact that a guaranty agreement was executed subsequent to the passing of consideration for the principal obligation does not rebut the statutory presumption of consideration nor does it shift the burden of proof to the plaintiffs to show additional consideration.

### *Ambiguity*

 **[17]** **[18]** Finally, appellants argue that the trial court erred in refusing to submit issues to the jury with respect to their allegation that the guaranties are ambiguous and further, that the trial court erred in determining as a matter of law that the guaranties were not ambiguous. Appellants urge that the guaranties are ambiguous because the agreements provide in one part that all guarantors are "jointly and severally" liable and that they bind themselves to pay "any and all indebtedness" which would indicate a general liability of each signer for the total indebtedness as set out in the equipment leases, and then the same instrument later provides that "the undersigned shall not be required to pay the lessor hereunder more than the sum set out adjacent to the undersigned names." Thus, appellants contend that on the face of the instrument it calls for two different liabilities. We cannot agree. First, it was not error for the trial judge to refuse to submit issues on the alleged ambiguity of the guaranties because the question of whether a written agreement is ambiguous is a question of law for the court, rather than for a jury question. Davis v. Andrews, 361 S.W.2d

419 (Tex.Civ.App.-Dallas 1962, writ ref'd n.r.e.). Secondly, a reading of the guaranty agreements clearly indicates that the agreements are capable of only one meaning and that is that each guarantor is jointly and severally liable for the indebtedness of Four C Corporation under each lease except that none of the guarantors can be required to pay more than the amount stated by each guarantor's name. Accordingly, the guaranty agreements were not ambiguous.

Reversed and remanded.

Footnotes

1        These default judgments have now become final since no appeal was taken from them.

**End of Document**                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

🚩 1. Mayfield v. Hicks ⬦
575 S.W.2d 571 , Tex.Civ.App.-Dallas , Oct. 24, 1978 , writ refused n.r.e. ( Jun 06, 1979 )

923 S.W.2d 663
Court of Appeals of Texas,
Tyler.

R.K. MURPHY a/k/a Ken Murphy d/b/a Murphy's
Exxon and d/b/a Murphy's Chevron, Appellant,
v.
CINTAS CORPORATION, Appellee.

No. 12–94–00371–CV.   |   Feb. 23, 1996.   |   Rehearing Overruled March 14, 1996.

Uniform lessor sued lessee service-station owner, alleging failure to pay in accordance with parties' agreement. After nonjury hearing, the County Court at Law No. 2, Smith County, Randall L. Rogers, J., rendered judgment for lessor, and lessee appealed. The Court of Appeals, Holcomb, J., held that: (1) as matter of law, suit was for breach of contract, and was not one on sworn account; (2) some evidence supported award of liquidated damages; and (3) liquidated damages provision was enforceable.

Affirmed.

**\*664**  Appeal from County Court at Law No. 2, Smith County; Randall L. Rogers, Judge.

**Attorneys and Law Firms**

H.L. McGee, for appellant.

Ronnie Horsley, Tyler, for appellee.

**Opinion**

HOLCOMB, Justice.

Ken Murphy appeals from a judgment awarding Cintas Corporation $6,167.30 for breach of a uniform rental agreement. In the first six points of error, Murphy challenges the legal sufficiency of the evidence to support the court's award of liquidated damages. In his seventh point, Murphy contends that the court erred when it awarded liquidated damages because the stipulated damage clause in the contract was an unenforceable penalty, as a matter of law. In his last point, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. In one cross-point, Cintas contends that the court erred when it permitted

Murphy to file a trial amendment after the court had taken the case under advisement. We will affirm.

Cintas Corporation is a national company that rents uniforms, towels and mats to businesses on a weekly basis. Murphy owns and **\*665** operates an Exxon and Chevron service station in Tyler, Texas. From 1988 until 1991, Murphy and Cintas entered into a series of contracts to rent uniforms. Initially, Cintas filed suit against Murphy alleging that he had failed to pay in accordance with their agreements which resulted in $8,724.59 in damages. As exhibits to its petition, Cintas attached the contracts, the invoices and Cintas's affidavit stating that the claim against Murphy was just and true, that it was due, and that all just and lawful credit had been allowed. TEX.R.CIV.P. 185.

Murphy answered by an unsworn denial, but alleged that Cintas "fail[ed] to furnish clean, high quality garments and fail[ed] to replace torn, damaged and worn garments when requested." Murphy also alleged that Cintas was not entitled to recover liquidated damages because the liquidated damage provision was an unenforceable penalty. After a non-jury hearing, the court rendered judgment in favor of Cintas. Neither party requested findings of fact and conclusions of law.

In points one, two, three, four, five, six and eight, Murphy challenges the legal sufficiency of the evidence to support the court's award of liquidated damages. According to Murphy, the record is void of any evidence regarding the amount of monetary loss that Cintas actually suffered as a result of the breach or the reasonableness of the liquidated damage provision. He also argues that the record is void of any evidence that the amount of liquidated damages was a reasonable forecast of just compensation. Therefore, Murphy concludes that the court erred when it awarded damages in accordance with the liquidated damage provision of the contract rather than awarding damages in accordance with common law contract law. We do not agree.

**[1]** **[2]** **[3]** When findings and conclusions are neither requested nor filed, the trial court is presumed to have made all of the findings necessary to support its judgment. *Roberson v. Robinson,* *768 S.W.2d 280, 281 (Tex.1989).* All questions of fact are presumed found in support of the judgment and the judgment will be upheld on any legal theory raised by the evidence. *Point Lookout West, Inc. v. Whorton,* *742 S.W.2d 277, 278–79 (Tex.1987).* Further, Murphy's points of error are "no evidence" points. In deciding a "no evidence" point, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* *752 S.W.2d 518, 522 (Tex.1988).*

**[4]** **[5]** **[6]** **[7]** Here, we have a dispute between the parties about whether the court rendered judgment on a suit on sworn account or breach of contract. TEX.R.CIV.P. 185. To be a valid suit on sworn account, the account or liquidated money demand must involve a claim for goods, wares, merchandise, personal services rendered, labor done or labor or materials furnished. *Great–*

*Ness Prof. Serv. v. First Nat. Bank of Louisville,* 704 S.W.2d 916, 917 (Tex.Civ.App.—Houston [14th Dist.] 1986, no writ). Had Cintas properly filed a suit on a sworn account in accordance with Rule 185, and Murphy had failed to file a written denial under oath, Murphy could not have denied Cintas's claim, he could not have disputed that he received the services, and he could not have disputed the correctness of the stated charges. *Vance v. Holloway,* 689 S.W.2d 403, 404 (Tex.1985); *Airborne Freight Corp. v. CRB Marketing, Inc.,* 566 S.W.2d 573, 575 (Tex.1978). However, a lawsuit involving a breach of a lease agreement is not a valid claim on sworn account because a lease agreement does not involve a purchase and sale, and title to personal property has not passed from one party to another. *Id.* Thus, we hold that Cintas's cause of action against Murphy is not a suit on sworn account as a matter of law. *Id.*

 **[8]    [9]**    Having determined that the court rendered judgment in favor of Cintas under a breach of contract, we will determine whether there is any evidence to support the damage award. Murphy argues that, because Cintas did not offer proof of its actual damages, there was no evidence in the record to show that the liquidated damage provision in the contract was reasonable. As an affirmative defense to Cintas's claim for liquidated damages, Murphy pled penalty. TEX.R.CIV.P. 94; **\*666** *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991). In doing so, Murphy not Cintas had the burden to prove that the liquidated damage provision was unreasonable and a penalty. *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 546 (Tex.1991). Murphy did not offer any evidence to prove the amount of Cintas' actual damages. Accordingly, points one, two, three, four, five, six and eight are overruled.

 **[10]**    In his seventh point, Murphy contends that the court erred when it awarded Cintas liquidated damages because the contractual provision was, as a matter of law, an unenforceable penalty. The disputed liquidated damage clause stated:

> In the event of cancellation of this service agreement by the Customer prior to the termination date, other than for failure of the Company to perform under its guarantee, the Customer will pay the greater of 50% of the weekly service charge per person per week for the unexpired term, or buy back all of the garments in inventory at the rates listed above as replacement value.

Citing *Servisco v. Tramco Inc.,* 568 S.W.2d 434, 437 (Tex.App—Texarkana 1978, writ ref'd n.r.e); *Mayfield v. Hicks,* 575 S.W.2d 571, 575 (Tex.App.—Dallas 1978, writ ref'd n.r.e.) and *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834, 837 (Tex.App.—Houston 1982, writ ref'd n.r.e), Murphy argues that a contract provision is a penalty and is unenforceable if it provides for unreasonable payments for a minor breach. In *Servisco,* the court held that "a sum stipulated to be paid under an agreement should be treated as an unenforceable penalty if the agreement contains several matters of different degrees of importance and the sum stipulated is payable for the breach of any, even the least." Murphy argues that, under the language of the Cintas–Murphy agreement, Murphy could have been liable for the same amount of damages whether he breached the agreement by failing to

pay the rental for all of the uniforms, by failing to pay for one shirt or by violating any of the other obligations contained in the contract. Murphy also contends that the harm caused by the breach must not be capable of estimation or difficult to estimate to be an enforceable liquidated damage stipulation. Because employees of Cintas testified that documentation of the actual damage that Cintas incurred as a result of the breach were available at the time of trial, Murphy concludes that Cintas admitted that the liquidated damage provision was unenforceable.

In *Stewart v. Basey,* the Supreme Court considered the difference between an enforceable liquidated damage provision and an unenforceable penalty. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484 (1952). More recently, the courts have restated this two-part *Stewart* test when analyzing the validity of a contractual damages provision:

> In order to enforce a liquidated damage clause, the court must find:
>
> (1) that the harm caused by the breach is incapable or difficult of estimation; and
>
> (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation.

*Phillips,* 820 S.W.2d at 788. For the provision to be an unenforceable penalty, the uncertainty of the damages and the reasonableness of the stipulation must have existed at the time when the contract was executed. *Oetting v. Flake Uniform & Linen Service,* 553 S.W.2d 793, 796 (Tex.Civ.App.— Ft. Worth 1977, no writ). Even though Murphy contends that the actual damage incurred by Cintas could have been calculated at the time of trial, such testimony was long after the contract between Cintas and Murphy had been executed. To forecast the actual damages to Cintas as a result of Murphy's termination of the contract sixty months in advance would be fraught with uncertainty. Further, similar contracts for liquidated damages have been approved in *Liberty Sign Co. v. Newsom,* 426 S.W.2d 210 (Tex.1968); *Blakeway v. National Credit Corporation,* 439 S.W.2d 155 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.); *Blakeway v. General Electric Credit Corporation,* 429 S.W.2d 925 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.); *Hyde v. Claude Neon Federal Co.,* 157 S.W.2d 952 (Tex.Civ.App.—Eastland 1941, writ dism'd); *White v. Wilbanks,* 144 S.W.2d 941 (Tex.Civ.App.—Amarillo 1940, no writ). Accordingly, we hold that the liquidated **\*667** damage clause is enforceable. Point seven is overruled.

 **[11]**  In his last point of error, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. However, he failed to cite any authority to support his position. Under Rule 74(f), Murphy's point is not preserved for our review. TEX.R.APP.P. 74(f); *Tobias v. Univ. of Texas at Arlington,* 824 S.W.2d 201, 206–07 (Tex.App. —Fort Worth 1991, writ denied).

**[12]** In one cross-point, Cintas contends that the court erred when it allowed Murphy to file a trial amendment after the case had been heard by the court. According to Cintas, Murphy had failed to plead the defense of penalty to the contract action under Rule 94 until after both parties had closed and the court had taken the case under advisement. TEX.R.CIV.P. 94. However, the only answer in the transcript is Defendant's Second Amended Original Answer. The record before us does not contain any of the answers that precede Murphy's last amended answer, from which Cintas complains. Accordingly, we cannot determine from the record to what extent Murphy amended his prior pleadings. To complain of error on appeal, it is incumbent upon the complaining party to submit evidence in the record to support his claim. TEX.R.APP.P. 50(d). Cintas's cross-point is overruled.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. Murphy v. Cintas Corp. ☞
923 S.W.2d 663 , Tex.App.-Tyler , Feb. 23, 1996 , rehearing overruled ( Mar 14, 1996 ) , writ denied ( Sep 26, 1996 ) , rehearing of writ of error overruled ( Nov 15, 1996 )

553 S.W.2d 793
Court of Civil Appeals of Texas, Fort Worth.

Howard W. OETTING, Appellant,
v.
FLAKE UNIFORM & LINEN SERVICE, INC., Appellee.

No. 17814. | June 23, 1977.

Uniform supplier brought action against guarantor of obligations of customer under two garment rental contracts with supplier. The District Court, Wichita County, Stanley C. Kirk, J., entered judgment for plaintiff awarding it 85% of amounts it would have received had contract been fully performed after date it was terminated, plus all amounts owing before termination, plus attorney fees and interest, and defendant appealed. The Court of Civil Appeals, Spurlock, J., held that: (1) provision of garment rental contract that if customer failed to pay supplier, supplier could terminate agreement, in which case customer would pay amount of money equal to 85% of rental charges which customer would have been obligated to pay supplier for garment rental from date of termination until end of existing contract period as liquidated damages was reasonable, notwithstanding additional provision that liquidated damages provision might be provoked "by reason of any other breach on part of customer," and (2) with respect to contract, stipulations in contract for liquidated damages was reasonable forecast of just compensation for harm to be caused by breach in that harm was incapable or very difficult of accurate estimation at time contract was executed, and there was practically no decrease in expenses of operation of supplier if customer breached agreement.

Affirmed.

**Attorneys and Law Firms**

**\*794** Gibson, Darden & Hotchkiss, and Tony Hotchkiss, Wichita Falls, for appellant.

Sherrill, Pace, Rogers, Cosnoe & Morrison, and Lonny D. Morrison, Wichita Falls, for appellee.

**OPINION**

SPURLOCK, Justice.

This is a suit against Howard W. Oetting as guarantor of the obligations of The Baker Corporation under two garment rental contracts with Flake Uniform & Linen Service, Inc. Baker Corporation failed to pay its monthly obligation and Flake Uniform obtained judgment for liquidated damages. Oetting appeals on the ground the contract provision for liquidated damages is unenforceable because it provides for a penalty.

We affirm.

 **\*795**  This suit originally was brought by Flake Uniform against The Baker Corporation, and Howard W. Oetting, Tommy Baker and Maurice Baker, individually. The Baker Corporation became insolvent and ceased doing business and the plaintiff was unable to serve either of the two Bakers who were dismissed from the suit. Baker Corporation as customer and Flake Uniform as supplier entered into an original garment rental contract on March 13, 1972, and a second contract dated February 10, 1975. In June, 1975, the parties entered into an amendment to the garment rental contract and a guaranty agreement. In summary form, the guaranty agreement recited that Baker Corporation was in default in various sums of money under the terms of existing contracts. The parties agreed to the amount of these obligations and that such indebtedness had matured and also agreed to pay attorney fees but provided that these past due installments should be paid in six monthly installments.

The other parties to the suit guaranteed the payment of these obligations. A third cause of action was for the payment of various checks that had been paid for this service which had been dishonored by the bank. The fourth cause of action was for the sum of $15,495.66 as liquidated damages for the loss of profits for the balance of the term of the rental agreement. The fifth cause of action was for the failure to return to plaintiff uniforms that had been supplied to The Baker Corporation, and the sixth cause of action was for attorney fees as provided for in the contracts.

After Oetting had been served and answered, Flake Uniform filed detailed request for admissions covering the entire transactions in all the matters in controversy and included in said request for admissions a request that Oetting admit the allegations of fact in each paragraph of plaintiff's petition. These were each by separate request.

Oetting did not answer the request for admissions and a motion was filed for an order deeming the request for admissions to be admitted. This was not contested and the court rendered judgment and signed an order deeming admitted all the request for admissions and allegations contained in plaintiff's trial pleadings.

Flake Uniform filed a motion for partial summary judgment. The court granted this summary judgment for all sums of money due under the contracts and for services that had theretofore been rendered. This was in the sum of $4,860.77.

There was no dispute concerning the provision for liquidated damages for the breach of the contract from the date of its termination, because of non payment of the monthly service charge that would accrue in the future, until the end of the term of the contract. This sum was in the amount of $15,495.66 plus interest and attorney fees. The remainder of the case was then tried before the court without a jury and resulted in the court making the partial summary judgment final and incorporating it into the final judgment and awarded Flake Uniform 85% of the amounts it would have received had the contract been fully performed after the date it was terminated because of the non payment of the monthly sums due, plus all amounts owing before the termination, plus $3,174.37 attorney fees and interest.

**[1]** No findings of fact or conclusions of law were filed and the record does not reflect that any were requested. Therefore, if there is any legal theory supported by the evidence on which to affirm, this court must do so. Smitheal v. Smitheal, 518 S.W.2d 842 (Tex. Civ. App., Fort Worth 1975, writ dism'd), cert. denied, 423 U.S. 928, 96 S.Ct. 277, 46 L.Ed.2d 256.

**[2]** These contracts provide for actual damages. Both contracts show on their face that the ascertainment of damages is difficult, at best. The defendant, by both allegation and proof, must raise the issue and assume the burden of proving the amount of the actual damages for the purpose of showing an absence of approximation between the actual loss and the stipulated sum. Smith v. Lane, 236 S.W.2d 214 (Tex. Civ. App., San Antonio 1950, no writ). **\*796** See also Southern Plow Co. v. Dunlap Hardware Co., 236 S.W. 765 (Tex. Civ. App., Dallas 1922, no writ); Walsh v. Methodist Episcopal Church, 212 S.W. 950 (Tex. Com. App. 1919, jdgmt. adopted).

**[3]** It follows then that plaintiff need not allege or prove actual damages where it cannot be said that the damages were certain, apparent or ascertainable. Pippin Bros. v. Thompson, 292 S.W. 618 (Tex. Civ. App., Waco 1927, writ dism'd); Schwarz v. Lee, 287 S.W. 519 (Tex. Civ. App., Fort Worth 1926, writ dism'd); McElroy v. Danciger, 241 S.W. 1098 (Tex. Civ. App., Amarillo 1922, no writ).

**[4]** In Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484 (1952), the court stated that to be enforceable as liquidated damages the damages must be uncertain and a stipulation must be reasonable. This must have existed at the time when the contract was executed. What the courts really do, in this type of case, is to permit the parties to estimate in advance the amount of damages, provided they adhere to the principle of just compensation. That court then stated: "Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:
" '(1) An agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

" '(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

" '(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.' "

Oetting assigns only two points of error to the effect that the liquidated damage provision is unreasonable in view of the nature of the several breaches upon which it is possible for it to become operative and it is unreasonable due to the amount of damages stipulated.

Paragraph A of the General Terms and Conditions of the contract provides, in pertinent part, ". . . Upon the failure of the Customer to pay Supplier as set out above, Supplier may, at its option, terminate this Agreement and, if Supplier so elects, then the provisions of paragraph D below shall apply. . . ."

Paragraph D provides:

"Inasmuch as the breach of this Agreement by Customer will cause a serious and substantial damage to Supplier, and because it will be difficult if not impossible to prove the amount of such damage, Customer agrees that in case of breach of this Agreement by failure to pay Supplier as agreed, or by reason of any other breach on the part of Customer, it will pay to Supplier within ten (10) days after the date of termination all accrued charges for garment rentals incurred prior to the date of termination together with an additional amount of money equal to 85% of the Rental Charges which Customer would have been obligated to pay Supplier for garment rental from the date of termination until the end of the existing Contract Period as liquidated damages; such sum being agreed upon by the Supplier and by the Customer as the amount which Supplier will be damaged by breach of this Agreement on the part of Customer."

 [5]    It is clear that Paragraph D, the liquidated damage provision, can only be invoked in the case of termination of the entire contract, since the measure of damages is 85% of the charge if performed, after the date of termination until the end of the contract period. There is no provision allowing termination of the contract, except in paragraph A, in the case of breach by failure to pay. Therefore, the liquidated damage provision can only come into play if: (1) the customer fails to pay as agreed; and (2) the supplier terminates the contract.

It is true that paragraph D also recites ". . . or by reason of any other breach on the part of Customer, . . ." but that appears to have been inserted in an abundance of caution, since termination must occur, and can only occur on nonpayment. The clause is mere surplusage, and can have no effect. Only the most major **\*797**  breach of all, nonpayment, can trigger paragraph D, and liquidated damages. This was not the situation in Stewart v. Basey, supra, where the breach was trivial.

We overrule point of error no. 1.

The judgment recites that ". . . the liquidated damage provision set forth in the Garment Rental Contract between the parties is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. . . ."

 **[6]**   As noted above, that judgment must be affirmed if it can be upheld on any legal theory supported by the evidence. Further, we are obliged to consider only that evidence which tends to support the court's finding, disregarding all that which is opposed to it. Smitheal v. Smitheal, supra; Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950).

The only witness who testified was Leon Edward Flake, who is president of plaintiff's corporation. In order to service the Baker contract, Flake had to obtain the sizes of the employees who were going to use the uniforms; buy new pants, shirts and uniforms; place thereon the name of the company, the name of the employee and other material; and replace them when they became worn and when employees would terminate and were replaced by other employees. He had a vast stock of used uniforms which he valued at 5¢ each. He attempted to replace worn uniforms with used clothing but, if he could not, the new ones cost approximately $12.50 each. These uniforms were picked up by a route man and the laundry was done in lots so that each driver's entire pickup load of clothing was washed in one machine, no matter what size the load. Flake operated several companies, including a chemical company and unrelated businesses, out of his central place of business. His route man serviced an account across the street from Flake Uniform. His route men were on salary. His bookkeeping was done by salaried personnel for this business and other unrelated businesses. Their salary remained the same after the Baker account was terminated. There was no difference in his cost of operation or his overhead after the Baker account was terminated. The major cost was a "front-end" cost, in that the uniforms were purchased and sized; the emblems and advertisement were purchased and placed thereon; the collars and waistbands were taped for identification; and the salesmen were paid a commission when the contracts were obtained.

Flake further testified that the fact that The Baker Corporation dropped out didn't cause his cost to go down any. "My revenue just ceased . . . from that particular account."

Under the facts in this case it would be very difficult to determine in advance what actual damages would be sustained as a result of Baker Corporation's failing to pay its rental contract and the contract then having to be terminated.

We have examined with care the cases cited in support of the contentions made by Oetting. In each instance, we concluded that the authorities relied upon by Oetting are distinguishable from the cases we consider controlling.

 **[7]**   We hold that the stipulations for liquidated damages are reasonable and find that, when the contract was made, the actual damages were uncertain. Any attempt to establish the actual damages would be fraught with such uncertainties and difficulty as to require this court to sustain the agreements in this case for liquidated damages. Similar contracts for liquidated damages have been approved in Blakeway v. National Credit Corporation, 439 S.W.2d 155 (Tex. Civ. App., Austin 1969, writ ref'd n.r.e.); Blakeway v. General Electric Credit Corporation, 429 S.W.2d 925 (Tex. Civ. App., Austin 1968, writ ref'd n.r.e.); Bowen v. Virginia Lee Candies, 44 S.W.2d 502 (Tex. Civ. App., Texarkana 1931, no writ); Hyde v. Claude Neon Federal Co., 157 S.W.2d 952 (Tex. Civ. App., Eastland 1941, writ dism'd); **\*798**  White v. Wilbanks, 144 S.W.2d 941 (Tex. Civ. App., Amarillo 1940, no writ); Liberty Sign Co. v. Newsom, 426 S.W.2d 210 (Tex. 1968).

Under the undisputed facts in this case reflecting that there was practically no decrease in expenses of operation of the supplier and the difficulty of ascertaining the actual damages, the finding of the court that 85% of the rental charges that Baker would have paid, if he had fully performed the contract is a reasonable forecast of just compensation for the harm that was caused by the breach and that this harm was incapable or very difficult of accurate estimation at the time the contract was executed.

We overrule point of error no. 2.

Judgment affirmed.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

820 S.W.2d 785
Supreme Court of Texas.

Martha Jean PHILLIPS, Petitioner,
v.
Harry S. PHILLIPS, et al., Respondents.

No. D–0107.　|　Dec. 11, 1991.　|　Rehearing Overruled Jan. 29, 1992.

Limited partner sued general partner for breach of partnership agreement. The 114th Judicial District Court, Smith County, Galloway Calhoun, J., granted judgment, and appeal was taken. The Tyler Court of Appeals, 792 S.W.2d 269, reversed and remanded, and further appeal was taken. The Supreme Court, Hecht, J., held that: (1) clause in partnership agreement calling for payment of ten times actual damages to limited partner if agreement was breached by general partner was unenforceable penalty, rather than enforceable liquidated damages provision, and (2) general partner did not waive affirmative defense of penalty by failing to plead it, in that such defense was apparent on face of petition and established as matter of law.

Affirmed.

Gonzalez, J., dissented and filed opinion in which Mauzy and Doggett, JJ., joined.

**Attorneys and Law Firms**

 **\*786**  Michael S. Wilk, Anna L. Stock, Jay N. Gross, Houston, for petitioner.

Patrick Kelley, Otis Carroll, Tyler, for respondents.

**OPINION**

HECHT, Justice.

We granted the applications for writ of error in this case to decide whether a contractual provision that requires payment of a multiple of actual damages for breach of trust is an unenforceable penalty, and if so, whether the defense of penalty was waived because it was not pleaded. The trial court and court of appeals refused to enforce the provision. 792 S.W.2d 269 (Tex.App.1990). We affirm the judgment of the court of appeals.

During 32 years of marriage, Harry and Martha Phillips accumulated over $18 million in community property, primarily through the oil and gas business Harry managed. When they divorced, rather than break up their oil and gas holdings, they created Phillips & Phillips, Ltd., a limited partnership, and transferred the bulk of their assets to it. Each had an equal interest in the partnership. Harry, the only general partner, agreed to work for the partnership full-time without salary and to offer Martha the option to participate in any business opportunities he pursued outside the partnership. Martha, the only limited partner, agreed that she would have no right to participate in Harry's business decisions for the partnership and that she would leave each of her four children by Harry at least one-sixth of her estate.

The partnership agreement required Harry to pay himself and Martha each a minimum **\*787** of $21,000 per month for 24 months, and then minimum monthly distributions adjusted for inflation and for oil and gas prices. It also required Harry to furnish Martha certain financial information about the partnership and to cooperate with her in auditing its affairs. The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust. Errors of judgment shall not be considered breaches of trusts."

The value of the partnership increased under Harry's management, but Harry did not fully comply with the terms of the written agreement. In particular, after the first 20 months Harry distributed much less than the required minimum amounts, never actually calculating what payments the agreement required. He also failed to provide timely annual statements of operations and refused to cooperate fully with Martha's attempts to audit the partnership.

Martha eventually sued Harry for dissolution of the partnership and damages based upon Harry's breach of contractual and fiduciary duties. The case was tried to a jury, who found that Harry breached the partnership agreement by favoring himself in paying his personal expenses and encumbering partnership assets, thus endangering partnership distributions. The jury also found that Harry breached both the partnership agreement and his fiduciary duty to Martha by failing to keep current and complete partnership books, failing to prepare required annual statements, and interfering with Martha's efforts to examine partnership books and records. [1] The jury assessed Martha's actual damages at $300,000. None of the jury's findings are challenged by the parties on appeal.

During the trial the parties stipulated that a reasonable fee for legal services necessary for Martha's prosecution of the case was $235,302.14. The jury was aware of this stipulation, and the trial court surmised that the jury included this amount in its $300,000 finding. Accordingly, the trial court rendered judgment for Martha for a total of $300,000, $235,302.14 against the partnership and $64,697.86 against Harry, and refused to award Martha any additional amount for attorney fees. The trial court also ordered the partnership dissolved.

Martha appealed; Harry did not. The court of appeals held that the trial court erred in refusing to award Martha the $235,302.14 stipulated attorney fees in addition to the $300,000 damages found by the jury, but that the trial court did not err in refusing to award Martha decuple damages under the partnership agreement. Consequently, the appeals court reversed the judgment of the trial court in part and rendered judgment against Harry for a total of $535,302.14, plus interest. [2]

**\*788** Martha contends that she is entitled to recover liquidated damages equal to ten times the actual damages found by the jury, as provided by the limited partnership agreement. Harry contends that the contractual provision is not an enforceable agreement for liquidated damages but an unenforceable penalty. Martha argues that even if Harry is correct, he has waived any defense of penalty by failing to plead it as an affirmative defense.

 **[1]**  We first considered the difference between an enforceable liquidated damages provision and an unenforceable penalty in *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–486 (1952). There we explained:

> Volumes have been written on the question of when a stipulated damage provision of a contract should be enforced as liquidated damages and when enforcement should be denied because it is a penalty provision.... All agree that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable.

. . . . .

> The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule.

More recently, in *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979), we restated the two-part *Stewart* test for determining whether to enforce a contractual damages provision as follows: "In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Cf.* TEX.BUS. & COM.CODE § 2.718(a). [3]

 **[2]**  Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Farrar v. Beeman,* 63 Tex. 175, 181 (1885); *see Lefevere v. Sears,* 629 S.W.2d 768, 771 (Tex.Civ.App.—El Paso 1981, no writ); *Muller v. Light,* 538 S.W.2d 487, 488 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.); *Schepps*

*v. American Dist. Telegraph Co.,* 286 S.W.2d 684, 690 (Tex.Civ.App.—Dallas 1955, no writ); *Zucht v. Stewart Title Guar. Co.,* 207 S.W.2d 414, 418 (Tex.Civ.App.—San Antonio 1947, writ dism'd); *Bourland v. Huffhines,* 244 S.W. 847, 849 (Tex.Civ.App.—Amarillo 1922, writ dism'd). Sometimes, however, factual issues must be resolved before the legal question can be decided. For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were. *See Johnson Eng'rs, Inc. v. Tri–Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.—Texarkana 1979, no writ); *Oetting v. Flake Uniform & Linen Serv., Inc.,* 553 S.W.2d 793, 796–797 (Tex.Civ.App.—Fort Worth 1977, no writ); **\*789** *Smith v. Lane,* 236 S.W.2d 214, 215 (Tex.Civ.App.—San Antonio 1950, no writ); *Southern Plow Co. v. Dunlap Hardware Co.,* 236 S.W. 765, 766–767 (Tex.Civ.App.—Dallas 1922, no writ); *Walsh v. Methodist Episcopal Church,* 212 S.W. 950, 952 (Tex.Comm'n App.1919, judgm't adopted).

**[3]** **[4]** The enforceability of the contractual provision in this case involves no fact issues. A contractual provision like the one here by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision. It cannot meet the first prong of the test because the harm caused by the breach of the contract is not incapable or difficult of estimation. The provision assumes actual damages can and will be determined, indeed must be determined, before the prescribed multiplier can be applied. The provision cannot meet the second prong of the test because, instead of attempting to forecast actual damages, it calls for them to be determined and then multiplied. *Cf. Robert G. Beneke & Co. v. Cole,* 550 S.W.2d 321 (Tex.Civ.App.—Dallas 1977, no writ) (contract provision which fixes liquidated damages without excluding additional liability for actual damages is not a reasonable forecast of just compensation and therefore a penalty). A contractual provision like the one in this case is thus, on its face, an unenforceable penalty.

**[5]** **[6]** Harry, however, did not plead penalty as an affirmative defense to an award of damages under the liquidated damages provision in the partnership agreement. Although penalty is not among the affirmative defenses enumerated in Rule 94, TEX.R.CIV.P., the listing in that rule is not exclusive. Penalty is, in the language of the rule, a "matter constituting an avoidance or affirmative defense." *Johnson,* 582 S.W.2d at 557; *Oetting,* 553 S.W.2d at 795–796; *Robinson v. Granite Equip. Leasing Corp.,* 553 S.W.2d 633, 637 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Walter E. Heller & Co. v. B.C. & M., Inc.,* 543 S.W.2d 696, 697 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n,* 467 S.W.2d 574, 576 (Tex.Civ.App.—Fort Worth 1971, writ dism'd); *Young v. J.F. Zimmerman & Sons, Inc.,* 434 S.W.2d 926, 927 (Tex.Civ.App.—Waco 1968, writ dism'd); *Smith v. Waite,* 424 S.W.2d 691, 693 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.); *Smith,* 236 S.W.2d at 215; *Southern Plow,* 236 S.W. at 766–767; *Walsh,* 212 S.W. at 952. As a general rule, an affirmative defense must be pleaded or it is waived. TEX.R.CIV.P. 94.

**[7]** One exception to this rule is the defense of illegality, a defense specifically listed in Rule 94. "[I]f the illegal nature of the document to be relied upon or sought to be enforced is apparent from the plaintiff's pleadings, it is not necessary that illegality be specially pleaded by the defendant in order to rely upon it as a defense." *Lewkowicz v. El Paso Apparel Corp.,* 625 S.W.2d 301, 303 (Tex.1981); *accord Niles v. Harris County Fresh Water Supply Dist.,* 339 S.W.2d 562, 563 (Tex.Civ.App.—Waco 1960, writ ref'd); *Reid v. Associated Employers Lloyds,* 164 S.W.2d 584, 585–586 (Tex.Civ.App.—Fort Worth 1942, writ ref'd); *Montgomery Ward & Co. v. Lusk,* 52 S.W.2d 1110 (Tex.Civ.App.—Waco 1932, writ ref'd); *Texas & P. Coal Co. v. Lawson,* 89 Tex. 394, 34 S.W. 919, 921 (1896). Two principles support this exception to the general rule that affirmative defenses are waived if not pleaded. One is that "[w]hen a plaintiff in his pleadings anticipates defensive matters and pleads them, a defendant may rely upon the defenses though his only pleading is a general denial." *Raney v. White,* 267 S.W.2d 199, 200 (Tex.Civ.App.—San Antonio 1954, writ ref'd). Pleading an agreement illegal on its face in effect anticipates the defense. The other principle is that the courts will not enforce a plainly illegal contract even if the parties do not object. *Lawson,* 34 S.W. at 921. Enforcement of an illegal agreement violates public policy. *Id.*

**[8]** For the same reasons, we hold that the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law. Enforcement of a penalty, like enforcement of an illegal contract, violates **\*790** public policy. RESTATEMENT (SECOND) OF CONTRACT § 356; *see State v. Alpha Oil & Gas, Inc.,* 747 S.W.2d 378 (Tex.1988). It should not be done, even if the parties do not object. In this case Martha pleaded that she was "entitled to damages ... in the amount of ten (10) times all losses suffered". Inasmuch as Martha's own pleading establishes that the contractual provision she relies upon is an unenforceable penalty under our decisions in *Stewart* and *Campesi* as a matter of law, Harry was not required to plead penalty as an affirmative defense.

Contrary to the dissent's very exaggerated alarms, we do not hold that the affirmative defense of penalty need never be pleaded. Whenever the defense is not clearly established on the face of the pleadings, as it is here, it must be pleaded. We do not "resurrect[ ] trial by ambush", *post,* at 790, or "retreat from ... encouraging full disclosure during discovery", *post,* at 792. We apply a narrow but necessary exception, long and well established, to the general requirement that affirmative defenses be pleaded. We do not hold that penalty "can be asserted as a defense for the first time on appeal", *post,* at 792, in violation of Rule 52(a), TEX.R.APP.P. The record in this case reflects that the issue of penalty was raised in the trial court, and that the trial court refused to enforce the penalty provision of the partnership agreement.

\* \* \* \* \* \*

Accordingly, we conclude that Martha is not entitled to recover ten times her actual damages. Finding no error in the judgment of the court of appeals, we affirm it.

GONZALEZ, Justice, dissenting.

Despite the clear language of TEX.R.CIV.P. 94 and the collective wisdom of every court of appeals of this state that has considered the issue, the majority holds that a defendant need not affirmatively plead the defense of "penalty" in a contract action. This holding resurrects trial by ambush and rejects the notion that parties are entitled to know what theories of law they will face at trial. I would hold that by failing to plead it, Mr. Phillips waived his right to assert that the contract he entered into with his wife is unenforceable. Furthermore, since Mr. Phillips waived the penalty defense by failing to affirmatively plead it, I would not reach the question of whether the contractual provision in question is, on its face, an unenforceable penalty. I thus would reverse the judgment of the court of appeals and remand this cause to the trial court for entry of a judgment that enforces the provision.

Mr. and Mrs. Phillips were married for 32 years prior to getting a divorce. With the assistance of counsel, they entered into a pre-divorce agreement, whereby they transferred about $18 million of their assets into a partnership which Mr. Phillips would manage. Mr. Phillips in effect said to his soon-to-be ex-wife: "Trust me." As a disincentive to cheating or short changing Mrs. Phillips, Mr. Phillips pledged that he would pay her 10 times the amount of the losses if he violated the contract. [1] The agreement also recited that Mr. Phillips owed Mrs. Phillips a fiduciary duty, a higher standard of care than normally exists between parties to a contract. [2]

Eight years later, Mrs. Phillips sued Mr. Phillips, alleging that he violated the agreement. **\*791** Mr. Phillips entered a general denial and asserted the affirmative defenses of limitations, laches, and equitable estoppel. In a unanimous verdict, the jury found that Mr. Phillips breached the agreement by interfering with Mrs. Phillips right to examine the books and records of the partnership, and by willfully underpaying Mrs. Phillips and overpaying himself.

### AFFIRMATIVE DEFENSE

Rule 94 enumerates specific affirmative defenses which are waived if not pleaded, such as accord and satisfaction, arbitration and award, fraud, illegality, statute of frauds, statute of limitations, "and any other matter constituting an avoidance or affirmative defense." TEX.R.CIV.P. 94. An affirmative defense does not tend to rebut factual propositions asserted by a plaintiff, but seeks to establish an independent reason why the plaintiff should not recover. *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 546 (Tex.1991). Asserting the defense of penalty does not deny the facts pleaded by the plaintiff; instead, it is an independent reason why the contract should

not be enforced as written. In other words, if the defendant asserts facts that defeat in whole or in part the plaintiff's claim, such assertion amounts to an affirmative defense that must be pleaded or it is waived. "Penalty" is a classic affirmative defense; in my view, it clearly falls within the purview of Rule 94.

The majority implies that as long as the issue does not depend upon evidence or findings, no purpose is served by requiring that it be specifically pleaded. But there is a valid purpose to serve, namely, the need for notice and fair play, so as to avoid trials by ambush.

The court refers to *Lewkowicz v. El Paso Apparel Corp.,* 625 S.W.2d 301, 303 (Tex.1981), for its holding that pleading is not necessary if the affirmative defense appears on the face of the plaintiff's pleadings. That case is distinguishable because it involved the defense of illegality of contract. The defense of illegality is a special situation and a poor choice from which to draw a rule of general applicability. The rule that a court will not enforce an illegal contract is for the public's benefit rather than contending parties. *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 151 (1947). A strong policy reason supports the illegality exception. That is, courts should not have to validate contracts that are illegal on their face merely because a defendant has failed to plead illegality.

Here, the court seems to be saying that pleading and proof are not necessary, because the issue of whether the liquidated damages provision is a penalty is a question of law. In some contracts it may be possible to determine from their four corners that they impose a penalty. The classic example is the lease that assesses the same liquidated damages for every breach, regardless of how trivial. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). But, in most cases, proof will be necessary. *Commercial Union Ins. Co. v. La Villa I.S.D.,* 779 S.W.2d 102, 106–107 (Tex.App. —Corpus Christi 1989, no writ); *See* D. WENDORF, ET AL., TEXAS RULES OF EVIDENCE MANUAL, I–38 (3rd ed. 1991).

A good example of the need for proof is *Presnal v. TLL Energy Corp.,* 788 S.W.2d 123, 127 (Tex.App.—Houston [1st Dist.1990], writ denied). In that case, a mineral lease provided that the lessee was required to drill a second well or pay $75,000, which the defendant contended was a penalty. There is no way a court could possibly know if this provision is a reasonable forecast of damages and therefore not a penalty, unless pleadings and proof develop the issue. It would be patently unfair not to require defendant to notify the plaintiff that the possible existence of penalty would be an issue and this is contrary to well established case law.

Every intermediate appellate court considering this issue has held that penalty is an affirmative defense under Rule 94 which is waived if not pleaded. *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834, 838–839 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); **\*792** *Robinson v. Granite Equip. Leasing Corp.,* 553 S.W.2d 633, 637 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Walter E. Heller & Co. v. B.C. & M., Inc.,* 543 S.W.2d 696, 697 (Tex.Civ.App.—Houston

[1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n,* 467 S.W.2d 574, 576 (Tex.Civ.App.—Fort Worth 1971, writ dism'd); *Young v. J.F. Zimmerman & Sons, Inc.,* 434 S.W.2d 926, 927 (Tex.Civ.App.—Waco 1968, writ dism'd); *Smith v. Waite,* 424 S.W.2d 691, 693 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.).

There is no compelling reason for this court now to reject by implication the well-grounded pleading practice and disagree with the cases cited above that hold that as a rule penalty is an affirmative defense which must be pleaded or it is waived. In my view, this is a retreat from this court's recent trend towards encouraging full disclosure during discovery of all witnesses, facts and legal theories upon which a party intends to rely at trial. This trend not only encourages litigants to be well prepared for trial, but also enables disputes to be resolved on their true merits and not on "mere technicalities." It makes no sense to me to subject parties to a severe sanction for failing to disclose witnesses or to supplement discovery responses, but not require them to plead the legal theory upon which they intend to rely to defeat their opponent's claim. The majority has created an exception to Rule 94 that has a visceral appeal, but collapses on its own logic. The court says that the contractual provision in issue is a penalty as a *matter of law,* and thus need not be pleaded (and can be asserted as a defense for the first time on appeal). But a defendant likewise may defeat a contract claim under a statute of limitations defense. And while the defendant may be entitled to a judgment as a *matter of law,* we nevertheless require affirmative pleading of the statute of limitations defense. The court ultimately rationalizes its de facto modification of Rule 94 by relying on the RESTATEMENT (SECOND) OF CONTRACTS § 356 to assert that public policy demands the result. The court expands the public policy exception to Rule 94's pleading requirement beyond the exception for illegal contracts to include contracts that allegedly impose a penalty. This is a faulty rationale. First, this is not a case where pure contract principles apply. Mr. Phillips agreed to a higher standard of care (namely, a fiduciary's standard) than he normally would have owed Mrs. Phillips in a standard contractual relationship. Courts impose damages on parties who violate a fiduciary duty in order to punish the party's breach of trust. I agree with the Restatement § 356's directive that the "central objective behind the system of contract remedies is compensatory, not punitive." RESTATEMENT (SECOND) OF CONTRACTS § 356 comment a (1979). But Mr. Phillips entered into this agreement with his eyes open, accepting a higher than normal standard of care and devising and adopting a measure of damages for his breach of that standard. I do not see how the it advances the best interest of the public to bail him out of his bargain. I would hold that penalty is an affirmative defense that must be pleaded and that Mr. Phillips waived this defense by failing to plead it. For the above reasons, I dissent.

MAUZY and DOGGETT, JJ., join this opinion.

Footnotes

The jury also found that Harry breached the partnership agreement by failing to calculate the amount of distributions required to be paid the partners and by failing to make all the distributions required by the agreement, but that Martha ratified Harry's actions in making distributions other than as called for by the agreement.

Harry contends that the court of appeals should not have disturbed the trial court's damage award. As a rule, however, the judgment in a case tried by a jury must conform to the verdict. *See* TEX.R.CIV.P. 301. The trial court properly did not ask the jury to include in its determination of Martha's actual damages a reasonable fee for legal services necessary to her prosecution of the case. *See Hammonds v. Hammonds,* 158 Tex. 516, 313 S.W.2d 603, 605 (1958). We must assume that the jury followed the trial court's instructions and answered the question put to them. *See Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). Given that assumption, we must conclude that the jury's answer of $300,000 to the trial court's question did not include attorney fees.

Harry argues that, logically, the jury must have arrived at their $300,000 finding by adding $37,585 accounting fees which Martha testified she incurred to the stipulated $250,000 in attorney fees. However plausible Harry's explanation of the jury's reasoning process may be, it cannot substitute for the jury's finding. What the jury found, not why the jury found it, is the relevant inquiry absent jury misconduct. *First Nat'l Bank v. Zimmerman,* 442 S.W.2d 674, 678 (Tex.1969).

Under Rule 301, the trial court could properly have rendered judgment awarding Martha less than the $300,000 found by the jury as actual damages only if the finding had no support in the evidence. *See Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952). *See also* 4 R. MCDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS § 17.32 nn. 7–8 (rev. 1984). Harry does not argue here that there is no evidence to support the jury's finding. Thus, we conclude that the court of appeals was correct in rendering judgment against Harry for the actual damages found by the jury plus stipulated attorney fees.

Harry also complains of the court of appeals' judgment that he, rather than the partnership, pay Martha's attorney fees. This point, however, was not raised in Harry's motion for rehearing in the court of appeals and is therefore not preserved. *See* TEX.R.APP.P. 131(e); *Oil Field Haulers Ass'n v. Railroad Commission,* 381 S.W.2d 183, 189 (Tex.1964).

"Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

At trial, Mr. Phillips testified as follows:

Q There's another interesting provision in [the partnership agreement] that says if Mrs. Phillips can show that you have breached your fiduciary duty to her that you will be obliged to pay her 10 times any amount that she proves. Are you familiar with that?

A Yes sir.

Q How in the world did that get in there?

A I wanted her to let me-wanted to prove to her that I would not do anything wrong.

Q So—

A So I put it in myself.

Q Was it your idea?

A Yes, sir.

The partnership agreement provides:

16.1 *Fiduciary Capacity.* "The general partner shall act in a fiduciary capacity with respect to the limited partner."

16.2 *Damages.* "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breach. Errors of judgment shall not be considered breaches of trusts".

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (2)

⚑ 1. Phillips v. Phillips

792 S.W.2d 269 , Tex.App.-Tyler , June 26, 1990 , writ granted ( Oct 03, 1990 )

*Judgment Affirmed by*

⚑ 2. Phillips v. Phillips 👓

820 S.W.2d 785 , Tex. , Dec. 11, 1991 , rehearing of cause overruled ( Jan 29, 1992 )

### Related References (2)

⚑ 3. Matter of Phillips

966 F.2d 926 , 5th Cir.(Tex.) , July 02, 1992 , rehearing denied ( Aug 10, 1992 )

*On Remand to*

⚑ 4. In re Phillips

175 B.R. 901 , Bankr.E.D.Tex. , Sep. 08, 1994

946 S.W.2d 90
Court of Appeals of Texas,
El Paso.

R. CONRAD MOORE & ASSOCIATES, INC., Appellant,
v.
Isabel LERMA and Luz Lelia Lerma, Appellees.

No. 08–96–00152–CV.   |   March 13, 1997.   |   Rehearing Overruled May 14, 1997.

Purchasers sued vendor for return of their earnest money pursuant to new home residential earnest money contract, after they were unable to obtain financing and close on house. Following jury trial, the 243rd District Court, El Paso County, Phillip R. Martinez, P.J., awarded purchasers $20,000 in damages. Vendor appealed, and purchasers cross-appealed. The Court of Appeals, Larsen, J., held that: (1) record supported finding that purchasers did not get loan approval for purchase of house; (2) by their intentional conduct after right to return of earnest money arose, purchasers waived any right to have their earnest money refunded; (3) vendor's failure to plead for attorney fees precluded award of fees; and (4) because valid, enforceable contract existed between the parties, restitution under unjust enrichment was not appropriate remedy for purchasers.

Reversed and rendered.

**Attorneys and Law Firms**

 **\*92** Lark H. Fogel, Jeff Pownell, Scherr & Legate, P.C., El Paso, for appellees.

R. Wayne Pritchard, Brandys Carson & Pritchard, P.C., El Paso, for appellant.

Before LARSEN, McCLURE and CHEW, JJ.

*OPINION*

LARSEN, Justice.

This is a defendant's appeal from an adverse jury verdict in a contract case. We reverse and render.

*FACTS*

On January 30, 1990, the Lermas (Appellees) and R. Conrad Moore & Associates, Inc. (Appellant) entered into an earnest money contract for the purchase of two lots at 1900 Gus Moran in El Paso. The Lermas tendered a check to Moore for $13,500 as part of the earnest money contract. The sale of the lots was contingent upon the Lermas using Moore as a builder. On April 16, 1990, then Lermas and Moore incorporated the previous contract into a new home residential earnest money contract. This contract provided for the construction of a custom home on the lots for a total price, including the lots, of $180,000. The new contract called for an additional payment of $6,500 earnest money, due upon the Lermas' approval of the house plan. Paragraph 4 of the contract required the following:

> FINANCING CONDITIONS: This contract is subject to approval for Buyer of a *conventional* (type of loan) loan (the Loan) to be evidenced by a promissory note (the Note) in the amount of $ *80,000,....* Buyer shall apply for the Loan within *15* days from the effective date of this contract and shall make every reasonable effort to obtain approval from *Competitive Mortgage Co.,* as lender, or any lender that will make the Loan.... **If the Loan cannot be approved within *60* days from the effective date of this contract, this contract shall terminate and the Earnest Money shall be refunded to Buyer without delay.** [Emphasis added.]

In addition to the standard provision of the preprinted contract, special handwritten provisions were included under Paragraph 11:

1) Seller give One Year (1) Builders Warranty and 10–Year H.O.W. warranty

2) **On Lot held more than 60 days, Earnest Money is non-refundable.**

3) Lot purchase contract dated January 30, 1990 is hereby transferred to this Home construction contract.

4) * Balance of Down Payment to be made at time of sale of properties located at 1400 Bodega and 3509 Breckenridge. [Emphasis added.]

Construction on the house began in December 1990, and was completed in the summer of 1991. The Lermas were ultimately denied credit and were unable to close on the house. In September 1991, after demanding the return of their earnest money, they initiated this suit in November 1992. After trial to a jury, the Lermas were awarded $20,000 in damages. The jury found that Moore

breached the contract by failing to return the Lermas' earnest money upon the Lermas' failure to get loan approval within the 60 days contemplated by Paragraph 4 of the contract. Moore appeals.

## *STANDARD OF REVIEW: LEGAL AND FACTUAL SUFFICIENCY*

Moore asserts in its first six points of error that the evidence was legally or factual insufficient to support the jury's findings.

In reviewing a "no evidence" or legal sufficiency claim, we examine only the evidence favorable to the verdict and disregard all evidence to the contrary. *T.O. Stanley Boot Company, Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992); *Furr's, Inc. v. Logan,* 893 S.W.2d 187, 190 (Tex.App.—El Paso 1995, no writ)*. We may reverse on a no evidence point only if the record reflects no evidence necessary to support a vital fact, **\*93** or if the evidence raises only a suspicion of the fact's existence. *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Furr's, Inc.,* 893 S.W.2d at 190. In reviewing a factual sufficiency or great weight and preponderance claim, we examine all evidence presented at trial, and may reverse only if the challenged finding is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Furr's, Inc.,* 893 S.W.2d at 190. We may not substitute our own conclusions for those of the jury, and we may not resolve conflicts in the evidence or pass upon the credibility of the witnesses. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Furr's, Inc.,* 893 S.W.2d at 190. Where the evidence is conflicting, the jury's verdict is generally conclusive on the matter. *Id.*

In reviewing a "matter of law" challenge, we first examine the record to see if any evidence supports the finding, ignoring all evidence to the contrary. If no evidence supports the finding, we then determine whether the evidence conclusively establishes its converse. If so, we must reverse. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Furr's, Inc.,* 893 S.W.2d at 190.

### *Loan Approval*

 **[1]**   In its first point of error, Moore asserts the evidence is legally and factually insufficient to support the jury finding that the Lermas failed to get loan approval for the purchase of the home. After a diligent search of the record, we have been unable to find any evidence that would support a finding that the Lermas did get financing for the purchase. Moore testified that "someone" at Sun World Savings informed her that the Lermas were approved within the 60 day period. However, Ms. Nancy Montes of Mortgage Plus, who took the Lermas' loan application, testified that they were never approved. She stated that a "take out" letter sent out in October 1990 was not final loan approval but a prequalification report that indicates a conditional approval subject

to verification and continuing good credit. Ms. Montes further testified that she exhausted all her sources in attempting to get financing for the Lermas. Ultimately, the Lermas were denied credit and were unable to close on the house. The record overwhelmingly supports the jury's finding that the Lermas did not get loan approval for the purchase of the house. Therefore, Moore's first point of error is overruled.

### *Waiver*

In its second point of error, Moore asserts that the evidence establishes as a matter of law that the Lermas waived any right to have the earnest money refunded. We agree.

**[2]** **[3]** **[4]** **[5]** Any contractual right can be waived. *Purvis Oil Corp. v. Hillin,* 890 S.W.2d 931, 937 (Tex.App.—El Paso 1994, no writ). A waiver is an intentional release, relinquishment, or surrender of a known right. *Id.* The following elements must be met to find waiver: (1) a right must exist at the time of the waiver; (2) the party who is accused of waiver must have constructive or actual knowledge of the right in question; and (3) the party intended to relinquish its right. *See Riley v. Meriwether,* 780 S.W.2d 919, 922 (Tex.App.—El Paso 1989, writ denied). Intentional relinquishment of a known right can be inferred from intentional conduct which is inconsistent with claiming the contractual right. *Id.*

**[6]** **[7]** **[8]** **[9]** **[10]** **[11]** It has been conclusively established that the Lermas did not obtain financing for the purchase of the house from Moore. Paragraph 4 of the contract clearly states that if the purchasers are unable to obtain financing within 60 days of the effective date of the contract, they had a right to have their money returned. Thus, on June 15, 1990, the Lermas had a right to the return of their earnest money. The Lermas' intention to relinquish their right to the return of the earnest money, however, is clearly established by their conduct after June 15. Between the date the contract was signed and the date construction began on the house, the Lermas participated in the design of the house, approved the blueprints in July 1990, and tendered an additional $6,500 in earnest money to Moore in October. The Lermas were then conditionally approved for **\*94** financing which allowed Moore to get a construction loan to begin building the house.

Additionally, after construction of the house began in December 1990, the Lermas monitored its progress on a daily basis. In March 1991, they requested and paid for an upgrade in tile for the house. In June, Isabel Lerma executed a promissory note in the principal amount of $6,000 to Moore to pay for the addition of another room to the house. During this same time period, the Lermas sold their home and another property, as agreed in the contract, to fund the down payment. Mr. Lerma testified that he fully intended to buy the house that Moore was building, and at no time prior to August 1991 did he consider the contract terminated. Mrs. Lerma also testified that until August 1991, they wanted and intended to purchase the home.

Although the Lermas claim that they were unaware that they could get their money back on that date, both Mr. and Mrs. Lerma signed the contract. Mrs. Lerma testified that she read the contract. Mr. Lerma was not sure if he read the contract, but testified that no one prevented him from doing so. A person who signs a contract is presumed to know and understand its contents; absent a finding of fraud, failure to apprehend the rights and obligations under the contract will not excuse performance. *See G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392 (Tex.1982); *Thigpen v. Locke,* 363 S.W.2d 247 (Tex.1962). There is no evidence of fraud, actual or constructive, on the part of Moore. Thus, we conclude the Lermas had knowledge of their right to a refund of the earnest money on June 15.

There is no evidence to support the jury's finding that the Lermas did not waive the right to have the earnest money refunded. The Lermas' intentional conduct after the right to the return of the earnest money arose was inconsistent with claiming that right. They intentionally relinquished a known right, and therefore, we find as a matter of law, that the Lermas waived Paragraph 4 of the contract, and the contract continued in effect, including Paragraph 11 allowing Moore to retain the earnest money on the lots.

The Lermas argue that Paragraph 4 operates as a condition precedent. When the Lermas failed to obtain financing within 60 days, the contract, including any forfeiture provisions, terminated. Thus, the Lermas assert Paragraphs 16 and 11 never became effective. Many Texas cases have construed provisions similar to Paragraph 4 as conditions precedent. *See e.g., Knox v. Townes,* 470 S.W.2d 290, 291 (Tex.Civ.App.—Waco 1971, no writ)(clause stating contract is contingent on obtaining financing creates a condition precedent that must be met before buyer is obligated to perform contract); *Watkins v. Williamson,* 869 S.W.2d 383, 384 (Tex.App.—Dallas 1993, no writ)(residential earnest money contract contingent on satisfactory financing contains a condition precedent; the contract depends upon the condition being met); *Berman v. M.O. Rife, III,* 644 S.W.2d 574, 575–76 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.) (contract "subject to approval" of a conventional loan is condition precedent inserted for benefit of buyer to avoid forfeiture or penalty). We agree with the Lermas that Paragraph 16, a simple default clause included in the preprinted sections of the contract, may not have become effective in the event the Lermas failed to obtain financing within 60 days. In this case, however, we have an additional handwritten provision that is somewhat out of the ordinary and distinguishable from the clauses considered in the cases finding conditions precedent. Under Paragraph 11, the "special provisions" section of the contract, the parties added the phrase "on Lot held more than 60 days, Earnest Money is non-refundable." This brief passage is less than a model of clarity. At first blush, it appears in direct contradiction to Paragraph 4, the termination clause.

If a contract is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *City of*

*Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *First City Nat'l Bank of Midland v. Concord Oil Co.,* 808 S.W.2d 133, 137 (Tex.App.—El Paso 1991, no writ). There is no allegation in this case that the earnest **\*95** money contract is ambiguous, and it does not appear to us to be so. Generally, the parties to a contract intend every clause to have some effect and the Court may not ignore any portion of the contract unless there is an irreconcilable conflict. *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex.1983); *Woods v. Sims,* 154 Tex. 59, 273 S.W.2d 617 (1954). In the interpretation of contracts, the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Duracon, Inc. v. Price,* 817 S.W.2d 147, 149 (Tex.App.—El Paso 1991, writ denied). This requires the court to examine and consider the entire instrument and reach a decision so that none of the provisions will be rendered meaningless. *Id.*

By its wording, Paragraph 11 is not merely a forfeiture clause subject to the condition precedent stated in Paragraph 4. Paragraph 11 envisions the non-occurrence of the condition (in this case financing obtained within 60 days), references the 60–day provision, and provides for continuation of the contract beyond 60 days. To give effect to both provisions and render neither meaningless, we must construe the handwritten provision to allow the buyer, at its option, to continue the contract after 60 days in the absence of financing. A condition precedent like any other provision of a contract can be waived. *Purvis Oil Corp.,* 890 S.W.2d at 931. Thus, if financing were not obtained in 60 days, the Lermas could do nothing, the contract would terminate, and the Lermas would be entitled to return of the earnest money. On the other hand, the Lermas could take action to have the lot "held more than 60 days" thereby waiving the right to the return of the earnest money.

The record establishes that the Lermas chose the latter option. They worked with Moore on the design of the house, tendered additional earnest money four months after the contract would have expired under Paragraph 4, contracted with Moore to increase the square footage of the house, paid for tile upgrades, and sold both the home they were living in and another property in anticipation of closing on the house when it was completed. The record therefore conclusively establishes that the Lermas waived termination of the contract and instead continued to operate pursuant to the contract under Paragraph 11.

 **[12]**    **[13]**    The Lermas further assert that even if we find waiver of Paragraph 4, Paragraph 11 is unenforceable as a penalty. The Lermas characterize Paragraph 11 as an attempted liquidated damages clause. Under Texas law, a liquidated damages provision will be enforced only if the court finds (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. *Rio Grande Valley Sugar Growers, Inc., v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979); *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.—Dallas 1991, no writ)(opinion on rehearing). The Lermas argue that Moore failed to establish these elements. The party asserting that a liquidated damages clause is unenforceable as a penalty, however, bears the burden of proof. *Id.* The Lermas failed to

plead penalty. Although they requested a trial amendment, the trial court denied the amendment and the Lermas do not attack that ruling on appeal. Further, the Lermas did not request, or object to the absence of, a jury question or instruction on the elements of penalty.

 [14]    The Lermas suggest that a jury question was unnecessary because whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court. They argue that the trial court in this case implicitly found Paragraph 11 an unenforceable penalty as a matter of law when it entered judgment in favor of the Lermas. While the determination between an unenforceable penalty and an enforceable liquidated damages provision is generally a question of law for the court, sometimes the factual underpinnings of the elements must be resolved before the legal question can be decided. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). This is such a case. The amount the Lermas paid in earnest money is not, on its face, necessarily disproportionate to actual damages Moore allegedly suffered as the result of the Lermas' failure **\*96** to purchase the custom built home. Thus, at least the fact of Moore's actual damages should have been determined by a jury before the trial court could consider whether the liquidated damages were a reasonable forecast of just compensation. *See Phillips,* 820 S.W.2d at 788–89. Even if fact issues did not exist in this particular context, we do not find that the trial court's entry of judgment implicates the penalty issue in any way. The trial court entered judgment on jury findings that the Lermas did not obtain financing by the deadline provided in Paragraph 4, and that the Lermas did not waive their right to return of the earnest money. An interpretation of Paragraph 11 is unnecessary to those particular jury findings. Moreover, we are hard pressed to find that the trial court "implicitly" found Paragraph 11 unenforceable as a penalty when it had refused to allow the Lermas to plead penalty by trial amendment.

We must reject the Lermas' arguments and affirm Moore's second point of error.

### *Moore's Attorney's Fees*

 [15]    [16]    [17]    [18]    [19]    In its eleventh and twelfth points, Moore alleges error in the trial court's failure to allow evidence of, and award, Moore's attorney's fees. Moore argues that the earnest money contract provided for attorney's fees to the prevailing party in the event of litigation. We find, however, that Moore failed to plead for attorney's fees. A judgment must be supported by the pleadings and, if not so supported, it is void. *State v. Estate of Brown,* 802 S.W.2d 898, 900 (Tex.App.—San Antonio 1991, no writ). A party may not be granted relief in the absence of pleadings to support that relief. *Stoner v. Thompson,* 578 S.W.2d 679, 682, 683–84 (Tex.1979); *Estate of Brown,* 802 S.W.2d at 900. A judgment, absent issues tried by consent, must conform to the pleadings. *Estate of Brown,* 802 S.W.2d at 900. Absent a mandatory statute, a trial court's jurisdiction to render a judgment for attorney's fees must be invoked by pleadings, and a judgment not supported by pleadings requesting an award of attorney's fees is a nullity. *Id.* In this case, there

is no pleading to support an award of attorney's fees. Accordingly, we overrule Moore's eleventh and twelfth points of error.

### *The Court Need Not Reach the Remainder of Moore's Points*

In its third through tenth points, Moore challenges the sufficiency of the evidence to support the jury's damages and unjust enrichment findings, the trial court's failure to disregard jury findings, and the trial court's calculation of prejudgment interest. Our disposition of Moore's second point of error, and of the Lermas' second cross-point, renders it unnecessary for us to reach Moore's Points of Error Three through Ten. Accordingly, we do not reach those points.

### *The Lermas' Cross–Points*

The Lermas raise three cross-points.

*The Lermas' Attorney's Fees*

In their first cross-point, the Lermas assert error in the trial court's failure to award them their attorney's fees. Section 38.001 of the Texas Civil Practice and Remedies Code provides for recovery of attorney's fees in addition to the amount of a *valid* claim for an oral or written contract. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). The contract in this case entitled the *prevailing* party in any legal proceeding to attorney's fees from the non-prevailing party. We have found, however, that the Lermas should not prevail on their causes of action. Accordingly, we overrule the Lermas' first cross-point.

*Recovery Under Unjust Enrichment*

 **[20]**   **[21]**   **[22]**   In their second cross-point, the Lermas argue that even if we find they cannot prevail on their contract cause of action, they can recover under an unjust enrichment theory. In addition to the contract claim, the jury also found in favor of the Lermas on their unjust enrichment cause of action. The unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties. *Burlington Northern R. Co. v. Southwestern Elec. Power Co.,* 925 S.W.2d 92, 96–97 (Tex.App.— Texarkana 1996, no writ). Restitution **\*97** under the principles of unjust enrichment is appropriate where a contract is unenforceable, impossible, not fully performed or void for other legal reasons. *City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.,* 830 S.W.2d 313, 319 (Tex.App.— Austin 1992, no writ). As discussed under Point of Error Two, a valid enforceable contract existed

between the Lermas and Moore, thus restitution under unjust enrichment is not an appropriate remedy. Accordingly, we overrule the Lermas' second cross-point.

*Recovery Under Contract*

In their third cross-point, the Lermas argue that they are entitled to judgment on their contract cause of action. Under Moore's second point of error, however, we found that the evidence established as a matter of law that the Lermas waived their right to recover the earnest money under the contract. Accordingly, we overrule the Lermas' third and final cross-point of error.

## *CONCLUSION*

Having sustained Moore's second point of error, we reverse the judgment of the trial court and render judgment that the Lermas take nothing on their contract and unjust enrichment causes of action.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

⚑ 1. R. Conrad Moore & Associates, Inc. v. Lerma ↝
946 S.W.2d 90 , Tex.App.-El Paso , Mar. 13, 1997 , rehearing overruled ( May 14, 1997 ) , writ denied ( Dec 04, 1997 ) , rehearing of writ of error overruled ( Feb 13, 1998 )

2005 WL 171349
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

SOUTHERN UNION COMPANY, Appellant
v.
CSG SYSTEMS, INC., Appellee.

No. 03-04-00172-CV.    |    Jan. 27, 2005.

From the District Court of Travis County, 201st Judicial District, No. GN-100403; Paul Davis, Judge Presiding.

**Attorneys and Law Firms**

Cynthia Keely Timms, W. Scott Hastings, Locke Liddel & Sapp LLP, Dallas, John L. Foster, Minton, Burton, Foster & Collins, Jennifer Ramsey, Cantey & Hanger, L.L.P., Austin, for appellant.

Scott S. Cooley, Patton G. Lochridge, Travis C. Barton, McGinnis, Lochridge & Kilgore, LLP, Austin, for appellee.

Before Justices KIDD, PATTERSON and PURYEAR.


*MEMORANDUM OPINION*

JAN P. PATTERSON, Justice.

 **\*1** Southern Union Company, a gas utility provider, contracted with CSG Systems, Inc., a printing company, to outsource Southern Union's print-and-mail operations. The conversion of services was more problematic than anticipated, causing Southern Union to cease operations and sue CSG for breach of contract. Following trial, the jury found in favor of CSG. Accordingly, the trial court entered a final judgment awarding damages to CSG. Southern Union appeals only the amount of damages awarded and does not challenge liability. Because there is legally sufficient evidence in the record to support the judgment, we affirm the award except as modified.

## BACKGROUND

Beginning in the late 1990's, Southern Union experienced technological difficulties and realized that its computer system was no longer capable of printing and mailing approximately one million bills per month to its customers. [1] Southern Union investigated companies to which it could outsource these operations and then requested proposals from several potential vendors. CSG responded to Southern Union's request in February 2000. Southern Union selected CSG's bid from the field of candidates, and the two companies engaged in formal negotiations from April until September.

A contract was finalized and signed by representatives from both Southern Union and CSG as of October 13, 2000. The contract contained a "discontinuance fee" provision, obligating Southern Union to pay a specified amount of damages to CSG in the event that Southern Union terminated the agreement before its five-year term expired. The parties agree that the provision was intended as a liquidated damages provision.

After the contract was finalized, CSG provided Southern Union with a written project plan contemplating December 1, 2000 as the date for CSG to "go live" with the print-and-mail operations. In the months leading up to that deadline, implementation problems arose on both sides and the conversion fell behind schedule. The companies continued discussions in an attempt to solve the problems until the first week of January 2001, when Southern Union ceased work on the project. Southern Union filed suit against CSG on February 7, asserting breach of contract among other causes of action.

In its verdict, the jury found that Southern Union and CSG were both in breach of the agreement, but that CSG's breach was excused, and that CSG would be fairly and reasonably compensated by an award of $2.1 million for the discontinuance fee; $111,000 for the cost of paper and envelopes purchased by CSG; $1,045,944 for CSG's lost profits; and $140,000 for the cost of software licenses provided by CSG to Southern Union. Beneath the last element of damages, the jury wrote "upon return of 300 licenses to CSG, the answer would be $0."The trial court determined that, as a matter of law, it was proper to award liquidated damages in lieu of actual damages, and therefore entered a final judgment in conformance with the jury's verdict, for a total amount of $2,351,000, plus interest and attorney's fees.

## ANALYSIS

**\*2** On appeal, Southern Union challenges the award of damages to CSG Systems, claiming that CSG should not be awarded any liquidated damages pursuant to the discontinuance fee provision, but rather that CSG's recovery should be confined to $1,045,944 in lost profits. Southern Union first asserts that, based on the timing of its breach, the proper calculation of the fee results in a zero sum. Alternatively, Southern Union asserts that even if the proper calculation is $2.1 million, CSG is not entitled to recover the award because that amount constitutes an illegal penalty. Southern Union also claims that prejudgment interest should not be awarded on CSG's damages for the discontinuance fee or lost profits. Finally, Southern Union urges that it is entitled to a remittitur of $140,000 because it returned the software licenses to CSG.

**The Discontinuance Fee Provision**

Southern Union's first issue, asserting that the timing of Southern Union's breach results in zero damages for the discontinuance fee, turns on a construction of the provision's terms. We agree with the parties that the provision is unambiguous. We therefore review this issue as a matter of law, looking only to the contract's four corners and interpreting its plain meaning. *See French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 796-97 (Tex.1995). The discontinuance fee provision states:

> The parties have mutually agreed upon the fees for the Services to be provided hereunder based upon certain assumed volumes of processing activity, and the length of the term of Agreement. Customer [2] acknowledges and agrees that, without the certainty of revenue promised by the commitments set forth in this Agreement, CSG would have been unwilling to provide the Services at the fees set forth in the Agreement. Because of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term, Customer agrees that prior to such termination and in addition to all other amounts then due and owing to CSG, Customer will pay to CSG (as a contract and not as a penalty) an amount equal to a percentage of the total Subscriber Statement Minimum for the remaining term of the Agreement, as defined in Schedule C, times the then current ESP Processing Fees for the First Physical Page, as defined in Schedule C beginning with the calendar month in which termination occurs ("Discontinuance Fee"). If any such termination occurs prior to the first anniversary of the Effective Date of this Agreement, the percentage shall be fifty percent (50%). If between the first and second anniversary of the Effective Date it shall be thirty percent (30%) and if following the second anniversary of the Effective Date it shall be ten percent (10%). Customer acknowledges and agrees that the Discontinuance Fee is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business contemplated by this Agreement.

> Customer shall not be required to pay the Discontinuance Fee if CSG terminates this Agreement other than as a result of Customer's breach of its obligations hereunder or if Customer terminates the Agreement for a material, uncured breach by CSG. The Discontinuance Fee shall be CSG's sole remedy resulting from a termination or other breach of this Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term. In the event of a sale or transfer of all or substantially all of Southern Union Company's assets to a third party, the percentages used to calculate the Discontinuance Fee shall be twenty-five percent (25%), fifteen percent (15%) and five percent (5%), respectively.

**\*3**  (Emphasis added.)

The parties agree that, given the plain meaning of the relevant language, the proper way to calculate the discontinuance fee for a breach within the first year of signing the agreement is to multiply the applicable "Subscriber Statement Minimum" by the applicable "ESP Processing Fees" and then take fifty percent of that total. The parties disagree, however, on how to determine one factor of this equation: the Subscriber Statement Minimum. Southern Union asserts that, pursuant to Schedule C, the minimum does not accrue until after the "commencement date." [3] Because Southern Union breached this agreement prior to the commencement date, [4] it claims that the minimum was zero, and that the total calculation should therefore be zero.

CSG interprets the provision to mean that, although Schedule C prevents Southern Union from having to pay the monthly minimum until after the commencement date, that time restriction does not apply to Southern Union's liability under the discontinuance fee provision. CSG asserts that Southern Union's interpretation is wrong because it allows Southern Union to breach the contract without consequence, so long as it does so within ninety days of the commencement date, regardless of the significant time and money invested by CSG during the implementation phase. According to CSG, the liquidated damages provision is most necessary during this initial time period because of the parties' unequal contributions and because of the difficulty in calculating potential damages before any actual profits have been made.

We agree with CSG's reading of the contract. Nothing in the provision limits its applicability to a breach occurring after the commencement of services. The provision specifies the circumstances in which Southern Union is excused from paying the discontinuance fee, and none impose such a timing limitation. To the contrary, the provision's express terms state that Southern Union shall be liable for the discontinuance fee, at a rate of fifty percent, should it cause "*any* termination" within one year of signing the contract.

Testimony of witnesses from both Southern Union and CSG also supports CSG's assertion that the provision was intended to apply during the implementation phase, to protect the significant up-front contributions made by CSG before it had received any profits from the agreement. Pamela Vanlandingham, CSG's Senior Vice President and General Manager of the statement processing center, testified that during November and December, the CSG team "worked around the clock" to complete the project, which included working "very hard over the holidays," and that "CSG [had] expended right at 500 to 600 hours" when Southern Union breached the contract. Southern Union officials confirmed that the nature of this contract required front-loaded efforts by CSG and that, prior to terminating the agreement, they were aware of the money CSG invested on supplies and equipment, and of the hours CSG put toward programming, testing, and implementing the new system. David Kvapil, the Chief Financial Officer for Southern Union, testified that he knew CSG had worked "well beyond the number of hours they were going to dedicate to the project," that CSG had provided a "significant batch of bills" to Southern Union for approval, and that CSG had spent over $100,000 on envelopes and paper by the end of December 2000. Christine Shores, a business analyst for Southern Union's mail services division, testified that Southern Union approved the order for paper and envelopes prior to CSG placing it, and that Southern Union was aware of the time and money spent by CSG in its efforts to commence live operations.

**\*4** Based on the plain meaning of the provision, as supported by the witnesses' testimony, Southern Union's liability for the discontinuance fee is not limited to a breach occurring after the commencement of live operations. Southern Union is liable under the discontinuance fee for its breach of the agreement during the implementation phase. The amount of fair and reasonable damages pursuant to the discontinuance fee was therefore properly calculated by the jury, and affirmed by the trial court, as $2.1 million. Southern Union's first issue is overruled.

**Liquidated Damages**

Southern Union claims in its second issue that, if the discontinuance fee is properly calculated as $2.1 million, then CSG is not entitled to any recovery of that amount because it constitutes an improper penalty. For the purposes of this case, the parties agree that the discontinuance fee should be treated as an award of liquidated damages.

A liquidated damages provision may only be enforced when the court finds "(1) that the harm caused by the breach is incapable or difficult of estimation and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). The party challenging the award of liquidated damages has the burden to establish that the two-prong test is not satisfied and that, instead, the award of liquidated damages is an unenforceable penalty. *See Dominzo v. Progressive County Mut. Ins. Co.,* 54 S.W.3d 867, 875 (Tex.App.-Austin 2001, pet. denied). Whether the liquidated damages provision is enforceable is a question of law. *Phillips,* 820 S.W.2d at 788.

*Difficulty of Estimation*

Southern Union seeks to satisfy the first part of its burden by claiming that CSG's damages were easy to estimate. Southern Union bases this claim on a "price projection" document prepared by CSG before entering the agreement, which anticipated that CSG would earn a total profit of $1,045,944 over the five-year term of its contract with Southern Union. Because the jury ultimately awarded this exact amount to CSG as lost profits, Southern Union argues that CSG was capable of precisely estimating its damages, and therefore the liquidated damages provision is an unenforceable penalty from which CSG is not entitled to recover. The record, however, shows otherwise.

The language of the discontinuance fee provision supports the trial court's determination that an award of liquidated damages was proper because CSG's actual damages were not easy to estimate. The provision expressly states that it was included in the contract "[b]ecause of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to pay the discontinuance fee in the event that it breached the contract. This provision was a bargained-for exchange, negotiated and approved by both companies.

 **\*5** When a provision is mutually bargained for by equally competent parties, we give deference to its enforcement. *See Shel-al Corp. v. American Nat'l Ins. Co.,* 492 F.2d 87, 94 (5th Cir.1974). Stanley Mayer, Southern Union's Chief Information Officer, testified that the provision's terms were negotiated between attorneys representing both companies. From the face of the contract, Southern Union understood at the time it entered the agreement that CSG's damages would be difficult to estimate and therefore agreed a liquidated damages provision was necessary.

"[T]he fundamental purpose of a valid liquidated damages provision is to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to the damages are indeterminable or will be otherwise difficult to prove." 24 Williston on Contracts § 65:3, at 250 (4th ed.2002). It is well established that lost profits can be inherently difficult to estimate. *See Texas Inst., Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). Frequently, lost profits are too speculative to recover because their calculation depends on "uncertain and changing conditions, such as market fluctuations," and this uncertainty is heightened where no profits have been made at the time the contract is breached. *Id.* The contract reflects that Southern Union and CSG sought to avoid such speculation in agreeing to the liquidated damages provision. The sliding scale of damages recognized the front-loaded value to be provided by CSG. As argued by CSG, had there not been a discontinuance fee to rely on, in the event of a breach by Southern Union-particularly early in the contract term-then CSG would have risked being unable to recover because of the uncertainty in calculating its lost profits.

That CSG prepared a projection of its prices, and that the jury looked to the projection as a reasonable calculation for lost profits, does not satisfy Southern Union's burden. The purpose of the document was not to define CSG's potential damages. Rather, as Vanlandingham testified, the projection was an internal tool used by CSG to outline the prices it anticipated charging for its print-and-mail services, so that CSG could make an informed bid in response to Southern Union's request for proposal. Vanlandingham also testified that the projection was prepared with a "conservative accounting approach to pricing." CSG excluded several items from its calculations because, prior to entering the contract, the parties had not assigned a value to these items. This increased the difficulty of estimating damages. CSG's expert confirmed the difficulty of this estimation by explaining several different ways that CSG's lost profits could be calculated, with the results ranging between approximately $1 million to $4 million. After hearing this evidence, the jury determined that $1,045,944 was a reasonable award of lost profits. But their verdict does not establish that the estimation was either an easy or precise one to make. Given the mutually agreed-upon terms of the provision, and the evidence in support of its plain meaning, we are unpersuaded by Southern Union's assertion that CSG's damages were easy to estimate.

### Reasonable Forecast of Just Compensation

**\*6** Southern Union seeks to satisfy the second part of its burden by showing that the discontinuance fee provision is an unenforceable penalty because the amount awarded to CSG as liquidated damages is unreasonable. Southern Union claims that this is established simply by the fact that the $2.1 million awarded to CSG pursuant to the discontinuance fee is double the amount found by the jury as lost profits. A liquidated damages provision will be considered an unenforceable penalty if the amount awarded is so disproportionate to the actual or anticipated damages that it in effect punishes the breach, thereby coercing performance of the contract by making it too costly to not adhere to its terms. 24 Williston on Contracts § 65:3, at 249 (4th ed.2002); *see also Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382 (1930).

But Southern Union fails to cite, and we are unaware of, any cases in support of its claim that a two-to-one ratio of liquidated-to-actual damages is unreasonable *per se.* There is, however, authority to the contrary. In *Baker v. International Record Syndicate, Inc.,* our sister court approved a liquidated damages award of $51,000, which was more than triple the $15,000 found as actual damages. 812 S.W.2d 53, 56 (Tex.App.-Dallas 1991, no writ). The Texas Supreme Court also upheld a trial court's judgment awarding $790,000 in liquidated damages, which was twice the $395,000 found as actual damages. *Sealock v. Texas Fed. Sav. & Loan Assoc.,* 755 S.W.2d 69, 70 (Tex.1988).

Southern Union seeks to distinguish such cases by urging that, even if it is normally reasonable to award liquidated damages in an amount that is double the actual damages, this ratio is unreasonable in a case where the amount at issue involves millions rather than thousands of dollars, as here.

Again, while no cases support Southern Union's claim, there is authority to the contrary. In a case involving high-end commercial real estate, the Fifth Circuit held that a liquidated damages award of $5 million was reasonable, despite an internal memorandum stating that the anticipated damages were $1.4 million. *Thanksgiving Tower Partners v. Anros Thanksgiving Partners,* 64 F.3d 227, 232 (5th Cir.1995). Thus, as a matter of law, it is not unreasonable *per se* to award liquidated damages in an amount that is double the actual damages. Moreover, in this case, the reasonableness of CSG's award is supported by the record.

The discontinuance fee expressly states that it "is not a penalty" and that it "is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business as contemplated by this Agreement."Although parties cannot avoid a challenge to a liquidated damages provision simply by characterizing it as "reasonable," such express language is instructive of the parties' intent when the terms are mutually bargained for between equally competent parties. *See Shel-al Corp.,* 492 F.2d at 94; *Loggins Constr. Co. v. Stephen F. Austin State Univ. Bd. of Regents,* 543 S.W.2d 682, 685 (Tex.App.-Tyler 1976, writ ref'd). Southern Union's own witnesses testified that the language of the discontinuance fee provision was bargained for and intended by the parties, and that the amount awarded under the discontinuance fee was reasonable. In response to questions on cross-examination, Stanley Mayer agreed that the provision was mutually negotiated, that he approved its terms, and that he knew Southern Union would be responsible for paying the fee if it breached the contract. When David Kvapil was asked whether he was aware at the time Southern Union filed suit against CSG "that the calculation of the discontinuance fee would be approximately $2 million," he responded that, "Yeah. I think that's what it calculates to."Kvapil further agreed that Southern Union understood the purpose of the discontinuance fee was "to compensate CSG for all the work they have done and all their expectation" and that this was "fair."

**\*7** The jury was asked to determine what amount would be "fair and reasonable" to award CSG pursuant to the discontinuance fee, and it responded "$2.1 million." A jury's findings on damages should be upheld if there is sufficient evidence in the record to show that the amount is fair and reasonable compensation. *Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 371 (Tex.2004). Here, the jury was entitled to make this finding based on both the express language of the contract and on the testimony of Southern Union's witnesses. We find that this is sufficient evidence from which the jury could determine that it was reasonable to award CSG $2.1 million in liquidated damages. Southern Union's second issue is overruled.

**Prejudgment Interest**

Southern Union urges in its third issue that, regardless of whether CSG is awarded lost profits or the discontinuance fee, CSG is not entitled to recover prejudgment interest on either award because both encompass elements of future damages, and section 304.1045 of the finance code, as amended in 2004, specifically prohibits recovery of prejudgment interest on awards of future damages.

Tex. Fin.Code Ann. § 304.1045 (West Supp.2004-05). CSG counters that the finance code does not prevent prejudgment interest in this case because, by its express terms, the provision only applies to cases involving "wrongful death, personal injury, or property damage."Tex. Fin.Code Ann. §§ 304.101, .1045 (West 1998 & Supp.2004-05). Southern Union asserts in response that, despite its express terms, section 304.1045 prevents prejudgment interest here based on the Texas Supreme Court's holding that the statutory framework should be applied to all cases, not just those involving "wrongful death, personal injury, and property damage."*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514, 530 (Tex.1998). CSG argues, however, that even if section 304.1045 prevents prejudgment interest on future damages in a breach-of-contract case, it is still proper for CSG to recover prejudgment interest on the amount awarded as the discontinuance fee because it is an award of liquidated, not future, damages. We review the trial court's award of prejudgment interest for an abuse of discretion. *Purcell Const., Inc. v. Welch,* 17 S.W.3d 398, 402 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

Southern Union and CSG agree that the discontinuance fee was intended to be a liquidated damages provision. Liquidated damages are given *in lieu of* actual damages and thus they are not considered "future damages," even though aspects of the liquidated award may compensate the party for what would have otherwise been recovered as future losses. *See Lafarge Corp. v. Wolff, Inc.,* 977 S.W.2d 181, 188 n. 13 (Tex.App.-Austin 1998, pet. denied); *Eberts v. Businesspeople Personnel Servs., Inc.,* 620 S.W.2d 861, 864-65 (Tex.App.-Dallas 1981, no writ). Liquidated damages are distinct from future damages because the measure of liquidated damages is stipulated to before the occurrence of a breach and thus, unlike future damages, the amount of liquidated damages can be immediately ascertained at the time of the breach. *See Phillips,* 820 S.W.2d at 788. It is permissible for a trial court to award prejudgment interest when a contract "provides the conditions on which liability depends and ... fixes a measure by which the sum payable can be ascertained with reasonable certainty."*Wheat v. American Title Ins. Co.,* 751 S.W.2d 943, 944-45 (Tex.App.-Houston [1st Dist.] 1988, no writ); *see also Sealock,* 755 S.W.2d. at 70 (upholding award of prejudgment interest on liquidated damages); *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 932 (Tex.1988) (Wallace, J., dissenting) ("The Legislature has given contracting parties notice that if they enter into and subsequently breach agreements in which damages are liquidated or otherwise ascertainable, they may be held liable for prejudgment interest. Parties to contracts have always had this corresponding obligation and right....").

 **\*8** We decline to reach the issue of whether the finance code prevents recovery of prejudgment interest on future damages in a breach-of-contract case because we agree with CSG's argument that liquidated damages are distinct from future damages and, as such, section 304.1045 does not prohibit the recovery of prejudgment interest on liquidated damages. The trial court therefore did not abuse its discretion in awarding prejudgment interest to CSG on the $2.1 million it recovered pursuant to the discontinuance fee.

**Remittitur**

In its final issue, Southern Union asserts that the judgment should be modified to remit $140,000 of CSG's damages. The jury expressly stated in the verdict that if Southern Union returned the software licenses provided to it by CSG, then CSG would be entitled to zero damages for the licenses. It is undisputed that Southern Union returned the licenses. The trial court awarded CSG $140,000 for the licenses, over Southern Union's objection. CSG does not oppose a remittitur of $140,000. Southern Union's fourth issue is sustained and we modify the judgment accordingly. In all other respects, the trial court's judgment is affirmed.

Justice KIDD not participating.

Footnotes

1    At the time, Southern Union had a contract with Pitney Bowes for that company to package the mailings after Southern Union processed and printed them, but that contract was set to expire in December 2001.

2    The provision refers to Southern Union as "Customer."

3    Schedule C states that, within the first year of the contract, the "minimums begin ninety (90) days ... following the initiation date of services ('Commencement Date')...." The contract defines the commencement date as "the first day of the calendar month in which the Services commence."Schedule D discusses "services" as including a list of activities related to the printing, inserting and mailing of customer bills in a specified carrier envelope, during specified billing cycles.

4    CSG agrees that the commencement date had not yet occurred at the time of Southern Union's breach.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1.  Southern Union Co. v. CSG Systems, Inc. ✎
2005 WL 171349 , Tex.App.-Austin , Jan. 27, 2005 , rule 53.7(f) motion granted ( Mar 14, 2005 )

334 S.W.3d 275
Court of Appeals of Texas,
Houston (1st Dist.).

SP TERRACE, L.P. and Tyee Management, LLC, Appellants,
v.
MERITAGE HOMES OF TEXAS, LLC, Appellee.

No. 01–09–00155–CV. | Oct. 21, 2010.

**Synopsis**
**Background:** Builder brought breach of contract action against subdivision developer, and developer counterclaimed for breach of contract. The 165th District Court, Harris County, Elizabeth Ray, J., granted builder summary judgment, and developer appealed.

**Holdings:** On rehearing, the Court of Appeals, Jane Bland, J., held that:

[1] alleged oral modification to parties' contract extending developer's deadline was unenforceable under the statute of frauds;

[2] genuine issue of material fact as to whether builder waived deadline in contract precluded summary judgment;

[3] genuine issue of material fact as to whether builder breached the implied covenant to cooperate precluded summary judgment;

[4] there was no evidence that earnest money liquidated damages provision was a penalty; and

[5] builder was not required to provide 30-day notice and an opportunity to cure if developer did not substantially complete contract by deadline.

Reversed and remanded.

**Attorneys and Law Firms**

**\*279** Michael C. O'Connor, O'Connor, Craig, Gould & Evans, P.C., Houston, TX, for Appellants.

David Watkin Jones, Beck, Redden & Secrest, LLP, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices BLAND and MASSENGALE.

## OPINION ON REHEARING

JANE BLAND, Justice.

In this dispute over an earnest money contract to develop a plat of real estate, the trial court granted summary judgment in favor of Meritage Homes of Texas, LLC (Meritage) on its breach of contract claim against SP Terrace, LP, and Tyee Management, LLC (collectively, SP Terrace). The trial court summarily rejected SP Terrace's counterclaims for breach of contract against Meritage.

The contract called for SP Terrace to file a subdivision plat by December 31, 2005. SP Terrace concedes that it did not meet this deadline. But it argues that the contract extended the deadline, or alternatively that its compliance was excused. It claims fact issues exist on its affirmative defenses of oral modification, waiver, delay and interference by Meritage, on the amount of attorney's fees, and on its counterclaim against Meritage. We conclude that SP Terrace raises a fact issue on the issues of waiver and delay, but not as to contract modification or interference. We therefore reverse the trial court's summary judgment and remand the case for trial. We grant rehearing and withdraw our opinion and judgment dated May 6, 2010, to address an argument that SP Terrace raises in its motion for rehearing. Our disposition is unchanged.

## Background

### *Underlying Facts*
SP Terrace entered into an earnest money contract with Meritage to develop and sell ninety-six lots in a proposed Harris County subdivision. The development plan required small and narrow lots, and Meritage was one of a few builders who could construct houses to fit the particular lot sizes. The contract terms required SP Terrace to improve the overall subdivision. In particular, it required SP Terrace to file a subdivision plat with Harris County by a December 31, 2005 substantial completion deadline. After substantial completion, Meritage would then purchase the lots in a series of transactions. The total purchase price was $2,688,000. Meritage deposited ten percent of this price, $268,000, with SP Terrace as earnest money. If SP Terrace did not achieve substantial completion by December 31, 2005, Meritage could terminate the contract and recover its earnest money deposit. But, if Meritage delayed SP Terrace's performance of its contractual obligations, the substantial completion deadline would "be extended to the extent of any such delay."

On November 30, representatives from Meritage and SP Terrace met to discuss **\*280** the project. At this point, SP Terrace was ready to file the subdivision plat. Meritage asked for changes to the plat, and it requested that SP Terrace postpone filing the plat to accommodate those changes. SP Terrace agreed, but informed Meritage that a six-month extension of the substantial completion deadline would be necessary to address these and any future changes to the development. According to Tyler Todd, the president of Tyee Management, SP Terrace's general partner, and Kelly Smalley, the project manager, the parties orally agreed to extend the substantial completion deadline, and the representatives of Meritage agreed to sign a written extension memorializing the oral modification. Smalley mailed a written agreement to Meritage before December 31, 2005. She never received a response.

The parties continued to work together to make changes and improvements to the development into early February 2006. But on February 3, Meritage informed SP Terrace that, due to SP Terrace's failure to meet the substantial completion deadline, Meritage was terminating the contract and demanding the return of its earnest money deposit.

### Procedural History

After SP Terrace refused to return the earnest money deposit, Meritage sued for breach of contract. SP Terrace counterclaimed for breach of contract, alleging that Meritage (1) delayed SP Terrace's performance, (2) failed to cooperate with SP Terrace, and (3) breached their oral agreement to extend the substantial completion deadline by six months, all of which entitled SP Terrace to retain the earnest money deposit and recover actual damages in addition to the earnest money it kept.

Meritage moved for traditional and no-evidence summary judgment on its claims against SP Terrace and on SP Terrace's counterclaim. Meritage contended that the parties never agreed to extend the substantial completion deadline. Meritage argued that SP Terrace's counterclaim failed as a matter of law because it did not state a claim for affirmative relief and the liquidated damages provision in the contract precluded SP Terrace from recovering actual damages in excess of the earnest money deposit. Meritage contended that SP Terrace's waiver defense failed because Meritage never renounced its right to terminate the contract, and the forty-eight days that had passed between the substantial completion deadline and the date Meritage demanded the return of its earnest money deposit was not long enough to show that Meritage intended to yield its right to terminate. Meritage argued that any oral modification of the contract is unenforceable because it materially altered the obligations of the underlying written contract. Meritage also noted that SP Terrace failed to present any evidence that the amount of liquidated damages was an unreasonable forecast of the amount of its damages.

SP Terrace responded with the Todd and Smalley affidavits to show that fact issues existed regarding (1) an agreement to extend the substantial completion deadline; (2) whether Meritage, through its oral agreement to extend the deadline and its continued work with SP Terrace after

December 31, 2005, waived the deadline; and (3) whether Meritage breached its duties to cooperate with SP Terrace and to not delay or interfere with SP Terrace's performance of its contractual obligations. SP Terrace also argued that the liquidated damages provision of the contract, which limited SP Terrace's recovery to retention of the earnest money deposit, was unenforceable penalty because it hypothetically would allow the forfeiture of the deposit due to any breach by Meritage, including a trivial one.

**\*281** The trial court granted Meritage's motions. Shortly thereafter, Meritage moved for entry of a final judgment, asking the trial court to award it $268,000 in damages, $71,170.50 in attorney's fees incurred in prosecuting its claims in the trial court proceedings, $40,000 in attorney's fees if SP Terrace appeals to an intermediate appellate court, and an additional $27,500 in attorney's fees if Meritage ultimately prevails after full briefing and oral argument to the Texas Supreme Court.

SP Terrace moved the trial court to reconsider the summary judgment. SP Terrace attached excerpts from the deposition of Michael Pizzitola, taken after the original submission of the summary judgment motions, to further support its contentions. SP Terrace also attached the affidavit of its counsel of record opposing Meritage's requested amount of attorney's fees. The trial court's docket sheet includes the following entry for December 8, 2008: "D. (seller) Motion for leave of court to file additional evidence granted." The trial court did not memorialize the docket entry in any order, even though SP Terrace submitted a proposed order and requested that the trial court sign it. The trial court entered a final judgment in favor of Meritage, awarding the $268,000 earnest money deposit as damages and the full amount of attorney's fees requested by Meritage.

## Discussion

### *Standard of Review*

We review de novo the trial court's grant of a motion for summary judgment. *Provident Life & Accid. Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003). After an adequate time for discovery, a party may move for no-evidence summary judgment if there is no evidence of one or more essential elements of a claim or defense on which the adverse party bears the burden of proof at trial. TEX.R. CIV. P. 166a(i). Once a party moves for no-evidence summary judgment, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact on each element specified in the motion. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). We review the evidence in the light most favorable to the non-movant, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005)).

**[1]** **[2]** **[3]** When we construe a contract, we must "ascertain and give effect to the parties' intentions as expressed in the document." *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam). We consider the contract as a whole in order to give effect to all provisions of the contract. *See id.* at 312. We give contractual terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties intended a different meaning to control. *See Heritage Res. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

### Late–Filed Summary Judgment Evidence

**[4]** **[5]** SP Terrace initially contends that the trial court erred in granting summary judgment because the late-filed deposition testimony of Meritage's Michael Pizzitola creates fact issues. Texas Rule of Civil Procedure 166a(c) provides that "[e]xcept on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response." TEX.R. CIV. P. 166a(c). A trial court may accept late-filed summary judgment evidence, but it must affirmatively indicate that it accepted or considered that **\*282** evidence. *See Stephens v. Dolcefino,* 126 S.W.3d 120, 133–34 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). If no order in the record indicates that the court gave leave to file untimely evidence, then we presume that the trial court did not consider the evidence. *See Benchmark Bank v. Crowder,* 919 S.W.2d 657, 663 (Tex.1996); *Dixon v. E.D. Bullard Co.,* 138 S.W.3d 373, 375–76 (Tex.App.-Houston [14th Dist.] 2004, pet. granted, judgm't vacated w.r.m.); *Farmer v. Ben E. Keith Co.,* 919 S.W.2d 171, 176 (Tex.App.-Fort Worth 1996, no writ).

**[6]** SP Terrace relies on the trial court's docket entry as sufficient indication that the trial court granted it leave to late-file the Pizzitola deposition as summary-judgment evidence. We previously have held, however, that a docket entry "forms no part of the record we may consider; it is a memorandum made for the trial court and clerk's convenience. This rule results, in part, from the inherent unreliability of docket entries." *Miller v. Kendall,* 804 S.W.2d 933, 944 (Tex.App.-Houston [1st Dist.] 1990, no writ) (citing *Energo Int'l Corp. v. Modern Indus. Heating, Inc.,* 722 S.W.2d 149, 151–52 (Tex.App.-Dallas 1986, no writ) ("Consequently, there is no indication in the record that permission of the court was requested or obtained to file the amended answer and that the amended answer was properly before the court.")). SP Terrace contends that our holding in *Dolcefino* supports its argument despite these cases. In *Dolcefino,* however, the trial judge stated on the record at the motion for reconsideration hearing that "the court will include the evidence offered today in the summary judgment record. The court, even taking this evidence into the record, denies Plaintiff's motion for new trial." *See Dolcefino,* 126 S.W.3d at 134. We noted that the trial judge's statement on the record indicated that the judge had accepted the evidence as belatedly offered summary judgment evidence. *See id.* Here, in contrast, SP Terrace requested that the trial court sign an order granting leave to file the additional evidence that it had attached to the motion for reconsideration. It attached the docket sheet and a proposed order, but the trial court never entered the order. Following *Miller,* we decline to extend the *Dolcefino* analysis to docket sheet entries, and thus hold that this evidence is not part of the summary judgment record.

**[7]** In a similar vein, Meritage, in its response to SP Terrace's motion for reconsideration, attached excerpts from the deposition of Tyler Todd that it had not previously filed with the trial court. Meritage did not request leave of court to late-file these excerpts from Todd's deposition, and thus these excerpts do not form part of the summary judgment record. *See* TEX.R. CIV. P. 166a(c); *Dolcefino,* 126 S.W.3d at 133.

### *Oral Modification of the Substantial Completion Deadline*

**[8]** Turning to the merits, SP Terrace first contends that an oral modification to the contract exists and thus it is not liable for any breach associated with missing the December 31 deadline. Under the statute of frauds, a contract for the sale of real estate must be in writing and signed by the party charged with compliance with its terms. TEX. BUS. & COM.CODE ANN. § 26.01(b)(4) (Vernon 2009). Generally, if a contract falls within the statute of frauds, then a party cannot enforce any subsequent oral material modification to the contract. *See Dracopoulas v. Rachal,* 411 S.W.2d 719, 721 (Tex.1967); *see also Walker v. Tafralian,* 107 S.W.3d 665, 670 (Tex.App.-Fort Worth 2003, pet. denied).

In *Dracopoulas,* the Texas Supreme Court held unenforceable an oral modification **\*283** that extended the time for performance indefinitely. *See Dracopoulas,* 411 S.W.2d at 722. The court reasoned that the termination date of the contract was the "hinge upon which still other contractual rights and duties turn," and extending the termination date indefinitely would destroy other contractual provisions that depended on the termination date to become operative. *See id.; see also King v. Texacally Joint Venture,* 690 S.W.2d 618, 620 (Tex.App.-Austin 1985, writ ref'd n.r.e.) ("It has been held that attempted alteration of the time for performance in real estate contracts is a material alteration." (citing *Vendig v. Traylor,* 604 S.W.2d 424 (Tex.Civ.App.-Dallas 1980, writ ref'd n.r.e.))). *But see Triton Comm'l Props., Ltd. v. Norwest Bank Tex., N.A.,* 1 S.W.3d 814, 819 (Tex.App.-Corpus Christi 1999, pet. denied) (holding that extending the time for performance does not, by itself, materially alter the underlying obligations, even if the contract would otherwise terminate). In the right circumstances, an extension for the time for performance can be a material alteration.

**[9]** This case presents one of those circumstances. Even if the oral modification extending performance would not ordinarily materially alter the underlying written contract, when a party relies on the modification to assert that the other party is in material breach to excuse further performance, the modification then becomes material and unenforceable unless in writing. *See Walker,* 107 S.W.3d at 670; *King,* 690 S.W.2d at 620.

**[10]** Todd and Smalley described the November 30 meeting between Meritage and SP Terrace representatives. Each averred that, at this meeting, Meritage representatives requested that SP Terrace delay filing the subdivision plat to allow the parties to continue making changes to

the development. SP Terrace agreed, but requested a six-month extension of the December 31 deadline. According to Todd and Smalley, Meritage's representatives agreed to extend the deadline and to sign a written agreement confirming that extension. Smalley mailed a written extension to Meritage before December 31, and although Meritage never returned a signed extension, it also never objected.

Meritage points to a January 20, 2006, letter from Smalley to Steve Harding as evidence that the parties did not agree to extend the deadline:

> I had previously sent you an addendum to the Earnest Money Contract prior to the end of the year extending the date of the contract to June 30, 2006. As of this date, I have not received an executed addendum. I know there are still questions to be answered, but we need some assurance that we can reach an agreement and declare some sort of modified substantial completion.

It is thus undisputed that the parties never signed a written agreement to extend the deadline beyond December 31. In addition, SP Terrace viewed the extension of time to be a material alteration to the contract, sufficient to excuse it from further performance, stating to the trial court:

> Meritage agreed to extend the substantial completion date and/or caused a default or delay in the substantial completion. Meritage then refused to perform under the Contract by its February 3, 2006 letter. This evidence is sufficient to show a prior or anticipatory breach by Meritage, which would excuse further performance by SP Terrace.

SP Terrace thus asserts that Meritage's breach of the alleged oral extension of the substantial completion deadline was sufficient to excuse any further performance by SP Terrace. The modification here is a **\*284** material term—as such, it is unenforceable because it was never reduced to writing. *See Walker,* 107 S.W.3d at 670; *King,* 690 S.W.2d at 620. We hold that the trial court correctly granted summary judgment on SP Terrace's affirmative defense of modification.

### *Waiver of the Substantial Completion Deadline*

 [11]   [12]   SP Terrace next contends that a fact issue exists regarding Meritage's waiver of the December 31 deadline. A party establishes waiver by demonstrating (1) the express renunciation of a known right or (2) silence or inaction for so long as to show the intent to yield a known right. *See Motor Vehicle Bd. v. El Paso Indep. Auto Dealers,* 1 S.W.3d 108, 111 (Tex.1999). Waiver can also result from acts that induce the other party to believe that the party will not insist on exact performance within the contractual time limits. *See Kennedy Ship & Repair, LP v. Pham,* 210 S.W.3d 11, 20 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *see also KMI Continental Offshore Prod. Co. v. ACF Petrol. Co.,* 746 S.W.2d 238, 243 (Tex.App.-Houston [1st Dist.] 1987, writ

denied) ("[A] waiver can occur if a party knowingly possessing the right acts in such a manner that the party misleads the opposing party into believing that a waiver has occurred."); *Alford, Meroney & Co. v. Rowe,* 619 S.W.2d 210, 213 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.).

**[13]    [14]    [15]**    The surrounding facts and circumstances must plainly demonstrate a party's intent to waive a known right. *See El Paso Indep. Auto Dealers,* 1 S.W.3d at 111. Waiver may result when: (1) a party assents to the other party's continued performance without objection to the delay; (2) a party states that it will not require strict compliance with a deadline or acts such that the other party reasonably believes strict compliance will not be required; or (3) a party insists on performance by the other party even after breach of the agreement. *See Delgado v. Methodist Hosp.,* 936 S.W.2d 479, 485 (Tex.App.-Houston [14th Dist.] 1996, no writ); *Fairfield Fin. Group, Inc. v. Gawerc,* 814 S.W.2d 204, 209 (Tex.App.-Houston [1st Dist.] 1991, no writ); *Seismic & Digital Concepts, Inc. v. Digital Res. Corp.,* 590 S.W.2d 718, 721 (Tex.Civ.App.-Houston [1st Dist.] 1979, no writ). Ordinarily waiver is a fact question; however, we decide a waiver issue as a matter of law if the facts and circumstances are admitted or established. *See El Paso Indep. Auto Dealers,* 1 S.W.3d at 111.

**[16]**    Todd and Smalley aver that, at the end of November, SP Terrace was prepared to file the subdivision plat, but delayed the filing at Meritage's request. They both averred that they told Meritage that delaying the filing of the plat would require a six-month extension of the substantial completion deadline and that Meritage orally agreed to this extension, which suggested to them that Meritage would not insist upon the December 31 deadline. Smalley further averred that she mailed the written extension prior to December 31 and never received any objections to the extension. Todd and Smalley continued to work with Meritage on the development into February 2006. Smalley participated in a January 10, 2006, meeting with Steve Harding of Meritage to "discuss the proposed subdivision changes."

Meritage cites *Beal Bank, S.S.B. v. Schleider,* 124 S.W.3d 640 (Tex.App.-Houston [14th Dist.] 2003, pet. denied), to support its contention that SP Terrace does not raise a fact issue on waiver. In *Beal Bank,* the Fourteenth Court of Appeals held that representations that "an extension would not be a problem," the parties were "set to go," and the bank would "get **\*285** back to" Schleider were insufficient to establish waiver. *See id.* at 654. In contrast, here, Todd and Smalley aver that Meritage continued to participate in meetings with SP Terrace representatives and work with SP Terrace on further changes to the development even after the December 31 deadline, indicating that it continued to insist on performance after breach of the agreement. In his affidavit, Tyler Todd states that SP Terrace "continued to work with [Meritage] under the Contract and to accommodate changes requested by [Meritage] throughout December 2005, January 2006, and into February 2006." Kelly Smalley states that a Meritage representative participated in a meeting to discuss the proposed subdivision changes on January 10, 2006, after the deadline. We hold that SP Terrace raises a fact issue as to whether Meritage waived the December 31 substantial completion deadline

and its right to terminate the contract on this basis, particularly in light of the contract provision that the substantial completion deadline "would be extended" to the extent of any delay caused by Meritage. *See Delgado,* 936 S.W.2d at 485 ("A party to a contract may effectively waive a breach by the other party by continuing to insist on performance by the other party even after a breach.").

### Delay and Interference by Meritage

SP Terrace contends that fact issues exist as to whether Meritage caused delays and interfered with SP Terrace's performance of its contractual obligations thus breaching an implied duty to cooperate.

**[17]  [18]  [19]**  We examine the written contract to determine the obligations of the parties. *See Bank One, Tex., N.A. v. Stewart,* 967 S.W.2d 419, 435 (Tex.App.-Houston [14th Dist.] 1998, pet. denied), *cited with approval in Keck v. Nat'l Union Fire Ins. Co.,* 20 S.W.3d 692, 701 (Tex.2000); *Nalle v. Taco Bell Corp.,* 914 S.W.2d 685, 687 (Tex.App.-Austin 1996, writ denied). We do not imply a covenant regarding a matter specifically covered by the terms of the written contract, but we imply a duty to cooperate to the extent necessary for the contract's performance. *See Stewart,* 967 S.W.2d at 434. Thus, a party cannot "hinder, prevent, or interfere with [another's] ability to perform [its] duties under [the] agreement." *See id.* at 435. The implied covenant to cooperate differs from the broader implied covenant of good faith and fair dealing, which the Texas Supreme Court has rejected. *See Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.,* 184 S.W.3d 760, 770 (Tex.App.-Dallas 2005, pet. denied) (citing *Tex. Nat'l Bank v. Sandia Mtg. Corp.,* 872 F.2d 692, 698–99 (5th Cir.1989)).

**[20]  [21]**  When one party prevents another from timely performing its contractual obligations, the failure to timely perform is excused. *See Anderson Dev. Corp. v. Coastal States Crude Gathering Co.,* 543 S.W.2d 402, 406 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.); *see also Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex.App.-Houston [1st Dist.] 2003, no pet.) ("Prevention of performance by one party excuses performance by the other party."). According to Todd and Smalley, SP Terrace prepared to file the subdivision plat in November 2005, but at Meritage's request, it delayed filing it. Smalley also stated the following:

> The development was often delayed by lack of information, delays in approvals and changes in plans and designs from [Meritage]. For example, I could not obtain timely approval from [Meritage] for finalizing the design of the fences, the location of the electrical service, Steve Harding's failure to attend a meeting on November 16, 2005 with CenterPoint Energy and failure to respond to CenterPoint Energy on various **\*286** issues. These failures and delays caused a delay in the substantial completion of the subdivision.

Section 16(k) of the contract provides that: "Seller [SP Terrace] shall not be responsible for any damage or delay caused by Purchaser [Meritage] or Purchaser's agent ... and the time limits for Seller's performance hereunder shall be extended to the extent of any such delay." [1] We hold that SP Terrace's summary judgment evidence raises a fact issue as to whether a delay caused by Meritage extended the substantial completion deadline.

### Summary Judgment on SP Terrace's Counterclaim

SP Terrace also sues Meritage for breach of contract, and seeks damages beyond the earnest money deposit. The trial court rejected this claim, and SP Terrace appeals. Meritage responds that SP Terrace's counterclaim is not one for affirmative relief, but in any event, SP Terrace's recovery is limited to the earnest money contract.

### A. Claim for Affirmative Relief

[22] [23] Meritage argues that SP Terrace's asserted contractual defense to the refund of Meritage's earnest money deposit is not an affirmative claim for relief. To qualify as a claim for affirmative relief, the defendant must allege a cause of action independent of the plaintiff's claim, on which the defendant can recover benefits, compensation, or relief, even though the plaintiff may abandon or fail to establish its claim. *See Gen. Land Office v. OXY USA, Inc.,* 789 S.W.2d 569, 570 (Tex.1990). If the defendant only resists the plaintiff's right to recover, then it does not state a claim for affirmative relief. *See id.*

In its "Second Amended Answer and First Amended Counterclaim," SP Terrace stated that Meritage's "actions, promises and representations" constituted a prior breach of the contract by Meritage, which excused SP Terrace from further performance and entitled SP Terrace to retain the earnest money deposit and recover actual damages, including lost profits, of at least $1,400,000.

[24] Meritage argues that because SP Terrace always possessed the earnest money deposit, and if SP Terrace prevailed or Meritage abandoned its claim, SP Terrace would simply retain the earnest money. Therefore, SP Terrace's counterclaim, which asks the trial court to determine that SP Terrace is entitled to the earnest money, is essentially a claim for declaratory relief. We disagree. SP Terrace asked the trial court to determine it has a right to the earnest money deposit, but it also seeks actual damages beyond the earnest money deposit. *See Howell v. Mauzy,* 899 S.W.2d 690, 706 (Tex.App.-Austin 1994, writ denied) ("A court may allow a declaratory-judgment counterclaim, however, if it is something more than a mere denial of the plaintiff's claim and has greater ramifications than the original suit. A counterclaim has greater ramifications than the original suit if it seeks affirmative relief.") (internal citations omitted). We hold that SP Terrace's allegations state a claim for relief independent of Meritage's breach of contract **\*287** claim. If the trier of fact concludes that Meritage has waived performance of the substantial

completion deadline and was in breach of the agreement, then SP Terrace is entitled to pursue its claim for breach.

## B. Earnest Money as Liquidated Damages

[25]   SP Terrace asked the trial court to set aside the earnest money liquidated damages provision for a breach by Meritage, contending that it penalizes Meritage because it requires Meritage to forfeit its earnest money no matter how trivial its breach. SP Terrace requests this interpretation of the contract so that its damages claim against Meritage can exceed the earnest money deposit it kept after Meritage terminated the contract. The clause in question provides that, upon default by Meritage, SP Terrace, as its sole remedy, may terminate the contract and retain the earnest money deposit.

[26]   [27]   [28]   [29]   [30]   We enforce a liquidated damages clause if (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). An assertion that a liquidated damages provision constitutes an unenforceable penalty is an affirmative defense, and the party asserting penalty bears the burden of proof. *See Urban Television Network Corp. v. Liquidity Solutions,* 277 S.W.3d 917, 919 (Tex.App.-Dallas 2009, no pet.); *Fluid Concepts, Inc. v. DA Apts., LP,* 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005, no pet.). Generally, that party must prove the amount of actual damages, if any, to demonstrate that "the actual loss was not an approximation of the stipulated sum." *Baker v. Int'l Record Syndicate, Inc.,* 812 S.W.2d 53, 55 (Tex.App.-Dallas 1991, no writ). If the amount stipulated in the liquidated damages clause is "shown to be disproportionate to actual damages," we should declare that the clause is a penalty and limit recovery to actual damages. *Johnson Eng'rs, Inc. v. Tri–Water Supply Corp.,* 582 S.W.2d 555, 557 (Tex.Civ.App.-Texarkana 1979, no writ); *see also* TEX. BUS. & COM.CODE ANN. § 2.718(a) (Vernon 2009) ("A term fixing unreasonably large liquidated damages is void as a penalty."). Whether a liquidated damages clause is an unenforceable penalty is a question of law for the court, but sometimes factual issues must be resolved before the court can decide the legal question. *See Phillips,* 820 S.W.2d at 788. For example, in *Phillips,* the Texas Supreme Court observed that "to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Id.*

[31]   SP Terrace adduced no evidence in the trial court that Meritage's forfeit of its earnest money operated as a penalty because Meritage's breach was a trivial one. Its aim was just the opposite— it was to prove that Meritage's breach caused damages far higher than the earnest money amount, although it offered no proof of that theory either. We decline to remove a limitation of remedy provision absent any evidence that the liquidated amount in the contract is unreasonably high or low in light of the alleged breach. *See Urban Television,* 277 S.W.3d at 919; *Fluid Concepts, Inc.,* 159 S.W.3d at 231.

SP Terrace relies on cases in which courts have disregarded liquidated damages provisions as unreasonable in their approximation of actual damages for trivial breaches. *See Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 487 (1952) ( "Our conclusion is that, since the contract provided the same reparation for the breach of each **\*288** and every covenant, and since it would be unreasonable and a violation of the principle of just compensation to enforce it as to some of them, the provision for stipulated damages should be treated as a penalty."); *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.,* 679 S.W.2d 721, 727 (Tex.App.-Houston [1st Dist.] 1984, no writ) (holding that liquidated damages clause in earnest money contract was unenforceable penalty, because even though it provided reasonable damages for major breaches of the contract, it also allowed unreasonable damages for trivial breaches); *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834, 837–38 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.) (holding same). These cases are distinguishable in that either it was the breaching party who argued that the provision was a penalty, or in that the party seeking to set aside the provision adduced evidence that the liquidated damages clause was not a reasonable approximation of damages caused by the breach. *See Stewart,* 245 S.W.2d at 487 (where actual damages incurred by breaching party amounted to $38.50, "stipulation to pay several thousand dollars ... would be so unreasonable that no court would lend its power to enforce it"); *Community Dev.,* 679 S.W.2d at 727 (jury findings and evidence supported claim that earnest money provision operated as penalty); *Bethel,* 635 S.W.2d at 843 (upholding trial court's determination that liquidated damages clause was penalty against breaching party, and limiting plaintiff's recovery to actual damages).

 **[32]**   A liquidated damages provision is a penalty if it punishes the breaching party by subjecting it to a disproportionately high amount of damages relative to reasonably anticipated actual damages. Absent evidence that the earnest money amount here was not a reasonable approximation of an anticipated breach, limiting recovery to the earnest money deposit and preventing a party from recovering actual damages in excess of the bargained for liquidated amount does not constitute a penalty to the breaching party.[2] We decline to hold as a matter of law that the earnest money provision in this case is a penalty. *Cf. Phillips,* 820 S.W.2d at 788–89 (no fact issue that provision was penalty against breaching party because it provided that actual damages be determined and multiplied tenfold).

### *Required Notice to Recover Earnest Money*
 **[33]**   Finally, SP Terrace contends that it did not receive thirty days' notice and an opportunity to cure the default. Section 9(c) of the contract states:

> In the event Seller shall default in Seller's obligations hereunder ... Purchaser shall give Seller thirty (30) days written notice and opportunity to cure such default. If Seller fails to cure its default within the thirty day period provided in **\*289** the notice, Purchaser, as its sole and exclusive remedies, may either (i)

> terminate this Contract and obtain the return of its Earnest Money or (ii) enforce specific performance of Seller's obligation to convey the Lot(s) upon payment of the Purchase Price.

Meritage responds that the contract does not require notice and an opportunity to cure because section 4(i) states that if "Substantial Completion does not occur by December 31, 2005 at option of Purchaser this Contract shall terminate and Purchaser is *relieved of any obligation hereunder.*" We agree, and hold that once Meritage exercised its option to terminate due to SP Terrace's failure to meet the deadline, Meritage was relieved of further contractual obligations, including the requirement of providing notice and an opportunity to cure. Reading the contract to require notice and an opportunity to cure before recovering the earnest money, even if SP Terrace did not achieve substantial completion by December 31, would render section 4(i)'s provision that failure to achieve substantial completion by December 31 relieves Meritage of *any* contractual obligation a nullity. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003) ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). We therefore hold that SP Terrace was not entitled to notice and a thirty day opportunity to cure any failure to comply with the substantial completion deadline.

## Conclusion

We hold that SP Terrace failed to raise a fact issue on its affirmative defenses of modification and interference by Meritage, but raises fact issues whether Meritage waived performance of the December 31 substantial completion deadline and whether Meritage caused delay that extended the time for performance. We further hold that SP Terrace's counterclaim states a claim for affirmative relief, but that SP Terrace fails to prove on this record that the earnest money provision of the contract is unenforceable as a matter of law. We therefore reverse and remand the case for further proceedings. [3]

## Footnotes

[1]   The contract provides in section 16(k) that the substantial completion deadline "would be extended" if Meritage caused the delay of the deadline. Meritage argued in the trial court that SP Terrace's reference to section 16(k) in an amended pleading filed after its motion for partial summary judgment was filed came too late to support its contractual defenses. We disagree, in so much as SP Terrace expressly argued in its summary judgment response that "by words, actions and inaction, Meritage caused the default and/or delay in the substantial completion."

[2]   Other jurisdictions that have addressed this issue have held similarly, and refused to strike the liquidated damages provision on the ground that it is an unenforceable penalty. *See, e.g., Mahoney v. Tingley,* 85 Wash.2d 95, 529 P.2d 1068, 1070 (1975) ("A penalty exists where there is an attempt to enforce an obligation to pay a sum fixed by agreement of the parties as a punishment for the failure to fulfill some primary contractual obligation. In this case, it is not the party in default who seeks relief from an excessively high liquidated damages provision. Rather, the provision operates to limit the recovery of the party who incurred a loss as a result

of the other parties' breach. There being no element of punishment involved, it cannot be said that plaintiff is being penalized in any sense.")(internal citations omitted); *Margaret H. Wayne Trust v. Lipsky,* 123 Idaho 253, 846 P.2d 904, 910 (1993) (following *Mahoney* and refusing to strike down liquidated damages provision as penalty when non-breaching party sought damages in excess of provision amount).

3    SP Terrace also contends that the trial court awarded unreasonable and excessive attorney's fees to Meritage. Because we reverse and remand on the merits, we vacate the award of attorney's fees.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (7)

### Direct History (5)

⚑ 1. Meritage Homes of Texas, LLC v. SP Terrace, L.P.
2008 WL 7929847 , Tex.Dist. , Dec. 09, 2008

*New Trial Denied by*

2. Meritage Homes of Texas, LLC. v. SP Terrace, L.P.
2009 WL 6617330 , Tex.Dist. , Feb. 10, 2009

*AND Reversed and Remanded by*

⚑ 3. SP Terrace, L.P. v. Meritage Homes of Texas, LLC ⚲
334 S.W.3d 275 , Tex.App.-Hous. (1 Dist.) , Oct. 21, 2010

⚑ 4. SP Terrace, L.P. v. Meritage Homes of Texas, LLC
2010 WL 1840183 , Tex.App.-Hous. (1 Dist.) , May 06, 2010

*Opinion Withdrawn and Superseded on Rehearing by*

⚑ 5. SP Terrace, L.P. v. Meritage Homes of Texas, LLC ⚲
334 S.W.3d 275 , Tex.App.-Hous. (1 Dist.) , Oct. 21, 2010

### Related References (2)

6. Meritage Homes of Texas, LLC v. SP Terrace, L.P.
2008 WL 7929845 , Tex.Dist. , Oct. 12, 2008

7. Meritage Homes of Texas, LLC v. SP Terrace, L.P.
2008 WL 7929846 , Tex.Dist. , Oct. 12, 2008

150 Tex. 666
Supreme Court of Texas.

STEWART et ux.
v.
BASEY.

No. A-3346. | Jan. 16, 1952.

Action by E. C. Stewart and wife against James Marvin Basey for damages for breach of lease contract. The 126th District Court, Travis County, Jack Roberts, J., held that provisions in lease contract was for a penalty and rendered judgment for plaintiff in the sum of $38.50 and plaintiffs appealed. The Austin Court of Civil Appeals of the Third Supreme Judicial District, Gray, J., 241 S.W.2d 353, reversed portion of judgment awarding $38.50 as damages and remanded the cause and plaintiff brought error. The Supreme Court, Hickman, C. J., held that where stipulation in lease contract provided the same reparation for breach of each and every covenant, provision should be treated as a penalty.

Judgment of Court of Civil Appeals affirmed.

**Attorneys and Law Firms**

**\*667  \*\*485** E. M. DeGuerin, Austin, for petitioners.

Smith & Furr, Austin, for respondents.

**Opinion**

HICKMAN, Chief Justice.

The controlling question in this case is whether the language quoted below stipulating the damages recoverable for **\*668** the breach of a lease contract is a provision for liquidated damages or for a penalty. The trial court construed it as a provision for a penalty and, finding that the lessor suffered no damages by lessee's breach except $38.50 caused by the destruction of a partition door in one of the leased buildings, rendered judgment for that amount only. The Court of Civil Appeals upheld the trial court in its refusal to award liquidated damages, but reversed that portion of the judgment awarding only $38.50 as damages and remanded the case to the trial court for the sole purpose of determining the amount of actual damages sustained by the lessor. Tex.Civ.App., 241 S.W.2d 353.

By a contract in writing petitioners, E. C. Stewart and wife, leased to respondent, James Marvin Basey, three store buildings on South Congress Avenue in the city of Austin. The lease stated that it was for a term of five years, beginning on January 1, 1949, and ending at midnight on December 31, 1954. The dates cover a period of six years, but for the purposes of this opinion it is immaterial whether the term was five years or six years. The lease provided for a monthly rental of $325.00, payable each month in advance. Respondent went into possession under the lease and paid the monthly rentals through November, 1949, during which month he vacated the buildings. On the following December 5th the keys were returned to petitioners upon their request, since which time they have executed leases to other tenants. The provision of the contract which we are called upon to construe reads as follows: 'The failure to pay any monthly installment of rental when such installment is due shall terminate this lease at the option of Lessors. The failure of Lessee to make said payment or payments or the breach of this contract otherwise by him shall render him liable to Lessors, as agreed liquidated damages, the sum of One Hundred Fifty (150) Dollars per month for each and every month of the unexpired term of this lease which shall become due and payable when the option to terminate this lease is exercised or at the time of the breach of this contract otherwise by Lessee if any, and the payment thereof be secured by lien on the property of Lessee in said Store Buildings at said time.'

Another provision of the contract is: 'That the violation of any term of this lease by either party hereto shall terminate the same at the option of the other.'

It will be observed that liability for the payment of $150.00 **\*669** per month as liquidated damages is not limited to the breach of any one particular covenant of the contract. The covenant to pay the rent when due is but one of the covenants the breach of which would give rise to a claim by the lessors for $150.00 per month for each and every month of the unexpired term of the lease.

 [1]   Volumes have been written on the question of when a stipulated damage provision of a contract should be enforced as liquidated damages and when enforcement **\*\*486** should be denied because it is a penalty provision. One line of cases, of which Eakin v. Scott, 70 Tex. 442, 7 S.W. 777, is typical, states that the intention of the parties governs and another line states that their intention is immaterial, but when the results are examined there appears but little disparity between them. All agree that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable. There is a statement in the opinion in Eakin v. Scott, supra, which, standing alone, would lead to the conclusion that the damages in that case were certain in amount. But when the entire opinion is read, it becomes obvious that the damages were very uncertain in the contemplation of the parties when the contract was executed; and that is the true test of uncertainty. The true theory is well expressed in Williston on Contracts, Revised Edition, Sec. 779, p. 2192, in this language: 'But as has been seen, the chief, almost the only, means of determining whether the parties in good faith endeavored to assess the damages is afforded by the amount of damages stipulated for, and the nature of the breach upon which the stipulation

was agreed to become operative. This is but saying in other words that the reasonableness or unreasonableness of the stipulation is decisive.'

 **[2]**   The cases which hold that the intention of the parties controls impute to the parties an intention to provide for a penalty when it would be unreasonable and unjust to do otherwise, even though their language clearly expresses the contrary intention. They indulge in a presumption in order to arrive at the justice of the case. The cases which disregard the intention of the parties treat the question as one of the legality of the stipulation. The reasoning in Langever v. R. G. Smith & Co., Tex.Com.App., 278 S.W. 178, 179, is typical of that employed in cases which announce that the intention of the parties controls. The statement in the opinion that 'the real intention of the parties when ascertained will control' is followed by the statement that such intention 'is not necessarily ascretained by the words  **\*670**  employed'. Regardless of which line of cases is followed, the courts will not be bound by the language of the parties.

 **[3]**   The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule. In those cases in which courts enforce stipulations of the parties as a measure of damages for the breach of covenants, the principle of just compensation is not abandoned and another principle substituted therefor. What courts really do in those cases is to permit the parties to estimate in advance the amount of damages, provided they adhere to the principle of just compensation. Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:
'(1) An agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

'(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

'(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.'

This comment on subsection (1) follows: 'b. Contracts are frequently made in which performance of very different degrees of importance and value are promised and one large sum of money is made payable as damages for any breach whatever. Since such a contract promises the same reparation for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one or of the whole contract, it is obvious that the parties have not adhered to the rule of just compensation. In this matter neither the intention of the parties nor their expression

of intention is the governing consideration. The payment promised may be a penalty, though described expressly as liquidated damages, and vice versa.'

**\*\*487** The rule as declared in that comment is in effect the same as that declared in Williston on Contracts, Revised Edition, Vol. 3, Sec. 783, p. 2204; McCormick on damages, Sec. 151; 15 Am.Jur., Damages, Sec. 253; and 25 C.J.S., Damages, s **\*671** 111. Early in the history of this court in Durst v. Swift, 11 Tex. 273, 282, the rule was stated in this language: '\* \* \* where the agreement contains several matters of different degrees of importance, and yet the sum named is payable for the breach of any, even the least \* \* \* the sum stipulated to be paid has been treated as a penalty.' That rule was followed in Palestine Ice, Fuel & Gin Co. v. Walter Connally & Co., Tex.Civ.App., 148 S.W. 1109, error refused, and in Sanders Nursery Co. v. J. C. Engelman, Inc., Tex.Civ.App., 109 S.W.2d 1131, error dismissed.

[4]    When that rule is applied to the provisions in the contract before us it seems clear that the stipulation should be construed as a provision for a penalty and not for liquidated damages. Obviously, the stipulation was not carefully drawn. It provides that for the failure of lessee to pay any installment of rent when due or for his breach of any other obligation of the contract, the lessors could, at their option, terminate the lease. Should they elect to terminate it, the lessee would be obligated to pay them at that time a sum of money arrived at by multiplying $150.00 by the number of months of the unexpired term of the lease. Should they not elect to terminate the lease they could, nevertheless, demand that amount in a lump sum on the date of the breach. The lease contains several covenants other than the covenant to pay rent when due. One is a covenant of indemnity in this language: 'Lessee further covenants and agrees to keep Lessors free and harmless from any and every claim, demand, or cause of action arising in or on the leased premises during the term of this lease.'

Another is a covenant that lessee will prudently use the premises and avoid injuries thereto, except usual wear and tear, and another that lessee will 'make such repairs as are not caused by Lessors or their agents and the usual depletion of said property.'

It is not necessary for us to decide whether petitioners would have been entitled to liquidated damages had the lease contract contained no covenant except the covenant to pay rent, and we therefore pass that question by without discussion. It is clear that petitioners should not be awarded a large sum for liquidated damages for the breach of the other covenants just mentioned. Take, for instance, the covenant for indemnity. Whatever amount respondent might have been called upon to pay petitioners as an indemnity would have been a **\*672** definite amount measured by the liability theretofore adjudged against petitioners. An obligation to pay an indemnity is nothing more than an obligation to pay a sum of money theretofore ascertained, and a provision that failure to pay a definite sum of money upon default of performance of a covenant in a contract entitles the obligee to recover liquidated damages in excess of the interest rate will not be enforced. Langever v. R. G. Smith & Co., Tex.Com.App., 278 S.W. 178.

With respect to the other covenants above mentioned, it was found by the trial court that respondent breached them, and damages of $38.50 were assessed against him therefor. A stipulation to pay several thousand dollars for the breach of a covenant which might well result in damages of $38.50 or even less would be so unreasonable that no court would lend its power to enforce it.

Our conclusion is that, since the contract provided the same reparation for the breach of each and every covenant, and since it would be unreasonable and a violation of the principle of just compensation to enforce it as to some of them, the provision for stipulated damages should be treated as a penalty.

We approve the action of the Court of Civil Appeals on rehearing in remanding the case for the purpose of determining the actual damages instead of rendering it.

The judgment of the Court of Civil Appeals is affirmed.

**Parallel Citations**

245 S.W.2d 484

---

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (2)

### Direct History (2)
1.  Stewart v. Basey
241 S.W.2d 353 , Tex.Civ.App.-Austin , May 30, 1951

*Judgment Affirmed by*

2.  Stewart v. Basey
150 Tex. 666 , Tex. , Jan. 16, 1952

124 S.W.3d 665
Court of Appeals of Texas,
Austin.

Jeanne N. TAYLOR, D.D.S., d/b/a Jeanne N. Taylor D.D.S.,
Individually, and on behalf of all others similarly situated, Appellant.
v.
STATE FARM LLOYDS, INC., Appellee.

No. 03–03–00079–CV.  |  Oct. 2, 2003.  |  Rehearing Overruled Nov. 13, 2003.

Insured sought declaratory judgment that insurer violated the Insurance Code by providing hired and non-owned automobile liability insurance in endorsement to business multi-peril policy without personal injury protection (PIP) or uninsured/underinsured motorist (UM/UIM) coverages. The 201st Judicial District Court, Travis County, Suzanne Covington, J., entered summary judgment in favor of insurer. Insured appealed. The Court of Appeals, Bea Ann Smith, J., held that: (1) the hired and non-owned auto liability insurance was not "automobile liability insurance" within the meaning of statutes mandating PIP coverage and UM/UIM coverage in automobile liability insurance policies; (2) insured had a justiciable controversy with insurer; and (3) insured did not need to exhaust her administrative remedies.

Affirmed.

**Attorneys and Law Firms**

**\*667** J.E. Buster Brown, Joe K. Longley, Philip K. Maxwell, Longley & Maxwell, L.L.P., Austin, R. Stephen Woodfin, Law Office of Stephen Woodfin, Kilgore, James A. Holmes, Wellborn Houston Adkison Mann Sadler & Hill, LLP, Henderson, for Appellant.

Larry F. York, Mary Keller, Scott K. Field, York, Keller & Field, LLP, Austin, for Appellee.

Before Justices KIDD, B.A. SMITH and PURYEAR.

### *OPINION*

BEA ANN SMITH, Justice.

Appellant Jeanne N. Taylor, D.D.S. appeals a district-court summary judgment dismissing her suit against appellee State Farm Lloyds, Inc. Taylor alleged in her suit that State Farm violated

articles 5.06–1 and 5.06–3 of the Texas Insurance Code when it issued Taylor's business a multi-peril insurance policy with "hired and non-owned auto liability" coverage without providing personal injury protection ("PIP") or uninsured/underinsured motorist coverage ("UM/UIM"). *See* Tex. Ins.Code Ann. arts. 5.06–1, –3 (West 1981). State Farm moved for summary judgment, and Taylor moved for partial summary judgment. The district court granted State Farm's motion, and dismissed Taylor's case. We affirm the summary judgment in favor of State Farm.

## BACKGROUND

Taylor purchased multi-peril insurance for her business from State Farm in 1993. At that time, multi-peril insurance policies were promulgated by the Texas Department of Insurance ("TDI"). Within that policy, State Farm offered limited non-owned auto liability insurance. Taylor purchased hired auto liability insurance as an endorsement to her multi-peril policy. In 1996, TDI allowed State Farm to write its own multi-peril policy subject to TDI's approval. At that time, State Farm issued hired and non-owned auto liability insurance as an endorsement to Taylor's multi-peril policy. None of the hired and non-owned auto liability coverage State Farm issued included PIP or UM/UIM coverage. Taylor contends that State Farm was required to issue PIP and UM/UIM coverage by the Texas Insurance Code. State Farm rejoins that TDI has the authority to regulate certain auto insurance by other provisions of the insurance code when TDI determines that it is appropriate. State Farm further asserts that TDI has chosen to regulate hired and non-owned auto coverage under the multi-peril subchapter of the insurance code rather than the auto liability subchapter, and therefore, PIP and UM/UIM coverages are not mandatory with regard to the hired and non-owned auto liability insurance that forms a limited part of the multi-peril insurance Taylor purchased for her business.

## STANDARD OF REVIEW

**[1]** **[2]** Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo.* **\*668** *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994); *Texas Dep't of Ins. v. American Home Assurance Co.,* 998 S.W.2d 344, 347 (Tex.App.-Austin 1999, no pet.). The standards for reviewing a motion for summary judgment are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). When the trial court grants one party's motion for summary judgment and denies the other, we review both motions and if we find the trial court erred, we will reverse

and render the judgment the trial court should have rendered. *See Bradley v. State,* 990 S.W.2d 245, 247 (Tex.1999).

## DISCUSSION

The issue presented is whether PIP and UM/UIM coverage is mandatory when an endorsement for hired and non-owned auto liability is added to a business's multi-peril insurance policy. When the district court granted State Farm's motion for summary judgment, it did not specify the grounds upon which it relied. Thus on appeal, Taylor argues that the district court erred in granting the summary judgment by questioning every possible ground advanced. [1] Taylor asks: (1) Did she have standing to seek declaratory relief?; (2) Did she have to exhaust administrative remedies before bringing suit?; (3) Is "hired and non-owned auto liability coverage" under this policy properly classified as "automobile liability coverage" subject to mandatory PIP and UM/UIM coverage?; (4) If "hired and non-owned auto liability coverage" is "automobile liability coverage," may TDI cancel or lessen coverage (PIP and UM/UIM) mandated by the legislature?; and (5) If TDI does have the authority to cancel or lessen mandated coverages, has it exercised any authority to do so?

### Does the court have subject matter jurisdiction?

By Taylor's first issue she asks whether she has standing to bring this suit. We understand Taylor's question really to be whether the court has subject matter jurisdiction contingent on the "ripeness" of her suit. It is fairly clear that Taylor has standing—she is the appropriate person to bring the action. We will therefore address Taylor's jurisdictional question as to the "ripeness" of her suit. We hold that her suit is ripe for consideration.

**[3]** Taylor sought a declaratory judgment in district court to determine whether State Farm had violated the Texas Insurance Code by issuing hired and non-owned auto liability insurance without providing PIP or UM/UIM coverage. The purpose of a declaratory judgment is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." Tex. Civ. Prac. & Rem.Code Ann. § 37.002(b) (West 1997). However, the Uniform Declaratory Judgments Act ("UDJA") does not confer jurisdiction on a trial court but rather makes declaratory judgment available as a remedy for a **\*669** cause of action already within the court's jurisdiction. *Chenault v. Phillips,* 914 S.W.2d 140, 141 (Tex.1996) (holding that mere request for declaratory judgment does not establish jurisdiction); *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). Thus, this Court must determine whether Taylor's request for declaratory relief is germane to a justiciable controversy already within the court's jurisdiction.

**[4]** A justiciable controversy need not be "a fully ripened cause of action." *Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex.App.-Austin 1998, no pet.) (citing *Ainsworth v. Oil City Brass Works,* 271 S.W.2d 754, 760 (Tex.Civ.App.-Beaumont 1954, no writ)). However, the fact situation must manifest the " 'ripening seeds of a controversy' ... even though the differences between the parties as to their legal rights have not reached the state of an actual controversy." *Ainsworth,* 271 S.W.2d at 761, *cited in Moore,* 985 S.W.2d at 154. In other words, there must either be a pending cause of action between the parties or such a clear indication of the extent of the parties' differences that a court may presume one is imminent.

**[5]** In the present case, although Taylor has not filed a claim against State Farm on the hired and non-owned auto liability coverage in her multi-peril policy, she asserts that State Farm has already violated articles 5.06–1 and 5.06–3 of the insurance code by issuing automobile insurance without including PIP and UM/UIM coverage. *See* Tex. Ins.Code Ann. arts. 5.06–1, –3. The language of both articles suggests that if Taylor's understanding of the insurance code is accurate (that hired and non-owned auto liability coverage must be issued with PIP and UM/UIM coverage), State Farm has indeed already violated the statute and has thereby infringed Taylor's legal rights. Whether State Farm was required to issue hired and non-owned automobile insurance with PIP and UM/UIM coverage is a question of law that may be appropriately decided by Taylor's invocation of the UDJA. As such, Taylor's controversy is ripe for adjudication, and the court has subject matter jurisdiction to hear her case.

### Did Taylor have to exhaust administrative remedies?

**[6]** **[7]** In her second issue, Taylor asks whether she was required to exhaust any administrative remedies before bringing her suit in district court. Requiring exhaustion of administrative remedies is a well-established doctrine, but it has numerous exceptions. Taylor did not file a formal complaint with TDI. However, when pure questions of law are involved, the doctrine of exhaustion of administrative remedies does not apply. *See Grounds v. Tolar Indep. Sch. Dist.,* 707 S.W.2d 889, 892 (Tex.1986). In this case, the facts are undisputed and the question before the trial court is a pure question of law—whether hired and non-owned auto liability insurance must be issued with PIP and UM/UIM coverage under the Texas Insurance Code. Concluding that Taylor did not need to exhaust her administrative remedies prior to raising this issue of law before the trial court, we agree that this could not form the basis for summary judgment.

### Did TDI have authority?

**[8]** In her third and fourth issues, Taylor asks whether hired and non-owned auto liability insurance is properly classified as "auto liability insurance" as contemplated by article 5, subchapter A of the insurance code, and, if so, whether PIP and UM/UIM coverage must be issued **\*670** with hired and non-owned auto liability coverage. *See* Tex. Ins. Code Ann. art. 5 (West

1981). We conclude that hired and non-owned auto liability insurance is distinguishable from "auto liability insurance" as contemplated by article 5, subchapter A of the insurance code, and therefore State Farm need not provide PIP and UM/UIM coverage along with the hired and non-owned auto coverage in Taylor's multi-peril policy on her business.

 **[9]** **[10]** We begin our analysis with rules of statutory construction. Determining legislative intent is the overriding goal of statutory interpretation. *Continental Cas. Co. v. Downs,* 81 S.W.3d 803, 805 (Tex.2002). In order to ascertain legislative intent, we first look to the plain and common meaning of the words used by the legislature. Tex. Gov't Code Ann. § 311.011 (West 1998); *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000); *Tex. Workers' Comp. Comm'n v. Tex. Builders Ins. Co.,* 994 S.W.2d 902, 908 (Tex.App.-Austin 1999, pet. denied). Unless a statute is ambiguous, courts abide by the clear language of the statute and enforce it as written. *RepublicBank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985).

 **[11]** **[12]** **[13]** **[14]** Statutes are interpreted by considering the entire statute, not just disputed provisions. *Thomas v. Cornyn,* 71 S.W.3d 473, 481 (Tex.App.-Austin 2002, no pet.). Disputed provisions are to be considered in context, not in isolation. *See Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999). Courts consider such things as the circumstances under which the statute was enacted, former statutory provisions on the same or similar subjects, and the consequences of a particular construction when interpreting statutes. *Keng,* 23 S.W.3d at 349. We do not give one provision an interpretation that is inconsistent with the other provisions of the act. *Id.*

In the case at hand, Taylor's assertion that State Farm was required to issue PIP and UM/UIM coverage with her hired and non-owned auto liability endorsement relies on the following provisions of the insurance code:

> No automobile liability insurance policy ... covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state unless coverage is provided therein or supplemental thereto ... for the protection of persons insured there under who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles....;

> No automobile liability insurance policy ... covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state unless personal injury protection is provided therein or supplemental thereto.

Tex. Ins.Code Ann. arts. 5.06–1, –3.

On the other hand, State Farm's conclusion that TDI has the authority to regulate certain auto insurance under other subchapters of the insurance code relies upon the following provision—found at the beginning of the subchapter dealing with automobile insurance:

> There shall be excluded from regulation under the provisions of this subchapter [subchapter A] any insurance against liability for damages arising out of the ownership, operation, maintenance or use of or against loss of or damage to motor vehicles ... which may, in the judgment of the Board, be a type or class of insurance which is also the subject of or may be more properly regulated under the terms or provisions of other insurance rating laws.... If such a **\*671** situation shall be found to exist, the Board shall make an order declaring which of said rating laws shall be applicable....

*Id.* at art. 5.02.

Taking the provisions together and noting their relative placements within the subchapter dealing with automobile insurance, it is clear that article 5.02 grants TDI the discretion to except some kinds of auto insurance from subchapter A's mandatory PIP and UM/UIM coverage.

State Farm urges the Court to accept the *Sidelnik* decision as controlling the case before us. *Sidelnik v. American States Ins. Co.,* 914 S.W.2d 689 (Tex.App.-Austin 1996, writ denied). In *Sidelnik,* an umbrella insurance policy was at issue. Any auto coverage encompassed within that umbrella policy was *excess* to the primary insurance coverage the insured had to obtain before being issued the umbrella policy. *Id.* The facts at hand do not exactly fit the *Sidelnik* scenario. Although it is true, as a practical matter, that in most cases hired and non-owned auto coverage operates much like an excess policy—excess to the primary coverage owned by the user—there are situations in which the hired and non-owned auto policy could be the only, and thus primary, coverage. For that reason, *Sidelnik* does not control the question presented regarding this multi-peril policy.

Nevertheless, TDI has unambiguous authority under article 5.02 to exclude some auto insurance from the requirements of subchapter A when in its judgment it is a type of insurance "more properly regulated under the terms or provisions of other insurance rating laws." Tex. Ins.Code Ann. art. 5.02. As discussed above, Taylor's hired and non-owned auto liability coverage was issued as an endorsement—a small part of her multi-peril business policy. Neither endorsement was rated based on the risk characteristics of the car or driver. And in fact, Taylor only paid $3.07 per $100 in anticipated annual rental expenses per year for her hired auto liability endorsement and approximately $4.00 a year for her non-owned auto liability endorsement. We reject Taylor's reading of articles 5.06–1 and 5.06–3 and overrule issues three and four.

**Did TDI exercise its authority?**

 **[15]** Having concluded that TDI does have the authority to remove hired and non-owned auto liability policies, such as Taylor's endorsement to a multi-peril policy, from the regulation of article 5, subchapter A, we address Taylor's fifth issue, asking whether TDI has *exercised* the authority to classify a multi-peril policy with hired and non-owned auto liability coverage under a different subchapter. We conclude that TDI has exercised its authority to do so.

Taylor argues that in the event TDI wanted to except hired and non-owned auto liability from subchapter A, it had to do so by an order that specifically invoked its authority to do so under article 5.02. We disagree. In 1992, TDI ordered that garage insurance, "including all coverages and endorsements included in the Texas Garage Policy, except for those coverages specifically rated on the basis of risk characteristics of the automobile or person driving," be regulated under the multiperil subchapter of the insurance code. At that time, as well as today, hired auto liability insurance was an endorsement under the Texas Garage Policy that was not specifically rated on the basis of risk characteristics of the automobile or person driving. As for the limited non-owned auto liability insurance, it had been included within the Texas Business Owners Policy promulgated by TDI. The fact that TDI did not expressly state that it was using the discretion afforded it under article 5.02 does **\*672** not render either order invalid. We overrule Taylor's fifth issue.

## CONCLUSION

Because the district court appropriately granted State Farm's summary judgment and properly denied Taylor's partial summary judgment, we affirm the judgment.

Footnotes

1    Grounds one and two would more properly be grounds for dismissal for lack of jurisdiction not summary judgment. We nevertheless address these jurisdictional issues raised by appellant.

**End of Document**                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (1)

### Direct History (1)

1. Taylor v. State Farm Lloyds, Inc. ⌐
124 S.W.3d 665 , Tex.App.-Austin , Oct. 02, 2003 , rehearing overruled ( Nov 13, 2003 ) , review denied ( Apr 02, 2004 )

852 S.W.2d 440
Supreme Court of Texas.

TEXAS ASSOCIATION OF BUSINESS, Appellant,

v.

TEXAS AIR CONTROL BOARD and Texas Water Commission, Appellees.

No. C–9556.   |   March 3, 1993.   |   Rehearing Overruled May 5, 1993.

Business association sought declaratory judgment that statutes authorizing administrative agencies to assess fines for violation of environmental laws are unconstitutional. The 250th District Court, Travis County, upheld statutes, and direct appeal was taken. The Supreme Court, Cornyn, J., held that: (1) statutes authorizing Air Control Board and Water Commission to assess fines prior to judicial review violate open courts guarantee of Texas Constitution, but (2) statutes do not violate constitutional right to jury trial.

Affirmed in part and reversed in part.

Doggett, Gammage, and Spector, JJ., concurred, dissented, and filed opinions.

**Attorneys and Law Firms**

 **\*441** R. Kinnan Golemon, James W. Checkley, Jr., Albert R. Axe, Jr., Scott R. Kidd and Douglas W. Alexander, Austin, for appellant.

Douglas G. Caroom, Mary E. Kelly, Dan Morales, Nancy N. Lynch, William D. Dugat, III and Amy R. Johnson, Austin, for appellees.


**OPINION**

CORNYN, Justice.

The Texas Association of Business (TAB), on behalf of its members, brought this declaratory judgment action seeking a ruling that statutes empowering two state administrative agencies to levy civil penalties for violations of their regulations conflict with the open courts and jury trial provisions of the Texas Constitution. The administrative agencies denied TAB's claims, and along with two Intervenors, [1] filed counterclaims seeking a declaration **\*442** that the same statutes and regulations comport with those constitutional provisions.

Following a bench trial, the trial court denied the relief sought by TAB, and as requested by the State and Intervenors, declared that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act, as well as the rules and regulations promulgated under those statutes, are constitutional with regard to the open courts and jury trial provisions. We affirm the trial court's judgment as it relates to TAB's jury trial challenge and reverse its judgment as to TAB's open courts challenge.

An overview of the regulatory scheme enacted by the legislature and these agencies is essential to an understanding of this case. In 1967, the Texas Legislature enacted the Clean Air Act of Texas. Clean Air Act of Texas, 60th Leg., R.S., ch. 727, 1967 Tex.Gen.Laws 1941. The Clean Air Act was designed to safeguard the state's air resources without compromising the economic development of the state. *Id.* at § 1. The Act created the Texas Air Control Board and granted it the authority to promulgate regulations to accomplish the Act's goals. *Id.* at § 4(A)(2)(a). In the event the Air Control Board determined that a violation of its regulations had occurred, it was authorized to enforce those regulations in district court. Upon a judicial determination that a violation of the Air Control Board's regulations had occurred, two cumulative remedies were available, injunctive relief to prohibit further violations and assessment of a fine ranging from $50 to $1,000 for each day the violations persisted. *Id.* at § 12(B).

In 1969, the Texas Legislature enacted the Solid Waste Disposal Act. Solid Waste Disposal Act, 61st Leg., R.S., ch. 405, 1969 Tex.Gen.Laws 1320. The express purpose for this legislation was to protect public health and welfare by regulating the "collection, handling, storage, and disposal of solid waste." *Id.* at § 1. The Texas Water Quality Board was designated the primary agency to effectuate the Disposal Act's purpose. *Id.* at § 4(f). Like the Air Control Board, the Water Quality Board was authorized to enforce its rules and regulations in state district court. The Solid Waste Disposal Act provided the same remedies as the Clean Air Act. *See id.* at § 8(c).

In the last of the relevant statutory enactments, in 1969, the Texas Legislature promulgated a revised version of the Water Quality Act. Water Quality Act—Revision, 61st Leg., R.S., ch. 760, 1969 Tex.Gen.Laws 2229. By that Act, the Water Quality Board was given the power to develop a statewide water quality plan, to perform research and investigations, and to adopt rules and issue orders necessary to effectuate the Act's purposes. *Id.* at § 3.01–3.10. The Water Quality Act provided the same remedies as the Solid Waste Management Act and the Clean Air Act. *See id.* at § 4.02.

Originally, neither the Water Quality Board nor the Air Control Board had the power to levy civil penalties directly in the event it determined that its regulations or orders had been violated. Instead, each board was required first to file suit against the violator in district court. Only the district court had the power to assess civil penalties.

The legislature substantially changed this enforcement scheme in 1985. That year the Air Control Board and the Water Commission (formerly the Water Control Board) were granted the power to assess civil penalties directly of up to $10,000 per day per violation.[2] Both administrative bodies also retained the option to pursue civil penalties in district court. **\*443** TEX.HEALTH & SAFETY CODE §§ 361.224, 382.081; TEX.WATER CODE § 26.123. This was the regulatory scheme in effect when the district court rendered judgment in this case.[3]

After the Air Control Board or Water Commission assesses a penalty, the offender must either timely pay the penalty or file suit in district court. However, a supersedeas bond or cash deposit paid into an escrow account, in the full amount of the penalty, is a prerequisite to judicial review. TEX.HEALTH & SAFETY CODE §§ 382.089(a), (b), 361.252(k), (*l* ); TEX.WATER CODE § 26.136(j). A party who fails to make a cash deposit or file a bond forfeits all rights to judicial review. TEX.HEALTH & SAFETY CODE §§ 361.252(m), 382.089(c); TEX.WATER CODE § 26.136(k).

TAB alleges that it is a Texas not-for-profit corporation, that its members do business throughout Texas, and that it is authorized to represent its members on any matter that may have an impact on their businesses.

TAB filed this suit under the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–37.011, alleging that some of its members had been subjected to civil penalties assessed by either the Air Control Board or the Water Commission. TAB further alleged that all of its other members that operate their businesses pursuant to the pertinent provisions of the Texas Clean Air Act, the Texas Water Code, or the Texas Solid Waste Disposal Act or any rules or orders issued pursuant to those provisions were put at "substantial risk (if not certainty)" of being assessed civil penalties by the Air Control Board or the Water Commission. Thus this suit does not challenge specific instances of the Air Control Board's or the Water Commission's exercise, or threatened exercise, of the civil penalty power. Instead, TAB's suit is a facial challenge to the constitutionality of this administrative enforcement scheme under the Texas Constitution.

The Defendants and Intervenors counterclaimed seeking a declaratory judgment that the statutes, rules, and regulations challenged by TAB do not, on their face, conflict with the open courts and jury trial provisions of our constitution. The trial court granted the Defendants' and Intervenors' requested declaratory judgment and denied TAB's request for a declaratory judgment. The court also denied TAB's request for injunctive relief.

TAB appealed directly to this court. *See* TEX.GOV'T CODE § 22.001(c);[4] TEX.R.APP.P. 140. In this court, TAB has limited its challenges to claims of unconstitutional denial of a jury trial and violation of our constitution's open courts provision.

## *I. Standing*

Before we reach the merits of this case, we first consider the matter of the trial court's jurisdiction, as well as our own; specifically we determine whether TAB has standing to challenge the statutes and regulations in question. Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing at the oral argument of this case. In response, the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal. We disagree.

 **[1]**    Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdiction **\*444** is never presumed and cannot be waived.[5]

 **[2]**    **[3]**    One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. *See* TEX.CONST. art. II, § 1; *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–74, 102 S.Ct. 752, 757–60, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *see also,* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 18 SUFFOLK U.L.Rev. 881, 889 n. 69 (1983) (noting that the dicta of *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), suggesting that standing is unrelated to the separation of powers doctrine has since been disavowed). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department.[6] *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644 (Tex.1933). Accordingly, we have interpreted the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions. *Firemen's Ins. Co.,* 442 S.W.2d at 333; *United Serv. Life Ins. Co. v. Delaney,* 396 S.W.2d 855, 863 (Tex.1965); *California Prods., Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780 (1960).

 **[4]**    **[5]**    The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *Firemen's Ins. Co.,* 442 S.W.2d at 333; *Puretex Lemon Juice,*

*Inc.,* 160 Tex. at 591, 334 S.W.2d at 783. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Texas courts, like federal courts, have no jurisdiction to render such opinions.

 **[6]**   The separation of powers doctrine is not the only constitutional basis for standing. Under federal law, standing is also an aspect of the Article III limitation of the judicial power to "cases" and "controversies." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). To comport with Article III, a federal court may hear a case only when the litigant has been threatened with or has sustained an injury. *Valley Forge Christian College,* 454 U.S. at 471, 102 S.Ct. at 758. Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury. Specifically, the open courts provision provides:

> All courts shall be open, and every person for an **injury** done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13 (emphasis added). Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

Under federal law, a lack of standing deprives a court of subject matter jurisdiction because standing is an element of such **\*445** jurisdiction. *Carr v. Alta Verde Indus.,* 931 F.2d 1055, 1061 (5th Cir.1991); *Simmons v. Interstate Commerce Comm'n,* 900 F.2d 1023, 1026 (7th Cir.1990); *M.A.I.N. v. Commissioner, Maine Dept. of Human Serv.,* 876 F.2d 1051, 1053 (1st Cir.1989); *Haase v. Sessions,* 835 F.2d 902, 908 (D.C.Cir.1987); *Page v. Schweiker,* 786 F.2d 150, 153 (3d Cir.1986); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Heckler v. Mathews,* 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211. Other states have followed this analysis in construing their own constitutions. [7] *See e.g., Prudential–Bache Sec., Inc. v. Commissioner of Revenue,* 412 Mass. 243, 588 N.E.2d 639, 642 (1992); *Bennett v. Board of Trustees for Univ. of N. Colorado,* 782 P.2d 1214, 1216 (Colo.App.1989), *cert. denied,* 797 P.2d 748 (Colo.1990); *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n,* 759 S.W.2d 272, 274 (Mo.App.1988); *Terracor v. Utah Bd. of State Lands & Forestry,* 716 P.2d 796, 798–99 (Utah 1986); *State by McClure v. Sports and Health Club, Inc.,* 370 N.W.2d 844, 850 (Minn.1985), *appeal dism'd,* 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Smith v. Allstate Ins. Co.,* 483 A.2d 344, 346 (Me.1984); *Ardmare Constr. Co. v. Freedman,* 191 Conn. 497, 467 A.2d 674, 675 n. 4, 676–77 (1983); *Horn v. County of Ventura,* 24 Cal.3d 605, 156 Cal.Rptr. 718, 726, 596 P.2d 1134, 1142 (1979); *Stewart v. Board of County Comm'rs of Big Horn County,* 175 Mont. 197, 573 P.2d 184, 186, 188 (1977); *State ex rel. Albritton v. Moore,* 238 La. 728, 116 So.2d 502, 504 (1959).

 **[7]**   Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. *Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782,* 163 Tex. 135, 352 S.W.2d 252, 253 (1961); RESTATEMENT (SECOND) OF JUDGMENTS § 11, comment c (1982). This court recently reiterated that axiom in *Gorman v. Life Insurance Co.,* 811 S.W.2d 542, 547 (Tex.), *cert. denied,* 502 U.S. 824, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991). Because we conclude that standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal. [8]

 **[8]**   If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury. We therefore hold that standing, as a component of subject matter **\*446** jurisdiction, cannot be waived in this or any other case and may be raised for the first time on appeal by the parties or by the court.

We are aware that this holding conflicts with *Texas Industrial Traffic League v. Railroad Commission,* 633 S.W.2d 821, 823 (Tex.1982) (per curiam). [9] The analysis that leads us to the conclusion we reach here, however, compels us to overrule *Texas Industrial Traffic League* and disapprove of all cases relying on it to the extent that they conflict with this opinion. [10] Although our concern for the rule of stare decisis makes us hesitant to overrule any case, when constitutional principles are at issue this court as a practical matter is the only government institution with the power and duty to correct such errors. *See Payne v. Tennessee,* 501 U.S. 808, —— – ——, 111 S.Ct. 2597, 2609–11, 115 L.Ed.2d 720 (1991) (observing that reexamination of constitutional decisions is appropriate when "correction through legislative action is practically impossible").

Consequently, we proceed to determine here, on our own motion, whether TAB has standing to bring this suit.

 **[9]**    **[10]**   Because standing is a component of subject matter jurisdiction, we consider TAB's standing under the same standard by which we review subject matter jurisdiction generally. That standard requires the pleader to allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836, 839 (Tex.1967). When reviewing a trial court order dismissing a cause for want of jurisdiction, Texas appellate courts "construe the pleadings in favor of the plaintiff and look to the pleader's intent." *Huston v. Federal Deposit Ins. Corp.,* 663 S.W.2d 126, 129 (Tex.App.—Eastland 1983, writ ref'd n.r.e. 1984); *see*

*also* W. Wendell Hall, *Standards of Appellate Review in Civil Appeals,* 21 ST. MARY'S L.J. 865, 870 (1990).

 **[11]** Here, however, we are not reviewing a trial court order of dismissal for want of jurisdiction, we are considering standing for the first time on appeal. A review of only the pleadings to determine subject matter jurisdiction is sufficient in the trial court because a litigant has a right to amend to attempt to cure pleading defects if jurisdictional facts are not alleged. *See* TEX.R.CIV.P. 80. Failing that, the suit is dismissed. When an appellate court questions jurisdiction on appeal for the first time, however, there is no opportunity to cure the defect. Therefore, when a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing.

 **[12]** TAB asserts standing on behalf of its members. The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). Texas, however, has no particular test for determining the standing of an organization, such as TAB. *See e.g.,* **\*447** *Touchy v. Houston Legal Found.,* 432 S.W.2d 690, 694 (Tex.1968); *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.,* 372 S.W.2d 525, 530–31 (Tex.1963). While we agree with the statement of the general test for standing set out in *Board of Water Engineers,* we foresee difficulties in relying on it alone to determine the standing of an organization like TAB. For instance, when members of an organization have individual standing, but the organization was not established for the purpose of protecting the particular interest at issue, it is not necessarily in the members' best interest to allow such a disinterested organization to sue on their behalf. Furthermore, an organization should not be allowed to sue on behalf of its members when the claim asserted requires the participation of the members individually rather than as an association, such as when the members seek to recover money damages and the amount of damages varies with each member.

 **[13]** The United States Supreme Court has articulated a standard for associational standing that lends itself to our use. We adopt that test today. In *Hunt v. Washington State Apple Advertising Commission,* the Court held that an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also New York State Club Ass'n v. City of New York,* 487 U.S. 1, 9, 108 S.Ct. 2225, 2231, 101 L.Ed.2d 1 (1988); *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986). This standard incorporates the standing analysis we adopted in *Board of Water Engineers,* yet addresses the additional concerns we have noted.

 **[14]**   We now apply the *Hunt* standard to the case before us. Reviewing the record in its entirety for evidence supporting subject matter jurisdiction, and resolving any doubt in TAB's favor, we conclude that TAB has standing to pursue the relief it seeks in this case.

The first prong of the *Hunt* test requires that TAB's pleadings and the rest of the record demonstrate that TAB's members have standing to sue in their own behalf. This requirement should not be interpreted to impose unreasonable obstacles to associational representation. In this regard the United States Supreme Court stated that "the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *New York State Club Ass'n,* 487 U.S. at 9, 108 S.Ct. at 2232. We are satisfied that TAB has not manufactured this lawsuit. A comparison of the association's membership roster with the list of businesses subjected to state penalties indicates individual TAB members have been assessed administrative penalties pursuant to the challenged enactments. Additionally, TAB has alleged that other of its members remain at substantial risk of penalty. A substantial risk of injury is sufficient under *Hunt. See e.g., Pennell v. City of San Jose,* 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 855 n. 3, 99 L.Ed.2d 1 (1988) (concluding that association of landlords had standing based on pleadings that individual members would likely be harmed by rent ordinance). Thus TAB satisfies the first prong of the *Hunt* test.

The second prong of *Hunt* requires that TAB's pleadings and the rest of the record demonstrate that the interests TAB seeks to protect are germane to the organization's purpose. TAB was chartered to "represent the interests of its members on issues which may impact upon its members' businesses." Considering a very similar question in *New York State Club Association,* the United States Supreme Court held that: "[T]he associational interests that the consortium seeks to protect are germane to its purpose: appellant's certificate of incorporation states that its purpose is 'to promote the common business interests of its **\*448** [member clubs].' " 487 U.S. at 10 n. 4, 108 S.Ct. at 2232, n. 4 (bracketed language in original). Likewise, the interests TAB desires to protect are germane to the organization's purpose, and thus the second prong is met.

Under the third and final prong of the *Hunt* test, TAB's pleadings and the record must demonstrate that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. The Supreme Court has interpreted this prong as follows:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441 (quoting *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213).

By seeking damages on behalf of its members, necessitating that each individual prove lost profits particular to its operations, the organization in *Warth* lacked standing to sue; rather, each individual member had to be a party to the suit. These facts are distinguishable from *Brock,* in which the union challenged an administrative interpretation of statutory provisions relating to unemployment compensation. 477 U.S. 274, 106 S.Ct. 2523. Recognizing that the suit raised "a pure question of law," and that "the individual circumstances" of any aggrieved member were not in issue, the Court held that the UAW had standing to challenge the government's actions. *Id.* at 287–88, 290, 106 S.Ct. at 2531–32, 2533; *see also Pennell,* 485 U.S. at 7 n. 3, 108 S.Ct. at 855 n. 3 (facial challenge to rent ordinance does not require participation of individual landlords). Here, TAB seeks only prospective relief, raises only issues of law, and need not prove the individual circumstances of its members to obtain that relief, thus meeting the third prong of *Hunt.*

Having found that TAB meets all three prongs of the *Hunt* test, we conclude that TAB has standing to pursue the relief it seeks in this case.

## II. Open Courts

TAB contends that the forfeiture provisions of the statutes and regulations in question violate the open courts provision of the Texas Constitution by unreasonably restricting access to the courts. After the agency has found a party to be in violation of any of these statutes and regulations, the offender must either tender a cash deposit or post a supersedeas bond in the full amount of the penalties assessed, or forfeit the right to judicial review. [11]

Historically, we have recognized at least three separate constitutional guarantees emanating from our open courts provision. First, courts must actually be open and operating, so that, for example, the legislature must place every county within a judicial district. *Runge & Co. v. Wyatt,* 25 Tex.Supp. 294 (1860). Second, citizens must have access to those courts unimpeded by unreasonable financial barriers, so that the legislature cannot impose a litigation tax in the form of increased filing fees to enhance the state's general revenue, *LeCroy v. Hanlon,* 713 S.W.2d 335, 342 (Tex.1986). Finally, meaningful legal remedies must be afforded to our citizens, so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress. *Sax v. Votteler,* 648 S.W.2d 661, 665–66 (Tex.1983).

 **[15]**   Here the second guarantee is applicable. This is not a question of the abrogation of any well-established common law **\*449** cause of action, [12] just as it is not a question of the physical absence of a court to which a complaint may be brought. The issue before us is access to the courts. In previous cases involving this issue, we did not predicate our decision on whether the

party whose access had been restricted was attempting to assert a common law cause of action. In *LeCroy,* for example, the court did not permit increased filing fees for statutory causes of action while denying them for common law claims. 713 S.W.2d 335. Likewise in *Dillingham v. Putnam,* when the court struck down a statute requiring a supersedeas bond as a condition of appeal, the court did not concern itself with whether the particular appeal being restricted involved a common law or statutory claim. 109 Tex. 1, 14 S.W. 303 (1890). Similarly, in the present case, the issue is simply whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved.

The stated purpose of the regulatory statutes at issue here is to protect our state's natural resources. [13] There is no question that this is an important state interest. [14] The state argues that the prepayment provisions further this interest by increasing the deterrent effect of the penalties and by aiding in their collection. The state maintains that a violator will be less deterred by an administrative penalty if it can delay payment without bond while appealing the case in the courts. The state also argues that delay may render the penalty uncollectible, as the violator may become insolvent.

In considering these rationales, we note that the prepayment provisions actually consist of two elements. First, the assessed penalty must be paid, or financial security provided, within thirty days; enforcement is not stayed pending any period of judicial review. [15] Second, if payment is not made or financial security provided within the thirty-day period, the right to judicial review is forfeited. We agree that the rationales advanced by the state justify the first of these elements. Requiring expeditious payment of the administrative penalties increases their effectiveness. The legislature, however, could have imposed the first element without the second. It could have provided the agency with the right to collection of assessed penalties unless a supersedeas bond is posted, yet provided for judicial review. The requirement of immediate payment, without the corresponding forfeiture provision, would not have implicated the open courts provision, as the charged party could have obtained judicial review regardless of payment. This approach would have been in accordance with the usual procedure governing appeals of trial court judgments. *See* TEX.R.APP.P. 40. Any litigant may appeal without superseding the trial court's judgment, but the mere pendency of an appeal does not stay enforcement of the judgment. [16] **\*450** Our specific focus for purposes of our open courts analysis, therefore, is not whether the requirement of immediate payment is reasonable, but whether the forfeiture of the right of judicial review, if the penalties are not superseded, is reasonable.

We conclude that the forfeiture provision is an unreasonable restriction on access to the courts. While the requirement of prepayment or the posting of a bond to stay enforcement furthers the state's important environmental interests by creating a strong incentive for timely payment of the assessed penalties, the forfeiture provision serves no additional interest. [17] The state may

accomplish its goals by enforcing the prepayment requirements without infringing on a party's right to its day in court. Accordingly, we hold that forfeiture sections of the statutes and regulations at issue facially violate our open courts provision. [18]

### III. Jury Trial

TAB also claims that the statutes empowering these agencies to assess civil penalties violate the right to a jury trial guaranteed by the Texas Constitution. [19] We disagree.

Article I, section 15 of our constitution [20] preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted. *E.g., State v. Credit Bureau of Laredo,* 530 S.W.2d 288, 291 (Tex.1975); *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917); *Hatten v. City of Houston,* 373 S.W.2d 525 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.); *Hickman v. Smith,* 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd). A jury trial is not mandated by this provision for any other judicial proceeding. *Id.*

 **[16]**    In *Credit Bureau,* we concluded that a suit for civil penalties for violation of an injunction issued pursuant to the Texas Deceptive Trade Practices Act was analogous to the common law action for debt, tried to a jury at the time our constitution was adopted. 530 S.W.2d at 293. Thus, we held that the right to a jury trial for that action remained inviolate. *Id.* We observed in *Credit Bureau,* however, that in certain types of adversary proceedings the constitutional right to a jury trial does not attach. Among the proceedings we referred to are appeals from administrative decisions. [21] *Id.* (citing *State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912), and **\*451** *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227 (Tex.Civ.App.—Houston 1937, writ ref'd n.r.e.)). Consistent with this noted exception in *Credit Bureau,* we conclude that these agencies' assessments of environmental penalties are not actions, or analogous actions, to those tried to a jury at the time the constitution of 1876 was adopted. To hold that these environmental statutes and regulations promulgated in the late 1960s merely parrot common law and statutory rights triable to a jury in 1876 would turn a blind eye to the emergence of the modern administrative state and its profound impact on our legal and social order. In the late 19th century, ours was primarily a sparsely-populated agrarian society. *See generally,* T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans,* 279–324 (1983). By contrast, concentrated industrial activity and its by-products, including the wide-spread emission of pollutants, with their resulting potential for significant damage to our natural resources are phenomena of relatively recent origin. In response to such phenomena, regulatory schemes, such as those challenged here, were designed to balance mounting environmental concerns with our state's economic vitality. In 1876 no governmental schemes akin to these existed. [22] Thus, we conclude that the contested proceedings are not analogous to any action tried to a jury in 1876. Accordingly, we hold that no right to a jury

trial attaches to appeals from administrative adjudications under the environmental statutes and regulations at issue here. [23]

We should not be misunderstood to say that the legislature may abrogate the right to trial by jury in any case by delegating duties to an administrative agency. Here, we simply reaffirm what this court held almost a half century ago, in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). In *Corzelius,* we concluded that certain judicial functions, including fact finding, may be delegated constitutionally by the legislature to administrative agencies in furtherance of the preservation and conservation of the state's natural resources. The decision in *Corzelius* was based on article XVI, section 59(a) of our constitution, which provides in relevant part: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). "By the use of the broad language used in Article XVI, Section 59(a)," the court stated, "the Legislature is authorized to enact such laws as are necessary to carry out the purposes for which such constitutional amendment was adopted." *Corzelius,* 186 S.W.2d at 964. [24]

 **[17]**   There is no doubt that the legislature delegated the power to assess these civil penalties to the Air Control Board and the Water Commission as a manifestation of the public's interest in preserving and conserving the state's air and water resources. That intent is apparent from the policy statements of the relevant statutes. [25]   **\*452**  We conclude, therefore, that the delegation of the fact-finding function by the legislature to the Air Control Board and the Water Commission under this statutory scheme was within the legislature's constitutional authority.

Of course, the fact that no jury trial is provided by the legislature to an alleged violator of these environmental protection laws does not mean that the agencies' power to assess penalties is unbridled. [26] The Air Control Board and the Water Commission may act only within constitutional and statutory parameters.

For the reasons set out above, we reverse that portion of the trial court's judgment declaring that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act and the rules and regulations promulgated under those statutes comport with the open courts provision of our constitution, article I, section 13. We declare that the requirement of a supersedeas bond or cash deposit paid into an escrow account as a prerequisite to judicial review under  TEX.HEALTH & SAFETY CODE §§ 361.252(m) (first clause), 382.089(c) (first sentence), and TEX.WATER CODE § 26.136(k) (first sentence) is unconstitutional. We affirm that portion of the trial court's judgment declaring that the listed statutes, rules, and regulations do not violate the jury trial provision of our constitution, article I, section 15.

Concurring and dissenting opinions by DOGGETT, GAMMAGE and SPECTOR, JJ.

HIGHTOWER, J., not sitting.

DOGGETT, Justice, concurring and dissenting.

### *"Don't Mess With Texas"*

*—A motto that captures the Texas spirit.*

Texans understand the directive "Don't Mess With Texas"; the majority does not. If the mess is big enough, if the stench is strong enough, no matter how great the danger to public health and safety, an industrial litterer can "mess" with Texas without fear of immediate punishment or legally effective citizen action.

And what an occasion for permitting polluters to "mess" with Texas air and water. Our state tops the nation in total toxic emissions and ranks dead last among the fifty states in important measures of environmental quality. [1] Although last in air **\*453** and water cleanliness, Texas today becomes the first state to strike down the imposition of penalties by administrative agencies to enforce statutes protecting the environment. I dissent from today's manipulation of the law to paralyze anti-pollution efforts, tragically announced at a time when protecting the quality of the air we breathe and the water we drink is so critical.

Today's opinion delivers a double whammy to protection of our natural resources. Polluters are first shielded from swift punishment for harming our environment, and then the courthouse door is slammed shut in the face of Texans who organize to object. Incredibly, this second punch was not even sought by the corporate organization that brought this challenge; it was wholly designed by the majority during the three years that this cause has lingered in this court. Announced today is an easily manipulable "friends in, foes out" rule to prevent further actions by those who organize to protect taxpayers, consumers or the environment.

Through its broad writing designed to eviscerate administrative enforcement of our state's environmental laws, the majority has also created significant new uncertainties for a wide range of state governmental activity—tax collection is imperiled, laws to protect nursing home residents are effectively voided, and even a leading weapon in the war on drugs is threatened. At a time of budgetary crisis exacerbated by the majority's great misadventure in public school finance, [2] today's opinion raises a substantial question of whether the State will be required to return to those

who despoil Texas millions of dollars in administrative penalties collected during the almost eight years this case has wandered through the judicial system.

This major blow to our environment is matched only by the threat to our system of justice lurking in the arcane language of today's opinion. Hidden within its lengthy legal mumbo-jumbo is an unprecedented blow to our jury system. The constitutional right of trial by jury, already suffering at the hands of this majority, is no longer inviolate; it may be abrogated at any time. Instead of walking into a courthouse, where a jury is guaranteed, citizens may be detoured to an administrative agency, to explain their problems to bureaucrats not directly answerable to the community.

Today precedent and tradition have been trampled as the majority's long-standing fear of ordinary people in our legal system has taken firm hold. The drafters of our Texas Constitution realized something that the majority has long ceased to appreciate—ordinary Texans can make an extraordinary contribution to our system of justice. The more their collective voice expressed in a jury verdict is disregarded, the more new barriers are contrived to shut them out of our system of justice, the less justice that system will offer.

### I. Open Courts

The ability of state agencies to enforce environmental laws through the assessment of administrative penalties is declared unconstitutional by the majority as contradicting our state guarantee of open courts. While concluding that TAB certainly has a right to judicial review on behalf of its members, I disagree that the statutory restrictions it challenges unreasonably restrict access to the courts.

Access to the courts is unquestionably a fundamental constitutional and common law right. Article I, section 13 of the Texas Constitution forms the nucleus of this protection:

> **\*454** The open courts provision specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court. *This right is a substantial state constitutional right.*

*LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986) (citations omitted). This court has a long history of assuring that the right of access remains guaranteed to Texas citizens. [3]

In *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), we required a litigant alleging an unconstitutional denial of access to the courts to show that: (1) a cognizable common law cause of action is being restricted and (2) the limitation is unreasonable or arbitrary when balanced against the purpose

and basis of the statute. The majority today appropriately eliminates the first showing in certain cases. In some circumstances the distinction between common law and statutory causes of action clearly does not affect whether access to the courts has been denied.

The second part of the *Sax* test, however, continues to be applied in all open courts cases.[4] Thus, in determining whether the open courts provision of the Texas Constitution is violated by the requirement that administrative penalties be paid as a prerequisite to judicial review, we must balance two competing interests: the right of TAB's members to access to the courts and the state's concern with effective and timely enforcement of its laws protecting the environment. The majority today restates in rather vague terms this second prong: "whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved." 852 S.W.2d at 449. As we held in *LeCroy:*

> Because a substantial right is involved, the legislature cannot arbitrarily or unreasonably interfere with a litigant's right of access to the courts. Thus, the general open courts provision test balances the legislature's actual purpose in enacting the law against that law's interference with the individual's right of access to the courts. *The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access.*
> 713 S.W.2d at 341 (citations omitted; emphasis supplied).

Applying this test, we have permitted certain restrictions on access to the courts, while disallowing others. *Compare LeCroy,* 713 S.W.2d at 341 (court filing fee unreasonably restricts access to judicial system), and *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (supersedeas bond as prerequisite to appeal, without regard to ability to pay, unconstitutional), *with Clanton v. Clark,* 639 S.W.2d 929 (Tex.1982) (court may constitutionally dismiss suit for failure to timely file cost bond), and *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932) (requirement that franchise taxes be paid prior to filing suit upheld under article I, § 13); *compare Lucas v. United States,* 757 S.W.2d 687 (Tex.1988) (limitations on damages for medical malpractice unconstitutional), *with Rose v. Doctors Hosp.,* 801 S.W.2d 841 (Tex.1990) (same limitations upheld under open courts provision in wrongful death cases). I favor a more complete and predictable open courts analysis designed to discourage such anomalous results.

**\*455** Today's implementation of the second prong of the *Sax* test demonstrates its malleability. After perfunctorily reciting the purpose of administrative penalties, the majority, without any further analysis, concludes that: "the forfeiture provision is an unreasonable restriction on access to the courts," 852 S.W.2d at 450, and "the forfeiture provision serves no additional [state] interest." *Id.* at 450. Enacted by the Legislature as an important means of enforcing our state's environmental laws, these penalties are today judicially extinguished. The majority determines that these laudable legislative objectives are not sufficiently "important" to justify the possibility that the use of penalties may perhaps someday impose some slight financial strain on some hypothetical polluter.

Whether examined under either the vague test employed today or my more exacting formulation, the majority's conclusory analysis suffers from at least three major flaws: (1) a failure to recognize the compelling interest, grounded in our state constitution, served by administrative penalties, including prepayment provisions; (2) a disregard of the extensive statutory constraints on penalty usage which represents the least restrictive means to achieve this purpose; and (3) an assumption that the prepayment provision interferes with individual access to the courts unsupported by even a single specific instance of such a restrictive effect.

The balancing required by *Sax* mandates careful consideration of the rights being affected. The more significant the right the litigant asserts, the more onerous the government's burden becomes. TAB has asserted a right to judicial review of penalties imposed against its members. This interest is encompassed within the right of access to the courts, which we declared a "substantial state constitutional right." *LeCroy,* 713 S.W.2d at 341.

The State has met its burden by demonstrating a compelling interest in employing administrative penalties reflected in constitutionally-guaranteed protection of our state's natural resources. Although not critical in overcoming an open courts challenge, a constitutional predicate for the state's interest is a highly persuasive factor in the balancing process. As declared in article XVI, section 59(a) [5] :

> [T]he preservation and conservation of all ... natural resources of the State are each and all declared public rights and duties; and the Legislature shall pass all laws as may be appropriate thereto.
>
> This very mandate of the people, as well as protection of the public health and safety was effectuated in the Clean Air Act, [6] the Texas Water Code, [7] and the Solid Waste Disposal Act, [8] including the right to assess administrative penalties. Protection of Texas' air, water and land is undeniably a compelling interest.

**\*456** The form of these particular administrative penalties has certainly been fashioned to serve this important state interest through the least restrictive means. Penalty usage is substantially limited and can in no way be said to be arbitrarily imposed. All three statutes at issue require that, once a violation is established, the agency assessing a penalty must consider such factors as the seriousness of the violation, including but not limited to the nature, circumstance, extent, and gravity of the prohibited acts; the hazard or potential hazard created to the public health or safety of the public; the history of previous violation; the amount necessary to deter future violations; and efforts to correct the violation. [9] There is thus statutory assurance that the amount of any resulting penalties will be directly related to the conduct.

Requiring that assessed penalties be paid, or a bond in the same amount be posted, prior to challenging the agency action in court is not unreasonable under these circumstances. Unlike the filing fee held violative of the open courts provision in *LeCroy,* the legislative purpose is not to raise money by making it more expensive for citizens to enforce their legal rights. Instead, the legislative objective is to *deter and punish* violations of the law that pose an environmental threat.

The wheels of justice grind slowly, with final resolution often years in reaching. Indeed, in this court they sometimes hardly grind at all. Clearly those willing to profit from polluting our natural resources will not hesitate to employ the delays in the judicial system to their advantage. A declaration of bankruptcy by a perhaps deliberately undercapitalized corporation during the pendency of a suit is likely to relieve the polluter of any responsibility to remedy the damage it has caused.

Showing no awareness of the purpose of and need for administrative penalties, the majority finds that "expeditious payment" is adequately guaranteed by the ability of the agency, through the attorney general, to initiate an enforcement action to collect the amount assessed. 852 S.W.2d at 449 & n. 15. In other words, the purpose of immediate deterrence of violation of environmental laws is ensured by the filing of a lawsuit that may take as many years to resolve as this case has. These agencies charged with protecting our natural resources have long had the ability to bring an enforcement action in state court. *See* Tex.Water Code § 26.123; Tex.Health & Safety Code § 382.081; *id.* § 361.224. The effort of the Texas Legislature to improve the effectiveness of enforcement through the use of administrative penalties is today rendered a nullity.

Given the time and expense that must be devoted to pursuing an enforcement action in court, the State will have the capability to proceed against only the most egregious wrongs. The vast majority of administrative penalties to date have been relatively small, reflecting technical yet important statutory violations. [10] In the absence of an administrative penalty power, most of these would have gone unpunished, even though collectively the environmental impact of small violations could be more profound than a major catastrophe. Relieving polluters from immediate sanctions dismantles the effectiveness of our laws protecting natural resources; no lesser means has been identified that provides for prompt enforcement. I would hold that the state has demonstrated a compelling interest in environmental protection that has been implemented by the least restrictive means, thus overriding any modest impediment that the prepayment of penalties may impose on access to the courts.

**\*457** Not even the slightest evidence has been provided to this court to suggest any actual restrictive effect. No affidavit of any member of the Texas Association of Business appears in the record stating that an inability to pay an administrative penalty has barred judicial review. As to most of the penalties assessed, $5,000 or less in amount, it is doubtful that such a contention could be made. The majority necessarily concludes that imposing fines of $2,000 against Exxon

Chemical Company, Shell Oil Company and Union Carbide Corporation has left those entities financially unable to pursue an appeal. [11] While the enormity of some future penalty could in fact unconstitutionally bar judicial access, that is certainly not the case here. *See Jensen v. State Tax Comm'n,* 835 P.2d 965, 969 (Utah 1992) (payment of assessed taxes, penalties and interest as precondition to suit "not unconstitutional in all cases," but only those in which taxpayer financially barred from prosecuting appeal); *see also Morrison v. Chan,* 699 S.W.2d 205, 207 (Tex.1985) (medical malpractice statute of limitations not unconstitutional as applied to facts of case).

Eliminating the need to prove actual restrictive effect, the majority declares "irrelevant" that "the affected parties may be able to afford prepayment." 852 S.W.2d at 450 n. 18. Unexplained is how this statement can be reconciled with *Dillingham,* in which this court found of critical importance the failure to accommodate those financially unable to post a supersedeas bond as a prerequisite to judicial review. Opining that "the guarantee of constitutional rights should not depend on the balance in one's bank account," *id.,* the majority would accord our state's largest businesses the same treatment as indigents in avoiding financial responsibility for court and other litigation costs.

Nor is the majority restrained by Texas decisional law validating similar requirements. We long ago upheld against this same type of challenge the condition that a corporation pay its franchise taxes in order to file a court action. *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932); *accord Rimco Enterprises, Inc. v. Texas Elec. Svc. Co.,* 599 S.W.2d 362 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). Various statutory requirements that taxes, penalties and interest be paid prior to contesting them in court have likewise sustained an open courts challenge. *See Filmstrips and Slides, Inc. v. Dallas Central Appraisal Dist.,* 806 S.W.2d 289 (Tex.App.—Dallas 1991, no writ) (property taxes); *Robinson v. Bullock,* 553 S.W.2d 196 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.), *cert. denied,* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978) (sales taxes).

The majority also ignores the certainty that far more than three statutes are impacted by today's decision. A broad range of regulatory enforcement programs vital to protection of the public health and safety will be stripped of their most timely and effective sanctions to deter harmful conduct. Laws designed to protect the old—residents in nursing homes [12]—the young—our children away at camp [13]—the sick and the injured, [14] and those we have lost [15] will be substantially weakened. Others, ensuring the sanitariness of food, drugs and cosmetics, [16] as well as the slaughter and **\*458** disposition of dead animals, [17] will be similarly rendered less effective. [18] Even where such penalties have not been frequently enforced, their potential use may promote law enforcement.

The most widespread damage, however, from today's decision will be in the enforcement of laws protecting our environment, where the Legislature has determined again and again that such penalties are the most effective means of assuring compliance and preventing pollution of our

air, water and land. [19] The majority ensures that those who pollute will be brought to justice very slowly or not at all.

Other statutes that impose administrative penalties permit the filing of an affidavit of inability to pay in lieu of prepayment or the posting of a bond. [20] Because the majority's reasoning strikes down administrative penalties without reference to financial ability, 852 S.W.2d at 451, these statutes similarly cannot be enforced.

Today's writing poses a potentially crippling effect for collection of taxes. All of our state statutes in this area require that assessed taxes, penalty and interest be prepaid before a suit challenging them may be filed. *See generally* Tex.Tax Code §§ 112.051, 112.101. If such requirements are unconstitutionally void even to fulfill a constitutional mandate of environmental protection, their validity for tax collection is certainly subject to question. *See R Communications, Inc. v. Sharp,* 839 S.W.2d 947 (Tex.App.—Austin 1992, writ granted).

Nor has the majority sought to consider the consequences of its decision for a major weapon in the war against drugs, forfeiting *prior to judicial review* money, vehicles and other property alleged to have been used in violating our criminal laws. Tex.Crim.Proc.Code art. 59.02–.11. Most frequently invoked to seize assets from drug dealers, such as money and cars that could finance their defense, this statute provides for the return of property prior to trial only **\*459** on the posting of a bond for the full value. *Id.* art. 59.02(b).

Procedures within our judicial system are also threatened. Why is not the requirement that corporations and other organizations appear in court only through counsel a violation of the open courts provision, since the cost of retaining an attorney in most cases exceeds the average administrative penalty considered here?

Inadequately considered by the majority's opinion is its effect on the millions of dollars in administrative penalties that have already been paid under the statutes now declared unconstitutional. Yet, under the general rule that our decisions apply retroactively, past violators of environmental laws may stand to reap a substantial windfall. [21] In the firm grasp of this majority, "open courts" may have been rewritten to mean open coffers. While claiming that nothing in today's writing suggests that a refund is required, the majority apparently once again concludes that monies extracted by the state under the coercion of an unconstitutional system may be retained. *See Carrollton–Farmers Indep. Sch. Dist.,* 826 S.W.2d at 515–23 (holding tax unconstitutional, but requiring taxpayers to continue payment for two years).

The majority today throws a large wrench into the workings of the important administrative mechanism of our Texas government. By severely limiting enforcement powers, the majority leaves law enforcers little choice but to forego prosecution of law violators. Our laws designed

to protect and conserve our natural resources are substantially weakened at the time their strength is most needed.

## II. Trial by Jury

The harm caused to our environment by today's writing is equalled only by the severe blow struck against our fundamental right of trial by jury. In holding that TAB and its members have no right to a jury trial, the majority employs an analysis that has far-reaching ramifications. While I recognize the need to accommodate the evolution of the administrative state, the history of this important guarantee mandates that only the narrowest of exceptions be permitted.

The ability of each individual to have a case heard by other members of the community is a vital part of our heritage and law. Long ago, Texans emphasized the paramount importance of this guarantee, stating in their grievances against the Mexican government:

> It has failed and refused to secure, on a firm basis, the right of trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen.

The Declaration of Independence of the Republic of Texas (1836), *reprinted in* Tex.Const.app. 519, 520 (Vernon 1955). A strong guarantee of this right had been unsuccessfully sought in an 1833 draft constitution,[22] which was submitted to Mexico by Stephen F. Austin[23] and was later incorporated in the 1836 Texas Independence Constitution.[24]

The central role of the jury as a democratic institution was firmly recognized, indeed celebrated, in our early jurisprudence by the Supreme Court of the Republic of Texas:

> The institution of jury trial has, perhaps, seldom or never been fully appreciated. It has been often eulogized in sounding **\*460** phrase, and often decried and derided. An occasional corrupt, or biased, or silly verdict is not enough for condemnation; and when it is said the institution interposes chances of justice and checks against venality and oppression, the measure of just praise is not filled. Its immeasurable benefits, like the perennial springs of the earth, flow from the fact that considerable portions of the communities at stated periods are called into the courts to sit as judges of contested facts, and under the ministry of the courts to apply the laws.... Let us then preserve and transmit this mode of trial not only inviolate, but if possible purified and perfected.

*Bailey v. Haddy,* Dallam 35, 40–41 (Tex.1841).[25]

In 1845, expanding the scope of this right was the subject of spirited debate in the deliberations over the new constitution for statehood. In addition to the previous guarantee, which was carried forward in a new Bill of Rights, [26] further protection was included in the Judiciary Article. Tex. Const. art. IV, § 16 (1845). While under our national Constitution and those of almost all of our sister states trial by jury is available only for those actions that could have been brought at common law, the Texas Constitution since 1845 has also preserved that right in cases that historically would have been brought in equity. Thus, even when a private party seeks injunctive relief that will inure to the public's benefit, any derogation of the right to a jury nonetheless violates the Texas Constitution.

Urging support of the additional Judiciary Article guarantee, Convention President Thomas Rusk declared:

> It is a dangerous principle to trust too much power in the hands of one man. Would it not be better to trust a power of this nature in the hands of twelve men, than to confide it to the breast of one?

William F. Weeks, *Debates of the Texas Convention* 268 (1846). He was opposed by John Hemphill, later the first Chief Justice of this court, who actually "preferred the civil law" system, *id.* at 271–73, and Jefferson County delegate James Armstrong, who insisted the new section would "operate very injuriously." *Id.* at 270. He declared:

> It would be better, in my opinion, to leave it to the legislature to apply these things; it is enough for us to say in the constitution that the trial by jury shall be preserved inviolate. If we intend the jury to determine every thing, it would be better to dispense with the judge altogether, as a useless appendage of the court.

*Id.* Today it is this same fear of juries, fortunately rejected in 1845, that now unfortunately prevails.

The original language providing for trial by jury in the Judiciary Article of 1845 was retained in later constitutions, Tex. Const. art. IV, § 16 (1861), Tex. Const. art. IV, § 20 (1866), but was thereafter extended to "all cases of law or equity." Tex. Const. art. V, § 16 (1869). It took its final form in our present Constitution of 1876, which continues to afford not one but two assurances on this vital subject:

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right to trial by jury....

Tex. Const. art. V, § 10.

The right of trial by jury shall remain inviolate.

Tex. Const. art. I, § 15. Rather than keeping it "inviolate," the majority today severely violates this right.

**\*461** Our heritage is now rejected by the majority in favor of a deliberately overbroad writing that treats trial by jury as a mere anachronism. This is consistent with the majority's increasing disfavor of decisionmaking by ordinary citizens composed as a jury.[27] Today's opinion insists that our constitutional assurance of trial by jury does not offer protection against legislative delegation of factfinding to an administrative bureaucracy. In essence, the majority engages in a massive redistribution of power from the people to the bureaucratic arm of state government. This extreme position is totally unjustified in view of the staunch legal and historical underpinnings of our constitutional commitment to afford Texans a jury of their peers.

Today's opinion accurately describes one element of the dual constitutional protection for this fundamental liberty:

> Article I, section 15 of our constitution preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted.

852 S.W.2d at 450 (footnote omitted). Then the majority grossly misconstrues this standard while making selective and misleading use of jurisprudence developed under the further guarantee of article V.

With its hangnail sketch of Texas history limited to one historian's very generalized description of Texas in the era "between 1835 and 1861",[28] 852 S.W.2d at 450, the majority ignores our longstanding concerns regarding threats to our natural resources. As early as 1860, the Legislature acted to penalize polluters, providing that:

> If any person ... shall in anywise pollute, or obstruct any water course, lake, pond, marsh or common sewer, or continue such obstruction or pollution so as to render the same unwholesome or offensive to the county, city, town or neighborhood thereabouts, or shall do any act or thing that would be deemed and held to be a nuisance at common law, shall be ... fined in any sum not exceeding five hundred dollars....[29]

In an early decision considering whether a criminal nuisance was posed by a tallow factory near Galveston at which cattle were slaughtered and their carcasses and offal were allowed to accumulate, this court stated:

> It requires no aid of the common law to convince any one accustomed to pure air, and who has been brought by accident or necessity within the sickening

and malarious influence of one of our modern tallow and beef factories, that it is a disgusting and nauseous nuisance, even for miles around it ... [those] so offending should be indicted and punished to the extent of the law.

*Allen v. State,* 34 Tex. 230, 233–34 (1871). How significantly has this court's once vigorous enforcement of anti-pollution laws waned.

Defilement of the environment was not only made punishable as a crime, but also subject to a common law action for nuisance. *See generally* Horace Wood, Wood's Law of Nuisances 501–21, 576–692 (2d ed. 1883) (discussing nuisance recovery at common law for various forms of air and water pollution). Such actions were regularly brought in Texas before 1876 to halt activities harmful to our air and water. In 1856, this court recognized that "[w]hat constitutes a nuisance is well defined."[30] **\*462** *Burditt v. Swenson,* 17 Tex. 489 (1856). Considering an action to enjoin operation of a livery stable on Congress Avenue in Austin because "manure and filth has already accumulated to such an extent, that it now causes an unhealthy and disagreeable effluvia, exceedingly offensive and prejudicial," *id.* at 492, this court concluded such "noisome smells" constituted a nuisance. *Id.* at 502–03. In *City of Fort Worth v. Crawford,* 74 Tex. 404, 12 S.W. 52, 54 (1889), an individual asserted that, because of the dumping of garbage, filth and bodies of dead animals on city land,

> his home was rendered almost uninhabitable; his family and himself were kept in bad health; and he was, in the language of a witness, "a walking skeleton."

This court further observed that

> The stench was so offensive that he had to shut the doors to eat and sleep.... The testimony shows that the filth on this place of deposit was so indescribable, and was so offensive as to make persons sick, and could be perceived a mile away.

*Id.* Affirming the judgment declaring the dump a common law nuisance, this court declared:

> There is also no doubt that every person has a right to have the air diffused over his premises free from noxious vapors and noisome smells....

*Id.*[31]

The majority's suggestion that "pollutants ... are phenomena of relatively recent origin," 852 S.W.2d at 451, is contradicted by the nineteenth century legislative response of criminalizing pollution and the common use of the common law of nuisance to fight soiling of the air and water. With the ongoing construction of the railroads, the mining of coal and sulphur, the emergence of industry and the nascence of our oil and gas industry, our state's natural resources were by

no means pure and unthreatened in 1876. *See* James C. Cobb, Industrialization and Southern Society 1877–1984, 128 (1984) (describing pollution relating to increased rail usage, lumbering and urban sewage); *see also* Robert A. Calvert & Arnoldo De Leon, The History of Texas 186–191 (1990) (discussing the development of Texas industry in the late 1800's, including lumbering, beef processing and mining); Louis J. Wortham, 5 A History of Texas (1924) (examining industrial development in the nineteenth century). Only the scope and depth of the problem has changed. But even if the fouling of the environment were a recent technological "innovation" of the past century, that would be irrelevant. As I recently wrote in another context,

> The law is not irretrievably locked in the days before televisions and videocameras, nor limited to operators of telegraphs and horse-drawn carriages.

*Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting). There is nothing about technological change that has made trial by jury any less vital. [32]

But because there was no modern bureaucracy in 1876, the majority insists: "no governmental schemes akin to these existed." *Id.* at 451. While our laws and society have grown more complicated, the mandate **\*463** of our constitution has not. As we concluded in *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292 (Tex.1975): "The right to a trial by jury is not limited to the precise form of action ... at common law." If there was an analogous cause of action with a right to jury trial in 1876, then our article I jury trial guarantee requires it today. Yet the majority ignores the fact that even the earliest of pollution statutes was designed to deter and punish those who harm our environment. Our jury trial article is thus decreed as dependent on form, not substance; not analogy, but exactitude. Under the majority's analysis, *Credit Bureau* was wrongly decided since a regulatory prohibition against deceptive non-disclosure or ambiguous language with the capacity to deceive was beyond the "deceptive acts" of common law fraud or deceit as it existed in 1876.

Seizing upon the rather obvious proposition that the administrative state had not yet been created in 1876, the majority concludes that there is no right to trial by jury in judicial review of an administrative proceeding. But under article I it is the nature of the cause of action that controls, not the procedures under which it is enforced. Each of the three statutes considered today defines "pollution" of air, water or land to incorporate early nuisance concepts. Tex. Health & Safety Code § 382.003(3) (contaminants that "are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property [or] interferes with the normal use and enjoyment of animal life, vegetation, or property"); *id.* § 361.003(44) ( "contamination of any land land or surface or subsurface water in the state that renders the land or water harmful, detrimental, or injurious to humans, animal life, vegetation"); Tex. Water Code § 26.001(13) (contamination that "renders the water harmful, deterimental, or injurious to humans, animal life, vegetation, or property"). The majority fails to examine these provisions and makes no attempt to distinguish their substance from nuisance actions at the time the constitution was adopted. The focus must

be on the nature of civil and criminal nuisance actions as they existed in 1876, not on whether administrative agencies existed then to bring such actions. That the creation of some administrative agency was not contemplated in 1876 does not mean that any type of factfinding transferred to that agency in 1993 or hereafter is beyond the purview of a jury. With its new approach, the majority is only clearing the way for a steady expansion of factfinding and decisionmaking by bureaucracy at the expense of trial by jury.

Concluding that no common law action analogous to the assessment of administrative penalties existed in 1876, the majority professes a superficial limit on its holding tied to article XVI, § 59(a) of the Texas Constitution, as interpreted in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). 852 S.W.2d at 451 n. 24. Nothing in this provision affects the determination of whether a nuisance action for pollution is analogous to an enforcement action for the same conduct. Clearly, the majority's reasoning rests solely on the fact that no administrative agency was charged in 1876 with protecting the state's resources. Nor does *Corzelius* in any way address the right to jury trial. Under the majority's asserted "narrow" holding, the right to trial by jury can be immediately abrogated in any case in which natural resources are even remotely involved, including private disputes that this court has held are subject to jury trial, such as those involving mineral ownership, contract rights, or mineral lease terms. *See, e.g., Amarillo Oil Co. v. Energy–Agri Prod., Inc.,* 794 S.W.2d 20, 26 (Tex.1990).

The constitutional limitation on legislative power to delegate away the people's right to trial by jury was amply demonstrated by the writing of this court in *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917). There a husband had his wife, who apparently did not contest that she was a "lunatic," committed to a state asylum. Commitment proceedings had been statutorily transferred to a "commission" appointed by a county judge and comprised of six members, "as many of [whom] shall be physicians as may be possible." Act of **\*464** April 8, 1913, 33rd Leg., ch. 163, art. 152, 1913 Tex.Gen.Laws 342. Although a review of decisions of other states and of federal practice indicated substantial support for what appeared to be a quite reasonable legislative attempt to entrust the determination of mental competency to the expertise of the medical profession, 196 S.W. at 514–15, this Court rightly concluded there that

> trial by jury means something more than a hearing before a commission....

*Id.* 196 S.W. at 511. Such "a hearing before a commission, in lieu of the time-honored trial by jury, is invalid." *Id.* 196 S.W. at 515. Moreover,

> [contrary] reasoning [in other jurisdictions] as to the right of the legislature to dispense with jury trials is not applicable to our judicial system and laws, and it is obnoxious to our [Texas] Constitution...."

*Id.* I maintain that the wholesale transfer of authority for factfinding from juries to the bureaucracy announced here is no less offensive to the rights our Constitution guarantees.

Beginning with the constitutional amendment that led to the creation of the Railroad Commission,[33] the use of administrative agencies in Texas has steadily increased. Today this arm of government implements broad legislative plans regulating many areas of public concern, including the conduct of public utilities, the development and conservation of energy resources, and the protection of the environment.

To preserve the workings of modern government, some exception for administrative proceedings may be necessary, but it should be drawn narrowly so as not to encompass every conceivable action that could arguably be assigned to some existing or future administrative body. And that is precisely what, until today, our Texas courts have usually done. In two decisions concerning administrative cancellation of a permit to sell liquor, courts narrowly recognized that no "cause of action" was involved. The court in *Bradley v. Texas Liquor Control Bd.,* 108 S.W.2d 300 (Tex.Civ.App.—Austin 1937, writ ref'd n.r.e.), specifically excluded from its ruling cases "based upon a civil right of [an individual] to compensation." Relying on *Bradley,*[34] the court in *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227, 229–30 (Tex.Civ.App.—Texarkana 1937, no writ), noted that unlike other administrative proceedings that might involve rights of the same character as a "cause of action," the cancellation of a liquor license is a proceeding brought by the state pursuant to its police power to protect the "welfare, health, peace ... and safety of the people of Texas."

This concern for "the safety of the people of Texas"—the rights and needs of the public, *id.,* is not dissimilar from the doctrine of "public rights" rather imperfectly employed by the federal courts. State cancellation of a liquor license essentially represents a "public right." In *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the court distinguished between cases involving governmental action to protect the public health and safety and those involving only private rights:

> At least in cases in which "public rights" are being litigated—e.g., cases in which the government sues in its sovereign capacity to enforce public rights created by statutes ... [the constitutional right to a jury trial] does not prohibit ... assign[ment of] the factfinding function to an administrative forum with which the jury would be incompatible.

*Id.* at 450, 97 S.Ct. at 1266.

*Bradley* and *Jones* are also consistent with writings in other jurisdictions strictly excluding from any administrative public rights exception actions invoking private **\*465** rights for which the Constitution mandates a right to trial by jury:

> Although the award of general compensatory damages may have substantive effect, in that it deters violation of the regulatory scheme ... when the damages awarded advance a substantial private interest in remuneration that is disproportionate to the concept of public relief, the right to a jury trial is implicated and a jury is required.

*McHugh v. Santa Monica Rent Control Bd.,* 49 Cal.3d 348, 261 Cal.Rptr. 318, 344, 777 P.2d 91, 117 (1989) (Panelli, J., concurring); *Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238, 246 (1989) (subjective determinations of damages are constitutionally entrusted to juries); *Broward County v. La Rosa,* 505 So.2d 422, 424 (Fla.1987) (constitutional right to jury precludes administrative awards of unliquidated damages).

Fortunately the rights of Texans are not constrained by whether the right to a jury trial was preserved in analogous actions in 1876. We have written quite clearly that an even broader right to trial by jury is afforded under article V, section 10 than under article I, section 15.[35] *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292 (Tex.1975). Relying on *Walsh v. Spencer,* 275 S.W.2d 220, 223 (Tex.Civ.App.—San Antonio 1954, no writ), which described the "much broader guarantee" of the Judiciary Article, and *Tolle v. Tolle,* 101 Tex. 33, 104 S.W. 1049, 1050 (1907), which said of the provision, "[l]anguage cannot be more comprehensive than this," we expressly disapproved of earlier cases "mistakenly" treating the two provisions

> as identical in meaning, that is, as protecting the right of trial by jury only as it existed at common law or by statutes in effect at the time of the adoption of the Constitution.
> 530 S.W.2d at 292 (citing *Hickman v. Smith,* 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd), as improperly assigning the two provisions equivalent meaning). We held that the Judiciary Article affords a unique right to trial by jury even for causes of action unknown at the time of the Constitution's adoption. *Id.*[36]

Instead of heeding this holding, the majority seizes upon a citation to a commentary in that writing as an excuse to rewrite the Constitution. In the discussion of the article V jury trial guarantee in *Credit Bureau,* which involved no administrative action, we noted a few "isolated" proceedings that do not constitute a "cause" that have been identified on a "case-by-case determination." *Id. at 293.* We made shorthand reference to a commentator's brief list of exceptions carved from the otherwise inviolate right to trial by jury. *Id.* (citing Whitney R. Harris, *Jury Trial in Civil Cases— A Problem in Constitutional Interpretation,* 7 Sw.L.J. 1, 8 (1953) (listing child custody by habeas corpus and adoption proceedings, election contests, and contempt proceedings)). Additionally,

Harris relied upon *Jones* for the broader proposition that proceedings originally brought before administrative agencies are excepted from constitutional jury rights. 7 Sw.L.J. at 12–13. [37]

 **\*466** Today the majority overexpands this exception before considering the rule it prefers that exception to swallow. In *Credit Bureau* we attributed "broad meaning [to] the word 'cause.' " 530 S.W.2d at 292. In defining it, we did not limit its meaning in the past, but turned to a relatively contemporary dictionary as well as older authority. *Id.* Clearly this term must adapt to modern developments; our understanding of a "cause" is not frozen in 1876. *See Davenport v. Garcia,* 834 S.W.2d 4, 19 (Tex.1992). Both the text of our Constitution and its historical backdrop demand that the right to trial by jury remain "inviolate." When, as here, however, changing circumstances require reexamination of the scope of this right in order to preserve the evolved workings of government, we must ensure that any exception does not destroy the guarantee. [38] We should instead follow the command of our Constitution in light of our contemporary situation, by limiting any exception in the most narrow way possible without completely undermining the administrative state.

I would accordingly clarify any existing exception for administrative proceedings to preserve the right to trial by jury in all suits except those in which the state is enforcing a regulation or statute protecting the public. If construed too broadly, however, even this exception limited to "public rights" could destroy our traditional reliance on the jury system. [39] Indeed, despite the writing in *Atlas Roofing,* such erosion has already begun at the federal level. [40] Properly limited, however, a "public rights" administrative exception to the right to trial by jury is both constitutionally sound and easy to apply. While perhaps far-reaching in other contexts, "public rights" that conflict with the right of each member of the public to have factual disputes resolved by a public jury must be narrowly construed. I would not permit the concept of "public rights" to be perverted to deny such a fundamental right. In this limited circumstance, I would define proceedings involving "public rights" as those in which the government, as a real party in interest, enforces a regulatory or statutory scheme. Contrary to the majority, I do not suggest that we follow its standard preference for copying a "federal test," 852 S.W.2d at 451 n. 24. Rather, I recommend a narrow and clear Texas standard that looks to Texas law predating *Atlas Roofing,* and which learns from the misapplication of this doctrine in the federal courts.

Here TAB's members are not entitled to a jury trial because the state is enforcing public regulations by imposing administrative penalties. Although this action is analogous to a common law nuisance claim, here the state is protecting the public's right to a clean environment rather than an **\*467** individual's use and enjoyment of private property.

The right to trial by jury is a critical state constitutional guarantee. Denigrating my concern with protecting this liberty, the majority dismisses my writing as "trumpeting." 852 S.W.2d at 451 n.

23. The trumpet call has sounded from the very earliest days of our Republic, heralding our right to trial by jury, a clarion to our citizens to shout out to preserve their heritage against attack. It demands that any intrusion on this right be narrow in scope, clearly-announced and thoughtfully considered. The majority's refusal to define with certainty its erosion of the right to trial by jury sounds a weak and shaky chord, reflecting a lack of commitment to this fundamental guarantee. Attempting to let the strong note drown the weak, the majority seeks to hide its equivocation by reference to my conclusion that a jury trial is not required under these anti-pollution statutes, *id.,* and by criticizing the narrow, clear and thoughtful exception I have drawn today. *Id.*

The inviolate nature of the right to trial by jury demands that this vital guarantee be circumscribed in only the most extraordinary circumstances and that any exception to it be clearly and narrowly construed. Although I do not disagree with the result announced by the majority, the analysis employed is designed to destroy one of our most precious freedoms as Texans. The alternative I offer would permit our administrative bodies to implement efficiently their regulations, while ensuring that efficiency concerns do not envelop a fundamental civil liberty. [41]

### III. Standing

The issue of standing is a stranger to this litigation. No party before this court has ever asserted that the Texas Association of Business lacked capacity to challenge the actions of state government. How rare the occasion when all litigants agree on the proper resolution of an issue, but how truly extraordinary is such unanimity when the parties are two state regulatory agencies, the Texas Association of Business, the Sierra Club and the League of Women Voters. This, nonetheless, is the exceptional circumstance in which we find ourselves today as all of these diverse parties have urged the court not to decide this matter in the manner adopted. Addressing the question of standing solely at the belated insistence of the majority, all parties asserted that this issue was not in dispute; that, under recent precedent, standing had been waived; [42] and, alternatively, that the record adequately demonstrated the right of the Texas Association of Business under Texas law to initiate this litigation. Why then does the majority insist on writing? Because it dare not pass up the opportunity to close access to our courts to those citizens who choose to challenge environmental degradation, neighborhood destruction and consumer abuse. Through a narrowly crafted test, the majority extends an invitation to TAB to come into the courts while telling other public interest groups to stay out.

While devoting over half of today's opinion to a nonissue in this litigation, the majority oddly limits its inquiry to only one of the three organizations asserting standing here. Nothing is said as to the League of Women Voters and the Sierra Club, both of which intervened in the trial court and were aligned as defendants with the State. Asserting the interests of its members in water and air quality, as well as its involvement in protecting the state's natural resources, the League of

Women Voters claimed standing to defend the challenged regulations. Similarly, the Sierra Club **\*468** based its standing on its purpose of environmental enhancement and conservation of natural resources. By completely ignoring whether these groups were proper parties and by embracing a federal standing test hostile to their participation, the majority erects new barriers to deny Texans access to Texas courts.

To achieve this result, the majority must overcome what, until recently, was viewed as a considerable obstacle—Texas law. This court has repeatedly held that the issue of standing may not be raised for the first time on appeal, either by the parties or by the court. In *Texas Industrial Traffic League v. Railroad Comm'n of Texas,* 633 S.W.2d 821, 822–23 (Tex.1982), we concluded:

> A party's lack of justiciable interest must be pointed out to the trial court ... in a written plea in abatement, and a ruling thereon must be obtained or the matter is waived.

> No plea challenging the standing of [the party] was filed in the district court. *The issue of standing was therefore waived, and the court of appeals erred in writing on the issue at all.*

(Emphasis supplied). The sole issue presented in *Coffee v. William Marsh Rice University,* 403 S.W.2d 340 (Tex.1966), was whether the court of appeals erred in dismissing a case, on its own motion, for want of standing. This court held that, because standing had not been challenged in the trial court, that issue could not deprive the court of appeals of subject matter jurisdiction. *Id.* at 347–48. Assuming that standing was lacking in *Sabine River Authority of Texas v. Willis,* 369 S.W.2d 348, 349–50 (Tex.1963),[43] this court nonetheless held that dismissal was erroneous, because the absence of a justiciable interest was not first raised in the trial court. We have repeatedly cited these decisions with approval. *See Central Educ. Agency v. Burke,* 711 S.W.2d 7, 8 (Tex.1986) (per curiam); *American General Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688 (Tex.1982); *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982) (per curiam).

Time and time again, the courts of appeals have also refused to consider challenges to standing not first raised in the trial court.[44] Until today, the only criticism of our prior holdings to this effect has **\*469** consisted primarily of writings authored by one appellate judge.[45]

The majority has a simple way to deal with this venerable body of law—overrule only one case, making today's abrupt change in the law appear less drastic, while ignoring the rest. In fact, six Texas Supreme Court cases must be overruled and no less than twenty-five decisions of the courts of appeals must be disapproved to reach today's result. The concept of reliance on the prior decisions of Texas courts has long since ceased to offer the slightest restraint on this majority.[46]

Bulldozing a new path through this jurisprudential forest, the majority vaults standing to a new and remarkable prominence by suddenly discovering that it has not just *one* but *two* constitutional

bases. And what unusual constitutional pillars each of these new finds represents. First, the proscription of the separation of powers doctrine against issuance of advisory judicial opinions allegedly requires rigorous enforcement of standing even when no party debates its existence. This link between standing and separation of powers is not predicated on any directly relevant prior court decision, [47] but instead is entirely premised on an article openly antagonistic to standing for environmental groups. 852 S.W.2d at 444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983). The current majority may be the first in the nation to anchor standing on this constitutional theory.

The authorities addressing the prohibition on advisory opinions cited in support of this proposition, of course, in no way implicate the question of standing. This precedent-setting concern with advisory opinions contrasts markedly with the eagerness to issue this very type of writing within the last year. *See Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491, 501 (Tex.1991) (Doggett, J., concurring); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting) (advisory opinions issued and retracted as necessary to thwart efforts to satisfy the constitutional command of equity and efficiency in our public schools). Writing on an issue not raised by any party, as the majority reaches out to revise the law of standing today, seems to me the very essence of an "advisory" opinion.

The second newly-announced constitutional basis is equally ironic—our state's vital guarantee that "[a]ll courts shall be open," Tex. Const. art. I, § 13, in some inexplicable way, mandates that they be closed to some and requires continual judicial monitoring of all who attempt to enter. No authority of any type is cited for this **\*470** proposition that "open" courts really means "closed" courts. Nothing in the history or text of the provision justifies this reading nor has any Texas court previously attempted such converse interpretation. This constitutional guarantee is used today as a two-edged sword: the majority invokes the open courts provision to bar environmental groups from seeking judicial assistance in enforcing the laws, while in the very same opinion misinterpreting this provision to allow continued violation of statutes protecting our precious natural resources. [48]

Then, with a final flourish, standing is conveniently classified as a nonwaivable component of subject matter jurisdiction. Until today, Texas followed the rule, adopted by many of our sister states considering the issue, that objections to a party's standing are waived if not first raised in the trial court. [49] No Texas case is cited for the proposition that standing is part of nonwaivable subject matter jurisdiction because, until today, this court had repeatedly stated precisely the very opposite—that standing is *not* jurisdictional. [50]

Texas has with good reason determined that standing is not excepted from traditional rules of appellate procedure. Our appellate system is predicated on the requirement of presentation of complaints to the lower court coupled with preservation and briefing in the reviewing court. *See*

Tex.R.App.P. 52; 74(d), 131(e). Appellate courts face considerable difficulties in deciding an issue not presented to the trial court; ordinarily, the necessary facts will not be fully developed. The unstated effect of today's opinion is to require trial courts to develop facts as to undisputed issues or risk subsequent appellate reversal. This is not an effective use of our limited judicial resources.

The requirement that issues first be presented to the trial court serves another function—preventing parties from "laying behind the log":

> The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time.

*Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). While this court has condemned "trial by ambush," **\*471** *Gutierrez v. Dallas Indep. School Dist.,* 729 S.W.2d 691, 693 (Tex.1987), today the majority promotes "ambush on appeal."

Three purported policy justifications for the majority's actions are offered, with not a single supporting authority. The first concern is that a strict standing rule is necessary to prevent collusive litigation. Under Texas law, the filing of a fictitious suit constitutes contempt by counsel, Tex.R.Civ.P. 13, and may serve as the basis for a host of sanctions, including dismissal with prejudice. Tex.R.Civ.P. 215 2b(5). Nor does our Texas judiciary lack the ability to reject collusive litigation. *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 932 (Tex.1971) ("We believe that our laws and judicial system are adequate to ferret out and prevent collusion...."); *cf. Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) (refusing to uphold Texas Guest Statute because of danger of collusion). Adhering to precedent today would in no way undermine the power to dismiss fraudulent suits.

The second virtue proclaimed for today's holding is the guarantee that the lower courts will be restrained from exceeding their jurisdictional powers. 852 S.W.2d at 445. This concern is derived solely from the federal law mandate that a federal appellate court is duty-bound to verify not only its own jurisdiction but that of the lower courts as well. Federal courts, however, have limited jurisdiction; Texas courts do not. Our Texas Constitution creates courts of general jurisdiction, investing them with all of the "judicial power of this State." Tex. Const. art. V, § 1. The differences are evident in our procedural rules. While a federal court must affirmatively ascertain jurisdiction over parties appearing before it, a Texas court's jurisdiction is presumed until proven lacking by a contesting party. *See* Tex.R.Civ.P. 120a.

Lastly, the majority expresses concern as to the res judicata effect on other potential litigants of a judgment rendered in the absence of genuine standing. 852 S.W.2d at 445–446. Aware of this concern, the very federal judiciary that this majority is so eager to emulate has failed to

perceive it as a problem of significance. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). If representation is inadequate, or a conflict of interest between members exists, any judgment will have minimal preclusive effect. *Id.* Instead of completely barring access to the courts, procedural safeguards can ameliorate any potentially overbroad effects. *See generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 18 Federal Practice & Procedure § 4456 at 490–94 (1981 & Supp.1991).

The manufactured nature of the majority's concerns becomes all the more evident when the real world experience of Texas is considered. The majority is unable to point to a single example of collusion during the three decades our Texas rule, which allows the issue of standing to be waived, has been in place. During this period there have likewise been no examples of lower courts making a grab for extrajurisdictional power, nor of oppressed litigants shackled by the res judicata effect of contrived litigation.

In defining state requirements for standing, we are in no way bound by federal jurisprudence founded upon converse jurisdictional principles from our own. Texas courts can afford their citizens access to justice in circumstances where they would have been unable to establish standing in the federal courts. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 113, 103 S.Ct. 1660, 1671, 75 L.Ed.2d 675 (1983) ("state courts need not impose the same standing ... requirements that govern federal-court proceedings"); *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952) (state courts not restrained by "case or controversy" limitations of Federal Constitution); *Greer v. Illinois Housing Development Auth.,* 122 Ill.2d 462, 120 Ill.Dec. 531, 524 N.E.2d 561 (1988) ("We are not, of course, required to follow the Federal law on issues of justiciability and standing.").

The differences between our Texas Constitution and the Federal Constitution not only justify, but also require, that citizen groups be accorded a broader right of access **\*472** to our state courts. The Texas Constitution contains no express limitation of courts' jurisdiction to "cases" or "controversies," as provided by the federal charter. U.S. Const. art. III, § 2. Instead, it affirmatively protects the rights of litigants to gain access to our judicial system:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. 1, § 13. As this court has recognized,

> The provision's wording and history demonstrate the importance of the right of access to the courts.... The right of access to the courts has been at the foundation of the American democratic experiment.

*LeCroy v. Hanlon,* 713 S.W.2d 335, 339 (Tex.1986).

This constitutional mandate is reflected in decisions of this court adopting an "open courts" approach to standing in general and associational standing in particular. On several occasions, we have recognized the power of the Legislature to exempt litigants from proof of "special injury." *Scott v. Board of Adjustment,* 405 S.W.2d 55, 56 (Tex.1966) (standing may be shown even in the absence of particular damage); *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597 (1915) (under statute, "any citizen" able to seek injunction, without showing particular interest or personal damage). [51] In enacting the Uniform Declaratory Judgments Act, the Texas Legislature has granted a broad right of standing: any person "whose rights, status or other legal relations *are affected by* a statute" may seek a declaration of those rights. Tex.Civ.Prac. & Rem.Code § 37.004 (emphasis supplied).

This court has previously extended its "open courts" approach to groups representing the interests of their members. [52] In *Texas Highway Comm'n v. Texas Ass'n of Steel Importers,* 372 S.W.2d 525, 530–31 (Tex.1963), we permitted a business association to challenge an administrative order. Although the order addressed only the import of foreign products for highway construction, this court recognized standing of an organization whose interest in foreign imports was not so limited:

> Some of [the respondents] are owners of imported foreign manufactured products suitable for highway construction purposes. All of them are actively engaged in the sale and use of imported manufactured products.... [S]uch parties clearly have the right and litigable interest to have the challenged ... Order declared null and void.
>
> *Id.* at 531. Similarly, in *Touchy v. Houston Legal Foundation,* 432 S.W.2d 690 (Tex.1968), the court considered whether an organization of attorneys had standing to maintain a suit against a charitable corporation to restrain violations of ethical canons governing the practice of law. Based solely on "the special interest attorneys have in their profession," the court held standing was established.

The "open courts" approach [53] of *Touchy* and *Texas Highway Commission* is quite sufficient to allow TAB access to the Texas **\*473** courts. [54] These two associational standing cases are all but ignored today, brushed aside as setting forth "no particular test." 852 S.W.2d at 446.

Yet in these cases in which the merits of standing are preserved for appellate court review, the Texas test applied has not been complicated. We simply look to whether a party has a stake in the action sufficient to ensure adversarial presentation of the issues and to whether the court's judgment will have any effect on those before it. *See Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955) ("there shall be a real controversy between the

parties, which ... will be actually determined by the judicial declaration sought."). Because both of these considerations are met in the instant case, reference to federal law is wholly unnecessary.

Today, however, to justify meddling with Texas standing law, the majority declares that "we foresee difficulties" not here with TAB, but in future cases involving organizational standing. 852 S.W.2d at 446. To cure these perceived but as yet totally unrealized woes, the majority imposes a difficult to meet, easy to manipulate standard drawn from federal law "that lends itself to our use." *Id.* at 447. Never needing an invitation to impose more federal requirements on Texas citizens, the majority writes into our Texas law books the confused and troubling federal standing limitations. Not surprisingly, that law has taken a regressive turn, denying standing to public interest associations, including those seeking to protect the environment. *See* Gene R. Nichol, Jr., *Abusing Standing: A Comment on Allen v. Wright,* 133 U.Pa.L.Rev. 635, 659 (1985) ("One could perhaps be forgiven for confusing standing's agenda with that of the New Right.").

The benefits of permitting an association to represent the concerns of its members are manifest. As recognized in *United Auto Workers,* 477 U.S. at 290, 106 S.Ct. at 2533, "[T]he primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." Judicial economy is promoted when one litigant can, in a single lawsuit, adequately represent many members with similar interests, thus avoiding repetitive and costly actions. The wider range of resources often available for associations enhances their effectiveness in litigation:

> Special features, advantageous both to the individuals represented and to the judicial system as a whole, ... distinguish suits by associations on behalf of their members.... An association suing can draw upon a pre-existing reservoir of expertise and capital. "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." ... These resources assist both courts and plaintiffs.

*Id.* at 289–90, 106 S.Ct. at 2532–33. In some cases, an injury that is substantial as to many may have an individual financial impact too small to make a challenge economically feasible. Associational representation may be the only means of redressing conduct when the harm is limited in degree but substantial segments of society are affected. Additionally, in challenging policies of government, organizations are generally less susceptible than individuals to retaliation by the bureaucrats they challenge.

These benefits are ignored as the majority declares that henceforth the right of associations to bring suit in Texas courts will be constricted by a three-part federal test set forth in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), requiring that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's **\*474** purpose; and (c) neither the

claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [55]

Yet the *Hunt* test won't hunt in Texas. It is adopted purportedly because of the similarities between the state and federal constitutional underpinnings of the standing doctrine. Two critical factors are ignored: (1) the significant differences between the Texas and United States Constitutions and (2) the fact that much of federal standing doctrine is not mandated by the federal charter, but is imposed solely on the grounds of judicial "prudence." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("This [standing] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.").

The majority works a grave disservice to our Texas Constitution by equating our open courts provision, affirmatively guaranteeing all Texans access to our judicial system, with an express federal constitutional limitation on the right to seek redress in court. Despite the fact that the two provisions are vastly different in language, history and purpose, the majority nonetheless determines to "look to the more extensive jurisprudential experience of the federal courts" to determine standing. This is clearly an erroneous course. *See Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992, orig. proceeding) (in blindly adhering to federal law, "based on different language, different history and different cases, "[f]rom our treasured state heritage, law and institutions ... [we] derive nothing....").

Even the federal constitutional constraint is a simple one, looking to whether "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of the court's remedial powers on his behalf." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205, *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 1103, 7 L.Ed.2d 663 (1962). In fact, this bare-bones test closely resembles the approach that Texas courts have long chosen to follow. To the extent *Hunt* constructs additional barriers to access to our judicial system, they are wholly court-created. [56] No justification for their adoption is contained in the majority opinion.

Moreover, in turning to the federal law of standing, the majority invokes a doctrine that has been criticized more heavily and justifiably than perhaps any other. *See, e.g.,* Gene R. Nichol, Jr., *Rethinking Standing,* 72 Cal.L.Rev. 68, 68 (1984); Mark V. Tushnet, *The "Case or Controversy" Controversy,* 93 Harv.L.Rev. 1698, 1713–21 (1980). Even the United States Supreme Court has recognized that federal standing requirements have an "iceberg quality," *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); yet the majority fails to navigate a course, not unlike the captain of the Titanic, that would steer Texas well away from this potential disaster.

The concept of standing is "employed to refuse to decide the merits of a legal claim." Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531, at 338. Critics of the doctrine's complexity and uncertainty have recognized how subject it is to

manipulation: "standing ... is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits." *Id.* at 348 (citing commentaries).[57] Important rights can be left unprotected **\*475** as a result. *Id.* at § 3531.3, 416–17 ("Standing decisions present courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise a decision on the merits in ... opaque standing terminology.... Unarticulated and arbitrary predilection, cast as standing, defeats rights that deserve judicial protection.").

Even during the three years that this particular cause has been pending here, the federal courts have been hard at work to manipulate standing requirements to bar public interest groups from seeking judicial vindication of rights common to their members. In *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), a nationally-recognized environmental group challenged a new development classification for certain federal wilderness areas that allegedly violated several federal statutes. The suit was dismissed for lack of standing based upon a rigid construction of the requirement of injury to the association's members. This decision has been widely criticized as significantly impairing the ability of public interest groups to represent their members, particularly those that seek to protect this nation's environment and natural resources.[58] Today the majority eagerly positions itself to give the same treatment to those Texans who would petition our state courts to protect the public interest. The majority not only conspicuously relies on *Lujan,* 852 S.W.2d at 445, but also embraces the extremist anti-environmental stance propounded in an article openly critical of judicial opinions permitting citizens to complain of harm inflicted upon our natural resources. *Id.* at 443–444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983).

Rather than a careful consideration of our Texas precedent and our unique Texas Constitution, today Texans are handed yet another unthinking embrace of federal law. Claiming "guidance" from federal precedent, 852 S.W.2d at 445, the majority overrules all Texas cases treating standing as a procedural issue, then unnecessarily modifies all Texas precedent addressing the merits of standing. Without explanation, today's opinion simply photocopies into our Texas law books the federal law of standing with all of its much-criticized complexities. Once again the majority chooses more Washington wisdom for Texas when what we need is more Texas thinking in Washington. *See Bexar County Sheriff's Civ. Service Comm'n v. Davis,* 802 S.W.2d 659, 665 (Tex.1990) (Doggett, J., dissenting).

While today the corporate members of the Texas Association of Business are permitted to challenge the bureaucracy, tomorrow this same reasoning will be employed to bar public interest, neighborhood, environmental and consumer groups from vindicating the rights of their members. Today's opinion not only repudiates our past "open courts" approach to access to the judicial system but also eliminates the long-recognized appellate requirement that **\*476** error be preserved. The majority has charged well beyond traditional constraints in its writing.

To the extent this case is about standing, it is about standing still, about closing the courthouse door, once standing open. For today the majority extends a standing invitation to those who would harm our environment to act without fear of citizen challenge in the Texas courts.

### IV. Conclusion

Today the environment is the immediate victim. Those who pollute our rivers, release toxins into our air, and damage our land cannot be promptly penalized. Instead, only after the very slow wheels of our judicial system have creaked to a stop will violators of environmental protection laws be held accountable.

Yet the environment is not the whole story. Much as a river may seem pure and clear even at the place where illegal sewage is being pumped into it, the danger from a court's opinion may not be immediately apparent on its surface. Only after the reasoning is applied in other cases is the severity of the resulting harm to our system of justice revealed. Today's impairment of the ability of concerned citizens to vindicate the rights of many in our courts and the majority's knockout punch to the right of trial by jury will unfold in future cases to bar participation of ordinary citizens in Texas courts.

The mess in Texas is not only with our environment but with the misinterpretation of the law.

GAMMAGE, Justice, concurring and dissenting.

Though I would prefer not to write separately, I find I am unable to agree entirely with any single opinion of the court's other members. I must write this concurring and dissenting opinion because, while I agree with the disposition of this cause, I disagree with substantial portions of the reasoning and language in the majority's opinion and I agree with part of Justice Doggett's concurring and dissenting opinion.

I agree with the preliminary portion of Justice Cornyn's majority opinion, which correctly sets forth the regulatory scheme and basic dispute.

I agree *substantially* with Part II of Justice Doggett's opinion and his jury trial discussion. In my view, whether or not a suit is a "cause" for purposes of the right to a jury trial is not controlled by whether it was first determined by an administrative agency. I also agree with Part III of Justice Doggett's opinion relating to standing, which I will further address below. I agree with Part II of Justice Cornyn's majority opinion. The statutes may not condition access to the courts on prepayment of a *penalty.* The principle here is the same as for a supersedeas bond. The statute

may condition the right to restrain the prevailing party (the State) from executing (enforcing) its judgment (administrative order) on the posting of a bond for the full amount. It may not, however, condition the *right to appeal* the judgment on posting of the full *penalty* imposed. *Dillingham v. Putnam,* 109 Tex. 1, 5–6, 14 S.W. 303, 304 (1890). This is true even if that "judgment" takes the form of an administrative agency decision. Administrative agency decisions, for the most part, entitle an appellant to only "substantial evidence" as opposed to *de novo* review. To further burden those regulated with prepayment of the "judgment" as the only alternative to total loss of even substantial evidence review violates the basic concept of our constitutional open courts in Texas.

As to the issue (or non-issue) of standing, the majority in effect adopts the position of federal courts that standing is a *jurisdictional* question. Otherwise it cannot be fundamental error to be addressed when no party raises it. Standing was not raised and should not be addressed in this cause.

Even assuming standing is an element of subject matter jurisdiction, the court should not write on the issue in this case. Even though a judgment is void and subject to collateral attack at any point if there is an absence of subject matter jurisdiction, *see* **\*477** *Mercer v. Phillips Natural Gas Co.,* 746 S.W.2d 933, 936 (Tex.App.—Austin 1988, writ denied), unassigned error of lack of jurisdiction should be addressed only if jurisdiction is in fact lacking. Since the majority concludes there was standing in this case, and since no party raised its existence as an issue, there is no reason to address it at all, even if it would be *fundamental error* if *lacking.*

The basis for the majority's discussion is its sudden revelation that "[s]tanding is implicit in the concept of subject matter jurisdiction." 852 S.W.2d at 443. Their opinion then claims this implication comes from the separation of powers doctrine and the open courts provision of the Texas Constitution. It is a curiosity of legal scholarship, however, that in the 156 prior years of its existence, this court never before found standing "implicit" in those constitutional provisions, but in fact wrote that standing could be waived and hence was not fundamental error. *Texas Indus. Traffic League v. Railroad Comm'n,* 633 S.W.2d 821, 823 (Tex.1982). Justice Doggett's opinion adequately addresses why there is no implication from those provisions that standing is jurisdictional.

The majority's struggle to put standing in issue whenit is not prompts me to address two statements in its opinion which strike me as either misleading or just plain wrong. The majority asserts, without citation to authority, that "[s]ubject matter jurisdiction is never presumed," 852 S.W.2d at 443–444, and in a footnote repeats that assertion in urging that "Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* TEX.R.CIV.P. 120a." 852 S.W.2d at 444 n. 5. The majority's claim that subject matter jurisdiction is never presumed is at its very best misleading.

Connected with this discussion is the implicit assertion in another footnote that there is a "jurisdictional standing" that is different from "objections to join a real party in interest or to a party's capacity to sue rather than jurisdictional standing." 852 S.W.2d at 445 n. 7. These remarks are made in an attempt to distinguish the cases cited by Justice Doggett from those of other states holding that standing is not jurisdictional. I suppose we should be encouraged to find out that there are some types of "standing" that will not be jurisdictional, but it occurs to me that by using the term "jurisdictional standing" the court is begging the question—if it is jurisdictional, then it must be fundamental. The problem is that the Texas cases, at least as I read them, define "standing" in terms of "the party's capacity to sue," [1] which is one example we are given of non-jurisdictional standing. The majority opinion is calculated—no, guaranteed—to cause confusion because apparently this court will henceforth tell litigants on a case-by-case basis whether the standing problems in their cases are "jurisdictional" or merely formal.

There is no need to create this confusion. The majority's fomenting it, however, requires that I address it to some extent. I will discuss the "subject matter never presumed" proposition first, then weave into the "jurisdictional standing" language.

I agree that subject matter jurisdiction is never presumed in one respect. Subject matter jurisdiction exists when the nature of the case falls within a general category of cases the court is empowered to adjudicate under the applicable constitutional and statutory provisions. *See Pope v. Ferguson,* **\*478** 445 S.W.2d 950, 952 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Bullock v. Briggs,* 623 S.W.2d 508, 511 (Tex.App.—Austin 1981, writ ref'd n.r.e.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). In this sense, there is no presumption because if the case is not one over which the court had constitutional and statutory authority to act one does not "presume" subject matter jurisdiction to make it valid. If a justice of the peace grants a divorce, the judgment is void because that is not the type of case the constitution and legislature entrusts to that court, and appellate courts will not "presume" the justice court had jurisdiction in order to make the judgment valid.

But what the majority addresses here under the rubric of "standing" is not a court assuming jurisdiction over a type of dispute for which the statutes do not grant it power. The district court undoubtedly had jurisdiction over the declaratory judgment and injunction action brought there, since district courts may entertain declaratory judgment and injunction actions. The question of standing the majority gratuitously addresses here is related to an incidental *party* issue.

This court has expressly held that some facts or similar matters relating to party issues *are presumed.* For example, for many years the subject matter jurisdiction for certain trial courts as set by the statutes has included a jurisdictional amount, sometimes as a minimum amount in controversy and sometimes as both a maximum and minimum. *Womble v. Atkins,* 160 Tex. 363, 370, 331 S.W.2d 294, 299 (1960). This court has held that jurisdiction, so far as the amount

in controversy is concerned, is determined by the pleadings unless facts disclose that a party fraudulently or in bad faith pleaded claims to make it appear there was jurisdiction over the case where there was not. *Brown v. Peters,* 127 Tex. 300, 94 S.W.2d 129, 130 (Tex.Comm'n App. B 1936). Despite the supposed requirement that the pleadings demonstrate jurisdiction, we have also held that unless the pleadings affirmatively show there is *no* jurisdiction, the court will *presume* the existence of jurisdiction in the trial court. *Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989). [2] This is not the only sense in which subject matter jurisdiction is "presumed" as to collateral matters. If a defendant contests jurisdiction and alleges in a verified pleading that plaintiff's fraudulent pleading amount was for the purpose of conferring jurisdiction on the trial court, but the trial judge still renders judgment in the case, on appeal the fact issue of jurisdiction is *presumed* decided against the defendant. *Ellis v. Heidrick,* 154 S.W.2d 293, 294 (Tex.Civ.App. —San Antonio 1941, writ ref'd); *see also Maddux v. Booth,* 108 S.W.2d 329, 331 (Tex.Civ.App. —Amarillo 1937, no writ) (appeal bond from county court to district court did not show filemark making the appeal timely, held "the absence of such a question being made in the trial court the presumption is that the court had jurisdiction"). Further, if the very power of the judge who sits is in question, that authority too may be presumed. It is presumed that the assignment of a retired judge was properly made pursuant to all statutory requirements absent an express showing to the contrary in the record. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 855 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

There is a type of lack of standing that this court formerly held to be fundamental error. When there was a joint interest in property involved in the litigation, and the joint owner was not joined as a party, this court earlier held that the party defect was jurisdictional fundamental error that could be raised for the first time on appeal. The injustice which that rule caused prompted **\*479** this court to reduce those "*indispensable* " necessary parties to near nonexistence. *Petroleum Anchor Equip., Inc. v. Tyra,* 406 S.W.2d 891, 893–94 (Tex.1966); *see also Cooper v. Texas Gulf Indus., Inc.,* 513 S.W.2d 200, 203 (Tex.1974). It was no accident that this court listed the case which the majority today overrules, *Texas Indus. Traffic League v. Railroad Comm'n,* 633 S.W.2d 821 (Tex.1982), as one of the cases showing that "[f]undamental or unassigned error is a discredited doctrine" as applied to these collateral defect-in-party type claims. *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982). After more than a hundred years of trying to narrow fundamental error exceptions, the majority today takes a quantum leap *backward.*

In an appeal of or other *direct attack* on a trial court default judgment, it is service on the defendant and related due process requirements which must affirmatively appear on the record. In such cases *personal* jurisdiction cannot be presumed. *Capitol Brick, Inc. v. Fleming Mfg. Co.,* 722 S.W.2d 399, 401 (Tex.1986); *Uvalde Country Club v. Martin Linen Supply Co.,* 690 S.W.2d 884, 885 (Tex.1985); *McKanna v. Edgar,* 388 S.W.2d 927, 928 (Tex.1965). Lack of personal jurisdiction can be waived by the party, and personal jurisdiction is presumed *in a collateral attack* on the judgment, whereas error in assuming constitutional or statutory jurisdiction not conferred upon

the court in question can be neither waived nor ignored. *See Crawford v. McDonald,* 88 Tex. 626, 631–32, 33 S.W. 325, 328 (1895). This court has long recognized that there may be party issues, i.e., the matter is "a mere matter of procedure" as opposed to the constitutional or statutory *power* of a court to render judgment, that may be presumed as to either type of jurisdiction. *Id.* at 630, 33 S.W. at 327.

The majority should not adopt the federal courts' position that "standing" is jurisdictional. There is a fundamental difference between federal law and state law that controls here. Federal courts are courts of *limited* jurisdiction. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178–79, 2 L.Ed. 60 (1803). The parties asserting a claim must plead and prove (when not obvious) that jurisdiction exists. FED.R.CIV.P. 8(a). A party suing under a statute must establish his right to claim under that statute—his *standing* —in order to establish jurisdiction. *General Comm., Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas Ry. Co.,* 320 U.S. 323, 337–38, 64 S.Ct. 146, 152–53, 88 L.Ed. 76 (1943). Consequently, standing is a part of jurisdiction under federal procedure, related to the "case" or "controversy" requirement of the federal constitution. *Association of Data Proc. Serv. Orgs. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). But there is no "case" or "controversy" limitation language in the Texas Constitution. In state courts of general jurisdiction, the power to entertain any suit not prohibited by either the federal constitution or federal law is *presumed. Cincinnati v. Louisville & N. Ry. Co.,* 223 U.S. 390, 32 S.Ct. 267, 56 L.Ed. 481 (1912). State courts have all residual jurisdiction that federal courts lack. *Id.; see generally* 2 CHESTER J. ANTIEAU, MODERN CONSTITUTIONAL LAW § 10:1 at 4–5 (1969). We should continue to recognize that "standing," like other procedural issues, may be waived. There is no reason to overrule the *Texas Industrial Traffic League* case, or its related progeny.

SPECTOR, Justice, concurring and dissenting.

I agree with the substance of the concurring and dissenting opinion by Justice Doggett. I write separately, however, to explain why I would uphold the statutory requirement that those who run afoul of environmental laws make timely payment of administrative penalties before seeking judicial review.

In two other causes decided today, this court has considered open courts challenges to the statutory requirement that state mineral lessees prepay administrative deficiency assessments before seeking judicial review of those assessments. *State v. Flag–Redfern Oil Co.* and *State v. Rutherford Oil Corp.,* 852 S.W.2d 480 (Tex.1993) (considering Tex.Nat.Res.Code § 52.137). Our analysis in those cases focused on the **\*480** public interest at stake: the State's only interest in the prepayment requirement, we noted, was its financial interest in immediate access to disputed royalty payments. *Id.* at 485. Thus, we concluded that the prepayment requirement of section 52.137 was no different, in constitutional terms, from the litigation tax disapproved in *LeCroy v. Hanlon,* 713 S.W.2d 335, 342 (Tex.1986). *Id.*

The present case, in contrast, does not involve a litigation tax. The Clean Air Act, the Solid Waste Disposal Act, and the Water Quality Act embody this state's commitment to protect the environment; and the prepayment requirements struck down today were intended to give force to that commitment, *not* to raise revenue. Without the need to prepay administrative penalties, polluters will be left with little if any incentive to timely comply with environmental laws and regulations.

The effects of today's decision, though, extend far beyond the statutes at issue in this case. By rejecting these prepayment requirements, without regard to the state interest involved, the majority has struck a severe blow to this state's ability to enforce a broad range of regulations in the public interest. The similar statutory provisions identified in the opinion by Justice Doggett, 852 S.W.2d at 457, cannot be dismissed as minor technicalities; they are carefully-crafted measures that the legislature considered vital to protect the public from recalcitrant lawbreakers. Casting those provisions aside will seriously disrupt the effective operation of our state government.

The Texas Constitution cannot be construed in absolutes. The basic right of access to the courts must be balanced against the need to protect the public's health and safety. While the restriction at issue in this case may be substantial, I would hold that the public's interest in clean air and water, combined with the due process afforded to TAB's members in the administrative process, tips the balance in favor of the prepayment requirement. I therefore dissent.

## Footnotes

[1] The League of Women Voters and the Lone Star Chapter of the Sierra Club intervened in the suit and were aligned as defendants with the Texas Air Control Board and the Texas Water Commission. Justice Doggett contends that the standing of the Intervenors should be addressed along with TAB's. We disagree. Standing concerns a party's faculty to invoke the court's subject matter jurisdiction. Once it has been invoked by a plaintiff, a court's subject matter jurisdiction is not affected by the status of defendants or intervenors aligned in interest with defendants.

[2] Act of June 14, 1985, 69th Leg., R.S., ch. 637, § 33, 1985 Tex.Gen.Laws 2350, 2359 (amending Texas Clean Air Act codified at TEX.REV.CIV.STAT.ANN. art. 4.041 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 382.088; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 6.001, 1985 Tex.Gen.Laws 2719, 2813 (amending Solid Waste Disposal Act codified at TEX.REV.CIV.STAT.ANN. art. 4477–7 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 361.252; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 5.007, 1985 Tex.Gen.Laws 2719, 2806 (amending TEX.WATER CODE § 26.136).

[3] Although some amendments have been adopted since, they are not relevant to the issue presented in this case. *See* Diana C. Dutton, *ENVIRONMENTAL,* 45 SW. L.J. 389 (1991) (summarizing statutory developments).

[4] "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c).

[5] Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* TEX.R.CIV.P. 120a.

[6] The analysis is the same under the federal constitution. *See e.g. Correspondence of the Justices,* Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 in Laurence H. Tribe, *American Constitutional Law* 73 n. 3 (2nd ed. 1988).

[7] Of the states listed by Justice Doggett, only Illinois, Iowa, Kentucky, New York, South Dakota, and perhaps Ohio, Pennsylvania and Washington actually treat jurisdictional standing as waivable. *See* 852 S.W.2d at 469. The other state cases cited deal with the waiver

of objections to join a real party in interest or to a party's capacity to sue rather than to jurisdictional standing. *See International Depository, Inc. v. State,* 603 A.2d 1119, 1122 (R.I.1992) (addressing real party in interest objection); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust,* 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992) (addressing real party in interest objection); *Sanford v. Jackson Mall Shopping Ctr. Co.,* 516 So.2d 227, 230 (Miss.1987) (addressing real party in interest objection); *Jackson v. Nangle,* 677 P.2d 242, 250 n. 10 (Alaska 1984) (addressing real party in interest objection); *Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984) (addressing real party in interest objection); *Torrez v. State Farm Mut. Auto. Ins. Co.,* 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981) (addressing real party in interest objection); *Brown v. Robinson,* 354 So.2d 272, 273 (Ala.1977); *Cowart v. City of West Palm Beach,* 255 So.2d 673, 675 (Fla.1971) (addressing capacity objection).

Justice Doggett disagrees that standing is a component of subject matter jurisdiction, yet he declines to explain what role standing plays in our jurisprudence. From his harsh critique of the doctrine, it seems that he not only objects to the conclusion that standing cannot be waived but also to the conclusion that standing is a requirement to initiate a lawsuit.

*Texas Industrial Traffic League* relied on two cases to support its holding that standing cannot be raised for the first time on appeal: *Coffee v. William Marsh Rice University,* 403 S.W.2d 340, 341 (Tex.1966), and *Sabine River Authority v. Willis,* 369 S.W.2d 348, 350 (Tex.1963). We need not overrule these two cases, however, because unlike *Texas Industrial Traffic League,* we believe that standing was present in the trial court in these cases. Our concern is with a party's right to initiate a lawsuit and the trial court's corresponding power to hear the case *ab initio.* Standing is determined at the time suit is filed in the trial court, and subsequent events do not deprive the court of subject matter jurisdiction. *Carr,* 931 F.2d at 1061.

Justice Doggett claims that we overrule three additional decisions of this court. *See Central Educ. Agency v. Burke,* 711 S.W.2d 7 (Tex.1986) (per curiam); *American Gen. Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688 (Tex.1982); *Cox v. Johnson,* 638 S.W.2d 867 (Tex.1982) (per curiam). We disagree. These cases hold that matters not raised in the trial court are waived. One exception noted by these decisions, however, is a lack of jurisdiction which may be raised by a party, or the court, for the first time on appeal. Justice Doggett does not believe that standing falls within that exception because he contends that standing is not jurisdictional.

In most other jurisdictions, such prepayment provisions are required only to stay execution of judgments and are not prerequisites to the right to appeal itself. *See* Gary Stein, *Expanding the Due Process Rights of Indigent Litigants: Will Texaco Trickle Down?,* 61 N.Y.U.L. REV. 463, 469 (1986).

Thus, contrary to Justice Doggett's reading of our opinion, the *Sax* test is inapplicable.

The Clean Air Act was implemented to "safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants...." TEX.HEALTH & SAFETY CODE § 382.002(a). The Texas Water Code was implemented to "maintain the quality of water in the state consistent with the public health and enjoyment ..." TEX.WATER CODE § 26.003.

The importance is evidenced by article XVI, section 59(a) of our constitution, which provides in relevant part that: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties." TEX. CONST. art. XVI, § 59(a).

If the person charged does not make payment or post bond within thirty days, the agency may forward the matter to the attorney general for enforcement. TEX.HEALTH & SAFETY CODE § 382.089(c), § 361.252(m); TEX.WATER CODE § 26.136(k).

It has been argued that our procedure of allowing immediate enforcement of trial court judgments violates federal due process when the judgment debtor is financially unable to post a supersedeas bond and immediate enforcement will cause irreparable injury. *Texaco, Inc. v. Pennzoil Co.,* 784 F.2d 1133 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). A similar argument could be fashioned under the Texas open courts provision, but TAB does not assert that argument here. TAB's open courts challenge centers not on the requirement of immediate payment, but on the forfeiture of judicial review if payment is not made.

Thus, contrary to Justice Doggett's assertion, we do not strike down the penalties themselves. Nothing in this opinion prohibits the state's collection of assessed penalties. We hold as violative of our open courts provision only the requirement that the penalties be paid as a condition to judicial review. Furthermore, nothing in our opinion requires that penalties already paid be refunded.

That the affected parties may be able to afford prepayment is irrelevant. The guarantee of constitutional rights should not depend on the balance in one's bank account.

TAB claims that the lack of a jury trial before the agency as well as the lack of a trial de novo violate article I, section 15. We limit our inquiry to the absence of a trial de novo because, as this court has said: "Trial by jury cannot be claimed in an inquiry that is non-judicial in its character, or with respect to proceedings before an administrative board." *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 561–62 (1916). Even if the right to a jury is denied before an administrative agency, the dispositive question is whether a trial de novo and the corresponding right to a jury trial is constitutionally required upon judicial review of the agency's decision. *See Cockrill v. Cox,* 65 Tex. 669, 674 (1886) ("The right of jury trial remains inviolate, though denied in the court of first instance [in civil cases], if the right to appeal and the jury trial on appeal are secured.") (bracketed language in original).

Article I, section 15, provides, in pertinent part:

The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. * * *.

TAB has not presented in this court, as it did below, its complaint that the statutes and regulations also violate the right to jury trial under article V, section 10 of the Texas Constitution.

While the *Credit Bureau* court specifically referred to the broader jury trial provision in article V, section 10 when it discussed the administrative proceeding exception, that exception necessarily also applies to the narrower provision found in article I, section 15.

We do not consider nineteenth century criminal nuisance laws comparable to modern environmental regulations. *See* 852 S.W.2d at 461.

Despite Justice Doggett's trumpeting of our constitution's guarantee of trial by jury, he agrees that the right does not attach under the circumstances of this case.

Justice Doggett contends that the basis for our jury trial holding is overbroad. Instead, he would have us adopt the "imperfectly employed" federal test first enunciated in *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). *Infra,* 852 S.W.2d at 464. The basis for our decision is more limited, arising as it does out of TEX. CONST. article XVI, section 59(a) and our decision in *Corzelius.*

The Clean Air Act proclaims:

The policy of this state and the purpose of this chapter to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property of the people, including the aesthetic enjoyment of air resources by the public and the maintenance of adequate visibility.

TEX.HEALTH & SAFETY CODE § 382.002.

The Texas Water Code proclaims in relevant part:

It is the policy of this state and the purpose of the subchapter to maintain the quality of water in the state consistent with the public health and enjoyment

. . . . .

TEX.WATER CODE § 26.003.

The actions of the agencies involved in this proceeding are subject to the Administrative Procedure and Texas Register Act (APTRA), which specifically affords a "full panoply of procedural safeguards" to a party to contested case before those agencies. *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 571 S.W.2d 503, 507 (Tex.1978). These procedural safeguards include the right to notice, the making of a full record of the proceeding before the agency, the taking of depositions, the right to subpoena witnesses, the application of the rules of evidence, the preparation of proposal for decision and the filing of exceptions and briefs, as well as separately stated findings of fact and conclusions of law. TEX.CIV.STAT.ANN. art. 6252–13a § 19 (Vernon Supp.1993). Judicial review is provided by section 19(e) under the substantial evidence rule, which directs a reviewing court to reverse and remand the agency adjudication if the agency decision is:

1) in violation of constitutional or statutory provisions;

2) in excess of the statutory authority of the agency;

3) made upon unlawful procedure;

4) affected by other error of law;

5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

6) arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

We have held that judicial review under APTRA based on the record developed before the agency "furnishes more assurance of due process and a surer means of determining whether an agency acted arbitrarily, capriciously and without due regard for the evidence." *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n of Tex.,* 557 S.W.2d 280, 285 (Tex.1977); *see also, Southwestern Bell Tel. Co.,* 571 S.W.2d at 509.

Statistics compiled from data sent by companies to the Environmental Protection Agency show that in 1990 535.7 million pounds of toxic chemicals were released into the Texas environment, more than in any other state. Texas also ranked first in the release of chemicals known to cause both cancer and birth defects. *See* Texas Citizen Action, *Poisons in Our Neighborhoods, Toxic Pollution in Texas,* Sept. 1992, at 1; *see also* John Sharp, Texas Comptroller of Public Accounts, *Texas at Risk: Environmental Hazards Threaten State's Air, Land, and Water,* Fiscal Notes Aug. 1991 (noting the release of about 800 million pounds of toxic substances in 1989). Additionally, only two states ranked below Texas in the American Public Health Association's Pollution Standard Index, based on data gathered between 1989 and 1991. *See* American Public Health Ass'n, *America's Public Health Report Card: A State-by-State Report on the Health of the Public* 59 (1992).

2    *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting).

3    *See, e.g., H. Runge & Co. v. Wyatt,* 25 Tex.Supp. 291 (1860) (placement of counties within judicial districts); *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (striking requirement of supersedeas bond as a prerequisite to appeal); *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932) (requirement that city be notified of street defect within twenty-four hours of accident unreasonable restriction on right of access to courts); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983) (striking statute of limitations barring action of minor); *LeCroy,* 713 S.W.2d 335 (Tex.1986) (holding unconstitutional increased filing fees designed to generate state revenues).

4    Oddly, the majority asserts that "the *Sax* test is inapplicable" to today's open courts decision, 852 S.W.2d at 449 n. 12, even as it explicitly relies on the analysis used in *LeCroy,* which in turn applied the *Sax* test. Nor does the majority attempt to explain how its analysis today differs from that employed in *Sax* and *LeCroy.*

5    This natural resources provision receives conflicting treatment in today's opinion, amply demonstrating both the malleability of the *Sax* test as applied by the majority and the majority's disdain for the right to trial by jury. While declaring that article XVI, § 59(a) will not permit payment of even the most modest penalties under our open courts provision, the majority inexplicably finds that it forms an insurmountable barrier to the right to jury trial. The majority makes no attempt to reconcile its inconsistent analysis of these constitutional guarantees.

6    Tex.Health & Safety Code § 382.002, provides that:

It is the policy of this state and the purpose of this Act to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of health, general welfare, and physical property of the people, including the aesthetic enjoyment of the air resources by the people and the maintenance of adequate visibility.

7    Tex.Water Code § 26.003, provides that:

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in this state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state....

8    Tex.Health & Safety Code § 361.002, declares that:

It is the policy of this state and the purpose of this Act to safeguard the health, welfare, and physical property of the people, and to protect the environment, through controlling the management of hazardous wastes, including the accounting for hazardous wastes generated.

9    Tex.Health & Safety Code § 382.088(c)(1–5) (Clean Air Act), § 361.251(c)(1–5) (Solid Waste Disposal Act); Tex.Water Code § 26.136(c). The Texas Water Code imposes additional considerations, including "the impact of the violation on a receiving stream or underground water reservoir, on the property owners ... and on water users," as well as the extent of previous violations, the degree of culpability involved, any good faith effort to correct the violation and any economic benefit gained as a result of the illegal conduct. Tex.Water Code § 26.136(c).

10    See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission.

11    See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission at 27, 44, 55.

12    *See* Tex.Health & Safety Code § 242.066 (administrative penalty for statutory violations "threaten[ing] the health and safety of a resident" of a convalescent or nursing home); *id.* § 242.069 (penalty must be prepaid or a bond posted prior to judicial review).

13    Tex.Health & Safety Code §§ 141.016–141.018 (providing for administrative penalties for violation of laws regulating youth camps and requiring their payment or the posting of a bond prior to judicial review).

14    Tex.Health & Safety Code §§ 773.065–.067 (administrative penalties to enforce Emergency Medical Services Act).

15    Tex.Rev.Civ.Stat.Ann. art. 4582b, § 6G (Vernon Supp.1992) (administrative penalties for violation of statutes governing funeral directing and embalming).

16    Tex.Health & Safety Code §§ 431.054–.056 (Texas Food, Drug & Cosmetic Act); *id.* § 466.043 (regulation of narcotic drug treatment programs).

17    Tex.Health & Safety Code §§ 433.094–.096 (Texas Meat & Poultry Inspection Act); *id.* §§ 144.081–.083 (Texas Renderers' Licensing Act).

18    *See also* Tex.Rev.Civ.Stat.Ann. art. 5069–51.17 (Vernon 1987 & Supp.1992) (administrative penalties for violation of the Texas Pawnshop Act).

19    Tex.Rev.Civ.Stat.Ann. art. 1446c, § 73A (Vernon Supp.1992) (permitting assessment of civil penalty for violation of Public Utility Regulatory Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); Tex.Rev.Civ.Stat.Ann. art. 4477–3a, § 16 (Vernon Supp.1992) (Texas Asbestos Health Protection Act); Tex.Rev.Civ.Stat.Ann. art. 5920–11, § 30 (Vernon

Supp.1992) (Texas Coal Mining and Surface Reclamation Act); Tex.Rev.Civ.Stat.Ann. art. 6053–2 (Vernon Supp.1992) (safety standards for transportation of gas and for gas pipeline facilities); Tex.Rev.Civ.Stat.Ann. art. 8905, § 9 (Vernon Supp.1992) (Water Well Pump Installers Act); Tex.Nat.Res.Code § 40.252 (Oil Spill Prevention and Response Act); *id.* § 81.0531–.0533 (assessment of penalties for violation of Railroad Commission statutes and rules "which pertain to safety or the prevention or control of pollution"); *id.* § 116.143–.145 (violation of laws relating to compressed natural gas "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); *id.* § 131.2661–.2663 (violations of Uranium Surface Mining and Reclamation Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); *id.* § 141.013–.015 (violation of geothermal resources regulations "pertain[ing] to safety or the prevention or control of pollution"); *id.* Tex.Water Code 13.4151 (regulation of water and sewer utilities); *id.* § 27.1013–.1015 (Injection Well Act); *id.* § 28.067 (regulation of water wells and mine shafts); *id.* § 29.047 (Salt Water Haulers Act); *id.* § 33.009 (regulation of water well pump installers); Tex.Health & Safety Code § 372.004 (water saving performance standards); *id.* § 401.389 (Texas Radiation Control Act).

20 Tex.Ag.Code § 12.020(*l* ) (violation of agricultural statutes); *id.* § 76.1555 (failure to comply with pesticide regulations); Tex.Water Code § 34.011 (irrigation regulation); Tex.Rev.Civ.Stat.Ann. art. 41a–1, § 21D(f) (Vernon Supp.1992) (public accounting); Tex.Rev.Civ.Stat.Ann. art. 135b–6, § 10B(k) (Vernon Supp.1992) (Structural Pest Control Act); Tex.Rev.Civ.Stat.Ann. art. 5155, § 5(h) (Vernon Supp.1992) (labor wage laws); Tex.Rev.Civ.Stat.Ann. art. 5282c, § 23A(k) (Vernon Supp.1992) (Professional Land Surveying Practices Act); Tex.Rev.Civ.Stat.Ann. art. 6573a, § 19A(k) (Vernon Supp.1992) (Real Estate License Act); Tex.Rev.Civ.Stat.Ann. art. 9100, § 17(m) (Vernon Supp.1992) (Texas Department of Licensing and Regulation).

21 Under recent and highly erratic writings determining retroactivity, of course, anything can happen. *See, e.g., Carrollton–Farmers Indep. Sch. Dist.,* 826 S.W.2d at 515–23; *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992) (creating uncertainty by disapproval of a type of pre-trial agreements previously upheld by this court).

22 "The right of trial by jury, and the privilege of the Writ of Habeas Corpus shall be established by law, and shall remain inviolable." *Proposed Constitution for the State of Texas* art. 4 (1833), *reprinted in Documents of Texas History,* 80 (Ernest Wallace ed., 1963).

23 *See* Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed., 1952).

24 Constitution of the Republic of Texas, Declaration of Rights, Section 9 (1836), *reprinted in* Tex. Const. app. 523, 536 (Vernon 1955), provided that "the right of trial by jury shall remain inviolate."

25 In our time this great constitutional principle continues to be reaffirmed:

> It is fundamental to our system of justice and the intention and policy of the law to permit all persons to have a trial by jury of disputed fact issues essential for a determination of [their rights]. The right of trial by jury is a valuable right which should be guarded jealously by all state courts.

> *Steenland v. Texas Commerce Bank Nat'l Ass'n,* 648 S.W.2d 387, 391 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *see also Lopez v. Lopez,* 691 S.W.2d 95, 97 (Tex.App.—Austin 1985, no writ) ("trial by jury should be granted zealously by all the courts of this state").

26 Tex. Const. art. I, § 12 (1845) (retaining identical language from 1836 provision).

27 *See, e.g., May v. United Services,* 844 S.W.2d 666, 674 (Tex.1992) (Doggett, J., dissenting); *Boyles v. Kerr,* 1992 WL 353277 (Tex.1992) (Doggett, J., dissenting); *Leleaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).

28 T.R. Fehrenbach, Lone Star: A History of Texas and the Texans 279 (1983).

29 Act of Feb. 11, 1860, Tex.Gen Laws 97, a later version of which was referenced by this court in *Gulf, Colo. & Santa Fe Ry. v. Reed,* 80 Tex. 362, 15 S.W. 1105, 1107 (1891).

30 The court further stated: "The word means, literally, annoyance; in law, it signifies, according to Blackstone, 'anything that worketh hurt, inconvenience, or damage.'.... 'So closely (says Blackstone) does the law of England enforce that excellent rule of Gospel morality, of doing to others as we would they should do unto ourselves.' " *Id.* at 492. *Accord Miller v. Burch,* 32 Tex. 208, 210 (1869).

31 *See also Rhodes v. Whitehead,* 27 Tex. 304, 316 (1863) (remanding for trial a complaint against a dam across the San Antonio river, recognizing that the creation "of pools of stagnant and putrid water" or the "tendency to cause sickness in [the plaintiff's] family or immediate neighborhood," was sufficient to constitute a nuisance); *Jung v. Neraz,* 71 Tex. 396, 9 S.W. 344, 344–45 (1888) (nuisance properly alleged by claim that "interment of dead bodies in [proposed cemetery] would infect, poison, and injure [plaintiffs'] wells, and the use of low grounds, and further injure plaintiffs' health by the foul odors from the decomposition of said bodies.").

32 Although some critics allege that juries are not competent to deal with complex scientific and technological issues, empirical data demonstrates otherwise.

> Research shows ... that the opportunity exists for meaningful [juror] participation in a wide range of adjudicatory and regulatory proceedings.... To the extent that juries encounter difficulties, these difficulties often vex judges as well.... The full potential of lay participation in adjudication has not been realized.

> Joe Cecil, Valerie Hans, and Elizabeth Wiggins, *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials,* 40 Am.U.L.Rev. 727, 773–74 (1991).

*See* Tex. Const. art. X, § 2 and interp. commentary (Vernon 1955) (noting that the provision was added to authorize the Legislature to regulate railroads after the people had issued strong complaints against them).

*See also State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912) (also holding that cancellation of liquor license is not a "cause").

In the commentary for recommended article V, section 14(e) of the proposed 1974 Constitution, the significance of holdings regarding this more expansive language was also noted:

> [T]he right of trial by jury guaranteed in Article V, Section 10 of the 1876 Constitution is not dependent on the existence of the right at the time the Constitution was adopted in 1876. The guarantee extends to any "cause" instituted in the district court. A "cause" is defined as a suit or action concerning any question, civil or criminal, contested before a court of justice.

> *See* Texas Constitutional Revision Commission, *A New Constitution for Texas: Text, Explanation, Commentary* 120–21 (1973).

The *Credit Bureau* opinion was authored for the court by now former Chief Justice Jack Pope, who had written previously, "[t]he struggle for survival by the institution we call the jury is truly the epic of our law." Jack Pope, *The Jury,* 39 Tex.L.Rev. 426 (1961). That struggle continues today.

Though he wrote in unnecessarily global terms regarding this exception, even Harris recognized that

> [t]he plain language of the Judiciary section conferring the right of trial by jury in all causes in the district courts would seem to entitle parties to jury trials irrespective of whether that right existed at the time of the adoption of the Constitution.

> Harris, *supra,* at 6–7.

The majority notes the existence of other statutory procedural protections, such as those contained in the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. art. 6252–13a, § 19(e). 852 S.W.2d at 452, n. 26. While important, these measures certainly do not constitute a complete substitute for a jury trial. If the Texas Constitution guarantees a right to trial by jury, no lesser protection will suffice.

To some extent every action legislatively entrusted to an administrative agency involves a public right. At the same time even actions by private parties may have incidental regulatory effects and are unquestionably invested with a public interest. *See The Dallas Morning News, Inc. v. Fifth Court of Appeals,* 842 S.W.2d 655, 663 (Tex.1992, orig. proceeding) (Doggett, J., dissenting from overruling of motion for leave to file petition for writ of mandamus).

The "public rights" concept has been recently muddled by the federal courts. In *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the court, although upholding the right to a jury trial for defendants sued for fraudulent conveyance by a trustee in bankruptcy, broadened the scope of its "public rights" exception to include all cases "involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency." *Id.* at 55 n. 10, 109 S.Ct. at 2797 n. 10. *See also Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 586, 105 S.Ct. 3325, 3335, 87 L.Ed.2d 409 (1985) (rejecting the view that the government must bring suit in order for litigation to involve "public rights"). I believe that such an expansive reading of "public rights" would not be consistent with the broad state constitutional protection of the right to trial by jury in Texas.

In view of recent attacks nationwide on the jury system, a recent study determined that

> Our central conclusion is that the civil jury system is valuable and works well.... It is [not] "broken," and therefore it need not be "fixed." The jury system is a proven, effective, an important means of resolving civil disputes.

> The Brookings Institution, *Charting a Future for the Civil Jury System* 2 (1992).

As the majority recognizes, "the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal." 852 S.W.2d at 443–444.

Despite the clear statement in *Sabine River* that "[w]e assume without deciding that Sabine has no justiciable interest," 369 S.W.2d at 349, the majority today asserts that "standing was present" in the trial court in that case. 852 S.W.2d at 446 n. 9.

*See, e.g., Espiricueta v. Vargas,* 820 S.W.2d 17, 20 (Tex.App.—Austin 1991, writ denied); *Integrated Title Data Systems v. Dulaney,* 800 S.W.2d 336 (Tex.App.—El Paso 1990, no writ); *State v. Euresti,* 797 S.W.2d 296, 299 (Tex.App.—Corpus Christi 1990, no writ); *Cissne v. Robertson,* 782 S.W.2d 912, 917 (Tex.App.—Dallas 1989, writ denied); *Broyles v. Ashworth,* 782 S.W.2d 31, 34 (Tex.App.—Fort Worth 1989, no writ); *Horton v. Robinson,* 776 S.W.2d 260, 263 (Tex.App.—El Paso 1989, no writ); *L.G. v. State,* 775 S.W.2d 758, 760 (Tex.App.—El Paso 1989, no writ); *Wilson v. United Farm Workers of America,* 774 S.W.2d 760, 764 (Tex.App.—Corpus Christi 1989, no writ); *Smiley v. Johnson,* 763 S.W.2d 1, 4 (Tex.App.—Dallas 1988, writ denied); *Ex Parte McClain,* 762 S.W.2d 238, 242 (Tex.App.—Beaumont 1988, no writ); *Goeke v. Houston Lighting & Power Co.,* 761 S.W.2d 835, 837 n. 1 (Tex.App.—Austin 1988), *rev'd on other grounds,* 797 S.W.2d 12 (Tex.1990); *Group Medical and Surgical Service, Inc. v. Leong,* 750 S.W.2d

791, 794–95 (Tex.App.—El Paso 1988, writ denied); *City of Fort Worth v. Groves,* 746 S.W.2d 907, 913 (Tex.App.—Fort Worth 1988, no writ); *Barron v. State,* 746 S.W.2d 528, 530 (Tex.App.—Austin 1988, no writ); *Reynolds v. Charbeneau,* 744 S.W.2d 365, 367 (Tex.App.—Beaumont 1988, writ denied); *Champion v. Wright,* 740 S.W.2d 848, 851 (Tex.App.—San Antonio 1987, writ denied); *Texas Low–Level Radioactive Waste Disposal Authority v. El Paso County,* 740 S.W.2d 7, 8 (Tex.App.—El Paso 1987, writ dism'd w.o.j.); *S.I. Property Owners' Ass'n v. Pabst Corp.,* 714 S.W.2d 358, 360 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Gonzales v. City of Lancaster,* 675 S.W.2d 293, 294–95 (Tex.App.—Dallas 1984, no writ); *Mabe v. City of Galveston,* 687 S.W.2d 769, 771 (Tex.App.—Houston [1st Dist.] 1985, writ dism'd); *Develo-cepts, Inc. v. City of Galveston,* 668 S.W.2d 790, 793 (Tex.App.—Houston [14th Dist.] 1984, no writ); *Griffith v. Pecan Plantation Owners Ass'n, Inc.,* 667 S.W.2d 626, 628 (Tex.App.—Fort Worth 1984, no writ); *City of Houston v. Public Utility Comm'n of Texas,* 656 S.W.2d 107, 110 n. 1 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Public Utility Comm'n v. J.M. Huber Corp.,* 650 S.W.2d 951, 955–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Vaughn Bldg. Corp. v. Austin Co.,* 620 S.W.2d 678 (Tex.Civ.App.—Dallas 1981), *aff'd,* 643 S.W.2d 113 (Tex.1982); *War–Pak, Inc. v. Rice,* 604 S.W.2d 498 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.).

45    *Texas Dep't of Mental Health v. Petty,* 778 S.W.2d 156, 166 (Tex.App.—1989, writ dism'd w.o.j.) (opinion by Powers, J.); *Public Utility Comm'n v. J.M. Huber Corp.,* 650 S.W.2d 951, 954–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *Hooks v. Texas Dep't of Water Resources,* 645 S.W.2d 874 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *see also Kircus v. London,* 660 S.W.2d 869, 872 n. 3 (Tex.App.—Austin 1983, no writ) (opinion by Phillips, C.J.).

46    *See, e.g., Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting) (objecting to majority's overruling of landmark Texas Supreme Court decision permitting recovery for negligence resulting in emotional distress); *Walker v. Packer,* 827 S.W.2d 833, 835 (Tex.1992, orig. proceeding) (Doggett, J., dissenting) (noting majority's "mass execution of precedent," encompassing "a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals"); *Carrollton–Farmers Branch Indep. Sch. Dist.,* 826 S.W.2d at 539 (Tex.1992) (Doggett, J., dissenting) (discussing rejection by majority of its own decision issued less than one year previously); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting) (majority disregards its own recent precedent, looking instead to overruled case); *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 852 (Tex.1990) (Doggett, J., dissenting) (disapproving of rejection of recent controlling precedent).

47    The United States Supreme Court has clearly stated that standing does not implicate separation of powers concerns. *See Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968) ( "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of ... Government.").

48    *See* section I, *supra.*

49    *See, e.g., Brown v. Robinson,* 354 So.2d 272, 273 (Ala.1977); *Jackson v. Nangle,* 677 P.2d 242, 250 n. 10 (Alaska 1984); *Torrez v. State Farm Mut. Auto Ins. Co.,* 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981); *Cowart v. City of West Palm Beach,* 255 So.2d 673, 675 (Fla.1971); *Lyons v. King,* 397 So.2d 964 (Fla.App.1981); *Greer v. Illinois Housing Development Auth.,* 122 Ill.2d 462, 120 Ill.Dec. 531, 552, 524 N.E.2d 561, 582 (1988); *Matter of Trust of Rothrock,* 452 N.W.2d 403, 405 (Iowa 1990); *Tabor v. Council for Burley Tobacco, Inc.,* 599 S.W.2d 466, 468 (Ky.App.1980); *Sanford v. Jackson Mall Shopping Ctr. Co.,* 516 So.2d 227, 230 (Miss.1987); *Fossella v. Dinkins,* 66 N.Y.2d 162, 495 N.Y.S.2d 352, 1019, 485 N.E.2d 1017, 1019 (1985); *Public Square Tower One v. Cuyahoga County Bd. of Revision,* 34 Ohio App.3d 49, 516 N.E.2d 1280, 1281 n. 2 (1986); *Federman v. Pozsonyi,* 365 Pa.Super. 324, 529 A.2d 530, 532 (1987); *McMullen v. Zoning Board of Harris Township,* 90 Pa.Cmwlth. 119, 494 A.2d 502 (1985); *International Depository, Inc. v. State,* 603 A.2d 1119, 1122 (R.I.1992); *State v. Miller,* 248 N.W.2d 377, 380 (S.D.1976); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust,* 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992); *Tyler Pipe Industries, Inc. v. State Dep't of Revenue,* 105 Wash.2d 318, 715 P.2d 123, 128 (1986); *Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984). The majority's odd attempt to distinguish some of these cases, all of which are predicated in terms of standing, as involving solely the question of whether the litigant was a proper "real party in interest" has never been drawn previously in the published decisions of any Texas court addressing the question of standing. *See* cases cited at notes 44, *supra,* and 50, *infra.*

50    *See Texas Industrial Traffic League,* 633 S.W.2d at 822–23; *Central Educ. Agency v. Burke,* 711 S.W.2d at 8; *American General Fire & Casualty Co. v. Weinberg,* 639 S.W.2d 688; *Cox v. Johnson,* 638 S.W.2d at 868. To avoid overruling these, the majority claims all three recognized that lack of subject matter jurisdiction can initially be raised on appeal. True, but ignored is the conclusion of each that subject matter jurisdiction cannot be waived while standing can be.

51    Our past acknowledgement of the legislative power to expand access to Texas courts is inconsistent with today's conclusion that we must narrowly limit access. *See* Mark V. Tushnet, *The New Law of Standing: A Plea for Abandonment,* 62 Corn.L.Rev. 663 (1977) (because court decisions do not question legislative power to confer standing by statute, they suggest that standing rules are not constitutionally grounded).

Despite the participation of associational litigants before this court, we have never before questioned standing on our own motion. *See, e.g., Austin Indep. Sch. Dist. v. Sierra Club,* 495 S.W.2d 878 (Tex.1973).

*See Safe Water Foundation of Texas v. City of Houston,* 661 S.W.2d 190, 193 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (recognizing precedent of this court as according broad right of standing), *app. dism'd,* 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984); *Texas Industrial Traffic League v. Railroad Comm'n of Texas,* 628 S.W.2d 187 (Tex.App.—Austin) (discussing Supreme Court's expansive approach to standing to allow access to Texas courts), *rev'd,* 633 S.W.2d 821 (Tex.1982) (per curiam), *overruled by Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440 (Tex.1993).

*Accord Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984) (recognizing statutorily-granted standing of litigants to seek mandamus to reduce substantial delays in court operations); *Safe Water Foundation of Texas v. City of Houston,* 661 S.W.2d 190 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.), *app. dism'd,* 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984) (drinking water consumer group had standing to contest fluoridation of city water).

These requirements are allegedly necessary to protect "the members' best interest." 852 S.W.2d at 447. Perhaps an organization's members are in a better position than this court to determine what is in their best interest.

Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 3531.3, at 418 ("The problems [of standing] are difficult enough without the compounding effect of constitutional attribution.").

*See also, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 490, 102 S.Ct. 752, 768, 70 L.Ed.2d 700 (1982) (Brennan, J., dissenting); Abram Chayes, *The Supreme Court, 1981 Term—Foreword: Public Law Litigation and the Burger Court,* 96 Harv.L.Rev. 4, 23 (1982) (Having ritually recited the standing formula, "the Court then chooses up sides and decides the case."); Michael A. Wolff, *Standing to Sue: Capricious Application of Direct Injury Standard,* 20 St.L.U.L.J. 663, 678 (standing barrier "raised or lowered based on the degree of hostility to, or favoritism for, consideration of the issues on their merits"); Albert Broderick, *The* Warth *Optional Standing Doctrine: Return to Judicial Supremacy?* 25 Cath.U.L.Rev. 467, 504, 516–17 (1976).

*See* Katherine B. Steuer and Robin L. Juni, *Court Access for Environmental Plaintiffs: Standing Doctrine in* Lujan v. National Wildlife Federation, 15 Harv.Envtl.L.Rev. 187, 232–33 (1991); Sarah A. Robichaud, Note, Lujan v. National Wildlife Federation: *The Supreme Court Tightens the Reins on Standing for Environmental Groups,* 40 Cath.U.L.Rev. 443, 470–74 (1991); V. Maria Cristiano, Note, *In Determining an Environmental Organization's Standing to Challenge Government Actions Under the Land Withdrawal Review Program, the Use of Lands in the Vicinity of Lands Adversely Affected by the Order of the Bureau of Land Management Does Not Constitute Direct Injury*—Lujan v. National Wildlife Federation, 2 Seton Hall Const. L.J. 445 (1991); Michael J. Shinn, Note, *Misusing Procedural Devices to Dismiss an Environmental Lawsuit,* 66 Wash.L.Rev. 893, 904–12 (1991); Lynn Robinson O'Donnell, Note, *New Restrictions in Environmental Litigation: Standing and Final Agency Action After* Lujan v. National Wildlife Federation, 2 Vill.Envtl.L.J. 227, 251 (1991); Bill J. Hays, Comment, *Standing and Environmental Law: Judicial Policy and the Impact of* Lujan v. National Wildlife Federation, 39 Kan.L.Rev. 997, 1042–43 (1991).

Before it adopts a federal test and federal gloss, the majority asserts the "general test for standing in Texas" is what it quotes from *Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). The majority overrules the *Texas Industrial Traffic League* case, which addressed standing in the context of "justiciable interest" discussed in the more recent cases of *Coffee v. William Marsh Rice University,* 403 S.W.2d 340 (Tex.1966), and *Sabine River Authority v. Willis,* 369 S.W.2d 348 (Tex.1963). The context of the cases differed from *Board of Water Engineers,* of course. The precise meaning of "standing" in fact depends on the context. The majority adopts a federal gloss, and the federal courts have stated, "Generalizations about standing to sue are largely worthless as such." *Association of Data Proc. Serv. Orgs. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Using "standing" to mean a party's legal capacity to sue is my best description of the labyrinth of different cases the majority uses interchangeably.

*Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836 (Tex.1967), relied upon by the majority for the proposition that pleadings must "affirmatively show that the court has jurisdiction to hear the cause," 852 S.W.2d at 446, was expressly distinguished in *Peek.* This unanimous opinion written for the Court by Chief Justice Phillips explained that *Richardson* really meant that if the pleadings affirmatively showed there was *no* jurisdiction, then the case should be dismissed, but otherwise there was a presumption that the amount omitted from the pleading would support jurisdiction. *Peek,* 779 S.W.2d at 804.

## History (1)

### Direct History (1)

⚑ 1. Texas Ass'n of Business v. Texas Air Control Bd. ↝
852 S.W.2d 440 , Tex. , Mar. 03, 1993 , rehearing of cause overruled ( May 05, 1993 )

411 S.W.3d 42
Court of Appeals of Texas,
Houston (1st Dist.).

TRITON 88, L.P. f/k/a Triton 88, L.L.C. and Triton 2000, L.L.C., Appellants

v.

STAR ELECTRICITY, L.L.C. d/b/a Startex Power, Appellee.

No. 01–10–00601–CV.　|　Aug. 13, 2013.

**Synopsis**
**Background:** Retail electricity provider (REP) brought action against commercial electric customer for breach of electric services agreement (ESA) and quantum meruit. The District Court, Harris County, Patricia J. Kerrigan, J., entered summary judgment in favor of provider, granted provider's motion for a turnover order, and appointed a receiver. Customer appealed.

**Holdings:** The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] REP conclusively established its right to recover over $105,000 from customer for breach of ESA;

[2] customer was not excused from performance of ESA by REP's use of estimated billing;

[3] it was impossible to determine the actual harm that would have been caused to REP by customer's early termination, as required for liquidated damages clause to be enforceable;

[4] when viewed as of the time the ESA was executed, ESA's method for calculating liquidated damages was reasonable;

[5] early termination fee in ESA did not violate statute;

[6] attorney's affidavit in support of attorney fees award was sufficient to support claims such that REP was entitled to statutory presumption that fees were reasonable; and

[7] excessive demand exception to REP's statutory right to attorney fees did not apply.

Affirmed.

**Attorneys and Law Firms**

**\*46** Anthony L. Laporte, Benjamin C. Wilson, Kent M. Hanszen, Hanszen Laporte, L.L.P., Houston, TX, for Appellants.

Joshua Huber, Rodney Lee Drinnon, Ronald Edward Wright, Jr., Drinnon & Wright, PLLC, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and HUDDLE.

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Triton 88, L.P. *f/k/a* Triton 88, L.L.C. and Triton 2000, L.L.C. (collectively, "Triton"), appeal the trial court's grant of summary judgment and a receivership order entered in favor of appellee, Star Electricity, L.L.C. *d/b/a* StarTex Power ("StarTex"). Triton presents fourteen issues for appellate consideration. In its first seven issues, Triton argues that (1) the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim because (2) the trial court misinterpreted and misapplied the law applicable to the claims and defenses asserted by the parties; (3) StarTex's summary judgment evidence did not establish that it was entitled to judgment as a matter of law on its breach of contract claim; (4) Triton's summary judgment evidence raised genuine issues of material fact as to one or more elements of StarTex's breach of contract claim; (5) genuine issues of material fact existed as to Triton's claims for offset and credit based on StarTex's use of improper and incorrect billing and StarTex's use of estimated billing; (6) genuine issues of material fact existed as to StarTex's billing practices and procedures and whether those procedures constituted a breach by StarTex of the parties' contract; and (7) genuine issues of material fact existed regarding whether Triton objected **\*47** to StarTex's billing practices and procedures and to invoices submitted to Triton by StarTex and whether StarTex failed to fulfill its legal obligations for handling such complaints.

Triton further argues that (8) StarTex's failure to comply with the legal requirements for handling complaints concerning retail electric service and Triton's pending complaint against StarTex before the Texas Public Utility Commission acted to stay the judgment and enforcement of the judgment. Triton attacks the trial court's damages award, arguing that the trial court erred in awarding StarTex (9) liquidated damages pursuant to the early termination provisions in the contract because such an award constitutes an impermissible and unenforceable penalty; (10) early termination fee damages based on unidentified and unproven monthly billings; (11) early

termination fee damages based on estimated billing and billings for periods outside the term of the contract that Triton allegedly terminated early; and (12) attorney's fees because the fees awarded were excessive and unreasonable, were for legal services not proven to be necessary, and were not properly proven by the summary judgment evidence. Finally, Triton appeals the order of the trial court appointing a receiver, arguing that (13) the trial court erred in appointing a receiver and ordering Triton to turn over to the receiver confidential records and all proceeds and revenue generated by Triton's businesses and that (14) Triton is entitled to immediate relief from the order appointing a receiver and is entitled to recover all records and revenue turned over pursuant to the order, including all funds that have been disbursed, paid, relinquished, distributed, or in any way disposed of by the receiver.

We affirm.

## Background

Texas deregulated its electric utility market beginning in 1999. *See* TEX. UTIL.CODE ANN. § 39.051(a) (Vernon 2007) ("On or before September 1, 2000, each electric utility shall separate from its regulated utility activities its customer energy services business activities that are otherwise also widely available in the competitive market."); *Tex. Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC,* 324 S.W.3d 95, 97 (Tex.2010). The Utilities Code provides that electric utilities must separate their business activities from one another into three units: (1) a power generation company; (2) a retail electric provider; and (3) a transmission and distribution utility. TEX. UTIL.CODE ANN. § 39.051(b).

Retail electric providers, like StarTex, essentially buy electricity from a transmission and distribution utility and resell it to Texas consumers. *See AEP Tex. N. Co. v. Pub. Util. Comm'n of Tex.,* 297 S.W.3d 435, 439 (Tex.App.-Austin 2009, pet. denied) (citing Tex. Util.Code Ann. § 39.051). The transmission and distribution utility's rates are still regulated by the Texas Public Utility Commission ("PUC"). *Tex. Indus. Energy Consumers,* 324 S.W.3d at 97. Transmission and distribution utilities provide metering services, charge retail electric providers for "nonbypassable delivery charges" under rates approved by the PUC, and may also bill retail customers directly at the request of the retail provider. *Id.* at 97–98. Thus, Texas's electric utilities have "voluntarily interconnected their transmission systems" to form a single grid managed by the Electric Reliability Council of Texas ("ERCOT"). *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 312 (Tex.2001). Electricity is produced by a generating facility, transmitted to a point of interconnection with the ERCOT grid, **\*48** and then distributed to end users who purchase it from retail electric providers.

It is in this context that Triton, as owner of five commercial buildings, entered into an Electric Services Agreement ("ESA") in May 2006 with StarTex, a retail electricity provider. StarTex agreed to supply Triton with electricity, and Triton agreed to pay at a fixed rate for a term of twelve months. Regarding invoicing and payment, the ESA provided that

> [StarTex] shall render to Customer [Triton] on a monthly basis, or as mutually agreed by [StarTex] and Customer but not less frequent than monthly, an invoice that is due and payable fifteen (15) days from the date of the invoice. If the payment of all undisputed amounts is not received by the due date, Customer will be charged a late fee equal to five percent (5%) of the past due amount. Customer must provide to [StarTex] written notice setting forth in particular detail any disputed amount, including the calculations with respect to any errors or inaccuracies claimed. If it is subsequently determined that Customer owes [StarTex] any portion of the disputed amount, Customer shall remit to [StarTex] within five (5) business days following such resolution the outstanding balance plus interest .... Any amounts that may have been overpaid or underpaid shall be applied to the next monthly invoice.

The ESA also contained the following language:

**Early Termination Fee.** In the event that Customer terminates this agreement or Customer defaults as described [below], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs. For purposes of this fee the mark to market costs shall be calculated by multiplying the difference between the initial cost of power procured to satisfy the ESA and the final net liquidated value of said power at the time of termination by the total amount of power procured from the Customer Location for the remainder of the original term of the ESA....

....

**Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP) ]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

....

**Event of Default.** An Event of Default occurs upon:

a. failure of Customer to pay amounts due under the ESA within 5 business days of receipt of written notice of payment due;

b. failure of either Party to perform a material term of this ESA[.]

....

In April 2007, Triton and StarTex extended their agreement, under modified terms, for another twelve months ("First Amendment"). Triton elected to replace the fixed-rate pricing schedule with the Market Clearing Price of Energy **\*49** ("MCPE"). The First Amendment provided:

1. PRICE FOR ENERGY: The term for this Amendment shall commence upon the Customer's normal meter read during the month of May 2007, and continue through the Customer's normal meter read during the month of May 2008. Customer agrees to purchase electricity from STARTEX at a variable rate based on the Electric Reliability Council of Texas ("ERCOT")'s Balancing Energy price ("Contract Price") for the Congestion Zone in which the Customer's location resides. The price calculated by ERCOT in the market for Balancing Energy is referred to as the Market Clearing Price for Energy ("MCPE") in the ERCOT protocols....

2. Except as herein changed and amended, the Agreement [ESA] shall remain in full force and effect as written. Any changes made in this Amendment that are disputed by Customer will be replaced by the original Agreement's terms and conditions.

In 2008, the parties again extended their agreement under the MCPE pricing terms for a term of thirty-six months ("Second Amendment"). The Second Amendment contained language identical to that in the First Amendment, except that the term of the Second Amendment commenced "upon the Customer's normal meter read during the month of May 2008 and continued through the Customer's normal meter read during the month of May 2011."

Triton objected to some of StarTex's billing practices. This eventually led to Triton's terminating its contract with StarTex in October 2008 and seeking electricity from a different retail electricity provider.

On September 14, 2009, StarTex filed suit against Triton alleging breach of contract, and, in the alternative, suit on a sworn account and quantum meruit. StarTex asserted that Triton owed it $319,094.11, consisting of unpaid utility service and contractual fees, interest, and liquidated damages. StarTex also sought attorney's fees under Civil Practice and Remedies Code chapter 38. StarTex attached to its petition an affidavit from Robert Verhage, its Collections Manager,

copies of the ESA and First and Second Amendments, copies of its unpaid invoices, and a claim presentment letter from its counsel to Triton demanding payment of the unpaid amounts.

On October 12, 2009, Triton answered. Triton generally denied StarTex's allegations and asserted that the liquidated damages provision was invalid and unenforceable and that the attorney's fees sought were not reasonable and necessary.

Triton also asserted that

> the account on which [StarTex] sues ... is not just and true, and all just and lawful offsets, payments, and credits have not been applied to [Triton's] account. [Triton] does not owe [StarTex] $319,094.11 in damages, because [StarTex] seeks to recover $197,323.95 in damages based on an invalid liquidated damages provision. Furthermore, based on the inaccuracies in [StarTex's] billing and estimates since 2007, [Triton] also challenge[s] [StarTex's] allegation that [it owes] $105,034.18 to [StarTex] for services rendered.

Attached to its answer, Triton provided the affidavit of Bill Bird, who averred:

> I am responsible for and have knowledge of Triton's business dealings with Plaintiff [StarTex]. Triton began doing business with Plaintiff in 2006. In the summer of 2007, Plaintiff began providing usage estimates to Triton, which reflected very high usage. Triton brought this issue to Plaintiff's attention, and the **\*50** issue was not resolved. Triton contests the validity of Plaintiff's account, and denies that it owes $105,034.18 to Plaintiff for services rendered.

On January 20, 2010, StarTex moved for summary judgment on its breach of contract claim. StarTex argued that the parties had a valid contract and that the First and Second Amendments of the contract required Triton to pay for the electricity received under the MCPE pricing schedule through May 2011. Copies of the ESA and First and Second Amendments were attached as summary judgment evidence. StarTex stated that "[t]he MCPE is a variable rate plan wherein the price changes every fifteen (15) minutes to reflect the supply and demand for power in a particular market."

StarTex argued,

> Due to the numerous price changes involved in an MCPE contract, StarTex had to customize its purchase to fit the particular consumption needs of Triton. Every customer's consumption needs differ, and StarTex must carefully time its purchases so that it has sufficient power for the customer during their peak usage hours and so that it does not over-purchase during down times. This is

referred to in the industry as the "shape" of a particular customer, and like a fingerprint, no two customers have an identical "shape." Triton's meters are located at commercial office buildings, and therefore, the "shape" of StarTex's purchase was designed to accommodate heavy usage from the hours of 8:00 a.m. to 5:00 p.m., with a slight decrease during the lunch hour, and minimal usage for the remaining hours of the day. Therefore, in order to service Triton's Contract, not only did StarTex commit to purchase sufficient power to cover the life of the Contract, but it also committed to make purchases every fifteen (15) minutes that mirror the kWh used by Triton during each fifteen (15) minute interval.

This argument was supported by the affidavit of Stephen Madden, the Senior Vice–President of Supply for StarTex.

StarTex asserted that it provided power to Triton throughout the term of the contract and submitted invoices to Triton "based on meter reads performed by CenterPoint Energy ("CenterPoint"), the Transmission and/or Distribution Services Provider ("TDSP") for the Houston area." StarTex further argued that:

> On several occasions, StarTex was required to generate [Triton's] monthly invoice using estimated reads based on historical usage. This was a result of CenterPoint being unable to gain access to [Triton's] meters to obtain the actual usage amounts. All such estimated reads were reconciled on subsequent invoices once CenterPoint obtained access to the meters, such that the final invoice reflected only actual usage. All estimated reads and subsequent reconciliations were detailed on [Triton's] monthly invoices.

StarTex provided invoices and the affidavit of Robert Verhage, the Director of Credit and Collections for StarTex, substantiating these arguments. Verhage averred that the invoices attached as summary judgment evidence were true and correct copies of Triton's monthly invoices. Verhage testified that, after Triton terminated the ESA on approximately October 19, 2008, "StarTex generated one final invoice that contained the final, outstanding balance that was reconciled to correct all estimated reads." The final invoice reflected that Triton owed $155,034.18, and Verhage averred that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing. Thus, StarTex argued that Triton breached the ESA **\*51** when it failed to pay for $105,034.18 worth of electricity provided under the ESA and subsequent amendments.

StarTex also asserted that Triton breached the ESA when it terminated the ESA early. StarTex stated in its motion, and Madden averred in his affidavit, that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with the electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." Thus, the ESA

contained a liquidated damages clause for early termination of the contract which entitled StarTex to $197,323.95 in liquidated damages after Triton unilaterally terminated the contract on October 10, 2008, approximately thirty-one months before the contract term was set to expire in May 2011.

StarTex argued, based on Madden's statements in his affidavit, that this early termination clause was a valid liquidated damages provision because, "[i]n the case of an MCPE contract, it is impossible to calculate the total damages that stem from an early termination until the term of the breached contract has expired and StarTex has been able to complete its attempts at mitigating the damages." StarTex argued that it "must continue to purchase Triton's power from its supplier until May of 2011" and that it was required to "purchase this power in Triton's particular 'shape' " even though StarTex did not have another customer to sell it to because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." StarTex thus calculated its liquidated damages as $197,323.25, based on the sum of Triton's three highest monthly bills because the mark-to-market losses were incapable of calculation until May 2011.

Finally, StarTex argued that it was entitled to attorney's fees on its breach of contract claim. It argued that, under its fee agreement with its counsel, it would incur attorney's fees "in an amount equal to twenty-five percent (25%) of all amounts recovered from [Triton]," or $75,589.36, and that this amount was reasonable and necessary. The summary judgment motion was accompanied by the affidavit of Rodney Drinnon, counsel for StarTex, who averred to the specific services provided by his firm and stated that the services described were reasonable and necessary and that "twenty-five percent (25%) is a reasonable contingency fee for the services provided."

On January 28, 2010, Triton amended its answer, adding claims that StarTex "materially breached the contract, which was modified by agreement," that Triton "complied with the terms of the modified contract," that Triton was "discharged from performing under the contract after [StarTex] materially breached same," and that StarTex failed "to mitigate its damages as required under applicable law, limitation of warranty, limitation of liability, laches, and waiver." Triton also sought a continuance of the summary judgment hearing, which the trial court granted.

On April 5, 2010, Triton responded to StarTex's summary judgment motion. Triton did not contest StarTex's statements that the ESA and subsequent amendments were valid contracts. However, Triton asserted that StarTex "made several promises to [Triton] and [orally] modified the terms of the parties' agreements." Triton argued that Michael Gary, Triton's property manager, "had several discussions with John Bejger, a representative of StarTex, relating to StarTex's estimated usage and Triton's disputes over **\*52** the StarTex invoices." As supported by Gary's affidavit in Triton's summary judgment evidence, Gary represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing. Gary also averred that Triton had "done everything

in its power" to give CenterPoint access to the meters and that Triton would not continue the business relationship with StarTex "if the estimations and errors in billing continued on a month to month basis." Gary further averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Triton's response asserted that Gary's affidavit about his discussions with Bejger raised a disputed issue of material fact as to whether there was a meeting of the minds in reaching a valid modification.

Triton also argued that it was excused from performing under the ESA based on StarTex's material breach of the agreements "when it failed to provide [Triton] with accurate and correct billings for the electricity that it actually delivered." Triton's motion referenced the invoices sent by StarTex and provided details regarding which specific invoices were based on estimated usage, including several instances in which it was invoiced based on estimated usage in consecutive months.

Triton presented Gary's affidavit, averring that Gary first contacted StarTex to resolve the billing problems during the original term of the ESA and that StarTex responded by saying that CenterPoint could not access and read the electricity meters in Triton's buildings. Triton included in its summary judgment evidence various e-mails between Gary and StarTex in which Gary raised questions and disputes over the amounts billed in the invoices and StarTex provided information reconciling its charges. Gary's e-mails did not contain any specific calculations or amounts with regard to the alleged errors or inaccuracies. StarTex's e-mail reflects that it sent Triton a spreadsheet demonstrating how StarTex reconciled the bills and comparing Triton's usage and rates. Triton also included an e-mail from CenterPoint to StarTex, received in response to StarTex's inquiry regarding the difficulty of getting actual meter readings. The CenterPoint representative stated,

> I disagree that CenterPoint is at fault for the estimations. Triton does not provide us unencumbered, permanent, ongoing access to our meters. The estimation reasons are specific to each address, but on some accounts Triton has their meters locked inside a mechanical room to which we're supposed to go track down an employee and a key, apparently unsuccessfully at times, perhaps because the right employee can't be found. On other accounts, we're supposed to enter through a locked gate where the gate code we have on record has been changed. Triton has a responsibility to keep us updated if access arrangements change.

Triton's summary judgment evidence also included the affidavit of Jim Phillips, the Vice President of IEA Engineering, an energy engineering company. Phillips stated that he reviewed StarTex's billing invoices and Triton's historical electricity usage. He averred that he found

various and repeated errors and irregularities in the billings for the Triton **\*53** buildings. These errors include, without limitation:

• several errors in math (multiplication of energy consumption by the cost of energy);

• excessive estimated energy readings;

• estimated energy readings at one site (meter) while the next site (meter) was actually read in the same month, again repeatedly;

• three meters had a monthly load factor greater than 100%, which is an impossibility (LF is the maximum demand used over hours of the month—over 100% is more hours than in that month);

• several examples where the ending energy reading of one month did not match the beginning reading of the next month;

• energy costs are not consistent across meters in the same month;

• multiple corrections from earlier months' estimated energy reading make analysis difficult; and

• it is improbable that back to back months would have the same exact energy consumption readings and that demand would remain the same for several months in a row.

Phillips provided his opinion about other errors and problems with StarTex's billing practices, without providing specific contested amounts, and concluded:

> In summary, the total value of the errors I analyzed came to almost $97,000.00. This is not an inclusive value and with additional time to review the invoices and billing, this amount should significantly increase. The numbers and values I used assume that StarTex's numbers were correct; however, I found that some of these numbers and values were not correct when compared to each other. To this amount and the other uncalculated errors, taxes must be added since they are a percentage of the energy and [TDSP] charges. The error value is therefore compounded.

Thus, Triton argued that it "created a fact issue on each element of [its] affirmative defense" of prior material breach and that it raised a fact issue regarding whether StarTex conclusively proved the proper amount of damages.

Triton further responded to StarTex's summary judgment motion by arguing that StarTex violated the ESA "by estimating Triton's electricity usage for no apparent justifiable reasons" and by estimating Triton's usage over consecutive months.

Triton also argued that summary judgment on the liquidated damages issue was not proper "because (1) a reasonable basis for estimating just compensation in an event of default does exist under the circumstances, and (2) there are factual issues that must be resolved before the legal question of liquidated damages is determined." Finally, Triton argued that StarTex was not entitled to recover attorney's fees because it "made an excessive demand on [Triton] before filing its lawsuit."

Triton also objected to Drinnon's affidavit, arguing that it "wholly fails to describe the time that was required and expended in prosecuting [StarTex's] claim, the hourly rate usually charged by [StarTex's] counsel, the novelty and difficulty of the questions involved in this lawsuit, and the skill required to perform the legal service properly under the circumstances." Triton also objected because Drinnon's affidavit was not supported by any documents other than the engagement letter.

On April 13, 2010, StarTex replied to Triton's response. StarTex presented the affidavit of John Bejger, contesting Gary's representations that the parties entered **\*54** into an oral modification of their agreement. StarTex also argued that, "because the TDSP [CenterPoint], not StarTex, is solely authorized by the State of Texas to provide actual and estimated readings [,] Bejger would not have made" any representations regarding discontinuing the use of estimated meter readings in the monthly invoices. Finally, StarTex argued that the parties entered into the Second Amendment after the alleged oral representations and thus Triton's argument that Texas law allows modification of a written agreement by later oral representations was inapplicable.

StarTex also argued that it did not breach the ESA. Specifically, StarTex argued that Phillips, Triton's energy engineer expert, did not specifically identify any breach by StarTex. StarTex argued that it was permitted by the ESA and Texas law to bill Triton based on estimated usage; that, under the terms of the ESA, it is irrelevant why CenterPoint provided Triton's estimated usage rather than actual usage; and that Triton did not follow the contractual provisions requiring it to pay undisputed portions of the invoice and to set forth in detail "calculations with respect to any errors or inaccuracies claims."

StarTex again argued that the liquidated damages provision was enforceable. Finally, StarTex argued that its original demand to Triton was not excessive, and thus that ground did not preclude it from recovering attorney's fees.

On April 16, 2010, following the summary judgment hearing, Triton filed its "Supplemental Response" to StarTex's summary judgment motion. StarTex objected to the supplemental response

and asked the trial court to strike it from consideration because it was filed outside the time permitted by Texas Rule of Civil Procedure 166a and without leave of the trial court. Triton also objected to the affidavit of John Bejger, attached to StarTex's reply to Triton's response.

On April 26, 2010, the trial court granted StarTex's motion. The trial court's order stated that it considered "the Motion, the response, the pleadings, the affidavits, other evidence on file with the Court, and arguments of counsel." The trial court awarded StarTex $105,034.18 "as actual damages for [Triton's] failure to pay for electricity provided by [StarTex]." The trial court awarded StarTex $197,323.25 "as liquidated damages for [Triton's] early termination of the [ESA]." Finally, the trial court awarded StarTex $12,000 as reasonable and necessary attorney's fees, as well as additional attorney's fees conditioned on an unsuccessful appeal by Triton.

On May 12, 2010, StarTex moved for a turnover order.

On May 25, 2010, Triton moved for reconsideration or a new trial. Triton supported this motion with new affidavits from Jim Phillips, Michael Gary, and Montague Morgan, attorney for Triton, who attempted to authenticate documents attached to Phillips' affidavit. StarTex objected to and moved to strike these affidavits on the ground that Triton did not timely file them and on the ground that Gary's affidavit was not based on his personal knowledge and was made in bad faith. The trial court granted StarTex's motion and struck the affidavits of Phillips, Gary, and Morgan that were attached to Triton's motion for new trial. [1]

**\*55** On June 21, 2010, the trial court denied Triton's motion for reconsideration/new trial and stated that it did not consider the stricken affidavits. On July 6, 2010, the trial court signed a modified order stating:

> On this day, after hearing [Triton's] Motion for Reconsideration/New Trial ("Motion"), the Court, relying solely [on] the summary judgment evidence on file, arguments of counsel and without considering the stricken, untimely supplement filed by [Triton], is of the opinion that [Triton's] Motion should be, in all things, DENIED.

> It is therefore ORDERED, ADJUDGED and DECREED that [Triton's] Motion is denied and that the Court's order of April 26, 2010, granting Plaintiff's Traditional Motion for Summary Judgment is hereby, in all things, REAFFIRMED.

On July 28, 2010, the trial court signed an order granting StarTex's motion for a turnover order and appointing a receiver. On September 9, 2010, the trial court signed another order requiring the receiver to pay to StarTex as the judgment creditor the balance of the rents collected during his receivership and any rents collected in the future until the full amount of the judgment is paid.

## Summary Judgment

### A. Standard of Review

 **[1]** **[2]** **[3]** **[4]** **[5]**  We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). The movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). Thus, for a plaintiff to prevail on its motion for summary judgment, it must show that it is entitled to prevail on each element of its cause of action. *Hourani v. Katzen,* 305 S.W.3d 239, 248 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (citing *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986)). Only if the movant conclusively establishes its cause of action does the burden shift to the nonmovant to respond to the summary judgment. *Willrich,* 28 S.W.3d at 23. When reviewing a motion for summary judgment, we take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Id.*

In its first through seventh issues, Triton argues that the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim. The trial court awarded StarTex summary judgment on both grounds of StarTex's breach of contract claim against Triton: that Triton breached (1) by failing to pay the invoices for electricity provided and (2) by wrongfully terminating the contract early.

### B. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Failure to Pay for Invoiced Electricity

In its first and second issues, Triton argues that the trial court erred in granting summary judgment because it misinterpreted and misapplied the law applicable to StarTex's breach of contract claim and to Triton's defenses. In its third issue, Triton argues that StarTex's summary **\*56** judgment evidence did not establish that it was entitled to judgment as a matter of law.

 **[6]** **[7]**  To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prod., Inc. v. S.S.I. Plastics, Inc.,* 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Thus, StarTex had to conclusively establish that a valid contract existed between it and Triton, that it performed under that contract, that Triton breached the contract, and that StarTex suffered damages as a result of Triton's breach.

### *1. Evidence Establishing Elements of StarTex's Claim*
Attached to its summary judgment motion, StarTex included copies of the ESA and First and Second Amendments. Neither party disputes that these documents constitute a valid contract between them.

StarTex also provided summary judgment evidence, including multiple invoices and the affidavits of two corporate representatives, that it provided electricity to Triton. Triton does not dispute that StarTex provided it with electricity up until Triton terminated the ESA.

StarTex provided invoices and affidavits demonstrating that Triton owed $105,034.18 under the unpaid invoices. The account summary on the final invoice showed that Triton owed $155,034.18 as of November 15, 2008. Verhage's affidavit testimony provided that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing.

 **[8]** We conclude that StarTex conclusively established its right to recover $105,034.18 from Triton for Triton's breach of contract by failing to pay the invoices. Thus, the burden shifted to Triton to respond to the motion for summary judgment and present evidence raising a fact issue on at least one of the elements of StarTex's claim or to present a valid defense. *See Willrich,* 28 S.W.3d at 23.

### *2. Triton's Response*
In its fourth issue, Triton argues that it presented summary judgment evidence controverting StarTex's evidence and raising genuine issues of material fact as to one or more elements of StarTex's breach of contract claim. Triton does not dispute that StarTex provided electricity to its buildings throughout the term of the contract up until Triton terminated the agreement. Neither does Triton dispute that it did not pay amounts invoiced by StarTex for the electricity provided. However, Triton disputes (1) the terms of the contract as presented by StarTex, alleging that the parties orally modified their agreement; (2) StarTex's satisfactory performance under the contract and its own excuse from performance by StarTex's prior material breach; (3) the sufficiency of StarTex's evidence to support the amount of damages awarded by the trial court; and (4) the trial court's implicit determination that it was not entitled to any offsets or credits.

### *(a) The alleged oral modification of the contract*

Triton argues that, according to Gary's affidavit testimony, the agreement between the parties was orally modified by representations Bejger made prior to execution of the Second Amendment that invoices based on estimated usage would no longer be used. Gary testified that he **\*57** represented

to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing and that Triton would not continue the business relationship with StarTex if it continued to use estimations and make errors in the monthly invoices. Gary averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Thus, on appeal, Triton argues that it agreed to the Second Amendment "only after receiving assurances that the billing errors and repeated use of estimated billing would be addressed and corrected by [StarTex]."

**[9]** **[10]** A written agreement not required by law to be in writing may be modified by a later oral agreement. *Double Diamond, Inc. v. Hilco Elec. Coop., Inc.,* 127 S.W.3d 260, 267 (Tex.App.-Waco 2003, no pet.); *Mar–Lan Indus., Inc. v. Nelson,* 635 S.W.2d 853, 855 (Tex.App.-El Paso 1982, no writ). However, this principle does not apply here. The statements Gary related in his affidavit as being made by Bejger and orally modifying the contract were made before the parties entered into the Second Amendment. Thus, the statements Triton asserts as oral modifications are, at most, extraneous evidence of negotiations prior to entering a written contract, which constitutes parol evidence. [2]

**[11]** **[12]** **[13]** "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008). Whether a contract is ambiguous is a question of law. *Id.* at 451. We may not use extrinsic evidence to contradict or vary the meaning of the explicit language of a written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995).

**[14]** Here, the Second Amendment expressly provided that, except for the extension of the term of the contract and the pricing scheme outlined in paragraph one, the ESA "shall remain in full force and effect as written." This includes the "Customer Acknowledgments" section of the ESA, which expressly stated that StarTex's "ability to invoice Customer is dependent on the [TDSP's] ability to furnish ... meter readings" and that StarTex "may invoice Customer based on estimated meter reading." As matter of law, we conclude that the Second Amendment is not ambiguous. It extended the terms of the ESA, including the express provision allowing StarTex to invoice Triton based on estimated meter readings, to the new 36–month term.

Triton failed to establish that the parties orally modified the contract.

### *(b) Triton's entitlement to be excused from performing under the contract*

Triton also argues it was excused from performance under the ESA and the subsequent **\*58** amendments by StarTex's prior material breach.

 **[15]**    **[16]**    "[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense...." *See City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 746 (Tex.App.-Fort Worth 2008, pet. dism'd).* The burden of proving an affirmative defense is on the party asserting it. *See Am. Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994).* Thus, Triton had to present evidence raising a fact question on each element of its defense to defeat StarTex's motion for summary judgment. *See id.* (holding, where "response was in the nature of an affirmative defense," that party asserting defense "could only have defeated summary judgment with sufficient evidence to raise a fact question for each of the elements" of defense).

 **[17]**    **[18]**    **[19]**    "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 196 (Tex.2004).* A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Henry v. Masson,* 333 S.W.3d 825, 835 (Tex.App.-Houston [1st Dist.] 2010, no pet.).* The materiality of a breach—the question of whether a party's breach of a contract will render the contract unenforceable—generally presents a dispute for resolution by the trier of fact. *Id.* Here, however, because we determine that StarTex's actions did not breach the contract as a matter of law, we need not consider whether Triton raised a fact issue on materiality.

 **[20]**    To raise a material fact issue on every element of its affirmative defense, Triton had to raise a fact question on StarTex's prior breach of contract. Triton argues that StarTex's use of estimated billing was not proper under the contract because StarTex did not establish that the conditions precedent to using estimated billing had occurred because StarTex did not prove that CenterPoint was unable to access Triton's meters.

The ESA provides:

> **Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP) ]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the

TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

Thus, the plain, unambiguous language of the ESA provided that StarTex could invoice Triton based on estimated usage in the absence of actual meter readings or other necessary information from CenterPoint, the TDSP. This contract provision is consistent with the legislatively mandated division of business activities in the electric utility market. *See* TEX. UTIL.CODE ANN. § 39.051(b) (providing that electricity utilities must separate their business activities into three units —power generation company, retail electric provider, and transmission and distribution utility); *Tex. Indus. Energy Consumers,* 324 S.W.3d at 97–98 **\*59** (observing that transmission and distribution service providers are responsible for providing metering services).

StarTex provided the affidavit of Robert Verhage, who averred that, on several occasions, it had to rely on estimated usage because CenterPoint did not provide Triton's actual meter usage. The summary judgment evidence also contained an e-mail from a CenterPoint representative stating that Triton was to blame for CenterPoint's failure to obtain actual meter readings. This e-mail shows that CenterPoint acknowledged that it provided StarTex with estimated usage rather than actual readings on several occasions and that StarTex was not at fault for CenterPoint's inability to access and read the meters.

The ESA expressly permits invoicing based on estimated usage. Triton did not present any summary judgment evidence that StarTex used estimates in its invoices on occasions when CenterPoint had provided actual meter readings. Thus, this argument is without merit.

 **[21]**   Triton also argues that, even if StarTex was permitted to use estimates in invoicing Triton for its electricity usage, StarTex was required to reconcile any charges based on estimated usage on the next bill. However, the plain language of the contract provides that StarTex must reconcile the estimated usage with the actual usage "[a]s soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP." Triton's argument that the actual usage was required to be reconciled on the next month's bill is not supported by the plain language of the contract.

Therefore, we conclude that Triton has not raised a fact issue on any element of its claim that StarTex committed a prior material breach of the contract.

### *(c) StarTex's alleged failure to prove damages*

In its fifth, sixth, and seventh issues, Triton argues that the invoices relied on by StarTex in establishing the amount of damages were inadequate estimates and were properly objected to and disputed by Triton. Thus, Triton argues that StarTex failed to prove its damages as a matter of law.

StarTex acknowledges that it used estimates in some of its bills, and we have already concluded that it was permitted to do so by the plain language of the contract. Furthermore, StarTex presented the actual invoices it sent Triton and Verhage's affidavit stating that the final invoice relied on in calculating the amount due and owing "contained the final, outstanding balance that was reconciled to correct all estimated reads."

Triton presented Gary's affidavit testimony that he disputed several invoices and objected to numerous charges. It also presented e-mail correspondence between Gary, Triton's property manager, and StarTex, in which Gary made general objections to several invoices without providing specific amounts or portions of the invoices that he believed were inaccurate. Triton also presented an expert affidavit pointing out general complaints about the invoices without specifying particular amounts in controversy.

Triton argues that StarTex was legally obligated to address Triton's objections to StarTex's billing practices before collecting on the unpaid invoices and that this evidence raises a fact question regarding the amount Triton owed to StarTex.

 **[22]**   The contract provides a method for disputing charges on invoices. The ESA provides that the "Customer must provide to [StarTex] written notice setting forth in particular detail any disputed **\*60** amount, including the calculations with respect to any errors or inaccuracies claimed." The record contains no evidence that Triton complied with this procedure. Neither Gary's and Phillips' affidavit testimony nor the e-mails sent to StarTex contain specific amounts or calculations. Triton did not produce any evidence that it provided StarTex with written notice articulating the particular disputed amount or calculations regarding claimed inaccuracies.

Thus, Triton failed to present evidence raising a fact issue on the accuracy of the invoices StarTex used to support its claim for the unpaid amounts for electricity usage.

### (d) Triton's entitlement to offsets and credits

Triton also argues that it was entitled to $97,000 in offsets and credits, based on Phillips' affidavit.

 **[23]**   "The right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.1980). Triton must show its entitlement to an offset and the amount. *See id.* (holding that party asserting right of offset bears burden of pleading offset and proving facts

necessary to support it). Thus, Triton must present evidence raising a fact question on its offset defense to defeat StarTex's motion for summary judgment. *See Am. Petrofina,* 887 S.W.2d at 830.

 **[24]**    Triton presented Phillips' affidavit, in which Phillips, as an electricity engineer, stated that the invoices contained errors entitling Triton to offsets and credits worth at least $97,000. However, as we have already stated, Triton did not provide a proper challenge to any particular charge or invoice. Phillip's conclusory statements in his affidavit, by themselves, do not support Triton's claim for offsets and credits. *See* TEX.R. CIV. P. 166a(f) (providing that supporting affidavit must set forth facts that would be admissible in evidence); *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997) (holding that expert's testimony will support summary judgment only if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted" and that conclusory statements by an expert are insufficient to support or defeat summary judgment).

Thus, we conclude that Triton failed to raise a fact issue on any element of StarTex's breach of contract claim against Triton for failure to pay the invoices. The trial court did not err in determining that Triton was entitled to summary judgment on this issue as a matter of law.

### C. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Early Termination of the Contract

In parts of its first through seventh issues, Triton also argues that the trial court erred in granting summary judgment on StarTex's breach of contract claim for Triton's wrongful early termination of the agreement.

### *1. Evidence Establishing Elements of StarTex's Claim*

As we have discussed, StarTex established the existence of a valid contract between itself and Triton, and it established that it performed under that contract. StarTex provided a copy of the Second Amendment, which provided that the parties agreed to extend the ESA through May 2011.

The ESA contained the following early termination provision:

> **Early Termination Fee.** In the event that Customer terminates this agreement **\*61** or Customer defaults as described [in the ESA], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs.

StarTex presented Verhage's affidavit testimony that Triton terminated the agreement on October 10, 2008, approximately thirty-one months earlier than the Second Amendment's contractual

termination date of May 2011, and Triton's final invoice reflecting a termination date in the middle of October 2008.

StarTex likewise provided Madden's affidavit testimony that StarTex was harmed by Triton's early termination. Madden averred that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with its electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." After Triton unilaterally terminated the contract on October 10, 2008, StarTex was still obligated to continue to purchase power from its supplier through May 2011 "in Triton's particular 'shape,' " even though StarTex no longer had a customer to whom to sell it. Madden testified that it was almost impossible to sell that electricity to another customer because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." According to Madden, these particular characteristics of a MCPE payment arrangement made it very difficult to calculate the mark-to-market losses because StarTex had no way of knowing what the exact cost of the future electricity would be. StarTex thus calculated its liquidated damages as $197,323.25 based on the sum of Triton's three highest monthly bills.

### 2. Triton's response

Triton does not contest that it terminated the contract in October 2008, approximately thirty-one months before the termination date provided in the Second Amendment. Triton again argues that its early termination was excused by StarTex's prior breach by billing based on estimated usage. We have already concluded that StarTex did not breach the ESA when it invoiced Triton based on its estimated usage.

Triton also raises several issues specific to the early termination clause and the trial court's award of liquidated damages. In its ninth issue, Triton argues that the early termination fee clause is unenforceable as an impermissible penalty. Triton argues in its tenth and eleventh issues that even if the early termination fee clause is enforceable as a matter of law, StarTex did not present summary judgment evidence establishing the amount of the early termination fee in compliance with the contract's terms.

### (a) Enforceability of early termination clause

Triton argues that the early termination fee clause constitutes an impermissible penalty. Triton argues that it is impermissible both under the common law standard set out in *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991), and under the Texas Business and Commerce Code.

 **[25]** **[26]** **[27]** **[28]** Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Dorsett,* 164 S.W.3d at 664 (citing *Phillips,* 820 S.W.2d at 788). Valid liquidated damages clauses "fix in advance the compensation to a party accruing from the failure to **\*62** perform specified contractual obligations." *Dorsett,* 164 S.W.3d at 664. To enforce a liquidated damages clause, the court must find that (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *Phillips,* 820 S.W.2d at 788; *GPA Holding, Inc. v. Baylor Health Care Sys.,* 344 S.W.3d 467, 475 (Tex.App.-Dallas 2011, pet. denied). The party asserting that the provision is unenforceable bears the burden of proof. *GPA Holding,* 344 S.W.3d at 475.

 **[29]** Triton argues that the harm caused by its breach is not incapable or difficult of estimation. Triton argues that StarTex "could determine the amount of electricity that would have been purchased by Triton but for the purported breach ... and determine what the electricity was sold for to an alternate customer versus what it would have been sold for to Triton." However, StarTex's Senior Vice–President of Supply, Stephen Madden, provided affidavit testimony that it is almost impossible to know what the cost of Triton's future energy use would have been because of the constantly fluctuating prices involved in the MCPE pricing structure. He averred that the price of electricity changes as often as every fifteen minutes, that StarTex committed to buy electricity in fifteen minute increments to meet its obligation to provide electricity conforming to Triton's unique "shape" of energy consumption, and thus it would be very difficult to find another consumer to use that energy. Accordingly, it was not possible to determine, at the time of Triton's early termination, the cost of the energy that would have been purchased by Triton but for the breach, and it was also very difficult for StarTex to predict whether it would find another consumer to purchase the electricity according to Triton's unique usage pattern, and if so, how much such a consumer would pay.

Triton did not present any evidence regarding the parties' ability to estimate actual damages when the contract was formed, and it did not controvert Madden's description of the pricing model applicable to the ESA and Second Amendment. Thus, we conclude that it was impossible to determine the actual harm that would be caused by early termination. *See Phillips,* 820 S.W.2d at 788.

Triton also appears to argue that the amount of the liquidated damages was not a reasonable forecast of StarTex's actual damages because it was unreasonably large. The ESA provided that the early termination fee "shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs." In this instance, due to the length of the term remaining on the terminated contract and the uncertainties of pricing, the "mark to market costs" could not be calculated. Thus, Madden testified that StarTex calculated its damages based on Triton's three highest monthly bills, which totaled $197,323.25.

 **[30]**   Triton did not present any evidence regarding what a reasonable forecast of damages would have been at the time the contract was formed, nor did it present any evidence of StarTex's actual damages. Thus, we conclude that, when viewed as of the time the contract was executed, the ESA's method for calculating the amount of liquidated damages provided a reasonable forecast of just compensation. *See id.*

 **[31]**   This same reasoning also demonstrates that Triton failed to show that the early termination fee violated Business and Commerce Code section 2.718. Section 2.718 provides that a liquidated damages clause is unenforceable if (1) the  **\*63**  agreed amount is unreasonable in light of the anticipated or actual harm caused by breach, (2) the proof of actual harm is not difficult, (3) obtaining an adequate remedy for breach is not inconvenient or not feasible, or (4) the agreed amount is unreasonably large. *See* TEX. BUS. & COM.CODE ANN. § 2.718 (Vernon 2009). As we have already discussed, the proof of actual harm is difficult, and obtaining an adequate remedy for breach is not feasible because StarTex could not have calculated the future cost of the electricity, nor could it predict the extent to which it could mitigate its damages. And, the agreed amount was not unreasonably large or unreasonable in light of the anticipated or actual harm. StarTex was obligated to buy thirty-one months' worth of electricity that it had no ability to resell. In that light, liquidated damages calculated from Triton's three highest monthly invoices are not unreasonable.

Triton failed to raise a fact question on its claim that the early termination fee clause constituted an impermissible penalty.

### (b) StarTex's proof of liquidated damages

Triton also argues that StarTex failed to prove the amount of liquidated damages permitted under the ESA. Several of Triton's arguments on this issue again challenge the accuracy of StarTex's billing and StarTex's use of estimates in its invoices. However, we have already determined that Triton has failed to raise a fact question regarding the accuracy or propriety of StarTex's invoices. Thus, we do not address those arguments again.

Triton argues that StarTex failed to identify which three invoices it relied on in calculating the liquidated damages. It also argues that no three invoices from the term of the Second Amendment add up to $197,323.95, and, thus, StarTex improperly used invoices dated prior to the execution of the Second Amendment to calculate the early termination fee. However, the early termination fee provision did not limit the time period from which the three highest bills could be taken, and Triton failed to present these arguments to the trial court. *See* TEX.R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not

be considered on appeal as grounds for reversal."); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979) (holding that nonmovant could not raise for first time on appeal additional fact issue that was not raised in its response).

We hold that the trial court did not err in granting summary judgment and awarding StarTex $105,034.18 on its claim that Triton failed to pay for electricity provided under the ESA and $197,323.25 as liquidated damages on its claim for Triton's early termination of the ESA as extended by the Second Amendment.

We overrule Triton's first through seventh, ninth, tenth, and eleventh issues.

## Attorney's Fees

In its twelfth issue, Triton argues that the trial court erred in awarding StarTex $12,000 in attorney's fees because that amount was not properly proven and was excessive and unreasonable. Triton also argues that StarTex was not entitled to recover attorney's fees because it made an excessive demand prior to filing this lawsuit.

### A. Standard of Review

 **[32]** **[33]** **[34]** The prevailing party in a breach of contract suit is entitled to attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 2008); *Haden v.* **\*64** *David J. Sacks, P.C.,* 332 S.W.3d 503, 510 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). A trial court determines the reasonableness of an attorney's fees award by considering the factors enumerated in *Arthur Andersen & Co. v. Perry Equipment Corp.* 945 S.W.2d 812, 818 (Tex.1997) (holding that evidence of contingency fee agreement alone does not support award of reasonable and necessary attorney's fees and that trial court must still consider other factors). The reasonableness of attorney's fees is generally a fact issue. *Haden,* 332 S.W.3d at 512. We review attorney's fees awards for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 163 (Tex.2004).

 **[35]** **[36]** An attorney's affidavit constitutes expert testimony that will support an award of attorney's fees in a summary judgment proceeding. *Haden,* 332 S.W.3d at 513; *see* TEX.R. CIV. P. 166a(c); *Gensco, Inc. v. Transformaciones Metalurgicias Especiales, S.A.,* 666 S.W.2d 549, 554 (Tex.App.-Houston [14th Dist.] 1984, writ dism'd). Civil Practice and Remedies Code section 38.003 provides that "usual and customary attorney's fees" are presumed to be reasonable. TEX. CIV. PRAC. & REM.CODE ANN. § 38.003 (Vernon 2008). Although the statutory presumption that usual and customary fees are reasonable is rebuttable, *see id.,* once triggered by an attorney's

supporting affidavit, the presumption of reasonableness remains in effect when there is no evidence submitted to challenge the affidavit proof of the summary judgment movant. *Haden,* 332 S.W.3d at 513.

### B. Analysis

 **[37]**   In its motion for summary judgment, StarTex sought $75,589.36 in attorney's fees, and its attorney, Rodney Drinnon, submitted an affidavit in support of an award for attorney's fees. Drinnon averred that the contingency fee agreement awarding twenty-five percent of damages recovered from any successful trial award constituted usual and customary attorney's fees; he provided a list of specific tasks he and his law practice undertook during the course of representing StarTex; and he stated that his fee was supported by several, listed *Arthur Andersen* factors. Drinnon's description was " 'clear, positive, and direct, otherwise credible' and [was] neither internally inconsistent nor [contradictory]" and could have been readily controverted by Triton. *See id.* at 514. Based on Drinnon's affidavit, submitted as evidence in support of the request for attorney's fees, StarTex was entitled to the statutory presumption that its attorney's usual and customary fees were reasonable. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.003; *see also Haden,* 332 S.W.3d at 514 (holding attorney's affidavit sufficient to warrant summary judgment when it (1) contained recitals establishing attorney's competency to swear to facts stated and other requirements of Rule of Civil Procedure 166a(f), (2) described work encompassed by the fees sought, and (3) specified factors that formed basis of his statement that amount claimed was reasonable and necessary, tracking seven of eight *Arthur Andersen* factors).

Triton filed a written objection to Drinnon's affidavit, arguing that it failed to describe the time required to prosecute StarTex's claim, to provide counsel's hourly rate, and to discuss two of the *Arthur Andersen* factors. We have already concluded that Drinnon's affidavit was sufficient **\*65** to support StarTex's claim for attorney's fees. *See Haden,* 332 S.W.3d at 514. Triton did not file a controverting affidavit or any other evidence disputing Drinnon's evidence. Because Triton did not present any controverting evidence, Triton cannot overcome the presumption of reasonableness accorded to Drinnon's affidavit in support of an award of attorney's fees. *See id.* at 514–16 (holding that because nonmovant "did not controvert [attorney's] affidavit or otherwise dispute the law firm's evidence, the law firm was ... entitled to the statutory presumption that the requested amount was both reasonable and necessary").

 **[38]**   **[39]**   Triton also argues that StarTex is not entitled to attorney's fees on the basis of its affirmative defense that StarTex made an excessive demand on Triton prior to filing suit. *See Kurtz v. Kurtz,* 158 S.W.3d 12, 21 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). When a claimant makes an "excessive" demand and will not accept a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter, even if it prevails on its breach of contract claim. *See, e.g., McMillin v. State Farm Lloyds,* 180 S.W.3d 183, 209 (Tex.App.-Austin 2005, pet. denied) (citing *Findlay v. Cave,* 611 S.W.2d 57, 58 (Tex.1981)). Demand is not excessive

simply because it is greater than the amount eventually awarded. *See Findlay,* 611 S.W.2d at 58. The dispositive question is whether the claimant acted unreasonably or in bad faith in making the demand. *See Standard Constructors, Inc. v. Chevron Chem. Co.,* 101 S.W.3d 619, 627–28 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

 **[40]** StarTex's demand letter requested $105,034.18 as principal on the unpaid invoices, $14,290.98 in interest and fees, $197,323.95 in liquidated damages, and $68,329.82 in attorney's fees. It stated that Triton should pay the listed amounts within thirty days or make arrangements to satisfy the debt. Thus, the amounts demanded by StarTex prior to filing suit were not so much greater than the amount it was eventually awarded as to be "excessive" or to indicate that the demand was made in bad faith. Triton presented no evidence that StarTex would have refused tender of the $314,358.13 awarded by the trial court. Triton has failed to establish that this exception to StarTex's statutory right to attorney's fees is met. *See Findlay,* 611 S.W.2d at 58; *McMillin,* 180 S.W.3d at 209.

We hold that the trial court did not err in awarding StarTex $12,000 in attorney's fees.

We overrule Triton's twelfth point of error.

## Other Issues

### A. PUC Rules and Procedures for Disputed Charges

 **[41]** In its eighth issue, Triton argues that its pending claim against StarTex before the PUC acted to stay the judgment and enforcement of the judgment. In its brief, Triton also argues that StarTex failed to properly investigate Triton's complaints according to the PUC's rules and procedures. However, Triton did not present these arguments to the trial court. Furthermore, the only indication before this Court that Triton actually filed a complaint with the PUC is Triton's statement in its appellate brief. We conclude that these complaints are not properly presented for our review. *See* TEX.R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.,* 738 S.W.2d 710, 712 (Tex.App.-Houston [14th Dist.] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard."); *see also* TEX.R.APP. P. 33.1(a) (providing that, "[a]s a prerequisite **\*66** to presenting a complaint for appellate review, the record must show that ... the complaint was made to the trial court by a timely request, objection or motion").

We overrule Triton's eighth issue.

### B. Receivership and Turnover Order

In its thirteenth and fourteenth issues, Triton argues that, because the trial court erred in granting summary judgment, the trial court also erred in appointing a receiver and in ordering Triton to turn over to the receiver confidential records and all proceeds and revenues generated by its businesses. Thus, Triton argues that it is entitled to immediate relief from the order appointing a receiver and the turnover order, including return of all records and revenues turned over to or seized by the receiver. We have already concluded that the trial court did not err in granting summary judgment. Therefore, this argument fails.

We overrule Triton's thirteenth and fourteenth issues.

## Conclusion

We affirm the judgment of the trial court.

Justice SHARP concurring in the judgment only.

## Footnotes

1    StarTex moved this Court to strike the affidavits Triton submitted with its motion for reconsideration or new trial from the appellate record. Those affidavits were part of Triton's motion, and "any filing that a party designates to have included in the record" is a proper part of the clerk's record. TEX.R.APP. P. 34.5(a)(13). Therefore, we DENY StarTex's motion. We note, however, that the affidavits attached to Triton's motion for reconsideration or new trial are not relevant to our review of the trial court's summary judgment. *See* TEX.R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.,* 738 S.W.2d 710, 712 (Tex.App.-Houston [14th Dist.] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard.").

2    StarTex also presented Bejger's affidavit testimony that he did not make the representations alleged by Gary. Triton objected to this evidence in the trial court, but it is not clear whether Triton is arguing on appeal that Bejger's affidavit should not be considered. However, it is unnecessary for us to consider Bejger's testimony as the terms of the contract are established as a matter of law.

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (4)

### Direct History (3)

1. Star Electricity, L.L.C v. Triton 88. L.P.
2010 WL 8995562 , Tex.Dist. , Jan. 20, 2010

*New Trial Denied by*

2. STAR Electricity, L.L.C. v. Triton 88, L.P.
2010 WL 9583454 , Tex.Dist. , Jan. 21, 2010

*AND Affirmed by*

3. Triton 88, L.P. v. Star Electricity, L.L.C. 👓
411 S.W.3d 42 , Tex.App.-Hous. (1 Dist.) , Aug. 13, 2013

### Related References (1)

4. Star Electricity, L.L.C. v. Triton 88, L.P.
2010 WL 9585471 , Tex.Dist. , June 17, 2010

277 S.W.3d 917
Court of Appeals of Texas,
Dallas.

URBAN TELEVISION NETWORK CORPORATION, Appellant

v.

Creditor LIQUIDITY SOLUTIONS, L.P., Appellee.

No. 05–07–01629–CV.  |  Feb. 6, 2009.

**Synopsis**
**Background:** Satellite uplink service provider brought breach of contract action against television network, which admitted default but asserted that contract's liquidated damages provision was an unenforceable penalty. The 162nd District Court, Dallas County, Loraine A. Raggio, J., granted provider's motion for summary judgment and awarded damages pursuant to liquidated damages provision, and network appealed.

**Holdings:** The Court of Appeals, Mazzant, J., held that:

[1] network had the burden of showing that contract's liquidated damages provision was a penalty, and

[2] liquidated damages provision was not a penalty on its face.

Affirmed.

**Attorneys and Law Firms**

**\*917** Kevin S. Wiley, Jr., Law Offices of Kevin S. Wiley, Jr., Dallas, TX, for Appellant.

Todd Alan Hoodenpyle, Singer & Levick, P.C., Addison, TX, for Appellee.

Before Justices BRIDGES, RICHTER, and MAZZANT.

**\*918  OPINION**

Opinion by Justice MAZZANT.

Urban Television Network Corporation appeals the summary judgment rendered against it in the breach of contract suit brought by Westar Satellite Services, L.P. Westar subsequently transferred its interest in the judgment to Creditor Liquidity Solutions, L.P. Appellant brings one issue, asserting the trial court erred in granting Westar's motion for summary judgment on the liquidated damages provision of the contract because that provision was an unenforceable penalty. We affirm the trial court's judgment.

In 2005, appellant and Westar entered into a five-year Master Services Agreement in which appellant promised to pay Westar $8800 each month and Westar promised to provide appellant satellite uplink services for local television programming and distribution. Paragraph 7 of the agreement contained a liquidated damages provision:

> 7. Early Termination Liability. In the event that Customer [appellant] terminates Service prior to the expiration of the Term specified on the appropriate Service Agreement or other request for Service other than for cause, or in the event that Company [Westar] terminates this Agreement as a result of Customer's failure to abide by the terms and conditions herein, Customer shall pay a termination charge equal to 100% of the monthly charges multiplied by the number of months remaining on the Term of the Service Agreement or any additional requests for Service, as applicable.

In 2007, appellant defaulted on its obligations under the agreement. Westar terminated the agreement and sued appellant for breach of contract seeking an award of damages under paragraph 7. In response to Westar's motion for summary judgment, appellant admitted it defaulted on the agreement, but it asserted that paragraph 7 was an unenforceable penalty. The trial court granted Westar's motion for summary judgment and awarded Westar damages pursuant to paragraph 7. [1]

To prevail on a summary judgment motion brought under Texas Rule of Civil Procedure 166a(c), a movant must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). If the movant establishes a right to summary judgment, the burden shifts to the nonmovant to raise a genuine issue of material fact in order to defeat summary judgment. *Teter v. Comm'n for Lawyer Discipline,* 261 S.W.3d 796, 798 (Tex.App.-Dallas 2008, no pet.). A plaintiff who establishes entitlement to judgment as a matter of law on its cause of action will not be prevented from obtaining summary judgment merely because the defendant has asserted an affirmative defense. *Wilson v. Gen. Motors Acceptance Corp.,* 897 S.W.2d 818, 823 (Tex.App.-Houston [1st Dist.] 1994, no writ). An affirmative defense will prevent summary

judgment only if each element of the defense is raised by evidence that would be admissible at trial. *Id.* (citing *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984)).

**\*919** We review the trial court's granting of a motion for summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 192 (Tex.2007); *Teter,* 261 S.W.3d at 799. We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003).

 **[1]** **[2]** An assertion that a liquidated damages provision is a penalty is an affirmative defense that the defendant has the burden of pleading and proving. *Murphy v. Cintas Corp.,* 923 S.W.2d 663, 665–66 (Tex.App.-Tyler 1996, writ denied); *see* TEX.R. CIV. P. 94; *see also Fluid Concepts, Inc. v. DA Apartments Ltd. P'ship,* 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005, no pet.). Thus, to avoid summary judgment, appellant had to present some evidence showing the liquidated damages provision was a penalty. *See Wilson,* 897 S.W.2d at 823; *see also Fluid Concepts, Inc.,* 159 S.W.3d at 231.

 **[3]** A liquidated damages provision is enforceable and is not a penalty when the damages are uncertain and the stipulated damages are reasonable. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (quoting *Stewart v. Basey,* 150 Tex. 666, 669, 245 S.W.2d 484, 486 (1952)). Appellant argues the trial court erred in granting summary judgment because Westar presented no evidence showing the damages were uncertain or that the stipulated damages were reasonable. Appellant, not Westar, had the burden of presenting evidence that the liquidated damages provision was a penalty, and appellant presented no evidence showing the damages were not uncertain or that the stipulated damages were unreasonable. *See Murphy,* 923 S.W.2d at 665–66.

 **[4]** Appellant also argues the liquidated damages provision is a penalty on its face because, appellant asserts, it "applies to breach of any covenant of the agreement, and not merely to payment provisions." Appellant cites *Bethel v. Butler Drilling Co.,* 635 S.W.2d 834 (Tex.Civ.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.), which stated that a liquidated damages provision is a penalty as a matter of law when "it applied equally to any breach of any provision of the contract by appellee irrespective of the importance or triviality of such breach." *Id.* at 837. The court observed that "[u]nder the liquidated damage clause as written, appellant would be entitled to the full amount of monthly payments for the full term of the contract irrespective of the nature of the breach or appellant's actual loss or damage." *Id.*

We disagree, however, with appellant's assertion that the liquidated damages provision applied to any breach of the agreement, no matter how trivial. Paragraph 7 permits Westar to recover the liquidated damages when Westar terminates the agreement for appellant's failure to abide by the terms of the agreement. Paragraphs 13 and 14 define the types of defaults for which Westar could

terminate the agreement. Paragraph 13 authorizes termination when appellant fails to make full and timely payments under the agreement. Paragraph 14 authorizes termination for an "Other Default," that is, a default other that a failure to pay the amounts due. However, Paragraph 14 defines "Other Default" as occurring when "either party fails to perform or observe any *material* term or obligation...." (Emphasis added.) This requirement of breach of a "material term or obligation" before termination may occur distinguishes this agreement from the contract in *Bethel.*

**\*920** Appellant has not established that the liquidated damages provision is unenforceable on its face or presented evidence raising a genuine issue of material fact as to its enforceability. We overrule appellant's issue on appeal.

We affirm the trial court's judgment.

Footnotes

1    Besides its default on the Master Services Agreement, appellant also defaulted on a promissory note payable to Westar. Westar sued for breach of the promissory note as well breach of the agreement, and Westar sought foreclosure of its security interest in appellant's property. The trial court granted Westar's motion for summary judgment on the breach of the note and foreclosure of the collateral. Appellant's issue and argument on appeal do not assert error in the rendition of judgment on those claims.

**End of Document**                                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

253 S.W.3d 353
Court of Appeals of Texas,
Eastland.

Stephanie WILLIAMS a/k/a Stephanie Scholler and Tim Williams, Appellants,

v.

William COLTHURST, Yuko Colthurst, WGW Properties,
Inc. d/b/a Century 21 Advantage, Tom Dewitt, Century 21
Real Estate Corporation, and Felix Kauffman, Appellees.

No. 11–06–00103–CV.    |    April 3, 2008.

**Synopsis**
**Background:** Landlords brought action against tenants, asserting claims for unpaid rent and property damage to house. Tenants filed counterclaim, asserting a statutory claim for wrongful withholding of security deposit and a premises liability claim based on sexual assault of female tenant. The 321st District Court, Smith County, John R. Adamson, J., entered summary judgment for landlords on unpaid rent claim, and following jury trial, issued directed verdict in favor of landlords on premises liability claim, and entered judgment on jury verdict for landlords on remaining claims. Tenants appealed, and landlords filed motion for sanctions.

**Holdings:** The Court of Appeals, Terry McCall, J., held that:

[1] landlords and tenants did not mutually assent to the release of the tenants' obligations under lease extension;

[2] alleged errors in two jury questions were immaterial;

[3] evidence was sufficient to support finding that landlords did not act in bad faith in connection with failure to return deposit;

[4] landlords were entitled to recover attorney's fees incurred in successfully defending tenants' security deposit claims;

[5] landlords could recover prejudgment interest on attorney's fees which they paid prior to entry of judgment;

[6] there was no evidence that the absence of a keyless bolting device proximately caused tenant's injuries from sexual assault; and

[7] tenants lacked standing to challenge sanctions imposed against their counsel.

Affirmed.

## Attorneys and Law Firms

**\*356** Christopher T. Massey, J. Bennett White, Tyler, Tyler, TX, for appellant.

**\*357** David A. McFarland, Craig L. Dowis, Dallas, Ken W. Good, Vance L. Metcalf, Tyler, TX, for appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

This appeal arises from a landlord-tenant dispute. William and Yuko Colthurst (the landlords) leased their home in Tyler to Tim and Stephanie (Scholler) Williams (the tenants) in a written lease signed on March 6, 2000. The lease provided for a term of two years beginning on May 1, 2000, and ending April 30, 2002. The landlords' home was available for lease for an extended period of time because they were moving to Japan. The landlords designated a real estate firm, Century 21 Advantage, to serve as the property manager for the house during the term of the lease. Tom DeWitt served as the individual that managed the property on behalf of Century 21 Advantage.

In the early part of 2002, the landlords and the tenants began discussing the disposition of the home at the end of the lease. The tenants had expressed an interest in continuing to lease the home. The landlords informed the tenants that they wanted to sell the home when the lease ended in April. The tenants subsequently invoked an extension clause of the lease that permitted them to unilaterally extend the lease for an additional six months.

The tenants' desire to remain in the home for an additional six months changed when Mrs. Williams was sexually assaulted in the home on April 16, 2002. Mr. Williams informed the landlords in an e-mail on April 20, 2002, that the tenants did not want to continue occupying the home. [1] Mr. Williams suggested to the landlords in this e-mail that, unless they listed the house for

sale, the tenants would sublease the home for the remaining six months. The landlords and the tenants subsequently exchanged several e-mails over the course of the next month discussing the possibility of the tenants vacating the home prior to the end of the six-month extension period. The tenants ultimately vacated the home at the end of May 2002.

The landlords subsequently filed suit against the tenants on January 8, 2003, asserting claims for unpaid rent and property damage. The tenants responded by filing a counterclaim against the landlords asserting a statutory claim for wrongful withholding of their security deposit and a premises liability claim in connection with the sexual assault. With respect to the premises liability claim, the tenants alleged that the landlords had failed to equip the home with proper security devices required by statute. The tenants additionally asserted a premises liability claim against WGW Properties, Inc. d/b/a Century 21 Advantage, Tom DeWitt, and Century 21 Real Estate Corporation (collectively referred to as the property manager). The landlords joined the assailant who sexually assaulted Mrs. Williams, Felix Kauffman, as a responsible third party with respect to the premises liability claim.

The trial court entered a partial summary judgment in favor of the landlords on the unpaid rent claim. The remaining claims proceeded to trial. At the conclusion of the presentation of evidence, the **\*358** trial court granted a directed verdict in favor of the landlords and the property manager on the premises liability claim. Issues concerning the property damage and security deposit claims and attorney's fees were submitted to the jury. The jury returned a verdict for the landlords on all submitted claims. The trial court entered a judgment in favor of the landlords and property manager in accordance with the partial summary judgment, the directed verdict, and the jury's findings.

### *Issues*

The tenants raise seven issues on appeal. The first issue challenges the partial summary judgment entered in favor of the landlords on their unpaid rent claim. In their second and third issues, the tenants contend that the trial court erred in failing to enter judgment in their favor on their statutory security deposit claim as a matter of law. The tenants' fourth issue globally attacks the trial court's judgment. The tenants challenge the directed verdict denying their premises liability claim in their fifth issue. The tenants' sixth and seventh issues relate to their attempt to set aside the award of the landlords' attorney's fees. We affirm.

### *Unpaid Rent*

[1] The trial court entered a partial summary judgment in favor of the landlords in the amount of $8,850 on their unpaid rent claim. This sum represented monthly rent of $1,450 and a monthly

late fee of $25 for the six-month extension period of May 2002 to October 2002. [2] We review the trial court's summary judgment *de novo. Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). The landlords filed a traditional motion for summary judgment with respect to their unpaid rent claim. In a summary judgment motion brought under TEX.R. CIV. P. 166a(c), the moving party has the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Browning v. Prostok,* 165 S.W.3d 336 (Tex.2005); *Knott,* 128 S.W.3d at 215–16. We review the evidence presented by the summary judgment motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006); *see Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754 (Tex.2007); *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006); *Wal–Mart Stores, Inc. v. Spates,* 186 S.W.3d 566, 568 (Tex.2006); *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

The landlords based their claim for unpaid rent on the six-month lease extension that the tenants exercised in February 2002. The tenants responded to the motion by asserting that the landlords agreed to release them from the extension in the e-mails exchanged between the parties in April and May 2002. The tenants submitted a portion of the e-mails as summary judgment evidence to support their contention. The landlords replied to the tenants' contention by submitting all of the e-mails between the parties to support their assertion that the parties did not reach a valid agreement to excuse the tenants from the six-month extension.

**\*359** **[2]** **[3]** **[4]** **[5]** **[6]** A modification of a contract must satisfy the elements of a contract: a meeting of the minds supported by consideration. *Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 228 (Tex.1986). Whether a contract is modified depends on the parties' intentions and is a question of fact. *Id.* at 228–29. The burden of proving modification rests on the party asserting the modification. *Id.* at 229. The affirmative defense of accord and satisfaction is a type of contractual modification that rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of a lesser payment tendered and accepted. *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). Because a valid accord and satisfaction depends upon an agreement, it "only occurs when the parties mutually assent to it," and their intention is a controlling element. *McCarty v. Humphrey,* 261 S.W. 1015, 1016 (Tex. Comm'n App.1924, judgm't adopted).

A review of all of the e-mails exchanged between the parties during the relevant period conclusively establishes that the parties did not mutually assent to the release of the tenants' obligations under the six-month extension. The tenants informed the landlords at the outset of the e-mails that they would be vacating the house in the near future. The initial communications focused on a discussion of whether the tenants would be subleasing the property to another tenant during

the six-month extension period or if the landlords would be putting the home up for immediate sale. The parties discussed the possibility of the tenants vacating the premises at the end of May 2002 and being released from the remainder of the six-month extension period. However, a dispute existed with respect to the payment of rent for the month of May. The tenants took the position that the security deposit that they made at the beginning of the lease term included the last month's rent. Based upon this contention, the tenants asserted that they had already paid May's rent since it constituted the last month that they would be occupying the home. The landlords disagreed with this contention and demanded the payment of rent for May.

The landlords sent the last communication in the exchange of e-mails between the parties on May 20, 2002. In this e-mail, the landlords advised the tenants as follows: "You are NOT released from your extension until you recieve [sic] written notice of such.... You ARE in breach of your lease, and you ARE overdue on your rent for May 2002." This e-mail conclusively establishes that the parties did not mutually agree for the tenants to be released from the six-month extension period. Accordingly, the trial court did not err in granting partial summary judgment on the landlords' claim for unpaid rent. The tenants' first issue is overruled.

## *Waived Issues*

 **[7]** **[8]** **[9]** The tenants second and third issues concern their statutory security deposit claim. *See* TEX. PROP.CODE ANN. § 92.109 (Vernon 2007). They assert in their second issue that the trial court erred in denying their motion for partial summary judgment on their statutory security deposit claim. We note, however, that the tenants' statutory security deposit claim was subsequently tried to the jury. The general rule is that a denial of a summary judgment cannot be reviewed on appeal. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996). Further, where a motion for summary judgment is denied by the trial court and the case is tried on its merits, the order denying the summary judgment cannot be reviewed on appeal. *See* **\*360** *Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966). [3] Consequently, the trial court's denial of the tenants' motion for partial summary judgment is not reviewable on appeal. The tenants' second issue is overruled.

 **[10]** In their third issue, the tenants assert that the trial court erred in denying their motion for directed verdict. The tenants moved for a directed verdict after the landlords rested their case-in-chief on the landlords' property damage claim. After the trial court denied the motion for directed verdict, the tenants proceeded with presenting evidence during their case-in-chief and did not reurge their motion for directed verdict at the close of the evidence. Therefore, the tenants failed to preserve their complaint for appellate review. *See 1986 Dodge 150 Pickup v. State,* 129 S.W.3d 180, 183 (Tex.App.-Texarkana 2004, no pet.); *Horton v. Horton,* 965 S.W.2d 78, 86 (Tex.App.-Fort Worth 1998, no pet.); *Cliffs Drilling Co. v. Burrows,* 930 S.W.2d 709, 712 (Tex.App.-Houston [1st Dist.] 1996, no writ). The tenants' third issue is overruled.

### *Trial Court's Judgment*

In their fourth issue, the tenants globally assert that the judgment entered by the trial court is "inconsistent with the evidence presented at trial and is contrary to applicable law." The tenants support this contention by making several complaints about the judgment. We address these complaints separately.

 **[11]**   The tenants first contend that the trial court should have disregarded the jury's "no" answers to Question Nos. 5 and 7 of the court's charge. Question No. 5 asked the jury if the landlords "wrongfully" withheld any portion of the security deposit. Question No. 7 asked the jury to determine if the landlords "wrongfully" failed to timely provide a written description and itemized list of damages after the tenants surrendered possession of the premises.

Section 92.109 establishes two causes of action that permit a tenant to seek a recovery of his security deposit from his landlord. *See Pulley v. Milberger,* 198 S.W.3d 418, 427–28 (Tex.App.-Dallas 2006, pet. denied). The first cause of action involves a landlord's bad faith retention of the security deposit and is established in Section 92.109(a). To prevail under this cause of action, the tenant must prove the landlord (1) acted in bad faith and (2) retained the security deposit in violation of the statute. When a landlord is found liable under Section 92.109(a), the tenant may recover from the landlord (1) an amount equal to the sum of $100, (2) three times the portion of the security deposit wrongfully withheld, and (3) the tenant's reasonable attorney's fees in a suit to recover the security deposit.

The second cause of action involves a landlord's bad faith failure to account for the security deposit and is established in Section 92.109(b). To prevail under this cause of action, the tenant must prove the landlord (1) acted in bad faith and (2) failed to provide the tenant with: (a) a written description of the damages in violation of the statute and (b) an itemized list of the deductions in violation of the statute. A landlord who is found liable under Section 92.109(b): (1) forfeits the right to withhold any portion of the security deposit, (2) forfeits the right to sue the tenant for damages to the premises, and (3) is liable for the tenant's reasonable attorney's **\*361** fees in a suit to recover the security deposit.

Question No. 5 contained most of the elements of a cause of action under Section 92.109(a), and Question No. 7 contained most of the elements of a cause of action under Section 92.109(b). Particularly, Question Nos. 5 and 7 omitted the element of bad faith. The court's charge submitted the element of bad faith to the jury in Question No. 8 in the following manner:

Did the [landlords] act in bad faith?

(a) In failing to return the [tenants] security deposit on or before the 30th day after they surrendered possession of the premises?

Answer "Yes" or "No."

Answer: *No*

(b) In failing to provide a written description and itemization of deductions to the [tenants] on or before the 30th day after they surrendered possession of the premises.

Answer "Yes" or "No."

Answer: *No*

Question No. 8 was not conditioned upon affirmative findings to Question Nos. 5 or 7. Thus, the jury considered the issue of bad faith on both causes of action set out in Section 92.109 even though the jury had previously determined that the remaining elements of the two statutory causes of action did not exist.

By answering "no" to both parts of Question No. 8, the jury found that the landlords did not act in bad faith in either failing to return a portion of the security deposit or providing an accounting of property damages. This unchallenged finding [4] precludes our consideration of the tenants' evidentiary challenges to Question Nos. 5 and 7. Even if the jury had answered Question Nos. 5 and 7 in favor of the tenants or if the trial court had disregarded the jury's "no" answers to these questions, the jury's "no" answers to Question No. 8 prevents the tenants from making a recovery on either of their statutory security deposit causes of action. Thus, the jury's determination that the landlords did not act in bad faith renders the jury's answers to Question Nos. 5 and 7 immaterial. A question is immaterial when it is rendered immaterial by other findings. *See Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). Accordingly, we do not consider the tenants' evidentiary challenges to Question Nos. 5 and 7 because they are not necessary to the final disposition of the appeal. *See* TEX.R.APP. P. 47.1.

**[12]** Moreover, there is evidence that supports the jury's answers to Question Nos. 5, 7, and 8. The landlords testified that they incurred expenses of $5,198.03 to repair the property after the tenants vacated the premises. This amount exceeded the amount of the security deposit. [5] Additionally, the trial court had previously determined that the tenants owed unpaid rent and late fees of $8,850. The lease provided that the landlords could deduct unpaid or accelerated rent and late fees from the security deposit. Furthermore, TEX. PROP.CODE ANN. § 92.107(a) (Vernon 2007) provides that the landlord is not obligated to return a tenant's security deposit or give the tenant a written description of the damages and an itemized list of the deductions until the tenant

gives the **\*362** landlord a written statement of the tenant's forwarding address for the purpose of returning the security deposit. *See Pulley,* 198 S.W.3d at 427–28. DeWitt testified that the tenants did not provide a forwarding address for this purpose. With respect to the issue of the landlords' bad faith, there is evidence that the tenants ended communications with the landlords by canceling their e-mail account prior to vacating the premises. The tenants also did not claim certified mail sent to them by the landlords' attorney. The landlords testified that they filed the suit in order to "get somebody to talk" to them because they had not had any communication with the tenants after the tenants vacated the property.

**[13]** **[14]** The tenants next argue that the trial court's judgment should not have included an award of attorney's fees to the landlords for defending the tenants' statutory security deposit claims. The tenants contend that Section 92.109 does not provide for the recovery of a landlord's costs for defending a security deposit claim. Attorney's fees may be recovered from an opposing party only when permitted by statute or by contract. *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 95 (Tex.1999). The lease executed by the parties contains an attorney's fees provision that reads as follows:

> **33. ATTORNEY'S FEES**: Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this Lease is entitled to recover prejudgment interest, attorney's fees, and all other costs of litigation from the nonprevailing party.

Pursuant to this provision, the landlords are entitled to recover their attorney's fees incurred in successfully defending the security deposit claims because the claims are "related to the transaction" described in the lease.

**[15]** **[16]** The tenants next contend that the trial court's judgment should not have awarded the landlords prejudgment interest on their recovery of attorney's fees in the amount of $23,000. Prejudgment interest is generally not allowed on an award of attorney's fees. *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 325 (Tex.1994). However, in *A.V.I., Inc. v. Heathington,* 842 S.W.2d 712, 717 (Tex.App.-Amarillo 1992, writ denied), the Amarillo Court of Appeals concluded that prejudgment interest on attorney's fees paid prior to the entry of judgment is recoverable. The landlords filed an affidavit in the trial court showing that they had paid attorney's fees in excess of $23,000 prior to the entry of judgment. Accordingly, the trial court did not err in awarding the landlords prejudgment interest on their recovery of attorney's fees.

**[17]** Next, the tenants attack the award of court costs in the trial court's judgment. They contend that the award of a specific amount of court costs is improper. They additionally assert that the award of court costs is not supported by evidence. [6] The tenants' evidentiary challenge is misplaced because court costs are not an issue for the finder of fact. *See Am. Commercial Colls., Inc. v. Davis,*

821 S.W.2d 450, 455 (Tex.App.-Eastland 1991, writ denied) (The right to costs is based entirely on statutes or procedural rules; the trial court should determine and award costs from the record.).

**[18]** The court's role is to adjudicate which party or parties are to bear the **\*363** costs of court, not to determine the correctness of specific items. *See Reaugh v. McCollum Exploration Co., 140 Tex. 322, 167 S.W.2d 727, 728 (1943); Pitts v. Dallas County Bail Bond Bd., 23 S.W.3d 407, 417 (Tex.App.-Amarillo 2000, pet. denied).* Thus, the judgment should not state the amount taxed as costs but only that costs are awarded against a certain party. *See Pitts, 23 S.W.3d at 417.* However, the tenants do not challenge the accuracy of the amount of court costs awarded in the final judgment. In the absence of a complaint about the amount of court costs taxed against them, we will not disturb the award of court costs in the judgment. However, if the tenants wish to complain about the taxation of any specific costs, the proper remedy is to file a motion to re-tax costs in the trial court. *See Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc., 937 S.W.2d 60, 87 (Tex.App.-Houston [14th Dist.] 1996), aff'd as modified, 975 S.W.2d 546, 570 (Tex.1998).*

**[19]** The tenants' next complaint focuses on the award of the landlords' attorney's fees for prosecuting their property damage claim. The jury awarded the landlords $1,858.63 in property damages. The tenants assert that the landlords could not have been prevailing parties under the lease's attorney's fee provision because the tenants' security deposit of either $2,450 or $3,900 exceeded the amount of property damages awarded by the jury. This contention is not consistent with the manner that the parties' presented the property damage question to the jury during closing arguments. Specifically, both parties argued that the jury's answer to the property damage question should be the amount of damages that the jury determined were in excess of the security deposit made by the tenants. Accordingly, the landlords were prevailing parties on their property damage claim because the jury made an award for property damages in excess of the security deposit made by the tenants.

**[20]** Finally, the tenants argue that they should have been credited with either a payment of $2,450 or $3,900 toward the judgment's award of prejudgment interest. The tenants base this argument on the same contention discussed in the preceding paragraph. This argument is misplaced because the award of prejudgment interest is based on amounts ordered to be paid by the tenants in excess of their security deposit. The tenants' fourth issue is overruled.

### *Premises Liability*

**[21]** In their fifth issue, the tenants challenge the trial court's directed verdict denying their premises liability claim. In reviewing the grant of a directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *City of Keller, 168 S.W.3d at 809–*

We must decide whether there is any evidence of probative value to raise an issue of material fact on the question presented. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). We must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 827.

As noted previously, Mrs. Williams was sexually assaulted inside the home on April 16, 2002. Her assailant, Felix Kauffman, testified at trial. Kauffman followed her home one day after observing her at a fitness club in Tyler. He returned to the home the next day and entered it when no one was present. Kauffman testified that he entered the home through the unlocked front door. He hid in the house while waiting for Mrs. Williams to return. After Mrs. Williams entered the home, he tackled her inside of the master bedroom. **\*364** Kauffman immediately blindfolded Mrs. Williams, and then he sexually assaulted her. The sexual assault ended when Mr. Williams returned home. Kauffman fled the home when Mr. Williams discovered the assault taking place.

The bedroom where the assault occurred had an exterior door that opened into the backyard. The tenants' premises liability claim focuses on the type of lock on the interior side of this door. The lock required a key in order for the door to be locked or unlocked from the inside. The tenants kept the key to this lock at another location inside the bedroom. The tenants contend that this type of lock violated the requirements of TEX. PROP.CODE ANN. § 92.153 (Vernon 2007) because it was not a "keyless bolting device."

Mrs. Williams did not attempt to escape from Kauffman during the attack. She testified that she considered trying to escape during the attack but that she knew there was no way she could have retrieved the key to the door and then used it to open the door. The tenants contend that the type of lock on the exterior bedroom door contributed to her decision to submit to the assault. They assert that Mrs. Williams would have had a better chance of escaping from Kauffman if the exterior bedroom door had been equipped with a keyless bolting device as required by the statute.

**[22] [23]** There is a significant body of law in Texas dealing with a landlord's liability for an attack on a tenant by a third party occurring on the leased premises. As a rule, a person has no legal duty to protect another from the criminal acts of a third person. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998). However, Texas courts have recognized an exception to the general rule for a landlord that retains control over the security and safety of the premises. In this situation, the landlord has a duty to use ordinary care to protect tenants from the criminal acts of third parties if the landlord knows or has reason to know of an unreasonable and foreseeable risk of harm to the tenant. *Id.*

In the typical landlord liability case, the tenant asserts that the landlord's negligence caused him or her to be the victim of the criminal act of a third person. The issue of foreseeability is a major element in these cases. Only the general danger, not the sequence of events that produced the

harm, must be foreseeable. *Id.* The general danger in the typical case is the risk of injury from the criminal activity of third parties. *Id.* There must be evidence of specific previous crimes on or near the premises in order to establish foreseeability. *Id.* In determining whether the criminal conduct was foreseeable, the court must consider whether any criminal conduct previously occurred on or near the property, how recently the criminal conduct occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given to the occurrences to indicate whether the landlord knew or should have known about them. *Id.* at 757.

The fact pattern in this appeal differs significantly from the ordinary claim because the tenants are not asserting that the landlords and the property manager failed to prevent the assault from ever occurring. Instead, the tenants are contending that the acts and omissions of the landlords and the property manager hampered Mrs. Williams's opportunity to escape from the criminal acts of a third party. The tenants' claim is, therefore, more complex than the typical landlord liability case because it requires us to consider an additional element to determine the landlords' potential liability. This additional element is the matter of evaluating **\*365** Mrs. Williams's opportunity to escape from her attacker.

 **[24]** **[25]** **[26]** To prevail on their premises liability claim, the tenants must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005); *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). We direct our analysis to the element of proximate cause. Proximate cause has two components: cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). These elements cannot be established by mere conjecture, guess, or speculation. *Doe,* 907 S.W.2d at 477. The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003). If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex.2004). In other words, the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *Id.*

Our application of the foregoing standards establishes that there is no evidence that the absence of a keyless bolting device on the exterior bedroom door proximately caused the tenants' injuries. Specifically, there is no evidence beyond mere conjecture, guess, or speculation that a different type of lock on the bedroom door would have allowed Mrs. Williams to escape from Kauffman's sexual assault. The possibility of escaping a physical assault brought about by a criminal perpetrator is an inherently speculative matter. Furthermore, the task of predicting the likelihood of escaping is particularly speculative when the victim does not attempt to escape his or her attacker.

The tenants contend that the type of door lock denied Mrs. Williams the "opportunity to [try] to escape" by contributing to her decision to submit to the assault. Mrs. Williams testified as follows in this regard:

Q. What do you remember, if anything, occurring to you that caused you not to resist his attack?

A. What do I remember?

Q. What do you remember occurring to you at the—at the time you were being attacked that caused you not to resist and try to escape?

A. Well, number one, I wasn't positive if he had a weapon. And number two, I—for the same reason we talked about. I didn't have anywhere to go. There was nowhere to get if I wanted to.

Q. What is your opinion of your—the likelihood that you would have looked for an opportunity or pursued an opportunity to escape had you had an idea that you could have gotten out that door?

A. I—I—I would have, hopefully, taken it. I mean, that's to me—I don't know that answer. I mean, I do know that I knew the door was locked and I couldn't get out that door, because there was no key. But I don't know from then if—if it hadn't been like that, I don't know what—

Q. Can you—can you tell us whether or not you can honestly say that realizing that the—realizing the type of lock that was there—

A. Uh-huh (Affirmative)

Q. —contributed to you submitting to the assault that you suffered?

A. What is your—say it again. I—I want to make sure I answer—

**\*366** Q. Can you tell us whether or not the type of lock that was on that door—

A. Yes.

Q. —contributed to you submitting to the assault that you suffered?

A. Yes.

As reflected by the foregoing testimony, Mrs. Williams testified that she does not know if she would have tried to escape from Kauffman if the exterior bedroom door had been equipped with a keyless bolting device. Accordingly, there is no evidence beyond mere speculation that Mrs. Williams would have been able to escape with a different type of door lock. The tenants' fifth issue is overruled.

### *Attorney's Fees and Sanctions*

The tenants' sixth and seventh issues pertain to the landlords' recovery of attorney's fees on their unpaid rent claim. The jury awarded the landlords attorney's fees of $10,000 on the rent claim. The landlords' trial counsel testified that they had incurred attorney's fees of $15,000 on the rent claim. On cross-examination, the landlords' trial counsel attributed $5,000 of the $15,000 amount to work performed through the point of obtaining the partial summary judgment.

Near the end of the trial, the tenants informed the trial court during a bench conference that they wanted to call one of the landlords' other attorneys as a witness. The tenants sought to challenge the previous testimony of the landlords' trial counsel with the testimony of his associate. Specifically, the tenants wanted to introduce an affidavit prepared by the associate regarding the landlords' attorney's fees that the landlords attached to their motion for partial summary judgment. The trial court did not permit the tenants to call the associate attorney as a witness. The trial court also did not permit the tenants to offer the associate's affidavit as an exhibit. [7]

The tenants alleged in their motion for new trial that the testimony of the landlords' trial counsel constituted intrinsic fraud on the basis that it was inconsistent with the matters set out in the associate's affidavit. In response to the motion for new trial, the landlords filed a motion for sanctions against the tenants' trial counsel, J. Bennett White, asserting that he lacked a factual basis for the intrinsic fraud allegation. The trial court denied the motion for new trial after conducting a hearing on the motion. The trial court also granted the landlords' motion for sanctions by ordering White to pay the landlords sanctions in the amount of $250.

In their sixth issue, the tenants assert that the trial court erred in denying the motion for new trial on the basis of intrinsic fraud. We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Dir., State Employees Workers' Comp. Div. v. Evans,* 889 S.W.2d 266, 268 (Tex.1994). We begin our analysis by noting that no reporter's record from the hearing on the motion for new trial has been filed in this appeal. In the absence of a record from the hearing, we are unable to determine if the trial court abused its discretion in denying the motion for new trial.

Moreover, the Tyler Court of Appeals has previously addressed the tenants' allegation of intrinsic fraud in a mandamus proceeding in *In re Williams,* No. 12–06–00361–CV, 2007 WL 1241517 (Tex.App.-Tyler April 30, 2007, orig. proceeding) (mem.op.). The mandamus request arose from the tenants' efforts to obtain the billing records of the landlords' trial counsel **\*367** by a subpoena duces tecum prior to their hearing on their motion for new trial. 2007 WL 1241517, at \*1. The trial court quashed the tenants' subpoena duces tecum. *Id.* The tenants sought an order from the Tyler Court of Appeals compelling the trial court's enforcement of the subpoena so that the

billing records could be included in the record in this appeal. [8] *Id.* In reaching its decision to deny the tenants' mandamus request, the Tyler Court of Appeals noted that the tenants "presented no evidence of **intrinsic fraud** at the hearing on their **motion** for **new trial.**" *Id.* In the absence of a record from the hearing, we are reluctant to disagree with the determination by the Tyler Court of Appeals that the tenants presented no evidence of intrinsic fraud. The trial court did not abuse its discretion in denying the motion for new trial if the tenants did not present any evidence of intrinsic fraud. The tenants' sixth issue is overruled.

The tenants allege in their seventh issue that the trial court erred in ordering White to pay sanctions. The landlords sought sanctions against White under TEX.R. CIV. P. 13 on the basis that White did not have a good faith basis to allege that the landlords' trial counsel offered false testimony on the issue of attorney's fees. The landlords sought sanctions in the amount of $500, which they alleged constituted their attorney's fees for filing the motion for sanctions. After a hearing, the trial court granted the motion by ordering White to pay sanctions of $250. We review the imposition of Rule 13 sanctions under the abuse of discretion standard. *See Low v. Henry,* 221 S.W.3d 609, 614 (Tex.2007).

 **[27]**    As a preliminary matter, we note that the tenants filed a separate notice of appeal with respect to the sanctions order that was entered after the trial court signed the final judgment. However, this notice of appeal does not list White as an appellant. The landlords contend that the tenants lack standing to appeal the sanctions order because it only affects White. In *Braden v. Downey,* 811 S.W.2d 922, 928 n. 6 (Tex.1991), the supreme court reserved this question for future consideration. ("We express no opinion on the question whether, in order to seek review of sanctions by appeal, an attorney must perfect a separate appeal apart from that perfected by his client.") In the absence of an answer to the question in *Braden,* we agree with the landlords' contention that the tenants lack standing to attack the sanctions order. "Texas courts have long held that ... appealing [parties] may not complain of errors that do not injuriously affect [them] or that merely affect the rights of others." *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 843 (Tex.2000); *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 988 S.W.2d 750, 752 (Tex.1999).

 **[28]**    Furthermore, the trial court's sanctions order indicates that a hearing was held on the motion for sanctions. However, a record of the hearing has not been filed in this appeal. As was the case with the motion for new trial, without a record of the hearing, we are unable to determine if the trial court abused its discretion in granting sanctions. Additionally, the opinion by the Tyler Court of Appeals reveals that White lacked a good faith basis for making the intrinsic fraud allegation because he did not seek discovery of the landlords' attorney's fees statements during the applicable discovery period. The tenants' seventh issue is overruled.

 **\*368** **[29]**    Finally, the landlords have filed a motion for further sanctions against White based upon the presentation of the tenants' sixth issue. This motion is overruled.

## *This Court's Ruling*

The judgment of the trial court is affirmed. The landlords' motion for sanctions on appeal is overruled.

## Footnotes

1    Mr. Williams did not inform the landlords in his April 20, 2002 e-mail that Mrs. Williams was sexually assaulted inside the home. Instead, Mr. Williams based the tenants' desire to vacate the house on "the sudden death of [Mr. Williams's] father and also a painful event for [Mrs. Williams]."

2    The partial summary judgment did not address the landlords' recovery of attorney's fees on their unpaid rent claim.

3    The party's remedy is to assign error to the trial court's judgment ultimately rendered following trial on the merits. *See Turner v. County of Marion,* 549 S.W.2d 254, 255 (Tex.Civ.App.-Texarkana 1977, writ dism'd).

4    The tenants have not challenged the sufficiency of the evidence supporting the jury's determination that the landlords did not act in bad faith.

5    As noted previously, the parties disputed the amount of the security deposit made by the tenants. Based upon the positions taken by the parties, the tenants posted a security deposit of either $3,900, $2,450, or $1,000.

6    We note that the tenants have not cited any authority in support of their contentions regarding the judgment's award of costs.

7    The arguments presented to the trial court indicated that the tenants did not list the associate as a witness and did not list the associate's affidavit as an exhibit.

8    The Texas Supreme Court transferred the instant appeal to this court from the Tyler Court of Appeals in a docket control order. The transfer order did not extend to the tenants' subsequent mandamus proceeding.

**End of Document**                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## History (9)

### Direct History (6)
1. Colthurst v. Williams
2005 WL 6036409 , Tex.Dist. , Dec. 12, 2005

*Judgment Affirmed by*

2. Williams v. Colthurst ⚏
253 S.W.3d 353 , Tex.App.-Eastland , Apr. 03, 2008

---

3. Colthurst v. Williams
2006 WL 5328044 , Tex.Dist. , Feb. 16, 2006

*Judgment Affirmed by*

4. Williams v. Colthurst ⚏
253 S.W.3d 353 , Tex.App.-Eastland , Apr. 03, 2008

---

5. Colthurst v. Williams
2006 WL 5328046 , Tex.Dist. , Feb. 16, 2006

*Judgment Affirmed by*

6. Williams v. Colthurst ⚏
253 S.W.3d 353 , Tex.App.-Eastland , Apr. 03, 2008

### Related References (3)
7. Colthurst v. Williams
2004 WL 5519821 , Tex.Dist. , July 29, 2004

8.  Colthurst v. Williams
2005 WL 6036408 , Tex.Dist. , Dec. 12, 2005


9.  Colthurst v. Williams
2006 WL 5328045 , Tex.Dist. , Feb. 16, 2006